```
 1              IN THE UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF TENNESSEE

 3                     AT CHATTANOOGA
     ---------------------------------------------------------
 4                                    :
     UNITED STATES OF AMERICA,        :
 5                                    :
               Plaintiff,            :
 6   -versus-                        :          CR-1-18-11
                                     :
 7   JERRY WAYNE WILKERSON,          :
     MICHAEL CHATFIELD, KASEY        :
 8   NICHOLSON, BILLY HINDMON and    :
     JAYSON MONTGOMERY,              :
 9                                    :
               Defendants.           :
10   ---------------------------------------------------------
                                    Chattanooga, Tennessee
11                                  October 1, 2019
            BEFORE:  THE HONORABLE HARRY S. MATTICE, JR.,
12                   UNITED STATES DISTRICT JUDGE
     APPEARANCES:
13
               FOR THE PLAINTIFF:
14
               PERRY H. PIPER, and
15             FRANKLIN PEARSON CLARK
               Assistant United States Attorneys
16             1110 Market Street, Suite 301
               Chattanooga, Tennessee 37402
17

18             FOR THE DEFENDANT WILKERSON:

19             MARK STEPHEN THOMAS, of
               Thomas Health Law Group, PA
20             5200 SW 91st Terrace, Suite 101-B
               Gainesville, Florida 32608
21                              -and-
               SETH A. SCHWARTZ, of
22             Schwartz Law Group
               10365 Hood Road South, Number 104
23             Jacksonville, Florida 32257

24                     BENCH TRIAL
                 TESTIMONY OF JAMES GOGUE
25
```

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 1 of 119   PageID #: 3552

1

2          FOR THE DEFENDANT MICHAEL CHATFIELD:

3          DAVID M. ELDRIDGE, and
           ZACHARY R. WALDEN, of
4          Eldridge & Blakney PC
           400 West Church Avenue, Suite 101
5          Knoxville, Tennessee 37902

6          FOR THE DEFENDANT KASEY NICHOLSON:

7          BRIAN O'SHAUGHNESSY, of
           O'Shaughnessy & Carter
8          735 Broad Street, Suite 1000
           Chattanooga, Tennessee 37402

9

10         FOR THE DEFENDANT BILLY HINDMON:

11         GIANNA MAIO, and
           JACKSON WHETSEL, of
12         Federal Defender Services of Eastern Tennessee
           One Central Plaza, Suite 600
13         835 Georgia Avenue
           Chattanooga, Tennessee 37402

14

15         FOR THE DEFENDANT JAYSON MONTGOMERY:

16         R. DEE HOBBS, of
           Hamilton County Attorneys Office
17         204 County Courthouse
           625 Georgia Avenue
18         Chattanooga, Tennessee 37402

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                          INDEX OF PROCEEDINGS

3

4   JAMES GOGUE,
                 Direct Examination By Mr. Piper              14
5                Cross-Examination By Mr. Thomas              41
                 Cross-Examination By Ms. Maio               57
6                Cross-Examination By Mr. O'Shaughnessy       83
                 Cross-Examination By Mr. Walden              88
7                Cross-Examination By Mr. Hobbs              105
                 Redirect Examination By Mr. Piper          107
8                Recross-Examination By Mr. Thomas          113
                 Recross-Examination By Ms. Maio            115

9

10                        GOVERNMENT'S EXHIBITS

11  No.                        Description                 Page

12   2304      Prescription Order Form for Joshua Linz       57
               with BLOA Language
13

14                      DEFENDANT CHATFIELD EXHIBITS

15  No.                        Description                 Page

16   13        Provider Network Manual                      93

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
 1          THE COURT:  All right.  Welcome back, everyone.  Are
 2   there any matters to take up before we call our first witness?
 3          MR. THOMAS:  Your Honor, on behalf of Wayne
 4   Wilkerson, we filed a motion to strike yesterday --
 5          THE COURT:  Yeah.
 6          MR. THOMAS:  -- regarding the materiality witnesses.
 7          THE COURT:  Right.  I got that.  I have just read it
 8   here right before I walked in.  I'm not sure I quite
 9   understand.  What's the situation here?
10          MR. THOMAS:  Would you like me to argue it, Your
11   Honor?
12          THE COURT:  Yeah.  I mean, sure.  When are these
13   witnesses supposed to testify?
14          MR. THOMAS:  I believe Mr. Gogue, Gogue?
15          MR. PIPER:  Gogue, Your Honor.
16          MR. THOMAS:  I believe Mr. Gogue today.  I believe
17   that the second witness, Mr. McCall, Friday?
18          MR. PIPER:  Thursday.
19          MR. THOMAS:  Thursday.
20          THE COURT:  Thursday.  All right.  And I think that
21   if I read correctly, Mr. Wilkerson contends they were not
22   properly disclosed.  Is that right?
23          MR. THOMAS:  Certainly they're fine as fact
24   witnesses.  We don't know what a materiality witness is.  I've
25   never heard of that.
```

UNITED STATES DISTRICT COURT

1            THE COURT:  Do what?

2            MR. THOMAS:  I don't know what a materiality witness

3    is, Your Honor.

4            THE COURT:  I don't either.

5            MR. THOMAS:  I was a little surprised to see CVS for

6    fact witnesses.

7            THE COURT:  Right.

8            MR. THOMAS:  These witnessers were not presented as

9    experts pursuant to the deadline.  We haven't had any kind of

10   an opportunity for *Daubert*.  I don't know what it is that the

11   two of them are going to be testifying --

12           THE COURT:  Have they filed any sort of reports or

13   anything like that?

14           MR. THOMAS:  Not to my knowledge, Your Honor.

15           THE COURT:  All right.  Mr. Piper.

16           MR. PIPER:  Thank you, Your Honor.  They are

17   materiality witnesses, Your Honor, which is a bit of a term of

18   art in fraud cases.  In other words, whether the actions taken

19   by the defendants were material.  And that is an element of

20   both mail, wire, and health care fraud.  And we must prove

21   that the actions were in fact material.

22           THE COURT:  Right.

23           MR. PIPER:  I have a case for the Court, *United*

24   *States versus Locke*, L-o-c-k-e.  If I might pass the two

25   copies of it, Your Honor.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  All right.  Okay.

 2              MR. PIPER:  And, Judge, in that case, Ms. Locke

 3     complained about the materiality of -- if you look on Page 5

 4     of the opinion.  Five in the bottom right-hand corner.

 5              THE COURT:  Right.

 6              MR. PIPER:  Very similar circumstances to here.

 7     Bank officers testified as to whether they would have made the

 8     loan knowing that these misrepresentations were made.  And

 9     they said no.  That it was in fact material to their decision.

10     That the misrepresentations were made or certain items were

11     hidden from them.  And, in fact, in Locke, the bank officers

12     testified that they thought it was fraud and used some other

13     word, too.  I've actually asked Mr. Gogue to refrain from

14     using the word fraud.  Now, he is --

15              THE COURT:  Is he an expert?

16              MR. PIPER:  No, sir.  He is not.

17              THE COURT:  He's a fact witness?

18              MR. PIPER:  Yes, sir.  Yes.  Judge, I'm not calling

19     in somebody to say this is the way health care systems work,

20     and --

21              THE COURT:  And he has actual knowledge of the

22     underlying facts of this case?

23              MR. PIPER:  He is, in fact, the health care fraud

24     specialist for the DHA, the Defense Health Agency in Aurora,

25     Colorado, which is responsible for Tricare cases.  And,
```

UNITED STATES DISTRICT COURT

candidly, Judge, he knows about this case.  He knows about the

four pharmacies involved, but I wasn't going to get into any

of that.  All I was going to ask him -- he does two things.

He also he can talk to the Court about why, can explain to the

Court why Tricare is a backward looking event.  There is a

million prescriptions roughly per day.  It would be impossible

for Tricare to look at each prescription and then to say, oh,

this is good, this is good or even, in fact, to have a hot

line.  He's discussed that, that what they've done in order to

cure this problem is the prior authorization which requires

the treating health care professional to sign an attestation

stating that this is medically necessary.  And he can testify

to that, too, if the Court is interested in what that created,

what that did to the problem of the compounding creams.

But, Judge, he is -- it would be the same as calling

the loan officer at the car dealership, the bank fraud

examiner.  I know Your Honor has had bank fraud cases before

where the fraud examiner is called as an expert and says, yes,

this is material.

THE COURT:  Yeah.  Okay.  All right.

MR. PIPER:  And, Judge, he works for Tricare.  And

the other one works for CVS Caremark, which is a --

THE COURT:  The other one being?

MR. PIPER:  Steve McCall.

THE COURT:  All right.

1          MR. PIPER:  Which is a PBM, which is a pharmacy

2     benefit manager, and he is also a fraud examiner for them.

3          THE COURT:  Okay.  Now, let me ask you about

4     Mr. McCall then.  I can see Mr -- what is it, Gogue?

5          MR. PIPER:  Gogue, Your Honor.

6          THE COURT:  Gogue.  I mean, it sounds like he was a

7     key member of one of the agencies that basically thinks they

8     were defrauded here.

9          MR. PIPER:  Yes, sir.

10         THE COURT:  What about Mr. McCall?  I don't recall

11    CVS or maybe they were --

12         MR. PIPER:  They are a PBM for, actually, I think it

13    was for Ms. Valadez's case.

14         THE COURT:  Okay.

15         MR. PIPER:  Actually, Judge, there are two PBMs,

16    Express Scripts and CVS Caremark.

17         THE COURT:  Okay.

18         MR. PIPER:  As far as I know, I'm not a health care

19    fraud guy, Your Honor, as far as I know, those are the two

20    main pharmacy benefit managers.

21         THE COURT:  Okay.

22         MR. PIPER:  And because we're having a bench trial,

23    I had hoped to cut out one of the PBM witnesses which would

24    have been a fellow, Blake Stockwell, out of St. Louis because

25    we anticipate that the materiality aspect of it would be the

UNITED STATES DISTRICT COURT

1   same from Tricare and CVS Caremark.

2          THE COURT:  I guess, but, I mean --

3          MR. PIPER:  Judge, I can call him in.

4          THE COURT:  I mean, you know, to be honest, to

5   obviate an issue as to whether they are fact or expert

6   witnesses, I mean, I hate to spend any more time than we have

7   to, but I'll leave that up to the government.

8          All right.  Mr. Thomas, you've heard this.  Do you

9   have any response to that?

10          MR. THOMAS:  Your Honor, to my ear that sounds

11   exactly like the definition of an expert.

12          THE COURT:  Hum.

13          MR. THOMAS:  Rule 701(c) provides that whenever

14   someone as a lay witness testifies as to technical or other

15   specialized knowledge that's not admissible, that's expert

16   testimony.  Again, to the extent that the government is going

17   to treat these two witnesses as essentially case agents,

18   additional case agents, that's fine.  They've reviewed claims

19   here and they've got, they've got specific testimony as to the

20   defendants at issue; that's a lay witness.  To the extent that

21   they're going to talk about the industry as a whole, that's an

22   expert.

23          THE COURT:  And, I mean, I think that's probably a

24   fair distinction, but I don't know that that's a reason to

25   exclude these witnesses.  Now, I will say this, and, I mean, I

UNITED STATES DISTRICT COURT

1    don't know whether you think that this falls into the category

2    of an expert witness. As to why the government health

3    agencies have to act as backward looking, in a backward

4    looking fashion, I do think that that is information that I as

5    the tryer of fact needs to have. Now, do you think that falls

6    in the category of an expert?

7            MR. THOMAS: Your Honor, to the extent that either

8    of these witnesses talks about specific events in this case

9    which is totally probative and relevant and states what the

10   policies may be at Tricare or CVS, I think that's fine.

11   That's essentially like a case agent. And I was going to

12   bring this up, almost kind of to do a lay witness voir dire,

13   Your Honor. And one of the questions I was going to ask

14   Mr. Gogue, it says he's a subject matter expert for Tricare.

15   And I was going to ask him in all of the cases that he's

16   listed as being a witness, what did he do, was he an expert or

17   was he a fact witness. And I'm concerned about --

18           THE COURT: In other words, how did he characterize

19   himself in other courts? Yeah. You know, I'll let you ask

20   that question. All right. Well, look, I intend to -- I'm

21   probably going to say I'm going to strike -- I'm going to deny

22   Mr. Wilkerson's motion to strike to the extent it seems to

23   exclude Mr. Gogue or Mr. McCall in the entirety. Having said

24   that, I guess we'll have to pick our way through the testimony

25   and see if certain -- even if you do object to them as an

1    expert, what's the remedy, for me to hold a *Daubert* hearing?

2        MR. THOMAS:  Well, at the very least, Your Honor, I

3    would reserve the right to voir dire these experts so that I

4    can find out what their background is, what their knowledge is

5    in preparation, essentially, having my expert respond to that.

6    And I disclosed our expert in time, offered the government any

7    kind of, you know, *Daubert* remedies, and did so pursuant to

8    Your Honor's scheduling order.

9        THE COURT:  When do you want to call conduct this

10   so-called voir dire, on cross-examination or before,

11   separately, what, how?

12       MR. THOMAS:  Given that Your Honor's ruling is that

13   the motion is to strike is denied.

14       THE COURT:  Yeah.  Motion is denied.

15       MR. THOMAS:  But that the court is on notice that

16   Mr. Wilkerson --

17       THE COURT:  That, I mean, I need to be on the

18   lookout, as to whether, you know, their testimony constitutes

19   fact or expert testimony.  And sometimes, as you know, that

20   line is not very bright, you know.  But I trust we can pick

21   our way through it one way or the other.  But, I mean, let's

22   assume that they are experts.  What is the remedy here?

23       MR. THOMAS:  I'd like the opportunity to voir dire,

24   Your Honor.

25       THE COURT:  I think that's the remedy instead of

UNITED STATES DISTRICT COURT

1    exclude their testimony.

2              MR. THOMAS:  Yes, sir.

3              THE COURT:  Yeah.  It seems to me.  Do you have any

4    problem with that?

5              MR. PIPER:  No, Your Honor.

6              THE COURT:  Okay.  All right.  Well, then it sounds

7    like that are we ready to hear Mr. Gogue.

8              MR. PIPER:  Yes.  Gogue, I think, Your Honor.

9              THE COURT:  Gogue.  Anything else?  Anything else we

10   need --  wait a minute.  Hold on.

11             MS. MAIO:  Your Honor, just for purposes of the

12   record, I would like to point the Court's attention to a Sixth

13   Circuit opinion that I found on this topic, which is *United*

14   *States versus Gordon*.

15             THE COURT:  United States versus what?

16             MS. MAIO:  *Gordon*.

17             THE COURT:  Right.  What's the citation?

18             MS. MAIO:  It's 2011 WL 6740665.

19             THE COURT:  Okay.

20             MS. MAIO:  It does not have a detailed analysis of

21   this particular issue, Your Honor, but what the Court did in

22   that situation was it prevented the government entirely from

23   admitting expert quote unquote materiality witnesses because

24   of the fact that they failed to make adequate disclosure under

25   Rule 16.  So, I just wanted to point the Court's attention to

UNITED STATES DISTRICT COURT

1     that.

2              THE COURT:  Give me the citation again.

3              MS. MAIO:  2011 WL 6740665.

4              THE COURT:  Did you get that?

5              MR. CARLSON:  Yes.

6              THE COURT:  We'll take a look at it.

7              MS. MAIO:  Yes, sir.

8              THE COURT:  I'm unaware of the case.  Of course,

9     it's another district court case.  I mean, I hear what your

10    characterization of the holding was, you know.  I have no idea

11    what the facts of that case were or what.  But, I mean, it

12    sounds to me from what I've heard here in the courtroom today

13    that the proper approach here is to let Mr. Gogue and

14    Mr. McCall get on the stand and see where they go with their

15    testimony from there.  And let the defendants object if they

16    wish.

17             Okay.  Anything else before we call Mr. Gogue.  All

18    right.  Let's call Mr. Gogue.

19             (Brief pause.)

20             THE COURT:  Mr. Gogue, come on up here to the

21    witness stand, please.  And I'm going to ask you to step up

22    into the witness stand, but I'm going to ask you before you

23    sit down -- no, step up into the stand.  Raise your right hand

24    and face Ms. Capetz there, she'll swear you in.

25             (Witness sworn.)

1          THE COURT:  Have a seat.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  If you'd like some water, there should

4    be some there in the pitcher and some cups.  I'm going to ask

5    you to speak into the microphone.  And once he's settled, you

6    can proceed, Mr. Piper.

7          MR. PIPER:  Thank you.

8                          JAMES GOGUE,

9    called as a witness at the instance of the U.S. Government,

10   being first duly sworn, was examined and testified as

11   follows:

12                    DIRECT EXAMINATION

13   BY MR. PIPER:

14   Q      Tell us your name, please, sir.

15   A      My name is James Gogue.

16   Q      And spell your last name for us.

17   A      G-o-g-u-e.

18   Q      All right.  Mr. Gogue, where do you currently live?

19   A      I live in Aurora, Colorado.

20   Q      How are you employed?

21   A      I am a health care fraud specialist for the Defense

22   Health Agency and our agency administers the Tricare program.

23   Q      Okay.  I'm going a little bit into your background.

24   Where were you born?

25   A      I was born in Agana, Guam.

1   Q        Can you spell the city for us, please?

2   A        A-g-a-n-a.

3   Q        Okay.  And do you have a college degree?

4   A        Yes, I do.

5   Q        In what?

6   A        I have an undergraduate degree in biology, a masters

7   degree in business.

8   Q        All right.  And were you in the military at one

9   point?

10  A        Yes.

11  Q        And for how long?

12  A        Over 21 years.

13  Q        And which branch of the military was that?

14  A        The Army.

15  Q        All right.  And that was active duty?

16  A        Yes, sir.

17  Q        All right.  So, you're retired from the Army and

18  after you retired from the Army, ultimately, did you go to

19  work for the DHA, Defense Health Agency?

20  A        Yes, I did.

21  Q        And how long ago was that?

22  A        That was back in 2004.

23  Q        All right.  And I have a copy of your CV here.  And

24  your title with the DHA is what?

25  A        Health care fraud specialist.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 15 of 119   PageID #: 3566

1   Q         Okay.  And have you been doing health care fraud

2   specialist since you started with DHA?

3   A         Previous to that, I was a contractor with the

4   Defense Health Agency.  I supported a retired general who was

5   vetting the contracts for the Tricare program.

6   Q         Okay.  And let's -- I want to invite your attention

7   then to some questions here that I think that the Court --

8   explain to the judge about the approval process for Tricare

9   claims, for example.  If you would, explain how it happens.

10  A         Yes.  We typically -- the program typically receives

11  through our Tricare contractors electronic claims.  And the

12  agency and our contractors receive millions of claims a day

13  through that electronic system.  Computers vet those claims to

14  determine if the information put on the claim is appropriate,

15  accurate, and correct.

16  Q         Does any --

17            THE COURT:  You say a computer vets it?

18            THE WITNESS:  Yes, sir.

19            MR. THOMAS:  Objection, Your Honor.  I move to

20  strike that answer.  There is a PBM, Express Scripts, that

21  handles that for Tricare.

22            THE WITNESS:  Correct.

23            MR. THOMAS:  Tricare does not do it.

24            THE COURT:  Say that again.

25            MR. THOMAS:  Tricare does not adjudicate Tricare

UNITED STATES DISTRICT COURT

1  claims.  Express Scripts does it for them.  It's a pharmacy

2  benefit manager.

3            THE COURT:  Okay.  Well, I don't know.  I mean,

4  you'll have an opportunity to cross-examine, so, okay.  My

5  real question was when you said a computer does this, this has

6  got to be some sort of artificial intelligence program, I

7  guess?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  Okay.  Well, all right.  Go ahead.

10  BY MR. PIPER:

11  Q        So, does Express Scripts do this on behalf of

12  Tricare?

13  A        They do.

14  Q        Good.  And does Tricare have a contract with Express

15  Scripts?

16  A        They do.

17  Q        Explain to the Court what your understanding as to

18  what Express Scripts does and why Tricare hires Express

19  Scripts to do this.

20  A        The agency hired Express Scripts, Incorporated, or

21  we call them ESI to represent Tricare in the adjudication of

22  claims which are submitted on behalf of the Tricare

23  beneficiary.  For all intense and purposes, Tricare is paying

24  those claims.  We rely on ESI to adjudicate those claims so

25  that we can provide those medical services that our

1  beneficiaries required.

2  Q        And by "beneficiaries" you mean whom?

3  A        The Tricare beneficiary is a beneficiary who

4  receives entitlement under the Department of Defense.

5  Q        And who is -- who draws Tricare, do you know?

6  A        Active duty members, their dependents, as well as

7  retirees and their dependents.  We also have reservists and

8  National Guard if they're placed on active duty, for whatever

9  reason, we cover them, as well as their dependents.

10  Q        Okay.  Now, let's talk about this.  Does Tricare or

11  Express Scripts vet every script that comes through the system

12  prior to it being approved?

13            MR. THOMAS:  Objection, leading.

14  A        Through their computers, yes.

15            THE COURT:  I didn't even hear.

16            THE WITNESS:  Go ahead.  I'm sorry.

17            MR. PIPER:  There was an objection, Judge.  What was

18  the objection?

19            MR. THOMAS:  Leading, Your Honor.

20            MR. PIPER:  Okay.  Judge, it's a foundational

21  question.  And I don't believe that by definition --

22            THE COURT:  Overruled.

23  BY MR. PIPER:

24  Q        Okay.  Prior to a script being approved, does

25  somebody from Express Scripts or Tricare, some person look at

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 18 of 119  PageID #: 3569

1   that script?

2   A        No, sir.

3   Q        Okay.  And tell the Court then how it happens -- let

4   me go this way.  Let me strike that.  Is Tricare either a

5   backward looking or forward looking on approval?

6   A        More of a backward looking.

7   Q        Explain to the Court what you mean by that.

8   A        Because of the fact that we receive millions of

9   claims a day, it would be economically unfeasible to have an

10  individual or a group of individuals vetting each and every

11  claim.  It would cost the Department of Defense billions of

12  dollars to adjudicate claims on behalf of the Tricare

13  beneficiary.  So, we rely on our contractors and their

14  automation to receive claims through their computer systems

15  via a secure mode indeed, but our contractors do that on

16  behalf of the agency, and we try and provide the best services

17  to the DOD beneficiary.

18  Q        That means the Tricare beneficiaries?

19  A        Yes.

20          THE COURT:  Let me just stop right here.  And I tell

21  you what, Mr. Gogue, I'm going to ask you to step out of the

22  courtroom while I have a conversation with the lawyers.  Okay?

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Okay.  Yeah.

25          (The witness left the courtroom.)

1          THE COURT:  The reason -- and, Mr. Thomas, why don't

2     you come to the podium, too.  The reason I asked Mr. Gogue to

3     step out is because I do have some questions.  And I don't

4     know whether they -- I mean, I bet you Mr. Gogue can answer,

5     but we may get into this fact versus -- we have established in

6     the course of this trial, and, I mean, he just established,

7     it's been referred today to a bit, that Tricare acts as a

8     backward looking -- well, he said mainly backward, okay,

9     principally backward.  And I do understand what he's talking

10    about.  And I think that I used the analogy the other day is

11    that the IRS is a, you know, backward looking entity.  And, I

12    mean, I think I understand of necessity why the IRS has to be

13    a backward looking entity.  Because, I mean, they're

14    collecting taxes from pretty much everyone in the United

15    States.  They have no choice.

16          A question that I might have for someone, Mr. Gogue

17    or otherwise, is how, you know -- there are both obviously

18    government insurers in the United States and private insurers

19    in the United States.  I understand that the government

20    insurers may, I don't know what the numbers are, insure a lot

21    more people than private insurers.  But it seems to me that

22    private insurers also have to manage an incredibly large

23    number of claims on a daily basis.  And here is my question.

24    It really goes to how legitimate is it to have a backward

25    looking system if you are going to enforce that backward

1    looking system, and this probably goes far beyond Mr. Gogue,

2    maybe anyone else's expertise, except that of the wisdom of

3    the United States Congress, of course, if you're going to

4    enforce that backward looking system through the mechanism of

5    fraud --

6              MR. THOMAS:  Yes, sir.

7              THE COURT:  -- and --

8              MR. THOMAS:  Your Honor --

9              THE COURT:  Well, wait a minute.  Let me finish.

10             MR. THOMAS:  Yes, sir.

11             THE COURT:  And I bet you've already thought about

12   this, Mr. Thomas.  But, you know, because to administer a

13   system like that, you've got to have a huge amount of, from a

14   business standpoint, capital reserved at your disposal because

15   I don't think that would be in the private sector a

16   sustainable business model for very long because it would put

17   a private company, for instance, in the position of having

18   potentially large and huge numbers of fraudulent claims go

19   through and leave it then to either administrative remedies or

20   perhaps even litigation to recover those in the past.  And,

21   boy, that just sounds to me like that that is not a

22   sustainable business model for anybody from the government.

23   So, I would be interested, although, I don't, I don't know if

24   we have any witness to explain to me --

25             MR. THOMAS:  We do.

1        THE COURT:  Who does?

2        MR. THOMAS:  Our expert.

3        THE COURT:  Okay.  Well, that solves my problem

4   then.

5        MR. THOMAS:  And, Your Honor, I don't want to

6   testify --

7        THE COURT:  And you disclosed that expert.  Right?

8        MR. THOMAS:  Absolutely.

9        THE COURT:  Okay.  Well, then I'm going to hear the

10  answer to that, I presume.

11        MR. THOMAS:  Thank you, Your Honor.  Not that I want

12  to steal any witness's thunder, but there are a lot of front

13  end edits in response to your question.  I don't have a lot of

14  experience with Tricare, but in the Medicaid program, most of

15  the state Medicaid programs have almost 200 front end

16  pharmacies edits --

17        THE COURT:  If I am going to hear this from a

18  witness, I think I should wait and hear from a witness.

19        MR. THOMAS:  Yes, sir.

20        THE COURT:  But that is on my mind.  Okay.  Do you

21  have anything to say?

22        MR. PIPER:  Mr. Gogue can address this issue, Judge.

23        THE COURT:  Well, I know, but   --

24        MR. THOMAS:  That's in the expert camp.

25        THE COURT:  Can he do it as a non-expert?

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 22 of 119  PageID #: 3573

 1          MR. PIPER:  Yes, sir.

 2          THE COURT:  He can.  Okay.  Good.

 3          MR. PIPER:  He is aware of what happened with

 4   Tricare and what happened with Express Scripts in 2011.

 5          THE COURT:  Then I'm worrying about nothing.

 6          Excuse my interruption.

 7          Let's call Mr. Gogue back in.

 8          (The witness returned to the courtroom.)

 9          THE COURT:  Sorry about that interruption I may have

10   been worrying about nothing, but I thought it was best.  It's

11   better to be safe rather than sorry.  So, sorry for the

12   interruption.  I'll remind you you're still under oath, of

13   course.

14          THE WITNESS:  Thank you, Your Honor.

15   BY MR. PIPER:

16   Q       Mr. Gogue, I'm going to invite your attention back

17   to around 2010 or 2011.  Do you recall something that happened

18   between Express Scripts and Tricare at that point?

19   A       Yes.

20   Q       Explain it to the Court, if you would.

21   A       I will.  The Program Integrity Office at Express

22   Scripts had advised our office at Tricare at the Defense

23   Health Agency that there was indication that in the pharmacy

24   benefit --

25          MR. WALDEN:  Your Honor, I'm going to object to

 1    hearsay.  He's explaining what Express Scripts told his

 2    office.

 3              THE COURT:  Well, I mean, okay.  I think we can cure

 4    that fairly easily.

 5              MR. PIPER:  We can, Your Honor.  It's the action

 6    that Tricare took.

 7              THE COURT:  Yeah, I know.  Just ask him a question

 8    that's not going to elicit hearsay.  In other words, hearsay

 9    being saying what someone else told you.

10    BY MR. PIPER:

11    Q         Did Express Scripts raise concerns --

12    A         Yes.

13    Q         -- about the pharmacy programs?

14    A         They presented data --

15    Q         Okay.

16    A         -- to our office.

17    Q         Okay.

18    A         Which, excuse me, which was indicating that there

19    were uncommon and irregular billings of compound drugs to the

20    Tricare benefit program.

21    Q         Okay.  Good.  And this was back in 2010 or 2011?

22    A         Yes.

23    Q         You were part of these discussions.  Is that

24    correct?

25    A         Yes.

1   Q        Good.  And as a result of that being presented to

2   Tricare, what did Tricare do back in 2011?

3   A        Our office went to our senior leadership, the

4   Undersecretary of Defense for Health Affairs, and advised the

5   senior leadership that there needed to be great focus on the

6   claims submissions of compound drugs because the appearances

7   were that there was being made manipulation of the average

8   wholesale prices of ingredients in compound drugs and the

9   market was being manipulated to inflate exorbitant costs on

10  the program, which as is a responsibility of our office at

11  DHA, is to look for these occasions of inappropriate billing

12  and advise law enforcement, justice, and other players in our

13  agency that attention needed to be made.

14           Unfortunately, our leadership because of their

15  mantra that access to care for the Tricare beneficiary is

16  paramount, they kind of sat on it and ignored it.  Only

17  because in the past the Tricare program has encountered

18  difficulties, particularly with Congress, and when some of our

19  beneficiaries complain, whether it's in the United States or

20  overseas, that they have an inability to acquire and receive

21  health care, they go immediately to the Congress people, our

22  Congress representatives and say, I had difficulty in

23  receiving a benefit.

24           THE COURT:  Yeah.

25           MR. WALDEN:  Your Honor, I'm going to object to

         1    hearsay.  I think he's going to testify as to what people told

         2    members of Congress, I think we need a lot more foundation on

         3    that.

         4              MR. PIPER:  Judge, I'm going to move on from that.

         5              THE WITNESS:  Okay.

         6    BY MR. PIPER:

         7    Q         2011 that was conveyed to Tricare.  What did Tricare

         8    do in 2011, did they stop the compounding?

         9    A         No, sir.

        10    Q         When did Tricare stop the compounding?

        11    A         In 2015 of April because of indications that --

        12    Q         I don't think you need to say that, Mr. Gogue.  It

        13    stopped in 2015.  So, from 2011 to 2015, Tricare continued

        14    honoring these compounded scripts.  Is that correct?

        15    A         Yes, sir.

        16              THE COURT:  Well, now, let me ask a question about

        17    that.  When you say -- are you telling me that in 2015 Tricare

        18    just blanket said no more compounded --

        19              THE WITNESS:  No, Your Honor.

        20              THE COURT:  Because I was going to say -- here, let

        21    me just tell you what my understanding, you know, is that I'm

        22    filtering this information through.  You know, I mean, I think

        23    that I personally first heard the word compounding probably

        24    three or four decades ago from a pharmacy and a pharmacist who

        25    I was representing who told me, this was 30, 30 some odd years

1   ago, 35 years ago, you know, I think compounding is the future

2   of a profitable pharmacy.

3           Now, I don't know what he was saying, you know, at

4   that time and I don't know that he knew what he was saying.

5   But he explained to me what compounding was.  But from that

6   time it was my understanding that, yeah, there is legitimate

7   purposes for compounding, you know, pharmaceuticals, because

8   not every brand that makes it to the marketplaces is ideally

9   suited to each and every individual patient.

10          And so, what prompted my thinking and caused me to

11  ask the question, you're not saying that they barred all

12  compounding because my understanding is, and I stand to be

13  corrected, there are legitimate needs and uses for compounding

14  drugs, but, I mean, what you're beginning to describe, I

15  think, is that Tricare was alerted, yeah, but there is some

16  abuse going on here.  So, okay.  I just lay that out because

17  that's what's on my mind.

18          MR. PIPER:  I think Mr. Gogue was fixing to answer

19  his question.

20          THE COURT:  Maybe I just keep jumping the gun.

21          MR. PIPER:  No, Judge.  I think it's completely

22  appropriate.

23  BY MR. PIPER:

24  Q       Mr. Gogue, does Tricare still honor compounding

25  requests?

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 27 of 119  PageID #:
3578

1    A        We do.

2    Q        Okay.  And explain to the Court what happened in or

3    around April of 2015 that changed.

4    A        In April of 2015, in collusion with our PBM, Express

5    Scripts, required pharmacies and the affiliated prescriber for

6    each prescription to sign and put down the reasoning of why a

7    compound drug would be issued.  And so --

8    Q        Is that called a prior authorization?

9    A        You can call it that.  And as well it's an

10   attestation by the prescriber and the pharmacy that the

11   compound drug prescription was medically necessary.

12   Q        And that's what changed in April of 2015.  Is that

13   correct?

14   A        Yes, sir.

15   Q        This attestation?

16   A        Yes.

17   Q        And that was who -- who required that; Tricare?

18   A        Yes.

19   Q        All right.

20            THE COURT:  While you're reading that.  Ms. Capetz,

21   I may be the only one in here because I've got this robe on

22   that thinks it's a little bit warm in here.  Does anybody else

23   think that -- got to be careful when we crank up the AC now,

24   we can quickly go below zero.  But let's see if we can sort of

25   try to get it a little bit more cool in here.  Go ahead.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 28 of 119   PageID #: 3579

1              MR. PIPER:  Thank you.

2    BY MR. PIPER:

3    Q          Mr. Gogue, do active duty members of Tricare pay a

4    copay?

5    A          No.

6    Q          Does anybody under the Tricare system pay a copay?

7    A          Other beneficiaries pay copays.

8    Q          Including retirees?

9    A          Including retirees and affiliated dependents.

10   Q          So, dependents and retirees pay copays, active duty

11   people do not?

12   A          Yes.  That's correct.

13   Q          If you had known, if Tricare had known that people

14   required to pay a copay were not paying a copay, would that be

15   material to Tricare?

16             MS. MAIO:  Your Honor, let me object.

17             MR. WALDEN:  Objection.

18             MR. THOMAS:  Objection, that is an absolute

19   violation.

20             THE COURT:  It's what?

21             MR. THOMAS:  This is absolutely a question designed

22   for an expert, Your Honor.

23             MR. PIPER:  Judge --

24             THE COURT:  Wait a minute.  It's my understanding

25   that Mr. Gogue is the one that made that decision.

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 29 of 119  PageID #:
3580

1          MR. PIPER:  He's the risk examiner, Your Honor.

2     This would just be like calling the bank examiner to talk

3     about that.  And no matter how vehement the defendants are

4     saying this is absolutely an expert opinion, it is a fact

5     opinion.  He works for Tricare.

6          THE COURT:  If you want to voir dire him, Mr.

7     Thomas, I'll give you an opportunity.  But, I mean, you're

8     going to have to convince me that he was not in a position to

9     have to make that decision.

10          MR. THOMAS:  Then, Your Honor, the objection would

11     go to relevancy as to how it is that it applies to the

12     defendants in this case that do not have a contract with ESI

13     or Tricare.

14          MR. PIPER:  Well, the defendants have told people

15     that they wouldn't have to pay a copay, Your Honor.

16          MS. MAIO:  Your Honor, when the government

17     referenced the bank fraud case and tried to make an analogy,

18     what the government said is this is the same as a bank fraud

19     case where an examiner would be called as an expert.  Those

20     were the government's own words.

21          MR. PIPER:  That's not true, Judge.

22          MS. MAIO:  They did not disclose this person as an

23     expert.

24          THE COURT:  How can he be an expert because it's my

25     understanding that -- look, let me just, let me say outloud

1    what my understanding is of how all of this works.  It has

2    always been my understanding that the reason insurers ask or

3    require insureds to make copays, and I've paid hundreds of

4    them just as pretty much everybody else has, is to make sure

5    that the patient has at least a little bit of skin in the

6    game, so to speak.

7            In other words, you know, if we're going to --

8    insurance, insurance, the whole concept of insurance, any sort

9    of insurance is about the concept that has been referred to as

10   moral hazard.  Right?  Everybody on board with me?  Does

11   anybody disagree with that?  We're talking about moral hazard.

12   Economic term, means that in order for one, for a human being

13   to act rationally with economic decisions there has to be some

14   consequence to acting improperly or irrationally.  That's what

15   I believe moral hazard means.

16           And, therefore, things like copays, deductibles, and

17   so forth are attempts to mitigate to some, to some extent the

18   moral hazard inherent in insurance.  Have I said anything

19   incorrect that anybody -- we're descending into a

20   philosophical type, well, not really, a theoretical type

21   conversation, but that's what -- and tell you the truth, if

22   someone is covering or paying someone's copay, deductible or

23   anything, it seems to me that that is at least relevant

24   because it sounds like that it's an attempt to, you know, undo

25   the mitigation of moral hazard that's inherent in all of these

 1    things.

 2              So, I mean, it does seem to me -- okay, Mr. Thomas,

 3    I can tell you're anxious to jump here.  Look, I'm sure you

 4    have thought about these things far more deeply than I have,

 5    but I'm trying to put on display my meager grasp of some of

 6    this --

 7              MR. THOMAS:  Your Honor, you give me too much

 8    credit.  I think my answer is very, very shallow.  I'm just

 9    going probative value versus prejudice.  It's uncontested in

10    this case that we've got active duty military where there is,

11    in fact, no copay.

12              THE COURT:  And, by the way, that is a judgment by

13    the United States of America through the wisdom of our elected

14    representatives that, you know, this is a benefit that we're

15    going to give to our active duty military, who I believe every

16    American reveres for their service to the country.  And

17    whether -- I'm going to shock you here.  Some things that

18    Congress does probably displays some wisdom, other things that

19    Congress do are beyond my capacity to understand how a

20    rational human being, human mind could come up with.  Okay.

21    So, whether they're right or wrong, that's what goes on.

22    Right?

23              MR. THOMAS:  Your Honor, that was the extent of my

24    objection, just that it's irrelevant because we have no copays

25    here.

1    THE COURT:  Yes.  I think for the reasons I've tried

2  to express I do think it is relevant.  And I do understand

3  that active duty doesn't -- Congress has made a judgment that

4  we're not going to require copays of active duty service

5  people.

6    All right.  Go ahead.

7    MR. WALDEN:  Your Honor, can I -- not to belabor

8  this, but I need to put my objection on the record as well.  I

9  would object to speculation.  The witness has testified that

10  Tricare is backwards looking, so I believe it's speculative to

11  say if we had known at the time when Tricare, has also

12  testified they never know at the time --

13    THE COURT:  Here's what I heard him say.  I do take

14  your point.  What I heard Mr. Gogue, is that --

15    THE WITNESS:  Yes, sir.

16    THE COURT:  Mr. Gogue say is that they are largely

17  backward looking, but, but, by the fact that they have

18  retained Express Scripts means, hey, we may be mainly backward

19  looking, but we're not crazy, because, you know, we don't want

20  to pay out billions and billions and only recover it years and

21  years later because that may test the solvency of even the

22  United States Government, right, as if the United States

23  government is solvent.  But at any rate.

24    All right.  Objection overruled.  Go ahead.

25    MR. PIPER:  Thank you.

1    BY MR. PIPER:

2    Q        If you had known that customers, people that were

3    required to pay a copay were not required to pay a copay,

4    would that have been material, would you all have honored that

5    claim?

6            MR. WALDEN:  Your Honor, I'm sorry.  I would object

7    to the phrasing of the word material because that calls for a

8    legal conclusion.  I think there is probably a different way

9    to ask that question.

10           MR. PIPER:  Judge, that's not true.  Materiality is

11   an element.  If I said would that have been fraud, that would

12   calls for a legal conclusion.

13           THE COURT:  Yeah.  Well, I tell you, I mean --

14           MR. PIPER:  Judge, I'll ask it this way.

15           THE COURT:  Would it have changed your mind is the

16   question.

17   BY MR. PIPER:

18   Q        Yeah.  Would it have affected your decision in

19   honoring that claim if you knew that people who were required

20   to pay a copay were not paying a copay?

21   A        Yes.  That would, that claim would not have been a

22   covered benefit.

23   Q        Okay.  If you had known that the customers or your

24   covered beneficiaries were being paid to participate in a

25   study, would that have affected your decision to honor that

1    claim?

2    A          Yes.  If the study was not an approved study by

3    Tricare, it would have not been a covered benefit.

4    Q          Okay.  If you had known that the marketers had

5    employed the doctors or health care professionals to prescribe

6    the creams, would that have affected your decision in honoring

7    a claim?

8    A          Yes.

9    Q          And why is that?

10   A          According to 32 C.F.R. 199, Chapter 9, under the

11   provisions or examples of fraud, there is --

12            MR. WALDEN:  Same objection, Your Honor.

13            MR. PIPER:  Judge -- okay.  Forget the C.F.R.

14            THE WITNESS:  Okay.

15   BY MR. PIPER:

16   Q          Don't tell the judge about the C.F.R., why would it

17   have affected your decision if you knew the marketers were

18   hiring doctors, put it in lay terms?

19   A          Certainly.  There is indication that the claim was

20   inappropriate and Tricare would have not covered that claim.

21   Q          Okay.

22            THE COURT:  Wait a minute.  Does that -- okay.  I

23   know you rephrased the question.  But, Mr. Walden, you're

24   saying if a lay witness quotes a statute or regulation to me

25   that's a legal conclusion?

1           MR. WALDEN:  No, Your Honor.  I was objecting.  I

2     don't think whether he's a lay person or an expert really had

3     anything to do with it, just him saying that example X is

4     fraud, that's a legal conclusion.  That's what I was objecting

5     to.

6           THE COURT:  Okay.  I just wanted to make sure that

7     it wasn't illegal to read me a statute or --

8     BY MR. PIPER:

9     Q          If you had known that marketers had arranged for

10    their doctors to call the Tricare insureds authorizing the

11    prescription, would that have affected your decision in

12    authorizing the claim?

13    A          Yes.  Tricare would not have covered that claim

14    because it's not a covered benefit.

15    Q          What's the problem, tell the Court in lay terms what

16    the problem is with the marketers using their own doctors.

17    A          There is indication that the claim in itself and

18    there was a coordination between the marketer and the

19    prescriber which would have influenced the medical necessity

20    of that prescription claim.  We rely on the integrity of the

21    prescriber to professionally make, on their own cognizance,

22    those diagnoses and evaluations which would reach a conclusion

23    that a prescription was medically necessary.

24          THE COURT:  Let me -- Mr. Gogue, you're being asked

25    questions and you're answering perfectly, but, you know, look,

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 36 of 119   PageID #: 3587

1    here's what I'm taking away from it.  When you were asked

2    early on whether Tricare is a backward looking or forward

3    looking, you said principally backward looking.  I guess, as I

4    listen to your answers, your more specific answers, I said, is

5    it fair to say, well, it's both depending upon the

6    circumstances?

7              THE WITNESS:  Would you like me to answer?

8              THE COURT:  Yeah.  Go ahead.  Argue with me.

9              THE WITNESS:  Yes, Your Honor.  There is no

10   argument, more because of the fact that our program addresses

11   literally millions of claims a day, it's inconceivable or just

12   very unpractical that at the front of the submission of the

13   claim that we have someone there --

14             THE COURT:  But you still try?  I mean, well, why do

15   you hire Express Scripts then if you're not trying?

16             THE WITNESS:  Correct.  The way that the

17   technologies are today, the way they have evolved, our office

18   has been working with our contractors to implement what we

19   call predictive analytics.

20             THE COURT:  Yes.

21             THE WITNESS:  And that's a new technology in itself.

22   We've been working with Health and Human Services or Medicare

23   and liaisoning with them to try and implement and learn from

24   some of the experiences they've already had.

25             THE COURT:  Okay.  All right.

 1              THE WITNESS:  But we're still way behind the game as

 2    far as catching inappropriate claims up front.

 3              THE COURT:  Way behind who?  Are you way behind

 4    private insurers?

 5              THE WITNESS:  Private insurers are more adept and

 6    they've got a bit more focus than admittedly Tricare has.

 7              THE COURT:  Okay.  I don't want to go any further

 8    than this, but.

 9              THE WITNESS:  Yes.

10    BY MR. PIPER:

11    Q        Private insurers have to cover their bottom line.

12    Is that correct?

13    A        Yes.

14    Q        And Tricare has what backing it?

15    A        We have the taxpayers' money backing us.

16    Q        All right.  Now, along those lines, though, one of

17    the things that Tricare tries to do with respect to medical

18    care is what?  How does Tricare want to compare with private

19    insurance or with Medicare and Medicaid?

20    A        We want to provide world class benefit, a world

21    class benefit to our Tricare beneficiaries, because deservedly

22    so.  They really need it and deserve it.  Their sacrifices for

23    the country prompt us and give us the initiative in our agency

24    to support those beneficiaries as best we can.

25    Q        All right.  If you had known that marketers were

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 38 of 119   PageID #: 3589

 1    being paid for their own, being paid commissions on their own

 2    cream, in other words, a Tricare beneficiary who is also

 3    marketing, if you had known that that person was being paid a

 4    commission on his own creams, would that have affected your

 5    decision in authorizing that claim?

 6    A        Yes.

 7    Q        And why is that?

 8    A        That would indicate that the claim was inappropriate

 9    and it would not have been a covered benefit.

10    Q        Okay.  If you had known that the medications listed

11    on the form were predetermined by the marketer or the

12    pharmacy, the compounding pharmacy, would -- for a compounded

13    drug, would that have affected the claim?

14    A        Yes.

15    Q        And why is that?

16    A        It would lead to indication that it would not have

17    been a covered benefit because there is indication that the

18    prescriber was likely not issuing a medically necessary

19    prescription.

20             THE COURT:  Well, let me ask about that.  Is it that

21    or is it, well, that in that case, if the components were

22    predetermined, then it doesn't fit the definition of a

23    compounded drug, because a compounded, my understanding of a

24    compounded drug is something and maybe I'm wrong, is a unique

25    formulation designed to meet the needs of a unique individual

1    patient?

2            THE WITNESS:  More, Your Honor, a compound drug is,

3    and forgive me, I'm not a total expert on this, but the way

4    that we've been trained is compound drugs are for patients

5    that have multiple diagnoses.  And, for example --

6            MR. WALDEN:  Your Honor, I'm going to object.  I

7    think he said that he doesn't have first-hand knowledge.

8            THE COURT:  Yeah.  That's all right.  It was my

9    question and maybe I was asking for, you know --

10           MR. WALDEN:  Your Honor, I believe we may be able to

11   clear that up later.

12           THE COURT:  Excuse me.

13           MR. WALDEN:  I think we may be able to answer your

14   question with other witnesses later.

15           THE COURT:  Okay.

16   BY MR. PIPER:

17   Q        If Tricare knew that there was no real need for the

18   drug, the compounded drug, would that have affected your

19   determination in authorizing the claim?

20   A        Yes.

21   Q        And it's fairly self-evident, is it not?

22   A        Yes.

23   Q        If you had known that the beneficiaries, the

24   customers, the patients were approached by the marketers to

25   order these compounded drugs, would that have affected your

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 40 of 119  PageID #: 3591

1    decision in authorizing the claim?

2    A        Yes.

3    Q        And why is that?

4    A        That would indicate that there was no interaction

5    between a prescriber and the beneficiaries who was being

6    approached to receive a compound drug.  Typically, it's the

7    other way around, it would be the beneficiary approaching a

8    prescriber saying, hey, I have a need for a particular

9    medication.  And that would indicate an uncovered benefit.

10   Q        After this attestation in April of 2015 was

11   required, did you all see a drop in compounded creams,

12   compounded medication requests?

13   A        Our agency saw a marked logarithmic decrease in the

14   submission and payment of compound drugs.

15            MR. PIPER:  May I have just a second, Judge?

16            (Brief pause.)

17            MR. PIPER:  That's all.  That's all I have, Judge.

18            THE COURT:  Who wants to cross-examine first?

19            MR. THOMAS:  I will, Your Honor.

20            THE COURT:  Okay.  Mr. Thomas, come on.

21                         CROSS-EXAMINATION

22   BY MR. THOMAS:

23   Q        Morning, Mr. Gogue.

24   A        Morning, sir.

25            THE COURT:  Why don't you tell him who you are and

UNITED STATES DISTRICT COURT

1    who you represent.

2    BY MR. THOMAS:

3    Q        I'm Mark Thomas.  I represent defendant Wayne

4    Wilkerson in this case.

5    A        Morning, Mr. Thomas.

6    Q        Mr. Gogue, you'll recall that Mr. Piper had asked

7    you regarding any concerns that you might have regarding

8    Tricare being a backward looking system.  Correct?

9    A        Yes.

10   Q        That pays claims and then has the opportunity only

11   later to investigate whether the payment of the claims was

12   adequate or proper?

13   A        Yes.  In our industry, we call that pay and chase.

14   And --

15           THE COURT:  Call it what?

16           THE WITNESS:  Pay and chase.

17           THE COURT:  Pay and chase?

18           THE WITNESS:  Yes.

19           THE COURT:  Okay.

20           THE WITNESS:  The federal health care programs have

21   a mandate given any extenuating circumstances, Tricare

22   together with all of the other federal health care agencies

23   are required to pay a claim within 30 days.  And so, because

24   of the exorbitant amount of claims that we receive on a daily,

25   monthly basis, our mission up front is to pay those claims.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 42 of 119   PageID #: 3593

1    And if the computers vet the claim and it contains the correct

2    information, which, again, we rely on the accuracy and

3    integrity of the individual or entity that is submitting those

4    claims, we will pay it first, and if there is indications that

5    the claim is incorrect, then potentially we'll reject it, but

6    those are far and few between, and we do, but a majority of

7    the claims that we process are paid up front.

8    Q        Is it possible to have front end edits to an

9    adjudication system to check for basic integrity of the

10   claims?

11   A        Not only is it possible they are being implemented.

12   Q        Does ESI utilize those for the Tricare program,

13   those front end edits for compounding?

14   A        Yes.

15   Q        Do you know -- do you have any idea how many there

16   are?

17   A        No.  But I do know that some of the requirements of

18   those edits are appropriate identity of the beneficiary, the

19   sponsor, whether the billing codes are correct based upon the

20   diagnosis that is submitted, et cetera.  And then whether the

21   provider listed on the claim is an authorized provider.  And

22   those are the basic elements of a claim.

23   Q        Have there ever been any front end edits regarding

24   compounded medications?

25   A        Not to my knowledge.  I don't know that answer.  I

UNITED STATES DISTRICT COURT

1    don't know that answer.

2    Q         Is it possible to add any of those edits?

3    A         I don't know that answer.

4    Q         Okay.  So that's a good question probably for ESI.

5    Correct?

6    A         For an expert to answer, yes.

7    Q         You had mentioned a prior authorization regarding

8    compounding?

9    A         Yes.  And more -- yes, it was a prior authorization,

10   but more it was an attestation by the prescriber to attest to

11   the fact that the compound drug claim that was being submitted

12   was or is medically necessary.

13   Q         Was that based upon any criticism from Congress as

14   to the front end edits in the Tricare system?

15   A         No, more it was based upon the data analytics that

16   we had, we are, our office, as well as the agency and Express

17   Scripts had gone through to identify that there were hundreds

18   if not thousands of inappropriate claims for compound drugs

19   that were being submitted where all indicators pointed to the

20   fact that those claims were not medically necessary, and,

21   therefore, they should have not been a covered benefit.

22   Q         Were you aware that the General Accounting Office

23   audited the Tricare compounding medication program and issued

24   a report in 2014 to Congress?

25   A         Somewhat, yes.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 44 of 119   PageID #: 3595

1    Q        Are you aware of the findings of that audit?

2    A        Not extensively, no.

3    Q        Are you aware that the GAO criticized the Tricare

4    program for not even having the same audits, I mean, not even

5    having the same edits and controls as the Medicare program?

6    A        My answer to that is that the GAO typically

7    criticizes Tricare.  And it's their function and their mission

8    to go out to the different agencies and review.  And, indeed,

9    there are some shortcomings and fallacies with the agencies

10   and the Tricare policy, and that's typically what the GAO

11   points at.  So, I've heard about their studies regarding

12   compound drugs, but as well, they have studied many other

13   policy situations that we have, some of the payment

14   methodologies that we have.  And, indeed, it's their job to

15   criticize us.

16   Q        Are you aware of any changes that the Tricare

17   program insisted that ESI make in terms of their claims

18   adjudication system in response to those audits?

19   A        No, not extensively.  I'm sorry.

20   Q        Mr. Gogue, has there ever been any form of financial

21   cap on compounded medications applied by ESI on behalf of

22   Tricare?

23   A        No.  Not to my knowledge.

24   Q        So, there has never been a cap on the cost of

25   medications?

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 45 of 119  PageID #: 3596

```
 1   A          Not to my knowledge.

 2   Q          Is it possible to have an override on a cap on the

 3   cost of compounded medications?

 4   A          Potentially.  But, again, that's not my field of

 5   expertise.

 6   Q          And, again, Mr. Gogue, I want to make sure that you

 7   understand.  You're unaware of the ESI imposed $1,000 cap on

 8   the total cost of any compounded medication that ESI utilized

 9   for the Tricare program.  You're unaware of that?

10   A          I believe that's a recent policy implementation, I

11   believe I've heard of it, but, again, we don't get too deep in

12   the weeds regarding specific payment methodologies --

13              THE COURT:  Mr. Thomas, let me just stop you.  By

14   the way, I find your questions on cross-examination very

15   informative and useful to me, however, there is some irony

16   here.  You're the one that's turning him into an expert.  And

17   so, I need to thank you for that.  Okay.  Go ahead.  Because

18   I'm learning things, I mean, you know.

19              MR. THOMAS:  Thank you, Your Honor.  I obviously

20   have an inflexion point as to my decisions here.

21   BY MR. THOMAS:

22   Q          Mr. Gogue, are you aware, does the ESI provider

23   manual provide any instruction to pharmacies about how it is

24   that they should be handling studies, clinical studies

25   regarding patients?
```

1   A        I don't have extensive knowledge.  I routinely

2   acquire the provider manual to give in support of law

3   enforcement in judicial matters, but regarding my extensive

4   knowledge of the provider manual, I apologize, I don't have

5   strong knowledge of that.  That's not typically our focus in

6   our office.

7   Q        Well, you had stated on direct with Mr. Piper that

8   had you at Tricare known about the use of unapproved studies,

9   then that would have been a concern for you as to materiality.

10  Correct?

11  A        Yes, sir.

12  Q        As to whether or not it would have been a covered

13  claim?

14  A        Yes.

15  Q        Explain to the Court how it is that you think that

16  the defendants should have known of that if it's not in the

17  ESI manual.

18  A        Our agency will liaison with providers and entities

19  who will approach the program saying, hey, I have, for

20  example, a cure for cancer, or something that will help the

21  Tricare beneficiary.  If there is interest with the agency or

22  by the agency with a particular study, then, indeed, they

23  would vet the clinical studies and review to see if they would

24  under strong coordination and management if they would pay the

25  claim.  Otherwise, if the study is not approved by Tricare, we

1  would not pay for those claims.

2          Typically, the type of claims that are involved in

3  these clinical studies which our agency is approached by and

4  asked to pay for those type of claims, there is strong

5  management as far as whether, you know, initially those claims

6  would not be paid, but because we're liaisoning with a

7  particular provider and there is a strong focus on who the

8  patients are and what type of billing codes they'll submit,

9  otherwise, if it's an unapproved study, we would not cover

10  that benefit.

11  Q        And, specifically, as it relates to our case here

12  today and the defendants here today --

13  A        Right.

14  Q        -- who I'm asking you to assume for our purposes are

15  marketing agents under contract with the pharmacies that have

16  contracts with ESI.  How would they know if it's not in the

17  manual which is where it is that they would go for data about

18  what's permitted and what's not permitted, how would they

19  know?

20  A        You know, I will say pointedly, I don't think a

21  marketer should even be involved in the coordination of a

22  clinical study with our agency.  They shouldn't have any type

23  of involvement.  It should be between the provider and our

24  agency.

25  Q        And the defendants -- so, the marketers should just

```
1    know that, they should?

2    A         No.  Why would they have a need to know that?  They

3    are not the provider conducting the clinical study, nor do

4    they represent our agency in order to do any type of

5    coordination.

6    Q         All right.  Mr. Gogue, you had responded to one of

7    Mr. Piper's questions on direct that you would have a concern

8    in terms of materiality regarding employee prescribers.  Do

9    you recall that testimony?

10   A         Yes.

11   Q         Is your understanding that doctors and nurses are

12   employees sometimes?

13   A         Yes.  But I understood the gist of what he was

14   asking if there is influence by any entity or individual on a

15   provider that is servicing our beneficiaries, our Tricare

16   beneficiaries, and those providers are being influenced by

17   other individuals or entities, other than that patient, then

18   our office would have a problem.  We typically administer

19   hundreds of cases a year regarding indications that there is a

20   lack of medical necessity on a claim that is being submitted

21   to Tricare.  And, again, we pursue those instances by

22   liaisoning with law enforcement, particularly DCIS and DOJ and

23   on some occasions even local judicial offices, to try and make

24   those entities and individuals that are submitting

25   inappropriate claims accountable.
```

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 49 of 119   PageID #: 3600

```
 1   Q         Let me make sure that I understand.  Is it your
 2   concern that just systemically as an operation if a doctor or
 3   a midlevel works for an entity that prescribes medication,
 4   that dispenses, right, whether it be a doctor's office or a
 5   hospital, that that in and of itself is a material concern?
 6   A         Yes.  And it would be because, again, there is
 7   indication that that prescriber or provider is being
 8   influenced by other things other than the condition of our
 9   beneficiary.  That's very important.
10             THE COURT:  So, in other words, so, there is -- in
11   any situation like that, there is an opportunity at least for
12   self dealing.  Right?
13             THE WITNESS:  For, I'm sorry, Your Honor?
14             THE COURT:  For self dealing.
15             THE WITNESS:  Okay.
16             THE COURT:  Well, and what I mean by that is Mr.
17   Thomas is suggesting that anytime anyone has any potential to
18   benefit from the sale, for instance, of a product as to
19   whether they are intended under the system to be a gatekeeper,
20   well, there is potential for self dealing.  I mean, am I being
21   too abstract about that.  I mean, that's --
22   BY MR. THOMAS:
23   Q         Yes, Your Honor.  Well asked, Your Honor.  That's my
24   question.  I'm asking systemically is that a problem if a
25   doctor or a midlevel works for a hospital, the hospital makes
```

1    more money if the doctor or the midlevel prescribes more

2    medications that the hospital dispenses, that in and of itself

3    is suspect.  Correct?

4    A        If it was not medically necessary.  And I keep

5    caveating the questions being put before me by saying that

6    very important to the agency is if the benefit that is being

7    charged to Tricare has any indication that there is

8    inappropriateness, and many of the things that have been

9    suggested, there is indication that there is kickback schemes

10   was going on, and we look at those instances on a daily basis.

11   And, again, when we are prompted that there is a potential for

12   those type of activities, we liaison with law enforcement and

13   DOJ to try and make those individuals accountable.

14   Q        Who should make the determination as to what's

15   medically necessary and what might be medically unnecessary?

16   A        The provider.

17   Q        The provider?

18   A        Yes.

19   Q        Okay.  Mr. Gogue, do you recall your testimony on

20   direct with Mr. Piper where you had stated that you have a

21   concern where a marketer would be getting reimbursed based

22   upon the marketers' own personal medications, so if a marketer

23   had a compounded medication that marketer was actually using

24   for themselves, they would be both receiving a commission and

25   be a patient at the same time.  Do you recall that testimony?

1    A        I think you're rewording something.

2    Q        And don't let me do that.

3    A        Okay.

4    Q        That's what I had in my notes.  Do you have a

5    concern with marketers receiving commissions on their own

6    medications?

7    A        On their own medications?

8    Q        Yes.  Where a person who is a marketer also happens

9    to have a medical condition for which they go to a physician

10   getting a prescription.  Right?  It so happens that it is for

11   a company and a pharmacy for which they sell that medication.

12   A        That would be inappropriate.

13   Q        That would be inappropriate?

14   A        Yes.

15   Q        Is that written anywhere, is that documented any

16   place?

17   A        32. C.F. R. 199, Chapter 9.

18   Q        That just says fraud.  Right?

19   A        There is fraud and abuse.

20   Q        I mean, that specific problem, how would the

21   defendants know that they should have a carve-out for any

22   medications that they receive from a pharmacy with whom

23   they've got a marketing contract?

24   A        Well, I can't speak to that.  I don't know what's in

25   their minds, so, whether they do know or don't know, that's

 1    not my purview.

 2    Q         And the same as to marketers for big pharma, right,

 3    AstraZeneca, Pfizer, it's your position that it's abusive that

 4    if a person works at Pfizer, they absolutely should not accept

 5    any prescriptions from their personal physician from Pfizer

 6    because that would be abusive.  Correct?  That's a conflict of

 7    interest?

 8    A         Potentially.

 9              THE COURT:  And I do hear what you're saying and I

10    see the purpose of Mr. Thomas' question.  But, I mean, Pfizer,

11    you got a pharmaceutical rep who gets a commission for selling

12    as much Lipitor as, I mean, if the pharmaceutical rep is

13    taking Lipitor, that's potentially a violation of the regs?  I

14    mean, because that happens all of the time, I mean, I'm just

15    using -- well, I mean, that may be an extreme example, but I

16    bet you there are a lot of --

17              THE WITNESS:  Yes, Your Honor.  That may be the

18    case, but if they're influencing the prescriber to --

19              THE COURT:  I hear, I hear -- I see in theory why

20    the regs, but, I mean, and I guess that's what Mr. Thomas is

21    trying to do.  I mean, boy, taken to its logical conclusion, I

22    mean, it leads to an absurd result.  And perhaps like any

23    language taken to its logical conclusion.  All right.  Let's

24    go.

25

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 53 of 119   PageID #: 3604

1  BY MR. THOMAS:

2  Q        Mr. Gogue, do you recall your testimony in response

3  to some questions on direct from Mr. Piper regarding Tricare's

4  concern as to preprinted prescriptions pads.  Do you remember

5  that testimony?

6  A        Yes.

7  Q        You said that was a concern?

8  A        Yes.

9  Q        Materiality issue?

10 A        Yes.

11 Q        Is that in the ESI manual?

12 A        I don't know.

13 Q        And I am going to go back to the same question.  How

14 would the defendants know that that was of concern with

15 Tricare if it's not even in the manual that they use?

16 A        Again, I can't speak to the defendants and their

17 knowledge of the provider manual.

18 Q        ESI is your pharmacy benefit manager, I'm sorry,

19 when I say your, that was a poorly asked --

20 A        Tricare's.

21 Q        Tricare's pharmacy benefit manager.

22 A        And it is mine as well as a beneficiary, yes.

23 Q        The was going to actually be my next question.  ESI

24 is also a pharmacy.  Correct?

25 A        They have pharmacies, I believe, that they own.

UNITED STATES DISTRICT COURT

1    Q        Are you aware?

2    A        I have knowledge that they own pharmacies, but more

3    that's on the commercial, their commercial side versus their

4    DOD contract.  And I don't know what these arrangements are,

5    so I can't speak with any strong or reliable knowledge to

6    whether that's the case or not.

7    Q        Sure.  Were you aware that the ESI pharmacies

8    utilize preprinted prescription pads for their own patients?

9    A        No.

10   Q        You were not aware of that?

11   A        I don't know.

12   Q        You don't know?

13   A        I don't know.

14            MR. THOMAS:  One moment, Your Honor.

15            (Brief pause.)

16            MR. THOMAS:  One more matter, Mr. Gogue.

17   BY MR. THOMAS:

18   Q        Can you see that?

19   A        Yes.

20   Q        The screen in front of you?

21   A        Yes.

22   Q        I'll give you just a second to look at it.

23            MR. WALDEN:  Mr. Thomas, what exhibit number is

24   this?

25            MR. THOMAS:  This is Government's Exhibit 2304.

UNITED STATES DISTRICT COURT

1          MR. WALDEN:  Thank you.

2          THE COURT:  Has it already been admitted?

3          MR. THOMAS:  Already been admitted, Your Honor, I

4    believe.

5    BY MR. THOMAS:

6    Q          Do you see the language regarding the override,

7    Mr. Gogue?

8    A          Yes.

9    Q          Do you see the dates there, 9/8/14 to 9/8/15?

10   A          Yes.

11   Q          Would that give you any more clarity at all as to

12   whether or not that there was a cost override for Tricare

13   compounded prescriptions during that time period?

14   A          Please forgive me, I don't have strong knowledge of

15   prescriptions in themselves.  I'm not an expert with

16   prescriptions.  I do know that overrides do occur.  And that

17   is because the pharmacy liaisons with the prescriber to get

18   their preapproval.  And, indeed, there may or may not be

19   preprinted forms and from my understanding if a particular

20   pharmacy might not have a particular ingredient for a

21   prescription, they'll reach out to the prescriber and get

22   their approval to change the constitution of the prescription.

23   But, otherwise, if you're asking me what those words mean, I'm

24   sorry, I can't do it.

25          MR. THOMAS:  Surely.  Nothing else, Your Honor.

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 56 of 119  PageID #: 3607

1          THE COURT:  Okay.  Other cross-examination?

2          MR. PIPER:  Judge, that exhibit is not in evidence.

3    We'd go ahead and agree to move it in if Mr. Thomas is in

4    agreement.

5          MR. THOMAS:  Apologies.

6          THE COURT:  With no objection, it's admitted.

7          MR. PIPER:  Twenty.

8          MR. THOMAS:  2304.

9          MR. PIPER:  2304.  We move it.  It's our exhibit,

10   Your Honor.

11         THE COURT:  Admitted.

12         (Government's Exhibit 2304 was received into

13         evidence.)

14         THE COURT:  All right.  If there is no other

15   cross-examination.

16         MR. WALDEN:  There is additional cross.

17         THE COURT:  Okay.  Who?

18         MR. WALDEN:  I think Ms. Maio.

19         THE COURT:  Ms. Maio, okay.

20                        CROSS-EXAMINATION

21   BY MS. MAIO:

22   Q      Good morning, Mr. Gogue.  My name is Gianna Maio,

23   and I represent Mr. Billy Hindmon.  And I have some additional

24   questions for you.  I know that you've touched on the

25   relationship between Tricare and Express Scripts, but I'd like

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 57 of 119  PageID #:
3608

1    to ask some additional follow-up questions regarding that.

2    A        Certainly.

3    Q        My understanding is that the PBM, which in this case

4    is Express Scripts?

5             THE COURT:  And PBM are Pharmacy Benefit Manager?

6             MS. MAIO:  Yes, Your Honor.

7             THE COURT:  Okay.  Go ahead.

8    BY MS. MAIO:

9    Q        They are the pharmacy benefit manager for Tricare.

10   And in that role, Express Scripts develops and maintains the

11   formulary for Tricare?

12   A        They liaison with Tricare to develop the formulary.

13   Q        Okay.

14   A        It's primarily a group of pharmacy managers in

15   Tricare or the defense agency that make that formulary.

16   Q        Okay.  So, they determine on an annual basis what

17   that, what drugs will be covered under the formulary, do they

18   not?

19   A        I believe so, yes.

20   Q        And when you mentioned that -- let me back up a

21   second.  One of the responsibilities of Express Scripts as the

22   PBM is to process and pay prescription drug claims on behalf

23   of Tricare?

24   A        Correct.

25   Q        And in that role, there are, as you mention, there

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 58 of 119   PageID #: 3609

1    are certain controls that are set in the computer system?

2    A        Correct.

3    Q        But I believe that as you testified on direct that

4    the system with Tricare in particular was quote unquote way

5    behind the game in terms of the predictive analytics, in

6    particular?

7    A        That's correct.

8    Q        And that was certainly true back in, let's say the

9    time period between 2013 and 2015, was it not?

10   A        It's still true today.

11   Q        Okay.  Thank you.

12   A        You're welcome.

13   Q        So, I think that there was a change that you may be

14   aware of when we're talking about the price that Tricare

15   agrees to pay the pharmacy for a particular drug or compound.

16   Again, you testified that the formulary and the pricing is

17   negotiated on an annual basis, is it not?

18   A        Yes.  But there is a distinction between drugs that

19   are contained in the formulary, those are individual drugs.

20   With respect to compound drugs --

21   Q        Uh-huh.

22   A        -- there is multiple, multiple drugs that are

23   contained in the formulary, and as I mentioned earlier, the

24   compound drugs are used to treat multiple diagnoses.

25   Q        Right.

1    A          And so, the compounding pharmacies, when they're

2    aware that a patient has a requirement for multiple drugs and

3    the provider or the prescriber deems that it's more beneficial

4    to the patient rather than taking five, 10 medications at one

5    time, the pharmacy will compound and combine those multiple

6    drugs into one single compound drug.  And so, with respect to

7    compound drugs themselves, those are not in the formulary.

8    There is a reliance on the average wholesale price of the

9    individual ingredients, which is not set by Tricare, it's set

10   by the market.

11   Q          And I'm not trying to cut you off, sir, but I do

12   have some questions about the average wholesale price, but I

13   just have a few other questions before we get there.

14   A          Sure.

15   Q          And I believe that there was a change in Tricare

16   regulations because prior to 2011 they would only allow

17   pharmacies to bill for one drug in a compound.  Is that not

18   the case?

19   A          I don't have knowledge about that policy.

20   Q          You're not aware of the change in 2011 that Tricare

21   allowed pharmacies to bill for up to 10 or more drugs within a

22   compounded medication?

23   A          Those policy specifics I'm not an expert on.  I

24   apologize.

25   Q          That's okay.  One more question before we get to the

```
 1   average wholesale price.  I understand you're familiar with
 2   the facts and circumstances of this particular case?
 3   A         I am.
 4   Q         Involving these defendants?
 5   A         I am.
 6   Q         You reviewed some of the specific records in this
 7   matter?
 8   A         To a limited extent.
 9   Q         Okay.
10   A         Law enforcement and DOJ more often than not does not
11   give us the specifics on the conduct of their cases.
12   Q         Yes, sir.  Okay.  Are you aware of Tricare
13   attempting to claw back any money from the pharmacies that
14   were involved in this particular matter?
15   A         Say again, please.
16   Q         Are you aware of Tricare seeking to recoup any money
17   paid to pharmacies in this particular matter?
18   A         Pharmacies involved in this case all happen to be on
19   my caseload.  I know that there are specific actions that have
20   been pending based upon the activities that are occurring with
21   this matter that has been transpiring over the past few weeks.
22   And I'm not at liberty to reveal, nor are they, nor are many
23   of the agents that I'm dealing with, they have not revealed
24   what those pending matters are, but I can only --
25   Q         They're unresolved.  We'll just leave it at that.
```

UNITED STATES DISTRICT COURT

1    A        Yes.

2    Q        So, moving on to my questions about the average

3    wholesale price.  Just to make sure that I understand what

4    that means.  The price of a certain drug is based in part on

5    what the average wholesale price is.  The price that -- let's

6    say that the price that Tricare agrees to pay for a drug,

7    agrees to pay a pharmacy; that price is determined at least in

8    part on what the average wholesale price is for that drug.  Is

9    that fair?

10   A        That's related to specific ingredients in a compound

11   drug.

12   Q        Okay.

13   A        And as you alluded to earlier regarding the

14   formulary, those prices are already set by the various health

15   care programs, federal health care programs.

16   Q        Okay.  And let me make sure that I understand.  On

17   the average wholesale price, that is driven by what the

18   manufacturer, essentially, it's kind of what the manufacturer

19   is setting in terms of that particular ingredient, is it not?

20   A        It's more driven by what the pharmacy market is

21   submitting to the federal health care programs.  And it's not

22   only Tricare, it's Medicare and Medicaid.  And, again, that's

23   with compound drugs.  Going back to formulary drugs, those are

24   individual drugs that have already been pre-vetted.  There is

25   also predetermination on what the programs will pay.  And

1  that's based upon the pricings in the past, how many drugs are

2  being issued in a particular region, and then agreement

3  amongst the federal agencies on what we will pay.

4  Q        Let me -- you said a lot there, so let me see if I

5  can break that down.  Obviously, there is market forces at

6  play in terms of if there is particular demand for certain

7  drugs in certain parts of the country, et cetera?

8  A        Yes.

9  Q        But if a manufacturer of a particular ingredient,

10 for example, Gabapentin, my understanding is, and I know that

11 you -- taking a step back, I know that Mr. Thomas asked you

12 specifically about the GAO report that was issued in 2014.

13 And I believe that you indicated that you have reviewed that

14 report to some extent, have you not?

15 A        To some extent, not the whole report.  And it was

16 only once.

17 Q        And I'm not going to ask you a thousand questions

18 about it because I understand you're not totally familiar with

19 it.  But one of the things that it references is that if

20 there's a particular ingredient, for example, Ketamine, if the

21 manufacturer, if that suggested wholesale price, the AWP jumps

22 1,000 percent over a three-year period, which I think it

23 has --

24 A        It has.

25          THE COURT:  3,000 percent?

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 63 of 119   PageID #: 3614

1              MS. MAIO:  1,000 percent.

2              THE COURT:  1,000 percent.

3    BY MS. MAIO:

4    Q         There are some drugs, I think, according to that GAO

5    report, such as Gabapentin which saw a 5,000 percent from 2011

6    to 2014?

7    A         Again, may I caveat your statement.  That's with

8    respect to ingredients --

9    Q         Yes.

10   A         -- in a compound drug.  Gabapentin or any other type

11   drug in and of itself, if it were to be issued as an

12   individual drug, the cost would be significantly lower, but

13   because the federal programs don't have defined formularies

14   for compound drugs, again, the only way that the federal

15   programs will base their payments is on what is being dictated

16   by the market as far as the submission of ingredient costs.

17   Q         Okay.  So, if the market is dictating a

18   1,000 percent increase or a 5,000 percent increase, Tricare is

19   going to pay that increased cost --

20   A         It was paying.

21   Q         -- for the compounded drug?  It was prior to 2015?

22   A         Yes.

23   Q         Okay.

24             THE COURT:  Ms. Maio, look, I apologize.  Can you

25   hold your train of thought about where you're going with this

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 64 of 119  PageID #: 3615

```
 1    line of questioning because here's what I'd like to do.  I'd
 2    like to take a 15-minute recess.  And I'd like to talk briefly
 3    with the lawyers with the witness outside of the room before
 4    we go any further.  Okay.
 5              MS. MAIO:  Yes, Your Honor.
 6              THE COURT:  Okay.  We're going to take a 15 minute
 7    recess, and you can step off of the stand and out of the room.
 8              THE WITNESS:  Yes, Your Honor.  Thank you.
 9              (Witness left the courtroom.)
10              THE COURT:  Okay.  Counsel, here's the reason I
11    stopped this witness because now that we're into this area, I
12    want to give -- I want the witness to go out so I can give
13    both sides an opportunity to see if they want to frame
14    questions about what's on my mind.  Here's what -- to put it
15    very bluntly, as I've listened to this testimony coming in, I
16    don't know if the witness doing it or otherwise, as whoever
17    was responsible for annually compiling this formulary, and I
18    think that's where you're going, Ms. Maio, and how it may
19    differ from market, you know, from brand drugs that are on the
20    market and compounded drugs.
21              Here's the real question here.  When this person,
22    let's just call it a person, it may have been a committee, was
23    looking and saw that, and I've seen the bottles, the bottles
24    are about that high, you know, that round, right, of a cream.
25    Okay.  And the ingredients in the cream are known, I mean, you
```

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 65 of 119   PageID #: 3616

```
 1   know, and I don't know the combination.  But when you got a
 2   bottle of cream that big that cost $1,5000, or more, as I've
 3   seen in this case, I mean, you don't have to be a trained
 4   medical professional, the question, boy, this stuff better
 5   cure cancer or we're not paying for it.
 6           I mean, that's what I do not understand how this
 7   could have gone on through the formulary for that long when a
 8   small bottle of cream with various prescription ingredients,
 9   I'm sure some more expensive than others, but, I mean, the
10   bottle cost $15,000.  I mean, give me a break.  I'll say it
11   again.  It better cure cancer or we're not covering it.  Okay.
12   Let's take a 15-minute recess.
13           MS. MAIO:  Yes, sir.
14           (Short recess.)
15           THE COURT:  All right.  Yes, sir, Mr. Piper.
16           MR. PIPER:  Mr. Hobbs just walked out, Judge.
17           THE COURT:  How about getting Mr. Hobbs and the
18   witness back and we'll start again.  Ms. Maio, are you going
19   to continue your cross-examination?
20           MS. MAIO:  Mr. O'Shaughnessy has a few questions --
21           THE COURT:  Well, I mean, are you finished?
22           MR. O'SHAUGHNESSY:  Oh, did you start?
23           THE COURT:  I cut Ms. Maio off in the middle, and I
24   meant to -- yeah.  I think that -- let's let Ms. Maio wrap up.
25           All right.  Come on back, Mr. Gogue, Gogue.
```

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 66 of 119   PageID #: 3617

 1          THE WITNESS:  Yes, Your Honor.  I've heard every

 2   aberration.

 3          THE COURT:  I know, I'm the same way with my name.

 4   I'll remind you you're still under oath.

 5          THE WITNESS:  Thank you.

 6          THE COURT:  And once he's settled, you can proceed

 7   with your cross-examination, Ms. Maio.

 8   BY MS. MAIO:

 9   Q        So, Mr. Gogue, my understanding is that what Tricare

10   saw was a pretty significant jump in the cost of compounded

11   medications between 2010 and 2014?

12   A        Up to 2015, yes.

13   Q        Up to -- right.  Then there was a very significant

14   jump between fiscal year 2014 and 2015 as well?

15   A        Yes.

16   Q        Okay.  But in each of those years, as you stated,

17   Tricare negotiated with the pharmacies what would be paid for

18   compounded medications?

19   A        That's not true.  We did not negotiate with any

20   pharmacies.

21   Q        Okay.  Express Scripts took that responsibility on

22   behalf of Tricare to make that negotiation?

23   A        I don't believe there were negotiations.  Again --

24   Q        Okay.

25   A        -- with compound drugs, at that time, the market was

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 67 of 119   PageID #: 3618

```
 1    driven by the average wholesale price of ingredients and what

 2    the pharmacies were submitting.

 3    Q        Okay.  So, let me make sure that I have an

 4    understanding then.  What you're saying is that there was a

 5    significant jump between, in a five-year period, between 2010

 6    and 2015 in terms of what Tricare was paying on an annual

 7    basis for compounded medications.  Would you agree with me?

 8    A        Yes.

 9    Q        Okay.  Tricare did not stop paying for compounded

10    medications in 2010?

11    A        Our office wanted to.

12    Q        But my question was did they?

13    A        No.

14    Q        Did they in 2011?

15    A        No.

16    Q        2012?

17    A        No.

18    Q        '13?

19    A        No.

20    Q        '14?

21    A        No.

22    Q        And in '15, in January of '15, there was a meeting

23    that took place, I believe it was -- I know that it took place

24    with DHA representatives and it was a committee meeting in

25    which the pharmacy group in particular discussed whether
```

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 68 of 119  PageID #: 3619

1    Tricare would continue to pay for compounded medications.  Are

2    you aware of that meeting?

3    A          I have knowledge of the meeting.

4    Q          Okay.

5    A          Because that was at a very senior level.  But my

6    understanding of what transpired, and I believe it was a group

7    of meetings, I believe that they were called town halls, but

8    the agency together with the ESI and pharmacy representatives

9    from around the nation met to discuss the fact that Tricare

10   was about to implement this attestation form or some sort of

11   control to bring about the control of the costs that were

12   transpiring with compound drugs submissions.  And even though

13   the agency did not blatantly say it, what they were implying

14   was, hey, we're going to make the industry, the pharmacy

15   industry accountable by requiring all players, including

16   prescribers, pharmacies, to attest to the fact that the claims

17   that they were submitting for compound drugs were medically

18   necessary.

19   Q          Okay.  Now, let me stop you there, because what my

20   understanding, part of that meeting, part of what was

21   discussed in January of 2015 was a recognition that prior to

22   that pharmacies were not being held accountable to the degree

23   to which they should have been perhaps?

24   A          That -- I don't know the specifics of what was

25   discussed --

UNITED STATES DISTRICT COURT

1    Q       Okay.

2    A       -- but my knowledge of what was being discussed

3  involved the fact that Tricare was about to implement a

4  control in the form of that attestation --

5    Q       Right.

6    A       -- to assure that whatever compound drug claims were

7  being submitted were medically necessary.

8    Q       Okay.  And let me follow up with one question there.

9  So, in terms of this accountability question, my understanding

10  is that there was some consideration in 2015, there was some

11  debate as to whether Tricare would even continue to pay for

12  compounded medications period.  Right?

13    A       I don't know.

14    Q       Okay.  But, in fact, Tricare did not -- they voted

15  to continue paying for compounded medications.  Right?

16    A       And they still do.

17    Q       With more controls in place?

18    A       Yes.  And Tricare still does.

19          THE COURT:  Ms. Maio, let me just ask.  And, of

20  course, it's none of my business, I'm assuming that, I mean,

21  this has already been described as a very high level meeting.

22  Apparently, it must have been very widely publicized, you seem

23  to have a lot of information about it.  I mean, can you give

24  me a little background about the meeting, who attended?  I

25  mean, it sounds like that, you know, a national summit or

1    something like that.

2            MS. MAIO:  So, my understanding, Your Honor,

3    Mr. Gogue can correct me if I'm wrong, but I believe that

4    there were two components here.  One was top level management

5    from DHA who met to discuss how to implement --

6            THE COURT:  Defense Health Agency?

7            MS. MAIO:  Yes, sir.  Defense Health Agency.

8            THE COURT:  Those would have been the very top level

9    people?

10            THE WITNESS:  Yes.  Three star general, the

11    Undersecretary of Defense for Health Affairs who oversees the

12    Tricare program.  And --

13            THE COURT:  That's about as high level as you get?

14            THE WITNESS:  It is.

15            THE COURT:  Okay.  And then who else attended, Ms.

16    Maio?  Pharmaceutical --

17            MS. MAIO:  Well, I think --

18            THE COURT:  -- or pharmacy companies?

19            MS. MAIO:  Pharmacy and therapeutic committee, so I

20    am not sure if that's a committee within DHS or if that's a

21    subcommittee or that's a degree that I'm --

22            THE WITNESS:  I believe it may have been industry

23    representatives.

24            THE COURT:  Okay.  In other words, the liaison to

25    the Department of Defense essentially who's representing the

 1    private pharmacy industry.  Right?

 2            THE WITNESS:  I can't say right or wrong, because I

 3    really don't know who --

 4            THE COURT:  Okay.  Can we assume that those are the

 5    representatives of the industry?

 6            THE WITNESS:  Industry, yes, Your Honor.

 7            THE COURT:  Okay.  All right.  They were there.

 8    And, I mean, am I correct that this must have been at least

 9    subsequently widely publicized?  I don't know.  You seem to

10    know a lot about it, Ms. Maio, I mean.

11            MS. MAIO:  Well, Your Honor, I believe that, and

12    I'll ask Mr. Gogue, I believe that there were also some

13    involvement by Congress to the extent that there were

14    beneficiaries, Tricare beneficiaries who made it known that --

15    who became aware of the fact that the Tricare costs for

16    compounded medication were ballooning, and they made it, they

17    became very vocal with their representatives and senators in

18    voicing concern over the potential for Tricare to stop paying

19    for compounded medications entirely.  And I believe that that

20    was one of the factors that played into Tricare's decision to

21    continue paying for compounded medications.  Is that right?

22            THE WITNESS:  Another factor was that --

23            THE COURT:  But, I mean, are you answering yes from

24    your understanding?

25            THE WITNESS:  Yes.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 72 of 119   PageID #: 3623

1          THE COURT:  So, I'm imagining without being said

2     these are representatives of perhaps the Congressional Armed

3     Forces Committee or maybe the Veterans Affairs Committee,

4     something like that who were --

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  Okay.  Go ahead.

7          MS. MAIO:  And there were particular beneficiaries

8     who educated their representatives on why compounding

9     medications were medically necessary for themselves and their

10    family members, and if they had particular health concerns

11    that really could not be addressed outside of a particular

12    compounded medication.

13         THE WITNESS:  Actually, I would say at least with my

14    experiences to the contrary of what you're suggesting.  Many

15    of the complaints that at least that what our office saw and

16    the only reason I know this is because in the conduct of some

17    of the compounding pharmacy cases that I do and have had, when

18    the, when law enforcement, when DCIS reaches out to us, not

19    only do they ask for record of the claims, but they ask for

20    record of complaints submitted against a particular provider.

21    And many of the complaints that I saw were alluding to the

22    fact that they never ordered a compound drug prescription.

23    They received a compound drug prescription that did not work.

24    They received or were -- received an explanation of benefits,

25    we call it an EOB, which had these exorbitant costs for

1    compound drug prescriptions that were medically unnecessary,

2    they never ordered it, or they put one and one together and

3    figured out, oh, that person sitting outside of Fort Hood in

4    Texas, that was giving me $100 coupon to get a meal wanted my

5    beneficiary information, my sponsor SSN, and all of the

6    pertinent facts that would go on a claim so they could submit

7    a claim in my name, which I never wanted.  And that's the

8    extent of the complaints that we were seeing.

9    Q        So, let me clarify.  What you're speaking to now is

10   on a general level.  You mentioned Fort Hood in particular.

11   And that has nothing at all --

12   A        Sure.

13   Q        -- to do with the documents that you reviewed in

14   this particular case?

15   A        Yes.

16   Q        Right?

17   A        Yes.

18   Q        Okay.  And, also, just to be clear, you received

19   complaints from beneficiaries that these creams were not

20   medically necessary, but Tricare reimbursed the pharmacies for

21   those medications, did they not?

22   A        That was before the complaints were submitted.

23   Q        Okay.  But my question was Tricare paid for those

24   creams, did they not?

25   A        That's correct.

1    Q         Or those medications?

2    A         That's correct.

3    Q         So, I'd like to contrast the practice of Tricare

4    with other federal health care, federal health care programs,

5    for example, my understanding is that Medicare has a much more

6    restrictive payment practice for compounded drugs than did

7    Tricare?

8    A         That's correct to my knowledge.

9    Q         And the same is true for VA, is it not?  That they

10   have much tighter controls on whether --

11   A         I'm not certain about the VA program.

12   Q         Okay.  That's fine.

13             Now, another topic that we discussed briefly earlier

14   on your direct was that, was the question of whether it is

15   permissible for someone to do direct-to-patient marketing of

16   compounded medications.  And my understanding is that under

17   the federal regulation it's made clear that direct-to-patient

18   marketing is permissible for compounded medications?

19   A         That's a possibility.  I don't know the specifics.

20   Q         You don't.  Okay.  And we also touched on studies

21   that are being conducted and I wanted to clarify that point.

22   Because the policy, Tricare's policy is not that -- I mean,

23   there are situations in which Tricare would approve a study of

24   a medication?

25   A         In all instances if Tricare is going to engage in

1    the conduct of a study, the agency has to approve that study

2    first.

3    Q        Right.

4             THE COURT:  There is an approval process for that?

5             THE WITNESS:  Yes.

6             THE COURT:  At the end of the day, if Tricare is

7    going to approve a study, there is a writing, a letter or

8    something that said okay this study is approved, and it

9    presumably sets certain parameters or something?

10            THE WITNESS:  Yes, Your Honor.  And typically those

11   parameters are previous clinical studies that have been

12   conducted --

13            THE COURT:  Okay.

14            THE WITNESS:  -- that indicate that there is some

15   efficacy to whatever potential medication or procedure is

16   being proposed, that the program assume under its covered

17   benefits.

18   BY MS. MAIO:

19   Q        Okay.  So there are, there is a mechanism and there

20   are parameters by which studies can be conducted for Tricare

21   medications?

22   A        And one of those mechanisms is that the agency must

23   approve the study.

24   Q        Okay.  Yes, sir.  The pharmacy is responsible for

25   paying the copays?

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 76 of 119   PageID #:
3627

1    A         No.  The pharmacy is responsible for collecting the

2    copays.

3    Q         For collecting the copays?

4    A         Yes.

5    Q         Okay.  That's their sole responsibility, the

6    pharmacies?

7    A         And to submit the claim and assure that as well the

8    claim is correct and true.

9    Q         Now, in terms of the cost of the medication, I know

10   we talked a little bit about what can drive the cost higher,

11   but I also want to be clear about to whom the cost of the

12   medication is disclosed.  Because my understanding is that the

13   contracts between the pharmacies and the PBM expressly

14   prohibit the pharmacies or any agent of the pharmacy from

15   disclosing the cost of the medication to anyone?

16   A         That's not my understanding.  There is a mechanism

17   in place for both federal health insurers as well as private

18   insurers that provide what is called, I think I referenced it

19   earlier, an explanation of benefits.  So, there is full

20   disclosure by the providers as to what they're providing and

21   what they're charging that should be available to the

22   beneficiary.

23   Q         Okay.  But in terms of the -- and I think that you

24   said you are, you are not familiar with the manual, the PBM

25   manual.  Did you testify to that on direct?

1    A         That is correct.  And not in its entirety.  I've

2    passed it along.  I've glanced at it, but as far as the

3    specifics, I don't have strong knowledge on it.

4    Q         Okay.  So, you don't know what the manual says in

5    particular regarding pricing and how it gets disclosed to a

6    customer?

7    A         No.

8    Q         Now, in 2015, you've mentioned that the control that

9    was put in place with respect to compounded medications was

10   that the pharmacy, the pharmacist and the health care provider

11   are now required to provide what's called an attestation

12   verifying that the compounded medication is medically

13   necessary?

14   A         Correct.

15   Q         Prior to 2015, there was no requirement that the

16   medical provider provide any additional verification of

17   medical necessity aside from just signing the prescription?

18   A         No.  But if the agency called for proof, and we've

19   done it on multiple occasions, if there is indication that

20   there was a lack of medical necessity, we will prompt our

21   contractors to acquire the medical records to verify.

22   Q         Sure.  And I understand.  And if there is cases

23   where there is suspected wrongdoing.  But what I'm talking

24   about is general policies and practices.

25   A         That's correct.

```
1    Q         Prior to 2015, there was no obligation for a medical

2    provider or a pharmacy to give Express Scripts or Tricare

3    proof of medical necessity aside from a signed prescription --

4    A         That's correct?

5    Q         -- for a compounded medication?

6    A         I believe that the requirement, also, is if called

7    upon to show proof that there was medical necessity, our

8    contractors will reach out to the provider and my

9    understanding is they're contractually required with the

10   Tricare contractor to provide those records.

11   Q         Yes, sir.  And that leads to my next question, which

12   is the auditing process.  My understanding is that there are a

13   very, very small number of Tricare auditors who are in place

14   for the entire country.  Is that not correct?

15   A         With the agency, correct.  But with our contractors

16   themselves, they have auditors as well.  With respect to the

17   relationship with how many auditors that may exist versus the

18   number of claims and beneficiaries, there is still a strong

19   need for more auditors.

20   Q         Yes, sir.  And just by way of context, I wanted to

21   try to illustrate, if you know, if you can verify this data.

22   My understanding is that in 2013, compounded medications

23   comprised about three percent of the Tricare budget for

24   prescription medications?

25   A         I don't know the specifics.  I can't speak to what
```

UNITED STATES DISTRICT COURT

1   we ultimately paid for compound drug prescription over that

2   period.

3   Q          If that data came from the GAO 2014 report, would

4   you have any reason to question its accuracy?

5   A          Again, I couldn't do either way whether question it

6   or refute it.

7   Q          But if you would, I suppose, perhaps you could agree

8   with me that the bulk of Tricare's prescription costs on an

9   annual basis is driven, is not driven by compound medications

10  even at the very peak in 2014 and '15, it was just a fraction,

11  I understand it was growing, but it was just a fraction?

12  A          On the contrary, it was a bulk of the prescription

13  costs during those periods when the heyday of compound drugs

14  and the billing submissions were transpiring, we were seeing

15  pharmacies that had never submitted a compound drug claim to

16  us, all of a sudden come out of the woodwork and submit claims

17  to us.

18  Q          Well, not, I guess maybe we're missing each other.

19  My understanding is not -- I understand that we've talked, I

20  think, at its peak that the compounded medication claims

21  reached their peak in fiscal year 2015.  Would you agree with

22  me on that?

23  A          '14/'15, yes.

24  Q          '14/'15.  Okay.  And as you testified on direct,

25  they have declined since then in the four intervening years?

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 80 of 119   PageID #: 3631

1    A          Significantly.

2    Q          Okay.  So, at the peak, my understanding is that the

3    costs for compounded medications to Tricare did not exceed

4    20 percent of its total payment for prescription medications?

5    A          I don't know the percentages, but --

6    Q          What you testified earlier was that it was a

7    majority --

8              MR. PIPER:  Judge, I'm going to object to her

9    cutting him off.  He said I don't know the percentage, but.

10             THE COURT:  Let me just say this.  You do need to

11   let him answer, Ms. Maio, but, look, when you're talking about

12   a program handling the volume of dollars that Tricare

13   apparently has, 20 percent or even three percent is a huge,

14   huge, huge number.  I would suspect in the billions of

15   dollars.  I don't know.  I mean, you know, but, I mean, I

16   mean, so you can ask him the question.  But, I mean, I guess

17   what I'm sitting here absorbing is 20 percent, my God, I mean,

18   you know, that's -- but at any rate, go ahead.

19   BY MS. MAIO:

20   Q          Well, the point that I just wanted to make is that

21   you saw, as we've talked about, you saw a significant

22   percentage, I know you don't know the specific numbers.  Okay.

23   But given the fact that the Tricare representatives at the

24   highest level, we've talked about the generals and the top

25   tier leadership of Tricare certainly was made aware of this

1  increase that was occurring over this five-year period?

2  A        Indeed, but as has been the mantra of our senior

3  leadership for decades, the focus is on access to care and the

4  ability for the Tricare beneficiary to receive any and all

5  benefits that they may require.

6  Q        And at the time, when Tricare reimbursed for these

7  compounded medications, there was no, there was no attempt to

8  put any sort of controls in place?

9  A        There were attempts, but, again, focus by the senior

10  leadership was not there.  I think that what prompted our

11  Undersecretary to finally take a step in the direction of

12  trying to control is when the program ran out of money.  And

13  we, DOD, Department of --

14          THE COURT:  When you say the program ran out, what

15  program?

16          THE WITNESS:  The Tricare program, Your Honor.  We

17  ran out of budget money.  And the reasoning was, in 2014, our

18  Undersecretary went to Congress and asked for more money.

19  Because what Congress allocated under the National Defense

20  Authorization Act was depleted.

21  BY MS. MAIO:

22  Q        Okay.  Can I ask you a follow-up question there,

23  Mr. Gogue?

24  A        Certainly.

25  Q        Because my understanding is that there was some

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 82 of 119  PageID #: 3633

1 concern that given the claims that were being submitted,

2 Tricare may have been put in a position in 2014 where at some

3 point during that fiscal year they were concerned that they

4 may not be able to cover the cost, cover pharmacy claims?

5 A        That's factual.

6 Q        And that is what led Tricare to seek an increase

7 allocation from Congress?

8 A        Yes.

9 Q        Which did, in fact, happen?

10 A        Yes.

11 Q        Which did, in fact, mean that Tricare was able to

12 cover the pharmacy claims, and all of the other medical claims

13 submitted on behalf of its beneficiaries, did it not?

14 A        Yes.

15        MS. MAIO:  I don't have any further questions.

16        THE COURT:  Who else?  Who goes next?

17        Mr. O'Shaughnessy.

18                    CROSS-EXAMINATION

19 BY MR. O'SHAUGHNESSY:

20 Q        Good morning, Mr. Gogue.

21 A        Good morning.

22 Q        My name is Brian O'Shaughnessy.  I represent the

23 defendant, Kasey Nicholson.  You've referred to 32 C.F.R. 199,

24 Chapter 9 several times today?

25 A        Yes.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 83 of 119   PageID #: 3634

1    Q         And that provides Tricare with a number of

2    administrative remedies for fraud, abuse, and conflicts of

3    interest.  Correct?

4    A         That is correct.

5    Q         That is actually in the name of that regulation?

6    A         Very good.

7    Q         You're not aware of any such administrative remedies

8    that have been pursued in direct response to these defendants,

9    are you?

10   A         Those actions are still transpiring as the reason

11   why we're here today.

12   Q         But you're not aware of an administrative remedy

13   that has been pursued in 32-199 against these defendants?

14   A         Not yet.

15   Q         And if that's not been pursued then, of course,

16   there has been no determination of fraud pursuant to 32-199,

17   32 C.F.R. 199 with respect to these defendants.  Correct?

18   A         We have taken administrative remedies against at

19   least one of the pharmacies involved in which some of the

20   marketing had transpired.

21   Q         One of the pharmacies, but not any of the defendants

22   in court today?

23   A         We're letting those actions play out as we speak.

24             THE COURT:  Well, I mean, look, I can cut through

25   this.  I mean --

UNITED STATES DISTRICT COURT

1          MR. O'SHAUGHNESSY:  Thank you, Judge.

2          THE COURT:  You want me -- you want to hear how I

3    think I can cut through it?

4          MR. O'SHAUGHNESSY:  Sure.

5          THE COURT:  I mean, look, and this has been over

6    these entire proceedings.  I mean, it has been discussed,

7    well, certainly, in one of my orders.  The government can

8    proceed how they choose in an individual case.  They can

9    proceed administratively.  They can proceed civilly.  And they

10   can proceed criminally.  In this, in this matter, the United

11   States government has chosen to proceed against these

12   defendants criminally.

13         Okay.  And my understanding of how that works, tell

14   you the truth, is that once that decision is made, presumably

15   at the Department of Justice, that any civil or administrative

16   remedies that the government may seek are put on hold pending

17   the outcome of the criminal proceeding.  I'm just stating my

18   understanding of how these things work.  And that's been my

19   experience.  If there is, if anybody through a witness wants

20   to educate me that that's not what's going on, but I'm

21   assuming that.

22         THE WITNESS:  May I caveat your statement, Your

23   Honor?

24         THE COURT:  Well, I don't know.  Let's see if Mr.

25   O'Shaughnessy wants you to.  I mean, that's --

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 85 of 119   PageID #: 3636

Gogue - Cross-Examination

```
1              MR. PIPER:  Judge, I'm not sure he should.  It might
2    get into --
3              THE COURT:  Well, look, I'm telling you, and, I
4    mean, the parties chose me as the tryer of fact.  That's -- as
5    everybody knows --
6              MR. PIPER:  I don't have any objection to Mr. Gogue
7    getting into it, Your Honor, it just may be --
8              THE COURT:  Okay.  What do you think, should he,
9    Mr. Gogue may want to correct me about his understanding.
10   What I'm saying is my general understanding having been a
11   former member of the Department of Justice that's how these
12   things happen.  Do you want him to correct me or not, Mr.
13   O'Shaughnessy?
14             MR. O'SHAUGHNESSY:  I don't know if anybody needs to
15   be correcting the Court, Judge.
16             THE COURT:  Well, no, that's not true.  Maybe not
17   the Court, but how about the tryer of fact.  Right?  I mean,
18   that's -- so.  What do you have to say, Mr. Gogue?
19             THE WITNESS:  I just wanted to add on you're totally
20   correct, Your Honor --
21             THE COURT:  I get that a lot, by the way.
22             THE WITNESS:  Yes.  The caveat I wanted to add is
23   that like you mentioned, the agencies themselves can act on
24   their best interest.
25             THE COURT:  But after the criminal, most
```

UNITED STATES DISTRICT COURT

1    likely after --

2            THE WITNESS:  Administratively we do react despite

3    the fact that there may be criminal or civil proceedings by

4    taking action such as suspension of the provider.

5            THE COURT:  Debarment maybe?

6            THE WITNESS:  Yes, Your Honor.

7            THE COURT:  Yeah.  Okay.  I get that.

8            THE WITNESS:  To stop the bleeding, yes.

9            THE COURT:  I get that, yeah.  But there are limits

10   to that, too --

11           THE WITNESS:  Yes, Your Honor.

12           THE COURT:  -- as we know, because Lockheed Martin

13   can defraud the government as much they want to, but we still

14   need their airplanes and weapons systems, so.

15           Anything else, Mr. O'Shaughnessy?

16           MR. O'SHAUGHNESSY:  I think so, Judge.  I apologize

17   32-199 is 38 pages long.

18           THE COURT:  Say that again.

19           MR. O'SHAUGHNESSY:  32-199 is 38 pages long and I'm

20   learning it on the fly.

21           THE COURT:  Say that again.

22           MR. PIPER:  Thirty-two --

23           MR. O'SHAUGHNESSY:  32-199 --

24           THE COURT:  The regulation?

25           MR. O'SHAUGHNESSY:  Yes, Judge.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 87 of 119   PageID #: 3638

```
 1              THE WITNESS:  That covers Tricare.

 2              MR. O'SHAUGHNESSY:  It was brought up this morning,

 3   and so I'm --

 4              THE COURT:  Okay.  So, it's 32 pages long.  Do you

 5   want to make it an exhibit or something?

 6              MR. O'SHAUGHNESSY:  No, Judge.

 7              THE COURT:  Oh, you're reading it?

 8              MR. O'SHAUGHNESSY:  Yes.

 9              THE COURT:  Well, let me ask you this.

10              MR. O'SHAUGHNESSY:  There was a portion of it that

11   addressed what you've brought up.

12              THE COURT:  In the interest of time, what if I let

13   you come back and let Mr. Walden go ahead and ask.

14              MR. O'SHAUGHNESSY:  That would be fine.  I believe

15   that there is something that addresses the question that you

16   asked.

17              THE COURT:  I tell you what, we will suspend your

18   cross-examination, let Mr. Walden go.  If you have any other

19   questions, I'll let you come back up.

20              MR. O'SHAUGHNESSY:  Thank you, Judge.

21              THE COURT:  All right.  Mr. Walden.

22              MR. WALDEN:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MR. WALDEN:

25   Q       Mr. Gogue, my name is Zack Walden.  I represent
```

1    Michael Chatfield.

2    A         Morning.

3    Q         Good morning.  It is still morning.  And I don't

4    want to replow a lot of ground here, but I do want to make a

5    few quick points just so we can answer where we are.  We've

6    already established that Express Scripts is a pharmacy benefit

7    manager.  Correct?

8    A         Correct.

9    Q         They are a private company.  Correct?

10   A         Correct.

11   Q         Okay.  And they are -- we can call them the PBM.

12   Right?

13   A         Correct.

14   Q         Which stands for Pharmacy Benefit Manager, of

15   course.  The PBM works for, is contracted with Tricare to

16   manage the pharmacy benefits program.  Correct?

17   A         Correct.

18   Q         Express Scripts also serves as PBM for private

19   insurance companies, too.  Correct?

20   A         Correct.

21   Q         Express Scripts processes claims from pharmacies on

22   behalf of Tricare.  Right?

23   A         Correct.

24   Q         And they pay the claims.  Right?

25   A         Correct.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 89 of 119   PageID #:
3640

```
 1   Q          Or they deny the claims.  Right?

 2   A          Correct.

 3   Q          They actually do that live, don't they?

 4   A          Yes.

 5   Q          Through a computer?

 6   A          Realtime, yes.

 7   Q          So, if a pharmacist inputs a claim, as they're

 8   filling the prescription, they're going to get a live response

 9   from Express Scripts.  Right?

10   A          Yes.

11   Q          It says approved or not approved?

12   A          Correct.

13   Q          So, while Tricare, as you've previously said, is

14   backwards looking, Express Scripts does it live.  Correct?

15   A          Correct.

16   Q          Through a computer, of course.  Right?

17   A          (Witness moves head up and down.)

18   Q          And Express Scripts or ESI as a private company,

19   they make a profit.  Correct?

20   A          They also make a profit with Tricare.

21   Q          Yes.  They are paid by Tricare to do this.  Right?

22   A          Correct.

23   Q          They're not just doing it because they love our

24   country.  Right?

25   A          That is correct.
```

UNITED STATES DISTRICT COURT

1    Q        They are --

2             THE COURT:  They're a government contractor?

3             MR. WALDEN:  Right.

4    BY MR. WALDEN:

5    Q        They're making money on every transaction.  Correct?

6    A        Yes.

7    Q        So every transaction that's approved, Tricare pays

8    them money.  Correct?

9    A        That is true.

10   Q        You've also talked a lot about the integrity of the

11   system.  Do you remember talking about that?

12   A        Yes.

13   Q        And how you had to rely on others' integrity.

14   Right?

15   A        Correct.

16   Q        Or, excuse me, Tricare has to.  Correct?  Tricare

17   has to rely on the integrity of ESI as well.  Correct?

18   A        That is true.

19   Q        And you're aware that they paid tens of millions of

20   dollars in False Claims Act settlements.  Right?

21   A        Yes, I am.

22   Q        Thank you.  So, you talked about the network

23   provider manual earlier and that you're aware it exists, you

24   don't know a lot about it, but you're aware it exists.

25   Correct?

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 91 of 119  PageID #: 3642

1    A         Yes.

2    Q         I'm going to show this to you.  Does this look like

3    a cover page of a provider manual?

4    A         It does, but it changes routinely.

5    Q         Okay.  And I want to point this out to you.  This

6    was revised in July of 2014.  Do you see that in the bottom

7    right-hand corner?

8    A         Yes.

9              MR. WALDEN:  I apologize.  This is marked as

10   Chatfield Exhibit 13.

11             THE COURT:  Chatfield 13.

12             MR. PIPER:  Judge, I think that Mr. Gogue was the

13   gentleman that was responsible for turning this over.  It's

14   not his, but as the Court may recall, Mr. Eldridge and Mr.

15   Walden had that Rule 17 subpoena issued and we asked that

16   Mr. Gogue provide this.  I think this is the one that he

17   provided to us.  Is that not correct, Dave?

18             MR. ELDRIDGE:  I think that's correct.  I know we

19   got it from you.

20             THE COURT:  Okay.  So, can we call it, can we call

21   it Chatfield 13?

22             MR. PIPER:  Yes, sir.  Yeah.

23             THE COURT:  Without objection, admitted.

24             MR. WALDEN:  I'll move for admission before I

25   forget.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 92 of 119   PageID #:
3643

1      THE COURT:  Yeah.  I'll just go ahead and admit it.

2  There is not going to be any objection.

3      MR. WALDEN:  Thank you, Your Honor.

4      (Defendant Chatfield's Exhibit 13 was received into

5      evidence.)

6  BY MR. WALDEN:

7  Q      Mr. Gogue, you said you had glanced through this

8  before.  Is that right?

9  A      That is true.

10  Q      Of course not read it cover to cover.  So, I would

11  like to direct your attention to, this is on Page 111.  And

12  this is the Tricare section of the PBM.  Would you agree where

13  it says 10.1, Department of Defense, Tricare?

14  A      Yes.

15  Q      And can you read for me the first sentence under

16  introduction?

17  A      "The DOD has one of the most unique benefit designs

18  and membership."

19  Q      So Tricare is unique among other insurance

20  providers.  Correct?

21  A      Yes.

22  Q      And it's even unique as compared to Medicare and

23  Medicaid.  Correct?

24  A      That is correct.

25      MR. WALDEN:  Okay.  Bear with me just one moment.

UNITED STATES DISTRICT COURT

```
1              (Brief pause.)

2    BY MR. WALDEN:

3    Q         And I'm staying on the same page.  And I'd like you

4    to look at Section 10.2, which I have called out for you.  If

5    you could read that sentence under cost sharing for me.

6    A         "The cost of medication, established by Tricare

7    varies according to the type of drug (brand name, or generic),

8    the formulary status of the drug and where the prescription is

9    filled."

10   Q         So, Tricare establishes the cost of medication.

11   Correct?

12   A         Correct.

13   Q         All right.  And we're going to look at a couple of

14   other places in the manual and it's a pretty lengthy document,

15   isn't it, several hundred pages.  Is that your memory?

16   A         I believe so.

17   Q         So, it takes me just a second to get where I need to

18   go.  And I'm going to Page 7.  Could you read the first

19   sentence that I've called out in this paragraph?

20   A         "The information contained in this Provider Manual

21   is confidential and proprietary to PBM and provided for

22   business purposes only."

23   Q         And why don't you keep going and finish off that

24   paragraph for us.

25   A         "Network provider may not copy, reproduce,
```

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 94 of 119   PageID #: 3645

1    distribute or otherwise, use or disclose the information

2    contained in this Provider Manual except as authorized by the

3    Provider Agreement."

4    Q        So, your understanding is this is a confidential

5    document.  Correct?

6    A        Yes.

7    Q        And the pharmacy cannot disclose information from

8    this manual to anyone.  Correct?

9    A        That I don't know.

10   Q        Is that what this says?

11   A        Well, you do understand as well that the pharmacy is

12   liaisoning with that network provider, so if they have to

13   communicate what is being portrayed in this manual, there is a

14   need for them to know.

15   Q        But they -- and if you'd like to read it again to

16   yourself, I'll let you do that, but this is from Express

17   Scripts.  Right?

18   A        Correct.

19   Q        This manual.  And this is a network provider manual.

20   A pharmacy would be a network provider.  Correct?

21   A        All pharmacies in the pharmacy benefit program are

22   network providers.

23   Q        That's right.  Thank you.  So, if you can just read

24   that to yourself one more time.  And then I'm going to ask you

25   again.  Under this manual, pharmacies cannot disclose this

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 95 of 119  PageID #: 3646

1    manual and the information contained in it to other people

2    according to this.  Is that right?

3    A        I believe that's what that says.

4    Q        Thank you.  Then I'm going to have to jump to

5    Appendix B, which is on Page 231.  All right.  This is at the

6    bottom of the page and it's titled confidentiality.  Right?

7    A        Yes.

8    Q        And I am going to attempt to highlight it for you.

9    Why don't you take a moment to just read both of these

10   paragraphs.  Well, the first paragraph to yourself.  I don't

11   think we need to take time to read it outloud.  And let me

12   know when you're finished and I'll ask you a question or two

13   about it.

14           MR. PIPER:  Your Honor, I'm going to object at this

15   point.  I'm not sure that Mr. Gogue is the correct person to

16   interpret -- we've had no objection to introducing the manual.

17   We got the manual for him.  Mr. Gogue is not the correct

18   person to interpret the manual for Mr. Walden or Mr.

19   Chatfield.

20           MR. WALDEN:  Your Honor, I'm not asking him to

21   interpret anything and I'm moving through this fairly quickly,

22   what I'm essentially asking him to do is read it.

23           MR. PIPER:  Well, then if he's not asking him to

24   interpret it, Judge, then there is no relevance to it.  My

25   point is that he's trying to read something that Mr. Gogue has

```
 1    said he doesn't -- this is not his manual.  He did get it for

 2    us.  I'll --

 3              THE COURT:  Well, okay.  Let me see if I can cut

 4    through this.  I mean, rather than having -- I'm not even

 5    sure -- if it's in evidence, I presume it can be pointed out

 6    to me at some point, I mean.

 7              MR. WALDEN:  You're right.  But some of the

 8    questions that I'm going to be asking, Your Honor, relate

 9    directly to what he says.  And some things in this manual are

10    contrary to his testimony, so if the Court would give me a

11    little leeway, I'd like to keep going.

12              THE COURT:  Okay.  Well, if you can tie that up,

13    I'll let you go through that.  I mean, I do find it

14    interesting that the manual prohibits disclosure of the

15    agreement between the pharmacy and Tricare to other people.

16              MR. WALDEN:  I think I can do this a little quicker,

17    Your Honor.

18    BY MR. WALDEN:

19    Q         So, if we can look at the sentence that I have

20    poorly highlighted.  "All information pertaining to a party's

21    business, including pricing," based upon what's highlighted.

22    Right, Mr. Gogue?

23    A         Uh-huh.

24    Q         This would be an example of something that is

25    confidential, pricing?
```

1    A        Again, not being an expert on this manual, I would

2    assume that what the manual is alluding to is the negotiated

3    rates between ESI and the pharmacies on what pricing

4    mechanisms or agreements they have come to agree upon, even

5    Tricare doesn't have a lot of purview on those pricing

6    agreements.

7            And these are agreements on what ESI and the

8    pharmacy agree to receive or be paid, more often than not, ESI

9    is negotiating on the side to get discounts so they can make a

10   higher profit margin on some of these drugs, but we have no

11   knowledge.  We, meaning Tricare, has no knowledge on what

12   those negotiations might be.

13   Q        But to be clear, as we showed in this manual

14   earlier, and as you testified earlier, Tricare sets the price

15   of medication?

16   A        For the formulary.  For formulary drugs, but not for

17   individual ingredients in a compound drug.  That's dictated by

18   the market.

19   Q        All right.  So, I'm going to move on to Page 112.

20   This is back in the Tricare section of the manual as you can

21   see.  And do you see where it says compound claims processing?

22   A        Yes.

23   Q        And it says refer to Section 2.9.  Correct?

24   A        Yes.

25   Q        And so, we're going to go to 2.9.  Can you take a

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 98 of 119   PageID #: 3649

```
1    look at that first paragraph -- actually, I'm going to keep

2    going.  Just a moment, Your Honor.  Actually, go ahead.  Can

3    you take a look at the first, it says, "a compound

4    prescription is a medication consisting of two or more solid,

5    semisolid, or liquid ingredients, one of which is a federal

6    legend drug, that are weighed, measured, prepared, or mixed

7    according to the prescription order."  So, you agree that a

8    compound must be prescribed by a health care provider.  Right?

9    A        I agree.

10   Q        And it has to be in a formula that's approved by a

11   health care provider.  Right?

12   A        That is correct.

13   Q        And the next step is the pharmacy would prepare it.

14   Right?

15   A        Correct.

16   Q        And they have to prepare it according to the

17   provider's formula.  Right?

18   A        Prescription, yes.

19   Q        Okay.  Then I'd like to direct your attention --

20   okay.  Do you see the second from the bottom paragraph where

21   it says "provider shall maintain valid non-resident licenses

22   in all states to which it mails/ships/delivers covered

23   medications"?

24   A        Yes.

25   Q        And that's there because it's common for compounding
```

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 99 of 119  PageID #: 3650

1    pharmacies to have out of state mail orders.  Is that correct?

2    A        That's my understanding.

3    Q        All right.  We're going to move on to Page 20

4    because I believe that the judge asked you about preprinted

5    pads.  And you talked a little bit about what preprinted

6    prescription pads mean to you.  But from this manual, I would,

7    I would like you read Section 2.10 outloud, please.

8    A        Excuse me.  "Network providers may not produce,

9    distribute, or accept pre-printed or pre-populated

10   prescriptions for covered medications that include a

11   controlled substance."

12   Q        Can you -- one more sentence.

13   A        Okay.  "This prohibition includes 'check the box'

14   order forms."

15   Q        So, what that means is that if a preprinted pad does

16   not include a controlled substance, they are permitted in the

17   use of compounded medications.  Correct?

18            MR. PIPER:  Judge, I'm going to object to that,

19   that's not what I asked him.  I asked him whether it was

20   material or whether it made a difference if there was a

21   preprinted pad.  And he said it did.  This is only saying that

22   it's not authorized for a controlled substance.  That's a

23   mischaracterization of what Gogue said earlier, Mr. Gogue said

24   earlier.

25            MR. WALDEN:  Well, Your Honor, if I misunderstood

UNITED STATES DISTRICT COURT

```
 1   what Mr. Gogue said, I apologize, but let's be clear what
 2   Section 2.10 says, because that's my point.
 3              THE COURT:  Well, I think I get it.  I mean, okay.
 4              MR. PIPER:  Judge --
 5              THE COURT:  You're suggesting you can use a check
 6   the box form if the formula does not include a controlled
 7   substance.  Right?
 8              MR. WALDEN:  Yes.
 9              THE COURT:  Well, okay.  Yes.  Maybe, maybe not.  I
10   mean, you know.  I agree.  I'm not even actually sure where
11   this is actually going.
12              MR. WALDEN:  I'm almost done, Your Honor.  This
13   purpose, Your Honor, was because you had asked a question
14   whether this preprinted form was something that was okay and
15   whether it really indicated that that was for a compound.
16              THE COURT:  What I'm reading from what's here, well,
17   it could be okay, as long as there is not a controlled
18   substance listed there.
19              MR. WALDEN:  Yes, sir.
20              THE COURT:  Because, look, we've discussed this
21   before.  I have seen a lot of preprinted prescription forms in
22   doctors' offices, I'm assuming that on some level they're
23   legal.  I mean, you know, I presume that pharmaceutical reps
24   hand them out when they go around and see doctors, you know.
25
```

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 101 of 119   PageID #: 3652

1  BY MR. WALDEN:

2  Q        Mr. Gogue, good news, we are done with the manual at

3  this point.  I do have just a couple of more questions.  You

4  testified on direct examination several reasons why a claim

5  may be inappropriate and denied by Tricare.  Correct?  If

6  there was no copay paid, there is no spot on the claim form

7  submitted by the pharmacy to indicate that.  Correct?

8  A        Correct.

9  Q        And the claim is all that's being communicated to

10 ESI and Tricare.  Correct?  All of the information you have is

11 the information contained in that claim when determining

12 whether to approve or deny a claim?

13 A        (Witness moves head up and down.)

14          MR. PIPER:  He needs to answer aloud, Judge.

15          THE COURT:  What?

16          MR. PIPER:  He needs to answer aloud, Judge.  He's

17 nodding.

18          THE WITNESS:  Yes.

19 BY MR. WALDEN:

20 Q        There is no place on that claim form to indicate

21 whether a patient is participating in a study or in an

22 evaluation.  Is that correct?

23 A        Correct.  Excuse me, yes.

24 Q        There is no place in that claim form to indicate how

25 a health care provider is paid whether it's by marketer or

1    hospital or anyone else.  Correct?

2    A        I don't understand.

3    Q        You stated on direct that Tricare would deny claims

4    if they were paid for by a marketer, if the health care

5    provider was paid by a marketer.  Correct?

6    A        Yes.

7    Q        There is no input into the claim process for a

8    pharmacy to input that information.  Right?

9    A        Why would they need to?  That's correct.

10   Q        Okay.

11            THE COURT:  But, I mean, I think what Mr. Gogue was

12   saying, but if they find out by other means, I mean, that

13   sends up a red flag.

14            MR. WALDEN:  Right.

15   BY MR. WALDEN:

16   Q        But as ESI is approving and denying, you only have

17   the information that ESI asks for.  Correct?

18   A        Yes.

19   Q        On the claim form?

20   A        (Witness moves head up and down.)

21   Q        There is no input on who referred a patient to a

22   doctor in a claim form.  Correct?

23   A        Correct.  Well, I take that back, there actually is

24   if the provider receives a referral from another provider.

25   Q        In that instance?

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 103 of 119  PageID #: 3654

1  A        Yes.

2  Q        But if a provider was referred by a friend, or for

3  any other circumstance, that would not be indicated on the

4  claim form.  Correct?

5  A        Correct.

6  Q        If a marketer was receiving a commission on a cream,

7  that would not be indicated on the claim form.  Correct?

8  A        That's correct.

9  Q        Nothing of a pharmacy's advertising costs would be

10  indicated on a claim form.  Correct?

11  A        That's correct.

12  Q        You also stated that Tricare would not have paid the

13  claim if they had known that marketers marketed directly to

14  patients.  That's what your testimony was on direct.  Right?

15  A        Yes.

16  Q        But there is no input in the claim form that would,

17  that would show that.  Correct?

18  A        That's correct.

19  Q        And let me ask you a little further about this.

20  You've seen advertisements for prescription medications,

21  haven't you?

22  A        Yes.

23  Q        You've seen them on TV perhaps.  Is that right?

24  A        Yes.

25  Q        And don't they typically say ask your doctor about,

1    we'll use the judge's example, Lipitor?

2    A        Yes.

3    Q        And that's because it's being marketed directly to

4    the patient.  Right?

5    A        Yes.  But with the implication that they go speak

6    with a professional to get that.

7    Q        Yes.  But the audience of that television commercial

8    is the patient.  Correct?

9    A        Correct.

10            MR. WALDEN:  Just a moment, Your Honor.

11            (Brief pause.)

12            MR. WALDEN:  Nothing further.

13            THE COURT:  All right.  Let's see.  Mr.

14   O'Shaughnessy, do you want to follow up?

15            MR. O'SHAUGHNESSY:  No, Judge.  The point that I

16   wanted were made.

17            THE COURT:  You're finished?

18            MR. O'SHAUGHNESSY:  Thank you, Judge.

19            THE COURT:  Mr. Hobbs.

20            MR. HOBBS:  I just have very, very few questions.

21                          CROSS-EXAMINATION

22   BY MR. HOBBS:

23   Q        Mr. Gogue, my name is Dee Hobbs.  I represent one of

24   the defendants here.  Did I understand you to say that -- you

25   were answering some questions from Mr. Walden that said

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 105 of 119   PageID #: 3656

 1    Tricare determined the cost of a formulary medication.  Now, I

 2    don't say things right, is that --

 3    A        That's correct.

 4    Q        That's correct.  And then you're going to tell me a

 5    formulary medication is what?

 6    A        An individual prescription drug.

 7    Q        Now, you also said that was different than the cost

 8    determination of compounded products.  Right?

 9    A        Correct.

10    Q        And I heard you say this, and if you didn't, please

11    correct me.  I think that I heard you say that is dictated by

12    the market?

13    A        Yes.  And, specifically, the average wholesale price

14    of ingredients in the compound drug.

15    Q        I understand.  And I don't want to get into the

16    weeds.  I really want to stay big picture.  If it's dictated

17    by the market, and the market says this cancer cream costs

18    $20,000, that's the market, isn't it?

19    A        Certainly, but, again, if --

20    Q        That's fine.

21             MR. PIPER:  Well, Judge --

22             THE COURT:  Well, okay, but it's time for you to

23    redirect.

24             MR. PIPER:  Yes.

25             THE COURT:  I mean, look, we know what Mr. Hobbs was

1    following up on.

2              MR. PIPER:  Sure.

3              THE COURT:  So, let's handle what you want on

4    redirect.

5              MR. PIPER:  Thank you, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MR. PIPER:

8    Q        Mr. Gogue, on the AWP, you mentioned this on direct

9    examination, were there some irregularities setting the AWP,

10   average wholesale price?

11   A        Yes, there were.

12   Q        Explain that to the Court, if you would, please,

13   sir.

14   A        Yes.  If you took a drug individually, for example,

15   Lidocaine, and I don't know the specifics of the particular

16   cost of that individual drug, but if Lidocaine is being sold

17   individually by a pharmacy for $10, and that's what Tricare is

18   paying, but on the same, by the same token in a compound drug,

19   because the government has no control on those average

20   wholesale prices, and a pharmacy submits a claim for the cost

21   of Lidocaine for $10,000 for that individual ingredient, there

22   is something wrong there, Your Honor.

23             THE COURT:  Yeah.  Yes.  I would agree.

24             THE WITNESS:  And so --

25             THE COURT:  Whose responsibility is it to --

UNITED STATES DISTRICT COURT

 1          THE WITNESS:  It was the responsibility of the

 2   government to at least implement some type of action to see to

 3   the fact that the comparable costs of that particular drug in

 4   and of itself on the market because of the formulary was $10,

 5   but Tricare was paying $10,000 for that same ingredient,

 6   because it was compounded.  And as a figure of speech, our

 7   hands were tied at least at that time trying to control that

 8   cost.  When we ran out of money, I think that was a -- we

 9   meaning Tricare, ran out of money to cover our beneficiaries,

10   I think that that's what ultimately prompted our senior

11   leadership to pay attention and say, wait a minute, we're

12   paying for an individual drug, Lidocaine in this example, for

13   $10 but we're paying for this ingredient in a compound drug

14   for $5,000.  There is something wrong with that picture, Your

15   Honor.

16          THE COURT:  And it -- and what I hear you saying,

17   Mr. Gogue, it took the agency running out of money to come to

18   that realization?

19          THE WITNESS:  As well as many other forces in the

20   industry, including Tricare, and its members to say, hey,

21   leadership, there is something wrong here.

22          THE COURT:  Well, and I guess what I would say is as

23   a taxpayer then thank God you ran out money, you know.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  I mean, you know, because I guess we'd

1    still be paying for it if you hadn't.

2    BY MR. PIPER:

3    Q        So, I want you to explain this to Judge Mattice.

4    The Lipitor example that everybody has used, including the

5    Court.  If I have Lipitor for cholesterol, if I have high

6    cholesterol, Mr. Gogue, and I've got Tricare and my doctor

7    prescribes Lipitor.  Is there a set price for Lipitor?

8    A        Yes.

9    Q        Okay.  And Tricare sets that price?

10   A        Well, the federal agency sets that price.

11   Q        So, it's a set price?

12   A        Yes.

13   Q        On a compounded drug, because it's got two

14   ingredients, who sets that price?

15   A        The market.

16   Q        Okay.  And the market is the AWP?

17   A        It's predicated by the average wholesale price.

18   Q        And that's based upon what the pharmacy says they're

19   charging for that?

20   A        That's what they're saying their costs are.

21   Q        Right.  And that's where you're talking about this

22   driving up the AWP, the average wholesale price?

23   A        Yes.

24   Q        And that's the same $10 of Lidocaine to $5,000 that

25   you just talked to Judge Mattice about?

1    A        Yes.

2    Q        So, Ms. Maio was asking you, and when I objected,

3    you were going to talk to Judge Mattice.  Do you remember how

4    much money Congress funded Tricare back in fiscal '14 or '15

5    to keep the doors open?

6    A        I know we were allocated billions of dollars, but I

7    believe that our Undersecretary asked for a few more billion

8    because we ran out at the middle of the fiscal year.

9    Q        That's billion with a B?

10   A        With a B.

11   Q        Okay.  Claim form.  If there was a part -- Mr.

12   Walden asked you about the claim forms.  If there was a part

13   that says the doctor works for the marketer that went to

14   Express Scripts, the claim form that went Express Scripts,

15   would that cause a red flag?

16   A        It would.

17            MR. WALDEN:  I'm going to object to speculation.

18            MR. PIPER:  He asked the question, Judge, about

19   whether that was on the form.

20            THE COURT:  What was the question again?

21            MR. PIPER:  Whether --

22            THE COURT:  What's the question?

23            MR. PIPER:  Whether on the claim form if there is a

24   portion that says the doctor works for the marketer, would

25   that cause a red flag.

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 110 of 119   PageID #: 3661

1           MR. WALDEN:  And my objection is he's testified that

2    there is not anything so we're just creating wishes on the

3    form.

4           MR. PIPER:  Judge, that's okay.

5           THE COURT:  I really do think that, counsel, I get

6    the point.  I mean, but, you know, I mean, look, look, the

7    defendants are trying to put the program on trial.  I think --

8           MR. PIPER:  Sure.

9           THE COURT:  -- they can do that.

10           MR. PIPER:  Yes, sir.  My point is I think it's a

11    fair question if they are putting the program on trial --

12           THE COURT:  Okay.  I'll let him answer.  Ask it

13    again.

14    BY MR. PIPER:

15    Q        Would that cause a red flag if there was something

16    on the claim form that says the doctor works for the marketer?

17    A        Yes.

18    Q        Okay.  And would it cause a red flag to say that the

19    marketer is getting money from the pharmacy for distributing

20    these creams?

21    A        Yes.

22    Q        Did Tricare at some point receive information as to

23    the efficacy of compounded creams?

24    A        Yes.  There were multiple entities to include

25    Tricare and their experts as well as ESI and their experts and

1　the overwhelming consensus was that these compound drugs that

2　our Tricare beneficiaries were receiving had no impact as far

3　as curing a scar.

4　　　　　THE COURT:  No clinical evidence?

5　　　　　THE WITNESS:  Yes.  Yes.

6　　　　　THE COURT:  Yeah.  And you're talking about the

7　compounds at issue in this case.  Right?

8　　　　　THE WITNESS:  Yes, Your Honor.

9　　　　　THE COURT:  I'm assuming that there are compound

10　formulations that do have efficacy?

11　　　　　THE WITNESS:  Yes, Your Honor.

12　BY MR. PIPER:

13　Q　　　Again, there are still legitimate usages for

14　compounds, Ms. Maio asked you, that's still happening.  Is

15　that correct?

16　A　　　Yes, sir.

17　Q　　　If somebody can't swallow or has some desperate need

18　for a medication that can't be taken regularly.  Is that one

19　of the reasons that people get to use compounds?

20　A　　　Yes.

21　Q　　　And you don't -- Tricare doesn't want to deprive

22　those people of that.  Is that right?

23　A　　　We do not want to deprive our beneficiaries of what

24　they deserve.

25　　　　　MR. PIPER:  May I have just a second?

Case 1:18-cr-00011-HSM-CHS  Document 332  Filed 11/01/19  Page 112 of 119  PageID #: 3663

```
 1              (Brief pause.)

 2              MR. PIPER:  That's all I have, Your Honor.

 3              MR. THOMAS:  Very narrow recross, Your Honor.

 4              THE COURT:  Very, very short and narrow.

 5                          RECROSS-EXAMINATION

 6   BY MR. THOMAS:

 7   Q        One question.  The question is why.  Let me lay a

 8   little predicate.  The average wholesale price is paid for by

 9   ESI on behalf of Tricare for compounded medications,

10   Mr. Gogue?

11   A        Yes.

12   Q        Where does that come from?

13   A        From the pharmacies.  There is an entity out there,

14   I think it's a federal entity that gathers all of this

15   information and puts together on a routine, I believe it's

16   almost daily basis what the average wholesale price of a

17   particular ingredient around the nation is being charged.  And

18   based upon those charges, that's where this entity, I'm not

19   sure who it is, but --

20   Q        The AWP is reported by the pharmacies, but where

21   does the price come from, the manufacturers.  Correct?

22   A        Say again, please.

23              THE COURT:  Well, what he's asking, if I understand,

24   the computation of the average wholesale price, ultimately,

25   the wholesale price is set by the manufacturer of the -- I
```

Case 1:18-cr-00011-HSM-CHS   Document 332   Filed 11/01/19   Page 113 of 119   PageID #: 3664

1  mean, where else would it come from?

2          THE WITNESS:  It's set by the pharmacies.

3          THE COURT:  What?

4  BY MR. THOMAS:

5  Q       Pharmacies set their own prices from which they can

6  buy the medication?

7          THE COURT:  Pharmacies are dealing with retail and

8  the manufacturers are dealing with wholesale.  Is that not

9  right?

10          THE WITNESS:  Yes, Your Honor, but we have cases in

11  our office where, and I don't know if I'm allowed to say this,

12  but we've already come to settlement with some of those

13  particular manufacturers in the fact that they were colluding

14  with the pharmacies --

15          MR. WALDEN:  I'm going to object to --

16          MR. PIPER:  Well --

17          THE COURT:  Okay.  I may need -- but, okay, I see

18  what he's saying, I mean.  And, I mean, you know, but, yeah,

19  the price is set between the buyer and the seller, and in this

20  case, the seller is the manufacturer and the buyer is the

21  pharmacy?

22          MR. PIPER:  Judge, but it's a perfectly valid

23  response in response to a question that Mr. Thomas asked --

24          THE COURT:  I know.  Okay.  But, I mean, look,

25  average wholesale price.  It is set in the marketplace between

1    the buyer and the seller, and in this case, the seller is the

2    pharmaceutical company and the buyer is the pharmacy.  Right?

3            MR. THOMAS:  That's my understanding, Your Honor.

4            THE COURT:  I mean, you know, because we probably

5    both were forced to take Economics 101, I mean.

6            MR. THOMAS:  Yes, sir.

7    BY MR. THOMAS:

8    Q       Let me go back to my one question.

9            THE COURT:  Wait a minute.  You said one question.

10   You got another one?

11           MR. THOMAS:  Yeah.  You're right, Your Honor, I

12   digressed.

13           THE COURT:  Okay.

14   BY MR. THOMAS:

15   Q       Why didn't Tricare ask ESI to reimburse on some

16   formula other than AWP for compounded medications?

17   A       I don't know.

18           MR. THOMAS:  Thank you, Your Honor.

19           THE COURT:  Anything else from this witness?

20           MS. MAIO:  Your Honor, if I may ask two follow-up

21   questions briefly?

22           THE COURT:  Okay.

23                          RECROSS-EXAMINATION

24   BY MS. MAIO:

25   Q       Mr. Gogue, what I understood -- I believe that the

```
1   judge asked you a question specifically about Tricare's
2   evaluation of some of the compounded medications.  And I think
3   that what the judge asked you directly was whether Tricare
4   conducted an evaluation of the creams that are at issue in
5   this case.  And you said that they had?
6   A       They did.
7   Q       And where are those reports?
8   A       I don't know.  But I am aware because of what our
9   office does that both the agency and ESI looked at the
10  efficacy of these compound drugs, and there were
11  determinations made that there was no efficacy or very little,
12  if any, especially with those creams that were purported to
13  assist in pain management topically.
14  Q       Okay.  So, you're saying they did an evaluation --
15          MR. PIPER:  Judge, I'm going to object, you know.
16          THE COURT:  You know, Ms. Maio, really, I mean,
17  we're on recross examination, I mean.
18          MS. MAIO:  Yes, Your Honor.
19          THE COURT:  It's not the time to do discovery, it's
20  time to within the scope of the redirect.
21  BY MS. MAIO:
22  Q       What you're telling me, Mr. Gogue, is that there are
23  no reports, you have no idea where --
24  A       No, I did not say that.  I said I am aware of
25  reviews done on the efficacy of those drugs both, again, by
```

UNITED STATES DISTRICT COURT

1    our agency and ESI.  And the consensus was that there was no

2    medically necessary need for those compound drug creams, which

3    is why our office has contributed significant efforts to try

4    and recover those monies that were paid out for these compound

5    drugs.

6    Q       So, all of those medications are no longer paid for

7    by Tricare?

8    A        I don't know that and only because of the fact that

9    I don't see those individual prescriptions, so, I don't know

10   at the time they were being paid, but they may be potentially

11   being paid now because the prescriber is attesting to the fact

12   that it's medically necessary.

13   Q       Yes, sir.  My last question for you is that my

14   understanding is that according to your regulations, Tricare

15   is to reimburse only for FDA approved drugs?

16   A        In the formulary.

17   Q       And so, by paying for compounded medications, which

18   included more than just FDA approved drugs, that was one of

19   the concerns that was expressed in the GAO report, was it not,

20   that Tricare was reimbursing for medications and that was

21   inconsistent with their own regulations?

22   A        I'm not aware of the specifics of that GAO report,

23   so I can't speak yes or no.

24   Q       But you are aware of the fact that under Tricare

25   regulations they are to pay for FDA approved only drugs?

```
 1    A          Not only.  Yes.  Yes.

 2    Q          Thank you.

 3    A          You're welcome.

 4              THE COURT:  All right.  May this witness be excused?

 5              MR. PIPER:  Yes, Your Honor.

 6              THE COURT:  Okay.  Thank you.  Thank you, Mr. Gogue,

 7    you're excused.

 8              THE WITNESS:  Thank you, Your Honor.

 9              (Witness excused.)

10              THE COURT:  All right.  Let's see.  It's about noon,

11    you know.  Here's what I don't know.  There are four witnesses

12    listed today.  Can we get at least, you know, if we worked

13    another hour, can we get at least part way into one or should

14    we take a break now?

15              MR. PIPER:  I doubt that we're going to get -- we're

16    not going to get through with that one.

17              THE COURT:  What's the most efficient way to use our

18    time today, that's my real question?

19              MR. PIPER:  Judge, I think we're only going, only

20    going to get two more witnesses done today, would be Josh

21    Morgan and Josh Linz.  Is that not correct?  And we --

22              THE COURT:  Do you think you can conduct a direct on

23    Mr.  Morgan in one hour?

24              MR. PIPER:  Yes.  Yes.

25              THE COURT:  Why don't we --
```

UNITED STATES DISTRICT COURT

1          MR. PIPER:  Judge, can we take a quick break?

2          THE COURT:  Let's take about a 10 or 15 minute break

3    and let's see if we can get Mr. Morgan through direct

4    examination before we take our lunch break.  Okay.

5          (Short recess.)

6

7          I, Shannan Andrews, do hereby certify that I

8    reported in machine shorthand the proceedings in the

9    above-styled cause held October 1, 2019, and that this

10   transcript is an accurate record of said proceedings.

11

12                              s/Shannan Andrews
                                Shannan Andrews
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT