1    IN THE UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF TENNESSEE

3              AT CHATTANOOGA
     ----------------------------------------------------------
4                                    :
     UNITED STATES OF AMERICA,       :
5                                    :
              Plaintiff,             :
6    -versus-                        :         CR-1-18-11
                                     :
7    JERRY WAYNE WILKERSON,          :
     MICHAEL CHATFIELD, KASEY        :
8    NICHOLSON, BILLY HINDMON and    :
     JAYSON MONTGOMERY,              :
9                                    :
              Defendants.            :
10   ----------------------------------------------------------
                                        Chattanooga, Tennessee
11                                      November 13, 2019
             BEFORE:  THE HONORABLE HARRY S. MATTICE, JR.,
12                    UNITED STATES DISTRICT JUDGE
     APPEARANCES:
13
             FOR THE PLAINTIFF:
14
             PERRY H. PIPER, and
15           FRANKLIN PEARSON CLARK
             Assistant United States Attorneys
16           1110 Market Street, Suite 301
             Chattanooga, Tennessee 37402
17

18           FOR THE DEFENDANT WILKERSON:

19           MARK STEPHEN THOMAS, of
             Thomas Health Law Group, PA
20           5200 SW 91st Terrace, Suite 101-B
             Gainesville, Florida 32608
21                              -and-
             SETH A. SCHWARTZ, of
22           Schwartz Law Group
             10365 Hood Road South, Number 104
23           Jacksonville, Florida 32257

24                         BENCH TRIAL

25

```
 1

 2          FOR THE DEFENDANT MICHAEL CHATFIELD:

 3          DAVID M. ELDRIDGE, and
            ZACHARY R. WALDEN, of
 4          Eldridge & Blakney PC
            400 West Church Avenue, Suite 101
 5          Knoxville, Tennessee 37902

 6          FOR THE DEFENDANT KASEY NICHOLSON:

 7          BRIAN O'SHAUGHNESSY, of
            O'Shaughnessy & Carter
 8          735 Broad Street, Suite 1000
            Chattanooga, Tennessee 37402

 9

10          FOR THE DEFENDANT BILLY HINDMON:

11          GIANNA MAIO, and
            JACKSON WHETSEL, of
12          Federal Defender Services of Eastern Tennessee
            One Central Plaza, Suite 600
13          835 Georgia Avenue
            Chattanooga, Tennessee 37402

14

15          FOR THE DEFENDANT JAYSON MONTGOMERY:

16          R. DEE HOBBS, of
            Hamilton County Attorneys Office
17          204 County Courthouse
            625 Georgia Avenue
18          Chattanooga, Tennessee 37402

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                      INDEX OF PROCEEDINGS

 2   MARK NEWKIRK,
                Direct Examination by Mr. Thomas
 3              Cross-Examination by Mr. Walden
                Cross-Examination by Mr. Clark
 4              Redirect Examination by Mr. Thomas

 5                      GOVERNMENT'S EXHIBITS

 6   No.                  Description                    Page

 7    109    Prescriptions for Brandon Chatfield          4

 8    113    CVS Provider Manual                         120

 9    58     Newsletter written by Mark Newkirk RE:      214
             Collection of Copays
10

11                  DEFENDANT WILKERSON'S EXHIBITS

12   No.                  Description                    Page

13    101    Mark Newkirk CV                              8

14    5      Prescription Form with Rep ID               85

15

16                  DEFENDANT CHATFIELD'S EXHIBITS

17   No.                  Description                    Page

18    20     Collective – Blue Cross Blue Shield        140
             Patient Files
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1          THE COURT:  All right.  Welcome back, everyone.  Are

2    there any matters we need to take up before we call the first

3    witness?

4          MR. PIPER:  Briefly, Your Honor.

5          THE COURT:  Come to the podium.

6          MR. PIPER:  Brandon Chatfield testified last week,

7    Your Honor may recall, Mr. Clark cross-examined him as to his

8    prescriptions, and we neglected -- we showed them to him and

9    we neglected to move them into evidence as Exhibit 109.

10          THE COURT:  Any objection?  Admitted.

11          (Government's Exhibit 109 was received into

12          evidence.)

13          MR. PIPER:  Thank you.

14          THE COURT:  All right.  All right.  Who's going to

15    call the next witness?

16          Mr. Thomas.

17          MR. THOMAS:  Thank you, Your Honor.  Mark Thomas on

18    behalf of Wayne Wilkerson.  We have one witness today, an

19    expert, Mr. Mark Newkirk.  I'll have a very, very brief

20    opening, Your Honor.  He's a Pharm.D, Doctor of Pharmacy.  He

21    specializes in compounding pharmacy compliance and auditing.

22          THE COURT:  Okay.

23          MR. THOMAS:  He has literally been on thousands of

24    audits, that's pretty much his job to make determinations as

25    to discrepancies in claims --

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.

2          MR. THOMAS:  -- payments being made and payments

3    being requested by pharmacies to payors to include Tricare and

4    commercial PBMs as to whether or not it is compliant with

5    provisions of the payment or not compliant with provisions of

6    payment.  We will also be utilizing him, Your Honor, as a --

7    he is certainly an expert.  We will also be utilizing him to

8    respond to the materiality witnesses that the government has

9    offered both on behalf of CVS and the Tricare program.

10         THE COURT:  Let's talk about materiality in the, in

11   the instance of, well, in this case, health care insurance

12   fraud case.  Materiality in this sense, you correct me if I'm

13   wrong, deals with -- in other words, in order for a

14   misrepresentation either an active misrepresentation or a

15   failure to disclose, in order for it to constitute actionable

16   fraud, it has to be something that would have likely changed

17   the decision-maker's decision.  Right?

18         MR. THOMAS:  Yes, sir.  Had the payor known.

19         THE COURT:  Had the payor known.

20         MR. THOMAS:  They would have said, I would not have

21   paid that claim.

22         THE COURT:  Okay.  All right.  Okay.  All right.

23   Why don't you call your witness.

24         MR. THOMAS:  Thank you, Your Honor.

25         (Brief pause.)

UNITED STATES DISTRICT COURT

1          THE COURT:  What's the witness' name again?

2          MR. PIPER:  Mark Newkirk, Your Honor.

3          THE COURT:  Newkirk.

4          Mr. Newkirk, come on up here to the witness stand.

5  Right up here.  And I'm going to ask you to step up, take the

6  step up into the stand, but before you sit down, if you would,

7  stop, raise your right hand, and face Ms. Capetz, she'll swear

8  you in.

9          (Witness sworn.)

10          THE COURT:  Have a seat.  If you'd like some water,

11  there should be some there in the pitcher.

12          THE WITNESS:  Okay.

13          THE COURT:  Make yourself comfortable.  I'm going to

14  ask that you speak into the microphone.  And once he's

15  settled, you can proceed, Mr. Thomas.

16          MR. THOMAS:  Thank you, Your Honor.

17                              MARK NEWKIRK,

18  called as a witness at the instance of the Defendant

19  Wilkerson, being first duly sworn, was examined and

20  testified as follows:

21                         DIRECT EXAMINATION

22  BY MR. THOMAS:

23  Q        Good morning, sir.

24  A        Good morning.

25  Q        Are you settled in there?

1    A         As much as I can be, yes.  Thank you.

2    Q         All right.  And you can see the screen in front of

3    you there.  Correct?

4    A         Yes, I can.  Thanks.

5    Q         Please state your name for the record.

6    A         Mark Robert Newkirk.

7    Q         And, Mr. Newkirk, please tell the Court, what do you

8    do for a living.

9    A         Currently, I am a -- I work for a company called

10   Pharmacy Compliance Consulting, and we work with pharmacies,

11   independent pharmacies for the most part around the country

12   and we consult on compliance issues with pharmacy benefit

13   managers.  We help with audits and appeals, you know,

14   basically, their interactions with the PBMs.

15   Q         And, Mr. Newkirk, how long have you been doing that?

16   A         This company formed two years ago in January is when

17   I joined.  I've been in the pharmaceutical industry for, you

18   know, 20 plus years though overall.

19   Q         And, Mr. Newkirk, does this appear to be a copy of

20   your current CV?

21   A         Correct, yes.

22   Q         That appears to be a copy of the CV that you

23   provided to me.  Correct?

24   A         Yes, it is.

25             MR. THOMAS:  I'd offer, for the record, what's

UNITED STATES DISTRICT COURT

 1   Defendant's Exhibit 101.

 2             THE COURT:  Any objection to admission?

 3             MR. CLARK:  No, sir.

 4             THE COURT:  Admitted.

 5             (Defendant Wilkerson's Exhibit 101 was received into

 6             evidence.)

 7             MR. THOMAS:  Thank you, Your Honor.

 8   BY MR. THOMAS:

 9   Q        And, Mr. Newkirk, what did you do prior to your

10   current position?

11   A        It might be probably easiest to maybe give a little

12   chronological --

13   Q        Please.

14   A        -- explanation of my background in pharmaceuticals.

15   I started -- I have a Bachelor of Science in business

16   administration degree.  And after getting this degree in 1989

17   or so, I, you know, unfortunately, had testicular cancer and

18   became interested in pharmaceutics through that process.

19             THE COURT:  Uh-huh.

20             THE WITNESS:  And I moved to -- I grew up near

21   Cincinnati, Ohio and I went to Cincinnati, Ohio and got a job

22   at a high volume independent pharmacy called Group Health

23   Associates.

24             THE COURT:  High -- what kind of pharmacy?

25             THE WITNESS:  A high volume independent -- they

1    processed many, many claims.

2         THE COURT:  Okay.

3         THE WITNESS:  Five hundred, they averaged 500

4    prescriptions a day.

5         THE COURT:  Okay.

6         THE WITNESS:  Back then in the early '90s that's a

7    lot because of the systems weren't the greatest.

8         THE COURT:  Yeah.

9         THE WITNESS:  This was my first hands on experience.

10   And what I was doing concurrently was taking the -- I had a

11   business degree, but I didn't have the science background, so

12   I was taking the science courses, the biology, the physics,

13   statistics in order to qualify to go to pharmacy school.  And,

14   you know, two, three years later, I applied to a couple of

15   pharmacy schools and couldn't get in and started putting out

16   resumes to, you know, look for, you know, a better income.

17        THE COURT:  Yeah.

18        THE WITNESS:  And Medco, large PBM in New Jersey

19   hired me.  They were one of the largest at the time.  And they

20   hired me to be a pharmacy auditor.  And so, for 13 years, the

21   next 13 years, I worked as a pharmacy auditor, traveling

22   mostly in the midwest, but as far as Seattle to audit

23   independent pharmacies, chain stores, long term care,

24   hospitals, anybody who billed a claim to Medco, I could walk

25   in the door and audit.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 9 of 236  PageID #:
7364

1          THE COURT:  Okay.

2          THE WITNESS:  It was --

3          THE COURT:  I mean, that was part of the pharmacy's

4    contract with Medco, that you, they could send people like you

5    out to check on what --

6          THE WITNESS:  Correct.  If you have a contract with

7    a PBM, you know, as long as they follow the procedures, send

8    you a letter, hey, we're going to come in, we're going to

9    audit on this date, please be ready for us.

10         THE COURT:  Yeah.  All right.  All right.

11         THE WITNESS:  And so, I did that for 13 years.  But

12   the ninth year in, I was -- by then, we had moved to

13   Pittsburgh, Pennsylvania, my wife and I.  That's where she

14   grew up so that decision was obviously that we move to

15   Pittsburgh.  I was in a chain store, Giant Eagle Pharmacy, and

16   the district manager because district managers would always

17   come and do the audit with us, and she asked me why aren't you

18   in Duquesne University weekend program for pharmacy school.

19   And I went, you know, who has a weekend program, are you out

20   of your mind.  So, I looked at it.  I had already done all of

21   the prereqs.  I applied.  I got in surprisingly.  So, for the

22   next really three-and-a-half years, I went to school on the

23   weekends, Saturday, Sunday, eight to six, year round, while

24   still working at Medco.

25         THE COURT:  Okay.  Did you go physically to Iowa or

UNITED STATES DISTRICT COURT

1    did you do it on line?

2              THE WITNESS:  No.  Physically at the University.

3              THE COURT:  Okay.  You would fly back and forth from

4    Pittsburgh?

5              MR. PIPER:  Duquesne is in Pittsburgh, I think.

6              THE WITNESS:  Yes, Duquesne is in Pittsburgh.

7              MR. PIPER:  Yes.

8              THE COURT:  I thought you said Iowa.  Okay.  I got

9    my geography wrong.  Duquesne is located in Pittsburgh.

10             THE WITNESS:  Yeah.  Five -- I would not -- oh,

11   gosh.

12             THE COURT:  Thanks for the geography lesson.

13             THE WITNESS:  I couldn't imagine doing that.  It was

14   hard enough driving five miles down.  But we'd have a midterm

15   every Saturday morning.  And it was just, you know, wife, two

16   small kids, working full-time --

17             THE COURT:  You were going to school on the weekend?

18             THE WITNESS:  Got through the program.  Excuse me?

19             THE COURT:  Going to school on the weekend?

20             THE WITNESS:  Yes.

21             THE COURT:  You were a pretty busy guy during this

22   period?

23             THE WITNESS:  It was a nightmare.  Hardest thing

24   I've ever done, including, you know, cancer.

25             THE COURT:  Right.

UNITED STATES DISTRICT COURT

1          THE WITNESS:  Got through the program.  Graduated.

2    I had to quit Medco at that point and do my rotations.  And I

3    got my rotations done.  Took the boards.  Passed the boards.

4    Medco hired me in the end as a pharmacist at their mail order

5    facility in Pittsburgh.  I worked for them for two-and-a-half

6    years, stepped up to a manager, had 50, 55 pharmacists under

7    me, 14 techs.  Then Express Scripts bought Medco.  And I

8    lasted about nine months or so.  And it was a pretty poor work

9    environment.

10          THE COURT:  Yeah.

11          THE WITNESS:  I had a Pharm.D, which I consider a

12   golden degree.  Left.  Joined Freedom Pharmaceuticals, which

13   is in Tulsa, Oklahoma, but I worked out of my house in

14   Pittsburgh, consulted, worked for them teaching a billing

15   class on compound billing.  How to properly bill, if possible,

16   according to all of the manuals.  And, you know, all of the

17   rules and how the manuals are different.  And then we had

18   client pharmacies all over the country.

19          THE COURT:  Is that a subspecialty within, you know,

20   the pharmacy profession, I mean, compounding, as opposed to,

21   compounding as opposed to, I guess, what is it --

22          THE WITNESS:  Traditional retail pharmacy?

23          THE COURT:  Yeah, labeled drug that's produced by

24   who knows.

25          THE WITNESS:  Any pharmacist or any pharmacy is

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 12 of 236  PageID #: 7367

1   capable of compounding.

2           THE COURT:  That's what you're trained to do.

3   Right?  Put together --

4           THE WITNESS:  You are definitely trained to be able

5   to compound, but to have the expertise to do compounding, you

6   know, taking two tubes and squirting together and mixing and

7   putting it into a container, yes, anybody can do that.

8           THE COURT:  Yeah.

9           THE WITNESS:  But taking bulk chemicals, mixing them

10  together, doing it properly, it's a higher level.

11          THE COURT:  You need to do it right?

12          THE WITNESS:  You need to do it right.  And you need

13  to have some training, some experience.  You have to have the

14  right equipment.  You have to have the right lab.  Back early

15  when I audited for Medco, I would go in and they would just

16  have a table and there are bulk chemicals, hormones, they are

17  just mixing, no mask, no gown.  And I didn't know any better

18  because I was young.  I wouldn't walk in the door of a

19  facility like that nowadays.

20          THE COURT:  Yeah.

21          THE WITNESS:  But for the most part they don't exist

22  anymore.  They have hoods.  They have separate rooms.  There

23  is a lot of regulation on how you compound and it's expensive.

24          THE COURT:  All right.  Go ahead.

25          THE WITNESS:  I think that gets us --

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 13 of 236  PageID #: 7368

```
 1              THE COURT:  So that's --

 2              THE WITNESS:  -- pretty close up to today.  And then

 3     after Freedom Pharmaceuticals, I moved on.  I formed a company

 4     to go after unapproved drugs that are processing and paying

 5     out there.  And, you know, I'm still pursuing that.  But

 6     what's, what's, you know, how I'm earning a living right now

 7     is in the consulting world with mostly independent pharmacies,

 8     small chains.

 9              THE COURT:  As I understand what you're describing

10     to me, you've sort of switched sides, and that's very common,

11     I mean, particularly in the legal profession.  You used to be

12     an auditor going in there to decide whether we're going to pay

13     or deny this claim by this particular pharmacy, and, now,

14     you're assisting pharmacies, if the auditors come up and say,

15     hey, we're going to deny this claim, working with presumably

16     the PBM, and, wait a minute, maybe I don't think you

17     understand what we got here.

18              THE WITNESS:  Switching sides.  Yeah, you know, in a

19     classic sense, yes.  But it's the same rule book.

20              THE COURT:  Same what?

21              THE WITNESS:  It's the same rule books.

22              THE COURT:  Yeah.

23              THE WITNESS:  I just know the rule books.

24     Typically, I'll research state law, as well as I can.  I'm not

25     an attorney.
```

```
 1              THE COURT:  Yeah.  Right.  Right.

 2              THE WITNESS:  But many pharmacies, you know, they

 3    don't always fight an audit because they don't know how.

 4              THE COURT:  Yeah.  Right.

 5              THE WITNESS:  And, you know, these manuals are, you

 6    know, super thick, they're chalked full of all kind of little

 7    things and they'll sit on a shelf and maybe not so critically

 8    read.  That's where I come in.

 9              THE COURT:  I think I understand.  Okay.

10    BY MR. THOMAS:

11    Q         Thank you.  Mr. Newkirk, let me ask a couple of

12    follow-up questions.  You mentioned you were a Pharm.D.

13    Correct?

14    A         Correct.

15    Q         And that's Doctorate in Pharmacy.  Correct?

16    A         Right.

17    Q         Is that the final degree that you can get as a

18    pharmacist?

19    A         As a pharmacist, yes.  I suppose there is maybe a

20    Ph.D., but, yeah, I'm done with school.  Thank you.

21    Q         And your background, that includes not just the ESI

22    Medco PBM, you have dealt with the other PBMs as well.

23    Correct?

24    A         Correct.  Correct.  And, you know, dealing with

25    audits, you deal with, you know, any time you process a claim
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 15 of 236  PageID #: 7370

1    as a pharmacy, it could be, you know, one of, you know, maybe

2    100 or 200 PBMs, but there is four big ones.

3            THE COURT:  What are the four big ones in the United

4    States?

5            THE WITNESS:  Express Scripts, CVS Caremark, Optum,

6    and Prime Therapeutics that's who I view as basically the few.

7    Optum is United Healthcare.  United Healthcare used to be with

8    Medco, and they got tired of, my opinion, they got tired of

9    paying Medco so they just bought their own PBM and brought it

10   in house so they could --

11           THE COURT:  I see.  Okay.

12   BY MR. THOMAS:

13   Q        And, Mr. Newkirk, or is it Dr. Newkirk?

14   A        Mr. Newkirk is fine.

15   Q        Mr. Newkirk, do you have experience also in

16   governmental payors, Medicare or Medicaid or Tricare?

17   A        Yes.  Yes.  The processing of claims to Medicare

18   Part D, and, you know, the formulary design and Tricare, and

19   the Tricare compound benefit, yes, I do.

20   Q        Okay.  Does Tricare utilize a pharmacy benefit

21   manager?

22   A        They do.  Currently and at that time, it was Express

23   Scripts.

24   Q        Okay.  And is that the same Express Scripts that

25   also handles commercial PBM work?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 16 of 236  PageID #:
7371

1    A          Yes.  Yes.

2    Q          So, the PBM just works underneath a contract.

3    Correct?  Just depends upon --

4    A          Correct.

5    Q          -- whether it's government or private?

6    A          PBMs will have multiple plan sponsors, three, 4,000,

7    you know, on average, the large ones.  But including they're

8    going to, you know, every PBM wants to also have Medicare Part

9    D because that's the largest prescription, you know, benefit

10   group in the country.

11              THE COURT:  In the world, I guess?

12              THE WITNESS:  They're the largest purchaser for, you

13   know, my understanding of prescription drugs in the world.

14              THE COURT:  Yeah.  And they don't -- and Medicare

15   Part D doesn't have a pharmacy benefit manager, I mean, they

16   handle it in house with government employees, I guess?

17              THE WITNESS:  I think almost the exact opposite.

18              THE COURT:  Oh, okay.

19              THE WITNESS:  They outsource to all of the PBMs out

20   there the Medicare Part D administration, they hire --

21              THE COURT:  And they become in that sense a

22   government contractor, the PBM, they contract with HHS?

23              THE WITNESS:  Correct.  They work together on the

24   formulation, just like a regular plan sponsor.

25              THE COURT:  Okay.  Good.  All right.  Thanks.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 17 of 236  PageID #: 7372

BY MR. THOMAS:

Q        Mr. Newkirk, do you go on site, did you go on site when you were auditing pharmacies?

A        Yes.  Extensively.  I was a field auditor.  There is typically in an insurance company or PBM, there are field auditors and in-house auditors.  In-house auditors will send out something like a desktop audit, which is a fax, here's two prescriptions, please send us the information on this and respond.  Field auditors, you know, go out and walk in, physically walk in the door.  And you'll have -- we used to have, you know, I've been doing this for so long, when we originally started, we didn't have laptops so they would mail out a box of prescriptions and we'd go back six, eight weeks worth of claims.  When we got laptops, we extended that to two years.  So, it's two years worth of data is the typical look back.

Q        And the pharmacies that you audited, was that within a state, was it regional, was it nationwide, what was the geographic scope?

A        It was nationwide.  Mostly I was based, you know, when I started I lived in Cincinnati.  And then we moved to Dayton for my wife to finish up her registered dietician and then we moved to Pittsburgh.  But I would travel all through the midwest as far as, you know, California and Seattle.  If we had a client who called, we were on the plane.

UNITED STATES DISTRICT COURT

1          THE COURT:  You used a term about the audits, and

2    we've talked a lot in this trial about the so-called look back

3    method.  And we've had at least one witness on the stand, I

4    think, from CVS Caremark.  And, you know, and he described, as

5    I recall, what sounded like a very sophisticated software

6    program whereby CVS Caremark to the extent possible or

7    theoretically possible to monitor in very broad terms claims

8    in realtime.  But it sounded, you know, yeah, we can do a

9    little bit of that.  Here's what it sounded like to me.  We

10   can do a little bit of that using artificial intelligence

11   through computers and so forth, but, realistically, given the

12   volume of scripts that are being submitted in the United

13   States in 2019, I mean, it almost has to be primarily a look

14   back system.  Is that -- that was my understanding of his

15   testimony.

16         THE WITNESS:  Yes and no.  I think that a lot of

17   times what PBMs will do, what we did at Medco is we would

18   build programs to look at outliers, so if you have an

19   inhaler --

20         THE COURT:  Using what I'm referring to as

21   artificial intelligence, the computer is programmed, okay,

22   look for these markers?

23         THE WITNESS:  Right.

24         THE COURT:  And in our experience sometimes at least

25   indicate there is something amiss.

1          THE WITNESS:  A good example would like an inhaler,

2   an inhaler is 17 grams, many of them.  So if they entered a

3   quantity of whatever 17 times 17 is, you know, 134 --

4          THE COURT:  Okay.

5          THE WITNESS:  -- you would look for that, because

6   instead of just entering it as a quantity of one, they

7   entered, you know, quantity one then their --

8          THE COURT:  Nobody needs 17 inhalers at one time?

9          THE WITNESS:  Exactly.  And it was a mistake.  And

10  they should be able to run reports and pick that up on a daily

11  basis.  But for the most part, it is, it is a retrospective

12  look back at the claims data in order to analyze it.

13         THE COURT:  Okay.  Just because, I mean, you know, a

14  physician's decision to write a script is, while it sounds

15  simple, I mean, basically, it involves, you know, an

16  incredibly complex set of variables to make the final

17  decision?

18         THE WITNESS:  I would completely wholeheartedly

19  agree.

20         THE COURT:  Okay.  All right.  Go ahead.

21         MR. THOMAS:  Thank you, Your Honor.

22  BY MR. THOMAS:

23  Q       Mr. Newkirk, could you give the Court any idea how

24  many pharmacies you've been in professionally?

25  A       It's thousands.  I look at, you know, when I worked

UNITED STATES DISTRICT COURT

1   for Medco, we averaged, we tried to do 10 audits a week.  And,

2   you know, 50 weeks a year for 13 years is over 6,000

3   pharmacies, you know, a lot of those are repeats, but in every

4   pharmacy we're looking at 100 to, you know, 150 at least

5   individual prescriptions.  So, I've reviewed many, many, many

6   prescriptions.

7   Q       Any rough idea for the Court how many audits you

8   participated in at those pharmacies?

9   A       Well, they were all audits, you know, from that

10  perspective.  Right.  The consulting side and working for

11  Freedom --

12          THE COURT:  Thousands --

13          THE WITNESS:  Thousands.

14          THE COURT:  Tens of thousands?

15          THE WITNESS:  Thousands of audits.

16          THE COURT:  Okay.

17  BY MR. THOMAS:

18  Q       Briefly for the Court, Mr. Newkirk, what do you do

19  in an audit, in general, what do you look at?

20  A       You have data when you walk into a store and you

21  have all of the, you basically have a retrospective look back

22  at the claims data.  And the night before I would typically

23  target what claims I wanted to review.  So, if it's a busy

24  store, I might have, you know, 30,000 claims.  I need to run

25  some filters and look for outliers, you know, anything over

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 21 of 236  PageID #: 7376

1    thousand dollars, I'd probably look at.  Anything with a

2    dispense as written code where the doctor indicated you could

3    only dispense the brand.  I'd probably look at it and make

4    sure that the doctor actually did it.  If there is a quantity

5    change, you know, prescription they got 30, 30, 30, then they

6    got a refill for 90, I'm going to look at that prescription

7    and say, well, what did they write for because if they only

8    wrote for 30, I'm going to pull back 60 on the audit.

9    Q        So, is it fair to come to the conclusion that you go

10   into the audit, you've got a set of standards, you review the

11   prescriptions, compare them to the standards and make

12   determinations as to what's discrepant and not.  Is that fair?

13   A        Yes.  According to, you know, I could make a

14   discrepancy according to the rules of the PBM, you know,

15   Medco.  So, if you're allowed to increase the quantity, I

16   probably wouldn't look at the because if I can't make it a

17   discrepancy, there is no real reason to look at.

18   Q        And that's how you find discrepancies.  Correct?

19   A        Correct.

20   Q        The preset, prior standardized terms for the PBM and

21   to determine whether the pharmacy complied with that or not?

22   A        Correct.

23   Q        Is that done on all of the claims all at once or is

24   it done on a claim by claim basis?

25   A        It's done on a claim by claim basis and only the

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 22 of 236  PageID #: 7377

1   claims you choose to look at.  You know, you can't -- I can't
2   go in and review 30,000 claims in a couple of hours.  It's
3   just -- it's just -- you can't.
4   Q        Is there a standardized format like a set of
5   discrepancy codes, some kind of a legend that you utilize to
6   find out whether any given claim has no discrepancies or one
7   or 10?
8   A        Well, every PBM has their own set of discrepancy
9   guidelines and what they consider and what they'll call, you
10  know, if you, if it's written for a quantity of 90 and you
11  decrease it to 30, and, you know, it's commonly called a cut
12  quantity.  But one PBM may call it something different.
13  Q        Those are pretty set.  Correct?  You don't walk in
14  the door and then start to, you know, kind of determine your
15  own discrepancy codes, your own legend, right, it's preset?
16  Correct?
17  A        Correct.  You cannot just, you know, I've never seen
18  where you just make up a new discrepancy at the time.
19           THE COURT:  Can I stop and ask you?  You know, in
20  another lifetime, somebody with my name who was much, much
21  younger than I am now, was a financial auditor, okay, for a
22  big accounting firm.  And what you're describing is a process
23  that you go in and look for what I'm going to refer to as
24  outliers, you know, the night before you look for, for
25  outliers.  When I was a financial auditor, we did some of

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 23 of 236  PageID #: 7378

```
1    that, and, obviously, but more prominently at least, and I was
2    a very low level accountant, I mean, we had what was
3    considered back then to be very, very sophisticated
4    statistical analysis where we would conduct a random audit of
5    certain transactions to see -- do you do that as well as the
6    outliers or not?
7              THE WITNESS:  No.
8              THE COURT:  Okay.
9              THE WITNESS:  Not so much --
10             THE COURT:  You're not doing random selection --
11             THE WITNESS:  Absolutely not.  And there is a
12   reason.
13             THE COURT:  Tell me why.  Yeah.  Tell me why.
14             THE WITNESS:  Because if you look at pharmacy data
15   as a whole and you bill 1,000 claims and you just randomly
16   pick five.  Chances are I'm going to look, you know, five out
17   of the five of those may be for, you know, a very cheap
18   hydrochlorothiazide --
19             THE COURT:  You know, if somebody wants that, we're
20   going to give it to them, you know, hopefully their physician
21   made them --
22             THE WITNESS:  Thirty of them are 30 cents.  You
23   know, I can audit that all day long, it's a waste of time.
24             THE COURT:  That's not where the money is?
25             THE WITNESS:  Absolutely not.
```

 1          THE COURT:  Now, let me ask you something else.  And

 2   I've been wondering about that.  Is that what you do, do you

 3   follow the money?  I mean, now that's what the IRS does when

 4   they audit someone, okay, yeah, we're not going to fool with a

 5   few thousand bucks, we're going to see who's committing --

 6          THE WITNESS:  Right.

 7          THE COURT:  -- hundreds of thousands or millions in

 8   tax fraud, because we want the money.  Is that what you do?

 9          THE WITNESS:  That's exactly what we did.

10          THE COURT:  Okay.  All right.  Good.  All right.  Go

11   ahead.  Yeah.

12          MR. THOMAS:  Thank you, Your Honor.

13   BY MR. THOMAS:

14   Q          Mr. Newkirk, you were an auditor you said for

15   Medco/ESI for 13 years?

16   A          For Medco.  I was only an auditor for Medco.

17   Q          Then what other auditing experience do you have

18   other than those 13 years?

19   A          Basically, working with client pharmacies around the

20   country with both Freedom Pharmaceuticals and our compliance

21   company.

22   Q          So, how many years total?

23   A          Close to 20.

24   Q          Twenty.  Can you guesstimate how many pharmacy

25   audits you've been in on 20 years, is it one a week or one a

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 25 of 236  PageID #:
7380

1   day --

2   A        Well, you know, thousands with Medco.  And then, you

3   know, we have pharmacy clients around the country, you know.

4   The consulting company we have right now, we have around 130

5   clients, you know, from California to the Bronx down to

6   Florida.  Freedom Pharmaceuticals, we had client pharmacies

7   all over the country.

8   Q        So, 20 years could literally be more than 100,000

9   audits?

10  A        That I've had my hands into.  I don't know if it's

11  quite, that's --

12  Q        Tens of thousands?

13  A        Yes.

14  Q        Tens of thousands?

15  A        100,000 audits seems like an awful lot.

16  Q        That includes compounding.  Correct?

17  A        Very much so.  Very much so.

18  Q        And you had mentioned what compounding is, you know,

19  how it differs from non-compounding.  Are there any other

20  audit criteria that you specify, that you look at that makes

21  compound pharmacy auditing different than other types of

22  pharmacy auditing?

23  A        Well, compound auditing is when I looked at

24  compounds, you know, it was, for us, back then, it was a

25  different computer system.  If I can, you know, I think you

     1    might want to understand, you know, an important date in the

     2    compounding arena was 2011.

     3              THE COURT:  What happened then?

     4              THE WITNESS:  So, prior to 2011, when you billed a

     5    compound to an insurance company you could only transmit one

     6    drug, one NDC, National Drug Code.  And when we audited, the

     7    pharmacy would set in the computer system that it was a

     8    compound.  Compound?  Yes.  And it would transmit over to us.

     9    But they could only transmit one NDC.  And depending upon the

    10    price of that NDC, the AWP, the average wholesale price,

    11    that's how that would reimburse.

    12              THE COURT:  Okay.  Now, let me see, make sure.

    13    Drug, DNC, drug what?

    14              THE WITNESS:  AWP.  NDC, National Drug Code, is the

    15    identifier that identifies the drug.

    16              THE COURT:  Okay.  All right.  Now, let's just --

    17    we've been talking a lot in this trial talking about Lipitor.

    18    Okay?

    19              THE WITNESS:  Okay.

    20              THE COURT:  So, Lipitor has --

    21              THE WITNESS:  NDC.

    22              THE COURT:  NDC.

    23              THE WITNESS:  National Drug Code.  Right.

    24              THE COURT:  Now, Lipitor, I mean, has perhaps, I

    25    don't know, one active ingredient, but necessarily it's got,

 1    it's a compound because it's got binders or whatever.

 2              THE WITNESS:  It's -- no, it's not a compound.

 3              THE COURT:  Okay.

 4              THE WITNESS:  So, Lipitor when it's approved by the

 5    FDA, goes through the FDA approval process.  And the way they

 6    put the active chemical ingredient in it, and it can have all

 7    of the binders and fillers and coating --

 8              THE COURT:  We're to ignore all of those?

 9              THE WITNESS:  You're going to ignore all of those

10    because it's not compounded, it's a finished drug.

11              THE COURT:  Okay.

12              THE WITNESS:  When you -- back when you could only

13    bill one NDC, this is what, in essence, helped control

14    compound billing.  Because if you're billing one drug and the

15    AWP, the price of it is a dollar a gram and you bill, you make

16    a compound, it's 100 grams.  And you bill $140 for that, it's

17    only, the max it can pay is $100.  So --

18              THE COURT:  Okay.  You know, and, I mean, I don't

19    want to get too far off of the beaten path here, but I'm

20    trying to understand compounding.  Okay.  When Pfizer was

21    developing Lipitor.  Okay.

22              THE WITNESS:  Uh-huh.

23              THE COURT:  Presumably its scientists didn't

24    discover a brand new previously unknown chemical because there

25    is nothing new under the sun, I mean, you know.  I mean, it

```
1    existed from time immemorial.  What scientists at Pfizer did
2    was put together certain pre-existing chemicals and found one
3    that, you know, what I'm going to call a combination or a
4    compound that works.  And they said, aha, you know, we're
5    going, we're going to submit this, go through the regulatory
6    process everything and then once we get approval, we're going
7    to call it Lipitor.
8              THE WITNESS:  Correct.
9              THE COURT:  And we're all going to get rich.  Now,
10   what's different from what the Pfizer scientist did and what a
11   compounding pharmacy did --
12             THE WITNESS:  Okay.
13             THE COURT:  -- does?
14             THE WITNESS:  So, a compounding pharmacy is going to
15   take multiple ingredients and combine them together.
16             THE COURT:  Right.
17             THE WITNESS:  And they do not -- they're not
18   required to go through the FDA approval process in order to do
19   that and dispense it.
20             THE COURT:  Not even, not even when, I mean, even
21   the individual ingredients don't have to go through the --
22             THE WITNESS:  Correct.  So, many compounds use bulk
23   chemicals.  No bulk chemical is FDA approved.  Bulk chemicals
24   are components of FDA approved drugs.  You could take six
25   different bulk chemicals and a base and combine them all
```

 1   together and --

 2            THE COURT:  That seems like to me, you know, just

 3   from a public health standpoint that seems like a big loophole

 4   to me because, wait a minute, I count on the government

 5   through the FDA to tell me is what I'm going to put in my

 6   mouth going to kill me.  Okay.  That's what, as a citizen,

 7   that's what I think, you know.  And I guess I've always

 8   thought, that, you know, if I can buy this at a grocery store

 9   or drugstore or somewhere else, somebody somewhere has

10   decided, somebody with authority and training, that's not

11   going to kill you probably.

12            THE WITNESS:  That would be the physician.  And

13   compounding has been going on since the time of pharmacy.

14   Compounding is prior to Merck.  It's prior to Lipitor.

15            THE COURT:  There were drug stores long before we

16   had an FDA and stuff like that.

17            THE WITNESS:  Correct.  And I don't, I absolutely

18   don't view it as a loophole, you know.  Statutorily, it's

19   allowed.  You're allowed to compound multiple ingredients per

20   a prescriber and, you know, put it together.  And it's exempt

21   from going through the FDA approval process.

22            THE COURT:  Okay.  All right.  Go ahead.

23   BY MR. THOMAS:

24   Q        Thank you, Mr. Newkirk.  So, are we correct in

25   understanding that the control mechanism, the gatekeeper for

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 30 of 236  PageID #: 7385

```
1    compounding is the physician who sees the patient and writes

2    the prescription.  Correct?

3    A          Correct.  You need a prescription in order to, you

4    know, fill it.

5    Q          And is there an interchange, a colloquy, a back and

6    forth between the doctor who writes the prescription and the

7    pharmacist who fills the compound?

8    A          There absolutely can be, yes.

9    Q          Because it's unique.  Correct?  It's a, it is a

10   unique compilation of drugs designed for one particular

11   patient?

12   A          Correct.

13   Q          Right.  The pharmacies often start out with a

14   preprinted suggested compound pad.  Correct?

15   A          Yes, they can.  Yes.  Absolutely.

16   Q          And that's to assist the doctor.  Right?

17   A          Yes.  Many times it's to allow for clarity and I

18   think that, you know, compounding is complex.  You can have

19   multiple ingredients in a compound.  And to me, you know,

20   physicians' handwriting is difficult enough writing one drug,

21   you know.  Now, imagine them writing six drugs, six different

22   strengths and the quantities, and then having to interpret

23   that.  So, a preprinted prescription pad makes absolute sense

24   when, you know, how I look at it like that.

25   Q          The doctor can change that prescription.  Correct?
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 31 of 236   PageID #: 7386

1    A        Yes.  Absolutely.  They have, you know, full power

2    to change a strength, if they, if they don't need a chemical

3    in there, or they don't agree or something, they, you know,

4    they can, you know, just cross it out.  It's no longer on the

5    prescription.

6    Q        Can the pharmacist change the prescription after the

7    doctor has written it?

8    A        With the physician's permission.  You know, they

9    have to -- any time you make a change to a prescription, you

10   need to get back, you know, with a doctor and get authority.

11   Q        Okay.  So, we've established that the bulk active

12   ingredients that go into compounds don't have approval,

13   they're not, they're not preapproved by the Food and Drug

14   Administration?

15   A        Correct.  Bulk ingredients are not FDA approved,

16   they're components of FDA approved drugs.

17   Q        And to go the Court's question, so how is it that

18   doctors and pharmacies know what active bulk ingredient to

19   choose to go into a compound if they can't go to an FDA

20   approved list?  How does that process take place?

21   A        Well, they're writing for the, you know, drug that

22   they want to be utilized in the compound.  And many drugs, say

23   Omeprazole is a common drug in compounding you could take, you

24   could order Omeprazole capsules and open them and, you know,

25   use that ingredient to make the compound or you can order a

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 32 of 236  PageID #: 7387

```
1   bulk ingredient, Omeprazole bulk powder, so they are available

2   in multiple ways.

3   Q        And, Mr. Newkirk, could you spell that medication?

4   A        Omeprazole?

5   Q        Yes.

6   A        O-m-e-p-r-a-z-o-l-e.

7   Q        Okay.  Let's talk briefly about pricing.  Who sets

8   the prices for the bulk ingredients for compounded medication?

9   A        The manufacturer does or whoever the labeler is of

10  the particular drug.  They set the price.

11  Q        And is that, is that per compound or per bulk cost

12  go into an average, a nationwide average, to calculate the

13  average wholesale price for that bulk?

14  A        No.  The average --

15  Q        How is the AWP calculated?

16  A        They just, the manufacturer selects it.

17           THE COURT:  All right.  And the manufacturer of, for

18  instance, you know, an FDA approved drug, a pharmaceutical

19  company, hey, let's call it Pfizer.

20           THE WITNESS:  Pfizer.

21           THE COURT:  Okay.  The manufacturer of a compound is

22  going to be the pharmacy that does the compounding.  Right?

23           THE WITNESS:  Well, the pharmacy compounds the drug.

24  But the way that the drug ends up being priced is the

25  different AWPs, the average wholesale price of each
```

UNITED STATES DISTRICT COURT

1  ingredient.  So, when you transmit a compound claim after

2  2011, you could bill for up to 25 ingredients.  That was the

3  big change.  And you would enter each NDC, and the average

4  wholesale price of each one and the quantity, it's a

5  completely 100 percent transparent transaction with the PBM.

6  They have every single ingredient, the quantity, the AWP, it

7  adds all up, and whatever it adds up to, it gets transmitted

8  to the insurance company.

9            THE COURT:  Okay.

10  BY MR. THOMAS:

11  Q        So, Mr. Newkirk, if I understand your testimony,

12  effective as of 2011, the software change that you had

13  mentioned, up to 25 individual bulk ingredients could be added

14  into a single compound.  Right?  A single script.

15  A        Correct.  Correct.

16  Q        And the pricing would be based upon the

17  manufacturer's AWP, what the manufacturer suggests.  Correct?

18  A        Correct.

19  Q        And then it's multiplied by the amount of that

20  compound.  Right?  Whether it's one grams or 20 grams or

21  30 grams.  Correct?

22  A        Correct.

23  Q        And then once you have a per ingredient total, you

24  total all of the 25.  Correct?

25  A        Correct.

1    Q        And that's why each and every compound prescription

2    is unique.  Correct?

3    A        Correct.

4    Q        As far as the payment goes, and thank you for that,

5    I'm kind of working on the pharmacy and the manufacturer side,

6    let's jump over to the other side of the industry.  So, when

7    that claim goes into a PBM and the PBM receives it, does the

8    PBM reprice any of those bulk ingredients or do they take the

9    manufacturer's AWP?

10   A        They pay according to contract which is going to be

11   based off of AWP.  So, if compounds pay at AWP minus 15, you

12   have, you know, the ingredient add up to $1,000 and the

13   contract pays compounds at AWP minus 15, it's going to pay at

14   $850 to the pharmacy.

15   Q        Got it.

16   A        If all of the ingredients are covered.

17   Q        And the PBM sets that AWP based price on a per bulk

18   item basis.  Correct?

19   A        Well, per -- not even per bulk, per the compound

20   claim.  So, you could have bulk chemicals in there, you could

21   have FDA approved ingredients, tablets, capsules, you could

22   have multiple ingredients in there, basically, if it adds up

23   to $1,000, they are going to pay per contract off of that

24   $1,000.

25   Q        I see.  Let me take you back to the software matter

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 35 of 236  PageID #: 7390

```
1    that you had mentioned in 2011.  Whose software program was

2    that, was it the pharmacies or was it the PBMs?

3    A        It's the pharmacies had to upgrade their software in

4    order to transmit all of the new data fields and communicate

5    really with the insurance companies.

6    Q        Prior to the software upgrade, how many bulk items

7    could be utilized in one prescription?

8    A        You could -- you could make a compound with as many

9    ingredients as you wanted prior to that upgrade, but you could

10   only transmit one NDC, one drug.

11   Q        So, the software upgrade allowed a transmission of

12   up to 25 NDCs?

13   A        Correct.

14   Q        And what was the impact on the industry of that, if

15   any?

16   A        Growth.  Transparency.  Pharmacies now instead of,

17   you know, if you billed one NDC and the price of that NDC was

18   ten cents and you billed 100 grams, you couldn't be paid any

19   more than $10.  Now, you could take, if you had 10

20   ingredients, and they all added up to $500, and you billed

21   $500, you could be paid off of that total price now.

22   Q        You mentioned transparency several times.  Does that

23   mean that the PBMs could look at the individual claim for each

24   compounded prescription and decide whether or not to pay it?

25   A        Yes.  I mean, and it was, when I was an auditor, we
```

UNITED STATES DISTRICT COURT

1  knew it was a compound claim but we only had one drug.  So, we

2  had to actually physically audit any compounded drug in order

3  to figure out if it was even ballpark being priced right, we

4  had to do a physical audit.

5          THE COURT:  And that seems like that's a pretty time

6  consuming endeavor?

7          THE WITNESS:  Oh, yes.  We could, you know, if I

8  audited --

9          THE COURT:  You can't do a whole lot of those in one

10  day?

11          THE WITNESS:  You cannot.  And there is no way we

12  could, you know, review all of the compounded prescriptions in

13  the country.  I mean, there weren't nearly as many as

14  compounding pharmacies at that time because of how difficult

15  it was to get paid for compounds, but after 2011, I'd say, you

16  know, it's 100 percent transparent claim.  The PBM knows

17  everything that's in there.

18          THE COURT:  Let me -- I really am reluctant, Mr.

19  Thomas, to interrupt your direct examination.  And I'm going

20  to let you go back, but can I interrupt?

21          MR. THOMAS:  Yes, Your Honor.

22          THE COURT:  What you're describing to me about

23  compounding.  Let's just assume theoretically that there is a

24  compounding pharmacy out there who really just has no concern

25  whatsoever for the efficacy, I mean, they are concerned that

```
 1    we're not going to kill someone because they're going to get
 2    sued for that or something, but no concern for the particular
 3    efficacy of the drug and no concern for patient welfare,
 4    something like that.  We just want to create a compound drug
 5    that will generate the most profits, okay, in the health care
 6    market.  It seems to me that there would be an incentive out
 7    there for such, you know, let's just call it amoral, you know,
 8    compounding pharmacy, let's decide the ingredients that based
 9    upon this, what you call it, average wholesale, AWP --
10              THE WITNESS:  AWP.
11              THE COURT:  -- would yield a compound that is the
12    most expensive.  Okay.  Let's just assume that for the time
13    being.  This is a theoretical question.  Follow me.
14              THE WITNESS:  Okay.
15              THE COURT:  And then, you know, got a health care
16    professional to prescribe that.  And so, that compounding
17    pharmacy would yield, would reap the profits, you know, of
18    that compound, it seems to me.  Follow me through, then let me
19    finish.  Okay.  Now, from my meager understanding of how
20    economics work.  The only check on unlimited profits for that
21    compounding are the forces of supply and demand.  In other
22    words, the assumption that, you know, given two equally
23    efficacious drugs, the consumer is always going to choose the
24    less expensive.  Okay.  That's my understanding of how
25    economics works.
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 38 of 236   PageID #: 7393

1          Okay.  Now, let me throw in a monkey wrench because

2    I do believe that in a system, in a market economy, a system

3    of supply and demand, insurance can skew the normal economic

4    calculations because of something that we have referred to

5    various times, including moral hazard.  In other words, if I'm

6    not paying for it, I don't care what it costs.  What's wrong

7    with the sort of analysis that I just sort of went through?

8          THE WITNESS:  It's kind of -- I don't know that

9    there is anything wrong.  You've described a free market.  And

10   one of the things missing --

11         THE COURT:  I described a free market up to the

12   point that I said, but let's throw in some significant

13   insurance coverage and that has a tendency to, whatever you,

14   skew, distort, whatever term you want to use, the normal

15   mechanisms of a pure free market.

16         THE WITNESS:  Right.  Because patients when they

17   walk into the pharmacies are disassociated from the true cost

18   of what a drug is.

19         THE COURT:  Any insurance works that way, I suppose.

20   I mean, presumably, if I have really good homeowners

21   insurance, I have a little bit less incentive to not leave my

22   gas stove on, you know, when I walk out, you know.  I mean, we

23   try to guard against that, but, you know.

24         THE WITNESS:  Right.

25         THE COURT:  That's just -- that's the nature of any

1    insurance.

2              THE WITNESS:  But, you know, most patients when they

3    walk into a pharmacy and they pick up five medications and

4    they pay $80 total in a copay, have no idea if they're walking

5    out of the store with $80 worth of meds, or $25,000 worth of

6    meds.

7              THE COURT:  Okay.  All right.  Okay.  All right.  Go

8    ahead.  Go ahead.

9              MR. THOMAS:  Thank you, Your Honor.

10   BY MR. THOMAS:

11   Q        Mr. Newkirk, just to make sure that we all

12   understand, I need to ask a few more follow-up questions

13   regarding pricing.  The PBMs pay on a per item and per amount,

14   right, per bulk amount basis for each individual bulk item

15   within a compound prescription.  Correct?

16   A        Correct.

17   Q        And that's based upon a discount from average

18   wholesale price.  Correct?

19   A        A discount or even in the case of Medco, they paid

20   straight AWP on compounds.

21   Q        And that's based upon contract.  Correct?

22   A        Correct.

23   Q        And who's the contract with, is the contract between

24   the PBM and the pharmacy or is the contract between the PBM

25   and the manufacturer?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 40 of 236  PageID #: 7395

```
 1   A         Not the manufacturer.  The contract is -- there is

 2   really two contracts, you know, a pharmacy will have a

 3   contract with the PBM and the PBM will have a contract with

 4   the insurance company or the plan sponsor and those will lay

 5   out the terms.

 6   Q         Is there a third contract as well where the pharmacy

 7   has a contract with the manufacturer to actually buy the

 8   products that they ultimately utilize for the compounding?

 9   A         The pharmacy will have a contract -- if you're going

10   to purchase bulk chemicals or drugs from a manufacturer or

11   from a wholesaler, you're going to have to have a contract in

12   order to purchase those.  You can't just call up and order

13   drugs without executing a contract.  They're going to want to

14   vet you as a pharmacy.

15   Q         Because the pharmacy has got to buy the raw

16   materials from someone.  Correct?

17   A         Correct.

18   Q         And I don't mean to oversimplify, but my basic

19   understanding, and I'm not a pharmacist by any means, so keep

20   it simple for me, please, the pharmacies buy low and sell

21   high.  Right?  They buy at a discount from AWP from a

22   manufacturer or a distributor or a wholesale or repackager,

23   then they do the compounding, and then they send a claim in

24   for the compound that they made, right, they're the

25   professional entity with a license to a PBM with whom they
```

UNITED STATES DISTRICT COURT

```
 1    have a contract and say I just compounded a pharmaceutical for
 2    your patient, she is an insured, here is the bill.  Right?
 3    After 2011, it's all laid out as to exactly everything that's
 4    in there.  And it is a payment rate, a reimbursement rate
 5    based upon some portion of AWP higher than what it is the
 6    pharmacy paid.  Correct?
 7    A         Correct.  And you're going to have --
 8              THE COURT:  It has to be just, again, free market
 9    economics, you know, in the long run, if they're not doing
10    that, they will soon be out of business.
11              THE WITNESS:  Correct.  And as a pharmacy, you have
12    a choice if you're buying a drug, there may be 10 different
13    suppliers you could purchase it from.  And they could have for
14    the same exact drug, they could have 10 different average
15    wholesale prices.
16              THE COURT:  Okay.  Yeah.
17    BY MR. THOMAS:
18    Q         Am I correct in assuming that the pharmacies do that
19    to make a profit.  Correct?
20    A         Absolutely.
21    Q         And I'm assuming that the manufacturers do it to
22    make a profit.  Correct?  They set the AWP at a rate that
23    allows them to be able to make the drugs in, literally, in
24    their factories and sell it to pharmacies.  They make a
25    profit.  Right?
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 42 of 236   PageID #: 7397

```
 1   A         Yes.

 2   Q         And I'll get into some questions later about the

 3   size of the PBMs and their market value, but to your

 4   understanding, PBMs make a profit.  Correct?

 5   A         They're very profitable.

 6   Q         Do you have any awareness of the size of some of the

 7   PBMs, let's say CVS Caremark, is it a large company, a small

 8   company?

 9   A         It's a massive company.  I think it's in the top 10

10   or so of the, you know --

11             THE COURT:  Top 10 --

12             THE WITNESS:  Yeah, largest companies.

13   BY MR. THOMAS:

14   Q         It's Fortune 5.

15   A         They don't lose money.

16             MR. THOMAS:  Your Honor, at this point, I would like

17   to move Mr. Newkirk as an expert in compound pharmacy

18   compliance.

19             THE COURT:  Any objection to that?

20             MR. CLARK:  No, sir, Your Honor.

21             THE COURT:  Yeah.  He's acknowledged his -- yeah.

22             MR. THOMAS:  Thank you, Your Honor.

23   BY MR. THOMAS:

24   Q         Thank you, Mr. Newkirk, very strong introduction for

25   us.  Am I correct in understanding that a pharmacy can't
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 43 of 236  PageID #: 7398

```
 1    dispense a compounded medication to a patient without a
 2    prescription.  Correct?
 3    A          Correct.  You have to have a prescription.
 4    Q          Prescription is written by the, by a physician.
 5    Right?
 6    A          A physician, nurse practitioner, anybody in a state
 7    who has prescribing authority according to the state medical
 8    board.
 9    Q          A patient can't simply go into a pharmacy or order
10    any kind of medication that requires a prescription.  Correct?
11    A          They can go into a pharmacy and request something
12    but the pharmacist is going to have to call their physician to
13    get a prescription.  Correct.
14    Q          Because without essentially an order or prescription
15    from a doctor, the pharmacist isn't authorized, correct, to
16    dispense to the patient?
17    A          Except in very limited instances like flu shots, you
18    can do collaborative agreements and you're allowed to dispense
19    flu shots without a prescription.
20    Q          That's probably subject to individual specific state
21    law?
22    A          Correct.  Correct.
23    Q          As to what authority a pharmacist has?
24    A          And it's very limited.
25    Q          Under what circumstances would a pharmacist check
```

UNITED STATES DISTRICT COURT

 1    back with a physician when presented with a prescription?

 2    A          Typically, you know, any time your professional

 3    judgment alarms are going off in your head.  You have a

 4    prescription that is typically dosed once daily, and they

 5    wrote it three times daily.  So, would that generate a phone

 6    call?  Perhaps unless they have a long history of taking it

 7    three times daily.  Anything that's outside of the norms is

 8    when a pharmacist would pick up the phone.  If they bill it

 9    and it gets a reject from the insurance company saying they

10    got it down the road two days ago.  So, you're going to call

11    the doctor and especially if it's a controlled medication,

12    hey, they got this, are you aware of this, and you go through

13    the process of --

14              THE COURT:  Let me ask another question.  To your

15    knowledge, are either pharmacists or to your knowledge, I know

16    you're not a physician, but physicians, are they trained or

17    are they under some sort of legal or ethical obligation to be

18    concerned about the price of any medication or are they solely

19    trained to worry about, you know, the patient, and, you know,

20    and the medical efficacy of the medication?

21              THE WITNESS:  I would much lean towards the latter.

22    Physicians don't know the pricing of drugs.

23              THE COURT:  Well, I mean, I've had physicians who

24    have no idea, you know, if I've gone back to them and said,

25    wow, that thing you prescribed, and they've said how much does

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 45 of 236   PageID #:
7400

1    it cost, so, I mean, you know, yeah.

2              THE WITNESS:  And you're typically paying just a

3    portion of it, the copay.  You know, the copays have gone up

4    and up and up and you get more push back from the patients to

5    the physician, but they really have no idea.

6              THE COURT:  All right.  Go ahead, Mr. Thomas.

7              MR. THOMAS:  Thank you, Your Honor.

8    BY MR. THOMAS:

9    Q        And based upon the Court's question, how is it that

10   a pharmacist would know when there is adequate clinical

11   efficacy, medical necessity in order to fill a prescription?

12   A        They wouldn't know.  I mean, they --

13             THE COURT:  They rely on the physician?

14             THE WITNESS:  Exactly.

15             THE COURT:  If that script --

16             THE WITNESS:  The physician's purview is, you know,

17   they're required to, you know, per the state board, medical

18   board, determine medical necessity in order to prescribe a

19   prescription.

20   BY MR. THOMAS:

21   Q        There is a basic requirement, though, under most

22   state licensure laws, correct, that when a clinically

23   unexpected prescription is presented for filling where the

24   pharmacist has a responsibility to not just turn the blind

25   eye, right, and fill the prescription, but to do something,

1    correct, to contact the doctor.  Right?

2    A          Correct.  Your initials, as a pharmacist, your

3    initials in the end go on anything.

4               THE COURT:  Yeah.  Okay.  But is it based -- okay.

5    Wow, this doctor just prescribed a really expensive medicine,

6    does the pharmacist, are the obligations you're describing

7    triggered by that or only by, well, boy, this, wonder if the

8    doctor meant to do this?

9               THE WITNESS:  It's clinical --

10              THE COURT:  Okay.

11              THE WITNESS:  -- 100 percent.

12              THE COURT:  As opposed to economic?

13              THE WITNESS:  The economic part is whether it's --

14              THE COURT:  It is what it is?

15              THE WITNESS:  It's either covered or not.  Is it a

16   formulary drug and a copay generated.

17   BY MR. THOMAS:

18   Q          Because the medicine and the pharmaceutical

19   prescribing is supposed to be in the best interest of the

20   patient clinically.  Correct?

21   A          Correct.

22   Q          It shouldn't be about the money.  Correct?

23   A          Correct.

24   Q          There are instances where a pharmacist can be

25   authorized to change a prescription that comes in from a

```
 1    physician.  Correct?  A compound script.  The pharmacist might
 2    look at a script and say that to me seems clinically
 3    unlikely --
 4    A        Yes.
 5    Q        -- I'll have to check.  Correct?
 6    A        Yes.  Absolutely.  If a compounded, you know, if
 7    there is a preprinted pad and it came in and you had never
 8    seen the preprinted prescription before and you look at it and
 9    there is a particular chemical on there and the strength is
10    excessive, you know, it's typically dosed at one percent and
11    it says five percent, you know.  You need to pick up the phone
12    and have a conversation.
13              THE COURT:  Unless that chemical happens to be like
14    arsenic or something like that --
15              THE WITNESS:  Well, yes.
16              THE COURT:  -- you know, let's make sure, you know.
17              THE WITNESS:  Well, that's -- as a pharmacist, you
18    own it.  So, if it's going out the door, and you're putting
19    your initials on something and it kills somebody, you know,
20    it's, you know the tech is not in trouble.
21              THE COURT:  Yeah.
22    BY MR. THOMAS:
23    Q        There are other circumstances, correct, other than
24    clinical suspicion when it is that a pharmacist would be
25    authorized, would be motivated to change a prescription.  Say
```

UNITED STATES DISTRICT COURT

 1    a patient comes in with a prescription for a particular drug,

 2    with their insurance card.  Right?  And the pharmacist checks

 3    and it's not a covered medication underneath the patient's

 4    plan.  Is the pharmacist, is that pharmacist's hands tied to

 5    say to the patient, I know you've got a prescription, I'm

 6    assuming it's medically necessary, but, you know, you know,

 7    your copay would ordinarily be $25, but this is a $30,000

 8    drug.  So, did you bring your checkbook?  Does the pharmacist

 9    have any authorization to make a change in order to be able to

10    get some kind of equivalent for the patient that the patient

11    has underneath their insurance plan?

12    A         In working with the physician, absolutely.  And this

13    happens every day, you know, compounds or non-compounds.  If

14    you're trying to fill a drug and it's not formulary coverage,

15    what are you going to do?  You're going to pick up the phone

16    and call the physician, hey, this is not covered.  And then

17    you're going to start the process of figuring out what is

18    covered in order --

19              THE COURT:  Let me give you a common example in

20    my -- we've talked a lot about Lipitor.  Well, now, hey, the

21    patent has expired, I mean, you know, I don't even know, I

22    guess they sell name brand Lipitor still, but, I mean,

23    everybody gets generics.

24              THE WITNESS:  Correct.

25              THE COURT:  Now, what's the deal with that, I mean,

```
1    I used to see on scripts, you know, the physician say, generic
2    authorized.
3              THE WITNESS:  Substitution permissible.  Correct.
4              THE COURT:  Tell you the truth, does a pharmacist
5    just have, okay, if it's a generic, I have the authority to do
6    this no matter what?  How does that work?
7              THE WITNESS:  Most state laws mandate that if they
8    prescribe a brand name drug and there is a generic available
9    you're to change to the generic.
10             THE COURT:  Okay.
11             THE WITNESS:  Absent a physician --
12             THE COURT:  It's a matter of state law?
13             THE WITNESS:  Yeah.  If they're demanding brand
14   medically necessary or brand only, then you're going to
15   dispense the brand.
16             THE COURT:  So, just in my personal experience, it
17   seems to happen almost as a matter of course.  And you're
18   telling me in most states it does happen?
19             THE WITNESS:  You're going to automatically switch
20   to the generic.  But, you know, there are sometimes where the
21   insurance company will, you know, you'll fill the generic,
22   you'll get a reject and it will say you must use the brand.
23             THE COURT:  Yeah.
24             THE WITNESS:  And that's largely because the
25   insurance company is getting a rebate and they're going to
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 50 of 236   PageID #: 7405

```
 1    tell the plan sponsor you're saving money, which, you know.

 2              THE COURT:  All right.  Yeah.  Well --

 3    BY MR. THOMAS:

 4    Q         And that circumstance is dictated by the payor,

 5    correct, the PBM?

 6    A         Correct.

 7    Q         As to whether to approve or not approve the

 8    pharmacists substitution of something that's on the

 9    prescription.  Correct?

10    A         Right.  Well, the PBMs also have rules to

11    substitute, also, you know, theoretically, they want you to do

12    the cheapest drug available.

13    Q         So, even after the doctor writes a prescription,

14    gives it to the pharmacist, right, the doctor can change the

15    prescription, the pharmacist can change the prescription, even

16    the PBM can change the prescription.  Is that correct?

17    A         As long as it's authorized by the physician or the

18    prescriber in the end.  Any change to a prescription, if you

19    make a change, it must be authorized by the physician.

20    Q         And as long as the physician authorizes it, those

21    changes are not improper.  Correct?

22    A         Correct.

23    Q         We talked a little bit about compounded medications

24    preprinted pads.  Correct?

25    A         Correct.
```

UNITED STATES DISTRICT COURT

1    Q          Who produces the pad, the pharmacy.  Correct?

2    A          The pharmacy, or, you know, the physician can create

3    a pad.  They can do it in working together.  But, you know,

4    typically the, you know, an expert compounding pharmacy is

5    going to create, you know, the prescription pad that makes the

6    most pharmaceutical sense.

7    Q          It's proprietary to that pharmacy, is it not?

8    A          The pharmacy would think it's proprietary, but there

9    is really -- if they're working with a physician, there is

10   nothing to stop a physician from, you know, faxing that off to

11   any pharmacy in the country.

12   Q          But doesn't the pharmacist in charge at the pharmacy

13   sort of utilize their own individual clinical knowledge and

14   experience in terms of setting up a suggested compound for

15   physicians.  Isn't that a part of pharmacy marketing?

16   A          Yes.

17   Q          That the pharmacist in charge says you can use any

18   compound pharmacy, you should use ours because we have some

19   kind of a special sauce with our formulations.  Correct?

20   A          Well, they could, but, you know, they are going to

21   develop relationships with physicians.  And, hopefully,

22   they're comfortable with each other and they know the level of

23   competence of the compounding pharmacy.  Not everybody can

24   compound.

25   Q          Right.  And that was going to be my very next

1    question.  Not everyone can compound.  Correct?

2    A          Very true.  If a physician sends a compound with

3    five ingredients over to a RiteAid, they can't do it.  They

4    don't have the equipment.  They don't have the facility.  They

5    probably don't have the expertise or, you know, the experience

6    to do it.  Typically, it needs to go to a compounding

7    pharmacy.  There is Walgreens had, you know, one out of, I

8    have no idea, 30 Walgreens pharmacies has a very elementary

9    compounding, you know.  They're able to do pretty simple

10   compounding, but they don't have a hood or anything.

11             THE COURT:  Is it up to the physicians to know who

12   has compounding abilities or not, because, I mean, the average

13   consumer is just not going to have any idea about that, I

14   think?

15             THE WITNESS:  Well, the average consumer doesn't and

16   the average physician doesn't unless they formed a

17   relationship with a compounding pharmacy or they know the

18   local compounding pharmacies, you know, most cities will have

19   a local.

20             THE COURT:  Is there any regulatory framework or is

21   it just buyer beware, I mean, you know, for a compound?

22             THE WITNESS:  There is -- compounding pharmacies

23   currently, they have to have -- it depends upon the state

24   regulations of, you know, it's called 795 compliance.  And

25   it's just a level of competence and cleanliness, you know, on

1    an elementary scale.

2              THE COURT:  Okay.

3    BY MR. THOMAS:

4    Q         So, preprinted compounding pads are common for

5    compounding pharmacies.  Correct?

6    A         Yes.  Very common.

7    Q         That's not in any manner restricted or prohibited by

8    the PBMs, is it?

9    A         During that time, they were not prohibited at all

10   except for Express Scripts, they had a caveat.  You couldn't

11   have a controlled drug also preprinted on the compound pad.

12   And if they saw -- if you had Ketamine somewhere written on

13   the pad that was preprinted, it was a full recoupment of

14   anything filled off of that.  And, to me, it was, it was a

15   made up rule that they put in their manual, but they enforced

16   it.  So, the pharmacies learned of this rule when they faced

17   recoupments and they removed all controlled substances from

18   the preprinted pads.

19   Q         And that's just that one PBM?

20   A         That's just that one PBM that had a rule on

21   preprinted.

22   Q         And any other PBMs did not even have that

23   restriction as to controlled substances on the preprinted pad?

24   A         They did not.  And they audited thousands of these

25   preprinted pads.

```
 1   Q          And that was going to be my next question.  The PBMs
 2   audited these compound pads, did they not, during the time
 3   period relevant to this case, 2013 to 2015?
 4   A          Yes.  And as long as it was a clean claim, you know,
 5   as long as the pharmacy filled it correctly, you know, if it's
 6   two percent, two percent, two percent of three different
 7   chemicals and they filled it correctly, they billed it
 8   correctly, it's a clean claim, there is, there was not a lot
 9   they could do while, you know, auditing those individual
10   claims.
11   Q          There is not an audit discrepancy code that is
12   reserved for the use of a compounded pad.  Correct?
13   A          No, there wasn't.
14   Q          You had stated in response to a couple of my earlier
15   questions that compounding is specialty pharmacy work, not
16   every retail store front pharmacy compounds.  Correct?
17   A          Correct.
18   Q          So, given that pharmacies are, compound pharmacies
19   are more rare, I hope I can use that term rare, how do they
20   get their medications to the patients, by mail?
21   A          They can.  They can.  You know, they can.  People
22   can come in traditionally and pick up at the pharmacy.  If
23   they're far away, they can absolutely mail to any state as
24   long as they are registered as a non-resident pharmacy in
25   order to ship into that state.  But one other thing is that
```

 1    there is, you know, there is, there could be a contractual

 2    prohibition against mailing.  Optum out there does not allow

 3    retail pharmacies to mail, but for compounding, they pretty

 4    much for the most part overlook this during that time period.

 5    Q          Does that have to do with the enrollment process,

 6    the credentialing process with each individual pharmacy with

 7    the PBM as to whether or not they can utilize mail?

 8    A          It does.  When you go through credentialing you have

 9    to classify yourself as a retail pharmacy, a mail order

10    pharmacy, a specialty pharmacy.  And if you're a traditional

11    retail pharmacy for the most part with the PBMs you're allowed

12    to mail.  And they don't want you mailing over, you know, a

13    high volume, a certain percentage, then they are going to say

14    all right, we need to evaluate whether you're a retail

15    pharmacy or mail order pharmacy and they could say we're going

16    to require you to be a mail order pharmacy, and that changes

17    your rates.

18    Q          I'm sorry.  That's controlled by the PBM.  Correct?

19    A          Correct.

20    Q          And that's a matter of contract?

21    A          Correct.

22    Q          And many of the PBMs inform the pharmacies, correct,

23    that if we don't specifically authorize you to mail, you can't

24    mail.  Correct?

25    A          Correct.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 56 of 236  PageID #: 7411

```
 1              THE COURT:  Let me --

 2              MR. THOMAS:  I'm sorry, Your Honor.

 3              THE COURT:  I'm constantly trying to put this

 4    information into my own frame of reference.  And let me just

 5    ask Mr. Newkirk.  Currently, I am enrolled in a pharmaceutical

 6    plan through my employer that is administered by CVS Caremark.

 7    Okay.

 8              THE WITNESS:  Uh-huh.

 9              THE COURT:  Now, there is a physical brick and

10    mortar CVS pharmacy, you know, half a mile from my home that

11    I've used for years and years.  I know the pharmacist, you

12    know.  They know me.  We talk and stuff like that.  However,

13    for the most part, for some prescriptions which fall in the

14    category I would say, for lack of a better term, maintenance

15    prescriptions, I found that the Caremark mail order pharmacy

16    whereby I can get a 90-day prescription just delivered through

17    the mail to me is more cost effective, but not always, you

18    know.  I've really found out sometimes, you know, they tricked

19    me on this one, I need to go to my brick and mortar CVS

20    pharmacy for this particular medication because it's a lot

21    cheaper than through the mail order.  So, you know, it seems

22    to me from a personal standpoint to be an endlessly complex,

23    you know, if you're determined to on every purchase get the

24    absolute lowest price, who knows, you know.  But I don't know

25    if my experience is common out there as to whether mail order
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 57 of 236  PageID #:
7412

```
 1   or I'm not really asking for personal advice here, but I'm
 2   just trying to understand how the system works between the
 3   mail order side and the brick and mortar side.
 4           THE WITNESS:  Well, you have to keep in mind who
 5   owns the mail order side, and that's the PBM, CVS Caremark,
 6   Express Scripts --
 7           THE COURT:  They own both of them?
 8           THE WITNESS:  Right.  They own both of them.  So, I
 9   have problems with mail order because you could have a cheaper
10   copay for yourself --
11           THE COURT:  Sure is convenient, by the way.
12           THE WITNESS:  It's convenient.  They may set up and
13   just, you know, every 80 days mail you a prescription whether
14   or not you need it.
15           THE COURT:  Need it or not.
16           THE WITNESS:  Need it or not, it's just going to
17   auto ship to you because they set the rules.  They're allowed
18   to auto ship it to you.  They like to fill prescription by
19   mail order because they make money at mail order.
20           THE COURT:  They need less human beings sitting
21   there in their -- fewer human beings sitting there in whatever
22   the big warehouse is where they send than they do in your
23   neighborhood --
24           THE WITNESS:  It's robotic and they're buying a
25   particular drug by the truckload.
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 58 of 236  PageID #: 7413

1           THE COURT:  And they don't have to have very --
2      well, expensive, trained licensed professionals there on site
3      or at least not as many as they do in my neighborhood brick
4      and mortar CVS?
5           THE WITNESS:  I worked at a mail order facility.
6           THE COURT:  Okay.
7           THE WITNESS:  And yes.
8           THE COURT:  Okay.  All right.
9           MR. THOMAS:  Thank you, Your Honor.
10          THE COURT:  Go ahead.
11     BY MR. THOMAS:
12     Q       Thank you, Mr. Newkirk.  We talked quite a bit about
13     the pharmaceutical and the medical side.  Let's switch a
14     little bit, start talking about the payor side.  I want to ask
15     a couple of questions about pricing and formulary.  Who makes
16     the decision as to what's a covered drug and what's not a
17     covered drug on any given insurance plan?
18     A       Typically, it's going to be the insurance company
19     and the PBM working together.  You know, they're going to
20     develop the formulary.  There could be a set, you know, a
21     standard formulary.  The larger the company, like General
22     Motors, the more input they're going to have on a formulary
23     and exclusions.  You know, the small, little company is going
24     to just basically sign up for, you know, a set formulary for
25     the most part.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 59 of 236  PageID #: 7414

```
 1    Q          Does that mean that a larger company would have a
 2    more expansive formulary?
 3    A          It could be either way.
 4    Q          Okay.
 5    A          They could have a more expansive or a more
 6    restrictive, you know, depending upon how involved they're in,
 7    you know, in the formulary management.
 8    Q          Who sets the prices for those formularies?
 9    A          Well, prices are still -- it's always, it's still
10    based off of average wholesale price set by the manufacturer.
11    And, you know, how the claim pays is determined by the
12    insurance company AWP minus X.
13    Q          For the benefit of the Court, I'd like to ask a
14    couple of questions about the relationship between PBMs and
15    the insurance companies.  My rough understanding, and correct
16    me if I'm wrong because it's probably rough, is that PBMs
17    essentially act as a contracted agent for the insurance
18    companies.  Is that accurate?
19    A          Yes.  I mean, they're hired by the insurance company
20    or the company in order to administer the prescription
21    benefit.  I view it as an outsourced, you know what I mean,
22    you hire someone to do this because they're experts and you
23    work with them to develop, you know, the best formulary you
24    can.
25    Q          Is that because the insurance companies have all
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 60 of 236   PageID #: 7415

1    different kinds of stuff to be thinking about, right, medical

2    claims, durable medical equipment?

3    A          Correct.  Yes.

4    Q          Let me ask some technical payment questions.  You've

5    heard of the term pharmaceutical rebate.  Correct?

6    A          Correct.

7    Q          What is a pharmaceutical rebate?

8    A          A rebate is an agreement between the manufacturer

9    and typically either the federal government Medicare Part D or

10   a PBM, you know, if a drug processes and there is a rebate,

11   they're going, when that drug processes, they're going to

12   capture that data and then the manufacturer is going to pay

13   the insurance company that rebate amount.

14   Q          So, it's money going the other direction, correct,

15   does that makes sense, that the PBM, right, pays the pharmacy

16   who is also paying the manufacturer?

17   A          Correct.

18   Q          And for some reason, whatever it may be, underneath

19   whatever rebate program it is, the manufacturer starts giving

20   some money back to the payor.  Is that correct?

21   A          Correct.  Well, it's given back to the insurance

22   company, to the PBM.  And then it's either, you know,

23   100 percent sent back to the insurance company or the plan

24   sponsor.

25              THE COURT:  They could achieve the same thing simply

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 61 of 236  PageID #: 7416

```
 1   by across the board lowering their prices, but, you know,

 2   well, they could --

 3              THE WITNESS:  Yes.

 4              THE COURT:  They could, but that would be a meat ax

 5   approach, something they would rather have more control over

 6   by using a scalpel?

 7              THE WITNESS:  I mean, the system is really, I think,

 8   a lot of smoke and mirrors and very opaque, the way it's

 9   currently designed.  And if they could get rid of rebates and

10   lower the price of drugs, yeah, that would be a significant

11   lower price of the drugs and to the consumer.

12              THE COURT:  Yeah.

13   BY MR. THOMAS:

14   Q        Mr. Newkirk, do the manufacturer rebates have any

15   impact as to PBM decisions as to what drugs to put on a

16   formulary?

17   A        Absolutely.

18   Q        How so?

19   A        You know, take for instance, like the Hepatitis

20   drugs, Hepatitis drugs, you've probably heard, you can,

21   Hepatitis C, you can basically cure Hepatitis C, it's $30,000

22   a month.  There is four or five of these drugs out there.  You

23   go through three months trial, it's $90,000, and you can cure

24   it.  Fantastic.  So you launch a new Hepatitis C drug and you

25   want to get it on the formulary.  You're going to be offering,
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 62 of 236  PageID #: 7417

```
1    basically, a rebate in order to get it on to the formulary.

2    And if your pricing is not in line and your rebate isn't

3    significant enough, you're not going to make it on to the

4    formulary, whatever it took to develop it.

5              THE COURT:  Well, that's the free market economy at

6    work.  In other words, there used to be only one of these

7    things 30,000 bucks a month and now you've got competitors

8    coming in and over time, presumably, the price will be driven

9    down?

10             THE WITNESS:  Correct.

11             THE COURT:  Okay.  That's what I learned in

12   economics 101.  Okay.

13   BY MR. THOMAS:

14   Q         Mr. Newkirk, is it fair to conclude that that's an

15   economic inducement for the PBM to put that drug on the

16   formulary versus some other competing drug?

17   A         Yeah.  Absolutely.

18   Q         Does that violate any compliance rules?

19   A         No.  This is the way the system has been set up and

20   been, you know, running for decades.

21   Q         Have you heard of the term manufacturer coupon?

22   A         Yes.  I'm very familiar with manufacturer's coupons.

23   Q         For the benefit of the Court, what's a manufacturer

24   coupon.

25   A         A manufacturer's coupon is say I'm Pfizer and I have
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 63 of 236  PageID #: 7418

1    a drug, and it's a, you know, brand name, it could even be a

2    generic drug nowadays and there is a $100 copay on the claim.

3    Patient can't afford $100 copay, so the pharmacy if they look

4    up that drug, they could do it on line, the doctor could have

5    the copay card, the patient can look it up on line.  You can

6    find it.

7             THE COURT:  I've seen that.

8             THE WITNESS:  You process that $100, you know, you

9    send the primary claim to the insurance, comes back you owe

10   $100 copay that must be collected.  You then bill that out to

11   the manufacturer's coupon, and it could take that $100 copay

12   down to $20, it could take it down to zero.  So, they're

13   basically the manufacturer of the drug is paying the copay for

14   the patient.

15   BY MR. THOMAS:

16   Q        Do you believe that the payors are aware of these

17   manufacturer's coupons?

18   A        The payors for the most part are not aware because

19   the way the system works is you bill the primary claim, you

20   know, the first claim.  You bill the drug.  It goes out and

21   gets reimbursed by the PBM, by the insurance company.  You

22   bill the secondary claim, which is the copay, and it goes out

23   to the manufacturer, and then comes back.

24            THE COURT:  Well, now, wait a minute.  Okay.  I

25   mean, they may not be aware of it on each individual

1    transaction, but they are certainly aware that all they have

2    to do is go on the internet and find, you know, yeah, this is

3    what happens.

4              THE WITNESS:  Well, they know the existence of the

5    copay card.  They do not know on individual transactions

6    whether or not --

7              THE COURT:  On individual transactions?

8              THE WITNESS:  Absolutely.

9    BY MR. THOMAS:

10   Q         So, are manufacturer coupons compliant with

11   applicable rules, regulations?

12   A         Yes.  As long as, you know, you follow the rules,

13   you know.  There is only a couple of prohibitions on

14   manufacturer's coupons.  You can't process them on Medicare

15   Part D claims for example.  It's not allowed.

16   Q         Any other prohibitions regarding manufacturer

17   coupons that reduce patient copays?

18   A         Medicare Part D and Tricare are really the ones out

19   there that you're not allowed to process.

20   Q         And is there a Tricare copay?

21   A         Yes and no.  Depends upon the member.  So, if

22   you're, my understanding --

23             THE COURT:  Not for active duty but --

24             THE WITNESS:  Exactly.

25             THE COURT:  -- could be for dependents?

UNITED STATES DISTRICT COURT

1          THE WITNESS:  Active duty is a zero dollar copay.

2  Dependents, families, back then, the copay was $17.

3  BY MR. THOMAS:

4  Q          Let's talk for a couple of minutes about copayments.

5  And correct me if I'm wrong, I'm just laying a little

6  predicate here.  That's the patient's financial responsibility

7  underneath their insurance plan --

8  A          Yes.

9  Q          -- for them receiving a prescription from a

10  pharmacy.  Correct?

11  A          Correct.

12  Q          And who collects that copayment?

13  A          The pharmacy.

14  Q          And is that a contractual requirement?

15  A          Yes.  Typically, it's spelled out that the copays

16  need to be collected and by the manuals.

17  Q          Manuals and probably the provider contract with the

18  pharmacy.  Is that accurate?

19  A          Or the contract may or may not spell out, the actual

20  contract, but the contract will reference the pharmacy manual,

21  and the pharmacy manual spells out the collection of copays.

22  Q          And it makes sense to me that at a point of sale,

23  right, at a community pharmacy that the patient is charged a

24  copay at the point at which they receive their medication.

25  Correct?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 66 of 236  PageID #:
7421

1    A         Correct.

2    Q         I would assume that the pharmacy tech wouldn't hand

3    the medication to the patient unless the patient pays the

4    copay.  Correct?

5    A         For the most part, yeah, that's the idea.

6    Q         So, how does that work with mail order.  Clearly,

7    the pharmacy and the patient are in different places, how does

8    the mail order pharmacy collect copay?

9    A         Mail order, you know, mostly they're going to

10   process by credit card.  They could have some type of accounts

11   receivable, you know, if the patients, you know, regularly pay

12   their bill every month, it would go on to AR, and then the

13   patient would pay off their bill.  If they're in arrears, I

14   don't know that they are going to dispense the next

15   medication.

16   Q         Is it any other party's responsibility to collect a

17   copay other than the pharmacy?

18   A         No.  There is --

19   Q         Just the pharmacy?

20   A         Nobody else would be able to, it's at the pharmacy.

21   Q         Okay.

22             THE COURT:  Just as at the physician's office for a

23   doctor's visit?

24             THE WITNESS:  Correct.

25             THE COURT:  The provider.

1    BY MR. THOMAS:

2    Q          Mr. Newkirk, have you ever seen an instance where a

3    mail order pharmacy uses an EOB, an explanation of benefits,

4    form in order to collect copays?  Is that common or not

5    common?

6    A          Do you mean -- how do you mean?  An EOB sent to a

7    patient?

8    Q          Correct.  In order to be able to collect copay after

9    the fact.

10   A          Well, the only one who could -- if you're talking

11   about a mail order claim, then, yeah, they could send out

12   statements to the patient in order to, hey, you owe this

13   copay, yes.

14            THE COURT:  But that would be more unusual because

15   typically they ask for payment up front and a lot of times,

16   you know, for mail order that is, all, you know, they are

17   asking for is three bucks for copay?

18            THE WITNESS:  Yeah.  They want to be paid.

19            THE COURT:  Yeah.

20   BY MR. THOMAS:

21   Q          Mr. Newkirk, have you encountered the term clinical

22   guidelines?

23   A          Yes.

24   Q          What are clinical guidelines?

25   A          Clinical guidelines is, you know, just at a high

1    level are, you know, the requirements when processing a claim

2    if it falls within clinical guidelines, it will process

3    through and without a reject.  If you're outside of clinical

4    guidelines, you know, could be dosing, could be a quantity,

5    could have an interaction with another drug, then, you know,

6    it falls outside of clinical guidelines and there could be an

7    edit where it's going to fire a reject, then you got, then you

8    need to deal with it at the pharmacy level.

9    Q        And that's a front end edit.  Correct?  We talked

10   extensively about the back end controls, this is at the front

11   end.  Correct?

12   A        Correct.

13   Q        My understanding, and correct me if I'm wrong, I'm

14   sure it's rudimentary is that that's designed to prevent

15   against common errors like a pediatric drug for somebody who's

16   in a nursing home, something that doesn't even make sense?

17   A        Male, female.  It's a point of sale edit that PBMs

18   create to help the pharmacist with their, you know, clinical

19   guidelines, you know, here's a reject.

20   Q        Who sets those clinical guidelines?

21   A        The insurance company.

22   Q        And the pharmacy is required to comply with it.

23   Correct?

24   A        Yes.  They have the ability once they have a reject,

25   to, you know, perhaps override it on their own with their

```
1    professional judgment or they might have to go through a prior

2    authorization process.  They may need to check with the

3    physician, you know.  There is -- there's a process of, you

4    know, it's not getting around it, but dealing with a clinical

5    rejection in a professional manner.

6    Q        And if the pharmacy doesn't do that, what happens,

7    the claim doesn't pay?

8    A        The claim doesn't pay.  You don't dispense the drug.

9    The only way -- if you get a clinical reject and you decide,

10   you know, it's an unpaid claim, you could theoretically charge

11   cash for it, you know.  It's not covered by your insurance, so

12   you just convert it over to, you know, the usual and customary

13   price or what you billed the insurance and the patient could

14   theoretically -- you would have to, you know, it's your

15   initials on it.  You still own it.  And if it's not clinically

16   appropriate, I hope you don't dispense it.

17   Q        Because the insurance company won't pay for it?

18   A        Correct.

19   Q        And if a patient wants the drug, they've got to pay

20   out of pocket?

21   A        Correct.

22   Q        Mr. Newkirk, have you heard the term prior

23   authorization?

24   A        Yes.

25   Q        What's a prior authorization?
```

UNITED STATES DISTRICT COURT

1    A        A prior authorization, it's a reject when you bill a

2    claim and there is a step process for the pharmacy to get the

3    drug approved.  So, like a standard example is, you know,

4    you're prescribed an expensive drug and there are cheaper

5    alternative generics that are older, the insurance company

6    might have a prior auth saying, have you tried this, have you

7    tried these three drugs first, or you're required to do these

8    before you're eligible for this.  So, that would be a prior

9    authorization process.

10   Q        Is the prior authorization process at the front end

11   or the back end?

12   A        It begins at the point of sale.  When you bill that

13   claim, it's going to immediately fire, you know, this is, this

14   requires a prior auth.

15   Q        And it's to control the dispensing of drugs.

16   Correct?  So that the payors pay for only the pharmaceuticals

17   that the payors decide they want to pay for?

18   A        Correct.

19   Q        Mr. Newkirk, have you heard the term utilization

20   controls?

21   A        Yes.

22   Q        What is that?

23   A        Utilization -- it's very similar to all of the other

24   edits.  It's, you know, like one utilization could be for a

25   refill too soon, you know.  They're looking at how often do

UNITED STATES DISTRICT COURT

```
 1    you utilize this drug.  So, if you're allowed a 30 day supply
 2    and it requires 75 percent utilization, you know, it could
 3    fire for a refill too soon if filled too early.
 4            THE COURT:  Mr. Thomas, I'm just -- not emergency,
 5    but I'm looking for a logical stopping point, you know.  I
 6    don't know how much longer you have on your direct, I mean, if
 7    you can finish up, you know, within the next half hour or so,
 8    that's fine, but if you want to take a break, I mean --
 9            MR. THOMAS:  Your Honor, now seems like a logical
10    time for a break.
11            THE COURT:  Okay.  Yeah.  Let's take about a
12    15-minute break.  We've been going for an hour-and-a-half.
13    We'll be in recess until quarter til 11.
14            MR. THOMAS:  Thank you, Your Honor.
15            (Short recess.)
16            THE COURT:  All right.  Everyone have a seat.
17    Proceed with your direct examination, Mr. Thomas.
18    Mr. Newkirk, you're still under oath.
19            MR. HOBBS:  Your Honor, before Mr. Thomas does that,
20    I'm not sure what our time will be, but Mr. Montgomery has
21    asked at noon he will step out of the courtroom, he has to
22    take a call, and I just wanted --
23            THE COURT:  That's fine, Mr. Montgomery.  Let me
24    just say on the record, now, you as a defendant, you have an
25    absolute constitutional right to be here for each and every
```

1    part of these proceedings.  Are you giving your consent that

2    the proceedings can continue until you're finished with your

3    phone call or would you prefer us to wait until your phone

4    call is over?

5                  DEFENDANT MONTGOMERY:  Ideally if we could take a

6    bathroom break for 15 minutes.

7                  THE COURT:  Okay.  Yeah.  Is it only going to be --

8    sure.  We'll take, we'll just take a recess at noon.  Okay.

9    Let me know.  Okay.

10                 MR. HOBBS:  Thank you, Your Honor.

11                 THE COURT:  We're starting -- we got about five

12   minutes until 11.  We got about an hour here, Mr. Thomas.

13   Okay.  Go ahead and proceed.

14                 MR. THOMAS:  Thank you, Your Honor.

15   BY MR. THOMAS:

16   Q        Mr. Newkirk, have you heard the term dispensing

17   limit?

18   A        Yes.

19   Q        What's a dispensing limit?

20   A        To me a dispensing limit would be a quantity limit.

21   So, there is a specific edit that would stop a claim from

22   processing over a certain limit.

23   Q        So, without a dispensing limit, I take it, as a lay

24   person, that would mean that any amount could be dispensed?

25   A        Without a dispensing limit, it would be considered

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 73 of 236  PageID #: 7428

1    what I would consider more of a wide open benefit.

2    Q        Have you heard the term maximum allowable cost?

3    A        Yes.

4    Q        In what relationship to compounding?

5    A        In relationship, you know, MAC pricing really

6    doesn't have a relationship with compounding drugs.  It's more

7    for generic pricing by the insurance companies.

8    Q        And are there ever pricing caps in any PBM program

9    in terms of limits on the amount that a PBM will pay just like

10   a hard stop at a ceiling?

11   A        Yes.  Yes.  You know, traditional retail claims or

12   compound claims there can be a hard cap and there is many

13   instances of that.

14   Q        And concurrent with that, is there ever a process to

15   waive the cap underneath certain circumstances?

16   A        Yeah.  Well, like, you know, Prime Therapeutics, you

17   know, to me they're known for having hard caps on compounded

18   claims.  So, Prime does Blue Cross-Blue Shield of Texas.  They

19   had at this time a $500 cap.  And if you billed a $600 claim,

20   you had to go through a prior authorization in order to get a

21   $600 compound covered.  The problem was that it would be, it

22   would never be approved.

23   Q        Mr. Newkirk, we've had testimony in this case about

24   a Tricare $1,000 cap on compound medications.  Have you ever

25   heard of a $1,000 cap on Tricare compounds?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 74 of 236  PageID #: 7429

1    A        Yes.  There was -- it was called -- the actual

2    reject code they got was a cost exceeds max edit.  It wasn't a

3    hard cap, obviously, because pharmacies were able to call and

4    get the claim overridden.  It's, to me, it was very bizarre

5    how this was happening, you know.  Cost exceeds max to me is a

6    hard edit.  What the pharmacies found out is that, you know,

7    if you bill a compounded claim to Tricare at $999, it would

8    shoot right through.  If you billed it at $1,000 or over, it's

9    going to reject, cost exceeds max.  And then the pharmacies in

10   the beginning, you know, they would just lower the price to

11   $999.  Somebody figured out all they had to do, if I bill a

12   $2,000 compound to Tricare, I make a phone call to Express

13   Scripts for the cost exceeds the max.  They're going to ask

14   you what's in it.  They would read off the ingredients, which

15   to me is nonsensical because they already have what the

16   ingredients are, they would generate the, what would you call

17   it, the authorization to fill it, the override.  And then the

18   override would be in my understanding is for that particular

19   claim for the next year.

20   Q        So, am I correct in understanding that without the

21   cost exceeds max override in the Tricare program that all

22   compounds would have been reimbursed underneath the Tricare

23   program at $999 or less.  Correct?

24   A        Correct.  If Express Scripts would have had that as

25   a hard cap, there would have been no claims over $1,000.

UNITED STATES DISTRICT COURT

1    Q        Who handled the administration or management of that

2    waiver program, was it the PBM, ESI?

3    A        ESI and Tricare together.

4    Q        Together they did it?

5    A        Yes is my understanding.  I think I'm pretty sure

6    that Express Scripts, they're the ones who field the phone

7    calls, they're the ones who staffed it, and, you know,

8    processed the overrides.

9    Q        To your understanding, was it difficult or not

10   difficult to get an override over the cost exceeds max?

11   A        The only difficulty was you were limited to three

12   claims at a time.  So, if you had three rejects for, you know,

13   cost exceeds max, you could call them up and they would do

14   three claims at a time.  And then you'd hang up and you'd call

15   back and do it again.

16   Q        Was it common?  Were there a lot of waivers in the

17   Tricare program on cost exceeds max?

18   A        All day long every day.

19   Q        Which generated --

20   A        Around the country.

21   Q        Which generated claims for compounds of $1,000 or

22   more?

23   A        Correct.  And once you're over that $1,000 cap,

24   there is no other cost edit at all, so it could be any amount

25   theoretically.

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 76 of 236   PageID #: 7431

1    Q        Mr. Newkirk, I want to ask a little bit about

2    marketing and marketing compliance in compounding.  You're

3    familiar with the CVS manual, are you not?

4    A        Yes.  Correct.

5             MR. THOMAS:  I'm going to offer for the Court.  This

6    is Exhibit 113.

7             THE COURT:  Has it already been admitted?

8             MR. THOMAS:  Yes.

9             THE COURT:  Okay.

10   BY MR. THOMAS:

11   Q        Mr. Newkirk, can I direct you to the screen and take

12   a look at the professional judgment and conduct.

13   A        Sure.

14   Q        See that?  You read the testimony of the materiality

15   witness, Steven McCall, from CVS Caremark in this case, have

16   you not?

17   A        Yes, I have.

18   Q        And do you recall reading in Mr. McCall's testimony

19   that he believed as a CVS Caremark representative or official

20   that the professional judgment and conduct language in the

21   manual applied to marketing.  Do you remember Mr. McCall's

22   testimony as to that matter?

23   A        I do recall it, yes.

24   Q        And you've read the professional judgment and

25   conduct language there.  Correct?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 77 of 236  PageID #: 7432

1    A        I have.

2    Q        Okay.  As an expert in compounding compliance,

3    Mr. Newkirk, do you believe that the professional judgment and

4    conduct language that you see before you applies to marketing

5    provisions?

6    A        I don't see how you could make that stretch.

7    Q        Is it compliant for pharmacies to market their

8    compounding services?

9    A        It apparently was because, you know, pretty much

10   everybody, all of the compounding pharmacies in the country

11   were using -- if you were billing any amount, you were, you

12   know, in essence, you were utilizing, you know, marketers.

13   And the insurance companies including CVS could readily tell.

14   Q        And there are, are there not, independent third

15   party marketing entities, correct, like not W-2 employees of

16   pharmacies but 1099 independent contractors who just do

17   marketing.  Correct?

18   A        Correct.

19   Q        Is it compliant for pharmacies to utilize third

20   party 1099 independent contractors to market their compounding

21   services?

22   A        You know, the compliance, the legal side, I'm not an

23   attorney.  I do know that, you know, this is how they were

24   reimbursed across the country across the board at that time.

25   That's how they were paid.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 78 of 236  PageID #:
7433

1    Q        And, certainly, don't give us a legal opinion, you

2    know you've been admitted as an expert in compound pharmacy

3    compliance, and that's what we're asking.  Do you know of,

4    have you seen a claims discrepancy code that relates to

5    marketing for compound services for pharmacies?

6    A        I've never seen a discrepancy of, you know, the

7    claim was a marketer.

8    Q        With any PBM?

9    A        With any.

10   Q        To your knowledge and understanding, did any of the

11   PBMs prohibit the use of third party marketers for pharmacies?

12   A        Not that I'm aware of.

13   Q        From your recollection, from your understanding,

14   from your knowledge, have you seen an insurance plan behind

15   the PBM reject any claims just based upon the use of third

16   party marketing for compound claims?

17   A        No.  And it, you know, doesn't even make sense, you

18   know.  I turned on the news this morning and what do I see,

19   commercials for prescription drugs, you know, marketing.  You

20   know, are those claims, those drugs going to be disallowed

21   because they're marketing directly to the consumer?  No.

22   Makes no sense.

23   Q        Have you seen any requirement in a contract or

24   manual for a network pharmacy to notify a PBM or an insurance

25   plan of the use of third party marketers?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 79 of 236  PageID #: 7434

1    A        No.  I can't even imagine a scenario where a

2    pharmacy would call up and just randomly, you know, ask, or,

3    hey, I'm using a marketer.  That's just never happened.

4    Q        Is marketing of a pharmaceutical a new phenomenon or

5    have you seen it throughout your 30 years?

6    A        Since pharmacy started.

7    Q        Would it be indicative to a PBM that's receiving

8    compounding claims from a pharmacy from a very wide

9    geographical range, say across the country, as to whether or

10   not that pharmacy is utilizing third party marketers?

11   A        Yeah.  I mean, absolutely.  If I was auditing a

12   pharmacy, and I walked in, prior to walking in the door, I'm

13   going to preview the claims.  And if I see that, you know,

14   I've got a pharmacy in Chattanooga and a patient in New York

15   and a physician in Iowa, and how did they get that

16   prescription.  I mean, you know, I can predetermine a marketer

17   is involved.  The PBMs had to have known just from the claims

18   data itself.

19            THE COURT:  You know, about this marketing

20   phenomenon.  Let me just say this.  And I've made the

21   observation, I'm probably the oldest person in the courtroom,

22   which happens pretty often these days, but, you know, it seems

23   like, and, of course, obviously, media, you know, has changed.

24   That, you know, when I was younger, I didn't see as much

25   prescription television ads, now, Bayer aspirin has been

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 80 of 236  PageID #: 7435

 1   obviously advertising on television, you know, throughout my

 2   lifetime.  Okay.  But it seems like that it's a more recent

 3   phenomenon where, you know, prescription medications were

 4   advertising at least on television to me.

 5            Now, having said that, you know, I think that before

 6   I was an adult, you rarely saw lawyers advertising on

 7   television.  And in the '70s, the U. S. Supreme Court changed

 8   the rules and now you can't avoid lawyers' advertisements on

 9   television.  So, is there -- has there -- I mean, am I wrong

10   that at least I didn't see it on television as frequently when

11   I was younger as I do now.  I mean, you can't turn on the

12   television without seeing a prescription.  They're always

13   careful to say, consult with your physician and all of that,

14   but.

15            THE WITNESS:  Correct.

16            THE COURT:  Am I wrong about that?

17            THE WITNESS:  I think it's absolutely grown, you

18   know, the direct-to-consumer marketing has grown especially by

19   television.

20            THE COURT:  But is there -- has it grown as a result

21   of any specific legal change?  Now, again, I can't remember

22   the name of the case, but I do think in the context of the

23   lawyer advertising that there were real questions whether it

24   was ethical until the Supreme Court said, I believe it was in

25   the '70s that, no, it's ethical.  And lawyers obviously have

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 81 of 236  PageID #: 7436

1    really taken the Supreme Court up on that.

2           THE WITNESS:  I don't really know the trigger.  I

3    know that Pfizer reps are greatly curtailed in how they work

4    directly with doctors, you know, you can't pay for expensive,

5    you know, giant expensive meals, you can't fly them all over

6    the country, you know.  They've cut back on that.  Has that

7    resulted in larger direct-to-consumer marketing on television,

8    you know, probably in some part, yeah.

9           THE COURT:  Okay.  Go ahead.

10          MR. THOMAS:  Thank you, Your Honor.

11   BY MR. THOMAS:

12   Q        In terms of the PBM's realization of the use of

13   third party marketers by network pharmacies, was that after

14   the fact or realtime or both?

15   A        What do you mean?

16   Q        Well, for instance, let me offer -- this is a

17   government's exhibit in this case.  This is a prescription.

18   Correct?  Looks to be -- well, instead of me telling you what

19   it is.  Mr. Newkirk, you know compound pads and compound

20   prescriptions much better than I do.  What does this appear to

21   be?

22   A        This is just a script pad for multiple different

23   compounds.  I've reviewed thousands of these.

24   Q        And that's pursuant to audits.  Correct?

25   A        Correct.  You have to --

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 82 of 236  PageID #:
7437

1    Q        You audit, you see the script?

2    A        In order for a PBM -- when you bill a claim there is

3    one important thing.  An insurance company does not have an

4    image of the claim, all they have is the data entered, the

5    quantity, the drug, the price on it.  What they do not have is

6    an image, but once they audit the image, then they look at the

7    prescription.  And like what you can see here is, you know,

8    clearly, a rep ID.

9    Q        What's a rep ID?

10   A        This identifies, you know, to me, this identifies as

11   soon as I see this on audit, I know that there is marketer

12   involved here.

13   Q        A representative?

14   A        A marketing representative.  And, clearly, you know,

15   I can pretty much determine from the location of the pharmacy

16   and the patient and the doctor, but this clearly indicates a

17   rep ID.  And the PBMs saw that.  They saw any time they

18   audited a claim and they saw anything like a rep ID or ID or,

19   you know, an unusual number, they knew 100 percent there was a

20   marketing rep involved.

21   Q        And would that generate a claim discrepancy?

22   A        No, it would not.

23            THE COURT:  Is there any requirement that a script

24   have a rep ID on it, is there a legal requirement?  Why do

25   they --

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 83 of 236  PageID #:
7438

          1            THE WITNESS:  No.  No.  Not at all.

          2            THE COURT:  Well, why does some people, why do

          3    people even bother to put it on?

          4            THE WITNESS:  That would be for the pharmacy to

          5    understand the rep that, you know, the marketing rep who's

          6    working with the physician, you know, who are they basically

          7    in agreement with, who does the script belong to in essence.

          8            THE COURT:  Why does a pharmacist care who it

          9    belongs to other than the physician?  Now, I understand why

         10    they would care, but, I mean, why -- so what?  Okay.  A

         11    marketing rep talked, for instance, a physician into, you

         12    know, writing a script.  I mean, that's on the physician, not

         13    the pharmacist.  Right?

         14            THE WITNESS:  Right.  Well, the pharmacy if you've

         15    hired marketing reps, you want to know who's responsible for

         16    which --

         17            THE COURT:  Okay.  So, they can compensate them, I

         18    guess?

         19            THE WITNESS:  Correct.

         20            THE COURT:  Okay.  I get it.  Okay.  Okay.  Okay.

         21    I'm sorry.  I wasn't following you.  So, that's really an

         22    internal thing for the pharmacy to figure out, okay, well, who

         23    do we give credit for?

         24            THE WITNESS:  Exactly.

         25            THE COURT:  Okay.  All right.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 84 of 236  PageID #: 7439

 1          MR. THOMAS:  Your Honor, this is a government's

 2    exhibit marked document, but I'd like to make it an exhibit

 3    and get it entered.

 4          THE COURT:  Okay.  Any objection?

 5          MR. CLARK:  No, Your Honor.

 6          THE COURT:  Admitted.

 7          MR. THOMAS:  I have no idea what number it is.

 8          THE COURT:  You need to mark it so Ms. Capetz can --

 9    yeah.

10          MR. THOMAS:  Yes, sir.

11          (Defendant Wilkerson's Exhibit 5 was received into

12          evidence.)

13    BY MR. THOMAS:

14    Q      Mr. Newkirk, for the benefit of the Court, please

15    describe how much control PBMs utilized over pharmacy

16    marketers, network pharmacies, a lot, a little, often, not

17    often, please describe.

18    A      Zero authority.  They don't have -- they're not

19    contracted with the marketer.  They're contracted with the

20    pharmacy, and, you know, the plan sponsor.  That's it.

21    They're not even contracted with the doctor.

22    Q      In your opinion as an expert in compound pharmacy,

23    is it compliant for pharmaceutical marketers to market

24    directly to physicians, the physicians who would be writing

25    prescriptions?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 85 of 236  PageID #:
7440

1    A        Yes.  It happens every day.

2    Q        Same question but as to potential patients.  Is it

3    compliant for a pharmacy to utilize third party marketers to

4    market directly to the general public?

5    A        From what I can tell, big pharma does it every day.

6    Look at a commercial.

7    Q        Can you offer the Court any specific examples?

8    A        Yeah.  Just, you know, commercials.  Billboards.

9    You know, direct-to-consumer marketing is, you know,

10   prevalent.

11   Q        How about advertisements that direct patients to

12   physicians?  We've got testimony in this case that we have

13   talked about the generalized commercials where there has been

14   direct-to-patient, direct public marketing saying, you know,

15   please ask your physician, if you don't have a physician,

16   we're happy to recommend one to you.  They've got lists.  Are

17   you familiar with that, Mr. Newkirk?

18   A        Yeah.

19   Q        Is that compliant?

20   A        I think so.  You know, if I go to UPMC, University

21   of Pittsburgh Medical Center, that's where we have our

22   insurance through, and if I go online and I need a doctor,

23   they're going to direct me to a UPMC doctor, 100 percent.

24   Q        Would it be compliant for a pharmacy to direct

25   patients to specific physicians in order for those physicians

1    to be writing prescriptions?

2    A        I think so, yeah.  I mean, that's part of their job.

3    If you need a specialized medication, you're going to want to

4    send them to a physician who's knowledgeable.

5    Q        And, finally, would it be a compliance problem if

6    that communication were directed by the pharmacy's third party

7    independent 1099 marketers to the patients to say if you don't

8    have a doctor, we can recommend one for you?

9    A        Yeah.  I don't see that as a problem, not that I

10   know of.

11            THE COURT:  Okay.  Let me stop you there because, I

12   mean, that's going to be a big issue in this case.  And, I

13   mean, that is a difference in what you see on television and

14   what was allegedly going on here, in that the television ads

15   say see your physician.  Okay.  You, patient, see your

16   physician.  Here, there is an allegation by the government

17   that the marketers were steering -- I think there are two

18   parts to the government's allegation.  That the marketers were

19   steering patients to particular physicians, a small group of

20   particular physicians.  That's the first part.  The second

21   part is that the government alleges that the marketers somehow

22   exercised control over the physicians' exercise of their

23   professional judgment to the extent it was compromised.  Okay?

24            THE WITNESS:  Okay.

25            THE COURT:  Now, this is my job, not yours, but if

 1    the government can prove both of those things, that the

 2    marketers steered individual patients that they approached

 3    initially to individual particular physicians, and, secondly,

 4    that those particular physicians' professional judgment was

 5    compromised at the behest of or that the marketers caused the

 6    physician's professional judgment to be abandoned.  Okay?

 7              THE WITNESS:  Uh-huh.

 8              THE COURT:  Is there anything wrong with that?  And,

 9    I guess, to say if there is anything wrong with it, is there

10    anything, to your knowledge, illegal about it?

11              THE WITNESS:  Illegal?  A marketer can --

12              THE COURT:  And who committed the illegality, is it

13    the physician or the marketer or both?

14              THE WITNESS:  The physician.  A marketer could yell

15    at a physician all day long --

16              THE COURT:  Or pay them?

17              THE WITNESS:  Or, well, as long as you're paying

18    correctly, you know, according to, you know, how a physician

19    should be paid.

20              THE COURT:  Well, to the extent it's a bribe, I

21    mean, but --

22              THE WITNESS:  That could potentially be a problem.

23    Let's assume you're paying correctly.  A marketer could yell

24    at a physician all day long, I want you to prescribe this.

25    And the physician has a, you know, their medical license, you

```
 1    know, their initials are on the line.
 2             THE COURT:  Yeah.
 3             THE WITNESS:  And if they do what the marketer says,
 4    they're out of their minds, like I'm a pharmacist and I got, I
 5    have a patient yelling at me to dispense a drug, and if in my
 6    professional judgment I don't want to do it --
 7             THE COURT:  What if they don't care what happens to
 8    their license, what happens to their license?  I mean, in
 9    which it's still on them if they are willing to risk their
10    license?
11             THE WITNESS:  It still comes to, you know, who has
12    the prescribing authority, you know, per state law.  It's
13    their license.
14             THE COURT:  Yeah.  Okay.  All right.  Go ahead.
15             MR. THOMAS:  Thank you, Your Honor.
16    BY MR. THOMAS:
17    Q        Following up on the Court's concerns and questions,
18    Mr. Newkirk, have you experienced circumstances whereby there
19    is at least an arguable conflict of interest say in a hospital
20    where a prescriber, say it's a nurse practitioners is an
21    employee of the hospital, and if the nurse practitioner
22    prescribes a medication, assuming it's going to be dispensed
23    by the hospital, right, an outpatient basis, how can you tell
24    whether or not that the independent prescribing responsibility
25    that you had just mentioned in response to your last question,
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 89 of 236  PageID #:
7444

1    how can you tell that's been compromised?

2    A        Exactly.  I've audited in hospital-owned pharmacies

3    in hospitals either in the basement or in the first floor, you

4    know, retail setting, the hospital owns the pharmacy.

5            THE COURT:  So, you're saying, basically, that at

6    the end of the day, anybody in the system is entitled to rely

7    on the integrity of the licensed professional?  I mean, that's

8    just the way the system is set up.

9            THE WITNESS:  It's the basis.

10            THE COURT:  Okay.

11   BY MR. THOMAS:

12   Q        Is it common to have nurse practitioners as

13   employees of hospitals?

14   A        Absolutely.  Any prescriber --

15   Q        Is it common for nurse practitioners to prescribe

16   medications?

17   A        Absolutely.

18   Q        Is it common for the hospitals to be dispensing

19   those medications that the nurse practitioners who are

20   employees wrote prescriptions for?

21   A        If they have a pharmacy and just like if they're

22   doing x-rays or anything else.

23   Q        Is it common for a hospital to be essentially

24   getting reimbursed more for the medications that they dispense

25   than they paid?

1    A        Yeah.  Absolutely, you know, unless --

2    Q        Am I correct in understanding it's not a per se

3    discrepancy on a claim?

4    A        It is not a discrepancy.

5    Q        And there is not any specified discrepancy that

6    you've seen in an audit, correct, where there would be a

7    discrepant claim based upon the same entity employing the

8    prescriber and doing the dispensing.  Correct?

9    A        Correct.  There is no discrepancy like that.

10   Q        Let me take you back to CVS representative Steve

11   McCall's testimony.  Do you recall where he was discussing

12   prescribers, nurse practitioners in CVS Minute Clinics.  Do

13   you recall that testimony?

14   A        Yes.

15   Q        From my reading of that testimony, and please tell

16   me if you don't agree, Mr. McCall even stated that that's not

17   a conflict of interest that no matter what, the nurse

18   practitioners who are working in Minute Clinics have an

19   independent responsibility to prescribe in the patient's best

20   interest period, not in CVS's best interest but in the

21   patient's best interest?

22   A        Correct.

23   Q        Is that correct?

24   A        Correct.

25   Q        In this specific circumstance, Mr. Newkirk, and

UNITED STATES DISTRICT COURT

1    you're aware of the facts in this case, there are allegations

2    from the government that it is a per se illegal event to have

3    one entity controlling the prescribers as an employee,

4    correct, and that entity or another affiliated entity making a

5    profit off of medications that those nurse practitioners are

6    prescribing.  You're aware that those facts are in this case?

7    A        Correct.  Yes.

8    Q        What is your professional opinion as an expert in

9    compound compliance, is that a non-compliant event to have an

10   entity both or dual entities that are both controlled by the

11   same person, or persons, to both employ the prescriber and

12   make money off of the prescriptions, is it non-compliant?

13   A        It is not non-compliant.  There is multiple models

14   that do this every day.

15   Q        And how do you find non-compliance, is it a blanket

16   event over all of the claims or do you do it on a claim by

17   claim basis?

18   A        It has to be on a claim by claim basis and that's,

19   you know, how PBMs audit, you know.  It is specific claims in

20   order to determine a specific discrepancy.

21   Q        We've had testimony in this case, Mr. Newkirk, we

22   discussed it briefly, that the government is alleging that

23   there is a requirement for marketers to communicate to a PBM

24   or to an insurance plan what they're doing.  You're aware that

25   that's testimony that's been presented in this case?

UNITED STATES DISTRICT COURT

```
 1   A          I saw that, yes, I did see that testimony.

 2   Q          In your background and in your experience over the

 3   last 30 years as an auditor in the pharmacy space, as an

 4   expert in compound pharmacy compliance, have you ever seen a

 5   requirement in any contract or manual that a marketer is

 6   required to reach out to a PBM or an insurance plan to let

 7   them know what they're doing?

 8            MR. CLARK:  I want to interpose an objection at this

 9   point.  I think that mischaracterizes, one, the testimony,

10   and, number two --

11            THE COURT:  I need to be familiarized -- tell me

12   what witness, I mean, I'm not saying they didn't, remind me

13   which witness, which government witness earlier said that a

14   marketer is under some sort of either legal or ethical

15   obligation to disclose their existence to, who, a PBM or an

16   insurance company?

17            MR. THOMAS:  Primarily, Mr. McCall stated that it

18   would be material to a determination --

19            THE COURT:  Would be material.  Okay.  But, I mean,

20   now, that may be different from either a legal or an ethical

21   obligation.  Right?  Let's be -- I think there is a need to be

22   precise here what we're talking about.  I do believe that

23   Mr. McCall may have testified to that.  Do you disagree with

24   that, Mr. Clark?

25            MR. CLARK:  Mr. McCall testified that was a fact
```

```
 1    they would have liked to have known along with others.  I
 2    don't think he ever said that a marketer is required to --
 3              THE COURT:  I mean, that's something that I'm
 4    probably going to let you both sides cite, you know, the
 5    transcript to me in their brief, precisely what he said, but I
 6    do believe that -- yes.  I will just state, if you can
 7    dissuade me, or, you know --
 8              MR. THOMAS:  Your Honor, I'm happy to restate.
 9              THE COURT:  I believe there is a difference between
10    materiality and a positive legal requirement of disclosure.
11    Yeah.
12              MR. THOMAS:  I'm happy to restate, Your Honor.  And
13    I will bring up Mr. McCall's testimony at a later point in
14    direct.
15              THE COURT:  Okay.
16    BY MR. THOMAS:
17    Q         But I would offer that from my reading of Agent
18    Kriplean's testimony, he stated that the marketer could pick
19    up the phone, could pick up the phone and disclose to an
20    insurance plan that they are being paid for marketing the
21    compound?
22              THE COURT:  But, I mean, what's remarkable about
23    that?  I mean, if that was his testimony, I could pick up the
24    phone and call the IRS and tell them, hey, I'm committing tax
25    fraud every day, I usually choose not to do that, okay, unless
```

1    I think they're on to me already.

2              MR. THOMAS:  May I restate the question, Your Honor?

3              THE COURT:  Yeah.  Go ahead.

4              MR. THOMAS:  Or would you prefer I move on?

5              THE COURT:  Yeah.  Go ahead.

6              MR. THOMAS:  Thank you, Your Honor.

7    BY MR. THOMAS:

8    Q          Mr. Newkirk, I had offered that we've got testimony

9    in this case from the case agent that one of the solutions

10   that a marketer could utilize in order to remove the

11   discrepancy, in order to remove the problem, is to just report

12   to the PBM or report to the insurance company what they're

13   doing.  Hey, I'm marketing drugs on behalf of a pharmacy.

14   Have you seen that in your experience?

15   A          Never.

16   Q          In your experience are there any limitations as to

17   the types of patients that, the types of insurance that the

18   patients have in terms of direct-to-patient marketing like is

19   it legal for Prime Therapeutics or legal for ESI or is it

20   across the board?

21   A          Across the board.  It's not addressed.

22   Q          Does that include Tricare patients?

23   A          That's a more difficult question.  I think that that

24   would be -- you'd have to look at the statutory language and

25   I'm not comfortable answering that question 100 percent.

1    Q        Well, let me ask the question this way.  ESI is the

2    PBM for Tricare.  Correct?

3    A        Correct.

4    Q        Are you aware of a limitation in the ESI provider

5    manual in terms of marketing to Tricare patients?

6    A        I'm not aware of any limitation.

7    Q        Are you aware of any limitations in the ESI manual

8    regarding how it is that marketers can be paid?  Do they have

9    to be W-2s, do they have to be 1099s, do they have to be paid

10   on productivity.  Are you aware of anything?

11   A        During this time period, absolutely not.

12   Q        When you say during this time period, 2013 to 2015?

13   A        Correct.

14   Q        So, the PBM manual was silent as to whether or not

15   marketers marketing to Tricare patients could be paid based

16   upon productivity?

17   A        I don't know that you can even find the word

18   marketing in the manual.

19   Q        Following up on our earlier question I had asked,

20   there is nothing in the ESI manual that pertains to Tricare

21   patients that addresses whether or not a marketer has got to

22   be a W-2 or a 1099.  Correct?

23   A        Correct.

24   Q        Mr. Newkirk, was there any confusion in the industry

25   as to how to classify Tricare in 2013, 2014, 2015?  Was there

```
 1    any confusion in the industry as to whether or not it was
 2    public or private?
 3    A        I mean, it was run through Express Scripts.  So, was
 4    there confusion or not, it was just a, you know, a plan
 5    administered by Express Scripts, so.
 6              THE COURT:  The pharmacy plan was administered by --
 7              THE WITNESS:  Correct.
 8              THE COURT:  -- Express Scripts?  I mean, Tricare --
 9    let's -- okay.  Tricare itself was in fact a government plan,
10    at least I've heard testimony that, hey, you know, Congress
11    had to appropriate additional funds, so, I mean, that's the
12    definition of a public insurance plan.  Now, having said that,
13    just like every aspect of the federal government, certainly,
14    including the Department of Defense, they contract out this
15    work to private companies to do that for them.  Okay.
16              THE WITNESS:  Correct.
17              THE COURT:  Best example I know is, yes, the
18    Lockheed Martin and other like-minded companies create the
19    weapons systems that our government uses to fight its wars.
20    Okay.  So, I mean, you know, there is nothing unusual about a,
21    about the government contracting with a private company to
22    administer aspects of its plan whether it be pharmacy benefit
23    management or weapon production.  Right?
24              THE WITNESS:  Right.  Correct.
25
```

BY MR. THOMAS:

Q        Mr. Newkirk, are you aware of any differences between Tricare and Medicare, are they the same program, are they different?

A        They're different.

Q        And I've got in my notes from your testimony earlier today that while Tricare uses ESI as a PBM that the Medicare program utilizes a different front end for their pharmaceutical claiming system.  Correct?

A        Well, Medicare contracts with nearly every PBM out there in order to administer the Medicare benefit.

Q        So, the Medicare program uses PBMs like the Tricare program?

A        Correct, including Express Scripts.

Q        Do you believe it's a compliance concern if a marketer utilizes submarketers or sub-submarketers?

A        I don't see how that's a compliance issue from a PBM or an audit perspective.

Q        Have you ever seen a claims discrepancy having to do with the use of submarketers or sub-submarketers?

A        No, not at all.

Q        Is there any -- is there any code for the denial of a claim based upon having another person pay the patient's copay other than the patient?

A        No.  When you're looking at an audit and proof of

         1    collection of copay, the PBM is basically just verifying that

         2    the copay was collected.

         3    Q        Do the PBM manuals specify that only the patient can

         4    pay the patient's copay?

         5    A        Not explicitly.  I mean, there is language, you

         6    know, that leads that way, but there is no restriction that,

         7    you know, if I go in and my son has an antibiotic, can I pay

         8    his copay?  Absolutely.

         9            THE COURT:  Let's say, but, if there is language

        10    that could be accurately interpreted to, you know, in a PBM

        11    manual to prohibit a third party from paying a patient's

        12    copay, well, if someone were to run afoul, if a pharmacy were

        13    to run afoul of that provision, the proper legal remedy, I

        14    believe, would be breach of contract.  Right?

        15            THE WITNESS:  For the particular individual claim,

        16    yes, upon audit.

        17            THE COURT:  Yeah.  I mean, it's a breach of

        18    contract?

        19            THE WITNESS:  Right.  But then, also, you know,

        20    manufacturer coupons are used every single day to reduce

        21    copays.

        22            THE COURT:  Yeah.  Well, yeah.  Okay.

        23    BY MR. THOMAS:

        24    Q        Manufacturers reduce copays.  Correct?

        25    A        Every day all day long.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 99 of 236  PageID #: 7454

```
 1   Q         Organizations reduce copays?

 2   A         There are many pharmacies out there that work with

 3   the local church and say somebody can't afford their

 4   medications, you know, the church will step up and pay those.

 5   Q         Patient assistance programs can be approved by the

 6   Medicare program.  Correct?

 7             THE COURT:  Well, I mean, how many times have I

 8   heard if you can't afford your medication AstraZeneca may be

 9   able to help, you know.

10             THE WITNESS:  They're designed that way in order to,

11   you know, sustain the business model.

12             THE COURT:  Okay.  Well, it creates public good

13   will.  Hey, this is not just, this is maybe primarily but not

14   just a greedy pharmaceutical company, you know.

15             THE WITNESS:  We're willing to pay for a couple of

16   these people who can't afford it in order to allow the

17   processing of these drugs, and, you know, you know, if you

18   don't have the means, we'll help, and if not, we have the

19   manufacturer's coupon to take your $1,000 copay down to 20

20   bucks.

21             THE COURT:  Yeah.  Right.

22   BY MR. THOMAS:

23   Q         Mr. Newkirk, have you ever seen a claims discrepancy

24   where a marketer paid for a patient's copay?

25   A         I have not.
```

UNITED STATES DISTRICT COURT

```
 1    Q        In 30 years?

 2    A        No.  I've never seen that discrepancy written up.

 3    Q        Is there a discrepancy that's dedicated to paying

 4    someone else's copay?

 5    A        They would have to create the discrepancy because in

 6    the current manuals and the manuals at that time there is no

 7    discrepancy identified as someone else paid the copay.

 8    Q        Mr. Newkirk, is there any requirement that you've

 9    seen that you're aware of either in contract or in a PBM

10    manual that requires the disclosure to a patient of the cost

11    of the medication to the insurance plan?

12    A        No.  No.  I mean, by who, by anybody?

13    Q        That was my next question.  Is the patient's

14    physician required to disclose to the patient the cost to the

15    patient's insurance plan for the medication that the doctor is

16    writing?

17    A        They're not only, you know, not required, but they

18    don't know the cost of the medication.

19    Q        Is the pharmacy required to disclose to the patient

20    the cost to the patient's insurance plan the cost of the

21    medication that the pharmacy is compounding and dispensing to

22    the patient?

23    A        They're not required, and in some instances, they

24    may even be prohibited.

25             THE COURT:  Actively prohibited?  Yeah.
```

UNITED STATES DISTRICT COURT

1          THE WITNESS:  Actively prohibited.

2   BY MR. THOMAS:

3   Q          Because pricing is proprietary.  Correct?

4   A          Pricing is proprietary, but they're just not

5   required to, you know, when the patient picks up the

6   medication, the cost in effect for the patient is a copay.

7   You have a $10 copay, how much did that cost, it cost $10.

8   Q          And, finally, my last question in this line of

9   questioning.  Is it required for a marketer who's working for

10  a pharmacy, who's in that work, the insurance plan and the PBM

11  to disclose pursuant to direct-to-consumer marketing the cost

12  to the patient's insurance plan or PBM of the medication at

13  issue?

14  A          Absolutely not.  And it's, to me, it's probably

15  impossible to do that.

16  Q          In your career have you ever seen a claims

17  discrepancy due to failure to disclose to the patient the cost

18  to the patient's insurance plan of the medication at issue?

19  A          No, it doesn't exist.

20  Q          As it relates to compounding, even if there were

21  requirement for the marketer to disclose to the patient to

22  whom the marketer is marketing the cost of the compound, how

23  is it that the marketer would know the cost of the compound?

24  A          They really couldn't, you know, perhaps, because a

25  compound has say seven different ingredients depending upon

UNITED STATES DISTRICT COURT

```
1    where they're sourcing the chemicals or the drugs, and put it
2    together, it could have all different types of pricing, the
3    final price and then, you know, what the insurance company
4    actually reimbursed.  There is just no way.  The only entity
5    that's going to know the final cost of the compound is the
6    pharmacy.
7    Q        Are you aware in any other sector of health care
8    where there is a requirement to disclose to the patient the
9    ultimate cost to the patient's insurance of goods or services
10   that the patient is about to receive?
11   A        I'm not aware.
12   Q        Not in hospitals.  Correct?
13   A        In the pharmaceutical side, no.
14   Q        Again, Mr. Newkirk, you reviewed the testimony of
15   Steve McCall, the CVS representative, that testified in this
16   case.  Correct?
17   A        Yes, I did.
18   Q        Do you recall Steve McCall testified that CVS
19   Pharmacy doesn't tell a patient what Caremark paid for the
20   prescription?
21   A        I recall that, yes.
22   Q        And are you aware in any instance of a pharmacy
23   being required to provide lower cost alternatives based upon a
24   prescription?
25   A        Only in, you know, brand generic substitutions.
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 103 of 236  PageID #: 7458

1    But, you know, as far as compounding drugs, it's up to the

2    pharmacy to choose who they're sourcing the drugs from for the

3    particular compound.

4    Q        And in the industry, are you aware, are there any

5    rules or regulations that require, I mean, apart from the

6    manual, apart from the contracts, are there any regulatory or

7    statutory requirements for disclosures of manufacturers in

8    direct-to-patient marketing to disclose cost of medications to

9    the patient's insurance plan?

10   A        No, not at all.  For a manufacturer to tell the

11   price of their drugs?  I've never seen it.

12   Q        In fact, are you aware of a relatively recent case

13   in which Health and Human Services promulgated a rule, a

14   proposed rule that would force manufacturers in their

15   direct-to-consumer marketing like on television, to disclose

16   the cost of the medication so that the patients would know

17   when I go to my doctor to ask for a medication, I know what my

18   insurance plan is going to pay?  Are you aware of any current

19   opinions that were just issued by federal courts relating to

20   that?

21   A        Yeah.  HHS wanted to implement that rule to have

22   pharmaceutical advertising, you know, list the price.  And big

23   Pharma, Merck, of course, challenged them on it.  And my

24   understanding from a layman is that, you know, they sided on

25   the side of the pharmaceutical companies and struck it down.

1   Q        That's the *Merck versus HHS* case that came out just

2   several months ago.  Correct?

3   A        Correct.

4   Q        That proposed rule was struck?

5   A        Yes.

6   Q        So even the manufacturers aren't required to

7   disclose pricing to patients in direct-to-patient marketing?

8   A        Correct.  And your commercials that you see, you're

9   not going to see a price at the bottom of the line scrolling

10  across.

11  Q        Mr. Newkirk, back to compound medications.  Would it

12  be a compliance concern if medications dispensed to a patient,

13  compounded medications were somehow ineffective, they just

14  didn't work.  Is that a compliance issue?

15  A        You know, if they don't work, I mean, it's up to the

16  physicians, you know, prescribing them, you know, medical

17  necessity and the appropriate drug, whether or not it works is

18  something that you pretty much figure out down the road and

19  you might have to try something else.

20  Q        Would it be a compliance concern if the prescription

21  that was generated was not generated pursuant to a physician

22  patient encounter?  Would that be a compliance issue?

23  A        It would be for the physician if there is not a

24  valid physician patient relationship, yeah, that's a definite

25  problem for the physician.  You know, how does a pharmacy tell

1    whether there is a valid patient, you know, physician

2    relationship.  I mean, when you get a prescription that comes

3    in, you're filling 1,000 prescriptions a day, you know, that's

4    on the physician to have that valid relationship for, you

5    know, for the most part from the pharmacy perspective.

6    Q        Is there a discrepancy code applicable to the

7    pharmacy in the event that somehow the encounter between the

8    doctor and the patient was non-compliant?

9    A        I've never seen one.

10   Q        It's not a pharmacy problem, is it?

11   A        It is not a pharmacy problem.

12   Q        Because it's the responsibility of the physician?

13   A        Correct.

14   Q        Okay.

15            THE COURT:  When you say a valid patient

16   doctor relationship, how would you define a valid patient

17   doctor relationship?

18            THE WITNESS:  It's going to come down to the

19   individual state laws and rules and regulations.  So, you

20   know, states may require that you have a physical encounter.

21   Telemedicine is being mandated, you know, the allowance of it

22   by the federal government, because, you know, access to meds.

23   So, can you have a valid relationship over the telephone now?

24   Yes.  Does it have to be a video?  Maybe, perhaps, depends

25   upon the state law, but, you know, it's determined by the

1    state.

2              THE COURT:  Okay.

3    BY MR. THOMAS:

4    Q        Mr. Newkirk, would it be a compliance concern if a

5    pharmaceutical marketer, third party marketer, were paid

6    through an individual LLC as opposed to getting paid

7    personally?

8    A        I'm not an expert on, you know, how a, how

9    corporations are set up and how they're paid.

10   Q        Fair enough.  Let me reask that question.  Not a

11   great question.  Have you seen a discrepancy code --

12   A        No.

13   Q        -- related to paying a marketers' LLC versus paying

14   a marketer directly?

15   A        No.  No, that has never come about.

16   Q        Would it be a compliance concern to you if a patient

17   and a marketer were one in the same person, that essentially a

18   sales rep were getting paid a commission based upon their own

19   personal compounded medication?  Would that be a compliance

20   concern?

21   A        I don't know.  It would be a claim you could audit.

22   Would it be a compliance concern?  I don't know.  There is not

23   a discrepancy code for it.

24   Q        That was going to be my next question.  No

25   discrepancy code?

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 107 of 236   PageID #: 7462

1    A          Right.  There is no discrepancy code, you know.

2          THE COURT:  Well, let's explore that a little bit

3    further.  Okay.  So, you say that would be perhaps a flag on

4    an audit if you became aware that a patient themselves had

5    been paid a commission somehow for, you know, the prescribing

6    of that medication for the individual.  Right?  Because it

7    provides a financial incentive for that individual to receive

8    that prescription as opposed to a medical incentive.  Right?

9          THE WITNESS:  Right.

10          THE COURT:  But as long as there is a physician

11    signature on the script.

12          THE WITNESS:  (Witness moves head up and down.)

13          THE COURT:  Okay.  Yeah.  What are you supposed to

14    say, well, you are going to almost 100 percent of the time

15    rely on that physician's signature or prescriber signature?

16          THE WITNESS:  That's their, that's their medical

17    license on the line.

18          THE COURT:  All right.  Go ahead.

19    BY MR. THOMAS:

20    Q          Given medical necessity for the compound medication,

21    do you think that that would be discrepant?

22    A          As long as -- no, it's not a discrepancy.

23          THE COURT:  What I hear him saying is as long as you

24    got that licensed professional signature on the script, that

25    may look fishy, but, you know, seems to be acceptable.

UNITED STATES DISTRICT COURT

1   BY MR. THOMAS:

2   Q         Because a sales rep may have pain that could be

3   treated by a topical medication?

4   A         A Pfizer rep could be treated with a Pfizer drug and

5   have a zero-dollar copay.

6             THE COURT:  I bet you there are Pfizer reps that

7   take Lipitor.

8             THE WITNESS:  I bet there are.  My wife worked for

9   GlaxoSmithKline for 17 years until they closed GSK in

10  Pittsburgh.  And we used to get brand name Glaxo drugs for

11  zero, did that affect us.

12  BY MR. THOMAS:

13  Q         Did your insurance company, and I don't mean to get

14  personal, but you brought it up, did your insurance company

15  ever --

16  A         They could have audited --

17  Q         -- give any kind of complaint --

18  A         Absolutely not.

19  Q         -- and say you're getting, you're double dipping?

20  A         No.  Absolutely not.

21  Q         Mr. Newkirk, I'd like to go into the final series of

22  questions that I'd like to ask, to ask of you.  Again, you

23  read Steve McCall's testimony, the CVS Caremark

24  representative?

25  A         Correct.

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 109 of 236   PageID #: 7464

1    Q        I'd like to address some of the matters that he

2    addressed as a materiality witness for the government.  The

3    government asked of Mr. McCall, and, of course, you read his

4    testimony, whether it would be material as to a decision for

5    CVS Caremark to pay a claim or not pay a claim if customers

6    were not paying a copay.  Would that be in and of itself a

7    discrepant claim based upon your experience?

8    A        On the individual claim itself.  You have to audit

9    the claim in particular in order to determine that.  You know,

10   a generalization, in the end, you have to audit the claim.

11   Q        Yes.  And was there a requirement for the pharmacy

12   to collect a copay, if no matter what the pharmacy did they

13   couldn't collect a copay, would that generate a clawback for

14   the payment to the pharmacy?

15   A        Yes.  Proof of collection of copayments were -- they

16   became standard auditing techniques.

17   Q        So, it's a requirement not to just try, it's a

18   requirement that literally get the copay and if for some

19   reason, like you say, I don't know, the patient is indigent

20   and they can't pay, that's going to generate a clawback?

21   A        It will absolutely generate a clawback.  You could

22   have a $20 copay and collect $19 of it and upon audit if you

23   still haven't collected that last dollar, it's 100 percent

24   recoupment of that claim.

25   Q        And that's determined on a claim by claim basis?

1    A        100 percent, yes.

2    Q        Is there any other way to determine that other than

3    a claim by claim basis?

4    A        No.  I mean, you can't extrapolate, you know, if you

5    find three out of 10 claims, that's 30 percent and extrapolate

6    against the board, across the board, you're not allowed to do

7    that audit wise for PBMs.  It's been shot down in court, at

8    least that's what I was, you know, trained at Medco.  We could

9    not extrapolate anything.  Everything was on a claim by claim

10   basis.

11   Q        What if a marketer paid the patient copay, would

12   that generate a discrepant claim?

13   A        It would, it would not generate a discrepancy.  When

14   the copay is audited, what the PBM requires is payment and

15   proof of payment.  So, who paid it, really, at that point does

16   not create a discrepancy.

17   Q        Do you recall that Mr. McCall stated that CVS

18   Caremark would find it material if CVS Caremark knew that the

19   same entity or the same person was both earning commissions

20   from a pharmacy for the promotion, sale of compounded

21   medications, and as well as employing prescribers who are

22   writing those prescriptions.  Do you recall that testimony?

23   A        I do.

24   Q        Would you find that on a claim by claim basis to be

25   a discrepancy, would you deny that claim?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 111 of 236  PageID #: 7466

1   A          There is not a discrepancy type for that, you know,

2   that scenario.  I don't know how, you know, if you're in a

3   pharmacy auditing a claim, you're looking at reviewing the

4   claim, you're not going to know the ownership structure of a

5   physician's office.  I don't see how that could ever be a

6   discrepancy.  And even if they knew the ownership structure,

7   there is not a discrepancy type for that.

8   Q          And from my notes, I jotted down that you had stated

9   that given independent clinical judgment, which is the

10  responsibility of the prescriber, that's the test.  Correct?

11  A          Say that again.

12  Q          Surely.  From my notes, I have that you had said to

13  me in response to one of my questions that no matter what,

14  discrepancies are going to be found in the event there is a

15  lack of medical necessity, for whatever reason, but that is

16  the sole determination of the patient, I'm sorry, the sole

17  determination of the prescriber and not anyone who employs the

18  prescriber.  Is that correct?

19  A          Correct.

20  Q          Mr. Newkirk, and this is a little bit repetitive

21  because we had just talked about this with marketers getting

22  paid on their own prescriptions.  Mr. McCall, you'll recall

23  from his testimony, stated that he would find it material as a

24  CVS Caremark official as to whether or not that a person who's

25  both a patient and a sales rep.  So, I'm going to ask you.  He

1  found it material.  Would you find it discrepant?

2  A        You would have to audit the individual claims in

3  order to identify a discrepancy.

4  Q        Do you recall from Mr. McCall's testimony that he

5  believed that it would be material to the CVS Caremark

6  determination as to whether or not to pay a claim as to

7  whether or not a patient contacted a nurse practitioner or the

8  nurse practitioner contacted the patient.  Do you recall that

9  testimony?

10 A        Not quite as clear as I do, but I understand what

11 you're asking.

12 Q        All right.  Let me rephrase the question.  Would you

13 find it to be discrepant in the event that a nurse

14 practitioner contacted the patient as opposed to a patient

15 contacting a nurse practitioner to get the encounter to write

16 the prescription for the patient?  Would you find that

17 discrepant?

18 A        I would not, no.  There is no discrepancy for how a

19 physician and a patient interact.

20 Q        Have you ever seen a claims discrepancy based upon

21 that?

22 A        No, I have not.

23 Q        Do you recall any testimony from Mr. McCall

24 regarding any input of the marketers into what compounds went

25 into the ultimate prescription?  Do you recall that testimony?

1    A          What ingredients?

2    Q          What ingredients.

3    A          Yes.

4    Q          Would you find it to be discrepant in the event that

5    a marketer had any control over what went into an ultimate

6    compound?

7    A          Well, no, it still comes down to the prescriber, you

8    know, in the end the prescriber has to prescribe the

9    medication.  And, you know, it's their signature, their

10   authority, and that's who it rests with.

11   Q          Have you ever seen a claims discrepancy based upon

12   that, a marketer having any effect upon what went into a

13   compound?

14   A          No, I have not.

15   Q          Mr. McCall testified that he believed that it would

16   be material to a CVS Caremark decision as to whether or not to

17   pay a claim in the event that CVS knew that marketers were

18   essentially directing prescriptions to particular compound

19   pharmacies, right, picking one compound pharmacy over another

20   compound pharmacy.  Would you find that to be a claims

21   discrepancy?

22   A          No.  Because, again, it's going to come down to the

23   physician prescribing the medication.  And it's going to come

24   from the physician's office.  And in the end, the physician

25   and the patient are working together, you know, hopefully to

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 114 of 236  PageID #: 7469

1    determine where they can send this medication.

2    Q        Have you ever seen a claims denial based upon a

3    marketer directing a compound prescription to any given

4    pharmacy?

5    A        No, I have not.

6    Q        Okay.  And we've covered this, but I'm going to ask

7    you again.  Have you ever seen a claims discrepancy based upon

8    the use of a compound pharmacy pad because Mr. McCall stated

9    that he believed it would be material to a CVS Caremark

10   determination?  Discrepancy or no?

11   A        No, there is no discrepancy.  And I don't understand

12   that testimony because, you know, all of the PBMs were well

13   aware of compounding pads, preprinted prescription pads

14   because they audited thousands and thousands of them and never

15   wrote them up as a discrepancy for being a prescription pad.

16   Q        It's my understanding that Mr. McCall had testified

17   that it would certainly be a material matter for CVS Caremark

18   to pay a claim if it appeared that multiple members of a

19   single family were receiving what appeared to be relatively

20   similar or the same compounds?  Would you find that event to

21   be discrepant?  Would you have a claims denial concern?

22   A        Well, the claim would have to be audited, you know,

23   for the family members and then it's still going to rest on

24   the prescriber prescribing the drug.  If the doctor is writing

25   for it, they're determining the medical necessity of the

1    medication.

2    Q        Do you ever recall seeing a claims discrepancy based

3    upon the same family getting similar prescriptions?

4    A        No.  And in the compounding world, this was, this

5    was quite common.  And I think I would argue traditional

6    retail pharmacy, this is, you know, common as we become older

7    and all, you know, family members have diabetes, are they

8    going to be treated with common diabetes medications?

9    Absolutely.

10   Q        From my notes, I have that the government inquired

11   of Mr. McCall whether or not there would be any concern

12   whether or not that marketers approached patients versus

13   patients approaching marketers.  Would you find that to be a

14   claims discrepancy in the event that that were true?

15   A        There is no discrepancy type for, you know, the

16   marketing entities at all.

17   Q        No claims discrepancy noted?

18   A        Correct.

19   Q        Do you ever recall seeing a claims denial based upon

20   that?

21   A        No.  I have never seen a claims denial on that.

22   Q        The government also asked Mr. McCall on direct

23   testimony whether or not that customers, patients that had

24   been offered money, the same patients who received

25   medications, that CVS Caremark would consider that to be a

UNITED STATES DISTRICT COURT

1  material event as to whether or not that they would pay the

2  claim.  Would you find that to be a discrepant claim?

3  A        You would have to -- that would be a claim you'd

4  want to audit and determine is there, you know, something

5  invalid about the claim.  Is there a discrepancy type for

6  that?  It doesn't exist.  You would have to, you know, create

7  it.

8            THE COURT:  But I heard his testimony, I think,

9  previously that that would raise something of a red flag at

10  least to look into it further.

11            THE WITNESS:  Yes.  Of course, you're going to have

12  concern, but you're still, you have to audit each and every

13  claim.

14            THE COURT:  Yeah.  That's what I understood your

15  testimony to be.  All right.

16  BY MR. THOMAS:

17  Q        Is there a discrepancy code for conflict of interest

18  or paying patients, giving them an incentive?

19  A        No.

20  Q        Mr. Newkirk, are you aware of any -- and you're an

21  auditor -- of any audits that were applicable in this case?

22  Were you aware that there was a Blue Cross audit at some

23  point?

24  A        Yeah.  Yes.

25  Q        It's a very difficult number to read, but this is a

 1    government's exhibit in this case.  Mr. Newkirk, have you seen

 2    this documentation previously?

 3    A          This particular one, I don't know if I saw this

 4    page, but I just read it.

 5    Q          I'll give you just a moment to look at that.

 6    A          I did review this.

 7    Q          Is this an audit result?

 8    A          This is, it looks like an audit result from, I think

 9    this was Blue Cross Blue Shield.  And they had some concerns

10    about family members.  And they did a chart review and

11    reviewed it, and, you know, gave it their stamp of approval.

12    Q          Chart review of Karma Medical Spa patients.

13    Correct?

14    A          Correct.

15    Q          And there were no aberrant claims findings.

16    Correct?

17    A          Correct.

18    Q          Any claims denials that you're aware of pursuant to

19    this audit?

20    A          Not that I'm aware of.

21    Q          Any other audits that you're aware of that applied

22    to Karma Medical Spa or Top Tier Medical?

23    A          Not that I'm aware of.

24               THE COURT:  Mr. Thomas, we've got about five more

25    minutes before I'm going to take a break.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 118 of 236  PageID #: 7473

 1              MR. THOMAS:  I'm wrapping up, Your Honor.

 2              THE COURT:  Okay.

 3              (Brief pause.)

 4              MR. THOMAS:  Your Honor, could we take a very brief

 5    recess?

 6              THE COURT:  I tell you what, why don't we go ahead

 7    and take a recess until 12:15.  You think that will give you

 8    time to complete your phone call, Mr. Montgomery?

 9              DEFENDANT MONTGOMERY:  Yes, Your Honor.

10              THE COURT:  We'll be in recess until 12:15.

11              MR. THOMAS:  Thank you, Your Honor.

12              (Short recess.)

13              THE COURT:  All right.  Are we ready to continue,

14    Mr. Thomas?

15              MR. THOMAS:  Thank you, Your Honor.  Housekeeping

16    matter.  You had asked me if 113 had been admitted, I

17    misinformed the Court, I thought it came in under Mr. McCall.

18    It did not.  I'd like to move it now, Your Honor.

19              THE COURT:  Any objection?

20              MR. CLARK:  I'm sorry.  Which exhibit is that?

21              THE COURT:  113.

22              MR. THOMAS:  113.  That's the CVS provider manual

23    from 2013.

24              MR. CLARK:  No objection.  No, sir.

25              THE COURT:  Admitted.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 119 of 236  PageID #: 7474

1          (Government's Exhibit 113 was received into

2          evidence.)

3          MR. THOMAS:  Thank you.

4     BY MR. THOMAS:

5     Q         Mr. Newkirk, I've got from my notes pursuant to a

6     couple of my questions of you earlier on direct that it can

7     become evident to a PBM when a pharmacy is utilizing marketers

8     through several telltale signs like a rep number on a claim,

9     sorry, on a prescription or geographically disbursed claims.

10    Can you offer the Court any other additional telltale signs

11    that would indicate to a PBM that a pharmacy is utilizing

12    third party marketers?

13    A         Besides the obvious, a rep ID on a hard copy.  The

14    geographical, perhaps, the volume of compounded prescriptions,

15    you know, that would be an indicator for sure.

16    Q         And you're aware that in this case the defendants

17    were marketing to at least in some instances Tricare patients.

18    Correct?

19    A         That's my understanding.

20    Q         And that the Tricare claims were coming in from a

21    relatively widely disbursed geographical range.  Correct?

22    A         Correct.  Tricare members are all over the country

23    and the world.

24    Q         Would it be fair to say that ESI, who's the Tricare

25    PBM, could at least to some degree been put on notice that the

1    pharmacies were utilizing third party marketers for Tricare

2    patients?

3    A          I don't see how they wouldn't know.

4    Q          Did ESI treat Tricare differently than other payors?

5    A          They treated them as a plan sponsor and they

6    designed the Tricare, you know, benefit along with Tricare.

7    And, you know, the compound benefit design was, you know, to

8    my knowledge specific to Tricare.

9    Q          We talked about the cost exceeds max and the

10   overrides.  That might be one difference, right, between

11   Tricare and the commercial payors.  Correct?

12   A          Yeah.  You know, any plan sponsor can, you know,

13   create whatever plan parameters they want to, you know, put in

14   place for a compound benefit.  Tricare's plan design was, you

15   know, pretty much a wide open benefit except for that, you

16   know, at this point I would consider it a soft edit at $1,000,

17   and then after that, there really was no stopping the claim.

18   Q          Can you offer the Court as we sit here today any

19   other matters that you're aware of that would differentiate

20   Tricare from the commercial payors?

21   A          Not that I can think of, no.

22   Q          Is it fair to state that due to the cost exceeds max

23   and the overrides that ESI, of course, was aware of the

24   compound prescriptions that were coming in to ESI and being

25   paid?

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 121 of 236   PageID #:
7476

1    A        Absolutely.  I mean, of course, they know, that's

2    their job, you know, they process the claims, and they pay

3    them at the point of sale, and they know how much the claim is

4    processing for and for who and for whom.

5    Q        That was realtime.  Correct?

6    A        Correct.

7    Q        So, you know, the people were literally picking up

8    the telephone and talking to ESI reps to get the override.

9    Correct?

10   A        Yeah.  There was no other way, if you bill a

11   compound claim for $2,000, and the ingredients add up to that,

12   it's a hard reject until you call Express Scripts and talk to

13   somebody there, and go through the process to have it

14   overridden.  They were, you know, it's a very fast process.

15   And to my knowledge, I do not know of one claim that was ever

16   turned down.

17   Q        And it's fair to state that ESI knew full well that

18   the volume of compound claims that were coming in and at what

19   amount because they were approving them?

20   A        Absolutely.  The volume and the cost.

21   Q        Realtime?

22   A        Realtime.

23   Q        Let me ask the same question as it relates to CVS.

24   You'll recall that Mr. McCall's testimony, and he's the CVS

25   Caremark representative, there was a 72-hour compound script

1    review process at CVS Caremark.  Do you remember that

2    testimony?

3    A        I do recall that.

4    Q        So, is it fair to say that's kind of an analog to

5    the Tricare, that CVS Caremark knew full well what the volume

6    was that was coming in, what the claims looked like, they were

7    doing realtime review of those claims coming in.  Correct?

8    A        They're a pharmacy benefit manager, that's what they

9    specialize in, the processing and paying of claims.  And, you

10   know, Steve McCall even went into further detail.  They had a

11   compounding expert he said reviewing all of these claims

12   within 72 hours.  I don't know how they would physically do

13   that, but, yes, they have the claims, the data, it's there.

14   Q        So, is it fair to say that the pharmacy benefit

15   managers were managing the pharmacy benefit for the payors in

16   this case?

17   A        Yes.  That's their job.

18            MR. THOMAS:  Thank you.  No further questions on

19   cross.

20            THE COURT:  On direct you mean?  Okay.

21            MR. THOMAS:  I'm sorry.  On direct, Your Honor.

22            THE COURT:  Okay.  That's what I thought.  Why don't

23   we go ahead and take our lunch break.  It's about 12:30.  Why

24   don't we be in recess until 2:00 p.m.  And I guess, Mr. Clark,

25   at that point you're going to begin your cross-examination?

UNITED STATES DISTRICT COURT

1        MR. PIPER:  Judge, he is, but I think other

2  defendants are going to cross as well.

3        THE COURT:  Oh, are they.  Okay.

4        MR. WALDEN:  Yes, Your Honor.

5        THE COURT:  Well, then, why don't we go ahead and

6  still take our lunch break until 2:00, then we'll have other

7  defendants first, and then let the government go.

8        All right.  We'll be in recess until 2:00 p.m.

9        (Luncheon recess.)

10        THE COURT:  All right.  Who's next?

11        Mr. Walden.

12        MR. WALDEN:  I believe I am, Your Honor.  Thank you.

13        THE COURT:  Okay.  Mr. Newkirk, I'll remind you,

14  you're still under oath, of course.

15        THE WITNESS:  Thank you.

16        THE COURT:  Go ahead, Mr. Walden.

17                CROSS-EXAMINATION

18  BY MR. WALDEN:

19  Q      Mr. Newkirk, I represent Michael Chatfield.  Of

20  course, we've met before and we've spoken before.  Right?

21  A      Correct.

22  Q      Okay.  There are a couple of things that you said on

23  your direct that I want to make sure that I'm clear on.  The

24  first thing that I want to talk about is this average

25  wholesale price.  And I believe that you said that the

1   manufacturer is essentially involved in setting what the AWP

2   is.  Correct?

3   A          Correct.  The manufacturer or whoever is, you know,

4   packing the drug, the pharmaceutical company, they set the

5   price of the AWP.

6   Q          And there is a difference between a manufacturer and

7   a compounding pharmacy, right, they're not the same?

8   A          Absolutely.  A compounding pharmacy is not going to

9   have anything to do with setting the price of a drug.

10  Q          So, the manufacturer makes sets of chemicals and the

11  compounding pharmacy all they do is just mix them together.

12  Right?

13  A          Correct.  They purchase the chemicals and.

14  Q          You talked with Mr. Thomas a little bit about these

15  preprinted prescription pads.  And you said they were very

16  commonly used especially in 2014 and 2015.  Correct?

17  A          Correct.

18  Q          Even though a formula is preprinted, it can still be

19  edited by the doctor.  Correct?

20  A          Correct.  Yes.

21  Q          Did that happen with some frequency in your

22  experience?

23  A          It absolutely can.  The physician is fully able to,

24  you know, sometimes the strengths of -- you'll have five

25  different chemicals written down and there is no strength.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 125 of 236  PageID #: 7480

```
1    So, the physician would need to enter, you know, two percent

2    or three percent, depending upon their knowledge.

3    Q        And if they were already written down, could the

4    prescriber edit the strength?

5    A        Yes.  They just cross it out and write in the new

6    strength.

7             THE COURT:  Let me ask a question.  And I'm sure

8    it's going to probably -- I won't hold it against any one of

9    you if you laugh because I've already admitted I flunked high

10   school chemistry.  But what I do remember from high school

11   chemistry is we had this periodic table that I thought I

12   understood this is to the best of our knowledge this is every

13   substance known to man.

14            THE WITNESS:  Yeah.  Well, I mean, a drug is a

15   chemical entity that causes a, you know, physiological effect

16   in the body.

17            THE COURT:  This is what I was trying to ask you.

18   In their purest most unadulterated form, any chemical known to

19   man is on the periodic table.  Right?

20            THE WITNESS:  In combinations of the different

21   elements in order to make it.  Correct.

22            THE COURT:  That's it.  That's what I was trying to

23   ask you.  So, in one sense, any drug, any drug is compounded

24   in a sense unless you are, unless it's being administered in

25   its purest unadulterated form directly from the periodic
```

UNITED STATES DISTRICT COURT

1    table, it is a combination of chemical, of substances that are

2    on the periodic table that have been shown over time to have

3    beneficial effects if ingested by human beings.  Is that a

4    fair definition of what a drug is?

5              THE WITNESS:  In proper dosage, yes.

6              THE COURT:  Okay.  Go ahead.

7    BY MR. WALDEN:

8    Q        And I just want to -- this has previously been

9    admitted, this is just one of Michael Chatfield's

10   prescriptions, Mr. Clark, just to make sure that we're clear

11   with what Judge Mattice was talking about.  So, what's on the

12   screen is examples of compounding formulas.  Correct?

13   A        Correct.

14   Q        So --

15             THE COURT:  Each of those things, Fluticasone, that

16   is what I'm going to call a drug that consists of certain

17   chemicals that are put together in certain, you know,

18   proportions.  But it's chemicals -- Fluticasone is a

19   combination of chemicals listed on the periodic table put

20   together in specific proportions.  Is that fair?

21             THE WITNESS:  In a broad sense, yes, absolutely.

22   BY MR. WALDEN:

23   Q        So, Fluticasone is something that's going to have

24   various combination of these elements bonded together as the

25   judge said.  Right?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 127 of 236  PageID #: 7482

1    A        Correct.

2    Q        But Fluticasone mixed with, I'm going to try to pick

3    one that's easier for the court reporter to spell.

4    A        Gabapentin.

5    Q        I'm going to go with Tranilast, T-r-a-n-i-l-a-s-t.

6    Tranilast is not combining with Fluticasone to make a new

7    substance, it's a mixture, so sort of like you pour salt and

8    pepper together, it doesn't make something new, it's just a

9    combination of both?

10   A        Correct.  They're both going to have a

11   pharmaceutical effect and they could be, you know, different,

12   one could be a steroid, one could, you know, do something

13   completely different, an antihistamine, you know, whatever the

14   pharmaceutical effect of that drug does not change when you

15   make it into a compound.  You're looking to get multiple

16   effects at the same time.

17            THE COURT:  Well, okay, so each of these, for

18   instance, scar cream is a compound of compounded chemicals or

19   elements.  Right?

20            THE WITNESS:  Correct.

21            THE COURT:  Okay.

22            MR. WALDEN:  Does that help Your Honor?

23            THE COURT:  Yeah.  I think so.  It's been a long

24   time since I was in the 10th grade.  It's not going to do me

25   any good anyway.  I already got my F, so.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 128 of 236  PageID #: 7483

```
 1              MR. WALDEN:  Your Honor, if I was good at chemistry,
 2    I probably wouldn't have gone to law school.
 3              THE COURT:  Yeah.
 4    BY MR. WALDEN:
 5    Q         While we're on that subject, I'm going to jump
 6    around just a little bit.  We were talking about -- so, we
 7    were talking about how these forms can be edited.  So, a
 8    prescriber could remove one of these ingredients from the
 9    formula.  Correct?
10    A         Correct.  They could cross it out.  They could
11    change a strength.  A pharmacy could bill, you know, say a
12    physician in the pharmacy, they pick a neuropathic transdermal
13    cream, they pick neuro one, they bill that off to the
14    insurance company and say Gabapentin is not covered, so, it's
15    blocked.  The pharmacy then could say, all right, let's see if
16    we can get something else that is covered.  And they would go
17    ahead and, you know, talk to the doctor and swap it out.  The
18    pharmacy could also just accept payment for what is covered
19    and not be paid for the Gabapentin, then it becomes more of,
20    you know, a financial decision and does it makes sense.
21              THE COURT:  Okay.
22    BY MR. WALDEN:
23    Q         Are there any reasons why these preprinted pads
24    might actually be beneficial for a pharmacy to use as opposed
25    to a regular handwritten script?
```

UNITED STATES DISTRICT COURT

1   A       Clarity. You know, cut down on errors, medication

2   errors, which with handwritten prescriptions are notorious.

3   They spell out an ingredient and, you know, Ketamine looks

4   like Ketapropen sort of, so they fill the wrong chemical.

5   They write one percent and the physician writes 1.0 percent,

6   which is an absolute do not do that in the pharmaceutical

7   world. You never have a zero after a decimal point because

8   you won't see the decimal point and you'll fill 10 percent

9   could, be dangerous.

10          THE COURT: Deadly?

11          THE WITNESS: Absolutely.

12   BY MR. WALDEN:

13   Q       Is it more likely for those errors to occur -- I'm

14   going to call them handwriting errors because the issue is the

15   pharmacist can't read the doctor's handwriting, is that

16   essentially what you're saying?

17   A       Essentially, yes. I mean, it's a long standing

18   joke, you know, doctor's handwriting.

19   Q       Is that more likely to occur when there is a

20   customizable medication such as a compound versus something

21   that's more common like Lipitor which --

22   A       Well, yeah, it's more likely because you have to,

23   you know, there might be six ingredients that a physician has

24   to write, you know. Now, you're writing instead of one drug,

25   you're writing six drugs.

```
 1              THE COURT:  Well, I mean, the Lipitor, for example,
 2    just comes to the pharmacist in its already combined form,
 3    there is nothing to do except measure, count the pills.
 4    Right?
 5              THE WITNESS:  Pretty much.  Pretty much.
 6              THE COURT:  All right.
 7    BY MR. WALDEN:
 8    Q         Which brings me right to my next point, Judge.
 9    Compounds are customized medications.  Right?
10    A         Correct.
11    Q         They are -- so, Lipitor when Pfizer or whoever it is
12    makes Lipitor, they're making thousands of pills at a time in
13    a factory.  Right?
14    A         Correct.
15    Q         How are compounds made?  Are they made all at once
16    in batches or are they made per script?
17    A         Depends upon the volume at the pharmacy, sometimes
18    they will make small batchers if they know they're going to
19    have, you know, so many of neuro one creams in a day, they
20    might premake on a small scale because you have to deal with,
21    you know, beyond use dating on a compound.  They're only good
22    for so long before they expire.  Ideally everything is made on
23    an individual basis, but if you have 10 of these coming in or
24    you have 10 prescriptions coming in, you're going to make a
25    larger batch.
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 131 of 236   PageID #: 7486

1    Q        You've testified that you're familiar with how the
2    software program for billing to a PBM works.  Right?
3    A        Correct.
4    Q        And sometimes you get reject codes in compounding.
5    Correct?
6    A        Correct.
7    Q        And those can be for various reasons.  Right?
8    A        Yes.
9    Q        What are some of those reasons?
10   A        It could be exceeding the cap, you know, there could
11   be a hard cap on the cost of the drug, you know, $500 cut off.
12   There could be an ingredient, so you have 10 ingredients and
13   two are not covered, so it will reject and tell you the two
14   that are not covered.  And then as a pharmacy you need to deal
15   with that.
16   Q        All right.  Let's talk about some other reasons.
17   So, let's say that I have a prescription that has a refill.  I
18   fill a 30-day supply and I come back in two days later and try
19   to get my refill.  What's going to happen then?
20   A        Chances are it's going to reject for a refill too
21   soon.  Chances are.  And most insurance companies have
22   utilization of about 75 percent is the standard.  So, if I
23   come in January 1st and fill a prescription for a 30-day
24   supply, if I go in on January 21st and try and refill it, it's
25   going to reject refill too soon in that instance.  If I get it

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 132 of 236   PageID #:
7487

1    filled on January 22, it will shoot right through.

2    Q        So, it doesn't have to be the full 30 days?

3    A        It does not.  But, you know, there is -- don't

4    assume that every plan has 75 percent utilization.  Some will

5    have 60 percent utilization, some will have 50 percent

6    utilization.  Back in, you know, Medco auditing there were

7    plans that had no restriction, so theoretically a person could

8    get, you know, one prescription with 11 refills, they could

9    come in every following day if the plan design isn't to reject

10   it for a refill too soon, it will go right through and pay.

11   Q        And if it's designed for a refill too soon, is there

12   a way to override that?

13   A        It depends upon the plan and the PBM, so.

14   Q        Can you give us some examples of that like, for

15   example, is there a lost or stolen override in some plans?

16   A        You know, the best example I can give you is first

17   hand knowledge of Medco because of the auditing.  So, they had

18   three overrides you could use at the pharmacy, you know, the

19   pharmacy could input an override for a lost med, which was an

20   03 override.  You just enter 03 and if the plan sponsor

21   covered lost meds, it would go through and cover it.  If they

22   didn't it would reject, it's not -- that was vacation, 03 is

23   vacation, sorry let me correct that.  04 is lost med.  Usually

24   almost never worked.  If you lost your medication, you're

25   pretty much out of luck.  The 05 override was for a therapy

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 133 of 236  PageID #: 7488

```
 1    change.  So, if you're getting one daily and then the doctor
 2    wants you to go up to twice a day, you get a new prescription
 3    for 60 is a 30 day supply, you're 10 days out, it rejects for
 4    refill too soon, you can use an 05 override for a therapy
 5    change.  That was Medco.  Many of the PBMs an early refill is
 6    a hard reject and you have to call the insurance company and
 7    explain what's going on and whether or not they will allow the
 8    override is determined by the insurance company.
 9              THE COURT:  Let me ask you an example.  For
10    instance, a lot of prescriptions are use as needed.  I mean, I
11    guess, I mean, basically, which tells me physicians leave it
12    up to the patient how much or little to use at any point in
13    time.  So, I mean, they give you, you know, some quantity the
14    first time you pick it up, you know, a tube of something, come
15    back the next day, you know, you got six refills, I used it
16    all last night, you know.  And, I mean --
17              THE WITNESS:  It's a great question and there is a
18    progression there.  You know, early on at Medco when you
19    dispensed a topical for 100 grams, use as directed, we audited
20    based upon refill history.  If it got filled every 30 days, we
21    weren't concerned.  If it got filled every 90 days, then we'd
22    say, okay, that's too much, we're going to cut it back.
23              THE COURT:  What if it said use as needed, the
24    physician wrote use as needed?
25              THE WITNESS:  Early on we would audit based upon
```

UNITED STATES DISTRICT COURT

1    utilization, on history.  After, you know, Medco during this

2    time period, use as needed wasn't really accepted.  You had to

3    get clarifying directions one to two grams twice a day, that's

4    four grams times 30.  Exactly.

5            THE COURT:  And the word went out to physicians

6    don't write use as needed, you know, prescriptions?

7            THE WITNESS:  When they don't --

8            THE COURT:  Well, no, I mean, if you said you didn't

9    accept scripts that said use as needed, I mean, you had to get

10   that word to the doctors and, hey, doc, don't write a use as

11   needed because we have no idea what you mean by that?

12           THE WITNESS:  Right.  Well, you'd only have to be

13   audited a couple of times by an insurance company to say --

14           THE COURT:  Your patients are going to complain?

15           THE WITNESS:  We need directions.  So, you know, if

16   you get use as directed, you're going to call the doctor, I

17   need specific directions so I can do the calculation.

18           THE COURT:  Okay.

19   BY MR. WALDEN:

20   Q        Taking the judge's point one step further.  Do these

21   compounds typically expire quicker than maybe a normal

22   prescription that you get from a retail pharmacy?

23   A        Typically, they do, yes.

24   Q        How quickly do they usually expire or do you know?

25   A        Offhand, it's all based upon the guidelines for

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 135 of 236  PageID #: 7490

1 compounding, and it's whether it's water based or not water

2 based, and usually, you know, 60 days, 90 days, something in

3 that range.

4          THE COURT:  Do they not put sort of preservatives

5 in?

6          THE WITNESS:  They do not.

7          THE COURT:  They do not?

8          THE WITNESS:  No.

9          THE COURT:  At all?

10          THE WITNESS:  Not at all.

11          THE COURT:  Okay.  Well, I mean, pharmaceutical

12 manufacturers do put preservatives in their medications

13 sometimes?

14          THE WITNESS:  Sometimes and sometimes not, you know,

15 a lot of times they're preservative free.

16 BY MR. WALDEN:

17 Q        And sometimes that's actually a reason for a

18 compounded medication, right, because someone may be allergic

19 to a preservative?

20 A        Exactly.

21 Q        I asked you to review some pharmacy patient files in

22 preparation for your testimony today.  Do you remember that?

23 A        Yes, I do.

24 Q        And did you review those?

25 A        I did.

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 136 of 236   PageID #: 7491

```
 1   Q         I'm going to call up on the iPad what is going to be

 2   Collective Exhibit 20 for Mr. Chatfield.  I believe it

 3   included 92 different patient files.  We're not going to go

 4   through all of those because that would be quite tedious, but

 5   you have gone through all of those.  Correct?

 6   A         Correct.

 7   Q         This is Jacob Burgess.  These were provided by the

 8   government in discovery and they were patient files from

 9   Willow Pharmacy.  My version is redacted, but we'll -- I

10   believe we can still use them for our purposes today.  So, the

11   first set of documents in these forms is usually this

12   universal claim form.  Right?

13   A         Yes.

14   Q         Can you kind of describe what this is?

15   A         It's a standard claim form that could be sent off to

16   an insurance company that lists all of the different

17   ingredients, the quantities of each ingredient, and it even

18   has, it has the ingredient cost on there also.

19   Q         All right.  Also contained in these files were the

20   prescriptions themselves.  Right?

21   A         I believe so, yes.

22   Q         And then there were also pages that looked like

23   this.  Correct?

24   A         Correct.

25   Q         Can you explain what -- because this is a lot of
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 137 of 236   PageID #: 7492

```
 1    gibberish to me, but can you explain what these pages mean to
 2    you generally?
 3    A          Generally, this looks like the information that is
 4    being submitted for each of the fields required to transmit a
 5    claim and/or the response back from the pharmacy.
 6    Q          All right.  So, for example, the additional message
 7    information at the top, from PBM.  So, that's a message from
 8    the PBM to the pharmacy.  Right?
 9    A          Correct.
10    Q          That says manual DUR necessary.  What does that
11    mean?
12    A          Manual DUR is drug utilization review.  So, there
13    has been some sort of edit that fired that the pharmacy is
14    going to have to use their professional judgment in order to
15    override this in order to process the claim.
16    Q          All right.  So, this code is a, it's a reject code
17    and the pharmacy has to override it if they see it?
18    A          Yes.  And it looks like, if you scan down, you'll
19    see the reason for the service code is a drug drug
20    interaction.  So, more than likely, you know, when this claim
21    was billed, they're on, the member is on another drug that
22    either has the same drug in it or a drug in the same class.
23    So, it's firing an edit there is a drug drug interaction.  And
24    at this point the pharmacist would review the history and if
25    needed call the physician and use their professional judgment
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 138 of 236   PageID #: 7493

1    in whether to override this or not.

2    Q        And, actually, I think there was an override page

3    for almost every prescription that I asked you to review.

4    Right?

5    A        Yes.

6    Q        And correct me if I'm wrong, the prescriptions that

7    I asked you to review were Blue Cross Blue Shield patients

8    specifically?

9    A        If I recall, yes.

10   Q        And, also, and more than that, Blue Cross-Blue

11   Shield patients who received prescriptions from Willow

12   Pharmacy in May of 2014?

13   A        That sounds correct, yes.

14   Q        Okay.  Did you ever see in this additional message

15   information a reject code that indicated that a prescription

16   was being refilled too soon?

17   A        I did not see a reject for a refill too soon.

18   Q        Did you see any override contained in any of the

19   data that would show that the pharmacist input a lost or

20   stolen override code?

21   A        I did not see that.

22            MR. WALDEN:  Just a moment, Your Honor.

23            (Brief pause.)

24            MR. WALDEN:  Your Honor, I need to move Collective

25   Exhibit 20 into evidence.

```
1                THE COURT:  Any objection?

2                MR. CLARK:  No objection, Your Honor.

3                THE COURT:  Admitted.

4                (Defendant Chatfield's Exhibit 20 was received into

5                evidence.)

6                MR. WALDEN:  That's all of the questions I have.

7    Thank you.

8                THE COURT:  Who's next?  Any other defendants?

9                MR. HOBBS:  No, Your Honor.

10               THE COURT:  Then, Mr. Clark, cross-examination.

11               MR. CLARK:  Thank you, Your Honor.

12                            CROSS-EXAMINATION

13   BY MR. CLARK:

14   Q         Good afternoon, Mr. Newkirk.

15   A         Good afternoon.

16   Q         Mr. Newkirk, my name is Frank Clark.  Mr. Piper and

17   I represent the United States in this matter.  You and I have

18   not spoken I don't believe.  You're currently in Birmingham.

19   Is that right?

20   A         No, that's the corporate address for Pharmacy

21   Compliance Consulting.  I live in Pittsburgh.

22   Q         You live in Pittsburgh.  I understand.  Now, sir,

23   you have reviewed the testimony of Steve McCall, is that

24   correct, before your testimony today?

25   A         I have read it, yes.
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 140 of 236  PageID #: 7495

1  Q        All right.  Who else's testimony in this trial have

2  you reviewed?

3  A        Was there an Express Scripts testimony?

4  Q        So, you reviewed the testimony of someone from

5  Express Scripts?

6  A        If I recall correctly.

7  Q        Well, did you review anyone else's testimony besides

8  Steve McCall?

9  A        Not that I recall.

10 Q        All right.  So, just one individual's testimony is

11 all you've reviewed before in preparation for your testimony

12 today?

13 A        As far as I recall.

14 Q        Okay.  Would you recall reviewing someone else's

15 testimony?  Is that something that you would have done and

16 then forgotten about?

17          THE COURT:  Do you think you reviewed anyone's

18 testimony that was from Express Scripts because as I recall

19 Mr. McCall was from CVS Caremark?

20          THE WITNESS:  Right.  Then that would be all.

21 BY MR. CLARK:

22 Q        Okay.  So, Mr. McCall from CVS Caremark testimony is

23 the only witness' testimony that you have reviewed from this

24 trial?

25 A        As far as I recall, yes.

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 141 of 236   PageID #: 7496

```
 1   Q         Okay.  I understand you said as far as you recall.

 2   You would recall reviewing someone else's testimony?  That

 3   would be an important fact in preparation for your expert

 4   testimony here today.  Correct, sir?

 5   A         Correct.

 6   Q         So, I'm not trying to ask a trick question.  Is

 7   there someone else's testimony that you have reviewed?

 8   A         I would have to say no.

 9   Q         Okay.  Thank you.  First off, compounded drugs I

10   think everyone agrees, there is at least a limited legitimate

11   purpose for a compound medication.  Correct?

12   A         There is a -- what do you mean by "limited"?

13   Q         They're not always appropriate, but there are

14   certain limited situations in which I think everybody can

15   agree they're appropriate?

16   A         Yes.  Appropriate, yes.

17   Q         Okay.  Let me ask you this.  Is the FDA's drug

18   approval process important?

19   A         I would imagine, yes, it is.  Yes, it is.

20   Q         Okay.  And it involves the vetting of drugs for a

21   whole host of reasons.  Correct?

22   A         Correct.  Right.

23   Q         And it's necessary -- would you agree that it's

24   necessary that these drugs that are not yet on the market go

25   through a pretty rigorous approval process before they become
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 142 of 236  PageID #: 7497

1   commercially available.  Would you agree with that?

2   A        Yes.

3   Q        Okay.  And what are some reasons that that's

4   necessary and a good idea that we require these drugs to be

5   vetted before they become available?

6   A        Well, safety reasons.

7   Q        Absolutely.

8   A        Efficacy.

9   Q        Absolutely.  Any other reasons?

10  A        You don't know in many of these drugs, you know,

11  down the road whether or not they're going to cause an adverse

12  effect.  So, multiple reasons for the FDA to take it through

13  clinical trials to establish, you know, whether a drug even

14  works.

15  Q        Right.  We've used the example Lipitor a lot today.

16  Before Lipitor ever hit the market, it had to go through this

17  very rigorous evaluation and testing process, didn't it, sir?

18  A        Correct.

19  Q        Any idea how long that takes?

20  A        Usually, I mean, upwards five, 10 years typically.

21  Q        Any idea how much it costs?

22  A        I've heard from big Pharma two billion dollars.

23  Q        You would agree with me, and I think I heard in your

24  direct examination, compounded pharmaceutical is a way around

25  that, isn't it, sir?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 143 of 236  PageID #:
7498

1    A        They are exempt from the FDA approval process.

2    Q        Right.  And a compounded drug has not been subjected

3    to the testing, to the screening, to the gatekeeping function

4    that that's designed to protect everybody against?  You would

5    agree with me on that, wouldn't you, sir?

6    A        Yes, of course.

7    Q        And that's why compounded medications are supposed

8    to be used in very narrow, very limited, and very unique

9    circumstances, aren't they, sir?

10   A        Well, if a physician prescribes a compounded drug

11   for a patient, that's within their right to prescribe it.

12   Q        I'm not talking about what someone has a right to

13   do.  I'm talking about you're a pharmacist and you know the

14   purpose and the role that compounded pharmaceuticals play, do

15   you not, sir?

16   A        I do.

17   Q        And because compounded drugs have not been subjected

18   to this battery of tests to make sure that they're safe,

19   they're effective, it's important that they be used in very

20   limited, specific and unique situations, isn't it, sir, or

21   would you not agree?  If you don't agree, that's fine, but do

22   you agree with me?

23   A        In that aspect, no, actually, I disagree.

24   Q        Okay.  So, you think that the mass prescribing of

25   compounded pharmaceuticals is appropriate?

1   A          I didn't say that either.

2   Q          Well, do you think that the mass prescribing and

3   sale of compounded pharmaceuticals is appropriate?

4   A          If utilized correctly, yes.

5   Q          Okay.  Do you agree with me that it is important

6   that before a compounded drug is prescribed to a patient other

7   treatment options should be tried first to see if they're

8   ineffective or adverse to a patient's health?

9   A          If there are other treatment options.

10  Q          You would agree with me, though, that a compounded

11  drug should not be prescribed until other treatment options

12  have been tried to see if they are either effective or adverse

13  to a patient's health?

14  A          In a sense I would disagree with that statement.

15  Q          All right.  So, you would not agree with the

16  statement that compounding -- compounded drugs provide

17  treatment options alleviating pain, suffering and long

18  occurring infections, just to name a few, where other

19  treatment options have been ineffective or adverse to the

20  patient's health.  You would not agree to that limiting

21  statement?

22  A          Repeat that again.

23  Q          Yes.  Compounded benefits provide prescription

24  treatment options alleviating pain, suffering, and long

25  occurring infections, just to name a few, where other

UNITED STATES DISTRICT COURT

```
 1   treatment options have been ineffective or adverse to

 2   patient's health.  Do you agree with that, sir?

 3   A          I could agree with it.

 4   Q          You could not agree with that?

 5   A          I said I could agree with that.

 6   Q          I'm not asking you could you.  Do you agree with it,

 7   sir?

 8   A          The way you read that, yes.

 9   Q          Okay.  So, you would agree with me that's a

10   statement that you had made yourself, is it not, sir?

11   A          Yes.  I wrote that.

12   Q          Right.  So, let me make sure I understand.  Is it

13   not important that other treatment options be tried first

14   before we go to compounded options?

15   A          Depends upon the physician.  You know, if you want

16   to treat pain, you know, a physician could go straight to

17   opiates or perhaps they might want to try a compounded pain

18   cream.

19   Q          Let me ask you this.  If you had this to write

20   again, would you delete this limiting sentence, where other

21   treatment options have been ineffective or adverse to the

22   patient's health because that's what you said?

23   A          I wouldn't change that.

24   Q          Okay.  So, it is at least something that should be

25   considered before a compounded drug is prescribed.  And by
```

1   something I mean the issue of whether or not that another

2   treatment option has been considered before going directly to

3   a compounded pharmaceutical?

4   A        That's going to be up to the physician.

5   Q        But it's something that you believe should be

6   considered when you wrote this, did you not?  And you're a

7   pharmacist.

8   A        I think I'm interpreting the statement differently

9   than you.

10  Q        Okay.  Well, tell me how you're interpreting the

11  statement, where other treatment options have been ineffective

12  or adverse to the patient's health.

13  A        I don't see how that says that they have to try

14  other treatment options first.

15  Q        Okay.  Sir, is a two-minute telephone conversation

16  between a nurse practitioner and a patient he or she has never

17  met or seen before sufficient for the nurse practitioner or

18  doctor to make a legitimate objective determination as to

19  whether a compounded pharmaceutical is appropriate for that

20  patient?

21  A        It would be up to the nurse practitioner.

22  Q        Is it possible for a nurse practitioner to make that

23  determination if the nurse practitioner never speaks with the

24  person or sees the person?

25  A        I think that would be difficult.

UNITED STATES DISTRICT COURT

1   Q          It would be difficult.  It's important that a

2   pharmacy collect a copay.  Is that correct?

3   A          Correct.

4   Q          As a matter of fact, it's required that a pharmacy

5   collect a copay.  Isn't that correct?

6   A          Correct.

7   Q          It's required by PBMs under the terms of most, if

8   not all, PBM contracts.  Is that correct?

9   A          The way I read, yes, it is contractually required.

10  Q          And it's required by law often times, is it not?

11  A          That would be a law question, but I would imagine it

12  could be addressed by state laws.

13  Q          Right.  You're familiar with some state laws

14  concerning copays, are you not?

15  A          Yes.

16  Q          Right.  You're aware that in many instances failing

17  to collect full copay from the customer is fraud, is it not,

18  sir?

19  A          It would depend upon the state law, yes.

20  Q          And it is a requirement that the copay be paid,

21  isn't it, sir?

22  A          It is.  If it's not collected, it would be a

23  discrepancy for that claim.

24  Q          Right.  And fraud?

25  A          Well, I don't know that because --

UNITED STATES DISTRICT COURT

1    THE COURT:  State law, is that what you're asking,

2    because, I mean, I mean, I just don't know.  Are there state

3    laws that define failure to require a patient to pay the full

4    amount of copay, that is defined as fraud under some state

5    law?

6    MR. CLARK:  Let me ask him if he agrees with the

7    statement.

8    BY MR. CLARK:

9    Q    Would you agree with the statement that some states

10   such as Florida have laws requiring copays to be collected?

11   A    I believe there is a statute in Florida that

12   requires under Medicaid for copays to be collected.

13   Q    Would you agree with me that waiver of the copay is

14   considered fraud and a violation of state law?

15   A    In the state of Florida for a Medicaid claim for the

16   pharmacy, yes.

17   Q    Let me show you a document.  Do you recognize this

18   document?

19   A    Yes, I do.

20   Q    Who's the author of this document?

21   A    I believe me.

22   Q    Okay.  That's you and Christopher Gruber.  Who is

23   Christopher Gruber?

24   A    He's my partner.

25   Q    And this is advice that you're sending out to

```
 1   pharmacies that pay you to provide consulting services.
 2   Correct?
 3   A        Correct.
 4   Q        Right.  And you would agree with me this says PBM
 5   require pharmacies to collect 100 percent of the copay at the
 6   point of sale.  You'd agree with that statement.  Correct?
 7   A        I would agree with that.
 8   Q        You made it.  That's correct.  Let me show you
 9   another document that's been introduced as Government's
10   Exhibit No. 6.  This is an e-mail that's been introduced.  Let
11   me show you number three.  I'll represent to you it's been
12   testified this is from a marketer to other marketers who
13   worked for him.  Be sure that the patients know they will
14   never pay more than a $15 copay.  Even if their insurance EOB
15   says you owe $$$, they do not owe that.  If the insurance pays
16   for the cream, Willow Pharmacy will eat the rest because there
17   will be enough to cover the cost.  You'd agree with me, sir,
18   that is prohibited by PBMs, and under your words, is
19   considered fraud.  Is it not, sir?
20   A        For the pharmacy, yes.
21   Q        For the pharmacy to eat, to "eat the rest" because
22   the pharmacy is required to collect a copay, sir?
23            THE COURT:  Wait a minute.  Is that -- okay.  Maybe
24   is that what that says, number three?
25   BY MR. CLARK:
```

UNITED STATES DISTRICT COURT

```
1    Q         Did I read it correctly, Mr. Newkirk?

2    A         I mean, it's basically, you know, they're saying

3    they're self limiting the copay to $15, the pharmacy is doing

4    this.  And if the copay is higher, Willow Pharmacy is either

5    going to cover it or just waive it.

6              THE COURT:  And you think that the entire Paragraph

7    3 refers to the copay?

8              THE WITNESS:  Never pay more than $15 copay.  I

9    think that refers to the copay.

10             THE COURT:  What about the rest?  What about the two

11   succeeding sentences?

12             THE WITNESS:  Even if their insurance EOB says you

13   owe money, they do not owe that.  I'm not sure what that

14   refers to.

15             THE COURT:  I'm not either.  And, I mean, I don't

16   know if you can answer it or not.

17             THE WITNESS:  I don't know why the EOB -- I think I

18   view an EOB, an explanation of benefits, that comes later.

19             THE COURT:  Okay.  I guess I'm going to let this go,

20   but, I mean -- well, maybe I shouldn't since I'm the tryer of

21   fact.  But, I mean, in my experience, I get explanation of

22   benefits from my insurance company.  And let's say it's

23   usually -- actually, this is confusing because what I think is

24   my explanation of benefits comes usually from my insurer, and

25   I get something from my pharmaceutical carrier that I referred
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 151 of 236  PageID #: 7506

1    to earlier that, I guess, is an explanation of benefits.  I

2    can't remember if that's what they call it.  But, typically,

3    in my experience, I've always paid my copay.  It's a pretty

4    minimal amount up front, you know, 15 bucks, 30 bucks,

5    something like that.  Now, sometimes, I will get later a

6    statement saying you owe this, but it's not my copay that I

7    didn't pay, it's because there is a deductible that's been

8    unfulfilled or something like that.

9              THE WITNESS:  Right.

10             THE COURT:  And so, that's where I'm confused.  And

11   maybe you two can clear that up for me.  I mean, what I'm

12   reading, the way I'm reading Paragraph 3 is that, okay, you

13   probably have to pay up to a $15 copay, but then you may get

14   an explanation, you owe this.  Well, in my experience, that

15   could be for various reasons.  And I don't know if that makes

16   a difference legally or not.  Can you -- okay.  That's my

17   question.  I don't know if anybody can clear it up or not.

18   BY MR. CLARK:

19   Q        You're familiar with insurance company billing and

20   with respect to what portion a patient has to pay?

21   A        Correct.

22   Q        The insurance framework that Judge Mattice is

23   talking about where there is a deductible and until you meet

24   your deductible --

25             THE COURT:  You have to pay.  I mean, that's what

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 152 of 236  PageID #: 7507

1  they always tell me, and by --

2  BY MR. CLARK:

3  Q        That's correct.  Two types -- generally speaking

4  you'd agree with me there is two types of insurance plans,

5  there is the deductible plan where you have to pay the entire

6  cost until your deductible is met, then you pay a percentage?

7  A        Correct.

8  Q        That's one type.  The other type is where you

9  probably pay either a smaller premium or higher premium, but

10 you pay a copay and then you don't pay anything else?

11 A        Correct.

12 Q        Correct.  Okay.  So, you'd agree with me that copay

13 either in the insurance world and in the vernacular, copay

14 refers to what a patient is going to have to pay out of their

15 pocket.  Correct?

16 A        Correct.

17 Q        Okay.  So, you'd --

18        THE COURT:  But does that include what I'm referring

19 to, what I'm calling a deductible?

20        MR. CLARK:  I think it's two different things, Your

21 Honor.  We throw the term copay around.  My understanding and

22 I'll ask Mr. McCall if he agrees with me --

23        MR. PIPER:  Mr. Newkirk.

24        MR. CLARK:  I'm sorry, Mr. Newkirk.  The copay

25 doesn't really come into play if you have an insurance plan

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 153 of 236  PageID #: 7508

1    involving a deductible.  Copay is for a different type of

2    insurance plan where a copay is all you're going to pay for a

3    particular service.

4            THE COURT:  Now, by the way, now, okay, and I'm

5    talking about my experience, okay.

6            MR. CLARK:  Yes, sir.

7            THE COURT:  I pay copays regularly and then I still

8    am sometimes called on to meet my deductible before my

9    insurance carrier pays.  Now, if I've been making foolish

10   insurance decisions all of these years, I presume I'm not

11   alone, but, I mean, you know, I mean, that has been my

12   experience.

13           MR. SCHWARTZ:  And, Judge, from a personal

14   standpoint, I have to disagree with Mr. Clark because I have a

15   Blue Cross plan and I have copays that I have to pay for

16   certain medications, zero copay for others.  And I still have

17   a $500 deductible that I pay on myself and then $1500 family

18   total deductible that we also have to meet.  So, I have

19   deductibles to pay as well as copays on visits, procedures

20   and --

21           THE COURT:  Okay.  Well, see, I have Blue Cross,

22   too.  And, I mean, I guess, I'm just -- really, now, I am

23   wondering if I've bought the wrong insurance plan all of these

24   years, but at any rate.  What I guess what I'm more interested

25   in for purposes of today is defining the term copay and what

1  all that that might entail.

2  BY MR. CLARK:

3  Q        Right.  And it's important that the patient pay the

4  copay.  Is this correct?

5  A        That's -- in a general sense, yes.  The copay needs

6  to be collected from the pharmacy.

7  Q        Right.  By the pharmacy.  Correct?  The copay needs

8  to be collected by the pharmacy?

9  A        Correct, by the pharmacy.

10  Q        Not from the pharmacy.  Okay.  It needs to be

11  100 percent.  Is that correct?

12  A        In the audit world, in the end, yes, if you have not

13  collected 100 percent of the copay and that claim is audited,

14  it's a recoupment.

15  Q        Right.  And a pharmacy is not allowed to eat any

16  portion of the copay.  You would agree with that?

17  A        I would agree with eating, yeah.  Yes.

18  Q        Okay.  And what is the purpose, do you know, behind

19  requiring a patient to pay even a small copay?

20  A        It gets them to have, you know, a part in the --

21          THE COURT:  Skin in the game.

22          THE WITNESS:  Skin in the game.  That's what I was

23  looking for.  Thank you.

24  BY MR. CLARK:

25  Q        So, if someone else makes that copayment on their

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 155 of 236   PageID #: 7510

1    behalf, it defeats the whole purpose behind requiring the

2    copay, does it not?

3    A         It can.  Yes.

4    Q         And, in fact, it does, if an interested third party

5    makes the payment, does it not?

6    A         Well, I look at manufacturer's coupons and the

7    reduction of copays by manufacturers.  I can't get over how,

8    you know, this affects the skin in the game.  And it's done on

9    a daily basis across the country all day long.

10            THE COURT:  Well, let me -- okay.  In the course of

11   this trial we've made this observation that, and I think I've

12   made this observation today, you know, I mean, to a certain

13   extent, the interjection of insurance into a free market

14   system detracts from what, for lack of a better -- well, I

15   mean, the economists call moral hazard.  Okay.  You make

16   decisions based upon relative benefit versus, you know,

17   detriment to you and so forth, so, insurance -- and, you know,

18   the policy reason for requiring a copay is to ameliorate at

19   least to some extent the problems associated with, you know,

20   moral hazard in a free market.  Now, that's a very abstract

21   way to state the problem.  I mean, is that your understanding

22   of what the underlying policy foundations for this are?

23            THE WITNESS:  I mean, the underlying copay is to

24   have skin in the game.

25            THE COURT:  Okay.  Yeah.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 156 of 236  PageID #: 7511

1          THE WITNESS:  And copays have gone up.

2          THE COURT:  That's a better way to put it, but I

3    tried to put it in a little bit more eloquent terms.  Okay.

4    Probably failed.  All right.  Go ahead.

5    BY MR. CLARK:

6    Q          As a matter of fact, you're familiar with -- let

7    me -- you're familiar with CVS Caremark.  Is that correct?

8    A          Yes, I am.

9    Q          You're familiar that CVS Caremark requires that the

10   copay be collected from the eligible person.  Are you aware of

11   that?

12   A          Their language, I think it is exactly that, the

13   eligible member.

14   Q          Right.  Yeah.  Provider must promptly collect from

15   the eligible person the full patient amount.  That means, in

16   other words, again, this is another safeguard to make sure

17   that the patient really needs and wants this medication?

18   A          In a large sense for the skin in the game.

19   Q          Right.  That's why it doesn't say provider must

20   promptly collect from anybody with money the full patient pay

21   amount?

22   A          But, you know, once again, you know, you have a

23   copay of $100 and you run a manufacturer's coupon, it pulls it

24   down to 20.

25   Q          I understand.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 157 of 236  PageID #: 7512

```
1    A          Is that the eligible member?

2    Q          I understand you keep going back to the

3    manufacturer's coupon, but it says here that it must be

4    collected from the eligible person.  Correct?

5    A          Correct.

6    Q          Right.  Full amount.  Correct?

7    A          Correct.

8    Q          Catamaran says the same thing.  Are you familiar

9    with that?

10   A          I am.

11   Q          They actually say, they actually say provider must

12   charge the member?

13   A          Correct.

14   Q          Okay.

15   A          Provider would be the pharmacy.

16   Q          Right.  And Express Scripts goes a little further,

17   they actually set forth why it's important to collect a copay

18   from the patient, don't they?

19   A          I would assume they are.

20   Q          Okay.  Well, you're familiar with the manual?

21   A          Yes, I am.

22   Q          You testified about your familiarity?

23   A          Yes, I'm very familiar.

24   Q          And would you agree with this statement in the ESI

25   manual, Section 2.3 that copayments are a critical benefit
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 158 of 236   PageID #: 7513

```
 1   design tool that can sensitize members to the cost of their
 2   medications and encourage members to seek out less expensive
 3   medications that are --
 4             THE COURT:  That's a great statement of what I just
 5   tried to express in a less artful manner.  Okay.
 6             MR. PIPER:  I thought yours was artful, Judge.
 7             THE COURT:  Does everyone in the courtroom agree
 8   that mine was better than everybody else's?
 9             MR. PIPER:  I'm kidding, Your Honor.
10             THE COURT:  I know.  All right.
11   BY MR. CLARK:
12   Q         And you'd agree with the rationale behind this,
13   would you not, sir?
14   A         Yes.  In a broad sense, this is the design of copays
15   to do this.
16   Q         Right.  And that's why a pharmacy is not allowed to
17   eat a copay?
18   A         Correct.
19   Q         When a church, to use your analogy, I think, you
20   used on direct, when a church volunteers to give an individual
21   money to pay their copay, what is that church's motivation?
22   A         Health care, I would imagine.
23   Q         Right.  Would you ever advise your pharmacies that
24   pay you for consulting advice that it's okay to send a
25   marketer to meet a customer at the Red Bank Post Office and
```

UNITED STATES DISTRICT COURT

1  give them cash to buy money orders to send in for their copay?

2  A        Would I advise that?  No.

3  Q        Okay.

4           MR. THOMAS:  Objection, Your Honor, far beyond the

5  scope of direct.

6           MR. CLARK:  I don't think it is at all, Your Honor.

7           THE COURT:  Well, no, I'm going to overrule that

8  objection.

9           MR. CLARK:  Thank you.

10          THE COURT:  I think that the direct was designed to

11 elicit -- I mean, that was a very concrete example, but I

12 mean, overruled.

13          MR. CLARK:  Thank you.

14 BY MR. CLARK:

15 Q        The doctor or the nurse practitioner is a very

16 important part of the prescription system, are they not, sir?

17 A        Correct.

18 Q        And as a matter of fact, they're one of, if not the

19 most important gatekeepers in the process.  Would you agree

20 with that?

21 A        They're one of the key gatekeepers, yes.

22 Q        One of them.  There are others, are there not, sir?

23 A        Correct.

24 Q        Right.  But one of them being the pharmacist.

25 Correct?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 160 of 236  PageID #: 7515

1    A        Correct.

2    Q        Right.  And the pharmacist, assuming the pharmacist

3    is operating independently, the pharmacist relies on the

4    doctor or the nurse practitioner for both the necessity of the

5    medication and the efficacy of the medication.  Isn't that

6    correct?

7    A        Yes.

8    Q        But you'd agree with me then that if the prescribing

9    health care professional is compromised, the entire system

10   breaks down, does it not, sir?

11   A        It could.

12   Q        If the prescriber has a financial or any other

13   interest in prescribing other than medical necessity, that

14   would be important, would it not, sir?

15   A        It could be relevant, yes.

16   Q        Right.  Now, what was the --

17            THE COURT:   Now, let's talk about.  I mean, we've

18   talked about that before.  That may well be true, that in a

19   perfect world the gatekeeper so to speak is totally

20   independent financially and otherwise of, you know, that whom

21   they're supposed to be regulating.  Now, in the United States,

22   for instance, publicly traded companies are required by the

23   Securities and Exchange Commission, United States government,

24   to have audits.  And, typically, these people are audited by

25   some of the wealthiest and most influential professional firms

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 161 of 236  PageID #: 7516

1   on the globe.  And, you know, I think that now they're called

2   the big four accounting firms.  They're for-profit

3   institutions that get their fees from audits from, and they're

4   huge fees, I mean, multi multi million dollars fees from

5   companies who pay those fees.

6         And then the financial markets, according to the

7   system, are supposed to, you know, rely on those audits by

8   these, by these firms who are being paid by the companies whom

9   they audit, you know, as the gatekeepers who they can rely on.

10  So, I am just pointing that out, as an example, yeah, in a

11  perfect world, any gatekeeper and let's, you know, I'm

12  analogizing to, you know, certified public accounting firms in

13  the United States, should be completely and totally

14  financially independent of those whom they're supposed to

15  regulate.  I mean, it just doesn't happen that way, I mean,

16  and that's just one example, you know.  I mean, by the way,

17  you know, in the same realm, law firms issue very expensive

18  legal opinions to their clients who are selling their

19  securities and the clients are paying those lawyers' fees for

20  their so-called independent legal opinion, and then they go

21  sell their securities based upon that.

22         So, I mean, I hear what you're saying, Mr. Clark.  I

23  do get that.  But, I mean, it would be hard to point me to an

24  absolutely pure system of that.  Okay.  And so, I want -- I'm

25  not going to cut you off.  You can question about that.  But,

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 162 of 236  PageID #: 7517

```
1   I mean, I'm just telling you, in my experience, pure systems

2   of what you're talking about are pretty rare.  And, I mean,

3   you know, so, all right.  Go ahead.  I've made my point.

4   BY MR. CLARK:

5   Q        You agree with me, certainly, that would be

6   relevant, though, would it not, sir?

7   A        Yes.  It could be relevant how that is structured.

8   Q        Right.  But you'd also agree with me there is no

9   discrepancy code for that.  Is that correct?

10  A        Correct.

11  Q        So, certainly, there are things that are relevant

12  for which there is not a discrepancy code?

13  A        Relevant to who?

14  Q        Relevant to whether the prescription is legitimate.

15  A        Correct.

16  Q        How many total discrepancy codes are there?

17  A        Which PBM?

18  Q        Well, in general terms, are we talking about

19  hundreds and thousands or are we talking about --

20  A        Twenty to 30 to 40.

21  Q        Twenty to 30 to 40?

22  A        Correct.

23  Q        There is also no discrepancy code for fraud, is

24  there, sir?

25  A        Not that I know of.
```

UNITED STATES DISTRICT COURT

1    Q        Right.  But, certainly, if a prescription was the

2    product of fraud, you're agree with me that would be relevant

3    as well, would it not?

4    A        Yeah.  They're going to --

5    Q        Right.  So, just because there is no discrepancy

6    code doesn't mean that an issue is not relevant and material,

7    does it, sir?

8    A        Or, you know, to be investigated on the claim.

9    Correct.

10   Q        Exactly.

11           THE COURT:  Well, okay.  And, I mean, this is the

12   crux of the testimony.  I mean, you know, Mr. McCall testified

13   as to what he, you know, based upon his background and

14   experience he found relevant.  The legal term is material.

15   Mr. Newkirk from a little bit different background, little bit

16   different perspective is what, you know, he has called

17   discrepant.  And those two things between what Mr. McCall was

18   talking about and what Mr. Newkirk have talked about are

19   different.  They're coming at the thing from different

20   perspectives.

21           And, obviously, I mean, different people may find

22   different things and situations "material," but my job in

23   deciding what is material is based upon an objective standard

24   that covers if not everybody can agree to, that's what I

25   decide a reasonable person would agree to would be material.

 1   So, let's just -- I want to get that out on the table because

 2   that's what we're talking about here today.  And I hear you

 3   two, you know, and this is perfectly appropriate, I mean, it's

 4   informative to me, but that's what -- the decision I've got to

 5   make is what an objective standard of materiality is.  Okay.

 6             MR. CLARK:  Thank you, sir.

 7   BY MR. CLARK:

 8   Q        Certainly, sir, a pharmacy, I believe you testified

 9   on direct examination can change a script?

10   A        Correct.

11   Q        But that is only in consultation with the doctor or

12   nurse practitioner.  Isn't that right, sir?

13   A        Yes.  The prescriber.

14   Q        Right.  The pharmacy or the pharmacist shouldn't be

15   changing the script on its own?

16   A        Correct.

17   Q        Whether it's a lab tech at the pharmacy or whether

18   it's the pharmacist, the pharmacy cannot do that.  Correct,

19   sir?

20   A        Correct.

21   Q        Neither can a marketer.  Correct, sir?

22   A        Absolutely not.

23   Q        Okay.

24   A        Or correct.

25   Q        Are you aware of compounding pharmacies hiring

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 165 of 236  PageID #: 7520

```
 1    doctors to write scripts for their own compounds?

 2    A         Compounding pharmacies to hire doctors to write for

 3    the pharmacy employees.  Is that what you're asking?

 4    Q         Are you aware of compounding pharmacies that pay

 5    doctors to write prescriptions for the drugs that they

 6    compound?

 7    A         No.

 8    Q         Have you -- you did not recall reviewing anyone

 9    else's testimony other than Steve McCall, so, certainly, you

10    didn't review the testimony of a nurse practitioner named

11    Michelle Craven.  Is that correct?

12    A         Just the -- I think there was -- I'm familiar with

13    the name.  I've looked at a document or two that she's come

14    up.

15    Q         Certainly.  Though, you would agree with me that if

16    she testified that she signed scripts at Mr. Wilkerson's

17    insistence without communicating with the patient and without

18    ever seeing the patient, that would be inappropriate, wouldn't

19    it, sir?

20    A         For her, absolutely.

21    Q         Well, I understand you keep saying it's strictly on

22    the doctor and the person inducing the doctor to do that in

23    your mind bears no responsibility.  Is that what I understand

24    you to be saying?

25    A         For a medical license, in my opinion, yes.
```

UNITED STATES DISTRICT COURT

1    Q        I'm not talking about medical license.  I'm talking

2    about someone -- I'm talking about -- you see nothing wrong

3    with a person offering, I'll call it a bribe, you simply see

4    something wrong with someone taking the bribe?

5    A        No.  No.  The prescriber has the full responsibility

6    when prescribing that medication.

7    Q        You'd agree with me that there is no doctor patient

8    relationship in the scenario I just presented to you with a

9    nurse practitioner signing scripts at a marketer's

10   encouragement and insistence without that nurse practitioner

11   ever seeing or talking to the patient?

12   A        In that scenario, it does not sound like that there

13   is a doctor patient relationship.

14   Q        Exactly.  Because there is not one, is there, sir?

15   A        In that scenario, it does not seem to be one.  They

16   may have a history.  I don't know.

17   Q        Right.  Were you, in any of the documents that you

18   reviewed, were you made aware that Candace Michelle Craven has

19   pleaded guilty to a health care fraud conspiracy?

20   A        With the documents, no.

21   Q        Were you aware of that?

22   A        I was aware of that.

23   Q        You talked about the chart review of the Blue Cross

24   Blue Shield patients at Karma.  You don't know if Blue Cross

25   Blue Shield knew that Ms. Craven was involved in a conspiracy

1  to commit health care fraud or not, do you, sir?

2  A        I do not.

3  Q        Because, certainly, Ms. Craven didn't tell them

4  that, did she?  Did she, sir?

5  A        Apparently not.

6  Q        Willow Pharmacy didn't, did they, sir?

7  A        I would imagine not.

8  Q        Nobody at Top Tier did, did they, sir?

9  A        I don't think so that they were consulted.

10 Q        So, certainly, Mr. Wilkerson didn't either, did he,

11 sir?

12 A        I would imagine not.

13 Q        All right.  Are you aware that Ms. Craven testified

14 that others in the conspiracy used her stamp to authorize

15 prescriptions without her knowledge?

16 A        I was not aware of that.

17 Q        Are you aware of a discrepancy that exists for

18 unauthorized signature?

19 A        I think that may exist in some of the manuals.

20 Q        Certainly, it's inappropriate, is it not?

21 A        Or marked it as invalid, something.

22 Q        Certainly, whether there is a discrepancy or not,

23 it's inappropriate, isn't it, sir?

24 A        Yes.

25 Q        Does it seem fraudulent to you, sir?

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 168 of 236   PageID #: 7523

```
 1    A        If someone else signs a prescription, yes, that is a
 2    major issue.
 3    Q        Right.  If the prescriber was involved in a
 4    conspiracy to commit health care fraud with the marketers,
 5    that certainly would be material, would it not, sir?
 6             MR. THOMAS:  Your Honor, objection.
 7             THE COURT:  What was -- restate the question again
 8    before you -- what was the question?
 9             MR. CLARK:  I asked him if the prescriber was in a
10    conspiracy to commit health care fraud with the marketers, as
11    Ms. Craven testified that she was, that would be material,
12    would it not, sir?
13             THE COURT:  What's your objection?
14             MR. THOMAS:  My objection is that does not assume
15    any facts in this case, we are hearing about the United States
16    versus Jimmy Collins.
17             THE COURT:  I think it probably calls for a legal
18    conclusion, so objection sustained.
19             MR. CLARK:  Okay.
20    BY MR. CLARK:
21    Q        The average wholesale price, sir, who is it that you
22    testified sets the average wholesale price?
23    A        The manufacturer or, you know, basically, the
24    labelers.
25    Q        Okay.  Can the average wholesale price be adjusted
```

UNITED STATES DISTRICT COURT

1    or manipulated one way or the other?

2    A         Once it's set?

3    Q         Once it's set.

4    A         No.  It can only be changed by the manufacturer or

5    the labeler.

6    Q         Okay.  The only way that the average wholesale price

7    can be changed is by the, who, the manufacturer or the

8    labeler?

9    A         Correct.

10   Q         Pharmacies can play no role in manipulating the

11   average wholesale price?

12   A         Of the actual average wholesale price, no.

13   Q         Okay.  Sir, you worked at Freedom Pharmaceuticals.

14   Is that correct?

15   A         Correct.

16   Q         From February of 2013 until September of 2015, I

17   think is what your --

18   A         That looks correct, yes.

19   Q         Is that correct?  What was Freedom Pharmaceuticals?

20   A         They were a wholesaler of bulk chemicals.  They

21   repacked bulk chemicals and sold them to compounding

22   pharmacies around the country.

23   Q         And what did you do at Freedom Pharmaceuticals?

24   A         I taught a billing class was my prior responsibility

25   where we went through the different PBMs and their manuals and

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 170 of 236   PageID #:
7525

1    the dos and the don'ts on compounding billing and how to teach

2    pharmacies to correctly bill compounds.

3    Q        Are you aware that last month Freedom

4    Pharmaceuticals settled with the United States of America for

5    doing just what you've said cannot be done, that is, teaching

6    pharmacy customers how to submit false and inflated compound

7    prescriptions to inflate artificially the average wholesale

8    price?

9            MR. THOMAS:  Objection, Your Honor.  We're talking

10   about another case, I think it's unfair to present this to

11   this witness.

12           THE COURT:  Okay.  I mean, you know, they -- okay.

13   So, Freedom Pharmaceuticals apparently entered some agreement

14   with the United States, you know, agreement with the United

15   States.  Is that right, Mr. Clark?

16           MR. CLARK:  Yes, sir.  I'll be happy to show him and

17   ask him --

18           THE COURT:  Does the settlement agreement say that

19   the defendant neither admits or denies?  It usually does, but,

20   I mean.

21           MR. CLARK:  It does.  It lists the United States'

22   contention, then it lists what Freedom Pharmaceuticals paid.

23           THE COURT:  Does it say whether Freedom

24   Pharmaceutical admits or denies the allegations?

25           MR. CLARK:  I think it states -- I don't believe it

UNITED STATES DISTRICT COURT

```
 1    says denies I'll say.  I can tell you the exact language.
 2              THE COURT:  I don't know.  I mean, I'm not sure
 3    that's here nor there.  Let me tell you what I'm interested in
 4    about this average wholesale price and how it's set.  For
 5    instance, any given drug is, I guess, there are a lot of cases
 6    where some manufacturer has a monopoly, they are the only
 7    source of this drug.  Right?
 8              THE WITNESS:  When it's a brand name drug, yes,
 9    there is no generics.
10              THE COURT:  Wait a minute.  That's different.
11    That's a patent.  Let's talk about, you know, let's talk about
12    the underlying, the underlying chemicals that I'm using Pfizer
13    has to pay for in order to manufacture Lipitor.  We keep
14    talking about Lipitor, okay.  How many manufacturers in the
15    world are there that manufacture those components of Lipitor,
16    just you may need to guess, I mean?
17              THE WITNESS:  The components of Lipitor might be
18    only made by Pfizer.
19              THE COURT:  Okay.  Maybe I don't -- here's my
20    question.  I'm wondering, the average wholesale price, I'm in
21    my mind sort of analogizing it to the price of a stock on the
22    stock exchange where there are literally thousands or millions
23    of people feeding into the marketplace for that stock.  Well,
24    that's -- that can be manipulated, but it's hard, because, I
25    mean, there are so many individual decisions being made.  And
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 172 of 236   PageID #: 7527

1  that's why we have confidence in the stock market.  Well, some

2  of us have confidence in the stock market.  Because we are

3  assuming that any individual player is probably going to be

4  incapable or close to incapable of meaningful, meaningfully

5  manipulating, you know, the price of its own stock.

6          Now, there would be exceptions to that.  I mean, you

7  might be able to find a publicly traded company that could

8  convince enough of its insider employees to go, hey, our stock

9  is only worth 50 bucks on the market, go buy it for 100 bucks

10 because that will have the affect of driving up the stock.

11 But, look, that's hard to do.  And it takes a lot of money and

12 most people just -- I mean, that's why we have confidence in

13 the stock market.  Is that a fair analogy to something called

14 the average wholesale price?  Are there enough players in the

15 market to create that sort of assurance that it's hard to

16 manipulate this price?

17         THE WITNESS:  I think that the best analogy is an

18 example.  So, let's take a drug, a bulk chemical called

19 Ketoprofen.  And let's say there is 14 different suppliers of

20 Ketoprofen out there.

21         THE COURT:  In the world?  In the whole world?

22         THE WITNESS:  In the whole world.

23         THE COURT:  Okay.  Now, that's not many.  And, I

24 mean --

25         THE WITNESS:  That's not.

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 173 of 236  PageID #: 7528

1        THE COURT:  They could -- 14 manufacturers, if they

2  wanted to probably could conspire to manipulate the price of

3  their product --

4        THE WITNESS:  Well, what happens is that, you know,

5  if I'm a pharmacy, I'm buying Ketoprofen, I have 14 suppliers

6  to choose from, the AWP is normally $100 and there are some

7  that will be $98, there is going to some that's $103.  A new

8  company comes on to the market and they set their AWP at $110.

9        THE COURT:  Okay.

10       THE WITNESS:  They can just set it there.  They can

11  set it at $3,000, wherever they want to put it.

12       THE COURT:  But in the United States at least

13  antitrust laws would affirmatively prohibit those

14  manufacturers from surreptitiously agreeing to fix a price.

15  We call that price fixing.  It gets prosecuted all of the

16  time.

17       THE WITNESS:  Correct.  And if you place it at $150

18  and your purchase price is the same as everybody else, you

19  know, give it six months or so and everybody else is going to

20  creep up to your $150 AWP price.  It actually drives AWP up.

21       THE COURT:  Okay.  I can't even remember how I got

22  off on this, but, okay.  Go ahead, Mr. Clark.

23       MR. CLARK:  Thank you, sir.

24  BY MR. CLARK:

25  Q        Getting back to whether a pharmaceutical or a

1  pharmacy can artificially drive up the average wholesale

2  price.  Is it your testimony that Freedom, for example, does

3  not have the ability to establish an average wholesale price

4  for let's say Fluticasone?

5  A        They absolutely do.  They would set -- Freedom,

6  PCCA, Spectrum any of the chemical companies out there are

7  going to set the AWP.

8  Q        Right.

9           THE COURT:  Is there competition among the companies

10  to establish the AWP or, I mean, do they just -- I mean, can

11  they dictate, I mean, that --

12          THE WITNESS:  I don't know if I would call it

13  competition.  It's just they're allowed to set the AWP.

14  BY MR. CLARK:

15  Q        And Freedom was the company that you worked for.

16  Correct?

17  A        Correct.

18  Q        Was Freedom setting the AWP?

19  A        For their particular chemicals, yes.

20  Q        Was Fluticasone Propionate a Freedom chemical?

21  A        Yes.

22  Q        What is the CPS or CPCSI division at Freedom?

23  A        That was the class I taught on compound billing.

24  Q        So, it had an operating division of CPCSI.  Who was

25  the head of that?

```
 1   A          That was me.

 2   Q          Now, let me --

 3   A          And eventually my partner, Chris Gruber.

 4   Q          Let me show this sentence and tell me if you agree

 5   with this.  Through its operating division CPCSI, and that was

 6   you.  Correct?  Through its operating division, CPCSI --

 7   A          Yes.

 8   Q          -- Freedom taught its pharmacy customers how to

 9   submit false and inflated compound prescription claims to

10   maximize reimbursement from federal health care programs, how

11   to manipulate the usual and customary price in order to obtain

12   reimbursement based upon the AWP, and how to alter compound

13   prescriptions to obtain approval after the claims had been

14   initially rejected.  Now, that's what the United States

15   alleged Freedom did.

16              THE COURT:  Are you reading -- what is this, is this

17   the settlement agreement?

18              MR. CLARK:  This is the signed settlement agreement,

19   yes, sir, Your Honor, between the now parent company of

20   Freedom, Fagron.

21   BY MR. CLARK:

22   Q          Were you aware that Fagron is the now parent company

23   of Freedom Pharmaceuticals?

24   A          Fagron, yes.

25   Q          I apologize for mispronouncing it.  Just so we're
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 176 of 236   PageID #:
7531

```
 1   fair.  It does state in answer to Judge Mattice's, this is
 2   neither an admission of liability by the company or concession
 3   by the United States that its claims are not well founded.
 4   That was part of the claim that the United States brought?
 5   A        And I would --
 6   Q        Artificially driving up the average wholesale price.
 7   Correct?
 8   A        I would completely utterly 100 percent disagree with
 9   this statement.
10   Q        So, you disagree that that happened.  Did you know
11   or had anyone told you that the company agreed to pay
12   22.05 million dollars to the United States as a result of
13   those allegations to settle this claim?
14   A        I did read that in the news.
15   Q        Okay.  So, while you disagree with it, you agree
16   that the company you worked for paid 22.05 million dollars to
17   settle a claim that you were teaching people how to submit
18   false and inflated compounded prescription claims to maximize
19   reimbursement from federal health care programs?
20            MR. THOMAS:  Objection, Your Honor.  That's
21   completely misleading.  This is a standard civil settlement
22   agreement and a couple of pages back there is an express
23   provision that no one admits any liability.
24            THE COURT:  Well, I think we just read that, I mean.
25            MR. CLARK:  I just read it.
```

UNITED STATES DISTRICT COURT

```
 1              MR. THOMAS:  Yes, sir.

 2              THE COURT:  He just read it, nobody admits or

 3     denies.  That's what every settlement agreement says.  So, I

 4     mean, you know, I don't really know what the relevance is.  I

 5     mean, I understand that's what the government's contention was

 6     in that particular sentence.  You know, Fagron, the successor

 7     to Freedom says, hey, look, we'll give you 22 million to go

 8     away.  We don't, you know -- I get that.  I've dealt with, I

 9     can't remember, I don't know how many settlement agreements

10     I've not only dealt with but drafted.  You know, probably a

11     very limited relevance in this trial.

12     BY MR. CLARK:

13     Q       But you agree --

14              MR. WALDEN:  Can we get a case number?

15              MR. CLARK:  I'll introduce it into evidence.

16              THE COURT:  Why don't we do that?  It is what it is.

17     Come look at it, Mr. Walden.  It's a settlement agreement.

18              MR. CLARK:  It's a settlement agreement.  It's

19     signed by the --

20              MR. WALDEN:  I don't know even the time period that

21     this allegedly took place.

22              THE COURT:  I don't either.

23              MR. WALDEN:  I would object based upon --

24              THE COURT:  I tell you what.  Why don't we take --

25     let's take about a 10-minute recess and you can show defense
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 178 of 236  PageID #: 7533

1    counsel what you got here, you know.  And, again, let's not

2    pay too much -- I mean, it was apparently an action by the

3    United States against, what, Fagron, the successor company,

4    and it was settled, you know.  And, you know, so, that is what

5    it is.  I mean, the Court is extraordinarily familiar with how

6    all of this goes, done it hundred times.

7              All right.  Let's take about a 10 or 15-minute

8    recess.

9              (Short recess.)

10             THE COURT:  All right.  Ready to proceed, Mr. Clark?

11             MS. MAIO:  Your Honor, I apologize.  I have two

12   brief matters before Judge Lee at 4:00, if I may be excused?

13             THE COURT:  You got your co-counsel here, if you

14   want to leave, that's fine.

15             MS. MAIO:  Yes, sir.

16             THE COURT:  Thanks, Ms. Maio.

17             MR. CLARK:  May I proceed, Your Honor?

18             THE COURT:  Yeah.  Go ahead.

19   BY MR. CLARK:

20   Q       Sir, there was a question about the date for which,

21   the time period this activity alleged in the other matter

22   occurred.  I'll show you Page 4, from January, 2012 through

23   December, 2016.  And, again, your time at Freedom

24   Pharmaceutical is wholly captured in that time period, is it

25   not, sir?

1    A        Correct.

2    Q        And I understand your testimony today is that you

3    did not teach your pharmacies how to engage in that behavior

4    and you state that pharmacies cannot artificially inflate the

5    average wholesale price.  But you would agree with me that the

6    company you worked for paid 22.05 million dollars in response

7    to an allegation that it did exactly that?

8            THE COURT:  Is it the company he worked for or the

9    successor to the company he worked for?

10           MR. CLARK:  The successor company paid it, but it

11   was based upon conduct of the company he worked for under the

12   division that he stated he was the head of, Your Honor.

13           THE COURT:  Okay.

14   BY MR. CLARK:

15   Q        You'd --

16   A        Correct to your statement.

17   Q        Okay.  Now, you were asked by Mr. Walden and I

18   believe you said you met with Mr. Walden as well as counsel

19   for Mr. Wilkerson.  Is that correct?

20   A        By, I've had phone conversations, and it's Zack.

21   Q        Okay.  How many times did you speak with Mr. Walden

22   in preparation for your testimony today?

23   A        I really don't know the count, five to 10 times,

24   maybe.

25   Q        How many times did you speak with Mr. Wilkerson's

```
 1   counsel?

 2   A        Probably more, 10 to 20 times.

 3   Q        Have you ever testified as a witness on behalf of

 4   counsel for Mr. Wilkerson before in any other court?

 5   A        No, sir.

 6   Q        Okay.  How much are you being paid by Mr. Wilkerson

 7   for your testimony today?

 8   A        There is a flat fee and a per hour contract that we

 9   had an attorney create for us.

10   Q        And the flat fee is how much, sir, Mr. Wilkerson's

11   paying you?

12   A        If I recall it's $3,000.

13   Q        And then per hour for your testimony, sir, is how

14   much?

15   A        I haven't looked at it in a long time.  I think it's

16   around $400 or something.

17   Q        Is it $400 per hour, you're not aware?

18   A        Ballpark.  I would have to review it to remember.

19   Q        Are you also being paid by Michael Chatfield for

20   testifying here today, that's the client represented by Zack

21   Walden?

22   A        No, sir.

23   Q        Are you being paid by any other defendants?

24   A        No, sir.

25   Q        Now, you were asked by Mr. Wilkerson's attorney as
```

UNITED STATES DISTRICT COURT

```
 1   to whether or not that there was some confusion back in 2014
 2   as to whether Tricare was a government insurance plan.  Do you
 3   recall that?  Or a government benefits plan.
 4   A       Yes.
 5   Q       Right.  In truth, just so we all know, there was no
 6   confusion, was there, sir?
 7   A       Tricare is a plan and they utilized Express Scripts
 8   to administer the prescription benefit.  That's my
 9   understanding.
10   Q       But there was no confusion among the pharmacies with
11   respect to whether or not that Tricare was a government
12   program that relied on federal funds, was there, sir?
13   A       I don't believe so.
14   Q       Okay.  You've testified about your knowledge of the
15   ESI PBM provider manual from 2014.  Correct?
16   A       Correct.
17   Q       Were you aware that on Page 111 it specifically
18   tells the pharmacy that Tricare involves federal funds.  Were
19   you aware that that was in there?
20   A       Correct.  Yes.
21   Q       Just so we're clear, there was no cloudiness or
22   murkiness or confusion with respect to the pharmacies as to
23   whether or not that Tricare was a government benefit program,
24   was it, sir?
25   A       If they read the manual, correct, yes.
```

UNITED STATES DISTRICT COURT

1   Q        All right.  And they are bound by the manual.  Is

2   that correct?

3   A        Contractually, yes, it's incorporated in the

4   contract that they sign.

5   Q        The PBM is also bound by the manual, are they not,

6   sir?

7   A        Yes, they are.

8   Q        Sir, you stated that the process for submitting

9   compounded prescriptions to insurance companies for

10  reimbursement is a 100 percent transparent process.  That was

11  your -- that was your phrase that you used on direct

12  examination, wasn't it, sir?

13  A        Yes, it is.

14  Q        And you agree with that, do you not?

15  A        Yes.  After 2011, when you can transmit every

16  ingredient in the compound, as long as they're submitting

17  every ingredient in the compound, which they're required to by

18  per the manual, it's transparent.

19  Q        Right.  So, certainly, given that transparency, it's

20  never okay for a pharmacy to submit a fake claim for a patient

21  that doesn't exist, for a prescription that's not needed

22  simply to see how much the PBM is going to pay for that claim,

23  is it, sir?

24  A        For the narrow definition you have there, correct.

25  Q        Well, is there any situation in which you contend

UNITED STATES DISTRICT COURT

1    it's okay to submit a fake claim under this 100 percent

2    transparent framework?

3    A        I think there are times when, you know, a pharmacy

4    when you bill a claim and it's been rejected, and it says, you

5    know, two of the eight ingredients are not covered, could a

6    pharmacy, you know, try and figure out before they call the

7    physician what is covered, you know, substitute a different

8    drug, send it off to the insurance, oh, it's covered, okay,

9    let me call the doctor and get the authorization to make that

10   switch.  To me, that makes absolute sense.

11   Q        Would you advise the pharmacies that pay you for

12   consulting to submit these fake claims?

13   A        I would not call them a fake claim.  But would I

14   advise them, you know, the alternative is any time you have a

15   rejected claim, you've got to pick up the phone and just call

16   the doctor and say, you know, it's not covered, what would you

17   like me to try next.

18   Q        But it's never okay to submit a fake claim simply to

19   see how much the reimbursement is, is it, sir?

20   A        I don't know why you would even do that.

21   Q        Exactly.  Because it's never okay?

22   A        Well, I think that you could just take the -- you

23   know the AWP of each ingredient.  You could take the

24   quantities.  You could just do the math yourself and you know

25   what that claim is going to transmit and bill at.  There is no

1    reason to submit a claim.

2    Q        Fair enough.  Now, sir, you were asked about whether

3    or not individual customers of these medications are told how

4    much their insurance company is going to be billed for the

5    drugs.  Do you remember those questions?

6    A        Yes, I do.

7    Q        And you stated you believed that the marketers were

8    prohibited from giving that information.  Is that correct?

9    A        I don't know that they're prohibited.  I just, I

10   don't know that it's even possible for them to give them that

11   information.

12   Q        Have you reviewed the testimony of Brian Kurtz,

13   that's Wayne Wilkerson's business partner?

14   A        No, I have not.

15   Q        So, are you aware that he testified that it was Top

16   Tier's policy to disclose the cost of the medications to the

17   customers?

18   A        I was not aware of that.

19   Q        Okay.  Getting back to the questions that were asked

20   by Mr. Walden.  You were asked regarding whether or not that

21   there were any specific override codes.  You have no way of

22   knowing whether any of the dates on those prescriptions are

23   legitimate and truthful dates, do you, sir?

24   A        I don't know what you mean.

25   Q        In other words, if a prescriber and someone at the

```
 1    pharmacy were backdating the prescriptions, you couldn't look

 2    at the piece of paper and tell that, could you, sir?

 3    A        If they entered all of the information and it had

 4    the fields for the written date, the submit date, and the

 5    dispense date, you could tell from that information.

 6    Q        You could tell whether or not that the date written

 7    by the health care provider on the prescription was backdated

 8    or whether it was accurate?

 9    A        You can't tell that.  Right.

10    Q        There is no way to tell that, is there, sir?

11    A        Right.

12    Q        Right.  There are no formularies for compounded

13    products, are there?

14    A        No.  There are just limits, edits, you know, caps.

15    Q        Is it wrong to give an inducement to the patient to

16    get the patient to ask for a compounded medication?

17    A        I don't know.

18    Q        Have you ever recommended that any of the pharmacies

19    that pay you for consulting advice do that?

20    A        No.

21    Q        Would you ever recommend that they do that?

22    A        No, I would not.

23    Q        Because the demand is supposed to create the

24    compounding, the compounding is not supposed to create the

25    demand.  Isn't that right, sir?
```

1   A        That's one way to phrase it I would imagine.

2   Q        Is it accurate?

3   A        For the most part.

4   Q        What part of it do you disagree with, sir?

5   A        Well, a pharmacy in and of itself creates demand for

6   prescriptions.

7   Q        Have you reviewed any -- well, obviously, you did

8   review prescriptions in this case, because you were, you were

9   shown a prescription for James Allen by Mr. Walden.  Do you

10  recall seeing this prescription?

11  A        Yes.

12  Q        Okay.  Look at this general wellness pill.  That's

13  coenzyme Q-10, 100 milligrams, that's CoQ-10.  Isn't it, sir?

14  A        Correct.

15           MR. WALDEN:  Your Honor, I'm going to object.  I

16  don't believe I actually showed this prescription.  Can you

17  show me the date for it?

18           MR. CLARK:  It's a date of 11/26/2014.

19           MR. WALDEN:  I did not show that prescription.

20  BY MR. CLARK:

21  Q        Let me show you this prescription.  You were shown

22  some billing information with respect to James Allen.  Have

23  you seen a prescription --

24           MR. WALDEN:  Your Honor, I'm going to object to the

25  mischaracterization.  I showed him billing information for

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 187 of 236   PageID #: 7542

```
1   Jacob Burgess.

2           MR. CLARK:  I apologize.

3   BY MR. CLARK:

4   Q       This is Government's Exhibit 1315.  You've seen

5   prescription forms like this, have you not?

6   A           Correct.

7   Q       Okay.  Let's look at the general wellness tablet,

8   this is Co Q-10.  Correct?  What's that for?

9   A           It's, I can't remember, but it's just a wellness,

10  you know, like a vitamin.

11  Q       And I can buy that at Wal-Mart, can't I, sir?

12  A           You can.

13  Q           And --

14  A           Lipoic acid.

15  Q           Lipoic acid.  What's that, sir?

16  A           Same thing it's just, you know, a vitamin.

17  Q           It's an aerobic metabolite vitamin?

18  A           Right.

19  Q           I can buy that at Wal-Mart, can't I, sir?

20          MR. WALDEN:  Your Honor, I'm going to object.  I

21  believe this line of questioning is outside of the scope of

22  direct examination.

23          THE COURT:  Where are we heading with this, Mr.

24  Clark?

25
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 188 of 236  PageID #: 7543

1          MR. CLARK:  Your Honor, he's the one who brought up

2     the pricing for the compounded products.  And I was simply

3     going to point out that a general wellness tablet which

4     contains products that I could buy at Wal-Mart was billed for

5     over $5,000.

6          THE COURT:  Well, and, I mean, we've talked a lot

7     about that.  I don't know.  I mean, I'll let you go into it.

8     I mean, but, you know.  I really -- yeah.  I'm having trouble

9     fitting this in that the creams that are at issue in this case

10    seem to me to cost a lot of money.  I mean, I'm still not

11    totally clear.  I mean, I've listened through many witnesses,

12    average wholesale price thing, and all of that.  And, I mean,

13    obviously, at a certain period of time, there seemed to be --

14    well, I don't know how you put it.  I'm going to call it a big

15    loophole in the system for compounded drugs.  I mean, I've

16    heard testimony that over time the insurance companies

17    themselves and the government have sought to close those

18    loopholes, but, you know, if you can enlighten me on that,

19    that's -- but, I mean, I've listened to many witnesses, I'm

20    still a little bit confused.

21          MR. CLARK:  Yes, sir.

22    BY MR. CLARK:

23    Q       Sir, the last question I'm going to ask about this.

24    Would you agree with me that all three of these ingredients

25    are common ingredients that I can buy over the counter at

1    any --

2    A        Individually, yes, you could.

3    Q        That is correct.  I could take them all together in

4    those doses, could I not, sir?

5    A        I'm not sure about the lipoic acid, but, yes, for

6    sure.

7    Q        Okay.  And it would not cost -- well, you bought --

8    how much would you expect for me to pay at Walmart for Co Q-10

9    lipoic acid and Vitamin D3?

10   A        Buy them separately, count of 30 each, who knows, 10

11   to $20, $30 each.

12   Q        That's correct.  And the industry which you were a

13   part of at Freedom Pharmaceuticals found a way to put them

14   together and sell them for in excess of $5,000.  Is that

15   correct, sir?

16   A        Well, if a physician wrote for this, and you filled

17   it with the bulk chemicals, and the AWP was entered correctly,

18   it would price out and be covered if it was a formulary drug.

19   Q        I understand you testified that there was no

20   discrepancy code for a marketer to be prescribed a medication

21   himself and get commissions on his own creams.  Is that

22   something you would ever advise the pharmacies that pay you

23   for consulting to do?

24   A        I don't know that I would advise them that.

25   Q        Okay.  Is there a limit to how much you think it

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 190 of 236  PageID #:
7545

1  would be acceptable for the marketer to make off of just his

2  own creams?

3  A        I don't know.

4  Q        What if the patient made over $100,000 just for

5  getting his own cream, is that an issue that would be relevant

6  from a PBM standpoint?

7  A        I would imagine a PBM would want to audit the

8  claims.

9  Q        Because it would be relevant?

10 A        Because they would, they would have a concern, I

11 would imagine.

12         MR. CLARK:  May I have just a moment, Your Honor?

13         THE COURT:  Yes.

14         (Brief pause.)

15         MR. CLARK:  Your Honor, that's all of the questions

16 I have.

17         THE COURT:  Redirect?  Mr. Thomas.

18                    REDIRECT EXAMINATION

19 BY MR. THOMAS:

20 Q        Mr. Newkirk, I'm going to ask you a couple of

21 follow-up questions to address the matters that Mr. Clark

22 brought on cross-examination.  I'll give you just a minute to

23 read that.  I'm sure you know what it says, but I'll give you

24 just a second to take a look at all of it.  I'm going to ask

25 you a question or two about it.

UNITED STATES DISTRICT COURT

1    A         Okay.

2    Q         From my notes, Mr. Newkirk, you had stated that

3    under Florida state law it is illegal, correct, illegal for a

4    pharmacy to not collect copayments from Medicaid patients.  Is

5    that correct?

6    A         That's the way I've read it, to waive a copay, to

7    waive copayments.

8    Q         To your understanding, does that Florida state

9    Medicaid law apply to any other state?

10   A         No.

11   Q         To your understanding, does that provision apply to

12   any other payor even in Florida?

13   A         It's under Medicaid.  So, I don't think so.  I don't

14   know.

15   Q         Florida Medicaid?

16   A         Correct.

17   Q         Mr. Newkirk, are you aware, is there a statute

18   applicable in the state of Tennessee that prohibits anyone

19   from collecting a copay?

20   A         I'm not aware of any statute.

21   Q         You're not aware of anything that applies underneath

22   Tennessee law.  Correct?

23   A         Correct.

24   Q         Mr. Newkirk, you'll recall Mr. Clark's questions of

25   you regarding whether or not that the bulk materials that go

UNITED STATES DISTRICT COURT

1    into compounds are FDA approved.  Correct?

2    A        Correct.

3    Q        Then some concerns as to the safety and efficacy of

4    those compounds if in fact they're not FDA approved.  Do you

5    recall that testimony?

6    A        Yes, I do.  Yes.

7    Q        Just laying a little predicate.  Mr. Newkirk, have

8    you ever seen an instance where a medication that standing

9    alone would be FDA approved, say, for instance, Gabapentin

10   which in Neurontin, which would also be included in a

11   compound?

12   A        Yes.

13   Q        So, Gabapentin standing alone would be FDA approved,

14   correct, but put into a compound loses that FDA approval.

15   Correct?

16   A        As soon as it's altered, if it's a capsule, as soon

17   as you open that capsule and you incorporate it into anything

18   else, it is now a non-FDA approved drug.

19   Q        Because it was mixed with other matters and it's

20   broken out of its original container that would be consumed by

21   the patient.  Correct?

22   A        Correct.

23   Q        But the Gabapentin is FDA approved.  Correct?

24   A        Yes.

25   Q        For safety and efficacy?

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 193 of 236   PageID #: 7548

1   A       The tablet or capsule, yes, it is FDA approved.

2   Q       And the reason that the FDA approval goes away is

3   because it's put into a compound with other medications?

4   A       Correct.

5   Q       That doesn't make it any less safe or efficacious,

6   does it?

7   A       It does not.

8           THE COURT:  Well, let me ask about that.  And I have

9   wondered about that.  And I do understand what you're saying,

10  Mr. Thomas, but, again, this probably displays my ignorance of

11  chemistry.  But, I mean, just because a substance is FDA

12  approved, does that necessarily mean that when it is combined,

13  mixed with other FDA approved substances that there is not a

14  way that they can be dangerously mixed in a way that it would

15  harm or even kill a human being?

16          THE WITNESS:  Yes.

17          THE COURT:  So, you've got to be careful with this

18  stuff FDA approved or not?

19          THE WITNESS:  Absolutely.

20          THE COURT:  About mix and match?

21          THE WITNESS:  You're still dealing with drugs.

22          THE COURT:  Okay.  And a bad mixture, you know,

23  accidentally or not, could have potentially lethal

24  consequences.  Right?

25          THE WITNESS:  Absolutely.

```
 1              THE COURT:  All right.  Go ahead.

 2   BY MR. THOMAS:

 3   Q         And to follow up on that question, that could be

 4   whether the drugs are compounded or they're completely

 5   separate.  There may very well be a completely separate FDA

 6   medication that if taken at the same time with let's say

 7   Gabapentin could be injurious to a patient.  Correct?

 8   A         Correct.

 9   Q         Whether they're taken separately at the same time or

10   they're mixed together in a compound taken at the same time?

11   A         Correct.

12              THE COURT:  And I presume that's the reason, for

13   instance, when I go to a physician, any physician, or a

14   pharmacist, they want to know what all of the medications I'm

15   taking because they want to make sure that, oh, gosh, we're

16   sorry, Judge, we thought this would help you, but, instead, it

17   killed you or explain, they'd explain it to my widow at that

18   point.  Right?

19              THE WITNESS:  Right.  Correct.

20   BY MR. THOMAS:

21   Q         Classic screening for drug interactions.  Correct?

22   A         Correct.

23   Q         Responsibility of the physician.  Correct?

24   A         Correct.

25   Q         And if the pharmacist sees it and notices that it's
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 195 of 236   PageID #: 7550

```
 1    a bad interaction, it is the responsibility of the pharmacist

 2    to stop right there and not just fill the prescription knowing

 3    full well it doesn't match what's in the Physician Desk

 4    Reference, right, and call the doctor?

 5    A          Correct.

 6    Q          You recall Mr. Clark asked you several questions

 7    regarding whether there is or should be or could be or a

 8    requirement to sort of have a fail first for an FDA approved

 9    medication before moving into compounding.  Do you remember

10    those questions?

11    A          Have a failed?

12    Q          Fail first.  Meaning, from my notes, Mr. Clark asked

13    you, wouldn't it make sense, wouldn't it be more efficacious

14    and more safe to utilize an FDA approved medication before or

15    instead of a compound medication.

16    A          Correct.

17    Q          Do you recall that testimony?

18    A          I do.

19    Q          Is there any requirement in fact prior to either

20    prescribing a compound or filling and dispensing a compound

21    that there must be the use of an FDA approved medication

22    first?

23    A          Not that I'm aware of.  There would have to be a

24    prior authorization reject, you know, must try FDA approved

25    drug first.
```

UNITED STATES DISTRICT COURT

1   Q        And that's how it would be handled, correct, through

2   a prior authorization?

3   A        Correct.

4   Q        That if someone sent in a request for a compound,

5   the PBM, knowing that there hadn't been an earlier FDA

6   approved drug to be utilized, would reject the claim.

7   Correct?

8   A        If that's what they required.

9   Q        Because that's the prior authorization?

10  A        Exactly.

11  Q        And it's up to the PBM to set or not.  Correct?

12  A        Correct.

13  Q        The nature of the relationship, and we've gone over

14  this, but after cross-examination I feel like I need to go

15  back over it and clear it up.  The relationship between the

16  pharmacy and the PBM is contractual.  Correct?

17  A        Correct.

18  Q        The pharmacy chooses the PBM and the PBM chooses the

19  pharmacy.  Right?

20  A        Yes.  They both have to sign the contract.

21  Q        The pharmacy essentially agrees to the PBM

22  requirements whether it be contractual or in the manual in

23  order to be able to stay in network, correct, to be a

24  participating pharmacy?

25  A        To participate, yes, you must sign.

UNITED STATES DISTRICT COURT

1    Q          In your experience, over 30 years, to the extent

2    that a pharmacy is non-compliant with a provision inside of

3    that PBM contract or inside of the PBM manual, is that a

4    breach of contract or is it fraud?

5    A          It could be a discrepancy.

6    Q          Or a discrepancy?

7    A          Right.  I don't know that it would constitute fraud

8    if you, you know, fill a prescription take one daily and you

9    fill 90 as a 30 day supply, is that fraud?  I would say no,

10   it's a clerical error.  It's a mistake.  It's a billing error

11   and it's going to be recouped on audit.

12   Q          And if the pharmacy has operations that are

13   non-compliant, not within the guidelines of the manual, not

14   within the guidelines of the contract, the PBM does an audit,

15   makes that determination of non-compliant, the claims, the

16   individual claims on a one by one basis are deemed to be

17   discrepant.  Correct?

18   A          Correct.

19   Q          Because the pharmacy was in non-compliance with the

20   manual.  Correct?

21   A          Correct.

22   Q          What's the remedy?  What does the PBM do?

23   A          It's a recoupment for the claims that are

24   discrepant.

25   Q          So, the remedy is civil, right, it's a clawback of

1    the money?

2    A          It is a clawback and typically they'll take it off

3    of future checks.

4    Q          It doesn't generate a criminal fraud action.

5    Correct?

6              MR. CLARK:  Your Honor, please --

7              THE COURT:  Yeah.  Let's talk about that, because, I

8    mean, you know, that's been sort of an undercurrent through

9    these entire proceedings.  I mean, I get it.  I think that --

10   I mean, obviously, the government thinks bringing this as a

11   criminal action is completely appropriate and so forth.  I

12   suspect every single defendant and their counsel would argue

13   that, you know, this, at best, is a regulatory matter, if not

14   just a private contractual matter, Judge.  And as a matter of

15   public policy, you know, the criminal law is a poor

16   enforcement mechanism for what's basically a regulatory or

17   contractual matter.  I get that.  Those are public policy

18   decisions that are above the pay grade of everybody in this

19   courtroom, including me, and I do understand that.  But, I

20   mean, I don't intend to delve into that in my decision about

21   this case.  I intend to hold the government to its burden of

22   proof beyond a reasonable doubt.  So, let's just move beyond

23   that.

24             MR. THOMAS:  Yes, sir.  My only post script on that

25   is I was responding when Mr. Clark said would that be fraud.

```
 1              THE COURT:  Yeah.

 2              MR. THOMAS:  I'm compelled to redirect.

 3              THE COURT:  I mean, and your questions, I'm

 4   criticizing either one of you, but your questions themselves,

 5   you are two ships passing in the night about how matters like

 6   this should be handled.  I think we can all agree with that.

 7              MR. THOMAS:  Yes, sir.

 8              THE COURT:  Okay.

 9              MR. THOMAS:  I'll move on.

10   BY MR. THOMAS:

11   Q        Mr. Newkirk, there was quite a bit of testimony on

12   cross-examination with Mr. Clark regarding, on the

13   requirements of copays.  Those copay requirements that the

14   PBMs impose on the pharmacies.  That's not imposed upon the

15   marketing agents.  Correct?

16   A        Correct.

17   Q        It's imposed upon the pharmacies?

18   A        Correct.

19   Q        The pharmacies are responsible for collecting the

20   copays?

21   A        Correct.

22   Q        Mr. Newkirk, I'm asking the deputy to hand you a

23   document that is a business record that was obtained from

24   Willow Pharmacy.  I'm going to ask you to take a look at it

25   and then I'll hand it to opposing counsel.  I'm going to have
```

UNITED STATES DISTRICT COURT

```
 1   it marked and try to get it into evidence here.  I'll give you
 2   a minute to review it.
 3              (Brief pause.)
 4   A       Okay.  I've briefly reviewed them.
 5              MR. THOMAS:  If I can get that back from you.
 6              THE COURT:  Can I ask you, Mr. Thomas, in just a
 7   moment, is this the first time you've disclosed this document
 8   to the government, whatever it is?  I don't even know what it
 9   is.
10              MR. THOMAS:  I think that it is.
11              THE COURT:  All right.  If that's the case, here's
12   the only thing I'm going to say.  I'd like to take a 10-minute
13   at least break to let the government review it.
14              MR. THOMAS:  Yes, sir.
15              THE COURT:  I have no idea what that is, but I
16   suspect that I'm going to be encountering an objection of some
17   sort.  I'd like everybody to take a look at it and think about
18   what their position is on this.
19              MR. THOMAS:  Yes, sir.
20              THE COURT:  So, let's take a five, 10-minute recess
21   and we'll reconvene.
22              (Short recess.)
23              THE COURT:  All right.  Let's see, Mr. Thomas.  You
24   have a document that you're waving around up there.
25              MR. THOMAS:  Thank you, Your Honor.
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 201 of 236   PageID #: 7556

```
 1              THE COURT:  Is this the letter?

 2              MR. THOMAS:  Yes, sir.  We've got it marked as

 3    Wilkerson No. 6.

 4              THE COURT:  Okay.

 5              MR. THOMAS:  It's covered up, but these are

 6    government numbers that came in through --

 7              THE COURT:  Okay.  You got these from the

 8    government?

 9              MR. THOMAS:  Yes, sir.

10              THE COURT:  Okay.

11              MR. THOMAS:  We would contend that's a business

12    record.  We've got a stipulation.

13              THE COURT:  Okay.

14              MR. CLARK:  Your Honor, if I could make my

15    objection.  We did --

16              THE COURT:  I didn't say you had to have an

17    objection, I just anticipated one.

18              MR. CLARK:  I do.  And here's the objection, Your

19    Honor.  Simply because something is a business record doesn't

20    mean it's not susceptible to other hearsay rules.  There can

21    be hearsay within an authentic business record.  This is a

22    letter written by an individual who apparently was

23    representing Willow Pharmacy pursuant to some audit.  It's

24    being offered for the truth of what that individual states and

25    it is his opinion that a particular --
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Whose opinion?

 2              MR. CLARK:  The opinion of the author of this

 3     letter, someone named Richard Quadrino that a particular copay

 4     amount is covered by a certain Affordable Medical Solutions

 5     benefit program.

 6              THE COURT:  Okay.

 7              MR. CLARK:  And, therefore, is not susceptible to

 8     the audit.  That's my understanding based upon my conversation

 9     with Mr. Thomas why it's being offered.  It's being offered to

10     show that Willow, in essence, was allowed to eat anything

11     other than $15 under this particular health care benefit or

12     prescription benefit plan.

13              THE COURT:  Okay.  It's a legal opinion as to an

14     interpretation of the contract?

15              MR. CLARK:  Absolutely.  And that is my objection,

16     because if we're going to get into that, then I think there is

17     a whole host of other things that we can get into such as one

18     of the prescriptions referenced here in this audit is Emilio

19     Hernandez's prescription who was one of the ones that Mr.

20     Hindmon and Mr. Montgomery went and paid Dawn Montgomery, not

21     Dawn Montgomery, paid Maria Valadez cash for so the

22     prescription, so that copay was actually paid.  And I think

23     that the Court has already stated that the Court didn't think

24     this was a particularly relevant issue anyway when I tried to

25     get into it with Mr. Newkirk, so I moved on.  And so, for
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 203 of 236  PageID #:
7558

```
 1    those reasons I would object.  It's a statement of Richard

 2    Quadrino being offered for the proof of it.  And simply

 3    because it's in a valid business record does not make it

 4    admissible.

 5                THE COURT:  Okay.  It's hearsay?

 6                MR. CLARK:  Yes, sir, Your Honor.

 7                MR. THOMAS:  May I respond, Your Honor?

 8                THE COURT:  Yes.

 9                MR. THOMAS:  We're not bringing it for the truth of

10    the matter asserted.  This is an expert in pharmacy

11    compliance.  I'm not asking to render an opinion of an

12    attorney as to whether or not Willow was in compliance.  I

13    don't represent Willow.  I am bringing this merely to respond

14    to the line of questioning from Mr. Clark that came off of the

15    e-mail from Mr. Hindmon that indicated that there is only a

16    $15 patient copay, and Willow Pharmacy eats the rest.

17                THE COURT:  I've already -- and, you know, I don't

18    know if it would become necessary for me -- I have -- well, I

19    explained I'm not sure that the second and third sentence of

20    that Paragraph 3 refer to the copay.  Okay.  That's what

21    I'm -- I'm still not sure of that, but it may or may not.  I

22    consider it at best a marginal issue in the case, tell you the

23    truth.  Look, you know, I don't mind admitting this letter,

24    it's just -- I mean, I'm really to the so what.

25                MR. THOMAS:  Yes, sir.
```

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 204 of 236   PageID #: 7559

 1          THE COURT:  I really do wonder what the relevance of

 2   it is, tell you the truth.

 3          MR. THOMAS:  Yes, sir.

 4          THE COURT:  What is the relevance of this?

 5          MR. THOMAS:  The only reason we were bringing this

 6   is to address what we consider to be an allegation by Mr.

 7   Clark that Mr. Hindmon and Willow Pharmacy were in some manner

 8   violating copay law because --

 9          THE COURT:  Well, I'll be honest --

10          MR. THOMAS:  -- the pharmacy was eating part of the

11   copay.

12          THE COURT:  Let me make a statement.  If that was

13   Mr. Clark's thrust, I don't blame him for making the argument,

14   but he probably has not yet persuaded me of that.  So, I mean,

15   that being the case, do we even need to go into this document?

16          MR. THOMAS:  If that's it, Your Honor, I'll

17   withdraw.

18          THE COURT:  Okay.  And I'll give you a chance later

19   on, Mr. Clark, if you want to take another crack at it, but

20   not yet.  Okay.  So, all right.  Let's move on.

21          MR. THOMAS:  Thank you, Your Honor.

22          THE COURT:  You know, and, again, ask him whatever

23   you want to about this, I mean, but I think I understand what

24   this is.  It's a settlement between the United States

25   government and a successor to a company that, you know, that

1    Mr. Newkirk used to work for.  And, you know, as all of these

2    settlement agreements does, denies liability.  You know, the

3    United States asserts claims, okay, fine.  It is what it is.

4    There is language in there that is suggestive of -- that the

5    United States believes somehow that Mr. Newkirk is some sort

6    of fraudster.  I don't know if you want to ask him that.  I

7    suspect that Mr. Newkirk is going to deny in this courtroom

8    that he's a fraudster, you know.

9              THE WITNESS:  Yes.

10             THE COURT:  You can ask him that, but, I mean, why

11   are we spending much time on this?  I mean, okay, there was a

12   settlement, you know, as I said, the Court has done a 100 of

13   them, I mean, a settlement is a settlement.

14             MR. THOMAS:  Yes.  I'll leave my inquiry to

15   literally one question.

16             THE COURT:  Do you think you're a fraudster,

17   Mr. Newkirk?

18             THE WITNESS:  No, sir.

19             MR. THOMAS:  That will do it for me.

20             THE COURT:  Your answer quite honestly doesn't

21   surprise me.

22             THE WITNESS:  Thank you.

23   BY MR. THOMAS:

24   Q         Mr. Newkirk, do you recall the question on

25   cross-examination by Mr. Clark regarding Mr. Kurtz's testimony

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 206 of 236  PageID #: 7561

```
 1   that patients were told how much the compounded

 2   pharmaceuticals would be.  Do you recall that testimony?

 3   A        Yes.

 4   Q        I would like to offer to you that this is the Top

 5   Tier sales process, this has been admitted into evidence, I

 6   think both by the government and by Mr. Wilkerson, although,

 7   this one doesn't have a marking on it.  I'd like you to very

 8   briefly to yourself read Paragraph 2.

 9   A        Okay.

10   Q        Mr. Newkirk, the Top Tier sales process doesn't

11   require telling patients how much their medications are going

12   to cost, it just requires informing patients reasonably of the

13   range of costs to their insurance company of their compound.

14   Correct?

15            MR. CLARK:  Your Honor, please, he has no way of

16   knowing what the Top Tier sales process is.  That was not the

17   question.  I asked him about whether or not he knew Brian

18   Kurtz testified that they did require their marketers to

19   disclose this information.  So, if he wants to say either

20   through this document simply says that --

21            THE COURT:  I really don't even know -- yeah, I

22   mean, I guess the objection is that does Mr. Newkirk have any

23   knowledge of what, you know, of how Top Tier went about

24   conducting it business, if not, you know, I guess it's okay, I

25   mean, you know, but, I mean --
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 207 of 236  PageID #: 7562

1    MR. THOMAS:  Your Honor, if it's not relevant on

2 redirect, it's also not relevant on cross, and I'm happy with

3 that.

4    MR. CLARK:  Your Honor, my objection wasn't that it

5 wasn't relevant, it was mischaracterizing what the testimony

6 was in the question --

7    THE COURT:  What do you think the testimony was on

8 cross?

9    MR. CLARK:  The testimony that I asked him on

10 cross-examination was whether or not he was aware that Brian

11 Kurtz testified that it was Top Tier's practice to tell

12 individuals how much their insurance company was going to be

13 billed.  Now, now, he has been asked, well, wouldn't you agree

14 that Top Tier's practice was to give them a range.  Well, he

15 doesn't know.  He can say what this document says, but I don't

16 think it's -- I think it's a mischaracterization for this

17 particular witness --

18    THE COURT:  You know, okay.  Why don't you just ask

19 him -- do you want to ask him if he thinks it's a better

20 practice or not, you know, which one, I mean, assuming that

21 there is a distinction between the way that Mr. Kurtz carried

22 out his business and the way that Mr. Wilkerson carried out

23 his --

24    MR. THOMAS:  Yes, Your Honor.

25    THE COURT:  I'll be honest, I think that it would be

```
 1    better practice for the cereal industry in the United States

 2    to tell all of the kids that they advertise how much sugar

 3    there is and what it's going to do to their teeth and all of

 4    that, but I'm not sure we have laws on the books that require

 5    that as to what the best practice is, so.  Do whatever you

 6    want to do with this.

 7              MR. THOMAS:  I'll be brief, Your Honor.

 8              THE COURT:  Okay.

 9    BY MR. THOMAS:

10    Q        Mr. Newkirk, you'll recall on direct I asked you was

11    there any way for a marketer marketing compounds to know how

12    much the patient's compound is going to cost.  My recollection

13    and my notes state that you said, no, there is no way to tell.

14    Correct?

15    A        Correct.  There is no way to tell.

16    Q        On cross-examination Mr. Clark said, well, Mr. Kurtz

17    says the opposite, says that sales reps were telling patients

18    all of the time what the prices were.  The only reason I'm

19    bringing this is to demonstrate that there is, in fact,

20    documented sales processes of Top Tier that demonstrates that

21    it wasn't a matter as Mr. Kurtz stated that they were telling

22    patients how much their drugs were going to cost, but just

23    demonstrating a range.  Does that seem reasonable and

24    appropriate?

25    A        Yes.
```

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 209 of 236  PageID #: 7564

1   Q          Thank you.  Mr. Newkirk, in the event that a PBM

2   finds non-compliance at a pharmacy for any reason, the

3   analysis is done on a claim by claim basis.  Correct?

4   A          Correct.

5   Q          To the extent that a claim is found to be

6   discrepant, there is a recoupment on that one single claim.

7   Correct?

8   A          Correct.  There is no extrapolation.

9   Q          Is there any instance where you have ever seen a

10  determination of non-compliance based upon a pharmacy sending

11  in a test claim, a dummy claim, to determine whether or not

12  that a claim will pay, and, if so, how much it will pay?

13  A          I've understood that PBMs have given feedback to

14  pharmacies when they have a claims pattern of submitting

15  claims and reversing them.  They could reach out to the

16  pharmacy and ask what is going on, ask them to stop doing

17  that, or conduct an audit, in all likelihood what that is

18  going to lead to is a field audit.

19  Q          Do you recall on cross-examination Mr. Clark asking

20  you questions regarding would you find it to be discrepant in

21  the event that a prescriber had his or her name stamped on a

22  prescription and didn't even realize it.  Do you recall that

23  line of questioning?

24  A          Yes, I do.

25  Q          You're familiar with E-prescribing.  Correct?

Case 1:18-cr-00011-HSM-CHS  Document 380  Filed 11/27/19  Page 210 of 236  PageID #: 7565

1  A        Correct.

2  Q        With E-prescribing a physician or the nurse

3  practitioner doesn't physically sign anything.  Correct?

4  A        Correct.

5  Q        They push a button in an electronic medical record

6  and it generates an E-prescription.  Correct?

7  A        Correct.  They sign in --

8           THE COURT:  That's different.  Come on.  Now, that's

9  different from using someone's stamp surreptitiously and the

10 person doesn't know, as long as they know that someone is

11 filing, I mean, you know, it may not be forgery, but, I mean,

12 if a person doesn't know, it's forgery.  Right?

13          MR. THOMAS:  Yes, sir.

14          THE COURT:  Okay.  That's that.

15          MR. THOMAS:  I'll move on quickly.

16 BY MR. THOMAS:

17 Q        Is there any way for the pharmacy to know when an

18 E-prescription comes in whether or not that the prescriber had

19 approved it or not?

20 A        No.  Other than, you know, typically the prescriber

21 is who can sign into the system to prescribe, you know, the

22 prescriber walks away from the terminal and someone enters a

23 prescription under the prescriber, yes.

24 Q        Do you ever recall in your 30 years of experience

25 having a discrepant claim due to a prescriber stating I didn't

UNITED STATES DISTRICT COURT

1  sign that prescription?

2  A       Yes.  But not with an electronic prescription.  It's

3  pretty much, it's pretty much there.

4  Q       So, it was found to be a discrepant claim because

5  the doctor didn't actually order the medication, somebody else

6  did and the doctor didn't approve it?

7  A       Correct.  Or that the doctor doesn't have a record

8  of approving it.

9  Q       What was the remedy in that case, what happened?

10  A       Recoupment of that particular claim.

11  Q       Civilly?

12  A       Correct.

13  Q       Underneath the contract?

14  A       Correct.

15  Q       You'll recall Mr. Clark asking you questions

16  regarding the sufficiency of the physician patient encounter,

17  when the patient was seen or not seen by the doctor.  Do you

18  recall that testimony?

19  A       Correct.  Yes.

20  Q       In the event that there was a discrepant claim found

21  because there was an insufficient encounter between the doctor

22  and the patient, what would the remedy be?

23  A       Recoupment of that claim.

24  Q       That one single claim?

25  A       That one claim, yes.

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 212 of 236   PageID #: 7567

1    Q        Just the money?

2    A        Correct.

3    Q        Civilly?

4    A        Correct.

5    Q        Under the contract?

6    A        Correct.

7    Q        You'll recall Mr. Clark asking you on

8    cross-examination that a pharmacist can't unilaterally change

9    a prescription without consulting with the physician.

10   Correct?

11   A        Correct.

12   Q        Is that the same as if the pharmacist is just

13   utilizing a clinical equivalent and swapping out one

14   medication for a clinical equivalent?

15   A        It has to be the same drug.  You cannot take two

16   NSAIDS non-steroidal anti-inflammatories and swap one for the

17   other.  You need permission from the doctor.

18   Q        Is there any instance when a clinical equivalent can

19   be utilized without contacting the physician?

20   A        Not that I'm aware.

21            THE COURT:  A generic.  Right?

22            THE WITNESS:  You could choose if there is five

23   different generics of the same drug, you could choose which

24   generic you choose to dispense.

25

Case 1:18-cr-00011-HSM-CHS   Document 380   Filed 11/27/19   Page 213 of 236   PageID #: 7568

1    BY MR. THOMAS:

2    Q        In these matters that we've been talking about,

3    discrepant claims, where the pharmacy submits to the PBM a

4    claim that the PBM finds is not sufficiently compliant to pay,

5    and finds a discrepancy, either not pays or does a recoupment.

6    Correct?

7    A        Correct.

8    Q        To what extent is the marketer responsible for that

9    discrepant claim underneath the PBM manual and the contract?

10   A        I don't know of, you know, any instance where the

11   marketer is in any consideration.

12   Q        It's a responsibility of the pharmacy.  Correct?

13   A        The pharmacy and the physician.  Correct.

14            MR. THOMAS:  Thank you, sir.

15            THE COURT:  Anything else, Mr. Clark, or any other

16   defendants?

17            MR. WALDEN:  Nothing further from us, Your Honor.

18            THE COURT:  Mr. Clark?

19            MR. CLARK:  Your Honor, I'd like to introduce the

20   prior witness statement of Mr. Newkirk regarding copays that

21   he's been questioned on?

22            THE COURT:  Any objection to that?

23            MR. THOMAS:  No, Your Honor.

24            THE COURT:  Admitted.

25            (Government's Exhibit 58 was received into

UNITED STATES DISTRICT COURT

```
 1          evidence.)

 2          THE COURT:  Any questions?

 3          MR. CLARK:  No questions, Judge.

 4          THE COURT:  May this witness step down and be

 5  excused?

 6          MR. THOMAS:  Yes, sir.

 7          THE COURT:  Thank you, Mr. Newkirk.  You're excused.

 8  All right.

 9          (Witness excused.)

10          THE COURT:  All right, counsel.  Let's talk a little

11  bit about where we go from here.  Of course, we're drawing

12  close to 5:00 today.  I don't know if there is much else we

13  can do today, but what happens tomorrow morning?

14          MR. SCHWARTZ:  Judge, at this point, at least as

15  to --

16          THE COURT:  Why don't you come to the podium, I

17  can't hear you, Mr. Schwartz.

18          MR. SCHWARTZ:  Yes, sir.  At this point, as to

19  Wilkerson, and I believe the rest of the defense, but they can

20  correct me if I'm wrong, I've got a handful of documents that

21  we received in discovery that I want to just admit.  And then

22  we don't intend to call Mr. Wilkerson, but I would request --

23          THE COURT:  You do not?

24          MR. SCHWARTZ:  Do not.  I would request a just

25  general colloquy that tells all of the defendants that they
```

UNITED STATES DISTRICT COURT

1    have the right to testify if they wish to.

2            THE COURT:  Well, of course, they do, but they --

3    but, you know, and I tried to give them that today, maybe I

4    need to do it again tomorrow.  But they have -- the most

5    important thing they need to know is they have an absolute

6    right not to testify.  Of course, they have the right -- it's

7    a waiver of their right not to testify.  And they need to know

8    that I am prohibited, that I am prohibited by law from drawing

9    any inferences --

10           MR. SCHWARTZ:  Yes, sir.

11           THE COURT:  -- from their failure to testify.  In

12   other words, what you need to know, I'm talking to the

13   defendants, if you choose to testify, fine, you have that

14   right.  But if you choose not to testify, I am prohibited by

15   the law to drawing any inference from your, the fact that you

16   chose not to testify.  In other words, I am prohibited by law

17   from saying, ah, they must be guilty or else they would have

18   gotten on the stand and told me they were innocent.  I can't

19   do that, not in the United States of America.

20           Okay.  What else do I need to say?  I mean, that's

21   under the Fifth Amendment, you know, but those, of course, you

22   can testify.  I mean, you've heard there is some people that

23   think, you know, the jury wants to hear me say I didn't do it.

24   Okay.  Well, and that's fine.  And you may think that I want

25   to hear you say you didn't do it.  And that may or may not be

UNITED STATES DISTRICT COURT

true.  But what I do know is someone who's done this for many, many, many years, I mean, it's part -- I'm hard wired.  It's part of my DNA is that I know I cannot hold it against you in any way, shape, or form if you do not testify.  Okay.  I cannot even subconsciously think that if they were innocent they would have gotten on the stand and told me, you know.  That's just the, that's the law in the United States of America.

Does anybody have any questions?  I mean, you know, again, I'm just hard wired to think this.  And lawyers that deal in criminal law are hard wired for this, but you need to understand that.  And if you do choose to waive your right to remain silent, I suggested the other day, consult carefully with your lawyers, because whatever upside you may think that there may be, I think that your lawyers can tell you they've seen it go wrong, sometimes horribly wrong, you know, on cross-examination.  Because I can almost guarantee you if you choose to get on the stand that the government will pull out all of the stops to whatever they can come up with on cross-examination, you know.

So, I don't know how to be any more blunt or specific than that.  That's usually -- I usually say it a little bit more eloquently, but maybe people don't get it, you know, so.  Is there anything else I can do?

MR. SCHWARTZ:  No, sir.  I think you did a more than

UNITED STATES DISTRICT COURT

1  sufficient job the other day talking to them about their right

2  not to testify, and I just wanted to make sure they all

3  understood they have a right to if they want to.

4          THE COURT:  Absolutely.  I mean, they can waive any

5  constitutional right that they have, you know, including the

6  right to free speech and everything else.  And tell you the

7  truth, most Americans don't think, we do it every day when we

8  sign employment agreements that prohibit us from, now you work

9  for us, you can't go out and say whatever you really think,

10 you know --

11         MR. SCHWARTZ:  Yes, sir.

12         THE COURT:  -- about that.  So, okay.  So, tomorrow

13 you want to introduce some documents into evidence?

14         MR. SCHWARTZ:  Yes, sir.  Just it will be real

15 quick.

16         THE COURT:  What about other defendants, Mr.

17 Eldridge?

18         MR. ELDRIDGE:  Thank you, Your Honor.  On behalf of

19 Michael Chatfield, we have every expectation that we will rest

20 in the morning after Mr. Wilkerson rests.  At this point, we

21 do not anticipate any additional evidence on his behalf.

22         THE COURT:  All right.

23         MR. ELDRIDGE:  I don't want to formally rest at this

24 point.

25         THE COURT:  That's fine.  I'm not going to ask you

UNITED STATES DISTRICT COURT

1     to rest until tomorrow.  Mr. O'Shaughnessy?

2               MR. O'SHAUGHNESSY:  I anticipate the same, Your

3     Honor.

4               THE COURT:  That Ms. Nicholson will rest?

5               MR. O'SHAUGHNESSY:  Yes, Your Honor.

6               THE COURT:  All right.  Let's see.  Who's next?

7               MR. WHETSEL:  Same for Mr. Hindmon, Your Honor.

8               THE COURT:  All right.  And last but not least, Mr.

9     Montgomery?

10              MR. HOBBS:  Same for Mr. Montgomery, Your Honor.

11              THE COURT:  Okay.  Well, it sounds like that the

12    defense will rest.  Now, Mr. Piper, let me ask you.  I think

13    you indicated the other day that you anticipated that the

14    government might seek to put on a rebuttal case.  Why don't

15    you come to the podium.

16              MR. PIPER:  We do, Your Honor.  There is an issue

17    that's arisen that I've informed defense counsel of.

18              THE COURT:  Why don't you enlighten me.

19              MR. PIPER:  I am going to, Your Honor.  Thank you.

20    We spoke to Noah Bowling and Luke Bowling, this is the Finley

21    Stadium incident, yesterday.  They're both represented by

22    Bryan Hoss.

23              THE COURT:  Okay.

24              MR. PIPER:  We spoke to Noah Bowling for five

25    minutes.  Then Luke did not testify last time, as the Court

UNITED STATES DISTRICT COURT

1    may recall, only Noah did.  And we were going to call Luke

2    Bowling for the issue of whether the five scripts were given

3    to Mr. Chatfield there at Finley Stadium.

4              THE COURT:  Okay.

5              MR. PIPER:  Or whether they picked up three --

6              THE COURT:  This is the issue that we encountered

7    the other afternoon where Mr. Clark and perhaps I was too

8    hasty, Mr. Clark, I said do you really think that Ms.

9    Chatfield was not there in the parking lot at Hamilton Place,

10   and just this is a complete fabrication.  And I didn't give

11   you a chance to answer.  I'm taking it from what Mr. Piper,

12   you do think that was a complete fabrication.  Right?

13             MR. CLARK:  Yes, sir, Your Honor.

14             MR. PIPER:  Well, we --

15             THE COURT:  I mean, I guess, there could be ways to

16   reconcile these two stories.

17             MR. PIPER:  There is I'm sure, Your Honor, but the

18   problem is -- let me get to the problem.

19             THE COURT:  Okay.

20             MR. PIPER:  Is that when we talked to Luke Bowling

21   yesterday, we were discussing this with him.  And I said have

22   you talked to anybody else, he said no, and he's lived up to

23   our and the Court's admonition on not discussing case with

24   anybody else.  And we started to get into the specifics and

25   then Mr. Hoss in about two or three minutes said, oh, by the

UNITED STATES DISTRICT COURT

```
 1   way, he has read --

 2             THE COURT:  Okay.

 3             MR. PIPER:  Judge --

 4             THE COURT:  And he was excused, by the way.

 5             MR. PIPER:  He never testified, Luke Bowling.

 6             THE COURT:  Oh, oh, oh, okay.

 7             MR. PIPER:  Luke Bowling never testified, Your

 8   Honor, and I do think that the rule of sequestration would

 9   apply to him.  And, Judge, I'll be real up front.  The three

10   witnesses we were going to call would be probably in this

11   order Luke Bowling, Noah Bowling, and Debbie Foster, who is

12   Natalie Foster Chatfield's mother.  She's testified before and

13   Noah has testified before.

14             THE COURT:  Well, now, what does Ms. -- look, maybe

15   I don't understand.  Okay.  Look, here's the way I recall the

16   testimony from, I guess it was Noah Bowling.  We're talking

17   about Finley Stadium.  I said, okay, you're in Finley Stadium

18   parking lot, did you just do the papers there on the hood of

19   the car.  And I recall that I asked that question and he said,

20   oh, yeah, just -- now, I don't know if I got down to or

21   anybody got down to did you actually sign the papers there and

22   that was the end of it or were the papers just exchanged on,

23   but --

24             MR. PIPER:  Noah is specific about that, Your Honor,

25   during his testimony.
```

UNITED STATES DISTRICT COURT

          THE COURT:  Okay.  Is he also specific about whether
there was any meeting the next morning about whether or not
that anything took place in, as I recall, outside of the men's
department of Belk in Hamilton Place parking lot?

          MR. PIPER:  Dillards, I think, Your Honor.

          THE COURT:  Okay.  Wherever.

          MR. PIPER:  We did not know that.  Mr. Eldridge did
not cross-examine on that.  We didn't do any direct on that
with Noah Bowling.  And I understand the defendants' concerns,
Your Honor, about this issue as far him reading the
Chattanoogan article with respect to what Grayson Fuller
Chatfield and Brandon Chatfield said on the stand.  As the
Court may recall, there was, I think that was last Thursday
night when Your Honor threatened to hold the entire courtroom
in contempt.

          THE COURT:  Which, by the way, that threat still
exists.

          MR. PIPER:  Thank you, Your Honor.

          THE COURT:  Of course, that's the way it does in any
of my proceedings.  Right?

          MR. PIPER:  Thank you, Judge.

          THE COURT:  Okay.  All right.  Go ahead.

          MR. PIPER:  But my point is that it was animated,
and I think that there was a fairly significant press coverage
of that at least from the Chattanoogan.  And Luke Bowling has

                    UNITED STATES DISTRICT COURT

```
1   read that, so.

2              THE COURT:  Okay.

3              MR. PIPER:  That's of concern to us, Your Honor, and

4   in fairness it showed be to the defendants.  I do know that

5   when there is a jury trial, the Court always admonishes the

6   jury not to read or watch TV or anything about the case when

7   we take off at night.  I don't know that the Court gives that

8   admonition to a defendant, but Mr. Luke Bowling has never

9   testified.

10             THE COURT:  I don't --

11             MR. PIPER:  Judge, we may decide for this reason not

12  to call him.  I don't know that, you know.  Mr. Noah Bowling

13  testifies to it.  Debbie Foster would be our other witness.

14  And, Judge --

15             THE COURT:  You know --

16             MR. PIPER:  -- when I had Debbie Foster on the

17  stand, I was trying to ask her about whether she had a

18  conversation with Ms. Natalie Foster Chatfield and Mr.

19  Eldridge objected, and the Court asked her a question

20  regarding her interaction with her daughter.  It's in the

21  transcript, Judge.

22             THE COURT:  Okay.  I don't remember.  That has been

23  several weeks ago.

24             MR. PIPER:  Yes, sir.

25             THE COURT:  What did I ask her?
```

UNITED STATES DISTRICT COURT

1          MR. PIPER:  You said did you lie to help your

2     daughter, protect, cover it up.

3          THE COURT:  Yeah.  What did she say?

4          MR. PIPER:  Yes.

5          THE COURT:  Okay.  Yeah.

6          MR. PIPER:  And my point is we may decide not to do

7     a rebuttal case, and I understand --

8          THE COURT:  This goes -- as I recall Mr. Eldridge

9     explaining to me, this goes to, what, two or three counts of

10    aggravated identity theft?

11         MR. PIPER:  Four, Your Honor.

12         THE COURT:  Four.  Okay.  Look.  For Mr. Chatfield

13    and every other defendant, every count is important.  Okay.

14    Every count is important.  I'm certainly not going to do that,

15    but let me just say this, counsel.  And, I mean, I'm not there

16    yet.  Okay.  But depending upon how this plays out, the Court,

17    I may view this case as being a big indictment that for all

18    practical purposes charges one count of conspiracy to commit

19    health care fraud.  I'll let you argue whether I should view

20    it that way or not.  And that almost every other count, if

21    not, probably this is a gross oversimplification, goes to an

22    overt act or not in furtherance of that conspiracy.  I mean,

23    you know, I'm going to let you argue all of that.  Okay.  But

24    here's what, here's the point I'm trying to make.  Hey, if you

25    want to put on a rebuttal case, fine, sounds like there could

UNITED STATES DISTRICT COURT

be problems one way or the other, but I'm just, you know, no
detail is too small when someone's liberty is at stake to
overlook, but I'm just giving you the benefit of my thinking
about this.

MR. PIPER:  Your Honor, we're going to discuss it
tonight and make a decision.

THE COURT:  Okay.  Well, I'll hear from you in the
morning.  I mean, I'm inclined to probably if you want to go
through, but I guess what I'm saying is that's important, but
not, it perhaps is not as important as you might imagine in my
mind.

MR. PIPER:  I understand, Your Honor.  I do think
that Mr. Eldridge had an objection that he might want --

THE COURT:  What would be your objection?

MR. ELDRIDGE:  Your Honor, I mean, based upon -- I
commend Mr. Piper for disclosing this information about Luke
Bowling and his exposure to the testimony of another witness,
which is a functional equivalent of a violation of the rule of
sequestration.

THE COURT:  Yeah, it is.

MR. ELDRIDGE:  We will be objecting to his testimony
on that basis.

THE COURT:  All right.  Okay.  Well, you know, and
your objection will be noted, you know.  It may be that I'll
take it for what it's worth.  And what I've just tried to say

UNITED STATES DISTRICT COURT

is that, look, it would be wrong of me to have made up my mind

about this case, but I think I've tried to tell you how I'm

thinking about this case all along. And I suspect that at

this juncture, counsel, it's not come as much of a surprise to

you that that may be the way I'm thinking about this case

about what it's about, what this whole case is about.

MR. ELDRIDGE: And, Your Honor, with regard to the

ag identity theft allegations against Mr. Chatfield, I mean,

they are serious and we --

THE COURT: Yeah, every criminal --

MR. ELDRIDGE: Because they actually do have a

mandatory jail sentence attached to them if he's convicted.

And there are two components to those charges. One is what

the Court has already identified, I mean, there has to be a

predicate.

THE COURT: Yeah.

MR. ELDRIDGE: Without the predicate, we don't even

get to whether he improperly used their identity, and the

Bowling, Foster testimony has all gone to that component, you

know, did he use that identity without their permission.

THE COURT: And, by the way, as I always tell

jurors, and I think that I'm supposed to do that in this case,

at this juncture, I don't think that I should be considering

what possible punishments are for the offenses charged.

MR. ELDRIDGE: And I understand. I probably

1    shouldn't have said that.

2              THE COURT:  I think I should be deciding whether,

3    you know, I should find the defendants guilty or not guilty of

4    those.  And we've still got all of these outstanding issues,

5    you know, of merger, so forth and so on, which are big issues

6    in an indictment like this.  I think everybody can agree.  I

7    mean, those are going to be important.  And I'm going to have

8    to have argument about that.

9              Let's go beyond tomorrow then.  Here's what --

10             MR. PIPER:  Mr. Schwartz had a question, I think.

11             THE COURT:  Yes, sir.

12             MR. SCHWARTZ:  I'm sorry.  So, it looks like, it

13   looks like it's anticipated that at least the defense will

14   rest and likely the government may bring a few witnesses.

15             THE COURT:  Or not.

16             MR. SCHWARTZ:  Or not.

17             THE COURT:  And you're going to get some documents

18   in.

19             MR. SCHWARTZ:  Yes, sir, just real basic stuff.  Are

20   you going to want to roll into, if after they're done and they

21   rest, are you going to want to roll into closing right away --

22             THE COURT:  No.  No.  No.  Here's what I'd like to

23   do.  We've set aside like eight full days.  And I'm assuming

24   that you are capturing on this calendar if I call you back for

25   those.  Okay.

UNITED STATES DISTRICT COURT

1      MR. SCHWARTZ:  Yes.

2      THE COURT:  But here's what -- let's just -- this is

3  a good conversation.  Let's talk about what happens.  I think

4  that the next thing once both sides have rested that we need

5  to turn our attention to is go into what I'm going to refer

6  to, I can't remember, 801(d)(2)(E), *Enright* hearings.  And

7  I've said, I understand that there were a lot of objections.

8  I reserved ruling on a lot of them.  I admitted a lot of

9  exhibits conditionally, but I need to know now that the dust

10  is settling, okay, what are you serious about, defendants,

11  about me not considering.  Get down, what do you really think

12  I should not consider.

13      Now, I also said the other day I am considering

14  calling witnesses on my own.  One reason, one possible witness

15  that I might call on my own is witnesses that go to the

16  *Enright* issues, which, I mean, as Ms. Maio pulled up a case

17  the other day, there is precedent for me to do that in that,

18  so, I mean, I'll need to consider that.  I encourage everybody

19  to read that case.

20      Okay.  Beyond that, and assuming I don't call any

21  other witnesses of my own accord, it seems to me that we also

22  need to have the equivalent, I've never done this before, of a

23  charge conference and at least let you know probably by way of

24  some document, maybe a proposed order or something, the

25  standards that I anticipate, the legal standards that I

1   anticipate applying to each and every count of the indictment

2   and give you an opportunity in something akin to, you know, a

3   Rule 31 charge conference to object or try to convince me to

4   modify the legal standards that I'm going to apply.

5           Okay.  At that point, we need to consider how we're

6   going to make closings, you know.  Again, I think somebody has

7   to ask me for written findings of law and conclusions of fact,

8   I mean, findings of fact and conclusions of law.  I've always

9   been assuming that someone will ask me for those, but maybe

10  not.  I mean, I guess I can just sit here from the bench and

11  declare someone guilty or not guilty of certain counts.  And

12  maybe, maybe you and your clients want it that way.  I don't

13  know.  I really just, I mean, again, this is almost unplowed

14  ground for me.  This is only the second criminal bench trial

15  I've had.  So, I need to know that as well.

16          I will assure you even if you don't want formal

17  written findings of fact and conclusions of law that I will

18  take this under advisement and, you know, carefully consider

19  the entire record before I decide upon.  So, I guess what I'm

20  saying, in my case, there is going to be extended period of

21  deliberation, not unnecessarily extended, but I'm going -- you

22  would not want to be sitting in this courtroom while I'm

23  trying to decide.  Okay.  Because, I mean, I may -- it may

24  take me awhile.  Okay.

25          MR. SCHWARTZ:  As to that circumstances, the defense

UNITED STATES DISTRICT COURT

1    has discussed whether we will request those written findings,

2    and it's my understanding that we are not going to.

3              THE COURT:  You are not?  What about the government,

4    does the government have the right to ask for under the rules

5    written findings of fact and conclusions of law?

6              MR. PIPER:  I'm going to have to research that,

7    Judge.

8              THE COURT:  Okay.  All right.  I need to know that,

9    I mean, you know, and really it's just a matter of what -- you

10   know, in the event, in the event that I find one or more of

11   the defendants guilty of anything, I mean, you know, what goes

12   to the Sixth Circuit.  I mean, right?

13             MR. SCHWARTZ:  Yes, sir.

14             THE COURT:  In a jury, in a jury trial all that goes

15   to the Sixth Circuit is the finder of fact verdict and the

16   complete record, you know, and leave it to the sides to figure

17   out --

18             MR. PIPER:  Judge, and we've been in trial, I think,

19   for over the span of two months and two days, we started on

20   September 11th, and it may be helpful for the Court for the

21   parties to brief the factual issues at least that we've

22   called --

23             THE COURT:  I'll probably ask you to do that no

24   matter what.  And I'm likely to ask you after you've briefed

25   it to come back for at least half a day or a day and make oral

UNITED STATES DISTRICT COURT

arguments to me, you know, and tell me, you know, what you

think I may have missed, you know, in that.  I mean, look,

this is critically important.  And I hope I've convinced

everybody in the courtroom, particularly, including the

defendants that I'm taking this deadly serious, I mean, you

know, that I fully understand the gravity of, you know, what

I'm being asked to do, which is defined, is to make decisions

regarding potentially someone's liberty.

        You know, depending upon how we do this, I may or

may not be around to be, if there is a finding of guilt, the

sentencing judge.  And, of course, let me just say something

else.  If I am the sentencing judge another issue will be what

the appropriate punishment is.  And, of course, I'll have to

look at the guidelines and so forth, and so on.  But, I mean,

this the only reason I mention this, I mean, if there is no

statutory mandatory minimum that I'm bound by, I'm reluctant

to even go into this, but, I mean, you know.  And I don't

think I will.  There are a range of punishments that could be

imposed in the event of a finding of guilt.  So, I mean, you

know, there is still a lot for us to talk about, I guess is

what I'm saying.  This is not over yet even though this phase

may be over and I'm sure to everyone's relief.

        Anything anybody wants to say?

        MR. PIPER:  10:00 tomorrow morning, Your Honor?

        THE COURT:  Yeah, I think, don't I have -- yes, I

```
 1   have a sentencing at nine, you know.  So, yeah, 10:00 tomorrow
 2   morning.  Anything else we -- yes, sir.
 3               MR. SCHWARTZ:  So, after obviously the defense rests
 4   and the government puts on their few witnesses, I'm sure we'll
 5   have time, what are you looking for, are you going to cut us
 6   loose or are you looking for us to have something for you?
 7               THE COURT:  Look, I'm inclined to cut you loose for
 8   the rest of this week, tell you the truth, but maybe come back
 9   next week, when, on Tuesday have we got set aside?
10               MR. PIPER:  Tuesday, Wednesday, and Thursday, Your
11   Honor.
12               THE COURT:  Because we've really got to do that
13   801(d)(2)(E), the *Enright* hearing.  We need to get that under
14   our belt at a minimum.  Okay.  And then let's go from there,
15   if that is it, okay, then I'll know what the universe of facts
16   I'm dealing with and then we can talk about how we brief this,
17   conduct closing arguments, and what kind of verdict you want
18   from me.  Okay?
19               MR. SCHWARTZ:  Yes, sir.
20               THE COURT:  All right.  And you need to discuss
21   among yourselves about that verdict, you know.  And, I mean, I
22   can understand.  That's an important issue, because if, if an
23   appeal is necessary, it's probably going to make a pretty
24   significant difference about what kind of record goes to the
25   Sixth Circuit.  Right?
```

UNITED STATES DISTRICT COURT

         1          MR. SCHWARTZ:  Absolutely.

         2          THE COURT:  You know, so, you need to give -- yeah.

         3   Okay.  Anything else?  Mr. Clark.

         4          MR. CLARK:  Yes, sir, Your Honor, please, the last

         5   exhibit that I introduced that I didn't have a number for for

         6   the record is number 58.

         7          THE COURT:  As I've admonished you all during the

         8   trial, make sure you've got straight with Ms. Capetz what you

         9   think is in and not in evidence.

        10          MR. CLARK:  I'm sorry, Your Honor.  It was number

        11   98.  Thank you.

        12          THE COURT:  Okay.  One final thing.  Ms. Andrews,

        13   how are the requests for transcript going?

        14          (Off-the-record discussion)

        15          THE COURT:  Okay.  Have I been clear enough?  It

        16   sounds like that tomorrow is going to be a relatively short

        17   day.  And I would say let's then just adjourn for the rest of

        18   this week and then come back next week and be prepared for an

        19   *Enright* hearing on 801(d)(2)(E) issues.  And then we'll

        20   discuss what kind of verdict the parties are seeking.  And

        21   then once I understand that, I'll be in a better position to

        22   talk about what sort of closing arguments I'll want.  Okay.

        23          MR. SCHWARTZ:  One last question.  And just for

        24   planning purposes especially for Mark and I because we're so

        25   far away, given that we expect that the *Enright* hearings will

1  be concluded next week --

2          THE COURT:  I would think, I mean, I can't imagine

3  those lasting more than a full day, although, I've been

4  surprised before.

5          MR. SCHWARTZ:  I agree with that.  We're not going

6  to have to worry about closing next week?

7          THE COURT:  No, I don't think, I don't think so.

8  I'll call you back for that whenever -- and it could be that

9  if you want to delay closings for some period of time until

10 you get transcripts, that will be fine, and I'll reserve --

11 but I do anticipate that I'll probably ask you for not only

12 written post hearing submissions but oral argument on

13 closings.  Okay.

14         So, let me just, as a practical matter, and I don't

15 know how your clients feel about this, it is probably unlikely

16 that I will render a verdict until after the beginning of the

17 new year sometime.  Okay?  That's just what I anticipate

18 looking at my calendar for the rest of this year, which is

19 only six weeks, believe it or not, and stuff like that, so.

20         MR. SCHWARTZ:  And I believe after next week the

21 next days we have are December 11 and 12.

22         THE COURT:  Which we may or may not even use those

23 depending upon how it plays out, you know.  I mean, if you can

24 get something fine, but if need be and if I want something in

25 writing, and you want transcripts, it may be that we'll just

UNITED STATES DISTRICT COURT

```
 1    look into January or something and schedule some new dates.
 2    Okay?
 3              MR. SCHWARTZ:  Okay.
 4              THE COURT:  Does that make sense?
 5              MR. SCHWARTZ:  Yes, sir.
 6              THE COURT:  Okay.  By the way, if what I've sort of
 7    off of the top of my head described here doesn't make sense to
 8    you after you -- let's talk about it tomorrow morning as well.
 9              MR. ELDRIDGE:  Very well, Your Honor.  Thank you.
10              THE COURT:  All right.  Anything else, anyone?
11              MR. PIPER:  Judge, with the closing, will it be an
12    oral argument situation where the Court is peppering us with
13    questions or will it just be --
14              THE COURT:  Well, let's just -- I mean, you know,
15    what if -- to be as thorough as possible, we've been, I think
16    we've done this, would it make more sense for you to submit
17    written briefs, post hearing briefs to me and then let me read
18    that and read relevant portions of the record and call you in
19    for oral argument.  I'll let you make an argument, but I
20    anticipate, you've been in front of me a lot, Mr. Piper, as
21    you know, I'm a pretty active bench most of the time and I may
22    have some questions on that, okay, counsel, what about this,
23    I'm confused about this, illuminate, what do you think about
24    this.  Okay?
25              MR. PIPER:  That answers my question, Judge.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Yeah.  Okay.  Anything else?

2          MR. ELDRIDGE:  No, Your Honor, not at this time.

3          THE COURT:  All right.  Everybody have a good

4 pleasant evening.  We'll be in recess until 10:00 tomorrow

5 morning.

6          (Evening recess.)

7

8          I, Shannan Andrews, do hereby certify that I

9 reported in machine shorthand the proceedings in the

10 above-styled cause held November 13, 2019, and that this

11 transcript is an accurate record of said proceedings.

12

13                      s/Shannan Andrews
                              Shannan Andrews

14                      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT