# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

UNITED STATES OF AMERICA,

v.

JERRY WAYNE WILKERSON,
MICHAEL CHATFIELD,
KASEY NICHOLSON,
BILLY HINDMON, and
JAYSON MONTGOMERY
    Defendants.

Docket No. 1:18-CR-11
JUDGE MATTICE
MAGISTRATE JUDGE STEGER

---

## DEFENDANT MICHAEL CHATFIELD'S CLOSING BRIEF

---

Comes now the Defendant, Michael Chatfield, by and through undersigned counsel, and submits his closing brief. Mr. Chatfield is charged in the Second Amended Third Superseding Indictment with a number of alleged offenses; specifically, he is charged in Count One with conspiracy to commit healthcare fraud, counts 24 through 48 with wire fraud, counts 114 through 123 with mail fraud, count 137 with health care fraud, counts 147 through 150 with payment of illegal remuneration, count 161 with receipt of illegal remuneration, counts 168 through 171 with aggravated identity theft, and counts 173 through 177 with money laundering. Mr. Chatfield has pled not guilty to each and every count. For the following reasons, Mr. Chatfield respectfully submits that the government has failed to meet its burden on each and every count, and this Honorable Court, as the finder of fact, should find Mr. Chatfield not guilty as to each count.

## Applicable Legal Standard

Mr. Chatfield is presumed innocent unless the government presents evidence that overcomes the presumption and convinces the Court, as the finder of fact, beyond a reasonable doubt. A reasonable doubt is a doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence. Sixth Circuit Pattern Jury Instruction 1.03.

## Factual Background

In early 2014, Michael Chatfield became acquainted with and entered into business with Wayne Wilkerson. Mr. Wilkerson's business, Top Tier, was to market compounded topical creams as an independent contractor for compounding pharmacies. Mr. Wilkerson received a sales commission from the pharmacies for sales that he generated. Mr. Wilkerson paid a portion of this commission to Mr. Chatfield for the sales he was responsible for generating. Mr. Chatfield approached friends and family members about these creams, explained their benefits, and asked the customers which creams they may be interested in. [See, generally, Doc. 311, McGowan Testimony, and Doc. 362 James Chatfield Testimony, p. 277]. Mr. Chatfield would fill out forms or have patients fill out forms and submit them to Wayne Wilkerson, who, as far as Mr. Chatfield knew, would deliver them to a licensed nurse practitioner, Candace Michele Craven, at Balanced Life, and later at Karma Wellness Spa. To Mr. Chatfield's knowledge, Ms. Craven contacted the person interested in the creams, and following that contact, would issue a prescription for the creams that was sent to a compounding pharmacy. When Mr. Chatfield recruited other marketers, he paid them a portion of his commission for sales they generated. [See, generally, Doc. 311, McGowan Testimony; and Doc. 362, Heather Fryar Testimony, p. 37].

Initially, Kirtis Green was another marketer working under Mr. Wilkerson. [Doc. 362, Heather Fryar Testimony, p. 22, ln. 17]. No specific proof was presented at trial, but reasonable (and accurate) inferences can be drawn that Mr. Green pled guilty to health care fraud in this Court based on his rogue conduct which Mr. Chatfield and others were unaware of at the time. [Doc. 331, George Striker Testimony, p. 146]. Later, after Mr. Green was no longer associated with Top Tier, Mr. Chatfield understood that Mr. Green had engaged in fraudulent conduct and referred to that in a recorded conversation in 2015 by saying, "that's where the fraud happened." [Id.] The government has presented no proof that Mr. Chatfield or the other Defendants were involved in or aware of Mr. Green's conduct that led to his conviction until after Mr. Green had ceased his involvement with Top Tier.

Mr. Chatfield's father-in-law, George Foster, formed a corporation for Mr. Chatfield, Top Shelf, Inc. [Doc. 279, George Foster Testimony, p. 55, ln. 17]. This corporation was used by Mr. Chatfield to operate his topical cream marketing business. Mr. Foster also prepared 1099 forms for marketers that Mr. Chatfield recruited. [Doc. 279, George Foster Testimony, p. 57, ln. 1].

Mr. Chatfield was himself a customer of the creams. [Gov. Ex. 110]. He also marketed the creams to his wife as a patient. [Doc. 379, Natalie Chatfield Testimony, p. 22, ln. 10]. Mr. Chatfield recruited others as marketers, including his brother, Brandon Chatfield. [Doc. 379, Brandon Chatfield Testimony, p. 269, ln. 17]. Brandon Chatfield recruited his then-girlfriend and current wife Grayson neé Fuller Chatfield as a patient. [Doc. 379, Brandon Chatfield Testimony, p. 292, ln. 2].

Mr. Michael Chatfield was approached by Heather Fryar and Amanda Morgan Booker, employees at Karma Wellness, because they wanted to market creams. [Doc. 362, Heather Fryar

Testimony, p. 45, ln. 5; and Doc. 329, Amanda Booker Testimony, p. 75, ln. 22]. Ms. Fryar marketed creams to Michael Sellers, and Amanda Morgan Booker marketed creams to Josh Morgan who also became a marketer. [Doc. 362, Heather Fryar Testimony, p. 31, ln. 20-p. 32, ln. 5; and Doc. 329, Amanda Booker Testimony, p. 80, ln. 2]. Mr. Chatfield also marketed creams to his longtime friend Ryan McGowan, who also became a marketer and marketed creams primarily to his family. [Doc. 311, Ryan McGowan Testimony, p. 7, ln. 22-24; and p. 10, ln. 21-23]. Mr. Chatfield also spoke with Jimmy Bettis, who became a marketer and recruited George Striker as a patient, and then subsequently a marketer. [Doc. 331, George Striker Testimony, p. 13, ln. 11-17].

Mr. Striker entered a guilty plea to health care fraud conspiracy during this trial and subsequently testified for the prosecution. [Doc. 331, George Striker Testimony, p. 9, ln. 25]. Mr. Striker, a former police officer, stated that he never believed he was doing anything wrong while he was participating in what he now claims was a conspiracy to commit a crime. [Doc. 331, p. 17, ln. 22; and p. 113, ln. 12-14, ("honestly, I didn't think there was anything wrong with what I was doing."); and p. 169, ln. 14; and p. 170, ln. 5-10; p. 170, ln. 23-p. 171, ln. 3; and p. 221, ln. 13-23].

When Mr. Chatfield recruited other marketers, he trained them. [Doc. 311, Ryan McGowan Testimony, p. 35, ln. 19]. He instructed them on how the forms worked. [Doc. 311, p. 37, ln. 1]. He gave them some basic information about the products to share with potential customers. He stressed that marketers should only market to patients who actually needed the creams. [Doc. 329, Amanda Booker Testimony, p. 76, ln. 8]. He also told his marketers that patients must speak with a health care provider in order to receive a prescription. [Doc. 329, Amanda Booker Testimony, p. 76, ln. 11]. He told the marketers not to pay patients just to receive

a prescription. [Doc. 329, Amanda Booker Testimony, p. 76, ln. 14]. Mr. Chatfield instructed his marketers that insurance generally covered the creams, but they may have to pay a co-pay. [Doc. 378, Brandon Chatfield Testimony, p. 271, ln. 14-16; and Gov. Ex. 2613]. The marketers were trained to fill out or have a patient fill out an order form, a product use form, and an evaluation form to give the marketers "the ability to use the patient's evaluation of [the] product" in the event of a future study. [Gov. Exhibit 26].

Mr. Michael Chatfield's brother, Brandon Chatfield, contacted Luke and Noah Bowling about becoming potential marketing representatives. They met the Bowlings at a soccer game in Chattanooga. Mr. Michael Chatfield explained how the process worked, and he further explained that they could receive more money for recruiting more patients. [Doc. 280, Noah Bowling Testimony, p. 7, ln. 4-20; and Doc. 378, Brandon Chatfield Testimony, p. 272, ln. 20-p. 273, ln. 13]. The Bowlings discussed marketing creams to their family members. [Doc. 280, Noah Bowling Testimony, p. 14, ln. 4-6; and Doc. 378, Brandon Chatfield Testimony, p. 272, ln. 24-25]. The Chatfield brothers gave the Bowling brothers some forms. [Doc. 280, Noah Bowling Testimony, p. 8, ln. 2; and Doc. 378, Brandon Chatfield Testimony, p. 274, ln. 8-9]. The following day, Brandon Chatfield and his then-girlfriend, now-wife, Grayson (Fuller) Chatfield met Luke Bowling at the Hamilton Place Mall to pick up the forms, which were subsequently delivered to Michael Chatfield. [Doc. 378, Brandon Chatfield Testimony, p. 274, ln. 15-p. 275, ln. 6; and Doc. 378, Grayson Chatfield Testimony, p. 309, ln. 18- p. 310, ln. 11].

Months later, FDA Agent Brian Kriplean approached the Bowlings. [Doc. 280, Noah Bowling Testimony, p. 40, ln. 14]. The Bowlings, knowing that they had forged their parents' and sister's names on forms and had creams ordered without their permission and delivered to Luke

Bowling's apartment, blamed Michael Chatfield. [Doc. 280, Noah Bowling Testimony, p. 41, ln. 22-p. 46, ln. 23]. No other marketer ever stated that Michael Chatfield was involved in or aware of any forms expressing interest in the creams without the patient's complete knowledge or permission. Noah Bowling, after previously telling the government that he forged the documents, testified inconsistently on the witness stand by stating that his brother possibly forged the documents. [Doc. 280, p. 32, ln. 16-20]. Despite admitting that they forged documents, neither Luke nor Noah Bowling were prosecuted. [Doc. 280, p. 46, ln. 20]. Instead, Noah Bowling was allowed to blame Mr. Michael Chatfield in this trial with a made-up story when evidence exists to the contrary.

Mr. Michael Chatfield's wife, Natalie Chatfield, spoke with her mother, Debra Foster, about the creams. Mrs. Foster agreed to order creams for her and her husband. [Doc. 379, Natalie Chatfield Testimony, p. 23, ln. 2-6; and p. 35, ln. 9-17]. Mrs. Chatfield and Mr. Chatfield submitted forms on their behalf. [Doc. 379, p. 36, ln. 25]. Mrs. Chatfield gave Ms. Craven the contact information for her mother. [Doc. 379, p. 47, ln. 13]. On the form submitted to the pharmacy, Mrs. Chatfield provided her own contact information in the shipping information section as the Fosters were not often home and had packages sent to Mrs. Chatfield's house for safe delivery— a fact which Mrs. Foster testified to. [Doc. 379, Natalie Chatfield Testimony, p. 24, ln. 23-p. 25, ln. 3; and Doc. 279, Debra Foster Testimony, p. 25, ln. 25-p. 26, ln. 16].

Months later, when Mrs. Foster was approached at work by FDA Agent Kriplean, Mrs. Foster initially admitted to talking to Ms. Craven. [Doc. 279, p. 31, ln. 11]. She then changed her story after threats of prosecution from Agent Kriplean for lying to a federal agent. She then claimed that she did not know about her receipt of the creams and discussions about them with

her daughter. [Doc. 279, p. 31, ln. 24-p. 33, ln. 4]. However, the facts at trial support that Mrs. Natalie Chatfield and Mr. Chatfield delivered the Fosters' forms to Ms. Craven, and Ms. Craven talked to at least Mrs. Foster about the prescriptions, that the creams were delivered to Mrs. Chatfield, and that Mrs. Chatfield gave the creams to her mother. [Doc. 379, Natalie Chatfield Testimony, p. 23, ln. 9-13, and p. 25, ln. 17-19].

In late 2014 or early 2015, Jimmy Collins purchased Michael Chatfield's book of business. [Gov. Ex. 716]. George Striker and Josh Morgan began reporting to Mr. Collins as Mr. Chatfield ended his involvement in the marketing of topical creams. [Doc. 333, Josh Morgan Testimony, p. 42, ln. 12]. At some undetermined point, Mr. Collins hired Ms. Craven to work directly for his wife's company. [Gov. Ex. 2112-N]. He also hired Mr. Wilkerson's former employee Heather Fryar as his personal assistant. [Doc. 362, Heather Fryar Testimony, p. 54]. By Mr. Collins own admission on the recordings by Mr. Striker, Mr. Collins operated his business very differently from Top Tier. [Gov. Ex. 2112-D]. Mr. Morgan described the comparison to Mr. Chatfield's favor, saying that Mr. Chatfield ran things the right way. [Doc. 333, p. 44, ln. 15]. Ms. Craven's and Mr. Morgan's involvement with Mr. Collins led to their guilty pleas to the charges of health care fraud in the Southern District of California. [Gov. Ex. 41 and 42].

In general, patients spoke with one of several health care providers, Ms. Craven, Nurse Practitioner Toni Dobson, or Dr. Suzy Vergot. [Doc. 375, p. 152, ln. 24]. The health care providers wrote prescriptions which were then faxed to a pharmacy. In the first half of 2014, the prescriptions were sent to Willow Pharmacy. [Gov. Ex. 501]. Later, prescriptions were sent to Central Rexall Pharmacy, Florida Pharmacy Solutions, and Soothe Pharmacy. [Gov. Ex. 234, 235, 236]. The pharmacies would fill the prescriptions and ship the compounded medications to the

patients. The pharmacies would file claims with the patients' insurance companies. The insurance companies' pharmacy benefits manager (PBM) would adjudicate and pay the claim. [Doc. 334, Steve McCall Testimony, p. 7, ln 6]. The PBM paid the claim in accordance with the agreement in which the PBM set the prices it was willing to pay. [Doc. 334, p. 10, ln. 17-20]. The pharmacies were responsible for collecting the co-pays. [Doc. 332, James Gogue Testimony, p. 77, ln. 1-8].

Based on the pharmacies' independent contractor agreements, the pharmacies would pay a commission to Top Tier (or for a brief period involving Central Rexall only, Top Shelf, Inc.) for sales generated for patients who had private insurance. [Gov. Ex. 46, Gov. Ex. 1332, Gov. Ex. 1333]. The contracts specifically excluded Medicare as a federally-funded insurer, so all marketers, including Mr. Chatfield, did not market to customers insured by Medicare. [Id.].

Willow Pharmacy used a coupon or third-party payor to supplant patient co-pays, perhaps in violation of Willow's agreement with the PBMs. [Doc. 334, Steve McCall Testimony, p. 98, ln. 20; and Doc. 311, Ryan McGowan Testimony, p. 8, ln. 7]. When Willow discontinued use of their third-party coupon program, Mr. Ryan McGowan testified that Mr. Wilkerson gave him money for co-pays, one time. [Doc. 311, Ryan McGowan Testimony, p. 27, ln. 21-23]. This isolated incident is the only allegation that Mr. Chatfield had any involvement in directly paying patients' co-pays.

Each pharmacy had a contractual relationship with the PBMs, governed by pharmacy benefit manuals, specific contracts, and terms, which have been submitted as evidence in this case. [Chatfield Ex. 13]. Through these agreements, the pharmacies maintained confidentiality as to pricing and other trade secrets. [Id.]. As Mr. Steve McCall testified, CVS Caremark, one such PBM, specifically prohibited pharmacies from disclosing the cost of medications to patients prior

to or during the sale. [Doc. 334, Steve McCall Testimony, p. 90, ln. 19]. Patients would only learn about the costs to insurance companies when receiving their EOBs. The pharmacies were required to submit true and accurate claims. [Doc. 332, James Gogue Testimony, p. 77, ln. 8].

Mr. Chatfield could not and did not prescribe a medication or submit a claim to a PBM. Mr. Chatfield had no privity or agreements with any PBM or insurance company. The Government never presented a claim submitted to a PBM that contained false information. There is no evidence Mr. Chatfield had knowledge that any claim submitted to a PBM was false.

Mr. Chatfield acted in good faith. He set up a legal entity with a CPA. [Doc. 279, George Foster Testimony, p. 55, ln. 17]. He paid his taxes. [Doc. 279, p. 56, ln. 9] He recorded payments to others on 1099 forms. [Doc. 279, p. 57, ln. 1]. He told his marketers to do things the right way, never instructed them to lie, and instructed them to market creams to patients that needed them. [Doc. 333, Josh Morgan Testimony, p. 44, ln. 15, ln. 22; and Doc. 329, Amanda Booker Testimony, p. 76, ln. 8]. He never acted to interfere with a relationship between a health care provider and a patient. He did not intend to commit fraud, nor did he commit fraud. He did not make a material misrepresentation, nor conspire to make a material misrepresentation, and the government cannot identify any misrepresentation that relates to Mr. Chatfield. There is no doubt that Mr. Chatfield was driven by a desire to make more money—making more sales, working with more marketers, and recruiting more patients.  However, a desire to make money should not be conflated with an intent to defraud, based on the evidence before this Court.

**Legal Argument –Law Applied to the Facts Demonstrate Reasonable Doubt as to Mr. Chatfield's Guilt on All Charges**

**Conspiracy – Count One**

*Conspiracy requires an agreement to commit a crime.*

The government has the burden of proving beyond a reasonable that "two or more persons conspired, or agreed, to commit the crime of health care fraud;" and that Mr. Chatfield "knowingly and voluntarily joined the conspiracy." [Doc. 355, p. 1].

The government, through its briefing, erroneously equates any agreement to act jointly and a conspiracy to commit a crime. The government fails to show, and in fact cannot show, that Mr. Chatfield agreed with his Co-Defendants to commit the crime of health care fraud. The government has attempted to substitute a showing that Mr. Chatfield agreed to engage in business for a knowing and voluntary agreement to commit a crime. Therefore, the government has failed to meet its burden in proving Mr. Chatfield is guilty of the crime of conspiracy to commit health care fraud.

*Michael Chatfield acted in good faith*

Mr. Chatfield began participating in the business of marketing topical creams at the age of twenty-three due to his relationship with his neighbor Wayne Wilkerson. It is clear that Mr. Wilkerson was the leader of this group of persons who marketed topical creams and that the business model at issue in this case was developed by him. Evidence was presented at trial through Mr. Wilkerson's witnesses, particularly Brian Kurtz and Brian Tabor, that Mr. Wilkerson had every reason to believe that this business model was legitimate and lawful. [See Doc. 378, pp. 12-167]. It is a reasonable inference from the proof that Mr. Wilkerson's understandings

were communicated to Mr. Chatfield and that he likewise had every reason to believe that his actions were legitimate and lawful.

Ryan McGowan, a witness for the government in this case, testified that he was well-acquainted with Mr. Chatfield prior to and during this time period, and it is his opinion that Mr. Chatfield is an honest person. [Doc. 311, Ryan McGowan Testimony, p. 41, ln. 5].

Mr. Chatfield was very young, only twenty-three, at the time he became involved in this business. [Doc. 378, Brandon Chatfield Testimony, p. 269, ln. 22]. He relied upon lawyers, [Doc. 378, p. 9, ln. 13-14] an experienced sales representative [See Doc. 378, Brian Kurtz Testimony, p. 152, ln. 12-14 (describing Wayne Wilkerson's background as a sales representative)], a licensed nurse practitioner and doctors, a pharmacist hired as a consultant [Doc. 378, Brian Kurtz Testimony, p. 202, ln. 2], and the pharmacies themselves to provide good advice and act appropriately. He never had reason to assume any of these actors were acting fraudulently.

In part, the Government has relied upon George Striker's plea that he is a co-conspirator in part to prove conspiracy. However, despite his plea, Mr. Striker repeatedly denied that he intended to do anything wrong or agreed to commit a crime. [Doc. 331, p. 113, ln. 12-14; and p. 169, ln. 14; and p. 170, ln. 5-10; p. 170, ln. 23-p. 171, ln. 3; and p. 221, ln. 13-23]. Notably, after one of Mr. Striker's denials, the Court stated:

> I'm going to be fascinated to hear where along the way and under what the circumstances are that you decided that what you were doing went from perfectly, legal, legitimate, you know, lucrative, to, you know, 'wow, I committed a federal crime.' I mean, now, let say this, Mr. Striker, that happens a lot in so-called white collar criminal law, you know people – but it is sort of a heck of a way to run a criminal justice system, I'll observe, because I learned in law school that to commit a crime you had to have something, the Latin term, actus reus, illegal act, and a means rea, in other words, a consciousness that you were committing a crime. And there has been a whole lot written in recent years as our society gets more complex

and we write the laws, that some people say the mens rea requirement has been written out of many aspects of federal criminal law. And I'll be honest, from what I've heard thus far in this trial, that's what I'm going to have to decide more than anything else whether or not that there is a mens rea here or not.

[Doc. 331, p. 50, ln. 9-p. 51, ln. 1]. The Court's anticipation of hearing when Mr. Striker's state of mind changed was never satisfied. The reason is that Mr. Striker truly did not believe he was doing anything wrong and did not have the requisite intent to join a conspiracy to commit a crime—and neither did Mr. Chatfield.

*Candace Michele Craven's lack of sound medical judgment cannot be imputed to Michael Chatfield*

There is no proof in the record that Michael Chatfield influenced or attempted to influence Ms. Craven's medical judgment. If Ms. Craven did not establish an appropriate relationship with a patient, that is—quite simply—her own fault. The government has not shown that speaking with patients over the phone is not a valid medical practice. The government's allegation that Craven never adjusted the formula is inaccurate. Based on the government's proof, numerous formulas were altered or adjusted. [Gov. Ex. 123, 137]. If pressure was placed on Ms. Craven, or if Ms. Craven was cutting corners with patient evaluations, there is no proof that Michael Chatfield was aware of this failure or contributed in any way to her negligence.

*Michael Chatfield did not knowingly pay Candace Michele Craven*

The government provided evidence of a text message from Wayne Wilkerson to Kirtis Green that he was going to take $4,000 from other marketing representatives to pay Candace Michele Craven and Jared Schwab in May 2014. [Gov. Ex. 504]. However, there is no testimony that Michael Chatfield was aware that his commission was reduced for that reason, and he was not included as a recipient on that text message. Further, Ms. Craven received small checks in

early 2014, but she wrote prescriptions for many months prior to and after that check. There is no indication that this small payment was to incentivize her to illegally write prescriptions, nor did she testify as such.

*The Government failed to show a "material" misrepresentation*

In a health care fraud scheme, the government must prove a material misrepresentation was made. The only "representations" made in this case that caused payments were the claims submitted by the pharmacies to the PBMs. Notably, the government did not produce any actual claims as evidence. They showed prescriptions and payments, but not the claims themselves. That is because the claims did not contain any misrepresentations. Furthermore, Mr. Chatfield has no capability to submit a claim for adjudication.

The "materiality witnesses" offered by the government cited several omissions that they claim would have been material. However, those were simply omissions—information not requested by the PBMs, and information that Mr. Chatfield had no way to inform a PBM as he had no relationship with a PBM. [Doc. 334, Steve McCall Testimony, p. 102, ln. 7-p. 103, ln. 10].

For an omission to qualify as a criminally punishable failure to disclose, it "may constitute a fraudulent representation if the defendant was under a legal, professional, or contractual duty to make such a disclosure, the defendant actually knew such disclosure ought to be made, and the defendant failed to make such disclosure with the intent to defraud". [Doc. 358, p. 3]. Mr. Chatfield had no duty to inform the PBM's of his existence or his actions, and there is no evidence before the Court that he actually knew that he should make such a disclosure. In fact the proof shows that he had no ability to even make such a disclosure or cause anyone else to make it.

The government provided testimony from "materiality" witnesses James Gogue and Steve McCall that suggests that at least some of the pharmacies involved in this case violated contractual agreements with the PBMs. To seek to criminalize Michael Chatfield's marketing actions, who was affiliated with an independent contractor for the pharmacies, for the pharmacy's perceived contractual violations is absurd

The government asserts that the defendants caused the pharmacies to not disclose information to PBMs, or that the defendants deceived the pharmacies. [Doc. 372, p. 8]. However, this assertion is completely lacking in foundation in the record of this trial. There has been no proof that Michael Chatfield misrepresented any information to a pharmacy.

*The government has mischaracterized Michael Chatfield's statements and intentions regarding patient evaluations*

Repeatedly, the government has referred to a "bogus study" that "never happened." This is a twisting of events. The form that patients signed indicated that they "*may* receive financial payment" in exchange for an honest evaluation. [Chatfield Ex. 11]. In the Sales Process document that was disseminated to marketers, they were instructed that this form was to get the "patient's evaluation of our product *if* we wanted to conduct a study." [Gov. Ex. 2614]. Only one witness relating to Mr. Chatfield claimed to have paid people for an evaluation—that was George Striker. No other Chatfield marketer claimed to have paid people evaluation fees, and no other patient marketed to by Mr. Chatfield claimed to have been paid for an evaluation. By Michael Chatfield's own words, he stated that he was trying to do a study, but he struggled because every time new patients signed up, insurance companies stopped covering creams so he could not establish an evaluation process. [Gov. Ex. 2112-E]. By the government's own evidence, Michael Chatfield's intent was to have an evaluation/study in place.

*Josh Morgan's testimony regarding paying patients is inconsistent with other proof*

Josh Morgan testified that he paid people $300 to sign up for prescriptions. [Doc. 333, Josh Morgan Testimony, p. 7, ln. 14-22]. However, he was recruited as a marketer by his cousin, Amanda Morgan Booker, who specifically stated that Michael Chatfield told her not to pay patients. [Doc. 329, Amanda Booker Testimony, p. 76, ln. 12-20]. No other witness testified that Mr. Chatfield told him to pay patients to sign up for creams, nor did anyone state that Mr. Chatfield told them to pay amounts as large as $300. One reason to disbelieve Mr. Morgan's version of events would be that he is not credible due to his two felony convictions. Another, more obvious, explanation would be that Mr. Morgan has confused Mr. Chatfield's business model with Mr. Jimmy Collins' business model. Mr. Morgan began working for Mr. Collins shortly after Mr. Chatfield recruited him. [Doc. 333, Josh Morgan Testimony, p. 8, ln. 4]. Mr. Morgan testified that Mr. Chatfield ran things the right way, unlike Mr. Collins. [Doc. 333, Josh Morgan Testimony, p. 44, ln. 12-15]. The government introduced recordings of Mr. Collins that suggest that he paid people larger sums to try creams. Mr. Collins states

> It's like if you have somebody that you're paying and you don't pay them properly—and then all of a sudden, I tell you—say you've been getting' fifty bucks. He's been getting ten thousand. Hey listen. He's been makin' ten thousand, all of a sudden you're like, 'well that mother-fucker got me....I'll give you twenty-five bucks a cream, don't even question it. Well then if they do get questioned, they're gonna say 'that's not worth the money, I'm gonna talk.'"

[Gov. Ex. 2112-B].

*Packaging was normal for compounded topical creams*

The government repeatedly put forth witnesses who testified as to "suspect" or "shady" packaging. The reality is, there was nothing wrong with the products. They are not commercially

produced, so they do not come with branding. Regardless, no defendant involved in this case created a compound, packaged it, or was remotely involved in how such things were done. This is a red herring, and it is inexplicable why the government continuously seeks to discredit the product itself by injecting a consumer's unhappiness with the packaging when the government has failed to provide any actual proof that there was a defect in the product or packaging.

*Michael Chatfield could not prescribe, order, fill prescriptions, or submit claims*

Repeatedly throughout the indictment, the trial, and the government's closing brief, the government seems to be under an erroneous impression of Mr. Chatfield's authority. As an example, the government states, "Indeed, if an insurance company did not pay what the defendants believed to be a worthwhile amount, the defendants would not bother filling those prescriptions." [Doc. 390, p. 49]. For clarity's sake, Mr. Chatfield cannot, could not, and did not "order" creams. He cannot, could, not, and did not prescribe creams. He cannot, could, not, and did not fill prescriptions. He cannot, could, not, and did not submit claims. Only health care providers could order or (more accurately) prescribe creams. Only pharmacies could fill prescriptions and submit claims.

*The government mischaracterizes Michael Chatfield's statement regarding "where the fraud happened."*

George Striker surreptitiously recorded a conversation between himself and Jimmy Collins, for which Mr. Chatfield was present. At some point in the conversation, the group begins talking about the government's investigation into Willow Pharmacy. Mr. Chatfield, referring to Willow Pharmacy, says, "that's where the fraud happened." [Gov. Ex. 2112-F]. This is in no way an admission by Mr. Chatfield that he committed fraud at Willow Pharmacy or was aware of fraud

at the time. By this point, all parties had learned of Kirtis Green's rogue actions, and that Mr. Green's misconduct started this investigation. [Doc. 331, George Striker Testimony, p. 146-148].

*The use of Natalie Chatfield's cell phone number is not indicative of fraud*

The government misrepresents evidence with the assertion that Natalie Chatfield's phone number on a prescription was meant to bypass Debra Foster. Throughout the trial, the government showed various forms used by patients. For the Fosters, they only submitted into evidence the actual prescription submitted to the pharmacy. The prescription forms asked for shipping information, and that shipping information for Debra and George Foster was Natalie Chatfield's house. This is the form Ms. Craven signed and sent—it was never asserted that this is the only form that Ms. Craven *received*. There is no evidence that this was the form that Ms. Craven used to glean contact information from patients. Mrs. Chatfield's address and phone number were used for shipping purposes only—and there is nothing fraudulent about that.

*Payments to Jared Schwab do not support the government's theory*

Jared Schwab worked for Willow Pharmacy. At the end of April 2014, Mr. Wilkerson began paying Mr. Schwab for a consulting fee in relatively small payments. [Gov. Ex. 55]. In June, Mr. Wilkerson and Mr. Chatfield stopped doing business with Willow Pharmacy, but the payments continued to Mr. Schwab. In fact, the next payment is not made until Top Tier stops doing business with Willow Pharmacy. [Id.]. The government wants the Court to infer that these payments were to induce a pharmacy representative to do something nefarious, yet the payments continued routinely after Top Tier's business with Mr. Schwab's employer ceased. Mr. Schwab had no ties to the other three pharmacies in this case.

*The government seeks to criminalize profit*

The creams were expensive. They were expensive because the PBMs set a scale relating to the Average Wholesale Price that it was willing to pay on behalf of insurance providers. [Doc. 334, Steve McCall Testimony, p. 93, ln. 3-8]. Neither Mr. Chatfield nor any of his Co-Defendants had any involvement in setting the price of the compounds. The pharmacies collected the money and agreed to pay a large portion to marketers. These were all decisions made by massive, complex, highly regulated businesses. These decisions resulted in Mr. Chatfield making large profits.[1] The government continuously harks on the high price of the creams and the high profit margin. The government routinely maligns the marketers for making a large amount of money for little effort when a marketer is able to convert a contact into a sale. These are the most important themes to the government. Mr. Chatfield is being prosecuted because he marketed an expensive product and made money. The reality is, making money is not a crime per the United States Code and not evidence of Mr. Chatfield's knowing participation in a conspiracy to commit the crime of health care fraud. For all these reasons, the evidence establishes a reasonable doubt as to Mr. Chatfield's guilt on the charge of conspiracy to commit the crime of health care fraud, and the Court should find Mr. Chatfield not guilty of that count.

**Wire, Mail, and Health Care Fraud Scheme**

As an alternative theory to conspiracy, the government charged Mr. Chatfield and his co-defendants in a fraud scheme. For the charges of wire fraud, mail fraud, and health care fraud, the government has the burden of proving that Mr. Chatfield had intent to defraud beyond a

---

[1] Because the amount of profit is not an element for the Court to consider in the guilt or innocence phase, Mr. Chatfield will not address the government's calculations here. However, that does not mean that Mr. Chatfield agrees with the calculation of his profits.

reasonable doubt. [Doc. 355]. Additionally, the government must prove the alleged scheme included a material misrepresentation or concealment of a material fact. [Doc. 355]. As more fully discussed in the Joint Motion for Additional Applicable Legal Standards, concealment of a material fact would require Mr. Chatfield to be under a legal, professional, or contractual duty to make such a disclosure. [Doc. 358]. As a preliminary matter, Mr. Chatfield did not have privity to any PBM and did not have such a duty to disclose anything to the PBM. The government has been unable to locate any statute or regulation that supports their theory that Mr. Chatfield had a duty to "pick up the phone." [Doc. 376, Brian Kriplean Testimony, p. 166, ln. 15]. Additionally, the government has failed to describe any *affirmative* misrepresentation made by Mr. Chatfield that was "material" to the PBMs, which paid the insurance claims.

Unlike a conspiracy charge, the substantive fraud counts should be considered solely based on Michael Chatfield's actions—not the actions of others. He is charged substantively, and only his conduct and intent are relevant to determining his guilt or innocence as to these counts.

The government has also failed to show that Mr. Chatfield had the requisite intent to commit a fraud—in part because he did not commit the actus reus of fraud. The government's witnesses reiterated that they were told to target patients with actual needs and not to pay people for prescriptions. No witness related to Michael Chatfield believed that their conduct was wrong or illegal at the time. At this point, it is unclear why anyone, such as George Striker, believes that this conduct may have been illegal other than because prosecutors have told them so after the fact.

*Michael Chatfield should be found not guilty of the fraud and aggravated identity theft counts related to George Foster's prescriptions – Counts 24, 26, 114, 115, 116, 118, 119, and 168*

George Foster is Michael Chatfield's father-in-law. [Doc. 279, George Foster Testimony, p. 46, ln. 16]. He claimed at trial that he has no knowledge about any topical creams being prescribed to him. [Id., p. 50, ln. 9]. However, his cross-examination revealed that, as a CPA and owner of Foster Financial Services, he set up a corporation for Top Shelf, Inc., Mr. Chatfield's business. [Id., p. 54, ln. 19-18]. Further, he assisted others in setting up LLCs who were involved in the marketing of topical creams. [Id., p. 57, ln. 15]. He also prepared 1099s for all of the marketing representatives for Top Shelf, Inc. [Id., p. 57, ln. 1-10]. He even prepared the tax returns for Michael Chatfield and Top Shelf, Inc. [Id., p. 56, ln. 9-16]. Yet on the witness, stand he claimed ignorance as to anything about Mr. Chatfield's business. Mr. Foster, a CPA, also claims to have never looked at an Explanation of Benefits from his medical insurance. [Id., p. 62, ln. 14-18]. This assertion stretches credibility beyond recognition.

What the facts actually show is that Foster Financial Services received $5,000 for preparing Mr. Chatfield's taxes. [Chatfield Ex. 3]. Top Shelf, Inc., also paid a check to George Foster personally for $5,000. [Chatfield, Ex. 2]. The government has claimed that every check written in this case has been solely for the purpose of incentivizing the ordering or marketing of creams—except for this one check, the check to George Foster. The government has no explanation for why Mr. Foster was paid $5,000 personally. The most likely scenario is that this payment was a commission similar to what every other witness in this case received—most similar to Jim Foster—which means that Mr. Foster did in fact know he and his wife had been prescribed creams. This fact creates a reasonable doubt as to Mr. Chatfield's guilt on the charges related to Mr. Foster's prescriptions.

The assertions by Mr. Foster and Mrs. Foster that Natalie Chatfield used their health insurance without permission are nonsensical. It has been established that Natalie Chatfield was still on Mr. and Mrs. Foster's insurance plans due to her diabetes. [Doc. 279, Debra Foster Testimony, p. 33, ln. 23-24; and George Foster Testimony, p. 48, ln. 2-3; and Doc. 379, Natalie Chatfield Testimony, p. 26, ln. 2-4; p. 43, ln. 7-p. 44, ln. 23]. Even to go to her own doctor's appointments, Mrs. Chatfield requested permission from her parents to get an insurance card. [Id.]. Yet, the government wishes the Court to believe that Mrs. Chatfield would risk misusing this insurance plan when she knew how closely her parents guarded this information. This assertion does not add up.

However, even if Mr. Foster is to be believed, the government has failed to show that Mr. Chatfield had any knowledge or intent to cause creams to be prescribed without Mr. Foster's knowledge. Mrs. Chatfield specifically testified that she communicated to Mr. Chatfield that she had obtained her parents' consent to fill out the forms. [Doc. 379, p. 35, ln. 14-21].

The government relies primarily on the testimony of Debra Foster—who lied to FDA Agent Kriplean and changed details of her stories in multiple meetings with the government. Mrs. Foster claims that she had no knowledge of being prescribed creams. However, the first time she met FDA Agent Kriplean, she told him that she had been prescribed creams, as had George Foster. [Doc. 279, p. 28, ln. 5]. She stated that she received a prescription from Michele Craven. [Doc. 279, p. 30, ln. 6]. She told Agent Kriplean that she had been told by a friend to contact Ms. Craven, and that the creams worked well. [Doc. 279, p. 31, ln. 9-13]. Then, once Agent Kriplean threatened her with criminal prosecution alleging she was lying to a federal agent, her story changed. [Doc. 279, p. 33, ln. 24]. Following this initial encounter, once Mrs. Foster hired an

attorney and agreed to meet with the United States Attorney, she told an unbelievable story that she has no idea how Natalie Chatfield would have access to her insurance information—despite the fact that Mrs. Chatfield was on the Fosters' health insurance plan. [Doc. 279, p. 33, ln. 20-p. 34, ln. 12]. At trial, Mrs. Foster attempted to assert that Mrs. Chatfield told her to cover up for her and Mr. Chatfield, despite assuring the government that no one had told her how to answer questions in August 2015. [Doc. 279, p. 38, ln. 14]. This unreliable witness who lied multiple times to federal authorities and constantly changed details of her story is the government's primary evidence against Mr. Chatfield on the count of aggravated identity theft. Yet even this dishonest witness could not fabricate enough testimony to actually connect Mr. Chatfield to having knowledge that Mr. and Mrs. Foster had not given permission to have creams prescribed or spoken with Ms. Craven.

Natalie Chatfield also testified at trial. She testified that she had spoken with her mother about the creams, and that her mother believed that she and her father would be interested. [Doc. 379, Natalie Chatfield Testimony, p. 23, ln. 2-6; p. 27, ln. 13-16, and p. 35, ln. 6-13]. Mr. and Mrs. Chatfield filled out forms and sent them with her husband to Ms. Craven. Mrs. Chatfield, who was friends with Ms. Craven, gave the contact information for Mrs. Foster. [Doc. 379, Natalie Chatfield Testimony, p. 47, ln. 13-14]. On the prescription forms for the Fosters, Natalie Chatfield provided her own information for shipping, including her contact number for shipping purposes. Natalie Chatfield testified that her parents often preferred to have items shipped to Natalie Chatfield because they worked long days and were not home to receive shipments. Deborah Foster even corroborated this testimony. [Doc. 279, pp. 24-26].

The actions of Ms. Craven here are vital. If Ms. Craven signed some prescriptions without talking to patients, there is no testimony or evidence to support that Michael Chatfield knew that. He was not her employer. If he sent a product form to Ms. Craven in May 2014, he assumed she would actually talk to the patient. Ms. Craven did not testify that Michael Chatfield asked her to sign these prescriptions without talking to the patients, nor was she asked if she signed prescriptions for George and Deborah Foster without talking to them.

For Count 168, which charges Mr. Chatfield with identity theft, the Court would first have to find Mr. Chatfield guilty of wire or mail fraud in Counts 24, 26, 114, 115, 116, 118, 119 or Conspiracy. If the Court finds Mr. Chatfield not guilty of these counts, then Count 168 fails. The government must also prove that Mr. Chatfield knowingly used a means of identification of Mr. Foster without lawful authority. Based on the foregoing, it is clear that reasonable doubt exists as to whether Mr. Chatfield had authority from Mr. Foster to fill out forms indicating his interest in topical creams—and certainly whether or not he had knowledge that Mr. Foster had not given his authority.

The government has failed in meeting its burden to prove these fraud and aggravated identity theft allegations beyond a reasonable doubt, and Mr. Chatfield should be found not guilty of these counts.

*Michael Chatfield should be found not guilty of wire and mail fraud counts related to Michael Chatfield's prescriptions – Counts 25, 28, 117, and 137*

The government presented evidence that Michael Chatfield was prescribed creams on April 8, 2014, via facsimile, and again on May 7, 2014. The government presented evidence that a prescription was shipped on May 9, 2014.

These medications were prescribed by Nurse Practitioner Candace Michele Craven and filled by Willow Pharmacy. [Gov. Ex. 112, 117, 204, 711] Ms. Craven testified in this trial. She was not asked about the validity or her medical assessment of Michael Chatfield or whether she inappropriately prescribed him medication. No evidence was presented that connected Michael Chatfield to the actual sending of the fax or causing the fax to be sent. Further, the government claims this prescription is fraudulent because Mr. Chatfield received a commission. There is no law, statute, regulation, or authority that the government has been able to cite to show that a marketer receiving a commission on his own medications is illegal. The government has a burden to show beyond a reasonable doubt that this fax was sent by Mr. Chatfield or caused to be sent by Michael Chatfield to further a scheme and not for a legitimate purpose. The government has provided no such evidence. Mr. Wilkerson provided evidence to the contrary, through the testimony of Brian Tabor, that these commissions to marketers for their own medications is routine. [Doc. 378, Brian Tabor Testimony, p. 62]. The government has failed in meeting its burden to prove these fraud allegations beyond a reasonable doubt, and Mr. Chatfield should be found not guilty of these counts.

*Michael Chatfield should be found not guilty of the wire fraud count related to Natalie Foster Chatfield's prescription – Count 27*

The government presented evidence that Natalie (Foster) Chatfield was prescribed topical creams on April 24, 2014. These medications were prescribed by Ms. Craven [Gov. Ex. 115, 402, 712, and 425]. Ms. Craven testified at trial and was not asked about the validity of this prescription. There was no evidence connecting Michael Chatfield to sending the fax or causing the fax to be sent. Furthermore, the government presented no evidence that this prescription was not valid. Natalie Chatfield testified in the defense case. She testified that she visited Ms.

Craven, her primary health care provider, and was examined and had a need for the creams she was prescribed. [Doc. 379, Natalie Chatfield Testimony, p. 39, ln. 21-23; p. 42, ln. 6-7]. The government has failed to prove beyond a reasonable doubt that this use of wires was caused by Mr. Chatfield and that it furthered a scheme to defraud. The government has failed in meeting its burden to prove these fraud allegations beyond a reasonable doubt, and Mr. Chatfield should be found not guilty of these counts.

*Michael Chatfield should be found not guilty of the wire fraud count related to Jim Chatfield's prescription – Count 29*

The government presented evidence that Jim Chatfield, Michael Chatfield's uncle, was prescribed topical creams on May 12, 2014. These medications were prescribed by Ms. Craven. Ms. Craven was not asked about this prescription at trial. Jim Chatfield testified at trial. He explained that Michael Chatfield talked with him about the creams and that he received creams, however he specified at multiple points that his memory was faulty as to any interactions with a health care provider or pharmacy. [Doc. 362, James Chatfield Testimony, p. 280, ln. 9-16; p. 299, ln. 4-p. 300-ln. 24]. Jim Chatfield is a career law enforcement officer and did not believe anything was wrong with his participation. He did not believe that the money Michael Chatfield sent him was to incentivize him to request topical creams. [Doc. 362, James Chatfield Testimony, p. 302, ln. 5-20]. It also seems unlikely that Mr. Chatfield would market creams to his uncle, a 31-year law enforcement veteran, if he believed he was committing fraud. The government has failed to show how Jim Chatfield's prescription furthered a scheme to defraud by Michael Chatfield. Further the government has failed to show that Michael Chatfield actually faxed the prescription or caused the prescription to be faxed.

The government also mischaracterizes Jim Chatfield's testimony. Upon receiving a check from Michael Chatfield, he did not "fear something was amiss" and had his lawyer "deposit[] it into his escrow account." [Doc. 390, p. 25]. Actually, Jim Chatfield testified he deposited the check in his own account. [Doc. 362, James Chatfield Testimony, p. 290, ln. 2]. He did not give the money to his attorney until *after* federal agents showed up at hs house. [Doc. 362, James Chatfield Testimony, p. 291, ln. 2-4]. The government has failed in meeting its burden to prove these fraud allegations beyond a reasonable doubt, and Mr. Chatfield should be found not guilty of these counts.

*Michael Chatfield should be found not guilty of the fraud and aggravated identity theft counts related to Emma, Hal, and Suzanne Bowling's prescriptions – Counts 30, 31, 32, 120, 121, 122, 169, 170, and 171.*

The government brought Noah Bowling to testify. Noah Bowling and Luke Bowling were approached by Brandon Chatfield, Michael Chatfield's brother, about marketing topical creams. The Bowling brothers met the Chatfield brothers at a soccer game in Chattanooga to discuss the creams. [Doc. 280, Noah Bowling Testimony, p. 7, ln. 4-20; and Doc. 378, Brandon Chatfield Testimony, p. 272, ln. 20-p. 273, ln. 13]. The Chatfields explained to the Bowlings if they could market creams to friends and family members, they would be able to earn more commission. [Doc. 280, Noah Bowling Testimony, p. 14, ln. 4-6].

In his testimony at trial, Noah Bowling claimed to not be able to remember if he or his brother filled out the forms for his siblings, although he previously testified to the Grand Jury that he filled out the forms and forged his parents' and sister's names. [Doc. 280, p. 32, ln. 12-p. 33 ln. 10].

Noah Bowling claimed that he and his brother filled out forms for his parents and his sister without their knowledge in Michael Chatfield's presence. [Doc. 280, p. 16, ln. 7]. Noah Bowling had every reason to exaggerate and fabricate this version of the story—he felt he needed to blame Michael Chatfield once he was questioned by federal authorities about his own forgeries. [Doc. 280, Noah Bowling Testimony, p. 41, ln. 22-p. 46, ln. 23] Indeed, Noah and Luke Bowling escaped being prosecuted for their admitted crimes and profited $2,000. [Doc. 280, p. 46, ln. 10-23]. However, Brandon Chatfield, who was also present for the meeting, strongly asserted at trial that Noah's version of events is false. Brandon Chatfield testified that Luke Bowling met him the next day at the Hamilton Place Mall and gave him the forms for Hal, Susanne, and Emma Bowling. [Doc. 378, Brandon Chatfield Testimony, p. 274, ln. 6-p. 275, ln. 6]. Brandon Chatfield's wife, Grayson (Fuller) Chatfield, also testified that she was present at this meeting, corroborating Brandon Chatfield's testimony. [Doc. 378, p. 309, ln. 13-p. 310, ln. 3].

Further, Michael Chatfield once again is entitled to rely on a belief that Ms. Craven would call patients before prescribing creams. Had Ms. Craven actually called the Bowling family, a prescription would not have been generated without their consent. Noah and Luke Bowling's deceit and Ms. Craven's negligence resulted in these prescriptions being filled—not any manner of fraud by Michael Chatfield.

The evidence on these counts establishes a reasonable doubt as to Mr. Chatfield's guilt on these allegations of fraud and aggravated identity theft, and this Court should find him not guilty on these counts

*Michael Chatfield should be found not guilty as to the wire and health care fraud counts related to Josh Morgan's prescription – Count 48 and 137*

Amanda Morgan Booker testified at trial about marketing creams to her cousin, Josh Morgan. Mrs. Booker approached Michael Chatfield about marketing creams. [Doc. 329, p. 75]. Mr. Chatfield explained to Mrs. Booker that she should market creams to patients who needed the creams, that the patients would talk to a healthcare provider, and that she should not offer money to anyone in exchange for signing up to a prescription. [Doc. 329, p. 76]. When Mrs. Booker recruited her cousin, Josh Morgan, she never told him to pay patients for signing up for creams. [Doc. 329, p. 76, ln. 20].

Mrs. Booker recruited Mr. Morgan at first as a patient because she knew that he had pain and scars from a surgery. [Doc. 329, p. 78, ln. 20-p. 79, ln. 25]. Based on Mrs. Booker's understanding, Josh Morgan spoke with Ms. Craven. [Doc. 329, p. 80, ln. 16]. Furthermore, Mr. Morgan confirmed that he spoke with a Nurse Practitioner about his prescription. [Doc. 333, p. 41, ln. 2].

The government alleges that Mr. Morgan's initial prescription on November 25, 2014, was an act of wire fraud and health care fraud in part because Mr. Morgan was incentivized to order creams. However, Mr. Morgan did not testify that he was incentivized to order creams. Mr. Morgan states that for that prescription, his cousin told him that he could sign up for the creams, which he did, and *after* agreeing to sign up, "she said if your friends want to do it, too, you could make money…" [Doc. 333, p. 10, ln. 64]. At the moment that the prescription was filled, Mr. Morgan had not received money or the promise of money. He spoke with a nurse practitioner about creams he felt he could use after his surgery. Mr. Chatfield did not misrepresent anything to Mr. Morgan, Mrs. Booker, the pharmacy, or the PBM to cause this prescription to be filled.

The government has failed in meeting its burden to prove these fraud allegations beyond a reasonable doubt, and Mr. Chatfield should be found not guilty of these counts.

*Michael Chatfield should be found not guilty as to the mail fraud regarding Ryan McGowan's money order – Count 123*

Ryan McGowan testified that he sent money orders through the mail. [Doc. 311, Ryan McGowan Testimony, p. 29, ln. 12]. Mr. McGowan further testified that he received money from Mr. Wilkerson, and that Mr. Wilkerson gave him instructions to send money orders to Willow Pharmacy through the mail. [Doc. 311, p. 28, ln. 21-23]. Mr. Chatfield was not present, did not give any money to Mr. McGowan, and did not direct or cause Mr. McGowan to send money orders through the mail. [Doc. 311, p. 39, ln. 20]. The government seeks to impute criminal liability of Mr. Wilkerson's and Mr. McGowan's acts to a substantive charge of mail fraud to Mr. Chatfield. The government has failed in meeting its burden to prove this fraud allegations beyond a reasonable doubt—indeed, the government has failed to provide cause to believe that Mr. Chatfield even committed this crime—and Mr. Chatfield should be found not guilty of these counts.

*Michael Chatfield should be found not guilty as to the wire fraud counts related to text messages – Counts 34-47*

The government has not met its burden to show that a scheme to defraud existed, or that Mr. Chatfield had intent to defraud, therefore Mr. Chatfield should be acquitted. However, these counts will still be examined in greater detail. Charging individual text messages as wire fraud is a novel approach, and, by the government's own admission, was done as part of a strategy to ensure evidence would be admitted over Mr. Chatfield's hearsay objections, the government still has the burden to show that each text message was sent or caused to be sent by Mr. Chatfield

and furthered a scheme to defraud. However, for determining whether Mr. Chatfield *sending* a text message to Kirtis Green or George Striker constitutes a substantive violation of the wire fraud statue, these messages should be examined in a different way: the government must prove beyond a reasonable doubt that sending each text message furthered a scheme to defraud. The vast majority of the text messages do not further the scheme and primarily contain commentary on the business (thus, why the government wished for the text messages to be introduced as evidence). What few text messages may arguably be considered an act, the government failed in any way to link the text to a furtherance of the scheme.

*Count 34 – Text exchange on 5/6/14*

This exchange [Gov. Ex. 513] references someone talking to a "website guy." No evidence has been presented that involves a website. This exchange also describes how much money Mr. Chatfield believes he made on commission, but it does not actually "further" anything. Mr. Chatfield says "…lol I'm going to add some more creams for me too" to Kirtis Green, but telling Kirtis Green what he may (or may not) do also does not "further" the action. There is also a question of whether Mr. Chatfield was even being serious, based on the usage of "lol," which is widely known to stand for "laugh out loud" to indicate a joke. There is a discussion about creams for Nicollette, but the government has not provided any evidence relating to Nicollette actually receiving creams. Put another way, whether or not Michael Chatfield's text messages in this conversation were sent in no way affected the outcome of anything or changed a course of events. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 35*

The first question that should be asked in reading Gov. Ex. 514 is, "What does this mean?" The government failed to provide any meaningful context to this portion of text messages. The government did not show who "Katrina" or "Morgan" was. Looking closely at these text messages, it appears that Mr. Chatfield is inquiring with Willow Pharmacy about information for Kirtis (i.e. "...Jared couldn't look him up so my guy requested his from hr dept"). Regardless, these text messages do not "further" a scheme, and the government has failed to show how Michael Chatfield sending these specific text messages actually furthered the scheme. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 36*

For this set of text messages in Gov. Ex. 515, Mr. Chatfield and Mr. Green are discussing new pads with formula changes made by Jared Schwab. However, this is once again an example where sending a text message is not furthering a scheme to defraud. Mr. Chatfield is simply describing the pads. The "act" that must be adjudicated is sending a text, not printing a pad. Therefore, the government has failed to meet its burden to show that this is an act in furtherance of a scheme.

*Count 37*

Count 37 is based on the text messages in Gov. Ex. 516. This includes the text messages involving Mr. Chatfield telling Mr. Green about early refills with a lost or stolen override. As demonstrated in Mr. Newkirk's testimony , this was not accurate, and no prescriptions from that time period were filled too early or used a lost/stolen override code. [Doc. 380, Mark Newkirk

Testimony, p. 139, ln. 14-21]. Later, a conversation involves a stamp. However, the sending of the text message itself does not further anything involving a scheme. It is only Mr. Chatfield describing what he believes is happening and explaining how a stamp is made with a vendor. Furthermore, Ms. Craven testified she had requested was aware of a stamp with her signature on it. [Doc. 314, p. 26, ln. 5-13]. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 38*

Count 38 is based on the text messages in Gov. Ex. 517. This is a conversation between Mr. Green and Mr. Chatfield about a sales report that Mr. Chatfield will not be able to access until another day. They both state they had several customers recently. No "act" is made to further a conspiracy. It is just a discussion of ongoing events—and primarily stating that they don't currently have access to information. The government has not linked any of these messages to how they actually furthered a scheme to defraud and has failed to meet its burden for these text messages to constitute a substantive violation of the wire fraud statute. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 39*

Count 39 is based on Gov. Ex. 518. Frankly, it is unclear what these messages are about, other than "Can you get kristy to see if they filled the 25 creams for the 5 Bowling family members?" There has been no evidence as to who Kristy is or if Mr. Green was able to find out the information Mr. Chatfield requested. This act did not further a conspiracy, and the

government has not linked this text message to how it actually affected whether or not prescriptions were filled for the Bowlings. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 40*

Count 40 is based on the text messages in Gov. Ex. 519. The first half of this conversation regards the creation of business cards for Kirtis Green. The government has not proven that the creation of Mr. Green's business cards furthered a scheme. The second half of the conversation is updating on Jared's supposed actions at the pharmacy and whether or not certain patients were processed. The sending of these text messages did not further any prescription being filled, nor has the government even linked this conversation to any actual prescriptions. The government has failed to meet its burden to prove these text messages constitute wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 41*

Count 41 is based on text messages in Gov. Ex. 520. In this conversation, Mr. Green advises Mr. Chatfield about not using fluticasone-based prescriptions for children and not marketing the same set of prescriptions to people repeatedly. First, these are texts sent *by Mr. Green*, so they are not sent by or caused to be sent by Mr. Chatfield. Mr. Chatfield sends Mr. Green an estimate of costs for various prescriptions at Mr. Green's request, but the government has failed to show how that particular text message furthers or affected a scheme to defraud. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 42*

Count 42 is based on text messages in Gov. Ex. 521. In the first half of the text exchange, Mr. Chatfield expresses his hope that most of the patients will get refills this month. An expression of hope does not "further" any scheme. Next, Mr. Green and Mr. Chatfield discuss a text from Ms. Craven regarding an audit. Despite calling Ms. Craven as a witness, the government did not ask her about this text message, the audit, or any involvement by Michael Chatfield. The government did not link these text messages to any furtherance of a scheme to defraud. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 43*

Counts 43-47 involve text messages between Mr. Chatfield and George Striker. While these text messages discuss the day to day business of marketing creams, the government's evidence fails to sufficiently link any message sent by Mr. Chatfield to the furtherance of a scheme. Count 43 is based on the highlighted text in Gov. Ex. 2102. These text messages describe what is happening day to day, but the government has failed to link these texts to any prescriptions that were filled or attempted to be filled. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 44*

Count 44 is based on text messages between Mr. Striker and Mr. Chatfield in Gov. Ex. 2103. In sum, these messages involve Mr. Chatfield informing Mr. Striker as to which patients had prescriptions filled and estimating how much money he should earn for the month. His

informing Mr. Striker did not affect whether or not prescriptions were filled, claims were submitted, or commissions were paid. The government has failed to show how the texts would further a scheme. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 45*

Count 45 is based on text messages between Mr. Striker and Mr. Chatfield in Gov. Ex. 2104. These messages are primarily Mr. Striker requesting Mr. Chatfield to check the shipping status of prescriptions for some of his customers. Checking the status does not change whether or not a prescription was filled, shipped, or paid for. The government has failed to show how these texts further a scheme. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 46*

Count 46 is based on text messages between Mr. Striker and Mr. Chatfield in Gov. Ex. 2105. In this series of texts, Mr. Striker and Mr. Chatfield discuss the amount of revenue Mr. Striker is receiving and the prescriptions his family is receiving. They also discuss the high co-pays for a patient and whether or not the copays are "worth it." However, nothing in the texts sent by Michael Chatfield further a scheme, nor has the government offered an explanation of how it would further a such a scheme. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Count 47*

Count 47 is based on text messages exchanged between Mr. Striker and Mr. Chatfield in Gov. Ex. 2106. The government primarily focused on Mr. Chatfield's (erroneous) explanation that Tricare isn't really government-funded insurance. However, this text in and of itself did not further a scheme to *defraud* (which would be separate than an anti-kicback scheme), nor did the text further any act alleged in this case. It was simply Mr. Chatfield's explanation of his understanding of Tricare. The text did not directly result in George Striker's father's prescription being written, sent, filled, or paid. The government has failed to meet its burden to show these text messages constitute an act of wire fraud, and the Court should find Mr. Chatfield not guilty on this count.

*Michael Chatfield should be found not guilty of payment and receipt of illegal remuneration – Counts 147, 148, 149, 150, and 161*

Mr. Chatfield is charged in counts 147 through 150 with making commission payments to Josh Morgan, individually, Amanda Mills, and Josh Morgan's LLC, JM Elite. He is charged in count 161 with receiving a commission payment from Mr. Wilkerson's company, Top Tier. (Doc. No. 322) The Government alleges that these commission payments were made or received in order to induce another person to refer someone to obtain a good or service paid for by a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) and (2); [Doc. No. 390, Page 60]. The Government alleges that Mr. Chatfield received commissions for patients covered by Tricare primarily through Mr. Josh Morgan and others in the military who signed up to receive the creams after speaking with Mr. Morgan.

In order to convict Mr. Chatfield for the payment or receipt of illegal remuneration as prohibited by 42 U.S.C. § 1320a-7b(b)(1) and (2), the Court must find beyond a reasonable doubt that he acted knowingly and willfully. [Doc. 355, Order as to Legal Standards, pp. 3-4].

As the Sixth Circuit Pattern Jury Instructions state, an act is "'knowingly' done if done voluntarily and intentionally, and not because of mistake or some other reason." There is very limited precedent in criminal prosecutions of the illegal remuneration statute in the Sixth Circuit. The Fifth Circuit has addressed what "willfully" means in the context of this statute. It "means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (quoting *United States v. Garcia*, 762 F.2d 1222, 1224 (5th Cir. 1985)). See also *United States v. Starks*, 157 F.3d 833, 837-838 (11th. Cir. 1998) (quoting 11th Circuit pattern instructions)

The evidence against Mr. Chatfield does not support a finding of willfulness beyond a reasonable doubt with regard to commissions received or paid for prescriptions paid for by Tricare, nor is there any evidence to show that he knew receiving commissions on pharmaceutical sales generally was illegal.

Mr. Chatfield is not a medical professional and this business was his first work in the medical sales field. Mr. Chatfield made no attempt to hide the nature or purpose of the payments. He received payments to and from his company's bank account of all four occasions alleged to be illegal payments.

The contract between the pharmacies and Top Tier, drafted by the pharmacies' attorneys and reviewed by the pharmacies' compliance officers, stated that commissions "shall be payable

on sales of Products that are reimbursement by private payors. Commissions are not paid when federal funds are used in whole or in part to pay for the Products (for example, a Medicare-affiliated plan)." Gov. Ex. 1333. This contract addendum does not mention Tricare. However, and in spite of that contractual provision, the pharmacies' (all four pharmacies) practice of paying commissions on prescriptions for which Tricare paid them, served to affirm for Mr. Chatfield the legality of the application of business model used for prescriptions paid for by private insurance to those paid for by Tricare.

Through this prosecution, the government is seeking to hold Mr. Chatfield to a higher standard than the pharmacies that paid the commissions he received and paid out that form the basis of the criminal counts against him. The fact that sophisticated pharmacies made a decision to pay commissions on Tricare reimbursed prescriptions reinforces the reasonable doubts that exist as to whether Mr. Chatfield's acts were "committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." These reasonable doubts are also reinforced by the confusion Mr. Chatfield expresses in a text message to Mr. Striker regarding Tricare because its insurance is managed by express scripts. When Mr. Striker questions whether government insurance would cover the prescriptions, Mr. Chatfield responds "That's not government really. It's managed by express scripts just not veterans affairs." [Gov. Ex 2016, ln. 310-311].

For all these reasons, a reasonable doubt exists as to whether Mr. Chatfield acted willfully with respect to the conduct alleged in Counts 147-150 and 161 and this Court should find him not guilty on those counts.

*Michael Chatfield should be found not guilty of money laundering – Counts 173, 174, 175, 176, and 177*

       To be found guilty of money laundering, the Court would first have to determine that the monetary transactions at issue were in property derived from specified unlawful activity. Because no crime was committed, no money laundering could have occurred. In addition, the government must prove that Mr. Chatfield knew that the transaction was in criminally derived property. For all the reasons stated above, Mr. Chatfield had no knowledge that the transactions were in criminally derived property. Mr. Chatfield simply spent money he earned through his business which he believed perfectly lawful.

**Conclusion**

*There is a Reasonable Doubt as to Whether Mr. Chatfield Acted with Intent to Defraud or in Good Faith*

       The legal standards applicable make clear that the good faith of Mr. Chatfield is a complete defense to the charges of Conspiracy to Commit Health Care Fraud, Wire Fraud, Mail Fraud, Health Care Fraud and Mr. Chatfield submits, to the Illegal Remuneration counts as those counts require that the defendant act willfully.  The instructions provide: "A person who acts, or causes another to act, on a belief or an opinion honestly held is not punishable under these statutes merely because the belief or opinion turns out to inaccurate, incorrect or wrong. An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct." … "If the evidence in this case leaves you with a reasonable doubt as to whether the evidence acted with an intent to defraud or in good faith, you must acquit the defendant."

For all the recited herein, such a reasonable doubt exists and Mr. Chatfield should be acquitted of the conspiracy to commit health care fraud, wire fraud, mail fraud, health care fraud, and the illegal remuneration counts because Mr. Chatfield acted in good faith.

For all the reasons stated herein, a reasonable doubt exists as to Mr. Chatfield's guilt on all the charges in the Indictment and this Court should find him not guilty on all charged counts.

Respectfully submitted this 13th day of January, 2020.

*s/ David M. Eldridge*

DAVID M. ELDRIDGE (BPR # 012408)
ZACHARY R. WALDEN (BPR #035376)
ELDRIDGE & BLAKNEY, P.C.
The Cherokee Building
400 West Church Avenue, Suite 101
Knoxville, Tennessee 37902
(865) 544-2010
*Attorneys for Michael Chatfield*