**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| | |
| **v.** | **Docket No. 1:18-CR-11** |
| | **JUDGE MATTICE** |
| **MICHAEL CHATFIELD,** | **MAGISTRATE JUDGE STEGER** |
|     *Defendant.* | |

---

**SUPPLEMENT TO SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE OR VARIANCE ON BEHALF OF DEFENDANT MICHAEL CHATFIELD**

---

Comes now the Defendant, Michael Chatfield, by and through undersigned counsel, and supplements his sentencing memorandum and motion or downward departure or variance. Mr. Chatfield moves this Honorable Court to depart downward or vary from the United States Sentencing Guidelines based on the United States Sentencing Commission's failure to appropriately implement Congress' goals into United States Sentencing Guideline §2B1.1. On June 8, 2020, this Court held a scheduling conference with all parties. At that conference, the Court noticed the parties to consider arguments relating to the American Bar Association's Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes proposal to replace §2B1.1. Based on the Court's suggestion, undersigned counsel prepared this briefing and files it within the timeline for a motion for departure or variance provided by LR83.9(j). The guideline is not properly related to empirical data, has been flawed since its inception, has been made worse by political influences on the Commission, and has been heavily

Case 1:18-cr-00011-HSM-CHS   Document 481   Filed 07/09/20   Page 1 of 22   PageID #: 9975

criticized by courts, academics, and the American Bar Association.

**Introduction**

This Court is well aware that the advisory guideline range is just that—advisory. The guidelines range is only one factors the Court is required to consider in imposing sentence. *Rita v. United States*, 127 S.Ct. 2456, 2463 (2007); *Gall v. United States*, 128 S.Ct. 586, 594-595 (2007). The Court is required to consider the guidelines but should not blindly defer to policy decision of the Sentencing Commission. *Id.* Based upon the facts of an individual case, judges "may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007) (internal quotation marks omitted).

**Historical Background of the United States Sentencing Guidelines and §2B1.1**

1. Creation of the United States Sentencing Commission

From the inception of Article III Courts and lasting for over 200 years, United States District Court judges had unrestrained sentencing discretion, subject only to Congressionally-imposed statutory maximums with no meaningful appellate review. *See* Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993). However, in the early 1970s, Hon. Marvin E. Frankel, S.D.N.Y., began a vociferous campaign for sentencing reform, calling for sentencing courts to be bound by rules and law formulated by an administrative agency in order to avoid sentencing disparities. *Id.* at 228.

Influenced by Judge Frankel's position, Senator Ted Kennedy joined strange bedfellows Senator Strom Thurmond and Senator Joseph Biden to push the "Comprehensive Crime Control

Act" in 1984, which was signed into law by President Reagan, undoing centuries of sentencing jurisprudence. *Id.* at 261 and 266. This omnibus legislation contained the Sentencing Reform Act of 1984. *See*. Pub. L. No. 98-473, tit. II, ch. 2, 98 Stat. 1987.

In the Sentencing Reform Act of 1984, Congress created the United States Sentencing Commission and tasked the Commission to develop guidelines that would not only reconcile various judicial philosophies of punishment (just desserts, deterrence, incapacitation, and rehabilitation), but also promote uniformity and proportionality. *See* 28 U.S.C. § 991(b)(1)(A).

Congress' intent was for the Commission to base the guidelines on empirical data. The Commission was directed to collect average sentences imposed for various offenses to develop a starting point in developing the guidelines. 28 U.S.C. § 994(m). However, the Commission was not bound by these averages. Id.

After collecting this data, the Commission began to recognize a "tension, however, between the mandate of uniformity…and the mandate of proportionality." *See* U.S. Sentencing Guideline Manual § 1A1.3 (1987)[1]. Further, the Commission was also concerned with implementing guidelines under the competing sentencing philosophies of "just desserts" and deterrence. Id. The Commission seemingly compromised by using an empirical approach to resolve practical problems of defining relevant distinctions in sentencing, as well as the philosophical dilemma. Id. at §1A1.4. This empirical approach goes beyond a "starting point" for the initial guidelines, as it represents the philosophical foundation of the Guidelines—balancing its Congressionally mandated objections.

---

[1] Available at www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_1.pdf

Once these initial guidelines were published, the Supreme Court was unsurprisingly called upon to rule on whether Congress violated separation of powers by delegating this rulemaking to the Commission. In *Mistretta v. United States*, 488 U.S. 361 (1989), the Supreme Court placed its blessing on the Commission, calling their work "essentially neutral—and therefore apolitical." *Id.* at 363.

2. The Commission Failed to Use the Empirical Approach in Developing USSG §2B1.1.

While the Commission initially gathered data on past sentencing practices for white-collar cases, the Commission declined to rely upon it when writing §2B1.1.

> Guidelines for most crimes were based on past practices, but important considerations led the Commission to depart from past practices for certain crimes such as fraud and drug trafficking. Some of these considerations were driven by statute…The Commission also sought to correct past under-punishment of crimes, such as "white collar" crimes.

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* at 15 (2004).

Regarding "under-punishment" of white-collar crimes, it seems that Commission abandoned its noteworthy empirical approach because the Commission thought that too many white-collar criminals received probation. "In response, the guidelines were written to reduce the availability of probation and to ensure a short but definite period of confinement for a larger percentage of these 'white collar' cases…" Id. at vii. The Commission, from the outset, intentionally sought to increase punishment for a subset of offenders, despite any empirical evidence that this change would meet the sentencing goals of 18 U.S.C. § 3553(a) or any Congressional directive to increase punishment of white-collar crime. And that is exactly what the Commission did. Under the first

Case 1:18-cr-00011-HSM-CHS   Document 481   Filed 07/09/20   Page 4 of 22   PageID #: 9978

set of guidelines issued, the Commission used a simpler version of §2B1.1. It set a small base

offset level of 4 and contained six special offense characteristics, including a loss table.[2]

§2B1.1. **Larceny, Embezzlement, and Other Forms of Theft**

(a) Base Offense Level: **4**

(b) Specific Offense Characteristics

(1) If the value of the property taken exceeded $100, increase the offense level as follows:

| | Loss | Increase in Level |
|---|---|---|
| (A) | $100 or less | no increase |
| (B) | $101 - $1,000 | add **1** |
| (C) | $1,001 - $2,000 | add **2** |
| (D) | $2,001 - $5,000 | add **3** |
| (E) | $5,001 - $10,000 | add **4** |
| (F) | $10,001 - $20,000 | add **5** |
| (G) | $20,001 - $50,000 | add **6** |
| (H) | $50,001 - $100,000 | add **7** |
| (I) | $100,001 - $200,000 | add **8** |
| (J) | $200,001 - $500,000 | add **9** |
| (K) | $500,001 - $1,000,000 | add **10** |
| (L) | $1,000,001 - $2,000,000 | add **11** |
| (M) | $2,000,001 - $5,000,000 | add **12** |
| (N) | over $5,000,000 | add **13** |

(2) If a firearm, destructive device, or controlled substance was taken, increase by **1** level; but if the resulting offense level is less than **7**, increase to level **7**.

(3) If the theft was from the person of another, increase by **2** levels.

(4) If the offense involved more than minimal planning, increase by **2** levels.

(5) If undelivered United States mail was taken, and the offense level as determined above is less than level **6**, increase to level **6**.

2.15

October, 1987

(6) If the offense involved organized criminal activity, and the offense level as determined above is less than level **14**, increase to level **14**.

---

[2] Accessible at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_A-C.pdf

Under the then-mandatory guidelines, and in the light most favorable to the government, Mr.

Chatfield's offense level would be 19, and his guideline range would be 30-37 months[3]:

## SENTENCING TABLE

### Criminal History Category

| Offense Level | I<br>0 or 1 | II<br>2 or 3 | III<br>4, 5, 6 | IV<br>7, 8, 9 | V<br>10, 11, 12 | VI<br>13 or more |
|---|---|---|---|---|---|---|
| 1 | 0 - 1 | 0 - 2 | 0 - 3 | 0 - 4 | 0 - 5 | 0 - 6 |
| 2 | 0 - 2 | 0 - 3 | 0 - 4 | 0 - 5 | 0 - 6 | 1 - 7 |
| 3 | 0 - 3 | 0 - 4 | 0 - 5 | 0 - 6 | 2 - 8 | 3 - 9 |
| 4 | 0 - 4 | 0 - 5 | 0 - 6 | 2 - 8 | 4 - 10 | 6 - 12 |
| 5 | 0 - 5 | 0 - 6 | 1 - 7 | 4 - 10 | 6 - 12 | 9 - 15 |
| 6 | 0 - 6 | 1 - 7 | 2 - 8 | 6 - 12 | 9 - 15 | 12 - 18 |
| 7 | 1 - 7 | 2 - 8 | 4 - 10 | 8 - 14 | 12 - 18 | 15 - 21 |
| 8 | 2 - 8 | 4 - 10 | 6 - 12 | 10 - 16 | 15 - 21 | 18 - 24 |
| 9 | 4 - 10 | 6 - 12 | 8 - 14 | 12 - 18 | 18 - 24 | 21 - 27 |
| 10 | 6 - 12 | 8 - 14 | 10 - 16 | 15 - 21 | 21 - 27 | 24 - 30 |
| 11 | 8 - 14 | 10 - 16 | 12 - 18 | 18 - 24 | 24 - 30 | 27 - 33 |
| 12 | 10 - 16 | 12 - 18 | 15 - 21 | 21 - 27 | 27 - 33 | 30 - 37 |
| 13 | 12 - 18 | 15 - 21 | 18 - 24 | 24 - 30 | 30 - 37 | 33 - 41 |
| 14 | 15 - 21 | 18 - 24 | 21 - 27 | 27 - 33 | 33 - 41 | 37 - 46 |
| 15 | 18 - 24 | 21 - 27 | 24 - 30 | 30 - 37 | 37 - 46 | 41 - 51 |
| 16 | 21 - 27 | 24 - 30 | 27 - 33 | 33 - 41 | 41 - 51 | 46 - 57 |
| 17 | 24 - 30 | 27 - 33 | 30 - 37 | 37 - 46 | 46 - 57 | 51 - 63 |
| 18 | 27 - 33 | 30 - 37 | 33 - 41 | 41 - 51 | 51 - 63 | 57 - 71 |
| 19 | 30 - 37 | 33 - 41 | 37 - 46 | 46 - 57 | 57 - 71 | 63 - 78 |
| 20 | 33 - 41 | 37 - 46 | 41 - 51 | 51 - 63 | 63 - 78 | 70 - 87 |
| 21 | 37 - 46 | 41 - 51 | 46 - 57 | 57 - 71 | 70 - 87 | 77 - 96 |

3. <u>The Commission's revisions to USSG §2B1.1 have been made with political motives, exacerbating the existing flaws in the guideline.</u>

Since the guidelines were published, the Commission has repeatedly changed §2B1.1, and

each change was made in the absence of any supporting data. First, the Commission responded

to the savings and loan crisis in 1989 by developing a new loss table increasing offenses involving

---

[3] Accessible at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_5.pdf

losses exceeding $40,000 and adding four additional loss categories.[4] The Commission made this change with no empirical support whatsoever. *See* Testimony of James E. Felmon, Esq., on behalf of the American Bar Association before the United States Sentencing Commission for the hearing on Proposed Amendments to the Federal Sentencing Guidelines (March 12, 2015).

This amendment drew heavy criticism, most notably from then-USSC member Michael K. Block:

> The increase in the fraud punishment level was not based on any proven or even any perceived problem with the existing fraud Guideline, nor was it a rationalizing measure; it was imply a 'pure' increase in punishment levels. The stated basis for the 'pure' increase was to 'provide additional deterrence and better reflect the seriousness of the conduct,' but neither analysis nor reasoning showed that this increase in punishment would significantly improve the effectiveness of sentencing.
>
> The actual basis for the increase was recent public and congressional attention to then-current scandals involving defense procurement and insider trading. The Justice Department's ex-officio representative to the Commission argued that recent congressional enactments had given oblique 'signals' to the Commission to increase fraud penalties.
>
> In fact, the two statutes in question said no such thing. Even though this argument obviously was fallacious as a matter of law, and despite the absence of any empirical proof that an increase would improve the effectiveness of sentencing, the amendment was approved by four of the six members of the Commission. By adopting the amendment in these circumstances, the Commission violated the Sentencing Reform Act's principle of conservation of punishment in its most basic form: the Commission prescribed gratuitous punishment, which will impose additional costs on society without providing any proven or even perceived benefit.
>
> …
>
> Perhaps even more disturbing than the result was the process that produced the amendment, which was overtly political and inexpert. The

---

[4] Accessible at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1989/manual-pdf/Chapter_2_A-C.pdf

statutory tools of the Commission were abandoned: current practice analysis indicated a lower level of punishment; impact analysis of the proposed amendment was not performed; and there was no consideration given to measuring the degree to which the proposed increase would be effective in meeting the purposes of sentencing.

The amendment was motivated entirely by political arguments about a supposed public uproar—or at least a media uproar—about the particular types of offenses in question. An elected legislature would be able to evaluate and act upon such arguments, because its members would have to answer their constituents. But an unelected Commission is not competent to do so.

Parker & Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?,* 27 AM. CRIM. L. REV. at 319-20. This criticism from a man responsible for crafting the initial guidelines and these amendments do not inspire confidence in the validity of this guideline.

The Commission continued to increase §2B1.1's ranges for the next 20 years. In 1990, the Commission added a 4-level increase if the offense threatened a financial institution, not based on empirical data, but due to Congress's direction that the Commission should promulgate guidelines that provide for a substantial period of incarceration for this conduct. U.S.S.G. Appendix C, Amendment 317 (1990). In 1997, the Commission added a 2-level increase if the offense involved misappropriating trade secrets because the Commission wanted "to more effectively punish computer-related offenses." U.S.S.G. Appendix C, Amendment 551 (1997). In 1998, the Commission added a 2-level increase if the offense involved theft from a national cemetery, again not based on any empirical reasoning, but based on a congressional directive. U.S.S.G. Appendix C, Amendment 576 (1998).

Most notably, the Commission implemented the economic crimes package in 2001. U.S.S.G. Appendix C, Amendment 617 (2001). The package merged three guidelines (§2B1.1-theft, §2F1.1-fraud, and §2B3.1-property guideline) into §2B1.1. Id. It also increased the base

offense level from 4 to 6, added enhancements based on the number of victims, and included a new loss table that increased the increments between the loss levels from 1 level to 2 levels. The new loss table results in "substantial increases in penalties for moderate and higher loss amounts" in response to DOJ comments that the prior guideline "under-punish[ed] individuals involved with moderate and high loss amounts…" Id.

A short time later after high-profile scandals such as Enron, Congress enacted the Sarbanes-Oxley Act, which directed the Commission to increase the penalties for high-loss economic crimes yet again. *See* Testimony of James E. Felmon, Esq., on behalf of the American Bar Association before the United States Sentencing Commission for the hearing on Proposed Amendments to the Federal Sentencing Guidelines (March 12, 2015). The Commission increased the base offense level from 6 to 7, increased the loss table again, and added additional special offense characteristics. U.S.S.G. Appendix C, Amendment 547, Amendment 653 (2003). However, this "expert" body cited to no empirical evidence, data, or research for any of these decisions.

### The Courts Have Harshly Criticized §2B1.1

Unsurprisingly, courts across the country have rebuked the Commission for its poor promulgation of §2B1.1. Courts have noted that the guideline leads to results that are "patently unreasonable," that the guideline "effectively guarantee[s] that many such sentences would be irrational on their face," that the guideline results in a "range that does not provide realistic guidance," and are "of no help." *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006); *United States v. Gupta*, 904 F. Supp. 2d. 350, 351 (S.D.N.Y. 2012); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (S.D.N.Y. 2008); *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010).

Courts have taken the Commission to task for developing a rule based on politics rather than empirical data and expertise. Judge Rakoff, one of the most vocal critics of the guideline, confirms that a case before him exposed "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp.2 d 512, 510 (S.D.N.Y. 2006)(varying downward, noting that the calculation resulted in "an absurd guideline result"). In a separate case, Judge Rakoff further attacks the fraud guideline: "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the produce of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *United States v. Gupta*, 904 F. Supp. 2d 350, 351 (S.D.N.Y. 2012).

Other courts have departed from the fraud guideline based on the Commission's departure from its mission. "[B]ecause the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them *less deference than it would to empirically grounded Guidelines.*" *United States v. Lenagh*, 2009 U.S. Dist. LEXIS 9226 at *17 (D. Neb. Feb. 6, 2009)(emphasis added); *See United States v. Kimbrough*, 552 U.S. 85, 108-109 (2007).

1. <u>Courts have taken note that the Guideline was purposely drafted to inappropriately deprive first-time white-collar offenders of alternative sentencing, increasing the federal inmate population.</u>

The drastic increase of the federal inmate population is widely regarded as a downfall of the Sentencing Reform Act. "Our federal prison system costs have ballooned because the federal prison population has exploded during the determinate sentencing regime ushered by in by the

Sentencing Reform Act of 1984[].” *United States v. Leitch*, 2013 U.S. Dist. LEXIS 22796 at *6

(E.D.N.Y. Feb. 28, 2013). This is a direct result of the Commission's failure to follow its

Congressional directive and adherence to the data it collected. Judge Gertner writes:

> The Sentencing Reform Act, *28 U.S.C. § 994(j),* directed the Sentencing
> Commission to "insure that the guidelines reflect the general
> appropriateness of imposing a sentence other than imprisonment in cases
> in which the defendant is a first offender who has not been convicted of a
> crime of violence or an otherwise serious offense." Id.
> As I noted in *United States v. Germosen*, *473 F.Supp.2d 221, 227 (D.Mass*
> *2007),* the Commission has not done so. It redefined "serious offense" in a
> way that was entirely inconsistent with prior practice, and not at all based
> on any real data or analysis.

*United States v. Watt*, 707 F. Supp. 2d 149, 158 (D. Mass. 2010). Other courts agree that this

arbitrary decision-making by the Commission has caused serious consequences:

> The Sentencing Commission was supposed to ensure "the general
> appropriateness" of probationary sentences for first-time offenders unless
> they commit "crime[s] of violence or…otherwise serious offense[s]."
> Instead, it unilaterally declared in 1987 that every theft, tax evasion,
> antitrust, insider trading, fraud, and embezzlement case is "otherwise
> serious," and thus no more eligible for a sentence of probation, even when
> committed by a first-time offender, than would a crime of violence."

*United States v. Leitch*, 2013 U.S. Dist. LEXIS 22796 at *9 (E.D.N.Y. Feb. 28, 2013); *See United*

*States v. Herink*, 2012 U.S. Dist. LEXIS 105549 at *19 (D. Neb. July 30, 2012) (quoting from the

Commission's Fifteen Year Assessment, Executive Summary, "The use of imprisonment for

economic offenders also has increased steadily throughout the guidelines era."). "It was clear

that the Commission's decisions led to a far higher incarceration rate for non-violent first

offenders than had been the pattern pre-Guidelines." *United States v. Watt*, 707 F.Supp.2d 149,

158 (D. Mass. 2010).

Now, the Sentencing Commission's terrible decisions in rulemaking (combined with the oft-derided mandatory minimum sentencing in drug cases and the Commission's similarly-criticized decisions to increase penalties for drug offenses based solely on quantities) has especially tragic consequences—beyond just the injustices it has imposed—due to the COVID-19 pandemic. As of July 9, 2020, 7,690 federal inmates have tested positive for COVID-19, and 94 inmates are dead[5]. Why are these numbers so large? In part, because "there is a substantial segment of our prison population that need not have been sent to prison at all[.]" *United States v. Leitch*, 2013 U.S. Dist. LEXIS 22796 at *9 (E.D.N.Y. Feb. 28, 2013)(advocating for the importance and effectiveness of alternative sentencing).

While prisons are overcrowded and while courts' dockets are filled with motions for compassionate release, now is not the time to follow erroneously-developed guidelines to hand out a draconian punishment to first-time, non-violent offender Michael Chatfield when the factors contained in 18 U.S.C. § 3553(a) are satisfied with a sentence of home confinement.

2. The Guidelines wrongly assign excessive weight to loss amounts.

The most-often levied criticism involves the importance the guideline places on loss amount. See *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)("The Guidelines place undue weight on the amount of fraud."). Inappropriately high guideline calculations are typically driven by

> the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss. As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics

---

[5] Accessible at: https://www.bop.gov/coronavirus/

cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.

*United States v. Adelson*, 441 F. Supp. 2d 512, 509 (S.D.N.Y. 2006). Then-District Judge Hon.

Gerard E. Lynch (now Senior Circuit Judge for the Second Circuit) attempted to explain the undue

weight placed on loss amounts as:

> attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

*United States v. Emmenegger,* 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).

Courts have noted that the Commission has used loss amount as "a proxy for evaluating

culpability" which is sometimes inappropriate and "not always reliable." *United States v. Watt*,

707 F. Supp. 2d 149, 155 (D. Mass. 2010); *United States v. Lenagh*, 2009 U.S. Dist. LEXIS 9226 at

*18 (D. Neb. Feb. 6, 2009). The greater the amount of loss, the more irrational the guidelines can

become. *United States v. Herink*, 2012 U.S. Dist. LEXIS 105549 at *19 (D. Neb. July 30,

2012)("When losses amount to millions of dollars, the Guidelines' graduated system of increasing

culpability aligned with increasing loss is especially skewed.").

   3. <u>Courts have found that the Guidelines do not comport with the requirements of the 18
      U.S.C. § 1355(a) factors.</u>

Loss amount alone cannot reasonably calculate a just sentence. "[I]ssues concerning the

blameworthiness of a defendant found guilty of fraud are more complex than simply measuring

the amount of loss." *United States v. Mueffelman*, 400 F. Supp. 2d 368, 378 (D. Mass 2005). By

focusing exclusively on loss amount, the Commission failed in following the statutory

requirements of 18 U.S.C. § 3553(a). "By making a Guidelines sentence turn, for all practical

purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account…and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d. 349, 351 (S.D.N.Y. 2012).

> [The Guidelines] err in giving virtually no weight to the "history and characteristics of the defendant" which Congress instructs the sentencing courts to consider equally with "the nature and circumstances of the offense." *18 U.S.C. § 3553(a)(1)*. No factor in the offense-level calculation addresses these characteristics, and the sentence computation as a whole takes into account only the defendant's history of convictions, not the full scope of the offender's "history and characteristics." In this case, a fact-sensitive assessment of the need "to protect the public from further crimes of the defendant," one of the factors that Congress has instructed the courts to consider, *18 U.S.C. § 3553(a)(2)(C)*, is conspicuously absent from the Guidelines.

*United States v. Emmenegger*, 329 F.Supp.2d 416, 428 (S.D.N.Y. 2004).

In the "superfluous" set of specific offense characteristics, the Commission has yet again failed to moor its Guideline to empirical data. *See* Testimony of James E. Felmon, Esq., on behalf of the American Bar Association before the United States Sentencing Commission for the hearing on Proposed Amendments to the Federal Sentencing Guidelines (March 12, 2015). Judge Rakoff has given weight to academic literature that explains the arbitrary nature of the guideline, "the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *United States v. Adelson*, 441 F.Supp.2d 506, 510 (S.D.N.Y. 2006) (quoting Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)).

**The ABA Proposed a New §2B1.1**

In light of heavy criticisms, the ABA lobbied the Commission to replace the maligned §2B1.1. Recognizing that the flawed guideline was resulting in the sentencing inequities that the guidelines were created to prevent, the ABA drafted a proposal that would actually be valid under 18 U.S.C. § 3553(a) factors and follow the Congressional mandates the Commission was charged with. *See* Testimony of James E. Felmon, Esq., on behalf of the American Bar Association before the United States Sentencing Commission for the hearing on Proposed Amendments to the Federal Sentencing Guidelines (March 12, 2015). It was important to have a proposal that sentencing courts would actually have faith in and find useful. "It is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).

The ABA's Task Force that developed their proposed guideline included the authors of some of the previously cited cases in this memorandum which so heavily criticized the fraud guideline, including Hon. Jed Rakoff, DJ, S.D.N.Y., Hon. John Gleeson, DJ, E.D.N.Y., and Hon. Gerard Lynch, CJ, 2nd Cir. *See* Am. Bar Ass'n, *A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes* (2014), p. 8 (Exhibit C)(hereinafter referred to as "ABA Report").

While the Commission declined to adopt the proposal, the report resulted in what some courts call "shadow guidelines." *United States v. Bayfield*, 796 Fed. Appx. 19, 22 (2nd Cir. 2019).

1. <u>Michael Chatfield's Sentence Under the ABA Proposal</u>

If calculated under the ABA's proposed guideline, Mr. Chatfield's guideline range would be significantly lower. Mr. Chatfield's exact guideline range under the proposal cannot be precisely

calculated because the offense levels in the draft "have been placed in brackets to indicate their tentative nature" and in some instances, the task force "bracketed a range of levels."

Mr. Chatfield has objected to the PSI Report in many instances. However, without waiving any of these objections, the guidelines would be calculated as follows, based on the PSI Report:

(a) Base Offense Level                                      [6-8]

(b) Specific Offense Characteristics

    (1) Loss

        (E) More than $10,000,000            add [12]

(2) Culpability

    (B) Low culpability                                subtract [3-5]

(3) Victim Impact

    (A) Minimal or none                              no increase

(7) Federal health care offense with loss      add 2
    more than $1,000,000

Under this calculation, Mr. Chatfield's offense level would be between 15 and 19 with guideline ranges from 18-24 months and 30-37 months. If Mr. Chatfield's objection to the loss amount is granted then the specific offense characteristic would be decreased by two levels—with a 12-18 month guideline range potentially resulting.

The proposed guideline would more appropriately take into account Mr. Chatfield's culpability. In comparison to others in the scheme, Mr. Chatfield has lesser culpability than the large pharmacies that profited handsomely and avoided prosecution, as well as less culpability than the lead defendant. *See* ABA Report, Application Note 2 ("The end result of the court's analysis should be a culpability level that 'ranks' the defendant in the hierarchy of five levels of

culpability for all defendants sentenced under this guideline"). The guideline assigns the highest level of culpability to "predatory" motives—which was not the case with any of these defendants. Id. Application Note 2(A)(1). Mr. Chatfield's culpability level lands most squarely within the "Gatekeeping" description, which is an offense "intended generally to prevent practices that create potential loss or a risk of loss. Examples include billing Medicare for medically necessary goods and services that are actually provided without the appropriate third-party verification of medical necessity. Such offenses are generally at the lower level of culpability under this factor." Id. Application Note 2(A)(4). Additionally, Mr. Chatfield's gain is not equivalent to the loss amount to the health insurance companies. "Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is less than the loss, this ordinarily indicates a lesser degree of culpability…" Id. Application Note 2(B)(2). However, Mr. Chatfield's duration in the scheme for approximately nine months would prevent him from being at the lowest level of culpability. Id. Application Note 2(D).

The level of victim impact is also based upon the application notes. In this instance, the victims are health insurance companies and Tricare whose financial soundness was not impacted by Mr. Chatfield's conduct. "It is assumed that in most offenses involving an institutional victim, the impact is measured principally by the amount of the loss such that no additional victim impact adjustment would ordinarily be appropriate in the absence of the failure or bankruptcy of the institution." Id. Application Note 3(B).

However, this Court may find under the ABA's proposed guideline that Mr. Chatfield, a first-time offender, did not commit "otherwise serious" conduct. In that instance, the proposed

guideline would cap the offense level at 10, which is a guideline range of 6-12 months and Mr.

Chatfield would be eligible for a probationary sentence.

> Factors to be considered in determining whether the offense is one for which a sentence of probation is appropriate including the following: the amount of the loss; whether loss was intended at the outset of the offense conduct; whether the defendant's gain from the offense is less than the loss; whether the defendant's offense conduct lacked sophistication (including whether it was committed in a routine manner or without the involvement of a large number of participants); whether the defendant acted under duress or coercion; the duration of the offense conduct and the defendant's participation in it; whether the defendant voluntarily ceased the offense conduct before it was detected; and the nature of the victim impact caused by the offense.

Id. Application Note 4.

While the amount of loss and the duration of the offense weigh against Mr. Chatfield,

many of the other factors weigh in his favor. Mr. Chatfield did not intend at the outset of the

conduct to commit fraud, the PSI Report has already concluded against adding an enhancement

for sophistication, he withdrew months before any of the other defendants—including George

Striker—and the victim impact was not significant. Therefore, under the ABA's proposal, Mr.

Chatfield would be an appropriate candidate for alternative sentencing.

**In the absence of appropriate guidance from the Commission, this Court should rely on 18 U.S.C. § 3553(a) to sentence Mr. Chatfield to a period of home confinement.**

The Court "may not presume that the guidelines range is reasonable," but must "make an

individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50

(2007). In fact, in this instance, this Court should find the opposite—that the guideline range is

unreasonable.

> [I]t is obvious that sentencing is the most sensitive, and difficult task that any judge is called upon to undertake. Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in

fashioning a sentence that is fair, just, and reasonable. But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a) as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.

*United States v. Adelson*, 441 F. Supp. 2d 512, 515 (S.D.N.Y. 2006).

Even the ABA proposal—though undoubtedly fairer and more appropriately attuned the sentencing factors in § 3553(a)—are only so useful and suffer from some of the same flaws as the Commission's guidelines. Primarily, the proposal also fails to account for any empirical data. See ABA Report, p. 9 ("We have performed no research and have no empirical basis for the levels we assigned in the draft."). This Court is "no more bound by a hypothetical set of guidelines issued by proponents of changes in the law than it [is] by the actual Guidelines promulgated by the Sentencing Commission." *United States v. Rivernider*, 828 F.3d 91, 114 (2nd Cir. 2016).

When the Guidelines cannot be reasonably applied, there is only one option left: This Court must "turn[] to the bedrock of all federal sentencing, section 3553(a) of Title 18, entitled, 'Factors to be considered in imposing a sentence." *United States v. Gupta*, 904 F. Supp. 2d 350, 353 (S.D.N.Y. 2012). Of course, the first factor to be considered includes the offense conduct and history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). This factor has been thoroughly discussed in the previously filed memorandum and letters of support.

The second factor includes the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide for just punishment; afford adequate deterrence; and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2).

Relating to this factor, Mr. Chatfield's case bears a few similarities with the defendant in the *Emmenegger* case. Mr. Chatfield and Mr. Emmenegger were both charged as young men who

were inexperienced in their field. Mr. Chatfield is presently 30 years old, and this case is the only blemish on his record. He participated in the marketing of prescription medication, which he had no experience and received no training. "The defendant's relative youth and inexperience reinforce this low likelihood of criminality. Emmenegger is young with respect to his exposure to the business world, yet relatively old for a first-time offender. He is old enough to have a meaningful record of previous good behavior, but young enough to be given a second chance." *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004).

Additionally, this case arose from a unique circumstance in changes in how PBMs allowed pharmacies to bill compounded medications. This loophole in billing has been firmly closed. Therefore, there is less need to generally deter this conduct or specifically deter Mr. Chatfield. "Fair consideration of that factor indicates that there is less need for incarceration to protect the public from future crimes committed by this defendant than is typical in cases of theft. This conclusion is not based merely on Emmenegger's status as a first offender, which the Guidelines take into account, or on a prediction of his future good behavior. Unlike defendants whose crimes require no special skill or position, Emmenegger yielded to a temptation and committed a crime particularly adapted to his chosen career. That career is over, and his potential to commit this particular type of crime has been eliminated." *Id.* The same is true for Mr. Chatfield. He is no longer involved in marketing healthcare products and cannot be involved in marketing the same types of medications anymore as compounding pharmacies are no longer motivated by high reimbursement rates.

Finally, this Court should give further consideration—as the Commission did not—to the likelihood of recidivism. Imprisonment of first-time offenders is not required to deter further

misconduct. "The Sentencing Commission's report, Recidivism and 'First Offender' (May 2004),…suggests that individuals—like Watt—with zero criminal history points are less likely to recidivate than all other offenders." *United States v. Watt*, 707 F.Supp.2d 149, 158 (D. Mass. 2010). Mr. Chatfield has zero criminal history points. As discussed more thoroughly in his previously filed memorandum, this Court can have confidence that Mr. Chatfield will not recidivate.

### Conclusion

At the upcoming sentencing hearing, Mr. Chatfield will continue to object to the loss amount as calculated by the probation office. He will do this not only because the record that underlies his sentencing should be accurate, but also because loss amount is the single most important factor in determining his guideline range. Yet, that guideline range completely fails to account for the 3553(a) factors to advise this Court of a "heartland" where Mr. Chatfield's sentence should fit. This is due to the Commission's abdication of its purpose to use expertise and data to develop an appropriate fraud guideline. In the absence of reasonable guidance, this Court must do what courts did for two hundred years before the promulgation of the guidelines— use good, common sense to craft a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing. In this case, the Court should consider Michael Chatfield—a young father who has spent his life showing kindness to others but, in youthful immaturity, was seduced by a "get rich quick" scheme—set against a background of a global pandemic and the now-realized consequences of too-harsh sentencing guidelines should be sentenced to a period of home confinement followed by supervised release.

Respectfully submitted, this 9th day of July, 2020.

*s/ David M. Eldridge*

DAVID M. ELDRIDGE (BPR # 012408)
ELDRIDGE & BLAKNEY, P.C.
The Cherokee Building
400 West Church Avenue, Suite 101
Knoxville, Tennessee 37902
(865) 544-2010
*deldridge@eblaw.us*

*s/ Zachary R. Walden*

ZACHARY R. WALDEN (BPR #035376)
ELDRIDGE & BLAKNEY, P.C.
The Cherokee Building
400 West Church Avenue, Suite 101
Knoxville, Tennessee 37902
(865) 544-2010
*zwalden@eblaw.us*

*Attorneys for Michael Chatfield*