

# A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes

*Final Draft*

*November 10, 2014*

- The views stated in this submission are presented on behalf of the Criminal Justice Section. The report has not been approved by the House of Delegates or the Board of Governors of the American Bar Association and therefore may not be construed as representing the policy of the American Bar Association.

**The American Bar Association Criminal Justice Section**
**1050 Connecticut Avenue, NW, Washington, DC 20036**
**202-662-1500 • crimjustice@americanbar.org**
**www.americanbar.org/crimjust**

## Economic Offenses

(a) **Base Offense Level**: [6-8]

(b) **Specific Offense Characteristics**

    (1) **Loss**. If the loss exceeded $20,000, increase the offense level as follows:

        (A) More than $20,000      add [4]
        (B) More than $100,000      add [6]
        (C) More than $1,000,000      add [8]
        (D) More than $5,000,000      add [10]
        (E) More than $10,000,000      add [12]
        (F) More than $50,000,000      add [14]

    (2) **Culpability**

        (A) Lowest culpability      subtract [6-10]
        (B) Low culpability      subtract [3-5]
        (C) Moderate culpability      no change
        (D) High culpability      add [3-5]
        (E) Highest culpability      add [6-10]

    (3) **Victim Impact**

        (A) Minimal or none      no increase
        (B) Low      add [2]
        (C) Moderate      add [4]
        (D) High      add [6]

(c) **Special Offense Considerations**

For offenses of a kind specified in Section 2B1.1(b)(3) through (9), (11) through (14), or (16) through (18), the court should consider those offense characteristics to the extent they are appropriate in determining culpability or victim impact. Where the offense presents a special concern of the kind intended to be addressed by these subsections, and where the concern has not been addressed in determining the offense level, increase by 2 offense levels. [incorporate specific Congressional directives].

(d) **Offense level cap of 10 for non-serious offenses by first offenders**

If the defendant has zero criminal history points under Chapter 4 and the offense was not "otherwise serious" within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate.

*Application Notes*:

1. *Loss*:

    [To be incorporated from current 2B1.1 with the modification that loss means actual loss].

2. *Culpability*:

    *Consideration of the various culpability factors*

    The guideline has 5 levels of culpability that range from lowest to highest. The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense and the defendant's participation in it; extenuating circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others; and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The list is not exclusive. Other factors may also bear on the culpability level.

    Because of the nature and number of these culpability factors, as well as the almost limitless variety of possible combinations, there is no workable formula for assigning values to each individual factor. Rather than assign a numeric score to each individual culpability factor, the court instead arrives at one of five culpability levels after considering the combined effect of all culpability factors. The weight that each particular culpability factor plays in a given case will vary. In some cases, the defendant's motive will be the factor most indicative of the defendant's culpability. In other cases, extenuating circumstances will play the most prominent role. Also, these various factors will often overlap. A less culpable motive, or a less culpable nature of the offense, will sometimes be evident in the extenuating circumstances that prompted the defendant to commit the offense.

    The end result of the court's analysis should be a culpability level that "ranks" the defendant in the hierarchy of five levels of culpability for all defendants sentenced under this guideline. By definition, all defendants sentenced under the guideline are to some degree "culpable." The court should not be reluctant to find a mitigating culpability value out of concern that it will signal a lack of opprobrium for the offense – the point of the analysis is to accomplish proportionality by meting out sentences that are sufficient but not greater than necessary to accomplish the purposes of sentencing in the light of each defendant's culpability when compared with all

1

other defendants sentenced under this guideline.

As a way of assisting the court in making the culpability assessment, it is anticipated that the middle culpability category – "moderate culpability" – would account for the largest number of defendants sentenced under the guideline. A defendant seeking an assessment of "low" or "lowest" culpability bears the burden of proof to establish this, while the government bears the burden to prove either "high" or "highest" culpability.

In assigning a culpability level, the court should be careful not to "double count" the amount of loss or the victim impact, each of which is a separate specific offense characteristic. Although in some circumstances there may be overlapping considerations bearing on each factor, loss, culpability, and victim impact are each intellectually distinct concepts warranting individualized assessment. Thus, a high loss or significant victim impact may result from conduct reflecting mitigated culpability by some or even all of the criminally responsible participants. Conversely some cases may present aggravated culpability resulting in more limited loss or victim impact.

There is also overlap between the considerations that inform the defendant's level of culpability and those that bear on the defendant's role in the offense as determined under Chapter Three. Nevertheless, as with the relationship of culpability to loss and victim impact, role in the offense is also intellectually distinct from culpability and requires separate inquiry. Where it is necessary for the court to weigh the same considerations governing role in the offense in its assessment of culpability, this may in some circumstances require a sentence outside the range resulting from a cumulative application of the culpability and role adjustments.

The court should also recognize that this guideline is intended to address *offense* characteristics. The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a). Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

(A)     *Motive/Nature of Offense*

One factor in the culpability level is the defendant's motive or the nature of the offense. The following examples occur frequently in cases sentenced under this guideline.

>   (1)     *Predatory* – These offenses are intended to inflict loss for the sole or dominant purpose of generating personal gain to the defendant or to others involved in the criminal undertaking. These offenses – accompanied by no legitimate purpose – are among the most culpable types of offenses sentenced under this guideline.

2

(2) *Legitimate ab initio* – These offenses often arise from otherwise legitimate efforts that have crossed over into criminality as a result of unexpected difficulties. Even though such offenses may be intended to cause loss for the purpose of generating personal gain to the defendant or to others involved in the criminal undertaking, they rank lower on the culpability scale than predatory offenses.

(3) *Risk shifting* – These offenses are not specifically intended to cause loss. Instead, they shift the risk of any potential loss from the defendant (or from others involved in the criminal undertaking) to a third party, such as the victim of the offense. Examples include false statements for the purpose of obtaining a bank loan that is intended to be repaid. Such offenses are generally less culpable than those where loss is specifically intended.

(4) *Gatekeeping* – These offenses are not specifically intended to cause loss or even to shift the risk of loss. Instead, they violate so-called "gatekeeping" requirements intended generally to prevent practices that create potential loss or a risk of loss. Examples include billing Medicare for medically necessary goods and services that are actually provided without the appropriate third-party verification of medical necessity. Such offenses are generally at the lower level of culpability under this factor.

There may be cases where the nature of the offense fits more than one of these descriptions. And there may be cases for which none of these categories is appropriate. Whether or not these descriptions fit a particular case, the court should take them into account when considering how the defendant's motive (including the nature of the offense) compares, for culpability purposes, to that of other defendants sentenced under this guideline whose offenses match these descriptions.

(B) *Gain*

Another culpability factor is the gain to the defendant or to others involved in the criminal undertaking.

(1) *Commensurate with loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is roughly commensurate with the loss, this ordinarily indicates a higher degree of culpability.

3

(2) *Less than loss* – Where the defendant and others involved in the criminal undertaking derive a gain from the offense in an amount that is less than the loss, this ordinarily indicates a lesser degree of culpability than (1).

(3) *Minimal or Zero* – Where the defendant and others involved in the criminal undertaking derive little or no gain from the offense, this ordinarily indicates a lesser degree of culpability than (2).

The extent to which the defendant *personally* gained may also be relevant to the culpability level. For example, an accountant convicted for participation in a securities fraud scheme would be less culpable (on the factor of gain) than an officer of the company who personally gained more than the accountant. Also, a small amount of gain in relation to the loss may not always mean a lower level of culpability. For example, a defendant who intentionally inflicts a large loss on others for the purpose of achieving a small gain would be more culpable with respect to the gain factor than someone who did not intend the loss. The degree of culpability in this example varies depending on the extent to which the loss was foreseeable to the defendant.

(C) *Degree of sophistication/organization*

Criminal undertakings involving a high degree of sophistication and/or organization generally reflect a greater threat of harm and a higher level of culpability. The reverse is also true – where the offense is executed in a simple manner without the involvement of large numbers of participants, this generally reflects a lesser threat of harm and a lower level of culpability. The court should also consider the extent of the defendant's contribution to the offense's sophistication or organization. A defendant with less responsibility for the offense's sophistication or organization would be less culpable, all other things being equal, than one with greater responsibility for these characteristics.

(D) *Duration*

As with sophistication and organization, the duration of the offense and the defendant's participation in it also frequently reflects differences in culpability. Criminal undertakings that extend over several months or longer suggest a greater degree of culpability, while those that occur in a single event or over a shorter period of time in many circumstances reflect a lower level of culpability.

(E)     *Extenuating circumstances*

Some defendants will commit an offense in response to various circumstances, such as coercion or duress. There are many extenuating circumstances that could contribute to the commission of an offense, and the extent of their contribution will also vary from case to case. A defendant's culpability will be affected by the nature of these extenuating circumstances and the extent to which they played a part in the commission of the offense.

(F)     *Efforts to mitigate harm, including voluntary cessation, self-reporting, or restitution*

A defendant will sometimes take steps that help mitigate the harm or otherwise reflect a lower level of culpability. Where the defendant voluntarily ceases the offense conduct prior to its detection, this generally indicates a decreased level of culpability. Self-reporting of the offense is also a sign of lower culpability, as is voluntary restitution. In considering the significance of restitution, care must be taken not to punish a defendant more severely as a result of a lack of financial resources.

The court may consider a defendant's cessation of criminal conduct even if it does not qualify as a legal defense to conviction for conduct that occurred after the defendant's involvement ceased. For example, the court may consider the fact that a defendant ceased taking part in a conspiracy even though the legal standard for withdrawing from the conspiracy was not met.

3.     *Victim Impact*:

The guideline has four levels of victim impact: (1) minimal or none; (2) low; (3) moderate; and (4) high. As with the culpability levels, there are many factors to consider in arriving at the appropriate level of victim impact. The court should consider how the combination of these factors places the defendant's offense in comparison to victim impact in other cases under this guideline. The court should also be cognizant that the amount of the victim(s)' loss is already accounted for and should not be counted again in the context of victim impact. An additional score for victim impact is appropriate only where there is a harm beyond that inherent in the amount of the loss.

(A)     *Vulnerability of victims*

Where victims are identified and targeted because some particular vulnerability they suffer, this may indicate a higher degree of victim impact (and/or culpability). The court should be careful not to "double count" the vulnerability of the victims in assessing culpability, victim impact, and the special adjustment in Chapter Three for vulnerable victims, 3A1.1(b). Nevertheless, there may be some circumstances in

5

which the vulnerability of victims results in a peculiar degree of impact, particularly where that impact was foreseeable to the defendant, that would warrant an increase in the victim impact adjustment as well as an enhancement for vulnerable victim in Chapter Three.

    (B)    *Significance of loss*

Where the victim suffers losses that threaten the victim's financial soundness, this generally indicates a higher degree of victim impact. This may be more common where the victims are individual as opposed to institutional. It is assumed that in most offenses involving an institutional victim, the impact is measured principally by the amount of the loss such that no additional victim impact adjustment would ordinarily be appropriate in the absence of the failure or bankruptcy of the institution.

    (C)    *Other non-economic harm*

Where the victim has suffered a significant non-economic harm, this may not be captured in the loss adjustment, and thus the guideline may understate the seriousness of the offense under some circumstances in the absence of an upward adjustment reflecting victim impact.

    (D)    *Victim inducement of offense*

In some circumstances the victim has contributed to the offense in some manner. This may include inducing the commission of the offense or some lesser degree of conduct. Under such circumstances it may be appropriate to partially discount the impact on the victim as a measure of offense severity.

4.    <u>*Offense level cap for offenses that are not "otherwise serious"*</u>:

The Sentencing Reform Act provides as follows: "The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…." 28 U.S.C. § 994(j). Many of the offenses falling within this guideline are not "otherwise serious."

In determining whether an offense is not "otherwise serious," the court should consider (1) the offense as a whole, and (2) the defendant's individual contribution to the offense. For example, a low level employee who is peripherally involved in what would be an "otherwise serious" offense as to other defendants may nevertheless qualify for this offense level cap.

Factors to be considered in determining whether the offense is one for which a sentence of probation is appropriate include the following: the amount of the loss; whether loss was intended at the outset of the offense conduct; whether the defendant's gain from the offense is less than the loss; whether the defendant's

6

offense conduct lacked sophistication (including whether it was committed in a routine manner or without the involvement of a large number of participants); whether the defendant acted under duress or coercion; the duration of the offense conduct and the defendant's participation in it; whether the defendant voluntarily ceased the offense conduct before it was detected; and the nature of the victim impact caused by the offense. Where the defendant has no criminal history points, and where the circumstances of the offense support a finding that the offense was not "otherwise serious," the offense level under this guideline shall be no greater than 10, and a sentence other than imprisonment is generally appropriate.

# Reporter's Notes

**A.   Members of the Task Force and Principles of Consensus.**

In April 2013 the Criminal Justice Section of the American Bar Association assembled this Task Force to evaluate the reforms needed in the sentencing of federal economic crimes and to draft a proposed federal sentencing guideline to effectuate those reforms. The Task Force consists of five professors, three judges, six practitioners, two organizational representatives, and observers from the Department of Justice and the Federal Defenders:

- Stephen Saltzburg (Chair)
  Professor of Law, George Washington
  University School of Law

- James E. Felman, Esquire (Reporter)
  Kynes, Markman & Felman, P.A.

- Sara Sun Beale
  Professor of Law
  Duke University School of Law

- Barry Boss, Esquire
  Cozen O'Connor

- David Debold, Esquire
  Gibson Dunn & Crutcher

- The Honorable Nancy Gertner
  Professor of Law
  Harvard Law School

- The Honorable John Gleeson
  United States District Court
  Eastern District of New York

- A. J. Kramer (Observer)
  Federal Defender
  District of Columbia

- Gary Lincenberg, Esquire
  Bird, Marella, Boxor, Wolpert,
  Nessim, Brooks & Lincenberg

- The Honorable Gerard Lynch
  United States Court of Appeals
  for the Second Circuit

- Jane Anne Murray
  Practitioner in Residence
  University of Minnesota Law School

- Kyle O'Dowd, Esquire
  Associate Executive Director for Policy
  National Association of Criminal
  Defense Lawyers

- Marjorie J. Peerce, Esquire
  Ballard, Spahr, Stillman
  & Friedman, P.C.

- Mary Price, Esquire
  Vice President and General Counsel
  Families Against Mandatory Minimums

- The Honorable Jed Rakoff
  United States District Court
  Southern District of New York

- Neal Sonnett, Esquire
  Neal R. Sonnett, P.A.

- Kate Stith
  Professor of Law
  Yale Law School

- The Honorable Jonathan Wroblewski
  (Observer)
  Director, Office of Policy and
  Legislation
  United States Department of Justice

8

After a number of meetings and telephone conferences, the group arrived at a consensus proposal subject to a number of important caveats. These caveats are an essential aspect of the proposal to avoid misunderstanding its nature and scope.

First, we feel more strongly about the structure of the proposal than we do about the specific offense levels we have assigned. We assigned offense levels in the draft because we think it is helpful in understanding the structure, but the levels have been placed in brackets to indicate their tentative nature. Indeed, in some instances we have bracketed a range of levels, although as noted below in the discussion of the "Twenty-Five Percent Rule" we recognize that a final guideline likely could not include such a range. We have performed no research and have no empirical basis for the levels we assigned in the draft.

We have applied the proposal to an array of specific case scenarios, and this exercise was very helpful to us on a number of levels. We were reassured about the structure of the proposal – we felt the proposal captured the offense characteristics most relevant to sentencing, and it placed appropriate weight on the considerations of loss, culpability, and victim impact in relation to one another. We also felt that the proposal is sufficiently clear and specific that it leads to reasonably uniform application. Although the culpability and victim impact considerations do not lend themselves to exact quantification in the same way as measuring the amount of loss, we were able to reach consensus on the application of the proposal to the scenarios without undue difficulty or disparity. Most us were comfortable with the range of outcomes that result from the levels assigned in the draft, but it should be understood that we devoted the bulk of our efforts to structural improvements and less time to issues of optimal punishment severity, in part out of a recognition that there are inherently political components to such judgments.

Second, we discussed but did not fully resolve the question of whether certain categories or types of offenses should be sentenced under a separate guideline in light of the very wide array of offenses sentenced under this guideline. We believe, in particular, that certain types of securities offenses where changes in the value of market capitalization drive the loss calculation may be especially suited for consideration under a separate guideline.

Third, the proposal is submitted as a consensus product in accordance with the following limiting principles:

1. It is assumed that, for the foreseeable future, the current structural framework dictated by statute will remain in place, including the 25% rule (28 U.S.C. § 994(b)(2)), and that the Commission therefore will still find it necessary to assign fairly specific numeric values to sentencing considerations. The draft proposal is written to comply with that assumed structural framework, although it should be noted that the American Bar Association supports the repeal of the 25% rule. ABA Justice Kennedy Commission, Reports with Recommendations to the ABA House of Delegates (August 2004), http://www.abanet.org/crimjust/kennedy/Justice KennedyCommission ReportsFinal.pdf).

2. This structural framework (both the 25% rule and the guidelines' overly arithmetic approach) is not ideal because it can be unduly rigid and lead to the arbitrary

9

assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

3. A better structural framework would (a) place less emphasis on arithmetic calculations and those few sentencing considerations that lend themselves to exact quantification; and (b) allocate greater sentencing authority to the judiciary.

4. The Task Force is not necessarily of one mind regarding the ideal allocation of sentencing authority between the Congress, the Sentencing Commission, the Judiciary, and the Executive Branch, but it was not deemed necessary to achieve consensus on this point as this proposal is premised on the assumption that the current structural framework will remain in place.

**B.     Intent of the Proposal Within the Existing Guidelines Structure**

The proposal is intended as a free-standing substitution in the Guidelines Manual for the existing Guideline Section 2B1.1. There are two aspects of this substitution that bear particular emphasis.

First, we understand that Subsection (c) of the proposed guideline regarding Specific Offense Characteristics ("SOCs") would need to be tailored to comply with specific Congressional directives to the Sentencing Commission. Many of these directives are open-ended, and require only that the Commission "consider" amending the guidelines as necessary in light of specific legislation. We believe our proposal accommodates those directives by instructing the court to apply the SOCs in the existing guideline that resulted from such directives where the offense presents a special concern of the kind intended to be addressed by these SOCs, and where that concern has not otherwise been addressed in determining the offense level under the guideline. But we also recognize that there have been a handful of Congressional directives that required specific amendments to the guideline. An example of such a specific directive is that contained in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10606, 124 Stat. 119, 1006 (2010), which directed new offense level increases for higher loss frauds involving government health care programs. Our proposal would need to be conformed to these specific directives if adopted by the Sentencing Commission.

Second, the proposal, like all provisions of Chapter Two of the Guidelines, is intended to deal solely with *offense* characteristics. The court should continue to consider *offender* characteristics at sentencing in accordance with 18 U.S.C. § 3553(a). Although aspects of offender characteristics may overlap with culpability considerations, these are intellectually distinct concepts requiring separate consideration.

## C. Compliance with the "Twenty-Five Percent" Rule

Title 28 U.S.C. § 994(b)(2) provides: "If a sentence specified by the guidelines includes a term of imprisonment, the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment." Early in the life of the Sentencing Commission, it decided to construe this statutory limitation to apply not only to the final sentencing range resulting from the guidelines computation, but also to each adjustment along the route of that computation. While this construction of the statute does not appear to be compelled by its terms, our proposal is drafted on the assumption that the Commission will not revisit this question. Accordingly, we recognize that adoption of our proposal would require the Commission to select a specific numeric value for the base offense level and each of the culpability categories. As noted above, we elected to include a range of possible values in our proposal to illustrate the range of possible outcomes under it, depending on the levels ultimately selected by the Commission. We are confident, however, that if a specific value is inserted for the base offense level and each of the culpability levels, our proposal would then comply with the statute. We have heard some outside comment that because the culpability consideration groups together a wide array of factors and thus results in such a wide array of ultimate offense level outcomes, this renders the proposal violative of the statute. We do not agree with this view, and find support for our position in the observation that role in the offense also groups together a wide array of potential considerations and can result in an eight-level swing in the range resulting from those considerations. *See* U.S.S.G. §§ 3B1.1, 1.2.

## D. Case Scenarios

These scenarios are intended to illustrate application of the proposal and the manner in which it might diverge from the current guideline. They are intended as a rough illustration of how the proposal would operate based on a very general level of detail. A much wider array of facts would frequently be relevant to a court's consideration of an appropriate sentence. Also, the scenarios do not include information regarding the history or characteristics of the offender under the assumption that these very important sentencing factors will be considered by the court in fashioning a reasonable sentence pursuant to 18 U.S.C. § 3553(a). Finally, the scoring of the scenarios continues to utilize a range of offense levels for the base and culpability factors, but we recognize that adoption of the proposal would require the selection of a specific numeric value for these factors in accordance with the "twenty-five percent" rule in 28 U.S.C. § 994(b)(2).

11

## Case Scenario 1

The defendant was an organizer and leader of a fraudulent "lottery" scheme in which elderly persons were identified and contacted by telephone, advised that they had won a lottery award, and told that to obtain the award they must first pay advance fees to cover matters such as taxes, insurance, bonding, or other matters. After the victims submitted the requested fees, they were advised to expect the delivery of their winnings via armored car to their homes at specific dates and times. When the armored car did not arrive, the victims' efforts to contact those to whom they had remitted the fees were not successful. The scheme victimized 14 individuals, most of whom were 70 years old or older. For six of the victims, the losses represented their life savings. The fees paid ranged from $20,000 to $175,000, with a total loss to all victims of roughly $1.7 million. The majority of these funds were obtained by the defendant and converted to his personal use.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +16 |
| more than 10 victims/mass marketing: | +2 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +8 |
| Highest culpability: | +6-10 |
| High victim impact: | +6 |
| Vulnerable victim | +2 |
| Role in the offense | +4 |
| | 32-38 |

This scenario presents a predatory offense where the defendant's gain was roughly commensurate with the loss. Although the scenario does not specify the degree of sophistication or duration of the offense, some sophistication and duration is implicit in the nature and extent of the scheme. No extenuating circumstances or efforts to mitigate harm are specified. This presents a "highest culpability" offense. The victim impact is also "high" in light of the significance of the loss to six of the victims. The scheme targeted the victims based on their elderly status, and if some of them were unusually vulnerable for that reason this would be additional support for findings of high victim impact and highest culpability. It is assumed that for purposes of Chapter Three this scenario would also score adjustments for both vulnerable victim and leadership role in the offense. These adjustments are the same under both this proposal and the existing guideline as this proposal does not address Chapter Three.

## Case Scenario 2

The defendant was the owner of a legitimate business for many years and financed the operations of the business through a line of credit secured by the inventory and accounts receivable of the business. When the business came on difficult times, the defendant caused the submission of false information to the lender regarding both inventory and accounts receivable, thus enabling the business to borrow more than it would otherwise have been permitted to borrow. The defendant also attempted to support the operations of the business by liquidating his personal assets and investing the proceeds into the business. The lender discovered the fraud and caused the termination of the business. After mitigating its losses by selling the inventory and collecting legitimate accounts receivable, the lender was left with a loss of approximately $6.9 million. A forensic accounting revealed that during the period of the fraud the defendant contributed more funds to the business than he withdrew from it in salary and other compensation.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Loss: | +18 |
| More than $1 Million in gross receipts: | +2 |
| Role in the offense | +4 |
| | 31 |

Score under ABA proposal:

| | |
|---|---|
| Base Offense level: | 6-8 |
| Loss: | +10 |
| Low culpability: | -3-5 |
| Low victim impact | +2 |
| Role in the offense | +4 |
| | 17-21 |

This scenario presents a mixture of legitimate ab initio and risk shifting fraud. Although the offense had some degree of sophistication, the less culpable motive, zero gain to the defendant, extenuating circumstances, and efforts to mitigate harm result in a "low culpability" score. The victim impact is also rated as "low" given that it involved a single institutional victim, but not minimal given the magnitude of the loss and the difficulty of the detection of the offense and the efforts needed to mitigate its harm. It is assumed the defendant would receive a leadership role in the offense adjustment under Chapter Three.

## Case Scenario 3

The defendant was the owner of a durable medical equipment business that provided oxygen to Medicare patients. To qualify for reimbursement, equipment providers must ensure the oxygen is medically necessary by sending patients to an independent laboratory for testing. Instead of referring patients to independent labs for testing, the defendant caused his employees to conduct the testing themselves and then falsely represent to Medicare that the testing had been performed by an independent lab. Virtually all of the oxygen was medically necessary, although Medicare would not have paid the bills for it had the failure to qualify the patients by independent testing been disclosed. The fraud continued for more than a year, and involved in false representations regarding the testing of 159 patients. The amount billed to Medicare for their oxygen was $7.1 million. The patients were billed a small co-pay fee, and a small portion of the reimbursement for the oxygen received by these patients was also paid by 109 supplemental insurance companies.

Score under current guideline:

| | |
|---|---|
| Base Offense level: | 7 |
| Intended loss: | +20 |
| Sophisticated means: | +2 |
| Production of unauthorized access device: | +2 |
| More than 250 victims: | +6 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 44 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Actual loss: | +10 |
| Moderate culpability: | 0 |
| Low victim impact: | +2 |
| Health care fraud offense | +3 |
| Role in the offense | +4 |
| | 25-27 |

This scenario presents a gatekeeping offense (although if the oxygen was either not provided or medically unnecessary this would be a predatory offense). Under current law in at least some circuits, the amount billed is treated as loss notwithstanding the medical necessity of the oxygen. *See, e.g., United States v. Bane*, 720 F.3d 818 (11th Cir. 2013). Notwithstanding the less culpable motive, the defendant's culpability is considered "moderate" given his personal benefit as the owner of the company, the degree of sophistication involved, the duration of the offense, and the absence of any extenuating circumstances or efforts to mitigate harm. The victim impact is considered low in light of the medical necessity of the treatments provided but not minimal in light of the sensitive nature of the government benefits program at issue. It is assumed that an additional three-level upward adjustment would be required under the Congressional directive presently located at 2B1.1(b)(7), as well as a leadership enhancement under Chapter Three.

14

**Case Scenario 4**

The defendant accepted $1,000 to act as a "straw purchaser" in a fraudulent real estate transaction that resulted in a $250,000 loss to a financial institution.

Score under current guideline:

| | |
|---|---|
| Base offense level: | 7 |
| Loss: | +12 |
| Role in the offense | <u>-2</u> |
| | 17 |

Score under ABA proposal:

| | |
|---|---|
| Base offense level: | 6-8 |
| Loss: | +6 |
| Low culpability: | -3-5 |
| Minimal victim impact: | 0 |
| Role in the offense | <u>-2</u> |
| | 5-9[1] |

This scenario presents a risk shifting offense in which the defendant's gain is minimal in relation to the loss and the offense involved limited sophistication and duration. On the other hand, the defendant knowingly played an essential role in a serious offense causing a significant risk of loss and did derive a direct personal benefit from the offense. For these reasons, the defendant's culpability would be "low" but not "lowest." The victim impact is considered minimal in that the victim is institutional, the amount of the loss did not threaten the security of the institution, and the severity of the offense conduct is adequately captured by the loss amount alone. A mitigating role in the offense adjustment under Chapter Three is assumed, but would not in all cases be applied.

---

[1] If the Base Offense Level is set at 8, Low Culpability is set at -3, and the defendant did not receive a mitigating role adjustment, this would result in an offense level 11, but in this scenario the offense level cap for non-serious offenses would cap the offense level at 10 if the defendant is a first offender.

15