

EXPRESS SCRIPTS®

# NETWORK PROVIDER MANUAL

  

*Guidelines, Policies and Procedures*

This document is confidential and may not be reproduced or distributed without the written permission of Express Scripts, Inc. Express Scripts® logo is a registered trademark of Express Scripts, Inc. Except as otherwise provided in this document, the Network Provider Manual is subject to the terms and conditions of the Provider Agreement. Revisions, amendments and updates will periodically be made to the Provider Manual and posted on the Network Provider website. **Printed copies are for reference only. Please refer to the electronic copy for the latest version.**

**© 2014 Express Scripts, Inc.**
Proprietary & Confidential Information.
All rights reserved
Network Provider Manual—Revised 07/2014

# TABLE OF CONTENTS

**Table of Contents**

ABOUT EXPRESS SCRIPTS ........................................................................................... **6**

GENERAL INFORMATION ............................................................................................ **7**

SECTION 1.  NETWORK PHARMACY INFORMATION ........................................... **8**
1.1  SUPPORT PHONE NUMBERS AND HOURS .............................................................8
1.2  CREDENTIALING STANDARDS ...............................................................................8
1.3  RE-CREDENTIALING ..............................................................................................9
1.4  PHARMACY ADDITIONS/DELETIONS OR ADDRESS CHANGES ...............................10
1.5  OWNERSHIP OR CONTROL CHANGES OF NETWORK PROVIDER ............................10
1.6  MEDCO RATE ASSIGNMENT ...............................................................................11

SECTION 2.  NETWORK PROVIDER SERVICES AND STANDARDS; CLAIMS ADJUDICATION ..................... **12**
2.1  MEMBER ELIGIBILITY VERIFICATION ..................................................................12
2.2  COLLECTION OF COPAYMENTS ...........................................................................13
2.3  SIGNATURE LOG/PROOF OF SERVICE REQUIREMENTS .........................................13
2.4  GENERAL CLAIMS SUBMISSION POLICIES ...........................................................14
2.5  CONTROLLED SUBSTANCES PRESCRIPTION PROCESSING .....................................15
2.6  MAINTENANCE OF THE SYSTEM .........................................................................16
2.7  ONLINE REIMBURSEMENT CALCULATION ...........................................................16
2.8  VACCINES ..........................................................................................................17
2.9  COMPOUNDS ......................................................................................................18
2.10  PRE-PRINTED PRESCRIPTIONS ..........................................................................20
2.11  TAXES, SURCHARGES AND FEES ........................................................................20
2.12  PRESCRIBER IDENTIFICATION NUMBERS ...........................................................21
2.13  DAYS SUPPLY AND QUANTITY ..........................................................................22
2.14  PRESCRIPTION ORIGIN CODE ...........................................................................23
2.15  PRIOR AUTHORIZATION ...................................................................................23
2.16  NON-STANDARD NDC NUMBERS ......................................................................23
2.17  ONLINE COORDINATION OF BENEFITS ..............................................................24
2.18  PARTIAL FILL TRANSACTIONS ..........................................................................24
2.19  REFILL-TOO-SOON EDITS .................................................................................25
2.20  REPACKAGING .................................................................................................26
2.21  DISPENSE AS WRITTEN (DAW) CODES / GENERIC SUBSTITUTION .....................26
2.22  MEMBER COMPLAINTS .....................................................................................28

SECTION 3.  PHARMACY REIMBURSEMENT ........................................................ **29**
3.1  PHARMACY REIMBURSEMENT SCHEDULE ...........................................................29
3.2  DISPUTED CLAIMS .............................................................................................29
3.3  REMITTANCE MEDIA AND TRANSACTION FEE REMITTANCE MEDIA ...................29
3.4  TRANSACTION FEE .............................................................................................29
3.5  REMITTANCE INFORMATION SERVICE FEES ........................................................30

SECTION 4.  FORMULARY OVERVIEW ................................................................ **31**
4.1  OVERVIEW OF FORMULARIES .............................................................................31
4.2  STEP THERAPY ..................................................................................................31

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information — All rights reserved
Network Provider Manual –Revised 7/2014

**SECTION 5.   NETWORK PROVIDER QUALITY ASSURANCE REVIEWS, AUDITS & INVESTIGATIONS** ........... **33**
5.1   INTRODUCTION ................................................................................................................. 33
5.2   QUALITY ASSURANCE REVIEW, AUDIT PROGRAMS, PROCESSES AND RESULTS ..................... 35
5.3   AUDIT GUIDELINES ......................................................................................................... 36
5.4   DISCREPANCY GLOSSARY ............................................................................................... 38
5.5   AUDIT APPEAL PROCEDURE/GUIDELINES ........................................................................ 41
5.6   AUDIT GRIEVANCE PROCEDURE ...................................................................................... 41
5.7   POTENTIAL FRAUD IDENTIFICATION ................................................................................ 42
5.8   INVESTIGATIVE METHODS .............................................................................................. 42
5.9   RECOVERY AND DISCIPLINARY ACTION ........................................................................... 43
5.10   PBM'S FRAUD TIP ......................................................................................................... 44

**SECTION 6.   COMPLIANCE WITH LAWS** ....................................................................... **45**
6.1   THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 ("HIPAA") .... 45
6.2   FEDERAL FALSE CLAIMS ACT .......................................................................................... 45
6.3   PROGRAM FRAUD CIVIL REMEDIES ACT (CFR 45 PART 79) ............................................ 45
6.4   COMPLIANCE WITH SELF-REFERRAL AND ANTI-KICKBACK STATUTES ............................... 46

**SECTION 7.   MEDICARE PART D PRESCRIPTION DRUG PROGRAM** ..................................... **47**
7.0   MEDICARE PART D ADDENDUM – PROVIDER NETWORK REQUIREMENTS ............................. 47
7.1   LOW INCOME SUBSIDY (LIS) RE-DETERMINATION ............................................................ 54
7.2   COVERED AND NON-COVERED MEDICATIONS .................................................................... 56
7.3   VACCINES ...................................................................................................................... 59
7.4   MEDICARE PART D COVERAGE GAP DISCOUNT PROGRAM .................................................. 60
7.5   MEDICARE PARTS A AND B VS. PART D DRUG COVERAGE ................................................. 60
7.6   MEDICARE PART D BENEFICIARY IDENTIFICATION CARD ................................................... 61
7.7   PRESCRIPTION PROCESSING ............................................................................................ 61
7.8   LONG TERM CARE DISPENSING ....................................................................................... 64
7.9   DAILY COST SHARING ..................................................................................................... 67
7.10   MEDICARE PART D $0 CLAIMS PROCESSING .................................................................... 67
7.11   STANDARDIZED MESSAGING ............................................................................................ 67
7.12   CMS REPORTING / PROCESSING REQUIREMENTS .............................................................. 69
7.13   GENERAL ONLINE COB PROCESSING FOR MEDICARE PART D (42 CFR 423.464) ................... 70
7.14   TRANSITION PERIOD ...................................................................................................... 71
7.15   GRIEVANCES .................................................................................................................. 73
7.16   BENEFICIARY RIGHTS ..................................................................................................... 74
7.17   TRUE OUT-OF-POCKET (TROOP) & TROOP FACILITATOR ................................................ 78
7.18   RECORDS RETENTION FOR MEDICARE PART D .................................................................. 80
7.19   EXCLUSION BY THE OIG; PRESCRIBER NPI; PRESCRIPTIVE AUTHORITY; TAXONOMY .......... 81
7.20   MEDICARE PART D CONTRACTUAL REQUIREMENTS BASED ON CHANGES IN LAWS, RULES OR
REGULATIONS, OR GUIDANCE ISSUED BY CMS FROM TIME TO TIME. ......................................... 83
7.21   MEDICARE MEDICAID PLANS – CMS FINANCIAL ALIGNMENT DEMONSTRATION FOR DUAL ELIGIBLE
MEMBERS ................................................................................................................................ 85
7.22   PATIENT RESIDENCE CODE AND PHARMACY SERVICE TYPE ............................................... 87
7.23   RESOURCES FOR MORE INFORMATION ABOUT MEDICARE PART D ...................................... 88

**SECTION 8.   MEDICAID PROGRAM** ............................................................................. **89**
8.1   EXCLUSION/REINSTATEMENT BY FEDERAL OFFICE OF INSPECTOR GENERAL (OIG), GENERAL SERVICES
ADMINISTRATION (GSA) EXCLUSION LISTS AND STATE AGENCIES .............................................. 91
8.2   ENROLLMENT AND ELIGIBILITY ....................................................................................... 92
8.3   UNIQUE MEDICAID PROCESSOR CONTROL NUMBER (PCN) ................................................. 92

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information – All rights reserved
Network Provider Manual – Revised 7/2014

201767.4

8.4    PRESCRIBER ID REQUIREMENTS ................................................................................92
8.5    TAMPER RESISTANT PRESCRIPTION DRUG PADS (TRPP) ..........................................92
8.6    340B DRUG DISCOUNT PROGRAM (340B PROGRAM) ...............................................93
8.7    DRUG COVERAGE SPECIFIC TO MEDICAID ...............................................................94
8.8    NDC TERMINATION DATE OR DRUG OBSOLETE DATE ...............................................94
8.9    OTHER HEALTH INSURANCE MESSAGING ..................................................................94
8.10   STATE-SPECIFIC MEDICAID REQUIREMENTS ..............................................................95
1.     STATE OF ARIZONA MEDICAID PROGRAM REQUIREMENTS .....................................95
2.     STATE OF FLORIDA MEDICAID PROGRAM REQUIREMENT .........................................96
3.     STATE OF KENTUCKY MEDICAID PROGRAM REQUIREMENTS .....................................97
4.     STATE OF NEW YORK MEDICAID PROGRAM REQUIREMENTS .....................................98
5.     STATE OF MICHIGAN MEDICAID PROGRAM ...........................................................99
6.     STATE OF PENNSYLVANIA MEDICAID PROGRAM REQUIREMENT ...............................99
7.     STATE OF SOUTH CAROLINA MEDICAID REQUIREMENT .........................................101
8.     STATE OF TEXAS MEDICAID PROGRAM REQUIREMENTS .........................................101
9.     STATE OF WEST VIRGINIA MEDICAID PROGRAM REQUIREMENTS .............................105
8.11   RESOURCES FOR MORE INFORMATION ABOUT MEDICAID ........................................105

SECTION 9.    HEALTHCARE EXCHANGES AND QUALIFIED HEALTH PLANS ........................ 106
9.1    EXCHANGE NETWORK PROVIDER REQUIREMENTS ..................................................106
9.2    SUBSIDIES ...........................................................................................................107
9.3    PRESCRIPTION PROCESSING ..................................................................................107
9.4    GRACE PERIOD .....................................................................................................107
9.5    CMS REPORTING ..................................................................................................108
9.6    COMPLIANCE .........................................................................................................108
9.7    RECORDS RETENTION AND REVIEW .......................................................................109
9.8    DELEGATION OF DUTIES .........................................................................................110
9.9    SUBCONTRACTS .....................................................................................................110
9.10   QHP CONTRACTUAL REQUIREMENTS BASED ON CHANGES IN LAWS, RULES OR REGULATIONS, OR
GUIDANCE ISSUED BY CMS OR APPLICABLE STATE REGULATORY BODY FROM TIME TO TIME ...................110
9.11   PRIVACY ...............................................................................................................110

SECTION 10.    SPECIFIC SPONSOR REQUIREMENTS ........................................................ 111
10.1   DEPARTMENT OF DEFENSE (TRICARE) ..................................................................111
10.2   TRICARE BENEFIT SUMMARY AND COST SHARING INFORMATION ...........................111
10.3   PRESCRIPTION PROCESSING ..................................................................................112
10.4   ONLINE COB .........................................................................................................113
10.5   NETWORK PROVIDER REIMBURSEMENT & RECOUPMENT .........................................114
10.6   PHARMACY AUDITS AND INVESTIGATIONS ..............................................................118
10.7   ADDITIONAL INFORMATION ...................................................................................118

PBM GLOSSARY ........................................................................................................... 120

APPENDIX A STATE LEGAL REQUIREMENTS FOR MANAGED CARE PLANS, HMOS AND MEDICAID .......... 124

APPENDIX A-1 SPECIFIC FORMS ................................................................................... 222
IOWA COMPLAINT FORM ................................................................................................223
MEDICAID PROVIDER GRIEVANCE & COMPLAINT FORM ..................................................224

APPENDIX A-2 STATE LEGAL REQUIREMENTS for MAXIMUM ALLOWABLE COST APPEALS.................. 225

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information – All rights reserved
Network Provider Manual –Revised 7/2014

**APPENDIX A-3. ADDITIONAL CONTRACT TERMS APPLICABLE TO CLINICAL PROGRAMS** ..................... **226**

**APPENDIX B ADDITIONAL PROVISIONS** .................................................................................. **228**
INDEMNIFICATION. ..........................................................................................................................228
NON-DISCRIMINATION. ....................................................................................................................228
RELATIONSHIP OF THE PARTIES. .........................................................................................................228
GOVERNING LAW. ...........................................................................................................................228
WAIVER. .......................................................................................................................................229
SEVERABILITY. ................................................................................................................................229
NON-COMPETITION. ........................................................................................................................229
SUBCONTRACTOR. ...........................................................................................................................229
COUPONS. ......................................................................................................................................230
MEMBER/SPONSOR HOLD HARMLESS. ...............................................................................................230
NOTICE. .........................................................................................................................................230
CONTACTING SPONSORS OR MEDIA. ...................................................................................................231
CONFIDENTIALITY. ..........................................................................................................................231
RECORDS. ......................................................................................................................................232
COUNTERFEIT REPORTING. ...............................................................................................................233
AMENDMENT. .................................................................................................................................233
MARKETING, ADVERTISEMENT AND RESERVATION OF RIGHTS. ...............................................................233
TERMINATION. ................................................................................................................................234
SURVIVAL OF TERMS AND CONDITIONS. ..............................................................................................235
DISPUTE RESOLUTION. .....................................................................................................................235
ENTIRE AGREEMENT. .......................................................................................................................236
TRANSITION. ..................................................................................................................................236

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 5 of 236   PageID #: 12031

## About Express Scripts

**Express Scripts Holding Company includes both Express Scripts and Medco. As we continue to integrate our companies, we are mindful of the important role the retail pharmacy plays in serving our Sponsors and Members. Our goal is to support community pharmacists in providing this service.**

### Providing Value to Pharmacies and Plan Sponsors

We offer the following:

• Dedicated account managers to support each major pharmacy chain and Pharmacy Services Administrative Organization (PSAO) serving independent pharmacies, as well as the unaffiliated independent pharmacy;

• 24-Hour Pharmacist Use Only phone lines;

• A website for Network Providers;

• Timely communications and education to Network Providers and their pharmacies; and

• Clinical and non-clinical online messaging that encourages generic and Formulary compliance.

Above all, through cooperation with our Network Providers, our overarching goal is to provide Members with the prescription medications they need in the most cost-effective and efficient manner possible.

| REMAINDER OF PAGE LEFT BLANK |
| --- |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information - All rights reserved
Network Provider Manual - Revised 7/2014

201767.4

# General Information

**It is important for all Network Providers to understand that, to the extent applicable, both Express Scripts' and Medco's Provider Agreements remain in force.**

This Provider Manual supersedes and replaces all previous versions of the Express Scripts' Provider Manual and the Medco Pharmacy Services Manual.

**References to "PBM" should be understood to mean both Express Scripts and legacy Medco. References to "Express Scripts" should be understood to mean Express Scripts, and references to "Medco" should be understood to mean Medco, each as they existed prior to the merger of these two companies. Capitalized terms are defined in the Glossary section of this Provider Manual. Certain terminology, e.g., "Eligible Person" and "Member," "Network Provider" and "Pharmacy," "Identification Card" and "Prescription Drug Identification Card" are interchangeable throughout this Provider Manual.**

The information contained in this Provider Manual is confidential and proprietary to PBM and provided for business purposes only. Network Provider may not copy, reproduce, distribute or otherwise use or disclose the information contained in this Provider Manual except as authorized by the Provider Agreement. Network Provider agrees that upon termination of its Provider Agreement for any reason, it shall not retain any copies of this Provider Manual and, upon request by the PBM, shall certify to the same in writing.

PBM will, on occasion, amend the Provider Manual and such amendments shall not require the consent of Network Provider. Revisions, amendments or modifications to the Provider Manual will be provided to Network Provider. Network Providers will abide by all notices, revisions, amendments, and modifications thereto. Network Providers may refer to http://www.express-scripts.com/services/pharmacists/ to review the most current Provider Manual.

The PBM Provider Manual and affiliated Payer Sheets are part of the Provider Agreement and incorporated into the Provider Agreement pursuant to the terms thereof. Network Provider must comply with the provisions and terms set forth in the Provider Agreement, which includes the terms, conditions, and processes contained in this Provider Manual and in the Payer Sheets. PBM also reserves the right, after notice to Network Provider, to increase the Transaction Fee to a minimum of $0.30 per transmitted transaction for failure to comply with any of the terms of the Provider Agreement.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information – All rights reserved
Network Provider Manual – Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 1 of 236   PageID #: 12033

# Section 1.    Network Pharmacy Information

## 1.1    Support Phone Numbers and Hours

For all online inquiries including claims processing, eligibility, or online messaging, contact the Pharmacist Use Only contact numbers.

| Pharmacist Use Only Numbers* |
|---|
| 800.824.0898 |
| 800.922.1557 |

Pharmacist Use Only phone lines are open 24 hours a day/7 days a week.

*PBM's primary "Pharmacist Use Only" numbers are listed in the table; however, Network Provider should always refer to the number shown on the Member's prescription drug ID card.

### Pharmacists' Website

Pharmacists may log on to http://www.express-scripts.com/services/pharmacists/ to access a web-based tool and retrieve claims rejection information during the adjudication process.  The website provides information the pharmacist needs to resubmit a claim.

Network Providers may also obtain helpful document resources on the website, such as a copy of the current Network Provider Manual, the PBM Payer Sheets, and other helpful information.

Network Provider's NCPDP or NPI and federal tax identification numbers are required to complete the online registration process.

## 1.2    Credentialing Standards

Network Providers must, at a minimum, meet all of PBM's standards and requirements in order to participate in PBM's network(s), including standards of operation as described in applicable federal, state and local laws.  If Network Provider participates in PBM's retail network(s), Network Provider and its Pharmacies must be Retail Providers as such term is defined in the Glossary section of this Provider Manual.

Each Network Provider has an ongoing obligation to inform PBM within five (5) business days of any changes to:

• Information previously submitted in the Provider Certification form;

• Its licensure and/or certification(s) status; and

• Other information PBM may have utilized in making its determination to contract with Network Provider or that may impact Network Provider's ability to perform services.

• Network Provider must immediately notify PBM in writing in the event of any action against Network Provider, its owners or employees by a state or federal regulatory body or law enforcement agency.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information - All rights reserved
Network Provider Manual - Revised 7/2014

Additionally, PBM performs due diligence to ensure all Network Providers are in good standing with federal and/or state health care, pharmacy or other regulatory bodies, including the OIG, GSA, or other such applicable state or federal programs. To remain eligible for participation in government paid programs, all providers must provide and attest to appropriate training for all employees.

PBM may require the submission and review of any documentation or information deemed necessary to determine Network Provider's ability to provide Covered Medications to Members. Network Provider agrees to provide PBM with all documentation and other information needed to comply with and/or demonstrate compliance with programs, processes, protocols, policies and procedures. Network Provider further agrees to provide PBM with information about its ownership, as requested. PBM may request such information during initial credentialing or at any time after initial credentialing has been completed. Additional information will be required of Pharmacies located in Medicare established Health Care Fraud Prevention and Enforcement Action Team (HEAT) Zones.

Failure to provide necessary credentialing documents or information to PBM will result in termination or denial of credentialing/re-credentialing. Questions about credentialing requirements should be directed to the **Network Contracting and Management Department at 888.571.8182, select Option 4, Monday through Friday 8:00 a.m. to 4:30 p.m. Central Time.**

### Medco

If a Network Provider is contracted with a PSAO that maintains an agreement with Medco in accordance with applicable schedule(s), and Network Provider terminates its relationship with PSAO or Provider is terminated from the PSAO, Network Provider agrees to continue providing Covered Services to Members in accordance with the applicable schedules for those Plan Sponsors where the applicable schedules have been implemented until the termination of the Plans' contracts with Medco.

### PBM Reporting and Disclosures

Network Provider acknowledges and agrees that any information provided to PBM by Network Provider may be disclosed and/or reported to Sponsors and/or state agencies, or a state agency's designee. Such reports and disclosures may include, but are not limited to, information provided by Network Provider to PBM at credentialing, in the Medicaid Disclosure Form (including Network Provider's TIN), and any information relating to Network Provider's participation (including claims submitted on behalf of Members). Network Provider expressly agrees that PBM, in its sole discretion, may make any such disclosures and reports as PBM deems appropriate.

## 1.3    Re-Credentialing

PBM re-credentials Network Providers on a rolling three (3)-year schedule. PBM may re-credential or request additional credentialing more often than every three (3) years when PBM determines, in its sole discretion, that such credentialing or re-credentialing request is appropriate. PBM reserves the right to request any and all information necessary to determine Network Provider's ability to provide Covered Medications to Members in accordance with the Provider Agreement(s), including this Provider Manual, and all state and federal laws.

PBM will charge an administration fee for re-credentialing each independent pharmacy.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual Revised 7/2014

201767.4

In addition, Network Providers must provide and attest to appropriate training for all employees to remain eligible for participation in government paid programs.  This process is a condition of Network Provider's continued participation in PBM's networks, and failure to return all required documentation may result in termination.

## 1.4    Pharmacy Additions/Deletions or Address Changes

Network Provider must notify PBM each time it opens, closes or relocates a Pharmacy.

Such notification must include the following information, as applicable, for proposed pharmacy additions or address changes:

- NCPDP#
- NPI
- Store Name
- Chain code
- State License(s)
- Federal Tax ID

- Mailing address
- Physical address
- Website address
- Phone #
- FAX #

- Medicaid ID
- Medicare ID
- The reason for the change.

Network Providers should submit the above information to PBM via:

- Fax:  866.515.3482, Attention: Network Contracting and Management;
- Mail:
    Express Scripts
    Attn: Network Contracting and Management HQ2W02
    One Express Way
    St. Louis, MO  63121; or
- Email:  **NetSpec@express-scripts.com**

## 1.5    Ownership or Control Changes of Network Provider

Network Providers must immediately notify PBM in the event of a change of ownership or control.

Any successor owner or operator ("Buyer") must be accepted to participate by PBM, execute a new Provider Agreement (at the discretion of PBM; alternatively, PBM may allow assignment of the Provider Agreement to Buyer) and meet all of PBM's credentialing and participation requirements.  The Buyer shall be liable and responsible for any obligations of the previous owner ("Seller") unless and until (a) Buyer or Seller notifies PBM in writing of the change of ownership, (b) Buyer completes any and all credentialing requirements communicated by PBM to Buyer, (c) Buyer executes a new Provider Agreement (or, in the alternative, PBM consents in writing to the assignment of the previous Provider Agreement), and (d) Buyer and Seller each notify PBM in writing that Seller has retained responsibility for any outstanding obligations.

PBM shall not be bound to any of its obligations under the Seller's Provider Agreement where Seller has assigned or subcontracted the Provider Agreement without PBM's consent, or where ownership or control of the operation of the Seller or any of its locations has changed, without PBM's prior written consent.  In such event, PBM has the right to immediately terminate the Provider Agreement.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved

Should a Network Provider sell or purchase any or all of its prescription records or files, such Network Provider shall notify the PBM, informing PBM within five (5) days of the sale as to which party (buyer or seller of the files) retains liability for any issues related to the records (*e.g.*, discrepant claims found upon routine audit).

## 1.6    Medco Rate Assignment

Medco may assign the rates contained in a Sponsor-specific pricing schedule to that Sponsor for use by that Sponsor, in that Sponsor's discretion, on other adjudication systems. Medco will provide 30 days' notice of such assignment. The reimbursement terms of network schedules may be used on the adjudication system of any Medco affiliate.

| REMAINDER OF PAGE LEFT BLANK |
| --- |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 1 of 1   PageID #: 12037

# Section 2.   Network Provider Services and Standards; Claims Adjudication

## 2.1    Member Eligibility Verification

### Identification Card and Eligibility

Each Member must present an Identification Card to Network Provider when having a prescription filled. Before processing a new or refill prescription, Network Provider should obtain and examine the Identification Card carefully to confirm whether the prescription to be filled is for the cardholder or an eligible dependent, and must use the information on the Identification Card to submit claims through the online adjudication system.

### In General

If a person claims to be a PBM Member and does not have an Identification Card, submit the claim online.  If Network Provider receives a *"Missing/Invalid Cardholder ID"* rejection code, verify eligibility by contacting the Pharmacist Use Only help line or logging into the PBM website at http://www.express-scripts.com/services/pharmacists/.  If eligibility cannot be confirmed, Network Provider should collect the Pharmacy's Usual and Customary (U&C) Retail Price for the prescription dispensed and instruct the Member to contact his or her benefit Sponsor, or the PBM.

If the Member's Prescription Drug Program allows, the individual claiming eligibility without an Identification Card should send the receipt and claim form for reimbursement to the address listed in the Member's Prescription Drug Program benefit information packet.   If the Member is eligible, reimbursement will be forwarded directly to the Member.  The amount reimbursed will depend on the Sponsor's contractual agreement with PBM, less any Member Copayment or deductible due under the applicable Prescription Drug Program.

**Prescription Drug Identification Cards will continue to carry the Express Scripts and Medco logos and processing information.  Network Provider should always check the Member Identification Card and follow the processing information indicated on the card.**

Sponsors may offer a smart phone application that allows Members to electronically access their ID cards.  When this is the case, the Member may present his/her ID card "virtually" on a smart phone or other portable electronic device.  Network Providers should accept these ID cards providing they contain all the necessary processing information.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved.
Network Provider Manual - Revised 7/2014

## Sample Identification Cards:

**PBM logos:** Required for pharmacist recognition.

**Rx BIN #, Processor Control #, Rx Group #, Member ID, and person code (if necessary)** are required information to process an Express Scripts claim.

**RxBIN #, Rx Group #, Member ID, and reltionship code (if necessary)** are required information to process a Medco claim.

**Client logo:** is required for pharmacist recognition.

Applicable Member customer service number and pharmacist help desk numbers will appear on the back of the ID card.



Certain Sponsors may have a custom Prescription Drug Identification Card displaying the Medco, Medco Health, Merck-Medco, and/or PAID logos shown below, or another identifier.



## 2.2      Collection of Copayments

PBM defines patient financial responsibility to be the amount of money a Network Provider is to collect from a Member for the provision of Covered Medications.  This amount can include Copayment or Coinsurance (a percentage "Copayment").  Sponsors determine the Copayment amounts to be collected. Copayment amounts vary from Sponsor to Sponsor and/or Prescription Drug Program.  Network Provider shall ensure that the correct Copayment is charged to the Member and is not changed or waived. Should a Member have a question about his or her Copayment or deductible and benefit limits, please instruct him/her to call the Customer Service number listed on the Member's Identification Card.

Network Provider may not institute Member Copayment discount programs or otherwise alter a Member Copayment, unless such waiver or discount is required by law.  If PBM becomes aware of any Copayment or cost-sharing discounts offered by Network Provider – either through audit, investigation, Member statements, or review of Network Provider's website or other advertising materials – Network Provider may be subject to immediate termination.   For clarification, if PBM identifies fliers, advertisements, or other statements from Network Provider suggesting that a Copayment will be a flat fee or will be discounted, capped, or waived, Network Provider will be subject to termination.

## 2.3      Signature Log/Proof of Service Requirements

Each Network Provider must maintain a signature log (paper or electronic) or other approved PBM alternative as indicated in the Provider Agreement for all claims in chronological order as prescriptions are received by the Member, including off-site delivery, with the following information:  Member name, prescription number, third party program, Member signature (or legal representative) and date prescription is picked up.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 2 of 23   PageID #: 12039

Unless required by law, rule, regulation or by a Sponsor, Network Provider may maintain an electronic proof-of-service in lieu of a signature log, which shall reflect, at a minimum, the following: (i) Member name or Member ID; (ii) prescription number; (iii) date and time the Covered Medication was received by the Member (or Member's representative); (iv) time of sale (if different than time received by the Member); and (v) proof of receipt of the Covered Medication by the Member or the Member's representative (e.g., the point of sale ("POS") computer receipt or such information electronically stored in the normal course of Network Provider's business in the delivery of prescription medications to its customers, including price paid by the Member (or Member's representative). The signature log/proof of service must be retained for six (6) years; (11years for Medicare, or longer in accordance with all applicable laws) from the date a prescription is dispensed.

## 2.4    General Claims Submission Policies

Network Providers are bound by the following:

- All claims information submitted by Network Provider must be accurate and complete.

- Network Providers shall submit claims online. If a claim cannot be transmitted online, Network Provider shall make reasonable attempts to retransmit the claim. If such retransmission fails, Network Provider should contact the PBM's Pharmacist Use Only phone line to resolve the transmission failure and make alternative arrangements to submit the claim. In the event a Network Provider must submit an electronic claim more than 90 days after the prescription is filled, Network Provider must enter a valid Delay Reason Code value in NCPDP Standard vD.0 Field 357-NV. Some Sponsors may not cover claims submitted more than 90 days following the fill date.

- All claims must be submitted in the current NCPDP (vD.0) HIPAA-mandated format and in accordance with the PBM Payer Sheets, the Provider Agreement, and all applicable laws, rules and regulations, as well as Sponsor's Prescription Drug Program requirements and this Provider Manual. PBM may require additional information from Network Provider for PBM to process the claim. In addition to any other remedies PBM may have, failure to comply with these requirements may result in the imposition of fines.

- Prescriptions dispensed to Members must contain the Provider NPI as registered with PBM. The NPI number (qualifier code "01"), and the NCPDP number (qualifier code "07") must identify the location where the pharmacist supervised dispensing of the prescription.

- Network Provider's U&C Retail Price on submitted claims must include all fees applicable to dispensing, preparing or administering the medication, as well as all "loss leaders," frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price, including any applicable discounts offered to attract customers, on the applicable date of fill.

- Network Provider must display all online messages, including drug utilization review (DUR) messages, for both rejected and paid claims transmitted from PBM to the dispensing pharmacist. In addition, Network Provider shall perform an internal DUR of each claim transmitted to PBM to monitor for Member safety concerns including, but not limited to, drug allergy monitoring, drug interaction screening, therapeutic duplication, drug disease contradictions and over-utilization concerns, such as high dosing.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of 19   PageID #: 12040

- PBM accepts DUR codes as indicated in the Payer Sheet. DUR codes may vary by Sponsor depending on plan design.

- All claims must be transmitted to PBM indicating the actual date of fill.

- The submitted NDC must be the complete NDC of the medication dispensed, including the package size.  Drug products contained in "unbreakable," (i.e "unsplittable") packages as determined by the FDA must be in their original packaging and dispensed as a whole unit.  Network Provider must use actual metric package sizes when available.  If the metric measurement is not available, the following conversions should be used:

  - One fluid ounce = 30 ml
  - One ounce = 30 g
  - One pint = 480 ml
  - One pound = 454 g
  - One liter = 1000 ml

- Network Provider must ask the Member (or Member's representative) to identify all sources of payment (i.e., all sources of insurance and/or payment coverage) including, but not limited to, attempting to obtain the Member's most current coverage information from all source(s), and bill the appropriate payer(s).

- Unless a shorter time period is required by a Sponsor or any law, rule or regulation (and then in accordance with such Sponsor's requirement or such law, rule or regulation), any prescription drug claims submitted to PBM and not picked up by the Member, must be reversed online within 13 days from date the claim was processed.

- PBM is the owner of all information it obtains through the administration and processing of any and all pharmacy claims submitted by Network Provider.

- Network Provider must not undermine U&C or other pricing, including but not limited to, separating cash and third-party prescription business.

## 2.5    Controlled Substances Prescription Processing

### Schedule II Drugs

Network Providers may ONLY dispense controlled substances listed in Schedule II that are prescription drugs as determined under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 353(b)), with a written prescription signed by the Prescriber, except as permitted by law in emergency situations.  See 21 C.F.R 1306.11 (d) for additional information.  Schedule II prescriptions may not be refilled.

A partial fill of a Schedule II drug is permitted under the following circumstances:

- **A Schedule II prescription is written for a Member in a Long Term Care (LTC) Facility or for a Member with a medical diagnosis documenting a terminal illness.**

  - The prescription is valid for 60 days after the issue date and the balance of medication may not be dispensed after 60 days.

  - For LTC Members, Network Provider must enter the appropriate Patient Residence Code in NCPDP Field 384-4X when submitting the claim.

  - Both the Network Provider and Prescriber have a corresponding responsibility to ensure the Schedule II prescription is for a terminally ill Member or one residing in an LTC facility.  Network Provider must record on the prescription whether the patient is "terminally ill" or an "LTCF"

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Member. A prescription that is partially filled and does not contain the notation "terminally ill" or "LTCF" Member shall be deemed to have been filled in violation of the Federal Food, Drug, and Cosmetic Act.

o Network Provider should increase the fill number (in field 403-D3) on each subsequent fill. Below is an example of a 30-day prescription submission for an LTC Member or Member with a terminal medical diagnosis.

|  | Fill Number (403-D3) | Qty Dispensed (442-E7) | Days Supply (405-D5) |
|---|---|---|---|
| Initial Fill | 0 | 14 | 14 |
| 2nd Fill | 1 | 14 | 14 |
| 3rd Fill | 2 | 2 | 2 |

## Retail Pharmacies – Schedule II quantity not in stock

o Network Provider may dispense a partial fill of a Shedule II drug if Network Provider is unable to dispense the full quantity prescribed in a written or emergency oral prescription, and the pharmacist makes a notation of the quantity supplied (i) on the face of the written prescription, (ii) in a written record of the emergency oral prescription, or (iii) in the electronic prescription record.

The remaining quantity may be dispensed within 72 hours of the first partial fill; however, if the remaining quantity is not or cannot be filled within the 72-hour period, the pharmacist shall notify the Prescriber. No further quantity may be supplied beyond 72 hours without a new prescription.

## 2.6    Maintenance of the System

Maintenance of the online claims adjudication system may be scheduled at any time, but usually during evening hours each weekend. During scheduled maintenance, Network Providers may receive the message "Host Processing Error" (NCPDP Reject Code 99) or "Scheduled Downtime" (NCPDP Reject Code 96). If either of these messages is displayed, Network Providers must resubmit claims after the maintenance is completed. If any other scheduled maintenance is required outside of the hours set forth above, PBM may notify Network Providers in advance.

## 2.7    Online Reimbursement Calculation

In general, PBM's reimbursement is based on the following information.

For **Single-Source Brand Drugs**, PBM will pay the lesser of:

• AWP ingredient cost minus contracted brand discount plus contracted brand dispensing fee for the applicable network; OR

• Network Provider submitted brand ingredient cost plus contracted brand dispensing fee; OR

• Usual and Customary Retail Price; OR

• If applicable, specific Sponsor reimbursement; OR

  • State Fee Schedule (e.g., Workers' Compensation)

For **Generic Drugs** or **Multi-Source Brand Drugs**, PBM will pay the lesser of:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

- AWP Generic Drugs or Multi-Source Brand Drugs ingredient cost minus contracted Generic Drug discount plus contracted Generic Drug dispensing fee for the applicable network; OR

- MAC discount plus contracted Generic Drug dispensing fee for applicable network; OR

- Network Provider-submitted ingredient cost plus contracted Generic Drug dispensing fee for applicable network; OR

- Usual and Customary Retail Price; OR

- If applicable, special Sponsor reimbursement logic; OR

- State Fee Schedule (e.g., Workers' Compensation)

Network Providers may be paid an amount in addition to the submitted ingredient cost, dispensing fee, or U&C Retail Price.  If applicable, taxes, surcharges, and incentive fees are included in the reimbursement.

## 2.8    Vaccines

At the request of some Sponsors, certain vaccine drug products or the administration of the vaccine drug products are Covered Medications according to the Member's specific plan benefit design. If Network Provider administers vaccines to Members, Network Provider must attest that registered pharmacists or other healthcare professional staff under its employment are certified and qualified to administer vaccines, and must agree to maintain vaccine administration records.  If the Sponsor elects to cover just the vaccine drug product under the Member's prescription drug benefit, the Member is responsible for the administration charges.  Network Provider may not add or represent the administration fee to the Member as the Copayment.  The drug product Copayment must be represented as a separate charge.

Certain vaccinations are covered under Medicare Part B, and the submission process is the same as for all other vaccination claims (See Section 7.3 of this Provider Manual).

Network Provider shall be reimbursed for the administration fee for vaccines administered to Members when an administration fee is a Covered Service under the Sponsor's benefit plan design, and then in accordance with such Sponsor's plan benefit design.  The vaccine claim, along with the administration fee, as applicable, should be submitted in a single transaction to PBM.  If Network Provider bills the vaccine administration fee separately at point of service, the claim will reject.

### Vaccine Administration Fee

If a Sponsor does not cover the administration fee/professional service fee for claims submitted using **Rx BIN 003858**, the claim will process and the pharmacist will receive the following online response message:  "REIMBURSEMENT DOES NOT INCLUDE PAYMENT OF PROFESSIONAL SERVICE FEE".  If the vaccine is injected, Network Provider should ensure the claim is submitted accurately with the MA code and the incentive fee amount, and then read the messaging regarding reimbursement of the Professional Service Fee (PSF) before charging the Member for the PSF.

For claims submitted using **Rx BIN 610014,** if a Sponsor does not cover the administration fee/professional service fee, the claim will reject (usually with "M5").  If the pharmacist receives this reject, the Member may be charged for the administration fee.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual – Revised 7/2014
201767.4

If a vaccine is administered by the pharmacist, Network Provider must ensure the claim is submitted accurately with the MA value entered in NCPDP Professional Service Code Field 440-E5 plus the administration fee amount.

## 2.9    Compounds

### General

A Compound Prescription is a medication consisting of two or more solid, semisolid, or liquid ingredients that are weighed, measured, prepared, or mixed according to the prescription order.  Network Providers may not bill PBM for a compound that is commercially available.  Claims for bioequivalent compounds of commercially available manufactured products may be subject to full recoupment.  Reconstitution of a drug (oral, injectable, or topical) or any similar product, or the addition or inclusion of water or a non-drug component (i.e., flavoring), is not considered a Compound Prescription.  Compounded medications that include an experimental or investigational ingredient may not be covered by the Sponsor.

Network Provider is responsible for compounding preparations with approved ingredients of acceptable strength, quality, and purity, with appropriate packaging and labeling in accordance with good compounding practices, official standards, and relevant scientific information.

Network Providers are prohibited from compounding prescriptions without a valid prescription or a reasonable expectation of a forthcoming valid prescription or as otherwise permitted by state or federal law, rule or regulation.  Evidence that Network Provider is manufacturing or sampling Compounded Prescriptions is cause for immediate termination.

Network Provider shall maintain valid non-resident licenses in all states to which it mails/ships/delivers Covered Medications.

Network Provider is responsible for properly documenting all Compounded Prescriptions, including but not limited to the drug's name, NDC of the package size used, manufacturer name when an NDC is not available, metric quantity and associated cost of each component used to prepare the Compounded Prescription.

### Submission of Compound Claims

Coverage of compound medications varies depending on Sponsor-specific benefits.   Compound Prescriptions, when covered by the Member's plan benefit design, are Covered Services and must be submitted electronically.

All ingredients used in the preparation of a compound must be submitted in accordance with NCPDP Telecommunications Standard vD.0 guidance.  However, gloves, smocks or booties are considered part of the cost of doing business, and are NOT ingredients to be included when calculating the price of a compound.

Additional supplies used to create a compound, such as syringes and capsules, may be included when calculating the price of a compound as long as these items have an active NDC in the PBM's drug file source.  The NDCs for these additional supplies should be included in the compound ingredient list in the event the claim is selected for audit.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information  All rights reserved
Network Provider Manual   Revised 7/2014

- Each compound claim must contain all NDCs, but no more than 25 NDCs. At least one of the NDCs must be a Legend Drug ingredient covered under the Member's Prescription Drug Program.

- Quantities for each compound ingredient should be submitted using the correct dispensing unit. When the quantity for an ingredient is in micrograms, field length restrictions may adjudicate a quantity of zero (0), causing the claim to reject due to invalid quantity submitted. In the event this rejection occurs, a Submission Clarification Code (SCC) of eight (8) may be submitted in field 420-DK. This allows the claim to process because Network Provider has agreed to accept non-payment for the rejected ingredient(s).

- The Ingredient Cost Submitted Field (409-D9) in the Pricing Segment must equal the sum of the Compound Ingredient Drug Cost Field (449-EE) in the Compound Segment.

- The total quantity of the compounded ingredients must be entered in the Compound Ingredient Quantity Field (448-ED) of the Compound Segment. The total quantity of the compound must be entered in the Quantity Dispensed Field (442-E7) of the Claim Segment.

- Network Provider must submit claims using the lowest ingredient cost NDC, in accordance with Section 2.20 "Repackaging."

The Sponsor is ultimately the decision maker regarding coverage of Compound Prescriptions, including specific compound ingredients. Network Provider may not be reimbursed for non-FDA approved ingredients used in compounding, including bulk chemicals. In the event Network Provider uses only bulk chemicals in the compounding of a prescription drug, Network Provider may receive no reimbursement for such prescription drug, or this use may result in full recoupment of any paid amount. Network Providers may not circumvent the Sponsor's benefit design and coverage of compounded prescriptions or compound ingredients, including, but not limited to, resubmitting rejected compound prescription ingredients as individual, non-compounded items.

Compound prescriptions using a Legend Drug when there is no FDA approved treatment may not be covered by any Prescription Drug Program and may result in full recoupment of the paid amount.

For compound medications using legend non-FDA approved ingredients (e.g., estriol, domperidone), Network Provider must maintain a copy or otherwise document that the appropriate IND (Investigational New Drug) has been supplied by the FDA. PBM may request a copy of the IND in auditing or investigating any claim. Failure to document an IND will result in the recoupment of all impacted claims.

Compound claims are highly susceptible to audit or investigation. Claims found to be in excess of the allowable amount or in excess of Network Provider's acquisition cost (taking into account a reasonable markup) may be reduced accordingly and offset in Network Provider's next regularly scheduled remittance.

## Compliance

Network Provider must be prepared to demonstrate compliance with any and all provisions set forth in this Provider Manual, including but not limited to, this Compounds section. Failure to demonstrate compliance may result in (i) withholding of payments; (ii) implementation of corrective action plan(s); (iii) recoupment and offset of improperly submitted claims; (iv) implementation of a compound pricing schedule; (v) assessment of fees; (vi) immediate termination; (vii) referral to Sponsor(s) and/or local, state or federal law enforcement agencies, such as the Drug Enforcement Agency, the Federal Bureau of Investigation, Office of Inspector General, and applicable state boards of pharmacy; and (viii) any other remedies available, including legal actions, for failure to comply.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4    Proprietary & Confidential Information. All rights reserved.
Network Provider Manual   Revised 7/2014

**Express Scripts**

- All Express Scripts' compound claims must be submitted with a Level of Effort value entered in Field 474-8E (DUR/PPS Level of Effort) in the DUR/PPS Segment, in order to determine the Professional Service Fee for filling the compound. (See chart below.)

| Express Scripts Level | NCPDP Level of Effort Code | Compound Type |
|---|---|---|
| 1 | 11 | Non-Sterile BASIC |
| 2 | 12 | Non-Sterile MEDIUM |
| 3 | 13 | Non-Sterile COMPLEX |
| 4 | 14 | Sterile (any type) |

**Medco**

- Reimbursement for Medco compound claims will account for the professional service fee, if applicable; i.e., Medco prices compounded prescription claims from Network Providers as follows:

  a. Each ingredient in the compound will be priced at the applicable contract rate;

  b. The Medco adjudication system will sum the price of all the ingredients in the compound, times (x) a multiplier of 1.25 for compounding services;

  c. PBM's Online Reimbursement Calculation (i.e., "lower of" logic) is applied to determine the final approved ingredient cost;

  d. The applicable dispensing fee is added to the final approved ingredient cost.

## 2.10 Pre-Printed Prescriptions

Network Providers may not produce, distribute, or accept pre-printed or pre-populated prescriptions for Covered Medications that include a controlled substance. This prohibition includes "check the box" order forms. Network Provider acknowledges and agrees that using, accepting, and/or distributing pre-printed or pre-populated prescription forms that include controlled substances constitutes a violation of law, including but not limited to, the Controlled Substances Act and its implementing regulations. PBM may, in its sole discretion, recoup claims and immediately terminate Network Provider for violating this section of the Provider Manual.

## 2.11 Taxes, Surcharges and Fees

If permitted by the terms of the agreement between PBM and Sponsor or where required by law, PBM will bill the Sponsor for any federal, state or local sales taxes payable with respect to any sales of a Covered Medication to a Member, and will remit to the Network Provider any such taxes collected from Sponsors. Network Provider shall remit any such taxes to the appropriate taxing authority.

As owner of the drugs dispensed, Network Provider has sole responsibility for determining taxability, submitting the appropriate tax on the claim, collecting the applicable tax, and remitting such tax to the applicable taxing authority. Network Providers must specifically identify the amount of any allowable taxes on each claim submitted as a condition of payment. For those states that require sales tax on prescription drugs and other items, such as diabetes supplies, Network Providers should identify the percentage sales tax rate and tax basis amount used to determine the sales tax amount. If Network

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual - Revised 7/2014

Provider believes PBM has paid the incorrect amount of tax on a claim, Network Provider is responsible for contacting PBM to report such incorrect payment within 30 days.

Any applicable sales, use or other similarly assessed and administered tax imposed on items dispensed, or services provided hereunder will be the sole responsibility of PBM's Plan Sponsors or their Members. If PBM is legally obligated to collect and remit sales, use or other similarly assessed and administered tax in a particular jurisdiction, such tax will be reflected on the applicable invoice or subsequently invoiced at such time as PBM becomes aware of such obligation.

## 2.12    Prescriber Identification Numbers

Network Providers must submit accurate and valid Prescriber identifiers on all claims.  Network Provider must make a reasonable attempt to obtain and transmit the NPI for all claims.  Medicaid claims will reject unless the Prescriber NPI is submitted.  For all other transactions, claims submitted with a legacy identifier (e.g. the Prescriber's DEA number or State License number) will not be rejected unless instructed otherwise by a Sponsor or for a Medicaid claim.   For Medicare Part D claims, please see below.   If upon audit, PBM determines that a Prescriber NPI could have been located, or that an inaccurate identifier was submitted, PBM will take action on the claim in accordance with Section 5 of this Provider Manual.

### Medicare Part D Claims

CMS requires a valid Prescriber NPI to be included on all Prescription Drug Events (PDEs) for all Medicare prescriptions.  The Prescriber's NPI is the only acceptable form of Prescriber identifier for Medicare Part D claims.  If Network Provider does not have the Prescriber's NPI on file, Network Provider must use best efforts to obtain the NPI prior to submission of the claim.

PBM will communicate with Network Provider if the submitted NPI is not active and valid.  If PBM communicates that the NPI is not active and valid, Network Provider must either (i) resubmit the claim with the corrected NPI; or (ii) override the "not active or valid" message if Network Provider believes the Prescriber NPI is active and valid (in which case the pharmacist should enter the Submission Clarification Code (SCC) in field 420-DK).   PBM will pay the resubmitted or overridden claim (unless there is an indication of fraud or other issue that would make the claim non-payable).  If Network Provider does not submit a corrected claim or use the override code, Network Provider is required to work with PBM to resolve the claim.  If Network Provider does not resubmit the claim or otherwise contact PBM to have the claim resolved, PBM will infer that Network Provider believes it is no longer necessary to provide medication to the Member.  If PBM determines for any claim that the NPI was not active and valid, PBM may reverse and recoup payment to the Network Provider if PBM communicated at point of sale that the NPI was not active and valid.  Network Providers must cooperate with PBM to timely resolve outstanding Prescriber NPI issues.

### Suboxone Claims

Authorized Prescribers of the controlled substance Suboxone are instructed to process Suboxone claims as follows:

- Submit the Prescriber's NPI or <u>original</u> DEA number <u>only</u>.

- <u>Do not submit DEA numbers beginning with "X" on Suboxone claims.</u>

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information. All rights reserved
Network Provider Manual - Revised 7/2014

- For Medicaid Suboxone claims, please submit with Prescriber NPI ONLY per above instructions.

## 2.13  Days Supply and Quantity

The exact metric quantity (as defined by NCPDP) of the drug prescribed must be submitted.  Network Provider should not reduce the quantity unless required due to a "quantity limit = x" online message.  The exact number of consecutive days supply must be submitted, with the calculation based on the metric quantity prescribed and the Prescriber's exact written directions.  If the Prescriber does not provide exact directions, or writes "as directed" or "prn", or writes directions when a consecutive days supply cannot be calculated, Network Provider must call the Prescriber or ask the Member for the directions, document such directions on the prescription, initial the same, and submit the exact days supply based on those directions and the quantity prescribed.  Prescriber's signature on the prescription does not translate into an assumed days supply.  Days supply must always be calculated based on the information written on the prescription and must never be assumed.

Should the days supply or quantity submitted exceed the Sponsor's Prescription Drug Program's limitation, Network Provider will receive an online message reading "days limit = 'x'" or "quantity limit = x".  In such cases, calculate the new metric quantity based on the Prescription Drug Program's days supply limit and the Prescriber's exact written directions for use.  Do not reduce days supply without also reducing quantity.  Failure to reduce a quantity when reducing a days supply may result in recoupment of the over-billed amount upon audit.

For products dispensed in unit of use packaging, PBM allows for "as directed" with the following guidelines:

- If a specific quantity is given and the smallest available package size is prescribed, dispense with "as directed" for a 30-day supply.  If quantity indicated is not the smallest package size, Network Provider must document directions for use.

- "As directed" may also be used in the following conditions (all others require specific directions)
  - Test Strips and Lancets – one box of 100 for 30 days
  - Insulin Vials – up to two (2) vials for a 30-day supply
  - Insulin Syringes – one (1) box of 100 for a 30-day supply (or nine (9) packages of 10)
  - Insulin Cartridges/Pens – one (1) box for 30 days
  - Pen Needles – one (1) box for 30 days

For oral solids dispensed as individual tablets, specific directions for use are required, except:

- Warfarin products:  If dispensed as a one (1) for one (1) ratio, dispense with "as directed" (e.g. 30 for 30 days, 90 for 90 days)

- Steroids:  When directions are "as directed per tapering dose,"

- All oral solids dispensed in manufacturer's original packaging must have directions for use except:
  - Drugs on current Quantity Level Limits (QLL) list (e.g. Viagra, Imitrex).  If QLL is exceeded, must have directions for use.
  - Manufacturers' packaging has pre-printed patient instructions (e.g. Fosamax).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual - Revised 7/2014

**Unbreakable Product Packages**

For commercial plans and the Department of Defense (DoD) TRICARE program, pharmacists may override a maximum days' supply as outlined below when dispensing certain unit of use medications or medications only available in unbreakable packages.

Pharmacies must always initially enter and submit an accurate days supply on all claims. Only after receiving an "Exceeds Plan Limits" rejection should a pharmacist consider maximizing the days supply on unbreakable packages. Please note that overriding a claim with an *actual* days supply greater than those listed in the chart below may result in recoupment.

| Plan Days Supply Limit | Maximum Actual Days Supply Allowed | Days Supply to Input |
|---|---|---|
| 30 days | up to 37 days | 30 days |
| 31 days | up to 38 days | 31 days |
| 34 days | up to 42 days | 34 days |
| 60 days | up to 74 days | 60 days |
| 90 days | up to 111 days | 90 days |

Network Providers may input the Sponsor's days supply limit when the smallest package size exceeds that limit.

When the *actual* days supply, calculated from directions, does not match the quantity ordered by the Prescriber, directions will supersede quantity.

All Medicare and Medicaid claims **must** be submitted with the correct days' supply without exception. For quantity considerations for Medicare Part D claims, see Section 7.2 of this Provider Manual.

*Careful adherence to this policy may prevent possible partial or full recoupment of claim(s).*

## 2.14   Prescription Origin Code

Network Providers are required to submit the appropriate Prescription Origin Code on all transmitted claims.

## 2.15   Prior Authorization

PBM's online system will identify medications requiring prior authorization for specific Prescription Drug Programs and/or Members. Prior authorization may be required for specific drugs, excessive quantities, excessive days supply, or unusually high cost medications, etc. The online message field displays appropriate information to remedy the situation or the Sponsor's PA phone number. You may also call the Pharmacist Use Only contact number printed on the Member's Identification Card for assistance.

## 2.16   Non-Standard NDC Numbers

**HIPAA standards expressly prohibit the use of any non-standard NDC codes,** including obsolete drugs. Investigational drugs are allowed only when covered by the Plan Sponsor. PBM's policy

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

follows this standard (i.e., PBM has adopted the NDC as its standard for reporting drugs, biologic agents and OTC medications).

## 2.17    Online Coordination of Benefits

### Commercial

Network Providers are required to submit COB claims online in accordance with the PBM Payer Sheets. PBM offers non-duplication processing at point-of-service, which means PBM will never pay more for a COB claim than the Sponsor would have paid as primary payer.  PBM's systems determine the Sponsor and Member responsibility for payment as though the Sponsor is the primary payer of the claim.  That calculated amount is then reduced by the other payer amount(s) and Network Provider is paid the resulting balance minus the Copayment, if applicable.

- Network Provider must submit the claim to the "primary" payer for payment before submitting a COB claim.

- Claims denied by the primary payer should be submitted using the COB segment and should include the reject code identified by the primary payer.

- When reversing COB claims, Network Providers must include the COB segment fields as indicated by the Payer Sheet.

- If Network Provider receives a reject message indicating the Sponsor does not accept COB claims, Network Provider should notify the Member.

### DoD

For COB considerations for the DoD, see Section 10.4 of this Provider Manual.

### Medicare Part D

For COB considerations for Medicare Part D, please see Section 7.13 of this Provider Manual.

## 2.18   Partial Fill Transactions

A Partial Fill transaction, as defined by NCPDP Standards, occurs when a Pharmacy attempts to fill a prescription and determines there is not enough of the prescribed drug in stock to provide the entire prescribed quantity/days supply.

PBM will accept partial fill transactions for most plan types, with the exception of Medicare Part D and Department of Defense (DoD), and as specified in Section 2.5.  Partial fills should only be submitted by a Network Provider as indicated below.

All partial fill fields are populated in accordance with NCPDP standards and the PBM Payer Sheets. When partially filling, Network Provider should be aware of the following:

- Dispensing fees are transmitted and paid on the initial fill only.

- Only the amount transmitted in PBM's response should be collected from the Member, because Copayment/coinsurance amounts differ from plan to plan.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information All rights reserved
Network Provider Manual - Revised 7/2014

- Sales tax, if any, is payable on all claims based on amount allowed.

- Provider has 30 days to complete a partial fill claim; after 30 days, the claim will reject.

- The associated prescription/service reference ID and dates of service are required for subsequent fills; the fill number should be identical on each fill if the prescription/service reference number is the same.

- When reversing a partial fill claim, include the dispensing status.

- Rejections will occur if the intended quantity, days supply, Member, or product dispensed differs from the initial fill.

- All authorized refills of any prescription must bear the original prescription number.

o Partial refills of schedules III and IV controlled substance prescriptions are permissible under federal regulations, provided each partial fill is dispensed and recorded in the same manner as a prescription refill (i.e., includes date refilled, amount dispensed, initials of dispensing pharmacist, etc.). The total quantity dispensed in these partial fills must not exceed the total quantity prescribed, and no dispensing should occur after six (6) months past the date of issue.

  ▪ The prescription may be refilled no more than five (5) times.

## 2.19   Refill-Too-Soon Edits

If Network Provider receives a "Refill Too Soon" message, Network Provider should verify that the Member actually needs the prescription filled early due to Prescriber increased dose, or check if the original days supply was entered incorrectly. If the original days supply was incorrectly submitted, reverse the original claim and reprocess with the corrected days supply. If Member needs the prescription replaced due to loss resulting from a natural disaster, please see the Emergency Override for Refill Too Soon Due to Natural Disasters section 2.20. In the event a Medicare Part D Member attempts to obtain a trial fill or synchronize his/her medication, information in section 7.9 of this Provider Manual will apply.

If Network Provider verifies that the Member needs the prescription filled early, enter one of the following standard NCPDP Submission Clarification Codes to override the refill too soon reject:

| Submission Clarification Codes | Definitions |
|---|---|
| 02 | Maximum Daily Dosage-Pharmacist is indicating that the prescriber has been contacted to confirm the dosage. |
| 03 | Vacation supply – Pharmacist is indicating the cardholder has requested a vacation supply of the medication. |
| 04 | Lost prescription – Pharmacist is indicating the cardholder has requested a replacement of medication that has been lost. |
| 05 | Therapy Change – Pharmacist is indicating the Prescriber has determined a change in therapy was required; either that the medication was used faster than expected, or a different dosage form is needed, etc. |

## Notes:

- The reason for the override must be recorded on the prescription. If an override is applied to more than one fill for the same prescription, the following must be documented and dated:  a) the reason for the override; b) the Authorization Code, if applicable; c) the name of the PBM

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4                                   Network Provider Manual   Revised 7/2014

representative, if applicable.  An automatically generated override code number, generated by Network Provider's software upon override code submission, is not considered documentation.

- Network Provider must use the proper Submission Clarification Code.  Utilization of any Submission Clarification Code for reasons other than the intended purpose specified above may result in the identification of audit discrepancies and recoupment from Network Provider.

**Emergency Override for Refill Too Soon Due to Natural Disasters**

When a natural disaster occurs such as a flood, wildfire, hurricane or tornado, PBM may implement emergency Refill-Too-Soon procedures.  If a Member in an affected area attempts to fill a prescription that has been lost or damaged as a result of the disaster, and the claim rejects with NCPDP Reject 79 (Refill Too Soon), Network Provider should populate the following fields:

| Field # | Segment | NCPDP Field Name | Value |
|---------|---------|------------------|-------|
| 461-EU | Claim | Prior Auth Type Code | 9 |
| 462-EV | Claim | Prior Auth Number Submitted | 91100000001 |
| 325-CP | Patient | Patient Zip/Postal Code | Current zip code of displaced patient |

Some Sponsors may use other values.

## 2.20    Repackaging

Network Provider is obligated to submit claims using the lowest ingredient cost dosage form (i.e., tablet vs. capsule) and the lowest cost package/size container available that results in the lowest reimbursement to Network Provider when compared to a claim submitted with a different dosage form and/or package size/container. Claims submitted using a higher ingredient cost, dosage form and/or package size/container that results in a higher reimbursement may be subject to recovery.  PBM will not reimburse a Network Provider at a higher AWP than the original manufacturer's product.  Claims for repackaged, relabeled NDCs submitted to the PBM that result in a materially higher reimbursement than claims for non-repackaged, relabeled NDCs may be subject to recovery.

## 2.21    Dispense As Written (DAW) Codes / Generic Substitution

The DAW (Product Selection) Code indicates the reason a certain product was dispensed by the Network Provider.  PBM requires a DAW Code for each claim transmitted.  Reimbursement considerations depend on the parameters of the Prescription Drug Program when these DAW Codes are used.  (Please refer to the DAW code descriptions in the table below.)

Generic Drugs should be dispensed whenever possible and as permitted by applicable law.  Network Provider will supply and charge for the drug that meets official compendium specifications.

If a Member insists on receiving the Multi-Source Brand Drug when the prescription provides that generic substitution is permitted by the Prescriber, DAW Code 2 must be transmitted. The online system will indicate the Copayment amount.

For certain Prescription Drug Programs, the Copayment may include an amount equal to the difference between the contracted Multi-Source Brand Drug price and the contracted Generic Drug price plus the Copayment.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual  Revised 7/2014

| DAW Code | Description |
|---|---|
| 0 | **No Product Selection Indicated**<br><br>Field default value appropriately used for prescriptions for single source brand, co-branded/co-licensed, or generic products.  For a multi-source branded product with available generic(s), DAW Ø is not appropriate, and may result in a reject. |
| 1 | **Substitution Not Allowed by Prescriber**<br><br>This value is used when the Prescriber indicates, in a manner specified by prevailing law, that the product is medically necessary and to be Dispensed As Written.  DAW 1 is based on Prescriber instruction and not product classification. |
| 2 | **Substitution Allowed – Patient Requested Product Dispensed**<br><br>This value is used when the Prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the Member requests the brand product. This situation can occur when the Prescriber writes prescription using either the brand or generic name and the product is available from multiple sources. |
| 3 | **Substitution Allowed – Pharmacist Selected the Product Dispensed**<br><br>This value is used when the Prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist determines that the brand product should be dispensed.  This can occur when the Prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources. |
| 4 | **Substitution Allowed – Generic Drug Not in Stock**<br><br>This value is used when the Prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the brand product is dispensed since a currently marketed generic is not stocked in the pharmacy.  This situation exists due to the buying habits of the pharmacist, not because of the unavailability of the generic product in the marketplace. |
| 5 | **Substitution Allowed – Brand Drug Dispensed as Generic**<br><br>This value is used when the Prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist is utilizing the brand product as the generic. |
| 6 | **Override**<br><br>This value is used by various claims processors in very specific instances as defined by that claims processor and/or its client(s). |
| 7 | **Substitution Not Allowed – Brand Drug Mandated by Law**<br><br>This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted but prevailing law or regulation prohibits the substitution of a brand product even though generic versions of the product may be available in the marketplace. |
| 8 | **Substitution Allowed – Generic Drug  Not Available in the Marketplace**<br><br>This value is used when, in a manner specified by prevailing law, generic substitution is permitted and the brand product is dispensed because the generic is not currently manufactured, distributed, or is temporarily unavailable. |
| 9 | **Substitution Allowed By Prescriber but Plan Requests Brand – Patient's Plan Requested Brand Product To Be Dispensed**<br><br>This value is used when the prescriber has indicated, in a manner specified by prevailing law, generic substitution is permitted, but the plan's formulary requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of 11   PageID #: 12053

201767.4

| DAW Code | Description |
|----------|-------------|
|          | product is available from multiple sources. |

## 2.22  Member Complaints

Network Provider must cooperate with PBM and/or Sponsors to resolve complaints by Members. Network Provider must make every reasonable effort to correct the situation leading up to the complaint. Network Provider must maintain written records of events and actions of the parties involved leading up to the complaint.

REMAINDER OF PAGE LEFT BLANK

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 28 of 236   PageID #: 12054

# Section 3.   Pharmacy Reimbursement

## 3.1     Pharmacy Reimbursement Schedule

Network Providers will receive reimbursement from PBM for pharmacy services provided, including the provision of Covered Medications and/or reimbursable services, as set forth in Network Provider's Provider Agreement, including all amendments, exhibits and/or rate schedules.  The net reimbursement will be less the applicable Copayment and any deductibles.

Claims will be paid in accordance with applicable federal or state laws, and overall, will be paid on an average of 30calendar days from PBM's receipt of a clean claim from Network Provider.  For purposes of clarification, "paid" shall mean the date PBM mails or otherwise transmits payment to Network Provider. "Clean claim" shall mean a claim that has been properly submitted to PBM in accordance with the terms and conditions of the Provider Agreement (including this Provider Manual), and which PBM determines does not require additional information or substantiation from Network Provider, a third party, or further review by PBM.

## 3.2     Disputed Claims

Network Provider is obligated to review remittance advices received from PBM to verify their accuracy. Network Provider must notify PBM in writing of any alleged error, miscalculation or discrepancy (and provide a detailed basis of such allegation) whether paid, denied, rejected or reversed, within 30 calendar days of the date of each remittance advice.  Network Provider will be deemed to have confirmed the accuracy of the claims processed under such remittance advice and waives any claim it may have of errors, miscalculations or discrepancies if it fails to object within such 30-day period.

Network Provider must notify PBM in writing within 10 business days of discovery and reverse a claim submission if Network Provider receives a payment to which it is not entitled, which exceeds the amount to which Network Provider is entitled, or was submitted in or contained any error.

## 3.3     Remittance Media and Transaction Fee Remittance Media

PBM provides a remittance advice with each Network Provider/Pharmacy remittance cycle.  A Network Provider may choose to receive remittance detail via paper or an electronic ASC X 12N 835.

Network Providers should email a request to Remittance@express-scripts.com if they wish to change their remittance medium.

## 3.4     Transaction Fee

A transaction fee of up to $0.20 per payable claim may be assessed for Network Provider's use of PBM's system, unless otherwise specified in the Network Provider's Provider Agreement.  PBM may deduct such transaction fee from claims payments to Network Provider for transactions transmitted in the most current NCPCP standard, and may deduct a minimum of $0.99 for transactions transmitted in any other version.

PBM's ASC X 12N 835 electronic remittance and paper remittance advice will reflect the transaction fee charged on all applicable claims.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

NOTE: Transaction fees will not appear in the NCPDP vD.0 claim response.

## 3.5    Remittance Information Service Fees

PBM will provide remittance information to Network Providers for each reimbursement cycle.  If the Network Provider requests an additional remittance report, PBM may automatically deduct a fee from the Network Provider's future remittance, or invoice Network Provider for said fee(s).

| Remittance Information Service | Service Fee* |
|---|---|
| Paper remittance of 20 or more pages | $75.00 |
| Paper remittance under 20 pages | $15.00 |
| Paper remittance under 5 pages | $5.00 |
| Check Trace/Stop Payment | $25.00 |
| Claim payment verification for claims remitted within the past 24 months | $2.00 per claim |
| Claim payment verification for claims remitted outside 24 months | $5.00 per claim |

* Fees are subject to change without notice.  PBM reserves the right to charge additional fees.

REMAINDER OF PAGE LEFT BLANK

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual   Revised 7/2014

# Section 4.   Formulary Overview

## 4.1     Overview of Formularies

A Formulary is a structured list of Covered Medications or Covered Services that offers choices among comparable drug treatments and an associated range of costs, depending on whether the Formulary or "preferred" drug is prescribed.

Because no single Formulary can meet the needs of all Sponsors, PBM offers several options. Consequently, each Sponsor may select and implement a cost-effective Formulary that meets its pharmaceutical and budgetary needs as well as those of its Members.

**Network Provider's pharmacists should make their best effort to dispense the Formulary drug and/or product and, except for generic substitution or reasons of medical necessity, should never switch a Member from the Formulary drug and/or product to a non-Formulary drug and/or product when filling a prescription.  Some Formularies and programs are Sponsor-specific and Network Providers must depend on online messaging to identify Formulary and non-Formulary products.   However, generic substitution of A-B rated equivalents is always permitted and, with documented Prescriber approval, therapeutic substitution of lower-cost brand or Generic Drugs is encouraged.**

It is inconsistent with PBM network standards if a Network Provider does not attempt to dispense in accordance with the Sponsor's Formulary, and Network Provider is required to keep a record on the original prescription of its attempt at achieving Formulary compliance.  PBM may recover from Network Provider the full amount of Network Provider's reimbursement and/or dispensing fees when Network Provider (i) fails to attempt Formulary compliance or note Formulary compliance efforts on the original prescription; (ii) acts contrary to Formulary compliance; or (iii) causes the prescription to result in a higher cost to the Sponsor and/or the Member.  Failure to comply with the Formulary may be considered a breach of Network Provider's Provider Agreement.  Since Formulary drugs and products may change from time to time, it is important to read and understand the online messaging provided by PBM.

Network Provider agrees that for all Sponsors and Members, the PBM's manufacturer agreements, therapeutic programs and Formularies take precedence over any agreements or programs to which the Network Provider is a party.  Network Provider also agrees not to implement any substitution programs for Members that are inconsistent with PBM's manufacturer agreements, therapeutic programs and Formularies.

## 4.2     Step Therapy

PBM assists Sponsors with Formulary management by allowing them to implement step therapy for various classes of drugs ("Step Therapy").  Step Therapy programs require Members to try front-line (step-one), clinically effective, lower-cost medications before they "step up" to a higher-cost medication. Step Therapy can also be used to promote generic utilization for selected drugs.

The Step Therapy program applies edits to drugs in specific therapeutic classes at the point of service. PBM's systems support automatic concurrent review of the Member's claims profile for use of front-line alternative medications.   Only claims for Members whose histories do not show use of front-line medications are rejected for payment at point of service.   As with PA, other coverage criteria are

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of
12057

automated whenever possible so that rejects are kept to a minimum.  PBM also employs patient care advocates trained to answer Members' questions and provide benefit education.

**Claims Adjudication for Step Therapy**

- Online edits are applied to each claim for non-preferred drugs.

- Secondary messaging is displayed (message varies according to therapy classification) specifying which alternative drugs are required first.

Network Provider should make every effort to communicate online and secondary messaging to the Member in order to allow for appropriate drug selection.

---

REMAINDER OF PAGE LEFT BLANK

---

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 1 of 2   PageID #: 12058

# Section 5.   Network Provider Quality Assurance Reviews, Audits & Investigations

## 5.1     Introduction

### Generally

PBM maintains an ongoing Network Provider quality assurance review, audit and investigation program as a service to its Sponsors, as well as to assist Network Providers in complying with the terms of their Provider Agreement.

**Quality Assurance Review**: PBM may conduct a review of claims prior to payment to ensure compliance with all provisions of the Provider Agreement, this Provider Manual, and each Sponsor's specific Prescription Drug Program requirements.

**Audits:**  All claims are subject to audit regardless of whether or not a claim successfully adjudicates, and PBM reserves the right to review (i.e. audit) any claim.  The authorization code transmitted to Network Provider does not limit or preclude PBM's right to review, audit or otherwise investigate claims.

PBM may conduct a post-payment audit of claims paid to Network Provider to ensure compliance with all provisions of the Provider Agreement, this Provider Manual, and each Sponsor's specific Prescription Drug Program requirements.

**Investigations:**  PBM may conduct an investigation of any claim(s) suspected of fraud, waste or abuse.

Network Provider must permit PBM and/or an authorized third party (the "Auditor" or "Investigator" as applicable) to inspect, review, audit, and reproduce, during regular business hours and without charge, any medical, business, financial, patient care documentation and prescription records maintained by Network Provider pertaining to the Member, the Provider Agreement or any claim submitted to PBM by Network Provider.  In addition, Network Provider must make records available to applicable local, state, and federal regulatory authorities in accordance with federal, state and local laws, rules and regulations.

### Work Environment, Access to Records, Network Provider Conduct

PBM requires Network Provider to be respectful to all PBM personnel.  If PBM is conducting an on-site audit or investigation, PBM requires that Auditors and/or Investigators are provided a clean, safe and clutter-free work environment located away from the most active area of the Network Provider's location(s), but with easy access to the documents and records being reviewed.  In the course of an on-site audit or investigation, in states that do not already require a photo on a pharmacy license, the pharmacist-in-charge or pharmacist on duty must provide identification in the form of a State Drivers License, State ID, passport, or other acceptable photo identification as necessary to verify State Board licenses and certifications when requested.

Records must be pulled by the Network Provider's staff in plain view of the Auditor and/or Investigator. Network Provider agrees to print, provide copies of the scanned prescriptions and scan all documents associated with the audit or investigation at no additional charge.   Network Provider should be sufficiently staffed on the day of the audit and/or investigation to ensure that Network Provider is reasonably available to answer questions from the Auditor and/or Investigator and to retrieve the information requested.   Network Provider will not be permitted to record an on-site audit and/or investigation (existing security cameras are allowed).  Additionally, in the event it is necessary for PBM

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4                                                                    Proprietary & Confidential Information All rights reserved
Network Provider Manual - Revised 7/2014

to perform an unannounced audit and/or investigation, Network Provider shall call in additional personnel so as to be sufficiently staffed, thus ensuring continuation of services in an orderly, routine manner. Network Provider should be reasonably available to cooperate with the audit and/or investigation and to provide the requested information to PBM's Auditor and/or Investigator.

## Non-Compliance

A Network Provider shall be deemed noncompliant when the Network Provider refuses to allow or cooperate with an audit and/or investigation, fails to provide PBM with the requested documentation, fails to prepare for an audit or investigation, or is otherwise uncooperative, abusive or violates any terms of the Provider Agreement, including this Provider Manual. If Network Provider (or any employee of Network Provider) is deemed non-compliant, an enforcement fee of $2,000 or 15% of the total final audit or investigation findings, whichever is greater, may be assessed  Non-compliance fees are in addition to any discrepancies identified. It is within PBM's sole discretion to recoup 100% of the amount for the paid claims in question and offset any amount owed to Network Provider. PBM, in its sole discretion, may take further action up to and including termination of Network Provider for non-compliance.

## Required Records

Network Provider must retain all records in accordance with industry standards and applicable laws, rules, and regulations (or for six (6) years, whichever is greater). Network Provider must make these records available to PBM and any applicable local, state, and federal regulatory authorities.

Network Provider agrees to provide PBM with any and all information and documents requested relating to a Covered Service including, but not limited to:

- Valid prescription documentation, including:  (a) Patient's complete name and current address; (b) Prescriber's complete name, address and telephone number; (c) Medication name and strength; (d) Quantity with specific dosage directions; (e) Generic substitution instructions; (f) Refill instructions; (g) Date of prescription; and (h) Any other information required by law

- Documentation justifying any change to a prescription, including the date and name of the person at the Prescriber's office who authorized the change

- Signature logs

- Patient consent forms

- Daily prescription logs

- Documentation for prescription refills

- All pharmacy and pharmacist licenses

- Wholesaler and supplier invoices, proof of invoice payment, and pedigrees

- Documentation of prescription stock transfers between Network Provider locations

- Documentation justifying the use of an override code, including but not limited to, reasons for early refill(s) (e.g., vacation supply) and Member's request for a multisource brand medication

- Prescription and refill transfer records including, but not limited to: (a) Date of transfer, (b) Identity and location of sending/receiving pharmacy; (c) Original prescription number of the original prescription; and (d) Any other information required by law, rule or regulation

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

- Vaccine administration records

- Any coupon or voucher used by Network Provider

- Compounds: NDC, metric quantity of each medication, Certificate(s) of Analysis (COA), compound recipe sheet/log, with quantity calculations used to prepare the compound

- Patient diagnosis codes or narratives, if required by law, rule, or regulation

- Residence code must be noted for a Member in a Long-Term Care (LTC) facility

- Date Member was discharged from the hospital or other acute care facility must be documented for home infusion patients

- Any pharmacy policy relating to dispensing or preparing Covered Medications

- Any other record required by the Provider Agreement, the Provider Manual, or by any law, rule or regulation

Failure to properly maintain and produce the above records may result in the recoupment.

## Sponsor Participation & Disclosure

PBM and/or a PBM designee may conduct and/or participate in an audit and/or investigation. This includes, but is not limited to, PBM's Sponsors and governmental authorities. Accordingly, PBM may require Network Provider to allow Sponsor or any other designee to accompany the Auditor or Investigator. In addition, PBM audit and investigation findings belong to and are the information of PBM and may be shared with appropriate individuals and entities as determined by PBM, including, but not limited to, PBM's Sponsors and governmental authorities.

## Fraud and Abuse Allegations

The audit requirements noted in this Provider Manual do not apply if the audit or investigation involves or identifies suspected fraud, abuse, or willful misrepresentation.

## 5.2    Quality Assurance Review, Audit Programs, Processes and Results

All claims are evaluated by PBM's proprietary programs. As a result, claims may be selected for additional review. Selection criteria are based on, but not limited to:

- Generic Drug, Multi-Source Brand Drug, and Single Source Brand Drug fill rates
- Generic substitution
- DAW Code usage
- Average claim amount
- Quantity dispensed versus days supply and FDA guidelines
- Quantity dispensed versus covered Member benefit Prescription Drug Program limitations

- Usual and Customary Retail Prices
- Reversals
- Compounding
- Controlled substance dispensing
- Formulary compliance
- Prescriber profiling
- Referral from Prescription Drug Program Members
- Referral from PBM Sponsors

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 52 of 253   PageID #: 12061

PBM utilizes the following types of audit programs; this list is not all inclusive. PBM reserves the right to use other audit methods and to contact Members, Prescribers, and other third-parties to validate claims information submitted by Network Provider.

- ***On-site Audits:*** A PBM Auditor visits Network Provider's location(s) (or the Network Provider's central location) to perform a comprehensive review of select claims, quality assurance documentation, procedures, and credentialing. On-site audits are normally scheduled with two (2) weeks prior written notice. PBM may, in its sole discretion, opt to give Network Provider a masked list of claim numbers to be audited in advance of an on-site audit.

- ***Desk Audits:*** Network Provider receives notification of the audit via facsimile, email, or USPS request for documentation. This notification will outline what documentation is required by the PBM auditor.

- ***Operational Claims Review (CAP):*** For certain Network Providers, online claims are automatically flagged utilizing predetermined criteria and reviewed for quality assurance. Each business day, a list of claims to be reviewed will be sent to Network Provider via electronic mail or facsimile to verify claim information including, but not limited to: Prescriber's directions for use, quantity dispensed, days supply, date written, Prescriber's name, Prescriber's phone number, Prescriber's DEA or NPI number (as applicable), refills authorized, compound ingredients (if applicable), and vaccine administration records (if applicable). Network Provider must send all requested documentation within 14 calendar days.

## Quality Assurance Review Processes

- ***Telephone Quality Assurance Review:*** PBM contacts Network Provider or Network Provider's representative via telephone to verify claim information including, but not limited to: Prescriber's directions for use, quantity dispensed, days supply, date written, Prescriber's name, Prescriber's phone number, Prescriber's DEA or NPI number (as applicable), refills authorized, compound ingredients (if applicable), and vaccine administration records (if applicable). In addition, the name of the individual at Network Provider's location providing the information, including title, must be given in the event any follow-up information is needed. If Network Provider fails to respond or fails to supply all requested information within one (1) business day, 100% of the amount for the claim(s) in question will become immediately due and owing to PBM, and PBM may reverse such claim(s) and/or offset the amount owing against any amount owed to Network Provider.

- ***Automated Quality Assurance Review:*** PBM also performs a daily claims review which may be conducted for improperly submitted claims. In this quality assurance process, claims may be reversed and reprocessed. When necessary, PBM will contact Network Provider for additional information.

## 5.3    Audit Guidelines

**Timing and Appeals:** Network Provider must comply with the timing outlined in audit letters. Documentation will only be considered for review if received by the documentation deadline. If Network Provider fails to respond or fails to supply all requested information, one 100% of the amount for the claim(s) in question will become immediately due and owing to PBM, and PBM may reverse such claim(s) and/or offset the amount owing against any amount owed to Network Provider. If PBM receives all required information, PBM will notify Network Provider of the audit results within 30 calendar days following receipt of requested audit documentation or the date of the on-site audit, whichever is later.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 40 of 236   PageID #:
12062

Thereafter, Network Provider has up to 30 calendar days, unless otherwise provided by law, to appeal the audit results. PBM shall notify Network Provider of the appealed audit results within 90 calendar days from receipt of Network Provider's appeal.

**NOTE:** No appeals are permitted for a DoD audit. Network Provider may submit a grievance in accordance with Section 5.6 of this Provider Manual.

**Appeal Documentation**: In general, Network Provider may provide any legally valid prescription to validate an audited claim. If Network Provider is unable to produce a complete prescription (i.e., missing directions sufficient to calculate days supply) or any other required documentation during an On-Site or within the timing required by the Desk Audit, Network Provider will be required to submit Prescriber generated documentation. No Network Provider generated documentation will be accepted. (Examples of Network Provider generated documentation include emails from Prescribers, Network Provider generated copies, telephone prescriptions and Network Provider generated faxed refill requests or other prescription forms).

Prescriber generated documentation includes: (i) photocopies of the original Prescriber generated prescriptions (if found) – original Prescriber generated prescriptions must be dated and, if a fax, must have a header identifying the Prescriber and the original fax date; or (ii) an original letter on Prescriber's letterhead or on a Prescriber's prescription blank that includes all information needed on a valid prescription (including specific directions). Electronic prescriptions and electronically transferred prescriptions may be accepted as Prescriber generated documentation as long as all relevant dispensing information is included. PBM will not review appeals filed by Network Provider if the appeal does not comply with these guidelines. Network Provider may contact the auditor conducting the review for additional guidance on appropriate appeal documentation.

**Recoupment and Offset:** PBM reviews all audit documentation to ensure Covered Medications are dispensed in accordance with all laws, rules, regulations, the Provider Agreement, the Provider Manual, and Payer Sheets. Claims not submitted in accordance with these requirements are subject to reversal and recoupment of paid claims.

**Federal or State Law**: In the processing and dispensing of prescriptions, Network Provider must comply with all state and federal prescription documentation and dispensing laws, rules and regulations. Violations are subject to audit and reversal, and recoupment of paid claims.

**DAW:** All DAW codes used in submitting claims are subject to audit and recoupment to ensure they are appropriate. Submission of a DAW 1 code must be supported by hard copy prescription documentation on the original prescription, the telephone order, or prescription update, and is subject to all applicable laws, rules and regulations. PBM may recoup for any claim submitted with missing or incorrect DAW Codes or with a DAW 7 code where no specific law, rule or regulation prohibits substitution.

**Government Requests for Documentation:** PBM and its Sponsors are subject to audits by various government agencies including but not limited to CMS, OIG, DoD, Medicaid, etc. From time to time, PBM or its Sponsors may be required to submit documentation supporting claims billed and/or paid to the government. In order to support government audits, Network Providers are required to provide the PBM with copies of prescriptions or other documentation as requested by the government agency. PBM will request claims through normal audit channels, and Network Provider must provide the requested documentation within 10 calendar days, or a shorter time frame as required by law or as specified by the government or Sponsor.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4                                                                                       Proprietary & Confidential Information All rights reserved
                                                                                              Network Provider Manual Revised 7/2014

Audited claims may result in recoupment.  Additionally, audits may be performed by the government using statistically valid sampling techniques.  Audit discrepancies, including failure to supply requested claims documentation within the required time frame, may be extrapolated by the government across an entire population of paid claims regardless of the terms of the Network Provider's Provider Agreement.  Any such extrapolation resulting from Network Provider's audit discrepancies will be charged or offset against an amount owed to Network Provider in addition to the actual claim discrepancy.

**Member Impact**:   If audit discrepancies impact Member responsibility calculations (e.g., TrOOP, Member Copayment or out-of-pocket amounts, etc.), Network Provider shall cooperate with PBM in correcting such claims, information and/or collections and payments, including repayment of any monies determined by PBM to be owed to the Member as a result of such discrepancy(ies) and offset.  For example, if PBM determines that a paid claim is subject to full recoupment, Network Provider must reimburse the Member's full Copayment amount.  This ensures that TrOOP and TDS calculations are up to date and accurate.  For paid claims subject to partial recoupment, Network Provider must "credit" or "re-charge" the Member's Copayment and ensure the Member's Copayment amount is accurate based on the corrected claim submission.

## 5.4    Discrepancy Glossary:

As an outcome of the audit process, prescription claims may be identified as discrepant. Claims discrepancies may result in recoupment.  Following is a list of common discrepancies and the calculated recoupment for each discrepancy.  PBM may identify a claim as discrepant if it is missing any required information, supporting documentation, or if the claim was otherwise submitted to PBM in a manner inconsistent with the Provider Agreement, including this Provider Manual.  Network Provider may submit an appeal to PBM in accordance to the appeal procedure set forth herein.

| Discrepancy Glossary | | |
|---|---|---|
| **Description** | **Definition** | **Code** |
| Altered RX | Prescription appears altered or was altered after audit was conducted. | ALT |
| Billed After Hours | Claim was adjudicated outside of Network Provider's normal operating hours. | BAF |
| Billed Wrong Drug | Submitted drug does not match prescription.  If Prescriber changes the medication, it must be written on the prescription or a new hard copy prescription must be issued.  Supporting documentation must be viewable at time of audit. | XDB |
| Can't Find Rx/Missing Prescription | Prescription could not be found at the time of the audit. | CF |
| Claim Billed for Non-Contracted Network Provider | Claim was adjudicated for a non-contracted provider with use of a contracted Network Provider's NCPDP number. | NCP |
| Compound Documentation Required | Claim was submitted for a compound without appropriate documentation (e.g., compounding log, Certificate of Analysis (COA), compound calcula-tions, or other applicable documentation requested by PBM). | CDR |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

| Discrepancy Glossary | | |
|---|---|---|
| **Description** | **Definition** | **Code** |
| Coordination of Benefits | Claim was submitted with PBM as primary payer, but should have been submitted as other coverage, or claim was submitted correctly with PBM as secondary payer but an error on the claim influenced payment. | COB |
| Cut Quantity | Quantity dispensed was reduced from that authorized by Prescriber and allowed under prescription drug plan. | CQ |
| Double Billed | Prescription was submitted twice on same day or on consecutive days. | DUP |
| Drug Dispensed not Equivalent to Prescribed Medication | Medication dispensed is non A-rated to originally prescribed medication | AB |
| Inappropriate Fill Date/Expired Prescription | Claim submitted with a date of fill prior to the date written on the hard copy prescription or beyond the expiration date as determined by the date. | IFD |
| Incorrect Prescriber ID | Claim submitted with a DEA or NPI number (as applicable) that does not match Prescriber. | IPI |
| Insufficient Purchase Invoice | Provider fails to/or provides incomplete purchasing invoices for claim validation. | INV |
| Invalid/Incomplete Prescription | Prescription was dispensed from a written prescription which does not contain required or accurate information (e.g. Prescriber signature, quantity, date, etc.) | IRX |
| Invalid/No Diagnosis Indicated | Claim was adjudicated using override code for diagnosis without supporting documentation. | IDX |
| Med A/B Eligible Sub-mitted Under Med D | Claim was submitted for payment under Medicare Part D but was eligible under Medicare Part A or B and/or is a Medicare Hospice drug. | AVD |
| Miscellaneous Discrepancy | Claim was submitted with a discrepancy not otherwise noted. | OTH |
| Missing DEA on Controlled Substance Prescription | Prescription for a controlled substance dispensed from a written prescription which did not contain the Prescriber's DEA number or other number as acceptable under regulations. | MDC |
| Network Provider Failed/Refused to Provide Requested Documentation or is Not Compliant | Network Provider failed or refused to provide documentation associated with a claim as requested and within the requested time frame. | PRD |
| Network Provider Reversed Audited Claim | Network Provider fully reversed the claim prior to PBM assessing and communicating an audit decision to Network Provider. | PRC |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information - All rights reserved
Network Provider Manual - Revised 7/2014

| Discrepancy Glossary | | |
|---|---|---|
| **Description** | **Definition** | **Code** |
| No Response to Audit | Network Provider failed to respond to audit request within allotted time. | NRD |
| As Directed" Not Permitted by Network Provider Agreement | Prescription was submitted with "as directed", "ud", or "prn" for the directions for use, or with vague directions for use when a consecutive day supply cannot be calculated | UD/UDR |
| No Signature Log, Not Picked Up, No Record of Fill, or No Proof of Service | Network Provider does not have a valid signature log or proof of service to establish that the Member received the prescription. | NPU |
| Patient Denied Claim | Claim is disputed by the Member and Network Provider is missing signature log. | PCR |
| Patient Name Different | Member name does not match patient name on the prescription. | PND |
| Prescriber Denied Claim | Prescriber denies writing/authorizing prescription. | MCP |
| Program Drug Dispensed Without Proper Qualification | Network Provider did not dispense drug in accordance with approved FDA labeling for a drug product(s) with a risk management program or other FDA regulation.  For the most current program requirements, please refer to the approved individual drug product labeling. | RMA |
| Refill Too Soon | Claim adjudicated using an override code without appropriate documentation of the reason for the early fill, or claim adjudicated without rejection due to incorrect days supply submission. | RTS |
| State Law | Claim was dispensed with a written prescription that does not contain required or accurate information per state regulation/ prescription was not dispensed in accordance with state regulations. | STL |
| Unauthorized Mail Prescription | Network Provider mailed or delivered prescriptions to a state where Provider is not credentialed to mail or did not have appropriate licenses. | UM |
| Unauthorized Refill | Claim was submitted for refills in excess of the number indicated on the original prescription.  Documentation must be viewable at time of audit. | UR |
| Vaccine Administration Fee Charged Incorrectly | Network Provider billed PBM an administration fee for administering a vaccination.  Network Provider was either not contracted to administer vaccinations or did not actually administer the vaccine. | VAC |
| Billed Over Usual & Customary Retail Price | Claim submitted with U&C Retail Price higher than the price charged to cash patients for the same medication on the same date of service.  If the price charged to cash patients falls below Network Provider's Provider Agreement rate, the difference will be charged back to Network Provider. | U&C |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

| Discrepancy Glossary | | |
|---|---|---|
| **Description** | **Definition** | **Code** |
| Billed Wrong NDC | Claim submitted using NDC for a dosage different than the dosage prescribed, or a package size incongruent with the prescribed dosage was dispensed.  Unless the quantities/total strength of the drugs are equivalent, the price difference will be charged back to Network Provider. | BWN |
| Dispensed Generic Billed Brand | Claim identified brand medication but generic medication was dispensed. | DG |
| Exceeds Plan Limits | Quantity or days supply dispensed exceeded amount permitted by the Prescription Drug Plan. | EPL |
| Inappropriate DAW | Prescription documentation does not support submitted DAW code | IDW |
| Overbilled Quantity | Claim submitted with inaccurate information resulting in an incorrect reimbursement, including prescriptions filled for a quantity in excess of the quantity written on the prescription or in excess of the days supply submitted. | OB |
| Incorrect Days Supply | Claim submitted with an incorrect days supply. | IDS |
| Compound, Adjustment for Overpayment | Claim for a compounded drug is submitted with an inflated cost or inappropriate professional service fee (PSF). | OC |
| Shared Prescription | Claim submitted for a quantity to be shared by two or more Members, instead of separate claims for each Member. | SHR |

## 5.5    Audit Appeal Procedure/Guidelines

All appeal documentation must include the Network Provider Name, NCPDP/NPI number, prescription number, date(s) of fill, date of the audit, audit log number (generated from the audit results report), disputed discrepancy code, and reason for appeal.  In order for an appeal to be considered, Network Providers must send **all of the preceding** to the PBM Audit Department via secure e-fax server indicated on the audit results report or via Certified Mail, Federal Express, UPS, or other certified carrier to the address indicated on the audit results report.   Network Providers may also send appeal documentation to PBM's headquarters address listed below:

Express Scripts Inc.
Attn:  PBM Audit Department
One Express Way, HQ2W02
St. Louis, MO  63121

**NOTE**: Only Prescriber-generated appeal documentation will be allowed.  Refer to section 5.1-5.3.

## 5.6    Audit Grievance Procedure

If Network Provider disagrees with the findings in a final audit report, Network Provider may file a grievance within 30 calendar days from the date of the final audit report.  To file a grievance, Network

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information   All rights reserved
Network Provider Manual - Revised 7/2014

Provider may request a copy of the "Audit Grievance Form" from any PBM auditor or may access the form online via the PBM's Pharmacy Resource Center.

In order for a grievance to be reviewed, Network Providers must submit **all of the following:**

- A completed "Audit Grievance Form" for each prescription number, any supporting evidence, and a clear statement of why the findings should be reversed.

- Original documentation from the Prescriber, in the form of a photocopy (front and back) of the original Prescriber generated prescription(s). Network Provider generated documentation will NOT be accepted when discrepancies require additional Prescriber generated documentation.

Network Provider should return the completed form and supporting documentation via secure fax-to-fax server to the fax number listed on the Final Audit Report, attention Audit Grievance, or via Certified Mail, Federal Express, UPS, or other certified carrier to:

Express Scripts Inc.
Attn: Audit Grievance
One Express Way, HQ2W02
St. Louis, MO 63121

**Grievances that do not comply with these submission guidelines may not be considered for reversal. All audit disputes will be reviewed within 90 calendar days of receipt or in accordance with applicable laws. PBM's decisions are final and are communicated to Network Provider in writing within 30 calendar days of the expiration of the 90 calendar-day review period.**

## 5.7    Potential Fraud Identification

PBM's Fraud, Waste and Abuse Services team identifies possible fraud, waste or abuse committed by Members, Prescribers, and Network Providers by using various methods including but not limited to:

- Claims review, which may include unusual billing patterns;
- Review of Network Provider, which may indicate quality or compliance issues of any type;
- Review of historical Network Provider dispensing analysis or trending;
- Monitoring of newspapers, Internet and other public news sources;
- Tip solicitation through various means, including PBM's toll-free Fraud Tip Hotline published on the Member and Sponsor web portals;
- Monitoring of BNA Health Care Fraud Report, the National Association of Drug Diversion Investigators (NADDI) newsletter and other industry sources;
- Investigations, including Member and Prescriber purchase verification; and
- Use of PBM's proprietary fraud investigation statistical tools.

Claims suspected of fraud, waste or abuse are subject to investigation.

## 5.8    Investigative Methods

PBM utilizes the following methods to investigate circumstances of potential fraud, waste and abuse.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

All Investigation results belong to and are the information of PBM and, in its discretion, may be shared with PBM's Sponsors and other investigative partners. This list is not intended to be all inclusive:

- **On-site Investigations:** The Investigator visits Network Provider's location(s) to perform a comprehensive review of claims and quality assurance documentation, procedures, and credentialing. Generally, PBM does not provide notice of these investigations. Sponsor representatives are permitted to accompany and assist the PBM Investigator.

- **Written Desk Investigations:** Targeted documentation is requested from Network Provider and compared to in-house Network Provider claims information.

- **Prescriber Investigations:** Targeted claims information submitted by Network Provider is comprehensively verified by the Prescriber.

- **Member Investigations:** Prescription receipt(s) and specific claim(s) information are substantiated through a Member's written verification.

- **Purchase Verification:** Quantities and package size of medications submitted by Network Providers are verified from information provided by wholesalers. Network Providers subject to a Purchase Verification Investigation will be required to list all suppliers of drugs that have been submitted as claims to PBM on the "Pharmacy Supplier Acknowledgment" form. This form must be returned to PBM within seven (7) calendar days of the date of the request. Supplier data, as indicated below, must be provided within seven (7) to 14 calendar days of the date of the request. At the end of the seven (7) to 14 (7-14) calendar-day period, the investigation will be considered closed and no further documentation will be accepted. Extensions may be granted for extenuating circumstances in PBM's sole discretion. If discrepancies are noted, PBM will provide a <u>Final Discrepancy Report</u> upon completion of the review.

  Documentation submitted as part of a Purchase Verification investigation must meet the following guidelines:
  - The documentation of purchases must be submitted to PBM directly from the drug supplier. No documentation provided by the Network Provider will be accepted.
  - Data must be provided in ".xls" spreadsheet format by email or CD. Exceptions may be made in extenuating circumstances.
  - Data provided must contain all fields listed in the purchase verification request and cover the entire date range specified.

Network Provider must provide complete and accurate information in response to all investigative requests. Network Provider must also meet all deadlines as outlined in written investigative requests.

## 5.9 Recovery and Disciplinary Action

PBM requires Network Providers to comply with all provisions of the Provider Agreement, this Provider Manual, and each Sponsor's specific Prescription Drug Program requirements. Violations will be aggressively investigated and resolved by PBM's Fraud, Waste and Abuse Services Department. Network Providers found in violation of the Provider Agreement or this Provider Manual will be subject to disciplinary action or recovery.

In instances when PBM has determined a Network Provider (or Member) has (i) refused to cooperate in an investigation, (ii) failed to substantiate drug purchases, (iii) acted in an inappropriate manner, (iv) caused a claim to be submitted that PBM suspects was submitted inaccurately, under false pretenses, or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

(v) taken any action or inaction that in any way suggests possible fraud, waste or abuse, PBM shall have the right to take any or all of the following actions at its sole discretion:

- Reverse the applicable claims and recoup the monies paid to Network Provider;

- Withhold Network Provider's future remittances until sufficient funds to cover such claims are collected;

- Refer Network Provider to government (if Federal or state-funded claims are involved), law enforcement, and/or the affected Sponsors;

- Refer Network Provider to PBM's Pharmacy Disciplinary Action Committee (PDAC). The PDAC will review evidence related to the suspected fraudulent activity and decide on appropriate disciplinary action. Potential disciplinary actions include, but are not limited to, probation and assessment of fines, follow-up investigations, suspension of status as a Network Provider, and/or termination from future participation in PBM's Provider Networks. In all cases, the decision of the PDAC is final;

- If sufficient funds are not repaid by Network Provider or cannot be withheld, PBM may initiate collection efforts to recover any funds owed; and/or

- Terminate Network Provider's Provider Agreement.

## 5.10   PBM's Fraud Tip

Together, PBM and Network Providers can coordinate efforts to provide an effective prescription benefit while helping to deter fraudulent claims. Network Providers should notify PBM if a Network Provider suspects that a potentially fraudulent or inappropriate claims activity is occurring, such as:

- A Member presents a prescription not written by the identified Prescriber.

- A Member presents a forged or altered prescription, calls in his/her own prescriptions, or may be over-utilizing prescriptions.

- A claim rejects based on a claim submitted by another Network Provider without explanation by a Member.

- Prescribed medication is inconsistent with the practice or specialty of Prescriber.

PBM provides two (2) options for Members, Sponsors and Network Providers to report suspected fraud: (i) by phone to the PBM Fraud Tip Hotline; and (ii) by email to PBM's Program Integrity team. Both methods are publicized on www.express-scripts.com and on Sponsors' websites.

Phone:  866.216.7096
Email: fraudtip@express-scripts.com

Telephone reports may be completely anonymous should the caller not wish to leave personal information. Emailed reports enable PBM investigators to contact the complainant via return email.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

# Section 6.    Compliance with Laws

## 6.1    The Health Insurance Portability and Accountability Act of 1996 ("HIPAA")

**Trading Partner Provisions**

PBM, inclusive of one or more of its subsidiaries, and Network Providers (including their Pharmacy(ies)) are "trading partners" as that term is understood under the rules promulgated by the United States Department of Health and Human Services ("HHS"), as amended, regarding standard electronic transactions under 45 CFR Part 160 and 162 ("HIPAA Rules").   The HIPAA Rules require Network Providers and PBM to enter into a "trading partner agreement" to comply with applicable sections of the HIPAA Rules.

The following "trading partner" terms are incorporated into the Provider Agreement between the PBM and a Network Provider for purposes of compliance with the HIPAA standard transactions rules.

**Standard Transactions.**   The HIPAA Rules provide for certain transaction standards for transfer of data between trading partners.   Network Provider shall submit to the PBM, and PBM will be prepared to accept from Network Provider the following:

   (i)    NCPDP Telecommunications Standard Version D.0 Release.

   (ii)    The ASC X 12N 835 – Health Care Claim Payment/Advice Version 5010, 005010X221AI, October 2010.

   (iii)    The parties each hereby agree that it shall not change any definition, data condition or use of a data element or segment in a standard, add any data elements or segment to the maximum defined data set, use any code or data elements that are either marked "not used" in the standard's implementation specification or are not in the implementation specification, or change the meaning or intent of the implementation specification.

**Effective Date.**   The above "trading partner" provisions shall commence as of the earliest applicable Compliance Date and shall be coterminous with the applicable Provider Agreement.

## 6.2    Federal False Claims Act

The Federal False Claims Act (31 USC § 3729) prohibits knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval to a Federal Health Program (including Medicare and Medicaid); this includes knowingly failing to give a credit when due and owing.   PBM employees, contractors or agents and Network Providers are prohibited from knowingly making a false claim against the government.

## 6.3    Program Fraud Civil Remedies Act (CFR 45 Part 79)

The Program Fraud Civil Remedies Act creates administrative remedies for making false claims separate from and in addition to the court remedy for false claims provided by the Civil False Claims Act.   It is a violation of federal law to submit improper claims or written statements to a federal agency.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 6 of 9   PageID #: 12071

201767.4

## 6.4     Compliance with Self-Referral and Anti-Kickback Statutes

State and federal anti-kickback and self-referral statutes prohibit health care providers from engaging in certain types of relationships with other health care entities – including pharmacies.  See e.g., 42 U.S.C. § 1395nn; 42 U.S.C. § 1320a-7b.  These prohibitions include (i) limitations on the direct or indirect ownership of pharmacies by Prescribers and the immediate family members of Prescribers, and (ii) prohibitions on direct or indirect compensation to Prescribers for Member prescriptions or referrals.  It is Network Provider's responsibility to be aware of all such laws and comply with all state and federal law, including anti-kickback statutes and self-referral statutes.  Failure to demonstrate compliance with these laws may result in immediate termination by PBM.

| REMAINDER OF PAGE LEFT BLANK |
|---|

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

# Section 7.  Medicare Part D Prescription Drug Program

The Medicare Part D program is designed to subsidize the cost of prescription drugs for Medicare Members under a <u>voluntary</u> prescription drug benefit.  This section details the PBM's network processes and requirements in support of the Medicare Part D program as created by Title I of the Medicare prescription Drug Improvement and Modernization Act of 2003.

## 7.0    Medicare Part D Addendum – Provider Network Requirements

On the effective date of Network Provider's participation in PBM's Medicare Part D provider network, the following provisions are added to, and made a part of, the Agreement currently in force between Network Provider and PBM.  The terms of this Medicare Part D Addendum (the "Addendum") apply to services (also referred to herein interchangeably as "Covered Services" or "Covered Products") provided to Members by Network Provider in one or more of PBM's Medicare Part D prescription drug benefit program provider networks.  Network Provider's Agreement with PBM includes participation in the Medicare Part D prescription drug benefit programs administered by PBM utilizing all rate exhibits and/or schedules in effect.  Provider's decision not to participate in this Addendum will not modify Provider's current contractual relationship with PBM.  To the degree any provisions in the Agreement conflict with this Addendum, the provisions of this Addendum shall prevail.  The terms of this Addendum will remain in effect until the termination of the Agreement currently in force between Provider and PBM.

Provider agrees to render Covered Services to Members.  Provider agrees to participate as a network provider in one or more of PBM's Medicare Part D provider networks under the terms and conditions agreed to by the parties.  Any activities or services performed by Provider in connection with a Medicare Part D Sponsor's Medicare Part D plan will be consistent and comply with the Sponsor's contractual obligations as a Medicare Part D Sponsor.  42 CFR § 423.505(i)(3)(iii).

In the event Provider delegates any activity or responsibility related to the provision of Covered Services to subcontractor(s), the subcontractor(s) will be subject to the terms and conditions set forth in this Addendum.  Provider will ensure that its agreements with such subcontractor(s), if any, provide that the subcontractor(s) will comply with all of the terms and conditions set forth in this Addendum.  42 CFR § 423.505(i)(3) and (4).  Notwithstanding the provisions of this paragraph, Provider shall not delegate services under the Agreement, unless it receives written permission from PBM.

CMS mandates that Medicare Part D Plans review the Office of Inspector General (OIG) and General Services Administration (GSA) exclusion lists on a monthly basis to identify Prescribers, pharmacies, and manufacturers that are on the lists.  Sponsors are to use this information to appropriately reject claims submitted for Part D Members that are written by an excluded Prescriber, dispensed by an excluded provider, or provided by a manufacturer on the OIG or GSA exclusion list.  If the prescription was prescribed by an excluded Prescriber, or manufactured by an excluded manufacturer, the claim will reject.  If the prescription was for a drug manufactured by an excluded manufacturer, Provider should purchase and dispense a drug manufactured by an alternative manufacturer that is not excluded.  If there is no alternative manufacturer, the claim should be denied for coverage under Medicare Part D. Additionally, and for clarification only, in the event it is determined that a claim is submitted by Provider in violation of any of the foregoing requirements, such claim(s) shall be subject to recoupment and offset.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 1 of 1 PageID #: 12073

PBM's Medicare Prescription Drug Plan and Medicare Part D Sponsors retain ultimate responsibility to comply with the terms of its CMS contract. 42 CFR § 423.505(i).

## A. Medicare Part D Addendum - Requirements Applicable to All Providers:

1. Provider agrees to participate in the Medicare Part D prescription drug benefit programs administered by PBM and to provide Covered Services to Medicare Part D Members, pursuant to the terms and conditions of Provider's Agreement, this Addendum, the Provider Manual, and all rate exhibits and/or schedules in effect.

2. Provider shall not employ or contract for the provisions of Covered Services with any individual or entity excluded from participation in the Medicare and Medicaid program under Section 1128 or 1128A of the Social Security Act. Provider hereby certifies that no such excluded person currently is employed by or under contract with Provider relating to the furnishing of Covered Services. Provider shall review the Office of Inspector General and General Services Administration exclusion files and verify on a monthly basis, or as often as required by CMS guidelines, that the persons it employs for Covered Services are in good standing. 42 CFR § 423.752(a)(6); CMS Fraud, Waste, and Abuse Guidelines. Each year during the term of this Addendum, or as often as required by CMS, Provider shall provide a written attestation to PBM confirming Provider's compliance and Provider's subcontractors' (if any) compliance with the requirements of this paragraph. Provider shall immediately disclose to PBM any debarment, exclusion or other event that makes its employees or subcontractor(s) ineligible to perform work related to federal healthcare programs.

3. Provider must distribute written notice instructing Members to contact their Medicare Part D plan to obtain a coverage determination or request an exception if the Member disagrees with the information provided by the Provider. To satisfy this requirement, Provider must use the form notice (Form No. CMS-10147 entitled "Medicare Prescription Drug Coverage And Your Rights") and may not deviate from the content of this notice. 42 CFR § 423.562(a)(3).

   1) Retail Pharmacies: The notice must be provided to the Member if the Provider receives an on-line adjudication system transaction response of rejected or paid indicating the claim is not covered by Part D. The notice instructs Members about their right to contact their Part D plan to request a coverage determination, including an exception.

   2) Mail-Order Pharmacies: The notice must be provided to the Member via the Member's preferred method of communication (fax, electronic, or first class mail) as expeditiously as the Member's health condition requires, but no later than 72 hours from the Provider's receipt of the original transaction response indicating the claim is not covered by Part D.

4. Provider has an obligation to report compliance concerns and suspected or actual misconduct related to the Medicare Part D program. Provider may report fraud, waste, and abuse anonymously to PBM's confidential Medicare Fraud, Waste, and Abuse Hotline at 1.866.216.7096, or email FraudTip@express-scripts.com, both of which are available 24 hours a day, seven days a week. Provider filing a report should not fear reprisal of any sort whatsoever. Provider is protected from retaliation for complaints under False Claims Act, as well as by other applicable Federal and State anti-retaliation protections. 31 U.S.C. § 3730(h).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information All rights reserved
Network Provider Manual - Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 49 of 237 PageID #: 12074

5. Provider shall submit a report in writing to PBM within 30 calendar days of Provider's knowledge of any and all civil judgments and other adjudicated actions or decisions against the Provider related to the delivery of any healthcare item or service (regardless of whether the civil judgment or other adjudicated action or decision is the subject of a pending appeal).

6. In accordance with CMS guidelines, payments made for Members cost-sharing by any entity – including safety net provider – that has an obligation to pay for covered Medicare Part D drugs on behalf of Medicare Part D Members, or which voluntarily elects to use public funds for that purpose, will not count toward that beneficiary's True Out-of-Pocket costs (TrOOP) expenditures. Provider shall let PBM know of the Member, if any and the claim(s) for which the cost sharing or Copayment is waived, so that PBM may delete those amounts from the Member's TrOOP as required under the Medicare Part D program.

7. Provider will comply with all applicable Federal and State laws and regulations and Centers for Medicare & Medicaid Services ("CMS") instructions. 42 CFR § 423.505(i)(4)(iv).

8. Provider will comply with State and Federal privacy and security requirements, including the confidentiality and security provisions stated in Medicare Part D regulations at 42 CFR § 423.136.

9. Provider will maintain, for the current contract period and 10 prior years, all books, contracts, medical records, patient care documentation, and other records of Provider relating to Covered Services, in their original format for the greater of three (3) years or the period required by State law and allow those records to be transferred to an electronic format that replicated the original prescription for the remaining seven (7) years of the 10-year record retention requirement. 42 CFR § 423.505(d); CMS Application (Records Retention).

10. Provider will give the U.S. Department of Health and Human Service (HHS) and U.S. Comptroller General, and their authorized designees, the right to inspect, evaluate and audit all books, contracts, medical records, patient care documentation, and other records relating to Medicare Part D Covered Services during the term of the Agreement and for a period of 10 years following termination or expiration of the Agreement for any reason, or until completion of any audit, whichever is later. This provision shall survive termination of the Agreement.  Provider agrees that CMS or its designees may have direct access to Provider's books, contracts, records, including medical records and documentation relating to the Medicare Part D program, on Provider's premises. 42 CFR § 423.505(i)(2).

11. Provider will ensure that Members are not held liable for fees that are the responsibility of PBM. Provider agrees that in no event, including but not limited to nonpayment by PBM's insolvency, or breach of Provider's Agreement with PBM, shall Provider or its subcontractors bill, charge, or collect a deposit from, seek compensation, remuneration, reimbursement, or payment from, or have recourse against, Members for Covered Services provided pursuant to Provider's Agreement with PBM. This provision shall not prohibit the collection of coinsurance, Copayments, or deductibles or charges for non-Covered Services, where applicable.  Provider further agrees that this provision shall survive the termination of Provider's Agreement with PBM regardless of the cause giving rise to termination and shall be construed to be for the benefit of the applicable Member(s). 42 CFR § 423.505(i)(3)(i). In addition, Provider understands and agrees that applicable dual eligible (Medicare/Medicaid) Members will not be responsible for any plan cost sharing for Medicare Part D services.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

12. If CMS or PBM or a Medicare Part D Sponsor contracted with PBM determines that Provider has not performed satisfactorily under this Agreement, CMS or PBM or Plan Sponsor may revoke any of the activities or reporting responsibilities delegated to Provider by this Agreement. 42 CFR § 423.505(i)(4)(ii).

13. PBM and Medicare Part D Sponsor will monitor the performance of Provider on an ongoing basis, including, but not limited to, ongoing audits performed by, or on behalf of, PBM, which assesses whether Provider is in compliance with all Medicare Part D provisions. 42 CFR § 423.505(i)(4)(iii). Provider will give PBM the right to inspect, evaluate, and audit all books, contracts, medical records, patient care documentation, and other records, and Provider shall cooperate with PBM and Medicare Part D Sponsor as necessary to support PBM's and Medicare Part D Sponsor's monitoring strategy. 42 CFR § 423.505(i)(2). If Provider refuses to provide documentation as requested by PBM to demonstrate compliance with this Provider Manual and CMS's directives, PBM reserves the right to assess up to a $500 a day fee per Provider location or increase the transaction fee to a minimum of $0.30 per transaction until the requirement has been met.

14. Payment of claims.

(a) With respect to Medicare Part D claims only, PBM shall post, mail or otherwise transmit payment to Network Provider for "clean claims" submitted by Network Provider (with the exception of claims submitted by mail order pharmacies or by pharmacies that are located in, or contract with, a long-term care facility) as follows:

    i. For clean claims submitted electronically, 14 calendar days after the date on which the clean claim is received by the PBM; and

    ii. For clean claims submitted in a format other than electronically, 30 calendar days after the date on which the clean claim is received by the PBM.

(b) Definitions.

    i. Clean Claim. "Clean Claim" means a claim that has no defect or impropriety (including lack of any required substantiating documentation) or a particular circumstance requiring special treatment which prevents timely payment from being made.

    ii. Date of Receipt of Claim. For claims submitted electronically, the "date of receipt" shall be the date on which the claim is transferred. For claims submitted in a format other than electronically, on the fifth (5th) day after the postmarked date of the claim or the date specified in the time stamp of the transmission.

15. "AWP" as used herein means the current average wholesale price as defined and distributed by Medi-Span. AWP prices will be updated on a daily basis (which is more frequently than the CMS requirement of every seven (7) days), beginning with an initial update on January 1 of each year, consistent with 42 CFR § 423.505(b)(21); 42 CFR § 423.505(h).

16. Network Provider shall submit each prescription drug claim to the PBM, online and at the point of sale, in the most current NCPDP telecommunications standard format for processing and payment and according to the PBM Payer Sheet, unless the Member expressly requests that a particular Part D Plan-eligible prescription drug claim not be submitted online and instead opts to pay the full cost for such prescription drug at the point of sale. In addition, Provider will exercise professional judgment and follow quality practice standards in performing a drug utilization

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4                                                 Proprietary & Confidential Information. All rights reserved.
                                                         Network Provider Manual - Revised 7/2014

review based on a discussion with the Member and a review of Provider's patient profile for that Member. 42 CFR 423.120(c)(3).

17. Provider will submit claims for Members through PBM's real-time claims adjudication system. 42 CFR § 423.505(b)(17). In the event Provider submits claims data on behalf of PBM, Provider, in addition to PBM, will certify to CMS regarding the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data submitted on behalf of PBM will be used for the purposes of obtaining Federal reimbursement.

18. As communicated through PBM's online adjudication system, Provider will provide Members with access to negotiated pricing and charge Members the correct cost-sharing amount, including that which applies to individuals qualifying for low income subsidy as indicated through the PBM's on-line adjudication system. 42 CFR § 423.104(g)(1).

19. Unless otherwise required or allowed by law, Provider will inform Members of any differential in price between the Medicare Part D covered drug being purchased and the lowest-priced generic drug that is therapeutically equivalent and bioequivalent, and available at the Provider, if one exists. Provider must provide this notice after the drug is dispensed at the point of sale or, in the case of dispensing by mail service, at the time of delivery of the drug. 42 CFR § 423.132.

20. Provider agrees to cooperate with all quality assurance activities designed to reduce medication errors and adverse drug interactions as required by CMS or PBM including, but not limited to, establishing an internal medication error identification and reduction system. 42 CFR § 423.153(c)(4).

21. Provider shall not, under any circumstances, promote or prefer any Medicare Part D plan over another, and may not distribute printed information comparing the benefits of different Medicare Part D plans unless Provider accepts and displays materials from all Medicare Part D plan Sponsors with which Provider contracts. 42 CFR § 423.2668(k).

22. Provider shall not refuse to provide services required under any Prescription Drug Program or attempt to disenroll any Member, or deny, limit, or condition coverage or the furnishing of healthcare services or benefits to Members based on health factors, such as medical condition (including mental as well as physical illness), claims experience, receipt of health care, medical history, genetic information, evidence of insurability (including conditions arising out of acts of domestic violence), and disability. 42 CFR § 423.505(b)(3).

23. Member data may not be used by Provider to market or sell any other goods or services.

## B. Medicare Part D Addendum – Requirements Applicable to Long-Term Care Providers:

1. Provider shall have at least 30 days and no more than 90 days (i.e., up to 90 days) to submit claims to PBM for payment of Medicare Part D claims. 42 CFR §423.505(b)(20).

2. Provider must dispense drugs and report information as required by 42 CFR §423.154.

3. In the Long-Term Care setting, when the Member is not the person presenting the prescription order directly to the pharmacist or the Provider's staff, Provider shall comply with the following CMS requirement. When there is an issue with the requested prescription order, the physician or other Prescriber may prescribe a different medication or request for an exception through the

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Medicare Part D exception process: (i) If Provider is offsite of the LTC facility, Provider must send (fax or deliver) the Form No. CMS-10147 entitled "Medicare Prescription Coverage and Your Rights" notice to the Member, the Member's representative, Prescriber or an appropriate staff person at the LTC facility as expeditiously as the Member's health condition requires, but no later than 72 hours from the Provider's receipt of the original transaction response indicating the claim is not covered by Part D; (ii) If Provider is on-site at the LTC facility, Provider must deliver the notice to the location in the LTC facility designated to accept the notice. Provider should indicate to the LTC facility staff that the LTC facility staff is responsible for providing the Member (or his/her appointed representative) and his/her treating physician with the notice consistent with the timing set forth in (i) above and for placing a copy of the notice in the Member's file at the LTC facility. 42 CFR § 423.562(a)(3).

4. <u>PERFORMANCE AND SERVICE CRITERIA SPECIFIC TO LONG TERM CARE PROVIDERS:</u>

(i) **Comprehensive Inventory and Inventory Capacity** — Provider must provide a comprehensive inventory of PBM's and Sponsors' formulary drugs commonly used in the long term care setting. In addition, Provider must provide a secure area for physical storage of drugs, with necessary added security as required by federal and state law for controlled substances. This is not to be interpreted that the Provider will have inventory or security measures outside of the normal business setting.

(ii) **Pharmacy Operations and Prescription Orders** — Provider must provide the services of a dispensing pharmacist to meet the requirements of pharmacy practice for dispensing prescription drugs to LTC residents, including but not limited to the performance of drug utilization review ("DUR"). In addition, the Provider must conduct DUR to routinely screen for allergies and drug interactions, to identify potential adverse drug reactions, to identify inappropriate drug usage in the LTC population, and to promote cost effective therapy in the LTC setting. The Provider must also be equipped with pharmacy software and systems sufficient to meet the needs of prescription drug ordering and distribution to an LTC facility. Further, the Provider must provide written copies of the Provider's pharmacy procedures manual and said manual must be available at each LTC facility nurses' unit. Provider is also required to provide ongoing in-service training to assure that LTC facility staff is proficient in the Provider's processes for ordering and receiving medications. Provider must be responsible for return and reuse, and/or disposal of unused medications following discontinuance, transfer, discharge, or death as permitted by State Boards of Pharmacy. Controlled substances and out of date substances must be disposed of within State and Federal guidelines.

(iii) **Special Packaging** — Provider must have the capacity to provide specific drugs in Unit of Use Packaging, Bingo Cards, Cassettes, Unit Dose or other special packaging commonly required by LTC facilities. Provider must have access to, or arrangements with, a vendor to furnish supplies and equipment including but not limited to labels, auxiliary labels, and packing machines for furnishing drugs in such special packaging required by the LTC setting.

(iv) **IV Medications** — Provider must have the capacity to provide IV medications to the LTC resident as ordered by a qualified medical professional. Provider must have access to specialized facilities for the preparation of IV prescriptions (clean room). Additionally, Provider must have access to or arrangements with a vendor to furnish special equipment

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of 16 PageID #: 12078

and supplies as well as IV trained pharmacists and technicians as required to safely provide IV medications.

(v) **Compounding/Alternative Forms of Drug Composition** — Provider must be capable of providing specialized drug delivery formulations as required for some LTC residents. Specifically, residents unable to swallow or ingest medications through normal routes may require tablets split or crushed or provided in suspensions or gel forms, to facilitate effective drug delivery.

(vi) **Pharmacist On-call Service** — Provider must provide on-call, 24 hours a day, seven (7) days a week service with a qualified pharmacist available for handling calls after hours and to provide medication dispensing available for emergencies, holidays and after hours of normal operations.

(vii) **Delivery Service** — Provider must provide for delivery of medications to the LTC facility up to seven (7) days each week (up to three (3) times per day) and in between regular rate exhibits and/or scheduled visits. Emergency delivery service must be available 24 hours a day, seven (7) days a week. Specific delivery arrangements will be determined through an agreement between the Provider and the LTC facility. Provider must provide safe and secure exchange systems for delivery of medication to the LTC facility. In addition, Provider must provide medication cassettes, or other standard delivery systems, that may be exchanged on a routine basis for automatic restocking. The Provider delivery of medication to carts is a part of routine "dispensing."

(viii) **Emergency Boxes** — Provider must provide an "emergency" supply of medications as required by the facility in compliance with state requirements.

(ix) **Emergency Log Books** — Provider must provide a system for logging and charging for medications used from emergency/first dose stock. Further, the Provider must maintain a comprehensive record of a resident's medication order and drug administration.

(x) **Miscellaneous Reports, Forms and Prescription Ordering Supplies** — Provider must provide reports, forms and prescription ordering supplies necessary for the delivery of quality Provider care in the LTC setting. Such reports, forms and prescription ordering supplies may include, but will not necessarily be limited to, pharmacy order forms, monthly management reports to assist the LTC facility in managing orders, medication administration records, treatment administration records, interim order forms for new prescription orders, and boxes/folders for order storage and reconciliation in the facility.

(xi) **Home Infusion Access –** Long Term Care Provider shall (and cause its Pharmacies to) ensure that the professional services and ancillary supplies necessary for the proper administration of home infusion drugs are in place prior to dispensing such Part D home infusion drugs.

## C. Medicare Part D Addendum – Requirements Applicable to Home Infusion Providers:

1. Provider shall ensure professional services and ancillary supplies necessary for home infusion are in place before dispensing home infusion drugs to Members in his/her place of residence. 42 CFR § 423.120(a)(4). Participating Home Infusion Provider may be required to attest to having complied with these CMS Home Infusion standards, and provide the attestation to PBM or its agent upon request.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 7 of 17  PageID #: 12079

2. Provider must distribute written notice instructing Members to contact their Medicare Part D plan to obtain a coverage determination or request an exception if the Member disagrees with the coverage information provided by the Provider.  To satisfy this requirement, Provider must use the form notice (Form No. CMS-10147 entitled "Medicare Prescription Drug Coverage And Your Rights") and may not deviate from the content of this notice.  The notice must be provided to the Member as expeditiously as the Member's health condition requires, but no later than 72 hours from the Provider's receipt of the original transaction response indicating the claim is not covered by Part D.  For Members brought on service by the home infusion Provider, the Provider can also choose to deliver the notice in person with delivery of home infusion drugs or through an infusion nurse, as long as the next scheduled visit is within 72 hours of the receipt of the transaction code indicating the claim cannot be covered by Part D. 42 CFR § 423.562(a)(3).

3. Participating Home Infusion Provider, at a minimum, hereby agrees to:

   (i)    provide delivery of home-infused drugs in a form that can be administered in a clinically appropriate fashion;

   (ii)   provide infusible Part D drugs for both short-term acute care and long-term chronic care therapies;

   (iii)  ensure that the professional services and ancillary supplies necessary for home infusion therapy are in place before dispensing Part D home infusion drugs;

   (iv)   provide delivery of home infusion drugs within 24 hours of discharge from an acute care setting, or later if so prescribed.

## 7.1    Low Income Subsidy (LIS) Re-Determination

CMS and the Social Security Administration determine whether Members who qualified for the Low Income Subsidy (LIS) in a given plan year will qualify the following year (i.e., Members who qualified for the LIS in 2013 may or may not qualify in 2014).

- Members who no longer qualify receive an explanatory letter from CMS along with an application to reapply if they believe they still qualify.

- Members who do qualify for the LIS in succeeding years may have a different Copayment amount.  These Members also receive notification letters from CMS.

### Low Income Cost Sharing Subsidy (LICS) Best Available Evidence Policy Guidance

Part D Plans must provide "best available evidence" or "BAE" documentation to support a Member's cost-sharing status during a discrepant period; i.e., a time frame when the Member's low income subsidy (LIS) status is in question.

CMS allows Part D Plans to use BAE to document low-income eligibility even if CMS's systems do not yet reflect such eligibility for a Member.  To ensure timely payment by PBM and the proper lower cost-sharing status at point of sale, it is a Network Provider's responsibility (including an LTC Network Provider) to provide BAE to Part D Plans, examples of which include:

- Member's Medicaid card containing name and eligibility date;

- Copy of a state document confirming Member's active Medicaid status;

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

- Hard copy of state electronic enrollment file verifying Member's Medicaid status;

- Computer screen print from a state Medicaid system showing Member's Medicaid status;

- Other state-provided documentation verifying Member's status;

- For individuals who are not deemed eligible but who apply and are found LIS-eligible, a copy of the SSA award letter.

Network Providers may also find elements of BAE on the CMS web site at https://www.cms.gov/PrescriptionDrugCovContra/17_Best_Available_Evidence_Policy.asp.

## BAE Process at Point of Service

When a Member presents BAE at time of fill, Network Provider is required to contact PBM's Prior Authorization Contact Center by phone at 800.417.8164 or by fax to 877.837.5922 for a BAE Copayment override. The contact center will issue an override if documentation presented is in a CMS-approved form for BAE.

If documentation appropriately constitutes BAE, Network Provider should enter the override code for a reduced LICS-level brand or generic Copayment, or for a $0.00 Copayment if the Member qualifies.

Network Provider shall fax the BAE documentation promptly to the Part D Plan using the NCPDP-approved BAE Fax Cover sheet.

- The Fax number and BAE representative's name can be found by referencing the comprehensive PBM Health Plan Fax Number and BAE contact list.

- Additional fills require a phone call to PBM's Prior Authorization Contact Center to request the BAE override; however, BAE documentation is only required to establish BAE and does not need to be presented by the Member for each subsequent prescription.

- If the Member does not present BAE but claims to qualify for the LICS benefit, Network Provider should have him/her contact the Part D Plan by calling the number on the back of the Medicare Part D ID card to obtain BAE documentation.

CMS has established a category for tracking complaints about BAE issues and will closely monitor Part D Plans' compliance with this policy.

Valid BAE documents for <u>non-institutionalized</u> Members include:

- State-issued Notice of Action, Notice of Determination, or Notice of Enrollment that includes the Member's name and Home and Community Based Services (HCBS) eligibility date during a month after June of the previous calendar year;

- State-approved HCBS Service Plan that includes Member's name and effective date beginning during a month after June of the previous calendar year;

- State-issued prior authorization approval letter for HCBS that includes the Member's name and effective date beginning during a month after June of the previous calendar year;

- Other documentation provided by the state showing HCBS eligibility status during a month after June of the previous calendar year; or,

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 55 of 236   PageID #: 12081

- State-issued document, such as a remittance advice, confirming payment for HCBS, including Member's name and dates of HCBS.

Per CMS, Medicare Part D Plans are required to accept any one of the forms of evidence listed below for the <u>institutionalized</u> Medicare Member, the Member's pharmacist, advocate, representative, family member or other individual(s) acting on behalf of the Member to establish that he/she is institutionalized and qualifies for zero cost-sharing ($0 Copayments):

- A remittance from the facility showing Medicaid payment for a full calendar month for that Member during a month.

- A copy of a state document confirming Medicaid payment on behalf of the Member to the facility for a full calendar month.

- A screen print from the state's Medicaid systems showing the Member's institutional status based on at least a full calendar month's stay for Medicaid payment purposes.

All acceptable BAE documents should identify the Member and clearly indicate the source of the documentation in order to establish that the information ties directly to the state or to Social Security Administration (SSA) systems.

## 7.2    Covered and Non-Covered Medications

Medicare Part D requires that at least two (2) products included in each therapeutic classification, plus all or nearly all products in the following six (6) drug classes are included in Part D Plan Formularies:

| | | | |
|---|---|---|---|
| Antidepressants | Antipsychotics | Anticonvulsants | Anticancer |
| HIV/AIDS | Immunosupressants | | |

Formularies may include Quantity Level Limits (QLL), Step Therapy (ST) and PA.

### Unbreakable Packages

In cases when the drug prescribed is an unbreakable (i.e., unsplittable) package that includes an extended days supply or quantity (generally, greater than 34 days, unless otherwise directed by the Sponsor) allowed by the Sponsor's Prescription Drug Program but for which Network Provider is not contracted, Network Provider should contact PBM to request the applicable contract, or direct the Member to contact his/her plan or PBM at the number listed on the Member's prescription drug ID card for assistance in locating a participating pharmacy.

### Medicare Part D Non-Covered Medications

- Agents when used for anorexia, weight loss or weight gain;

- Agents when used to promote fertility;

- Agents when used for cosmetic purposes or to promote hair growth;

- Agents when used for symptomatic relief of cough and cold;

- Agents used for the treatment of sexual or erectile dysfunction (ED). ED drugs will meet the definition of a Part D Covered Drug when prescribed for medically-accepted indications approved by FDA (such as for pulmonary hypertension).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

- Covered outpatient drugs when a manufacturer seeks to require, as a condition of sale, that associated tests or monitoring services be purchased exclusively from the manufacturer or its designee;

- Prescription vitamins and mineral products, except prenatal vitamins and fluoride preparations;

- Non-Prescription Drugs

- Drug Efficacy Study and Implementation Program (DESI) drugs; and

- NDCs not properly listed on the FDA's Comprehensive NDC Structured Product Labeling Data Elements File.

Benzodiazepines and barbiturates are considered Medicare Part D-eligible for any medically accepted indication.

NOTE: Some Part D Plans may cover Part B drugs. These will be indicated by point-of-sale response.

### FDA's Comprehensive NDC Structured Product Labeling (SPL) Data Elements File

- CMS edits prescription drug events (PDEs) using the Structured Product Labeling (SPL) Data Elements File.

- Part D plans implement point-of-sale edits to reject non-listed NDCs if submitted on Medicare Part D claims.

- To minimize Member disruption, Pharmacies should stock an alternative NDC whenever possible.

- The SPL is available at this link: http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/ucm240580.htm.

- The SPL has replaced the FDA's NDC Directory on which the Non-matched NDC List was based.

### End Stage Renal Disease Drug Coverage

As a reminder, services provided to Medicare Members by an ESRD dialysis center are covered through Medicare Part B.

All renal dialysis services are to be provided through a dialysis facility, including the prescription drugs associated with these procedures.

If the Member has been identified by CMS as having ESRD and is taking a drug on the "always" ESRD drug list, it is most likely being used for dialysis treatment and therefore should be covered under Medicare Part B. The following drug list includes "always" ESRD drugs.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information All rights reserved
Network Provider Manual - Revised 7/2014

| End Stage Renal Disease (ESRD) "Always" Drug List | | | |
|---|---|---|---|
| Renal Dialysis Service Drugs and Biologicals Included in ESRD PPS Bundle | | | |
| - Injectable Drugs | | | |
| Activase | Carnitor | Ferrlecit | Procrit |
| Aranesp | Cathflo Activase | Hectorol | Refludan |
| Aredia | Cubicin | Heparin Flush | Retavase |
| Boneva | Cyanocobalamin | Heparin Sodium | Vancomycin Hcl |
| Calcijex | Deferoxamine Mesylate | Levocarnitine (inject & oral) | Venofer |
| Calcitriol | Desferal | Miacalcin | Vitamin B-12 |
| Calcium Gluconate | Epogen | Pamidronate Disodium | Zemplar |

In 2014, the list of drugs that require a PA was expanded to include seven (7) drug categories that are on a "maybe" ESRD list. Drugs on the "maybe" ESRD list can be used for dialysis treatment but have other indications, thus requiring a B or D determination. Drugs in the categories listed below will reject at point of sale with the following reject code combination:

| Reject Code | Description |
|---|---|
| 75 | Prior Authorization Required |
| A4 | This Product May be Covered Under the Medicare – B Bundled Payment to an ESRD Dialysis Facility |
| 569 | Provide Notice: Medicare Prescription Drug Coverage and Your Rights |

| End Stage Renal Disease (ESRD) "Maybe" Drug Categories | | | |
|---|---|---|---|
| Antiemetics | Antiinfectives | Antipruritics | Anxiolytics |
| Excess Fluid Management | Fluid and electrolyte management, including volume expanders | | |
| Pain Management | | | |

If the pharmacist is able to determine the prescription was written by one of the following Prescriber specialists (dentist; gynecologist; ophthalmologist; podiatrist; or hospital emergency room prescriber), he/she should instruct the Member or physician to initiate a coverage review for a Prior Authorization approval, as these prescribers would NOT be receiving a monthly capitation payment under ESRD Part B.

**Nebulized Medications**

PBM allows claims for nebulized medications to process under Medicare Part D when submitted at both LTC and retail pharmacies.

- Medicare Part D covers these medications when a Part D-eligible Member resides in an LTC or skilled nursing facility.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 1 of 1   PageID #: 12084

- The list of covered nebulized medications is as follows:

| | |
|---|---|
| Albuterol Sulfate Soln Nebu 0.083% (2.5 MG/3ML) | Iloprost Inhalation Solution 10 MCG/ML |
| Albuterol Sulfate Soln Nebu 0.5% (5MG/ML) | Ipratropium Bromide Ihnal Soln 0.02% |
| Albuterol Sulfate Soln Nebu 0.63 MG/3ML (Base Equiv) | Isoetharine |
| Albuterol Sulfate Soln Nebu 1.25MG/3ML (Base Equiv) | Levalbuterol |
| Albuterol-Ilpratropium Neb 1.25 MG/3ML | Metaproterenol Sulfate Soln Nebu 0.4% |
| Arformoterol | Metaproterenol Sulfate Soln Nebu 0.6% |
| Budesonide Inhalation Susp 0.25 MG/2ML | Metaproterenol Sulfate Soln Nebu 5% |
| Budesonide Inhalation Susp 0.5 MG/2ML | Mucolytics |
| Budesonide Inhalation Susp 1 MG/2ML | Pentamidine Isethionate for Nebulization Soln 300 MG |
| Cromolyn Sodium Soln Nebu 20 MG/2ML | Legend Sodium Chloride (Inhalant) |
| Dornase Alfa | Treprostinil |
| Epinephrine | Tobramyacin Nebu Soln 300 MG/5 ML |
| Formoterol | Methacholine* |

## Shortages of Formulary Drugs

Occasionally, shortages impact the offering of drug products on Medicare Part D Plan Formularies. By "Shortage," CMS is referring to drug products identified on the FDA Drug Shortage web site http://www.fda.gov/Drugs/DrugSafety/DrugShortages/default.htm.

When applicable, CMS expects Medicare Part D Sponsors to allow Network Providers to enter a value of "8" in NCPDP field 408-D8 (Dispense as Written) to specify that the equivalent brand product is being dispensed due to unavailability of the generic formulary product. Access to the non-formulary drug is limited to the duration of the shortage.

## 7.3    Vaccines

Medicare Part D drugs include certain vaccines determined by CMS to be covered under the Medicare Part D Program, and administration costs associated with such Part D vaccines ("Covered Vaccines") are also included. CMS has determined that the dispensing and administration of Medicare Part D vaccines by pharmacists be limited to adult Medicare Members, and that pediatric vaccines should continue to be dispensed and administered by physicians. Pediatric vaccines are not Covered Vaccines.

Network Providers must dispense and administer the Covered Vaccine in accordance with all applicable state and federal laws. Only the administration cost of Covered Vaccines, as such list may be amended by CMS from time to time, will be reimbursable and only if the claim is submitted in accordance with the Provider Agreement and this Provider Manual. Documentation of administration must be available upon request for audit.

Vaccines covered under Medicare Part B will remain covered by Medicare Part B (e.g. flu and pneumonia vaccines). One exception is the Hepatitis B vaccine which, in most instances, will be covered under Part B or require a PA for coverage under Medicare Part D. Some Part D Plans may elect to cover a Part B vaccine under Part D. This will be indicated by point-of-sale response.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 2 of 2 PageID #: 12085

See Section 2.8 of this Provider Manual for information on submission of vaccine claims.

## 7.4   Medicare Part D Coverage Gap Discount Program

CMS's Coverage Gap Discount reduces the costs incurred by Members who reach the Part D coverage gap or "donut hole." The Coverage Gap Discount Program makes manufacturer discounts available to applicable Members.

### Coverage Gap Discount Process Example

Step 1: A Medicare Part D beneficiary in the coverage gap presents a prescription for a Covered Medication.

Step 2: If the Sponsor provides an enhanced benefit with coverage in the gap, Network Provider would collect 50% of the Member's copayment. For standard benefit plans, Network Provider would collect the applicable beneficiary cost-sharing amount returned at point of sale. The Part D Plan will be reimbursed later by the pharmaceutical manufacturer for the the discounted amount applied under the Coverage Gap Discount Program.

Step 3: The Part D Plan sends a Prescription Drug Event (PDE) file indicating the adjudicated coverage gap discount.

Step 4: CMS provides the PDE to its Third Party Administrator (TPA).

Step 5: The TPA provides an invoice with supporting detail to the pharmaceutical manufacturer.

Step 6: Manufacturer must pay the discount amount within 38 days of receipt of the invoice from the TPA; all disputes are handled through the TPA.

### Pharmaceutical Manufacturer Agreement

All major large drug manufacturers have signed on to the Coverage Gap Discount Program. Manufacturers that have NOT signed with CMS will NOT have their drugs covered under Medicare Part D. Claims for non-covered medications reject with NCPDP Reject AC (Product Not Covered Non-Participating Manufacturer). A few hundred drugs are not covered. Only drugs (NDAs/BLAs) marketed under the labeler codes specified in the list of Applicable Labeler Codes may be covered under Part D.

All other drugs under ANDA, or supplies associated with insulin, are not affected and may continue to be covered.

## 7.5    Medicare Parts A and B vs. Part D Drug Coverage

**Drugs that are eligible to pay under Medicare Part A or B are not eligible for payment under Medicare Part D**.

Medicare Part A will reimburse a Skilled Nursing Facility (SNF) up to one hundred (100) days for medications prescribed for Members, following a qualified Part A inpatient stay, and therefore Medicare Part D should not be billed. It is the responsibility of the Network Provider, in collaboration with the SNF, to determine appropriate Medicare billing. CMS expects Network Providers to have formal policies and procedures in place to ensure the prescription is for a Part D-eligible medication. Network Provider, if requested by PBM, shall obtain and provide documentation to demonstrate that claims were properly billed to the Medicare Part D Program, if applicable, rather than to Medicare Part A. PBM reserves the

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 61 of 237 PageID #: 12086

right to charge up to a $100 per day fee per location for Network Providers who fail to provide the requested documentation.

The list of products eligible for payment under Medicare Part B is not based solely on the drug but also on the indication of the drug in certain situations. Accordingly, PBM only includes drugs on the Formulary that will pay under the Medicare Part D benefit (depending upon the circumstances).

Claims submitted by LTC Network Providers that include a Submission Clarification Code value of 19 in field 42Ø-DK will not be reimbursed for a dispensing fee or may be reduced by the dispensing fee paid by the Medicare Part A plan.  Value 19 represents the following description according to the NCPDP Standard: "Indicates the quantity dispensed is the remainder billed to a subsequent payer when Medicare Part A expires. Used only in long term care settings."

To ensure claims are allowed to process only under the correct circumstances, PBM places a PA on these dual eligible drugs.

| EXAMPLE |
|---|
| **Methotrexate; the criteria will ask if it is used for arthritis or chemotherapy.** |
| ➢ **If used for arthritis, it will be allowed to process through the Medicare Part D benefit.** |
| ➢ **If used for chemotherapy, the claim will be rejected and not allowed to process.** |

## 7.6    Medicare Part D Beneficiary Identification Card

The Medicare Identification Card requires a nine (9)-character alpha-numeric plan ID number issued by CMS.  Additionally, the Identification Card contains Member Copayment information.



If a Member presents a plan ID card without the Medicare mark, the claim should not be processed under Medicare but under the Sponsor's Prescription Drug Program using plan information displayed on the card.

## 7.7    Prescription Processing

In accordance with Medicare Drug Rules, Medicare Part D claims must be adjudicated one claim per transmission using the NCPDP Telecommunications Standard vD.0 for both primary and secondary coverage.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual - Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of 9   PageID #: 12087

Network Providers providing Covered Services to LTC Members must submit all claims electronically. The total days supply of each individual drug, as defined by ingredient combination, strength, dosage and form (and route of administration on compound claims) must be submitted. The route of administration is only required for submission of compound claims. It is the Network Provider's responsibility to ensure PBM is credited for any unused medications in accordance with the claims adjudication process and all applicable pharmacy laws and regulations.

## Tamper Resistant Prescription Drug Pads (TRPP)

The CMS Tamper Resistant Prescription Drug Pads (TRPP) regulation requires that all written, non-electronic prescriptions for outpatient drugs be written on tamper resistant prescription pads in order for the medications to be federally reimbursable.

All written, non-electronic prescriptions must contain ALL three (3) of the following characteristics:

- One or more industry-recognized features designed to prevent unauthorized copying of a completed or blank prescription form;

- One or more industry-recognized features designed to prevent the erasure or modification of information written on the prescription by the Prescriber, AND

- One or more industry-recognized features designed to prevent the use of counterfeit prescription forms.

The table below provides examples of tamper resistant prescription pad features:

| Industry-recognized features designed to: | Examples of features include but are not limited to: |
|---|---|
| Prevent unauthorized copying of a completed or blank prescription form | • High security watermark on reverse side of blank<br>• Thermo chromic ink (for example, a latent "void" pattern printed across the entire width of the front of the prescription blank, such that if it is photocopied, the word "void" will appear in a pattern across the entire front of the prescription.) |
| Prevent erasure or modification of information written on the prescription by the Prescriber | • Tamper-resistant background ink showing erasures or attempts to change written information |
| Prevent use of counterfeit prescription forms | • Sequentially numbered blanks<br>• Duplicate or triplicate blanks |

## Medicare Claim Submission and Reversal Time Frames

1. Network Providers will have 90 days from the date of fill to process and reverse Medicare Part D claims.

2. LTC Network Providers have 90 days from the date of fill to process and reverse Medicare Part D claims.

## Reversal for Failure to Pick-Up

Unless a shorter time period is required by a Sponsor or any law, rule or regulation or CMS guidance (and then in accordance with such Sponsor or such law, rule or regulation or CMS requirements), any

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual Revised 7/2014

prescription drug claims for which prescription drugs were approved for payment by the PBM and not picked up by the Member, in whole or in part, as set forth in the Network Provider's Provider Agreement, must be reversed online within 13 days, or within the time frame specified in the Network Provider's Provider Agreement.

## Signature Log/Proof of Service Requirements:

Each Network Provider must maintain a signature log (paper or electronic) or other approved PBM alternative as indicated in the Network Provider's Provider Agreement for all claims in chronological order as prescriptions are received by the Member, including off-site delivery, with the following information: Member name, prescription number, third party program, Member signature (or legal representative) and date prescription is picked up.

Unless prohibited by law, in lieu of a signature log, Network Provider may maintain an electronic proof-of-service to establish that the Covered Medication was dispensed and received by the Member or the Member's representative and shall reflect, at a minimum, the following: (i) Member name or Member ID; (ii) prescription number; (iii) date and time the Covered Medication was received by the Member (or Member's representative); (iv) time of sale (if different than time received by the Member); and (v) proof of receipt (e.g., the point of sale ("POS") computer receipt or such information electronically stored in the normal course of Network Provider's business in the delivery of prescription medications to its customers, including price paid. The signature log/proof of service must be retained for six (6) years; (11 years for Medicare, or longer in accordance with all applicable laws).

## Medicare Part D Auto Refill Requirements

As required by 42 CFR §423.504, Network Providers must obtain Member consent to deliver a Medicare Part D prescription, new or refill, prior to each delivery. Pharmacies only need to obtain Member or authorized representative consent prior to shipping refills that the Member or authorized representative did not initiate (e.g. refills prompted by auto-fill systems). A pharmacy would not need to obtain consent to deliver a refill prompted by the Member (e.g. refills requested by phone, fax, or online). According to the statute, this is to ensure "that Medicare beneficiaries only receive new prescriptions and refills that are requested."

**Note:** This policy does not affect retail refill reminder programs that require the Member to pick up the prescription, and does not apply to long-term care pharmacy dispensing and deliveries.

## Patient Residence Field

Per the PBM Payer Sheet, field 384-4X (Patient Residence) is a required field to identify where a Medicare Member resides.

For Medicare Members:

- Enter value of two (02) for Members in a Skilled Nursing Facility. **For Medicare Part B use only**.

- Enter a value of three **(03)** for Members in a Nursing Facility.

- Enter a value of four (04) for Members residing in an Assisted Living Facility.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

- Enter a value of five (05) for Members in Custodial Care Facility.  **For Medicare Part B use only.**
- Enter a value of six (06) for Members residing in a Group Home.
- Enter a value of **nine (09)** for Members in an Intermediate Care Facility/Mentally Retarded.
- Enter a value of eleven (11) for Members in Hospice care.

## Generic Savings Message

As part of the Medicare Part D Drug Program, the primary program messaging design will reference field **577-G3** with the generic savings delta to the Network Provider when a brand drug is dispensed.  The **field (577-G3)** will note the value.  Network Provider is responsible for notifying the Member of this price difference.

## 7.8     Long Term Care Dispensing

### Appropriate Dispensing (Short Cycle Fill)

Medicare Part D Plans offering prescription drug coverage must allow for short cycle fills (SCF) in the LTC setting in order to reduce waste associated with 30-day fills.  Network Providers are required to dispense brand-name oral solid drugs for Members residing in LTC facilities in no greater than a 14-day supply.

This dispensing methodology is known hereto as "short cycle fill." **LTC Network Providers not contracted for short cycle fill with a daily dispensing fee will not be allowed to submit claims for Medicare Part D Members.**  The Short Cycle Fill requirement will only be applicable to patients residing in a nursing facility (patient residence code 03).  Short cycle fill submissions of required medications will be paid a daily dispensing fee multiplied by the days supply to obtain the total dispensing fee reimbursement as set forth in the LTC Provider contract.

Indian/Tribal/Urban (I/T/U) pharmacies and pharmacies that service Intermediate Care Facilities for the Mentally Retarded and Developmentally Disabled (ICFMRDD) and Institutes for Mental Disease (IMDs) are exempt from the CMS short-cycle fill requirement.

### LTC Short Cycle Fill – Submission Clarification Codes (SCC) and Special Packing Indicator Codes (SPI)

Short cycle fill submissions must include a valid SCC and SPI code combination based on the appropriate filling frequency and packing of the medication.

- Following are the valid values for short cycle fill:
  o  Patient Residence code:  03
  o  Short cycle fill pharmacy service types:  01, 03, 04, 05, 07, 08, 99
  o  SCC values:  16 & 22-35
  o  SPI values:  1-7

**Short cycle dispensed claims must be submitted with Submission Clarification Codes (entered in field 420-DK) and Special Package Indicators (entered in field 429-DT) which**

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information All rights reserved
Network Provider Manual   Revised 7/2014

**identify short cycle dispensing increments. Invalid submissions may reject or be subject to post-adjudication review.**

- The following values may cause the claim to process as **non-**short cycle fill when used in combination with short cycle fill valid values:
  - SCC codes 21 and 36
  - SPI code 8

- Claims submitted with these values will process, but NOT as short cycle fill claims.

## Additional Points

- Members' Copayments will be pro-rated based on the days supply.  Short-cycle fill logic will apply regardless of the beneficiary's standing in their Part D benefit (ICL/Coverage Gap/Catastrophic).

- Compound claims can be short-cycle filled.

## Prepackaged Drugs

- LTC pharmacists are only able to submit claims for up to a one month's supply of prescription drugs. Many prescription drugs come pre-packaged in quantities of 90 days supply or more.

- PBM will ensure that Members in an LTC setting are able to receive appropriate amounts of medication regardless of whether the medication is prepackaged or not.  In order to allow LTC Network Providers to successfully process claims for prepackaged drugs, PBM will not enforce LTC pharmacists' submission of a maximum of one month's supply (plan maximum) and will not reject an LTC claim if the days supply is greater than one month (plan maximum).  Pharmacists will be advised to submit the appropriate days supply for these prepackaged drugs and SCC 21, which indicates that the limited days supply is not appropriate.

## Emergency Fill for LTC

If a Medicare Part D Member resides in an LTC facility and the facility needs to dispense the medication in order to meet its LTC conditions of participation with CMS, PBM will authorize a 34-day emergency supply.  Network Providers will need to call the PBM or Sponsor to obtain the PA for the emergency supply, or use one of the override codes listed below.

## Refill-Too-Soon Overrides for LTC

LTC Network Providers filling for Medicare Part D Members may obtain an override for Refill-Too-Soon rejects (Reject 79) under the following admissions circumstances:

- **Member is a NEW admission with a new prescription order;**

- Member has transferred out of and back into an LTC facility due to illness and is prevented by regulations from bringing his/her prescription medications; or

- The LTC facility re-orders the Member's medication upon re-admission and the claim rejects for Refill-Too-Soon.

## PBM will override the reject if:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 66 of 236   PageID #: 12091

- Network Provider is an LTC Pharmacy and noted/contracted as such with the PBM; and

- The Submission Clarification Code field value = **14 Long Term Care Leave of Absence** – The pharmacist is indicating that the cardholder requires a short-fill of a prescription due to a leave of absence from the LTC facility.  (Medco plans only).

- The Submission Clarification Code field value = **15 Long Term Care Replacement Medication** – Medication has been contaminated during administration in an LTC setting; or

  The Submission Clarification Code field value = **16 Long Term Care Emergency box (kit) or automated dispensing machine** – Indicates the transaction is a replacement supply for doses previously dispensed to the Member after hours; or

- The Submission Clarification Code field value = **17 Long Term Care Emergency supply remainder** – Indicates the transaction is for the remainder of the drug originally begun from an Emergency Kit.

- The Submission Clarification Code field value = **18 Long Term Care Patient Admit/Readmit Indicator** – Indicates the transaction is for a new dispensing of medication due to the Member's admission or readmission status.

- No Quantity Level Limits (QLL) overrides will be allowed in these situations.

## Standardized Reject Messaging

PBM will return reject codes applicable to the most recent version of the NCDPDP External Code List (ECL) as indicated in the Payer Sheet.  Secondary messaging MAY be returned on the claim response to assist Network Providers in understanding why a claim is rejected.

## Other Member Coverage/Other Health Insurance Information

CMS requires a Part D Plan to provide the Network Provider with "other payer coverage" (supplemental-secondary/tertiary) information for the Medicare Member when responding to the initial primary Medicare claim submission.

The paid claim will provide other payer eligibility to enable Network Provider to bill the secondary payer. This information is displayed in the two response message fields:

- 504-F4 (Message)

- 526-FQ (Additional Message Information)

## Post-Consumption Billing

CMS permits post-consumption billing under the Medicare Part D program.  Any Network Provider (typically an LTC Pharmacy) using this billing is responsible for verifying that drugs dispensed to the Member are covered under the Member's Part D Plan.  Network Provider must employ another mechanism for verifying coverage in advance of dispensing, since Pharmacies using post-consumption billing will not submit the first claim to a Part D Plan until after the drug has been dispensed.

If post-consumption billing is utilized with short cycle fill dispensing, Network Provider must submit the appropriate short cycle fill SCC code designating the actual dispensing frequency.  The actual date of fill must be transmitted regardless of the date the claim is submitted.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 16 of 23   PageID #: 12092

## 7.9    Daily Cost Sharing

A daily cost-sharing rate will be applied to Medicare Part D claims for:

- Members with prescriptions written for less than a 30-day supply, *and*
- Drugs that are solid oral medications, excluding pre-packaged drugs and antibiotics.

Note: The "less than 30 supply" is designed to enable Members to use trial fills and synchronize prescriptions.

Claims that pay with a daily cost-sharing rate will be accompanied by NCPDP Approved Message Code 23 "Prorated copayment applied based on days supply.  Plan has prorated the copayment based on days supply."

Reject Code 79 (Refill Too Soon) may apply on these claims as appropriate.

- If the claim is for a trial fill or synchronization, the pharmacist may override the reject with either of the Submission Clarification Codes (SCC) in the following table:

| SCC CODE | DESCRIPTION |
|---|---|
| 47 | **Shortened Days Supply Fill** – only used to request an override for plan limitations when a shortened days supply is being dispensed; or |
| 48 | **Fill Subsequent to a Shortened Days Supply Fill** – only used to request an override for plan limitations when a fill subsequent to a shortened days supply is being dispensed. |

- All claims overridden with SCC 47 or 48 are subject to retrospective review and audit.

**Note:**  Short Cycle Dispensing was previously implemented for long term care and will remain in place.

## 7.10    Medicare Part D $0 Claims Processing

PBM accepts zero dollar ($0) claims for Medicare Part D only. This change was prompted by CMS guidance requiring that $0 claims be reported on Prescription Drug Events (PDEs) under specific circumstances.

For claims processing purposes, $0 claims are identified as those claims submitted with the value "0" in the Usual and Customary (U&C) field **and** at no charge to the Member.

- Please note that Network Providers will not be reimbursed for claims submitted with a "0" value in the U&C field, so it is critical that Network Providers review all claims to ensure the submitted U&C is correct.
- Also please note that normal claims editing, inclusive of Drug Utilization Review, will be provided by PBM for $0 claims.

## 7.11    Standardized Messaging

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in-part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

A standard response message was created for the B1 and E1 transaction types in order for Network Providers to bill appropriate Sponsors in the proper order for Members eligible under Medicare Part D. This response message communicates third party billing information to the Network Provider using NCPDP Message Field 504-F4 and Additional Message Information Field 526-FQ. Message field 504-F4 is used to communicate the primary and additional insurance billing information to the Network Provider on either a B1 response from the PDP or an E1 response from the TrOOP Facilitator.

Overflow messages are communicated in Additional Message Information Field 526-FQ with the Brand/generic savings message first (see section "_NCPDP Batch Standards – Medicare-Related Questions_", subsection "_Differential Price and Transitional Assistance_"), followed by any additional insurance information not communicated in field 504-F4. It is necessary to specify placement of these messages to allow for parsing and proper display of the message. Messages are to be returned in a standard format by all PDPs and TrOOP Facilitators.

**KEY:**
MEDICARE ELIG CHECK = Med
ADDINS = Additional insurance
BN = BIN
PCN = Processor
GRP = Group ID
ID = Cardholder ID
PC = Person Code
PH = Other Payer Help Desk
PRIMARY = Primary Payer

**Additional Insurance (Example)**

NCPDP-approved ADDINS:1;BIN;123456;PCN:1234567890;GRP:123456789012345;
ID:12345678901234567890;PC:001;PH:8001234567;&

**Unique PCNs**

PBM BIN numbers are listed on the PBM Payer Sheets. Network Providers should refer to the Member ID Card for the most accurate, recent processing information to adjudicate the claim. The RxBin, RxPCN, RxGroup ID, and Member ID may vary depending on the plan.

_Medicare Part D claims must be adjudicated one claim per transaction and in the proper coverage order (e.g. Primary, Secondary, Tertiary)._

**Reversal of Primary Medicare Part D Claims**

The reversal of primary claims requires reversal of any Secondary/Tertiary claims billed. Likewise, the resubmission of a primary claim requires resubmission of Secondary/Tertiary claims.

The procedure outlined above also applies to manual claim reversals. If Network Provider cannot reverse a claim and requests that PBM reverse it, the Network Provider must also make the same request to other payers in order to ensure accurate True Out-of-Pocket (TrOOP) reporting.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information All rights reserved
Network Provider Manual Revised 7/2014
201767.4

## 7.12   CMS Reporting / Processing Requirements

Medicare requires that Part D Plans provide CMS with monthly records of all claims submitted.  This includes reporting on all rejected/denied claims.  Therefore, any inquiries from CMS may require PBM to contact Network Provider in order to be able to provide a response to CMS.  Accordingly, Network Provider agrees to cooperate with any requests made by PBM so that PBM and its Part D Sponsors may comply with this and other CMS requirements.

### Requirements for Processing Claims for Hospice Patients

Network Provider must make a "reasonable attempt" to ascertain if hospice coverage exists if there is reason to assume a patient is receiving hospice care.  For example:

- Patient's prescription is from a hospice physician;
- Pain medication regimen indicates palliative therapy.

CMS expects Network Providers to have formal policies and procedures in place to ensure the prescription is for a Part D-eligible medication.  Network Provider may be accountable for prescriptions billed to a Part D Plan when there is reasonable indication that the patient is under hospice care.

**Medicare Part A** is responsible for covering all drugs or biologics for the palliation and management of the terminal and related conditions for Members who have elected into a hospice benefit.

If a Medicare beneficiary has elected hospice and a claim is submitted under the Part D benefit, the claim could reject at point of sale with the following reject code combination:

| REJECT CODE | DESCRIPTION |
|---|---|
| 75 | Prior Authorization Required* |
| A3 | This Product May be Covered Under Hospice – Medicare A |
| 569 | Provide Notice: Medicare Prescription Drug Coverage and Your Rights |

- The Pharmacist should confirm with Member/caregiver if the Member is hospice eligible.
- Upon confirmation of the Member's hospice eligibility, the pharmacist should educate or direct the Member/caregiver back to the hospice provider to submit the claim through the hospice benefit if drug is related to the terminal illness.
- Drugs covered under Medicare Part D for Members who have elected hospice <u>must</u> be for treatment of conditions completely unrelated to the terminal illness, and the Member, the Member's authorized representative or Prescriber should request a PA.

### Requirements for Processing Home Infusion Claims

**Express Scripts**:
Home Infusion Network Providers please reference Exhibit A – Home Infusion Provider Medicare Part D Addendum to the Express Scripts Pharmacy Provider Agreement for additional details.

**Medco:**

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 69 of 236
12095

Each individual drug, as defined by ingredient combination, strength, dosage form, and route of administration, must be billed to Medco no more than four (4) times during any month.

Three fields must be used by Network Provider to identify the Provider that is billing the claim. The fields are 147-U7 (Pharmacy Services Type), 384-4X (Patient Residence), and 307-C7 (Place of Service). Please refer to the Payer Sheets for details. Additionally the date the Member was discharged from the hospital or other acute care facility must be documented.

Home Infusion claims must meet the CMS qualifications for the submission of patient identification fields. Failure to submit patient identification fields may result in a fee of $50 per claim. Home Infusion providers please reference Schedule A – 4326-HINF-01 Home Infusion Pharmacy Network Schedule for additional details.

## Home Infusion Pharmacies Compound Claims Processing

Refer to Section 2.9 for information on compound claims processing for *all* compound claims.

## Prescription Origin Code for E-prescribed Prescriptions

CMS requires that use of the value 3 (Electronic) in the prescription origin field be tracked to identify all e-prescribing events.

## 7.13   General Online COB Processing for Medicare Part D (42 CFR 423.464)

Network Providers must determine if a claim is covered under group health, workers' compensation, Auto NoFault Insurance or other coverage when identified as primary coverage, to which Medicare is almost always secondary.

## Plan Cap Method

A Sponsor may place a payment cap on secondary COB claims when Medicare Part B is the primary payer and the Sponsor is the secondary payer. For example, if Medicare Part B pays the Sponsor 80% of the prescription cost as the secondary payer and the Sponsor places a cap at 20% of the prescription cost as the primary payer, Network Provider must be sure to submit these amounts correctly to the PBM. If Network Provider does not correctly submit the 80% as paid by the secondary payer (Medicare Part B) to the primary payer (Sponsor), any amount over the 20% of the cost of the prescription will be indicated in the "Amount of Copay" field (518-FI) in the response pricing segment. The message field will state: "Copay includes excess not paid by primary: 00.00 (the actual dollar amount in excess), verify primary paid amount."

Network Providers should ensure that the amount entered in the "Other Payer Amount Paid" field (413-DV) in the Coordination of Benefits/Other payments Segment correctly reflects the Medicare Part B payment.

## Dual Eligibles – Cost Sharing

Sponsors may provide coverage for Members classified as "dual eligible Members," under applicable Medicare regulations, in that such Members are eligible for both Medicare and Medicaid benefits. In accordance with Network Providers' COB functions, to the extent required by applicable law, and subject to Network Provider receiving all COB and eligibility information with respect to dual eligible Members as necessary to accomplish the following, Network Providers may not cause dual eligible Members to pay or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4

otherwise be responsible for any plan cost-sharing amounts for Medicare Part A, B or D services when the relevant state Medicaid agency is responsible for paying those amounts. Rather, Network Providers will either accept the Sponsor's payment as payment-in-full for the claim, or bill the relevant state Medicaid agency as appropriate.

## 7.14    Transition Period

The Medicare Part D Program allows Members a ninety (90)-day transition period during which they may receive a temporary fill in order to continue receiving the drugs they are currently taking, which are not included on their new Part D Plan Formulary. This transition gives a new enrollee time to work with the Prescriber to move to a Formulary alternative or obtain an exception or PA.

CMS emphasizes that Member access is crucial and that Members eligible for a transition fill must leave the pharmacy with their required medications. Failure to provide transition supply, as directed by the Member and PBM's online messaging, may result in a fee of $50.00 per claim.

### Transition fills at Retail

New Members are eligible to receive a temporary one-month fill of non-Formulary medication at a retail pharmacy if: (i) it is a Part D-eligible medication; and (ii) it is filled within the first ninety (90) days of the Member's enrollment in a Part D Plan. Currently enrolled Members are also eligible for this transition during their first 90 days of the plan year if their current utilized drug was previously on the Formulary but is negatively impacted in the new plan year. LTC Members are allowed to receive multiple fills as defined by the Sponsor pursuant to CMS regulations. After the initial transition fill, both the Member and Prescriber receive a notification advising them of the transition fill, however, to ensure compliance with the CMS requirement that Members have access to needed medications, the pharmacist may advise the Member as a part of the patient consultation, based on the transition fill confirmation that occurs with the paid claim message.

### Transition Fills for LTC

Under the transition program, LTC Members will be able to receive multiple fills of non-Formulary medication or medication that may have utilization management (UM) restrictions as defined by the Sponsor pursuant to CMS regulations and associated with the benefit if: (i) it is a Medicare Part D eligible medication; and (ii) it is filled within the first 90 days of the LTC beneficiary's enrollment in a Part D Plan or the first 90 days in the plan year for an eligible current enrollee affected by negative formulary changes across plan years.

To accommodate short-cycle fill requirements, the transition policy in LTC settings will include a 91-98 days supply. When a transition fill is requested, the short cycle fill logic will process first, then the transition logic.

### Transition Fills – General

- Transition fill eligibility will be identified when the claim adjudicates. No pharmacist intervention is required for eligible non-Formulary or UM-restricted medications to pay during transition.

- Medicare Part B vs. D determinations: Non Part D covered medications, exceeded days supply, DUR and other appropriate edits may occur at point of sale. It is important that the pharmacist review online messaging for further instructions to assure Member access in these circumstances.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of 9   PageID #: 12097

- If the Member's benefit allows a max days supply and the transition fill is lower, the next claim will allow the Member to receive a fill until the days supply limit is met.

- The transition fill status will be identified when the claim pays.

## Reject Codes / Secondary Messaging

- Formulary Quantity Level Limits (QLLs) may reject during transition to indicate that quantity must be reduced based on the Member's benefit. Network Provider may receive a message to lower the quantity and resubmit the claim using a code provided in the message.

- If the prescription is for an amount greater than the Sponsor's days supply, the system will reject for dispensing with a message to reduce the days supply and resubmit the claim.

| Sample Reject Code | Sample Secondary Message | Pharmacy Action |
|---|---|---|
| 7X (Days Supply Exceeds Plan Limitation) | "DAYS SUPPLY EXCEEDS PLAN LIMITATION" | Reduce quantity for max days supply and resubmit claim |

- Messaging appears in NCPDP field 504-F4.
- Network Provider enters appropriate Prior Authorization (PA) code in NCPDP field 462-EV.

| Sample Messaging on Paid Claim | Network Provider Action |
|---|---|
| Paid under transition fill. PA. | • Advise Member that this was a Transition Fill and a temporary supply. |
| Paid under transition fill. Non-formulary. | |
| Paid under transition fill. Other reject. | • Member needs to work with physician/prescriber to either file an exception or move to formulary alternative. |
| Transition fill | |

- Messaging appears in NCPDP field 504-F4

## Transition Fills – Level of Care

CMS requires Network Providers to fill prescriptions for Medicare Part D Members transitioning from one level of care to another, e.g., following discharge from a hospital.

| Member Action | Network Provider Action | PBM Action |
|---|---|---|
| Member is discharged from hospital and attempts to fill a prescription based on hospital discharge instructions. Claim rejects with 70 "Product/Service Not Covered." | Network Provider calls PBM for an override at the Pharmacist Use Only phone number on the back of the Member's ID card. | PBM's Prior Authorization Team or Part D Plan reviews the criteria and determines if the drug should be approved for a one-time transition fill. |

## Transition Fills – Transition Extension requests

Members or their representatives may request an extension of the transition period if a Member has not effectuated the transition due to the pending status of an exception or appeal, or in the event the Member or representative is still working with the Prescriber. In such a case, Network Provider may call

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 1 of 1 PageID #: 12098

the PBM Pharmacist Use Only phone line or Sponsor Pharmacist Only phone number on the back of the Member's ID card to request a one-time PA for at least a 31-day supply of medication.

## Transition Fills – Barbiturates

CMS expects that all claims for newly eligible barbiturates are considered to be continuing therapy during an eligible Member's transition period.  Consequently:

- Point-of-Sale (POS) edits should not be applied to these newly Part D-eligible drugs.
- PBM's systems are set up so these drugs will pay for all Members during their 90-day transition period, regardless of prior utilization.

## Transition Period – Durable Medical Equipment (DME)
A transition supply is required if the equipment/product is limited by the plan to specific brands or manufacturers.

**PBM's systems will allow transition of Part B DME for diabetic supplies, including test strips, lancets and glucometers:**

- **New and current Members will have a 90-day transition period for Part B DME**
  - o An initial fill and one (1) refill are allowed.
  - o Transition fill status will be identified when the claim pays using standard transition messaging.

## 7.15   Grievances

A grievance is an escalated complaint or dispute from a Member about a specific issue <u>not</u> related to initial drug coverage or Copayment determination, but rather for example, if a prescription is not filled in a timely manner.

PBM will handle Member grievances regarding Medicare Part D in accordance with CMS guidelines. Inquiries or concerns related to coverage determinations or appeals will initially be directed to PBM's Prior Authorization Department.

The PBM's Corporate Quality Medicare Grievance Team is available to receive grievances Monday – Friday, from 8:00 a.m. to 5:00 p.m. central time.  During non-business hours, Members may leave a message and their calls will be returned on the next business day.

Grievances from Members will be received by PBM's Corporate Quality Medicare Grievance Team either by mail, phone, or fax.

**MAIL:**  Grievances may be mailed to the following address:

Express Scripts
Attention, Director of Grievances
P.O. Box 66517
St. Louis, MO  63166-6517

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.

201767.4

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 42 of 75   PageID #: 12099

**TELEPHONE:** Grievances may be phoned Monday – Friday, 8:00 a.m. until 5:00 p.m. CST by dialing 866.533.8512. (TTY number is 800.899.2114.)

**FAX:** Grievances may be faxed to 800.305.1686.

Members will be notified of the grievance ruling within 30 days of the date the grievance was received by PBM. All notification of grievance rulings submitted in writing will be provided in writing to the Member. Notification decisions will be provided to a Member in writing if the grievance was submitted by the Member verbally or in writing. Notification decisions will also be provided to a Member in writing if the grievance was verbally submitted by the Member, unless the Member requests the notification decision be submitted verbally. Notwithstanding, all grievances related to quality of care will be provided in writing to the Member.

If the grievance is determined to be invalid, the grievance facilitator will communicate to the Member his/her ineligibility to file a grievance and direct him/her to call 1-800-MEDICARE if he/she has any further questions about the Medicare policy. If the grievance is determined to be an appeal or duplicate, the grievance facilitator will communicate to the Member the proper Medicare procedure and direct him/her to call 1-800-MEDICARE if he/she has any further questions about the Medicare policy.

## 7.16    Beneficiary Rights

Network Providers must display or hand out to Medicare Part D Members the CMS-10147 *Medicare Prescription Drug Coverage and Your Rights* instructing them to contact their Part D Plan(s) to obtain a coverage determination or ask for a Formulary or tier exception if the Member disagrees with the information provided by the pharmacist.

### Medicare Prescription Drug Coverage and Your Rights Reject Code and Messaging

When a drug is not covered under the Medicare Part D benefit, PBM rejects the claim using an additional NCPDP reject code, 569.

The Standardized Pharmacy Notice, CMS-10147, must be distributed to Members when reject 569 is returned to the pharmacy. This notice fulfills the requirements under 42 CFR §423.562(b)(7)(iii) and §423.562(a)(3).

*Medicare Prescription Drug Coverage and Your Rights* is a standard notice, and Part D Plans may not deviate from the content. Please note that the OMB control number must be displayed in the upper right corner of the notice.

### CMS Requirements for the Medicare Prescription Drug Coverage and your Rights Notice

The definition of Reject 569 is "Provide Notice: Medicare Prescription Drug Coverage and Your Rights." The 569 reject will not be returned when:

- The claim rejects only because it does not contain all necessary data elements for adjudication;
- Drug in question is an over-the-counter (OTC) drug not covered by the enrollee's Part D Plan;
- Prescription is written by a sanctioned provider who has been excluded from participation in the Medicare program;
- Drug is not listed on the participating CMS Manufacturer Labeler Code List;

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

- Drug is not listed on the Food and Drug Administration (FDA) Electronic List—NDC Structured Product Labeling Data Elements File (NSDE);

- The Part D Plan rejects the claim because of a "refill too soon/early refill" edit; or

- Drug in question is not covered by the Part D Plan benefit, but is covered by a co-administered insured benefit managed by a single processor. In this scenario, Network Provider submits a single claim transaction for the drug and the drug is covered by the co-administered insured benefit after being rejected by Part D and processed in accordance with the benefits offered by the supplemental payer.

**Highlights of Revised Guidance for Distribution of Standardized Pharmacy Notice**

72-Hour Turn-around Time for Home Infusion and Long Term Care Pharmacies:

| Home Infusion | LTC Pharmacy |
|---|---|
| The pharmacy may also choose to deliver the notice in person with delivery of home infusion drugs or through an infusion nurse, as long as the next scheduled visit is within **72 hours of the receipt of the transaction** code indicating the claim cannot be covered by Medicare Part D. | If the pharmacy must fax or otherwise deliver the notice to the enrollee, the enrollee's representative, Prescriber or an appropriate staff person at the LTC facility as expeditiously as the enrollee's health condition requires, **but no later than 72** hours from the pharmacy's receipt of the original transaction response. |

As a reminder, all Network Providers are required to provide enrollees with a written copy of the "Medicare Prescription Drug Coverage and Your Rights" notice when an enrollee's prescription cannot be filled under the Part D benefit and the issue cannot be resolved.

Pharmacies may visit the website http://www.cms.gov/Medicare/Appeals-and-Grievances/MedPrescriptDrugApplGriev/PlanNoticesAndDocuments.html to obtain a current copy of the "Medicare Prescription Drug Coverage and Your Rights" notice and accompanying instructions for its use.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

## CMS 10147 – *Medicare Prescription Drug Coverage and Your Rights*



Approved OMB Number (OMB control number)

**Members have the right to a written explanation from their Part D Plan if:**

- Their Prescriber or Network Provider tells them the Part D Plan will not cover a prescription drug in the amount or form prescribed; or
- Members are asked to pay a different cost-sharing amount than they think they are required to pay for a prescription drug; or
- The Member's secondary or other coverage pays for the prescription.

**Members have the right to ask their Part D Plan for an exception if:**

- They believe they need a drug not included on their Part D Plan's Formulary; or
- They believe they should get the drug they need at a lower cost-sharing amount.

**Members should contact their Part D Plan:**

- To request a written explanation of why a prescription is not covered, or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of 108   PageID #: 12102

- To ask for an exception if they believe they need a drug not covered on their Part D Plan's Formulary, or

-  If they believe they should pay a lower cost-sharing amount.

Refer Members with questions to his/her Part D Plan benefits booklet or call **1.800.MEDICARE (1.800.633.4227)** for Part D Plan contact information.

When contacting the Part D Plan, Members will need to provide the following:

- Prescription drug name(s);

- Name of Prescriber or Network Provider who told him/her the drug is not covered; and

- Date the Member was told his/her prescription is not covered.

### CMS-10146 *Notice of Denial of Prescription Drug Coverage* (Approved OMB#0938-0976)

Part D Plans must complete and issue a CMS-10146 *Notice of Denial of Prescription Drug Coverage* whenever they deny a Part D Plan Member's request for prescription drugs.  Information entered on this form must include the date, Member's full name and address, Part D Plan Member identification number, the name(s) of the drugs for which coverage was denied, and the reason for the denial.  The reason should include a description of any applicable Medicare Part D coverage rule or Part D Plan policy. The form is available at http://www.cms.hhs.gov/cmsforms/downloads/cms10146.pdf.

***Notice of Denial of Prescription Drug Coverage*** **(CMS 10146) is a standard notice.  Part D Plans may not deviate from the content.  Please note that the OMB control number must be displayed in the upper right corner of the notice.**

### Denial of Benefits Appeals

CMS-10146 also provides instructions for a beneficiary to appeal the denial.  The Part D Plan must add its own phone and fax numbers, TTY numbers, and address(es).

### CMS-10146 describes two kinds of appeals:

- Expedited (72 hours) – Members may request this appeal if they or their Prescribers believe their health could be seriously harmed by waiting up to seven (7) days for a decision.  If the Member's request to expedite is granted, the Part D Plan must provide a decision within 72 hours after receipt of the appeal. Please note that direct Member reimbursement claims are not subject to expedited processing status.

- Standard Appeal (seven (7) days) – Part D Plan must give the Member a decision no later than seven (7) days after receipt of the appeal.

### Redetermination Form

The redetermination form should be provided for Member convenience if he/she chooses to file a redetermination.

Members must provide their names, addresses, beneficiary identification numbers, reasons for the appeal, and any evidence they may wish to attach in support of their appeal.  If the Part D Plan still

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 78 of 236   PageID #:
12103

denies the Member's request following an appeal, the Member may request an independent review of his/her case.

## Long Term Care (LTC) Network Providers

Due to the uniqueness of the LTC setting, the LTC Network Provider must arrange to send the Beneficiary Rights notice to an individual or location within the LTC facility responsible for such notices no later than 72 hours from the Pharmacy's receipt of the original transaction response.

The LTC Network Provider must work with the LTC facility to provide the notice to the Member or the Member's appointed representative.  The notice should also be provided to the Member's attending physician, and placed in the Member's file at the LTC facility.

## 7.17   True Out-of-Pocket (TrOOP) & TrOOP Facilitator

TrOOP refers to the "true out-of-pocket" expenditures that identify when a Member is eligible for coverage under the catastrophic dollar limit as defined by CMS.  This limit varies from year to year.

## TrOOP and TrOOP Facilitator

CMS identifies the "true out of pocket" expenses paid by the Member as TrOOP.  The ability of Medicare to **accurately** track TrOOP is extremely important as it is the "trigger" that determines when the catastrophic coverage benefit will become effective for the Member.

Incurred costs allowed for meeting the catastrophic limit (and thus count towards TrOOP) have been defined as costs that are paid:

- By an individual or another person such as a family member, on behalf of the beneficiary;

- On behalf of a low income subsidy person; or

- Under a state pharmaceutical assistance program (SPAP).

## Role of TrOOP Facilitator

The TrOOP Facilitator is contracted to work with CMS, PDPs, Medicare Advantage Plans and supplemental coverage carriers to coordinate Medicare Part D benefits and track cost-sharing payment sources. The TrOOP Facilitator website is http://medifacd.ndchealth.com.

TrOOP Facilitator:

- Helps Network Provider identify a Member's Medicare eligibility (E1 Transaction);

- Communicates with the primary plan to provide TrOOP information from "other payers", enabling the Part D Plan to properly calculate TrOOP balances; and

- Acts as a checks and balances tool for CMS.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information All rights reserved
Network Provider Manual – Revised 7/2014

## Role of E1 Transaction

The TrOOP Facilitator helps Network Provider identify a Member's Medicare eligibility through the Network Provider's submission of an NCPDP E1 transaction record. When Medicare Members cannot identify their specific Part D Plans or do not have their Medicare Identification Cards with them, the Network Provider may send an E1 transaction through its switch to the TrOOP Facilitator.

## TrOOP Eligibility Verification

CMS provides the required eligibility information to the PDP and to the TrOOP Facilitator to facilitate the eligibility lookup. The TrOOP Facilitator matches the submitted Member data to the enrollment data provided by CMS. The TrOOP Facilitator then creates and sends a standard eligibility response and message back to the Network Provider.

| Accepted Request | There was a **MEDICARE ELIG** (eligibility) |
|---|---|
| Check | The primary and other insurance information was returned to the Network Provider in the message field |
| OR | |
| Rejected Request | There was **no MEDICARE ELIG** (eligibility) |
| Check | No single match was found (possibly including reject codes, in case this will help the pharmacy obtain a patient match). |

Included with either message is the help desk telephone number of the TrOOP Facilitator or CMS contact information.

TrOOP eligibility messaging should be returned in field 504-F4 (Message field) AFTER the processor message of **MEDICARE ELIG CHECK.** Field 504-F4 (Message field) is a 200-byte field. If additional bytes are needed, the Additional Message field 526-FQ should be used.

EXAMPLE (See key on page 68):

- PRIMARY;BIN:123456;PCN:1234567890;GRP:123456789012345;ID:1234567890123456789;PC: 001;PH:8001234567.

Maximum message length is 100-byte and 101-byte ADDINS. If additional insurance is listed on the beneficiary record, the message could be repeated with a different title (ADDINS:1). However, each individual insurance message should not be split between fields. For example if PRIMARY; and ADDINS:1 could not both fit in message field 504-F4, PRIMARY should be entered in field 504-F4 in its entirety and ADDINS:1 should begin in position one of the additional message field (526-FQ).

EXAMPLE:

- PRIMARY;BIN:123456;PCN:1234567890;GRP:123456789012345;ID:1234567890123456789;PC: 001;PH:8001234567; and

- ADDINS:1;BIN:123456;PCN:1234567890;GRP:123456789012345;ID:1234567890123456789;PC :001;PH:8001234567.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual - Revised 7/2014

E1 transactions return the following:

- Contract ID #;
- PBP (Plan Benefit Package) Number;
- Effective/termination date of Medicare Part D coverage;
- Relationship code;
- LIS copayment level flat (Y/N);
- Member first and last name; and
- Date of birth.

The E1 v2 transaction requires the first four letters of the Medicare Part D Member's last name when a pharmacist searches on the Identification Card number (e.g., SSN or Medicare ID number). The E1 v2 allows pharmacists to enter a date (past, present, or future) which will locate Member Part D Plan enrollment information.

Additional messaging provides more detailed information, including:

- More than one Member is found;
- Member is not found;
- Member is found but not active for date of service; or
- Cardholder ID matches but the last name does not match.

### Role of the Pharmacy in Calculating a Beneficiary's TrOOP Costs

Although the Part D Plan is responsible for the accurate calculation of TrOOP, Network Provider plays an important role in ensuring the process works properly. Network Providers must be able to read and use the other coverage information sent by the primary payer in message fields 504-F4 and 526 FQ. Network Providers must adjudicate claims in the proper order: Submission to primary plan, followed by submission to secondary and tertiary plans. If a beneficiary has an SPAP, it is important to know the SPAP is always the payer of last resort. If Network Provider reverses a primary Medicare Part D claim, then any other payer claims must also be reversed in the appropriate order (*e.g.*, order of payment primary, secondary, tertiary, etc…).

### TrOOP Information Websites

For more information on TrOOP and the TrOOP Facilitator, visit the website http://medifacd.relayhealth.com/.

### 7.18   Records Retention for Medicare Part D

Network Providers are required to maintain all Medicare Part D prescription records and supporting documentation for a minimum of 10 years plus the current plan year (or longer if required by law). This retention is consistent with the requirements of other government-sponsored programs.

Access to Medicare Part D-related records is required for audit purposes, including audits by the U.S. Department of Health and Human Services (HHS) and the Comptroller General or its designees, or the

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

201767.4

PBM.  The PBM reserves the right to assess a financial penalty if Network Provider repeatedly fails to provide Medicare Part D-related records.

## 7.19   Exclusion by the OIG; Prescriber NPI; Prescriptive Authority; Taxonomy

Federal regulations prohibit all individuals included on the Department of Health and Human Services' Office of Inspector General's (HHS OIG) exclusion lists or the General Services Administration (GSA) debarment list from involvement in any federal or state health care programs, including the Medicaid, Medicare and TRICARE programs.  The result of an exclusion from federal health care programs is that no federal health care program payments may be made for any items or services furnished by an excluded individual or entity (42 CFR 1001.1901).

Network Providers must immediately notify PBM in writing in the event it or any of its Pharmacies (if a chain) or any individual or vendor providing services, supplies or medications to the Network Provider has been or is excluded from participating in any federal or state health care program or government contract, or is otherwise subject to any restriction by the OIG, GSA or other state or government entity.

Additionally, Network Providers are not to use any company or individual, whether such individual is an employee, independent contractor, agent, vendor or provider, to provide Covered Services to Members covered under Medicare Part D or any other federal or state health care program, if such company or individual has been or is excluded by the OIG or the GSA from participating in any federal or state health care program or government contract, or is otherwise subject to any restriction which may affect its, his or her eligibility to provide or participate in providing services in such programs.

Network Providers are further responsible for ensuring that no individuals or companies associated with their Pharmacy(ies) are included on the OIG, GSA or other state or government exclusion list(s).  Federal regulations require that Network Providers check the exclusion lists for all new employees upon hire, and for any vendor providing services, supplies or medications with which Network Provider intends to contract, and at least monthly thereafter to verify that no employees or vendors involved in the dispensing or processing of federal or state benefits are included on these lists.

Links to these lists are http://oig.hhs.gov/fraud/exclusions/exclusions_list.asp and

https://www.sam.gov.

### PBM's Response to Federal OIG or GSA Requirements

PBM has implemented a system edit on any Prescriber NPI or DEA number that matches a Prescriber identified as appearing on the OIG or GSA list of excluded individuals/entities.  Network Providers are required to submit the Prescriber's NPI on all claims.  Claims for prescriptions written by excluded Prescribers will reject with NCPDP Reject A1 (ID Submitted is associated with a sanctioned Prescriber). Secondary messaging will read:  "Claim rejected because Prescriber ID submitted matches Prescriber listed on the Office of Inspector General/General Services Administration Lists."

The Prescriber NPI and DEA edits affect Medicare Part D claims, Medicaid claims and DoD claims.

### Prescriber NPI Required by CMS

CMS requires a valid, active Prescriber NPI to be included on all Prescription Drug Events (PDEs) for all Medicare prescriptions.  Network Providers must submit the Prescriber's National Provider Identifier

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4    Proprietary & Confidential Information All rights reserved
Network Provider Manual - Revised 7/2014

(NPI) as the only acceptable form of Prescriber identifier for Medicare Part D claims. If Network Provider does not have the Prescriber's NPI on file, Network Provider must use best efforts to obtain the NPI prior to submission of the claim.

Upon claim submission, PBM will communicate with Network Provider if the submitted NPI is not active and valid. If PBM communicates that the NPI is not active and valid, Network Provider must either (i) resubmit the claim with the corrected NPI; or (ii) override the "not active or valid" message if Network Provider believes the Prescriber NPI is active and valid, in which case the pharmacist should use the Submission Clarification Code (SCC) 42 (Prescriber ID submitted is valid and prescribing requirements have been validated) or 49 (Prescriber ID has been validated, is active) in field 420-DK. PBM will pay the resubmitted or overridden claim (unless there is an indication of fraud or other issue that would make the claim non-payable). Network Provider must ensure that any rejects are resolved within no less than 24 hours to ensure Member access. If PBM determines the NPI was not active and valid for any claim, PBM may reverse and recoup payment to Network Provider if PBM communicated at point of sale that the NPI was not active and valid. Network Providers must cooperate with PBM to resolve outstanding Prescriber NPI issues in a timely manner.

## Controlled Substance Prescribing Authority

Per state and federal regulations, Network Providers must validate the Prescriber DEA schedule for controlled substances.

PBM may reject claims at point of sale and/or conduct post-adjudication review of controlled substance claims when the Prescriber's registered DEA schedule does not match the Covered Medication's DEA Schedule. PBM may also review Schedule II controlled substance claims to ensure that no refills were permitted.

The following reject codes will be returned in field 511-FB (Reject Code) if a submitted Controlled Substance prescription claim does not contain:

- A valid Prescriber DEA number, as compared to the registered DEA schedule.
- A Prescriber ID number that is cross-walked to a valid DEA number, as compared to the registered DEA schedule.

| REJECT CODE | DESCRIPTION |
|---|---|
| 43 | Plan's Prescriber database indicates the associated DEA to submitted Prescriber ID is inactive |
| 44 | Plan's Prescriber database indicates the associated DEA to submitted Prescriber ID Is not found |
| 46 | Plan's Prescriber data base indicates associated DEA to submitted Prescriber ID does not allow this drug DEA class |
| 618 | Plan's Prescriber database indicates the submitted Prescriber DEA does not allow this drug DEA schedule |

Pharmacists may override rejects by providing one of the following Submission Clarification Code (SCC) values in field 420-DK if the pharmacist believes the Prescriber's DEA schedule is appropriate for the controlled substance medication prescribed:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

| SCC CODE | DESCRIPTION |
|---|---|
| 43 | Prescriber's DEA is active with DEA Authorized Prescriptive Right |
| 45 | Prescriber's DEA is a valid Hospital DEA with Suffix and has prescriptive authority for this drug DEA schedule |
| 46 | Prescriber's DEA has prescriptive authority for this drug DEA schedule |

All claims re-submitted with SCC 43, 45, or 46 will be returned as PAID claims with one of the following Approved Message Codes in field 548-6F:

| APPROVED MESSAGE CODE | DESCRIPTION |
|---|---|
| 20 | For the submitted Prescriber ID, the associated DEA number is not found – Flagged for Retrospective Review |
| 21 | For the Submitted Prescriber ID, the Associated DEA Number is Inactive or Expired – Flagged for Retrospective Review |
| 22 | For the submittedNPI, the Associated DEA Number Does Not Allow this Drug DEA schedule – Flagged for Retrospective Review |
| 27 | The submitted Prescriber ID does not allow this drug DEA schedule – Flagged for Retrospective Review |

In the event PBM identifies that Network Provider dispensed a controlled substance without evidence of appropriate prescribing authority or schedule, and Network Provider cannot provide evidence of appropriate prescribing authority within a reasonable period 30 days from the date the Pharmacy is notified), PBM may take action up to and including reversal of the claim.

## Taxonomy

CMS requires that individuals prescribing medications under Medicare Part D have appropriate prescriptive authority. This prescriptive authority includes a valid "taxonomy" (i.e., healthcare provider type) such as physician, nurse practitioner, etc. The following reject code will be returned in field 511-FB (Reject Code) if the Prescriber NPI cannot be matched to a valid taxonomy code:

| REJECT CODE | DESCRIPTION |
|---|---|
| 71 | Prescriber ID is not covered |

The Pharmacist may override the reject by entering Submission Clarification Code (SCC) 99 in field 420-DK if the pharmacist believes the Prescriber's taxonomy is valid. Claims overridden with an SCC will be flagged for retrospective review and audit.

In the event a claim is processed with SCC 99 and the taxonomy code indicates Prescriber is not eligible to prescribe under Medicare Part D, PBM may take action up to and including reversal of the claim.

## 7.20 Medicare Part D Contractual Requirements Based on Changes in Laws, Rules or Regulations, or Guidance Issued by CMS from Time to Time

CMS routinely issues regulatory guidance affecting the Medicare Part D Prescription Drug Program. This regulatory guidance affects the services provided by Network Providers and as such, PBM may, from time to time, incorporate language into this Provider Manual to comply with CMS's requirements.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

The following shall become part of Network Provider's Provider Agreement and may be updated by the PBM from time to time to reflect changes in the law.  In the event there is a conflict between the terms and conditions set forth herein and in Network Provider's Part D Agreement, the terms and conditions set forth herein shall control.  Capitalized terms used, but not defined, herein shall have the meaning ascribed to them in the Provider Agreement.

### 1.    In General.

Network Providers are required to take reasonable and necessary measures to safeguard the privacy and security of information identifying any Member, including a Medicare Part D Member. This includes compliance with all applicable laws, rules and regulations, including Medicare Drug Rules and such other regulations or guidance promulgated by CMS applicable to the Medicare Part D Program.

### 2.    HIPAA.

PBM shall and Network Provider shall, and shall cause its Pharmacies to comply with all federal and state laws, rules and regulations regarding the confidentiality of patient information, including, but not limited to, compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as amended and the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") as amended, including all applicable rules, regulations and official guidance promulgated, in connection with HIPAA and the HITECH Act, by the U.S. Department of Health and Human Services or otherwise.

### 3.    Compliance Plan

Network Provider must maintain a compliance plan in accordance with the requirements promulgated by CMS and all applicable laws, rules and regulations, including any applicable policies and procedures necessary to detect, correct and prevent fraud, waste and abuse.  At a minimum, such compliance plan and related policies and procedures should contain the following requirements:

(a) that its officers, directors, managers, employees, and other representatives act in an ethical and legally compliant manner in performing their duties and functions;

(b) that all such officers, directors, managers, employees, and other representatives report conduct that is in violation of the compliance plan or related policies and procedures; and

(c) that Network Provider take action to address and remedy any violation of its compliance plan and/or related policies and procedures, including, but not limited to, taking all appropriate disciplinary action up to and including termination.

Network Provider is required to comply with PBM's fraud, waste and abuse program as described in Section 5 of this Provider Manual, including the use of PBM's "Fraud Tip Hotline" to report potential or identified fraud.

### Conflict of Interest

Network Provider must maintain a conflict of interest process in accordance with the requirements promulgated by CMS and all applicable laws, rules and regulations. Accordingly, Network Provider must have procedures in place that require its officers, directors and managers responsible for the administration or delivery of Medicare Part D benefits to sign a conflict of interest statement, attestation or certification at time of hire and annually thereafter, certifying that such individual is free from any

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

conflict of interest (as defined and described by CMS) in administering or delivering the Medicare Part D benefit.

### 4.    Education and Training

At the time of hire and at least annually thereafter, Network Provider shall (and shall cause its Pharmacies to) implement and conduct general compliance education and training, including fraud, waste and abuse training, in accordance with all applicable laws, rules and regulations and any guidance promulgated by CMS. Such compliance and education shall also include training tailored specifically to employee and other individual job functions with the potential for fraud, waste and abuse.  Network Provider (and its Pharmacies) shall maintain records of attendance, topics of training and training materials, which shall be provided to PBM upon request.  Network Provider shall require, by contract, any subcontractors (to the extent allowed) who provide Medicare Part D services under the Provider Agreement to train their individuals who provide such services as they deem appropriate and in accordance with the requirements hereunder and their respective compliance plans.

If Network Provider does not have a compliance training and education program, the National Health Care Anti-Fraud Association (NHCAA) provides an online fraud, waste and abuse general compliance training course.  This course was developed by the National Association of Chain Drug Stores (NACDS) in partnership with LearnSomething, Inc.

Network Provider may participate in the above-described training.

### 5.    PBM's Compliance Programs

Network Provider agrees to comply with PBM's compliance and fraud, waste and abuse programs, including, but not limited to, the policies and procedures, training and education, and corrective action plans related to such program.  Network Provider shall provide copies of Network Provider's corrective actions related to Medicare Part D to PBM upon request.

### 6.    Non-Compliance

Network Provider acknowledges that PBM may audit Network Provider's compliance with these requirements.  Network Provider agrees to cooperate with PBM, including providing any information requested by PBM necessary to verify compliance with and meeting the requirements set forth herein. Additionally, Network Provider may be asked from time to time to certify in writing its compliance with these requirements.  Failure to comply with the requirements set forth in this Provider Manual may result in immediate termination of the Provider Agreement and/or the Medicare Addendum by the PBM upon written notice to Network Provider.  PBM further reserves the right to assess up to a $500.00 per day fee per Network Provider location or increase Network Provider's transaction fee to a minimum of $0.30 per transaction until such requirement(s) has been met.

## 7.21  Medicare Medicaid Plans – CMS Financial Alignment Demonstration for Dual Eligible Members

Section 2602 of the 2010 Affordable Care Act provides the authority for a three (3)-year demonstration program to better coordinate the care of individuals eligible for both Medicare and Medicaid under one benefit.  Individuals eligible for both Medicare and Medicaid are referred to as "dual eligibles."

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 2 of 3   PageID #: 12111

In July 2011, CMS introduced a capitated financial alignment model for the demonstration to align financing between Medicare and Medicaid and provide dual eligibles with improved coordination of care. Under this model, CMS, individual states, and managed care health plans enter into a three (3)-way contract.   Participating managed care health plans, referred to as Medicare-Medicaid Plans (MMPs), receive a capitated and blended payment to provide comprehensive, seamless coverage to dual eligibles.

Network Providers participating in PBM's Medicare Part D Network are considered participating in the MMP Program unless Network Provider contacts PBM to opt out of the MMP Program.

| Dual Eligible in Medicare Plan and Medicaid Plan | Dual Eligible in MMP |
|---|---|
| **Three ID Cards:**<br>• Medicare, Medicaid, and Pharmacy | **One ID Card:**<br>• Medicare-Medicaid Plan |
| **Three sets of benefits:**<br>• Medicare, Medicaid, Medicare Part D | **One set of comprehensive benefits:**<br>• Medicare, Medicaid and Medicare Part D |
| **Multiple providers:**<br>• Potential for fragmented Member experience<br>• Potential for uncoordinated healthcare decisions | **Single care team:**<br>• Member-centric, seamless experience<br>• Coordinated efforts between care providers |

The benefit provided under MMP is **based on Medicare Part D requirements**, except when CMS provides specific **additional MMP guidance and/or state-specific guidance supersedes**.

**Additional MMP requirements that may impact Network Providers include:**

• Waiver of Low Income Cost Sharing (LICS), enabling a further reduced cost share to the Member beyond traditional Extra Help;

• A coordination of benefits between Medicare and Medicaid is not required as Members are under one benefit which covers both Medicare Part D drugs and Mediaid state-paid drugs;

• Comprehensive formulary that includes Part D drugs, state-required non-Part D and OTC drugs;

• Part D transition requirements also apply to the non-Part D state-required drugs and OTC drugs;

• Medicaid prohibits a Member from being refused service due to his/her ability to pay cost sharing;

• A new Benefit Stage Qualifier (BSQ) of 63 to be introduced October 1, 2014 for MMP benefits;

• An expectation that Network Providers provide linguistically and culturally-competent services, including but not limited to:

   o Competency training for Pharmacy staff, including information about the following:

      ▪ Various chronic conditions prevalent within the MMP population;

      ▪ Compliance with the Americans with Disabilities Act;

      ▪ Access to Network Provider's facility, medical equipment, and programs, as applicable;

      ▪ Use of evidence-based practices and specific levels of quality outcomes;

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential 2014 Express Scripts. All rights reserved
Network Provider Manual - Revised 7/2014

- ▪ How to work with Members who have mental health diagnoses, including crisis prevention and treatment;
- ▪ Understanding the needs of MMP Members who have a variety of medical concerns, including but not limited to:
  - Adults with serious mental illnesses and/or substance abuse disorders;
  - Members with complex medical needs;
  - Members with physical or intellectual disabilities, including for Members who are homeless;
  - Members with Traumatic Brain Injury;
  - Members with dementia/Alzheimer's Disease;
  - Members with ESRD;
  - Members with HIV/AIDS.

- Resources available (such as language lines) to help Members with limited or no English proficiency.

## NY MMP (FIDA) Readiness

In addition to CMS's overall MMP requirements, some states are also adding requirements to meet the needs of this unique population. New York FIDA (Fully Integrated Dual Advantage) plans have additional CMS and State Network Provider requirements, including:

- Signed Attestation Form indicating that Network Provider (including pharmacy) meets ADA requirements;

- Pharmacy hours of service included in provider directories;

- Transition of care includes extended days supply of up to 90 days available to the Member if required;

As additional CMS and state MMP guidance is released, PBM will provide information to Network Providers as soon as reasonably practical.

## 7.22   Patient Residence Code and Pharmacy Service Type

For Medicare Part D claims, Network Providers must include a valid Patient Residence Code on submitted claims, which currently include:

- 0- Not specified, other patient residence not identified below
- 1- Home
- 3- Nursing Facility
- 4- Assisted Living Facility
- 6- Group Home
- 9- Intermediate Care Facility/Mentally Retarded
- 11- Hospice

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual – Revised 7/2014

In addition, Network Providers must include the appropriate valid Pharmacy Service Type Code, which include the following values:

- 1- Community/Retail Pharmacy Services
- 2- Compounding Pharmacy Services
- 3- Home Infusion Therapy Provider Services
- 4- Institutional Pharmacy Services
- 5- Long Term Care Pharmacy Services
- 6- Mail Order Pharmacy Services
- 7- Managed Care Organization Pharmacy Services
- 8- Specialty Care Pharmacy Services
- 99- Other

Pharmacists must include a valid Patient Residence Code on all Part D claim transactions. If this code is unknown, the pharmacist may default to a Patient Residence Code of 1 (Home). LTC pharmacies should know the patient residence and submit the appropriate Patient Residence Code on the claim.

Claims with a missing or invalid Patient Residence Code or Pharmacy Service Type Code may be rejected at point of sale. PBM will not accept a "blank" in the Pharmacy Service Type field. ("Blank" is not a valid value.) Network Providers should continue to submit Medicare Part B claims the same as they do today for applicable patient residence codes.

## 7.23   Resources for More Information about Medicare Part D

| More Information – For Health Care Professionals | |
|---|---|
| Training materials for health care professionals | http://www.cms.hhs.gov/MLNProducts/downloads/provtoolkit.pdf |
| Official U.S. government website for people with Medicare | http://www.medicare.gov |

| More Information – For All |
|---|
| Visit www.medicare.gov |
| Visit www.cms.hhs.gov |
| TrOOP Facilitator, Per-Se Technologies: http://medifacd.ndchealth.com |
| Visit www.socialsecurity.gov<br>Publications such as:<br>• *Medicare & You*  handbook<br>• *Facts About Medicare Prescription Drug Programs* |
| Call 1-800-MEDICARE |
| Call Social Security at 800.772.1213 |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).   Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

# Section 8.   Medicaid Program

## Introduction

Medicaid programs are operated by the states, with each state enacting its own laws and regulations. Network Provider is responsible for assuring compliance with all applicable Medicaid laws, rules and regulations.

In providing services to Medicaid Members, Network Providers shall (and shall cause their Pharmacies, employees, agents and independent contractors) to process prescription drug claims and supplies in accordance with all applicable state Medicaid laws, rules and regulations and in accordance with Sponsors' Prescription Drug Program requirements.   Network Providers agree (and shall cause their Pharmacies, employees, agents and independent contractors to agree) they shall not engage in any activity that would have the effect of causing or encouraging a Member not to submit a claim for Covered Medications to such Member's Medicaid Sponsor and/or through such Member's Medicaid Prescription Drug Program.

## Payer of Last Resort

Under federal law, the Medicaid program is intended to be the payer of last resort.  That is, Medicaid is properly responsible for payment of medical costs, including prescription drug costs, only after other third-party sources have met their legal obligations.

## Medicaid Coverage of Medicare Beneficiaries (Dual Eligibles)

Medicare beneficiaries who have limited income and resources may get help paying for their Medicare premiums and out-of-pocket medical expenses from Medicaid. Medicaid may also cover additional services beyond those provided under Medicare. Individuals entitled to Medicare Part A and/or Part B and eligible for some form of Medicaid benefit are often referred to as "**dual eligibles**." Dual eligibles are eligible for some form of Medicaid benefit, whether that Medicaid coverage is limited to certain costs, such as Medicare premiums, or the full benefits covered under the State Medicaid plan.

Dual eligibles whose **benefits are limited** include:

    Qualified Medicare Beneficiaries (QMB);
    Specified Low-Income Medicare Beneficiaries (SLMB);
    Qualifying Individuals (QI); and
    Qualified Disabled Working Individuals (QDWI).

## Balance Billing a QMB

For a QMB, Medicaid is responsible for deductible, coinsurance, and copayment amounts for Medicare Part A and Part B covered services.  Network Providers may not bill a QMB for either the balance of the Medicare rate or Network Provider's customary charges for Medicare Part A or Part B services.  The QMB is protected from liability for Medicare Part A and Part B charges, even when the amounts Network Provider receives from Medicare and Medicaid are less than the Medicare rate or less than Network Provider's customary charges, as specified in the Balanced Budget Act of 1997.  Providers may not bill a QMB for amounts above the Medicare and Medicaid payments, even when Medicaid pays nothing.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 6 of 23   PageID #: 12115

Network Providers may also not accept QMB patients as "private pay" in order to bill the Member directly.  Network Providers must accept Medicare assignment for **all** Medicaid patients, including QMBs.

## PBM Reporting and Disclosures

Network Provider acknowledges and agrees that PBM may make disclosures and/or reports to Sponsors, states and state agencies or a state agency's designee.  Such reports and disclosures may include, but are not limited to, information provided by Network Provider to PBM at credentialing, in the Medicaid Disclosure Form (including Network Provider's TIN), and any information relating to claims submitted on behalf of Medicaid enrollees.  Network Provider expressly agrees that PBM, in its sole discretion, may make any such disclosures and reports as PBM deems appropriate.

## Cultural Competency

The term "cultural competency" refers to the set of interpersonal skills that allow individuals to increase their understanding, appreciation, acceptance and respect of cultural differences and similarities within, among and between groups, and the sensitivity to how these differences influence relationships with Medicaid enrollees.  Network Provider shall provide Covered Services in a culturally competent manner, including complying with any applicable elements of a Sponsor or Medicaid plan's cultural competency plan.  Compliance with this section requires a willingness and ability to draw on community-based values, traditions and customs, to devise strategies to better meet culturally diverse enrollee needs, and to work with knowledgeable persons of and from the community in developing focused interactions, communications and other supports.

## Payment of Pharmacy Claims

PBM shall make payment for all correctly submitted claims within the time frames set forth in law, rule, regulation or the Sponsor's contract with the relevant state, as applicable.

## Hours of Operation

Network Providers shall offer hours of operation for Medicaid enrollees that are no less than the hours of operation offered to commercial Members or comparable to those whose Medicaid services are reimbursed on a fee-for-service (FFS) basis, if the provider serves only Medicaid enrollees.

## 72-Hour Emergency Supplies

Medicaid regulations require that Medicaid Members receive a 72-hour supply of a prescribed drug without delay when the medication is needed and a prior authorization is not available.  This generally applies to all drugs requiring a PA, either because they are non-preferred on the formulary or because they are subject to clinical edits.  The 72-hour emergency supply should be dispensed any time a PA cannot be obtained for a medication that is appropriate for the Medicaid enrollee's medical condition.  If the Prescriber cannot be reached or is unable to request a PA, Network Provider should submit an emergency 72-hour prescription.

## Cost Sharing Out of Pocket Costs

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 4 of 151   PageID #:
12116

201767.4

States can impose Copayments, coinsurance, deductibles, and other similar charges on most Medicaid-covered benefits, both inpatient and outpatient services, and the amounts that can be charged vary with income. All out of pocket charges are based on the individual state's payment for that service.

Out of pocket costs cannot be imposed for emergency services, family planning services, pregnancy-related services, or preventive services for children. Generally, out of pocket costs apply to all Medicaid enrollees except those specifically exempted by law and most are limited to nominal amounts. Exempted groups include children, terminally ill individuals, and individuals residing in an institution. Because Medicaid covers particularly low-income and often very sick patients, services cannot be withheld for failure to pay, but Members may be held liable for unpaid Copayments.

Network Providers are responsible for collecting applicable cost sharing and may not refuse service to a Medicaid Member due to his/her inability to pay the cost sharing amount at the time a service is provided.

## 8.1    Exclusion/Reinstatement by Federal Office of Inspector General (OIG), General Services Administration (GSA) Exclusion Lists and State Agencies

### Exclusion by Federal OIG and GSA

Federal regulations prohibit all individuals included on the Department of Health and Human Services' Office of Inspector General's (HHS OIG) and GSA exclusion lists from involvement in any federal or state health care programs, including Medicaid. The result of an OIG or GSA exclusion from federal health care programs is that no federal health care program payments may be made for any items or services furnished by an excluded individual or entity (42 CFR 1001.1901). Claims will reject at point of sale if the provider/Prescriber is identified as excluded by the OIG or GSA. Network Provider must immediately notify PBM in writing in the event that Network Provider (or any employee, agent, or affiliate) is sanctioned or excluded from a federal program, including but not limited to a state Medicaid program.

Please refer to Section 7.19 of this Provider Manual for additional information on OIG exclusions.

### Exclusion by State Agencies

Under 42 C.F.R. Part 1002, a state agency may exclude an individual or entity from participation in the Medicaid program as Mandatory Exclusions or Permissive Exclusions. These regulations specifically address the authority of state agencies to make exclusions on their own initiative, regardless of whether the OIG has excluded an individual or entity. The regulations also delineate the States' obligation to inform the OIG of certain Medicaid-related convictions. Network Provider must immediately notify PBM in writing in the event that Network Provider (or any employee, agent, or affiliate) is sanctioned or excluded from a state program, including but not limited to a state Medicaid program.

Claims may be rejected at point of sale if the provider/Prescriber is identified as excluded by a Medicaid State Agency.

### Reinstatement

An individual or entity that has been excluded from Medicaid may be reinstated only by the Medicaid agency that imposed the exclusion.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 3 of 4   PageID #: 12117

## 8.2    Enrollment and Eligibility

### Enrollment

Generally, Network Providers must enroll as FFS Medicaid providers with the state(s) in which they dispense prescription drugs and/or provide services for Medicaid Members, observing all applicable state Medicaid laws, rules and regulations.  When enrollment in FFS Medicaid is required, Network Provider must provide its Medicaid ID number to PBM at the time of credentialing or immediately upon receipt of a Medicaid ID number.

### Eligibility

In order for a state to participate in the Medicaid program, federal law requires states to cover certain population groups (mandatory eligibility) and provides the flexibility to cover other population groups (optional eligibility).  States may therefore set individual eligibility criteria within federal minimum standards, and may apply to CMS for a waiver of federal law to expand health coverage beyond these groups.  As a result of this federal/state arrangement, Medicaid programs are very state-specific.

## 8.3    Unique Medicaid Processor Control Number (PCN)

PBM uses a Medicaid plan-specific PCN of MA, implemented on January 1, 2014.  At this time, not all Sponsors use the new Medicaid PCN; however, Network Providers will know when to submit it because Sponsors will issue new Member prescription drug ID cards displaying this unique PCN.

| New Medicaid BIN/PCN | |
| --- | --- |
| **BIN** | **PCN** |
| 0035858 | MA |

## 8.4    Prescriber ID Requirements

Federal law requires a valid Prescriber NPI for all Medicaid prescriptions.  Network Providers are required to submit accurate and valid Prescriber identifiers on all claims, and Medicaid claims will reject unless the Prescriber NPI is submitted.  Claims are checked during adjudication to ensure the appropriate Prescriber NPI is included.  (Please refer to Section 2.12 of this Provider Manual.)

## 8.5    Tamper Resistant Prescription Drug Pads (TRPP)

CMS TRPP regulation requires that all written, non-electronic prescriptions for outpatient drugs be written on tamper resistant prescription pads in order for the medications to be federally reimbursable.

All written, non-electronic prescriptions must contain ALL three (3) of the following characteristics:

- One or more industry-recognized features designed to prevent unauthorized copying of a completed or blank prescription form;

- One or more industry-recognized features designed to prevent the erasure or modification of information written on the prescription by the Prescriber, AND

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 2 of 2  PageID #:
12118
201767.4

- One or more industry-recognized features designed to prevent the use of counterfeit prescription forms.

The following table on the following page provides examples of tamper resistant prescription pad features:

| Industry-recognized features designed to: | Examples of features include, but are not limited to: |
|---|---|
| Prevent unauthorized copying of a completed or blank prescription form | • High security watermark on reverse side of blank<br>• Thermo chromic ink (for example, a latent "void" pattern printed across the entire width of the front of the prescription blank, such that if it is photocopied the word "void" will appear in a pattern across the entire front of the prescription.) |
| Prevent erasure or modification of information written on the prescription by the Prescriber | • Tamper-resistant background ink showing erasures or attempts to change written information |
| Prevent use of counterfeit prescription forms | • Sequentially numbered blanks<br>• Duplicate or triplicate blanks |

## 8.6　340B Drug Discount Program (340B Program)

The 340B Program requires drug manufacturers to provide covered out-patient drugs to certain eligible health care entities, known as covered entities, at or below statutorily defined discount prices (340B ceiling prices).  The purpose of the 340B Program is to lower the cost of acquiring covered outpatient drugs for selected health care providers so they can stretch their resources to serve more patients or improve services.  As a condition of continued participation in the Medicaid program, drug manufacturers must sign an agreement with the Secretary of Health & Human Services (HHS) that their product sales to the covered entities will be at or below the ceiling prices mandated by section 340B. Failure to sell covered drugs at these prices could result in a manufacturer being prohibited from receiving payments for its products from the Medicaid program.

The Health Resources and Services Administration (HRSA), the agency that administers the 340B Program, has issued guidance regarding billing of 340B-purchased drugs.  The Office of Pharmacy Affairs (OPA) is responsible for administering the program.  The guidance states that a drug purchased under Section 340B shall not be subject to both a 340B discount and a Medicaid rebate. OPA has established a mechanism for covered entities to comply with this provision. Covered entities that bill Medicaid submit their Pharmacy Medicaid provider numbers to OPA, which then submits them to state Medicaid agencies. The provider numbers are then used by Medicaid agencies to identify covered entity Pharmacy bills and exclude them from the rebate program.

PBM encourages all Network Providers that bill claims using pharmaceutical stock purchased under Section 340B pricing to identify the claims using NCPDP values as applicable.  The current NCPDP standard allows pharmacies to identify these claims as 340B by submitting:

- Basis of Cost Determination code "08" in field 423-DN plus their 340B acquisition cost in field 4Ø9-D9 Ingredient Cost Submitted **OR**

- Submission Clarification Code value "20" in field 420-DK

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.　EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS　Document 576-7　Filed 03/29/21　Page 4 of 5　PageID #: 12119

## 8.7    Drug Coverage Specific to Medicaid

The following drugs are generally not covered under Medicaid:

- Agents when used for anorexia, weight loss, or weight gain

- Agents when used to promote fertility

- Agents when used for cosmetic purposes or to promote hair growth

- Agents when used for symptomatic relief of cough and cold

- Agents used for the treatment of sexual or erectile dysfunction (ED). Except when prescribed for an FDA labeled indication outside of ED (ex: Pulmonary Hypertension or BPH)

- Covered outpatient drugs when a manufacturer seeks to require, as a condition of sale, that associated tests or monitoring services be purchased exclusively from the manufacturer or its designee

- Drug Efficiency Study Implementation (DESI) drugs

- Agents where the manufacturer has not entered into a rebate agreement with CMS as required under the Social Security Act

## 8.8    NDC Termination Date or Drug Obsolete Date

Generally, Medicaid agencies require that claims be submitted within a defined period of time. States may have different requirements and time frames regarding Health Care Financing Administration (HCFA) NDC Termination Date and Drug Obsolete Date. The HCFA Termination Date is defined as the expiration date of the last batch of the drug produced.  The Obsolete Date is defined as the expiration date of when the manufacturer stopped producing the drug.

PBM edits Medicaid claims at point of sale using the HCFA Termination Date or state-defined periods of time after an NDC's Obsolete Date if no HCFA Termination Date exists.  Claims for dates of fill after the HCFA NDC termination date will reject with NCPDP Reject Code 77 (Missing/Invalid NDC).  Claims will reject in the following instances:

- If an HCFA NDC Termination Date exists for the NDC, the claim will reject if the date of fill is after the HCFA NDC Termination Date.

- If no HCFA Termination Date exists, the claim will reject if the date of fill is after the state-defined period of time following the NDC's obsolete date.

**In states without specified obsolete date acceptance periods, PBM will allow pharmacies to fill the script for three (3) years after the obsolete date or until the HCFA NDC Termination Date, whichever is less.**

To process these claims and avoid the 77 reject, Network Providers should enter an active NDC. Doing so also avoids the need to contact the Prescriber for a new prescription.  Please see the state-specific section (8.10 below) for more information on state-defined HCFA NDC Termination Date requirements.

## 8.9    Other Health Insurance Messaging

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 94 of 236   PageID #: 12120

When PBM determines a Member has other primary health insurance coverage, the claim will reject with NCPDP Reject Code 41 (Submit Bill To Other Processor Or Primary Payer) and will return the BIN/PCN, Rx Group and Member ID for the primary payer, when known, in the Additional Message Information field 526-FQ.

## 8.10 State-Specific Medicaid Requirements

In response to the variability of state laws and requirements related to Medicaid programs, this section documents state-specific requirements applicable to PBM's Network Providers. (Please note Network Providers are required to comply with all applicable state and federal laws pertaining to the Medicaid program as previously indicated, including those set forth in Appendix A of this Provider Manual.)

### 1. State of Arizona Medicaid Program Requirements

**Non-Covered Services**

Section R9-22-702 states that a Network Provider may charge an Arizona Medicaid Member for a statutorily excluded service, if the Member signs a document in advance of receiving the non-covered service stating that he/she understands the service is not covered, and that the Member will be financially responsible for payment.

**Vaccine Processing**

Arizona Health Care Cost Containment System (AHCCCS) policy allows Pharmacies to administer the pneumococcal and seasonal flu intramuscular (IM) vaccines for adult plan Members (aged 21 years and older) without requiring a prescription from the Member's prescribing clinician. These are the ONLY vaccines that can be obtained or administered at a Pharmacy under Arizona Medicaid regulations.

Billing for the provision and/or administration of pneumococcal and seasonal flu intramuscular vaccines must be submitted online at point of sale using the current NCPDP telecommunications standard vD.0. (See table below.)

| Field # | NCPDP Field Name | Submission Criteria | |
|---------|------------------|---------------------|---|
| 455-EM | Prescription/Service Reference Number Qualifier | 1 = Rx Billing | |
| 473-7E | DUR/PPS Code Counter | 1=Rx Billing | |
| 440-E5 | Professional Service Code | **MA** | **If dispensing and administering the vaccine to the patient** |
| | | **Blank** | **If dispensing vaccine without administration** |
| 438-E3 | Incentive Fee Submitted | Provider's Vaccine Administration Fee to include administration and all supplies necessary for injection and administration<br>NOTE: Reimbursement limited to $4.10 for all AHCCCS vaccine claims | |
| 409-D9 | Ingredient Cost Submitted | Vaccine drug ingredient cost | |
| 426-DQ | Usual and Customary Charge | Amount submitted should include the cost for the vaccine PLUS provider's vaccine administration fee | |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 42 of 12121

Per AHCCCS mandate, the maximum allowable amount for the vaccine administration fee and/or dispensing fee is $4.10 per claim. Therefore, Network Providers will be reimbursed the professional service fee (PSF) of $4.10 in addition to the Network Provider's contracted rate. No dispensing fee may be paid on seasonal flu or pneumococcal claims when the $4.10 PSF is reimbursed

## AHCCCS 340B Program

In 2012, AHCCCS mandated Pharmacy-specific 340B pricing for claims filled for Arizona Medicaid Members. The rule applies to all Arizona Medicaid claims including managed care claims. In addition, AHCCCS requires the managed care organizations (MCOs) serving Arizona Medicaid Members to reimburse these AHCCCS-identified 340B entities in accordance with the state mandated 340B pricing.

AHCCCS mandates that all specific Federally Qualified Health Center (FQHC) and FQHC look-alike pharmacies be paid the lesser of their 340B acquisition cost, the 340B ceiling cost or the state defined 340B MAC rate plus an AHCCCS 340B dispensing fee. This pricing is applicable to any drug identified as a 340B drug by AHCCCS regardless of the purchase type (340B or non-340B).

## Tamper Resistant Prescription Drug Pads (TRPP)

AHCCCS and its contractors are required to comply with the CMS TRPP regulation which became effective November 1, 2012. This regulation requires all written, non-electronic prescriptions for outpatient drugs to be written on tamper resistant prescription pads in order for the medication to be federally reimbursable. AHCCCS mandates that PBMs also include these requirements as part of their Pharmacy review and audit processes. If a prescription is found that was NOT written on non-tamper resistant paper, it will be marked as an Invalid Prescription and all payments will be recouped.

## Medicaid Provider Number Requirement

Pharmacies serving Arizona Medicaid Members must have an Arizona Medicaid Provider Number (also referred to as AHCCCS ID) on file with the PBM to process the claim. Claims from pharmacies without an Arizona Medicaid Provider Number may be rejected at the point of sale.

Pharmacies concerned about the status of their Medicaid Provider Number should contact their state Medicaid agency to ensure their Medicaid Provider Number is active. Pharmacies should also inform the PBM after they obtain or have changes to their Medicaid Provider Number.

2. **State of Florida Medicaid Program Requirement**

## Psychotherapeutic Drugs

The state of Florida requires that a signed consent form be on file with the pharmacy at the time any new prescription for a psychotherapeutic drug is dispensed to a Florida Medicaid recipient 12 years of age or younger.

- The child's parent or guardian should receive this form at the time the drug is prescribed.

- A hard copy of this form must be on file for any new prescription (and all related refills).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 96 of 236   PageID #: 12122

201767.4

When submitting one of these claims for a Florida Medicaid Member, the Pharmacy may receive reject code 60 (Product/Service Not Covered for Patient Age) with secondary messaging that states: "Under 13, Reqd PA Type Code 2 Med. Cert."

- To reflect that a completed consent form for the Member is on file:
  - o Pharmacists should resubmit the claim with a "2" (Medical Certification) in the PA Number Type Code field (461-EU)
  - o Leave the Prior Auth Number Submitted field (462-EV) as blank.

- If the Pharmacy receives the prescription via phone or email, the pharmacist must obtain a completed consent form from the Prescriber or guardian via fax or mail <u>prior to</u> dispensing the medication.

Please note these prescriptions may require a Prior Authorization (PA). The informed consent form does not replace PA requirements for non-PDL medications or prior authorized antipsychotics for children and adolescents for 0 through 17 years of age.

- If these claims reject with 75 (Prior Auth Required), the pharmacy will need to obtain a PA.

- The Medical Certification code will not bypass reject 75 and will only bypass reject 60.

Use of this override code indicates the Member has a consent form on file. Claims submitted with improper use of the override code will be subject to reversal and recoupment.

## Medicaid Provider Number Requirement

Network Providers serving Florida Medicaid Members must have a Florida Medicaid Provider Number (also referred to as Medicaid ID or FL MMIS ID) on file with the PBM to process the claim. Claims submitted by Network Providers without a Florida Medicaid Provider Number on file may be rejected at point of sale.

Pharmacies concerned about the status of their Medicaid Provider Number should contact the Florida Agency for Health Care Administration to ensure their Medicaid Provider Number is active. Providers should also inform the PBM after they obtain or have changes to their Medicaid Provider Number.

### 3. State of Kentucky Medicaid Program Requirements

## Copayments

Members meeting the following criteria do not pay a Copayment:

- Non-KCHIP Children

- Children under 19 years old who are in foster care

- Pregnant women

- Patients using the following services:
  - o Hospice care patients
  - o Personal Care
  - o Family Care Home

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved.
Network Provider Manual - Revised 7/2014

**Prescription Limits**

Adults 19 and over are limited to four (4) prescriptions per month with a maximum of three (3) brand names. This rule does not apply to:

- o Children age 18 and under
- o Insulin

**Medicaid Provider Number Requirement**

Network Providers serving Kentucky Medicaid Members must have a Kentucky Medicaid Provider Number (also referred to as Medicaid ID) on file with PBM to process the claim. Claims submitted by Network Providers without a Kentucky Medicaid Provider Number on file may be rejected at point of sale.

Network Providers concerned about the status of their Medicaid Provider Number should contact Kentucky Medicaid to ensure their Medicaid Provider Number is active. Providers should also inform the PBM after they obtain or have changes to their Medicaid Provider Number.

## 4. State of New York Medicaid Program Requirements

**Signature Log Requirements**

According to New York State Department of Health Rules and Regulations, Title 18, 504.3(e) adopted in 2011, Network Providers are required "to submit claims for payment only for services actually furnished and which were medically necessary… and which were provided to eligible persons."

To ensure this requirement is met, the Member or his/her designee must sign for each prescription.

- This policy applies to:
  - o Prescriptions picked up by Member or designee at the Pharmacy
  - o Delivery by the Pharmacy to facilities.

**Durable Medical Equipment (DME)**

Network Providers contracted to provide pharmacy services for New York Medicaid Members who are also eligible to provide DME for these Members should process these claims using an NDC number. PBM does not process claims using Healthcare Common Procedure Coding System (HCPCS) or modified HCPCS codes.

**Prescription Serial Numbers**

The New York State Department of Health requires all pharmacies serving New York Medicaid patients to submit the official New York prescription serial number when submitting claims for prescriptions written on an official New York State Prescription Form. This serial number is defined by the New York State Department of Health as "a unique number used to identify an individual prescription sheet within a prescription pad."

When processing a Medicaid claim, Network Providers should submit the Prescription Serial Number in NCPDP Field 454-EK (Scheduled Prescription ID Number) of the Claim Segment. Medicaid claims

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential 2-Sensitive All rights reserved
Network Provider Manual – Revised 7/2014

Case 1:18-cr-00011-HSM-CHS  Document 576-7  Filed 03/29/21  Page 98 of 236  PageID #: 12124

submitted without a serial number or with an invalid serial number will reject with NCPDP Reject Code EK (M/I Scheduled Prescription ID Number).  Please note that serial numbers:

- Cannot be less than eight (8) alphanumeric characters;

- Cannot contain embedded spaces;

- Should be entered starting at the left-most position in the field;

- Should not have trailing zeros added at the end if less than 12 characters.

Some valid prescriptions may still be dispensed when not written on Official New York Prescription Forms.  The table below lists the specific situations when this is allowed and indicates the appropriate code to be entered instead of the Prescription Serial Number in these instances only:

| Code | Value |
|---|---|
| HHHHHHHHHHHH | Prescriptions written on hospital prescription pads and the prescription pads of their affiliated clinics |
| ZZZZZZZZZZZZ | Prescriptions written by out-of-state Prescribers |
| EEEEEEEEEEEE | Prescriptions submitted electronically or via fax |
| NNNNNNNNNNNN | Prescriptions for carve-out drugs for nursing home patients |
| 999999999999 | Oral Prescriptions |
| SSSSSSSSSSSS | Supplies |

Network Providers should resubmit claims rejecting with EK (M/I Scheduled Prescription ID Number) with either the correct serial number from the official New York State Prescription Form or the appropriate code from the table above.

## 5.  State of Michigan Medicaid Program

**NDC Termination Date or Drug Obsolete Date**

Claims will reject for NDCs filled after the HCFA Termination Date and for those filled more than 365 days after the obsolete NDC date.  Claims for dates of fill after the HCFA NDC Termination Date will reject with NCPDP reject code 77 (Discontinued Product/Service ID Number).

Claims will reject in the following instances:

- When an HCFA NDC Termination Date exists for the NDC and the date of fill is after the HCFA NDC Termination Date.

- When no HCFA Termination Date exists but the date of fill is after the state-defined period of time following the NDC's obsolete date.

To process these claims and avoid the 77 reject, please enter an active NDC. This will also avoid the need to contact the Prescriber for a new prescription.

## 6.  State of Pennsylvania Medicaid Program Requirement

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information. All rights reserved.
Network Provider Manual – Revised 7/2014

## Six (6) Prescription Limit

The State of Pennsylvania Medicaid program restricts adult Members to a monthly limit of six (6) prescriptions. This limit does not apply to pregnant women or Members residing in skilled-nursing or LTC facilities. Many other drugs are excluded from the six (6)-prescription limit per Pennsylvania's "exclusion" list. Messaging will be returned when a prescription rejects for exceeding a Member's six (6)-prescription limit, instructing Network Provider on how to override the reject.

## Claims Processing Override

Network Providers must **appropriately use** the 8844 Medicaid Claims Processing Override, which has been implemented for certain Members in Pennsylvania. This override should never be used on multiple occasions for the same drug for the same Member. The Claims Processing 8844 Override is intended to allow certain Members to receive a short supply of medication when a PA has been submitted for review for a previous claim. Per Pennsylvania requirements, all decisions and communications regarding PAs are made within 24 hours of receipt by the participating Plan Sponsor. This override is not meant to be used to circumvent PA logic or formulary requirements.

If the Member has an "immediate need," Network Providers may enter an override for a 72-hour supply. If the medication is an "ongoing medication" (i.e., applies only to a medication previously dispensed to the Member), the pharmacist may enter an override for up to a 15-day supply. The Pharmacy must then notify the Prescriber of the requirement to submit the Prior Authorization Request Form.

- **"Immediate Need"** – Occurs when, in the professional judgment of the dispensing registered pharmacist and/or Prescriber, it is necessary to dispense a drug at the time the prescription is presented in order to reduce/prevent occurrence or persistence of a serious adverse health condition.

- **"Ongoing Medication"** – Medication previously dispensed to the Member for treatment of a chronic illness, or which is required over a period of time without a gap in treatment. This is in order to complete the course of treatment until the medication is no longer considered necessary by the physician/Prescriber. If a Member's current prescription is for a higher dosage than previously prescribed, the prescription is for an ongoing medication.

The requirement that the Member be given a 72-hour or 15-day supply **does not apply when the pharmacist determines that taking the prescribed medication, either alone or with another medication, would jeopardize the health or safety of the Member**. In such instances, the pharmacist must make a good faith effort to contact the Prescriber.

## Days Supply of Five (5) or Less

The State of Pennsylvania Medicaid program allows for coverage of all prescriptions for a five (5)-day supply or less.

- To process these claims, please enter one (1) in Prior Authorization Type Code Field 461-EU – and "8844" in Prior Auth Number Submitted Field 462-EV.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

## 7.  State of South Carolina Medicaid Requirement

### Four (4) Prescription Limit

The South Carolina Medicaid program has a limit of four (4) prescriptions per calendar month for Members age 21 and greater.  Network Providers may override rejections for certain Members for certain disease states up to seven (7) prescriptions per calendar month.

If a claim for such a Medicaid Member rejects with NCPDP Reject Code 76 (Plan Limitation Exceeded), additional messaging will read:  "ENTER CD 8844 TO EXCEED MNTH RX LIMIT."

- To process these claims, please enter one (1) in Prior Authorization Type Code Field 461-EU – and "8844" in Prior Auth Number Submitted Field 462-EV to override the rejection.
- Overriding more than seven (7) prescriptions per calendar month per Member will require prior authorization by calling 866.310.3666 or by faxing a request to 800.357.9577.

This message will appear in the additional message field before any other additional messaging if it pertains to an impacted Medicaid plan Member.

### Days Supply of Five (5) or Less

The State of South Carolina Medicaid program allows for coverage of all prescriptions for a five (5)-day supply or less.

- To process these claims, please enter one (1) in Prior Authorization Type Code Field 461-EU – and "1111" in Prior Auth Number Submitted Field 462-EV.

### Transition Fills:

If a Medicaid managed care organization (MCO) Member changes plans, the new MCO is required to honor existing prescriptions that need a PA under the new plan's Formulary for a period of no less than 30days. In addition, the MCO must provide continuation of pharmaceutical services and /or honor the PA for an additional 30days, for a total of up to 60days, or until the Member may be transferred without disruption when the Member has one of the following conditions:

- Major Depression
- Schizophrenia
- Bipolar Disorder
- Major Anxiety Disorder
- Attention Deficit/Hyper Activity Disorder

## 8.   State of Texas Medicaid Program Requirements

### Provider Enrollment

Network Providers in the State of Texas are required to enroll in the Texas Vendor Drug Program (VDP), in order to process claims for Texas Medicaid STAR and CHIP Members.  Information about the VDP

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in-part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

enrollment process, along with the required forms, may be accessed on the website http://www.txvendordrug.com/providers/contracting-info.shtml.

## Formularies

Formulary information is available to Network Providers electronically as follows:

- Texas STAR and CHIP/CHIP Perinate formularies and the Medicaid Preferred Drug List (PDL) are available at www.epocrates.com or on the VDP website: http://www.txvendordrug.com/pdl.

Please note:

- OTC items are covered for the STAR program ONLY if included on the PDL.  All covered OTC products require a prescription.
- Products to treat infertility, erectile dysfunction, or those used for cosmetic purposes or to promote hair growth are not covered.

## Compound Claims Processing

PBM will reimburse compound claims with non-covered ingredients at point of sale when submitted as defined in the Texas Vendor Drug Program (VDP) Provider Procedure Manual and described below.

To submit compound claims, Network Providers should:

- Submit multi-ingredient compounds using the compound segment;
- Submit only one compound claim per transmission (please do not include in a multiple claim transaction);
- Submit all ingredients for each compound;
- Submit the value of eight (8) (defined as "Process Claim for Approved Compound Ingredients") in Submission Clarification Code Field 42Ø-DK and enter the appropriate value in the Submission Clarification Code Count Field 354-NX.

Reimbursement is dependent on ingredient coverage provided under specific program formularies. Consistent with VDP guidelines, non-covered ingredients will be paid $0 when submitted with a Submission Clarification Code value of eight (8).

## Guidelines for Influenza Vaccinations

Please follow the guidelines below to administer influenza vaccinations for Blue Cross and Blue Shield of Texas (BCBSTX) STAR Members age 21 years and older:

- Follow the Texas State Board of Pharmacy rules related to certification to immunize and vaccinate (Texas Administrative Code, Title 22, Part 15, §295.15).
- Process these claims using the Pharmacy's NPI.
- The Pharmacy must be enrolled in the Vendor Drug Program (VDP) and be a contracted Provider in at least one of PBM's networks.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 102 of 236   PageID #: 12128

- Use the same billing method that has been defined for Medicare Part D vaccine administration billing.

- For Submission Clarification Code Field 420-DK, please enter seven (7).  (See table below.)

| Field # | NCPDP Field Name | Submission Criteria | |
|---------|------------------|---------------------|---|
| 455-EM | Prescription/Service Reference Number Qualifier | 1 = Rx Billing | |
| 473-7E | DUR/PPS Code Counter | 1=Rx Billing | |
| 440-E5 | Professional Service Code | MA | If dispensing and administering the vaccine to the patient |
| | | Blank | If dispensing vaccine without administration |
| 438-E3 | Incentive Fee Submitted | Provider's Vaccine Administration Fee to include administration and all supplies necessary for injection and administration | |
| 409-D9 | Ingredient Cost Submitted | Vaccine drug ingredient cost | |
| 426-DQ | Usual and Customary Charge | Amount submitted should include the cost for the vaccine PLUS provider's vaccine administration fee | |
| 4Ø7-D7 | Product/Service ID | Appropriate NDC for the vaccine | |
| 42Ø-DK | Submission Clarification Code | 7 = Medically Necessary | |

## Timely Claims Filing

For claims payment to be considered, claims must be received by Texas Medicaid and Healthcare Partnership (TMHP) within 95 days from each date of service (DOS). Claims received after the claims filing deadlines are not payable because Texas Medicaid does not provide coverage for late claims.

## E-prescribing

PBM Medicaid Sponsor BCBSTX offers e-prescribing via Surescripts.  With this e-prescribing service, Network Providers may:

- Verify Member eligibility

- Review medication history

- Review formulary and PDL information

## Complaints and Appeals

- Network Providers may direct complaints or appeals to PBM's Pharmacist Use Only phone number at 800.824.0898.

- Network Providers may submit written complaints to the Texas Health and Human Services Commission (HHSC) by email to hpm_complaints@hhsc.state.tx.us.

## Prior Authorization (PA)

Prescribers may call or fax a PA form to the PBM using the following phone numbers:

- STAR (PA Voice) at 866.533.7008

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information.  All rights reserved
Network Provider Manual - Revised 7/2014

- CHIP/CHIP Perinate (PA Voice) at 866.472.2095
- PA Fax: 800.357.9577

Prior authorization decisions will be made within 24 business hours.

## Pharmacist Use Only Assistance

Network Provider assistance is available by phone 24 hours per day/seven (7) days per week as follows:

- STAR Pharmacist Use Only Voice – 866.294.1562
- CHIP/CHIP Perinate Pharmacist Use Only Voice – 866.323.2088

## 72-Hour Emergency Supplies

Federal and Texas law require that Medicaid Members receive a 72-hour emergency supply of a prescribed medication if it is needed immediately for a medical condition and a PA is not available. The 72-hour emergency supply is available for STAR Members only. This rule applies to non-preferred drugs on the Preferred Drug List and any drug impacted by a clinical PA edit that requires Prescriber approval.

Network Providers should dispense the 72-hour emergency supply any time a PA is not available and a prescription should be filled for any medication or medical condition. If the Prescriber cannot be reached and is unable to request a PA, the Pharmacy should submit an emergency 72-hour claim.

Network Providers may call the Pharmacist Use Only number listed above for 72-hour emergency supplies while awaiting PA approval, or may submit the claim as follows:

- Enter "8" in field 461-EU (Prior Authorization Type Code)
- Enter "801" in field 462-EV (Prior Auth Number Submitted), to override a 75/PA required rejection, and submit the claim for a 72-hour emergency supply. This override is available ONLY for drugs that reject with 75 (PA required).
- Enter three (3) in the Claim Segment Field 405-D5 (Days Supply).
- The quantity submitted in field 442-E7 (Quantity Dispensed) should not exceed the amount necessary for a three (3)-day supply of medication, according to the Prescriber's directions for administration of the drug. If the medication is in a dosage form that cannot be dispensed in a three (3)-day supply, e.g., an inhaler, the dispensing pharmacist may indicate that the emergency prescription is a three (3)-day supply, and enter the full quantity dispensed.

Network Providers are cautioned not to use this procedure continuously or for routine overrides. A 72-hour emergency prescription will be reimbursed in full, and does not count toward the three (3)-prescription limit for adults who have not already received their maximum number of prescriptions in a month. (There is no prescription limit for Members or dependents under the age of 21.)

## Family Planning Products

Under Texas law, family planning products prescribed for contraception are not covered by CHIP, and claims for these products will reject with NCPDP Reject 70 (Drug Not Covered). Network Providers may

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual – Revised 7/2014

override claims submitted for these drugs prescribed for a non-contraceptive diagnosis, and do not require Network Providers to call for PA.

To process these claims:

- In PA Type Code Field 461-EU, submit a value of two (2) (Medical Certificate) or three (3) (EPSDT).  For a non-contraceptive override, enter a value of two (2).
- In PA Number Submitted Field 462-EV, submit one of the following values:
  - o   "31" (Dysmenorrhea)
  - o   "32" (Acne Treatment)
  - o   "33" (Miscellaneous, other than contraception)

## Durable Medical Equipment (DME)

Network Providers contracted to provide Pharmacy services for BCBSTX Members are also eligible to provide DME services for these Members.  Interested Network Providers must enroll on the TMHP website as DME providers and are required to complete a DME Provider Contract with BCBSTX.

## 9.    State of West Virginia Medicaid Program Requirements

### Member Eligibility Verification

Network Providers needing to confirm a Member's West Virginia Medicaid eligibility with any of the Managed Care Organizations ("MCOs") can utilize a single toll-free phone number.  This toll-free number will provide Network Provider with the capability to determine a Member's current West Virginia Medicaid eligibility information with the MCO if it is unknown by the Member, or if a claim rejects due to an incorrect WV Medicaid ID card having been presented to Network Provider.
The toll-free number Network Providers may call for West Virginia Medicaid MCO eligibility verification requests is 866.641.1112.

## 8.11   Resources for More Information about Medicaid

| More Information Regarding Medicaid |
| --- |
| Visit www.medicaid.gov |

| REMAINDER OF PAGE LEFT BLANK |
| --- |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual - Revise 7/2014

# Section 9.   Healthcare Exchanges and Qualified Health Plans

The Patient Protection and Affordable Care Act (PPACA), also known as the Affordable Care Act (ACA), significantly expands health coverage to a previously uninsured and/or under-insured population.  Public Exchanges, organized in each state, are the central mechanism of the PPACA. These public Exchanges are the primary public contact point through which the newly insured population will enroll in health insurance and apply for federal subsidies.

Sponsors wishing to participate in the public Exchanges are required to be certified as Qualified Health Plans (QHPs).  A QHP must meet a number of requirements and offer plans that cover the Essential Health Benefits (EHBs) benchmark in its respective state.  PBM has a number of Sponsors participating as QHPs in public Exchanges.   This Section 9 of the Provider Manual details PBM's network processes and requirements applicable to Network Provider when providing services, including dispensing Covered Medications, to individuals enrolled in QHPs ("Eligible Individuals") administered by a Sponsor.

Network Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following processes and requirements are included and shall apply with respect to services provided to Eligible Individuals.   In the event there is a conflict between the terms and conditions set forth in Section 9 of the Provider Manual and the terms and conditions set forth in the Provider Agreement, the terms and conditions set forth in this Section 9 shall control with respect to any services provided to Eligible Individuals.

## 9.1    Exchange Network Provider Requirements

Network Provider agrees to render Covered Services to Eligible Individuals through its continued participation in one or more of PBM's provider networks.   Any activities or services performed by Network Provider in connection with a QHP will be consistent and comply with the Sponsor's contractual obligations as a QHP issuer.

Network Provider shall not employ or contract for the provision of Covered Services with any individual or entity excluded from participation in a Federal health care program under Section 1128 or 1128A of the Social Security Act.   Network Provider hereby certifies that (i) it checks the Office of Inspector General and General Services Administration exclusion lists for all new employees upon hire, and at the time of contracting for any vendor providing services, supplies, or medications with which Network Provider intends to contract, and (ii) at least monthly thereafter to ensure that no employees or vendors involved in the dispensing or processing of state or federal benefits are included on these lists.  At the request of PBM, Network Provider shall provide a written attestation to PBM confirming compliance and Network Provider's subcontractors' (if any) compliance with the requirements of this paragraph. Network Provider shall immediately disclose to PBM any debarment, exclusion or other event that makes its employees or subcontractor(s) ineligible to perform work related to federal healthcare programs. Network Provider shall not submit claims from or related in any way to an excluded entity to PBM for reimbursement.  Links to these lists may be found at
http://oig.hhs.gov/fraud/exclusions/exclusions_list.asp and http://epls.arnet.gov/.

Network Provider shall not refuse to provide services required under Sponsor's QHP contract with CMS or any applicable state regulatory body (the "Exchange Contract") or attempt to disenroll any Eligible Individual, or deny, limit, or condition coverage or the furnishing of healthcare services or benefits to

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information
Network Provider Manual - Revised 7/2014

Eligible Individuals based on health factors, such as a medical condition (including mental as well as physical illness), claims experience, receipt of healthcare, medical history, genetic information, evidence of insurability (including conditions arising out of acts of domestic violence), and disability.

## 9.2    Subsidies

Certain Eligible Individuals may be entitled to QHP coverage paid for with subsidies from the federal government. These subsidies are available on a sliding scale for qualifying Eligible Individuals with a household income of up to 400% of the Federal Poverty Level (FPL). The subsidies may take the form of premium tax credits (available to qualifying Eligible Individuals with a household income of up to 400% of the FPL) or cost-sharing reductions (available to qualifying Eligible Individuals with a household income of up to 300% of the FPL).

For Eligible Individuals receiving subsidized coverage in the form of cost-sharing reductions, PBM will apply the applicable subsidized cost-sharing amount and communicate that amount to Network Provider via the adjudication messaging at point of sale. Network Provider must collect the applicable cost-sharing amount as further set forth in the Provider Agreement and this Provider Manual.

## 9.3    Prescription Processing

Network Provider shall submit each prescription drug claim to the PBM online through PBM's real-time adjudication system and in the most current NCPDP telecommunications standard format for processing and payment and according to the PBM Payer Sheet. Additional HCR processing information will be included in the Express Scripts Commercial Payer Sheet.

Network Provider agrees to cooperate with all quality assurance activities designed to reduce medication errors and adverse drug interactions as required by state or federal requirements, or by PBM or Sponsor, including, but not limited to, establishing an internal medication error identification and reduction system.

Unless a shorter time period is required by Sponsor or any law, rule or regulation, or state or federal guidance (and then in accordance with such Sponsor or such law, rule or regulation or state or federal requirement), any prescription drug claims for which prescription drugs were approved for payment by the PBM and not picked up by the Eligible Individual, in whole or in part, as set forth in the Network Provider's Provider Agreement, must be reversed online within 13 days, or within the time frame specified in the Network Provider's Provider Agreement.

## 9.4    Grace Period

Under the ACA, QHPs must provide a mandatory 90-day Grace Period to Eligible Individuals receiving advance payments of the premium tax credit. This Grace Period only applies when Eligible Individuals have previously paid at least one month's premium and are behind on subsequent premium payments.

If the Eligible Individual is not eligible for the 90-day Grace Period, the Eligible Individual will be afforded whatever grace period is allowed by state law, if any, and the claims will process according to the standard plan rules.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

During the first month of the 90-day Grace Period, claims will process as usual. In the second and third months of the 90-day Grace Period, Sponsors can choose to pay the claim per the existing benefit setup, reject the claim, or process with an Eligible Individual Copayment of 100% of the discounted cost. This election will apply to all Eligible Individuals, including those receiving subsidized coverage.

If the Sponsor chooses to reject claims in the second and third months of the 90-day Grace Period, claims will reject and the following NCPDP approved message will be provided:

| NCPDP Field Number | NCPDP Field Name | Field Value | Value Description |
|---|---|---|---|
| 511-FB | Reject Code | 646 | Patient Not Eligible Due to Non Payment of Premium. Patient to Contact Plan. |

If the Sponsor chooses to process claims (at 100% of the discounted cost), the following NCPDP approved message code will be displayed:

| NCPDP Field Number | NCPDP Field Name | Field Value | Value Description |
|---|---|---|---|
| 548-6F | Approved Message Code | 29 | Patient required to pay for the full cost of the prescription. Patient to contact plan. |

Please note that when a Sponsor chooses to process claims with an Eligibile Indvidual Copayment of 100% of the discounted cost, Eligible Individuals may indicate they will not pay the 100% Eligible Inidivudal Copayment (i.e., they intend to contact their plan and pay their overdue premium prior to paying for their prescription). In such cases, Network Provider should immediately reverse the claim and reprocess it when the Eligible Individual returns to the Pharmacy. Failure to follow this process will result in a duplicate claim when Network Provider resubmits the claim and/or a failed reversal (reject 87) when Network Provider attempts to reverse the original claim.

## 9.5    CMS Reporting

Federal regulations require that Sponsors provide CMS or the applicable state regulatory body with periodic records of certain claims data. Therefore, any inquiries from CMS or the state may require PBM to contact Network Provider in order to provide a response to CMS or the state. Accordingly, Network Provider agrees to cooperate with any requests made by PBM so that PBM and its Sponsors may comply with this and other CMS and state requirements.

Network Provider will certify to PBM, Sponsor and/or CMS, or the applicable state regulatory body, as to the accuracy, completeness and truthfulness of their submitted claims data, and acknowledge when necessary that the submitted claims data may be used for purposes of obtaining Federal reimbursement.

## 9.6    Compliance

Network Provider will perform all services under the Provider Agreement in a manner consistent with the requirements of the ACA and other applicable federal and state laws, regulations, CMS guidance and instructions. Without limiting the generality of the foregoing, Network Provider expressly agrees it shall comply with the following federal statutes:  False Claims Act (32 USC 3729, et seq.); Anti-kickback

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual - Revised 7/2014

statute (section 1128B (b) of the Social Security Act); Title VI of the Civil Rights Act of 1964; Age Discrimination Act of 1975; Americans with Disabilities Act; Rehabilitation Act of 1973; Title XVIII of the Social Security Act; ACA regulations governing Qualified Health Plans found at 45 C.F.R. §§ 155, 156 and 157, respectively; Civil Monetary Penalties of the Social Security Act (42 U.S.C. § 1395w-27 (g)); and the Beneficiary Inducement Statute (42 U.S.C. § 1320a-7a(a)(5)). Network Provider further agrees it shall provide Covered Medications in accordance with and comply with all requirements applicable to Network Provider through the Exchange Contract.

Network Provider shall report compliance concerns and suspected or actual misconduct related to the Sponsor's QHP(s). Network Provider may report fraud, waste, and abuse anonymously to PBM's confidential Fraud, Waste, and Abuse Hotline at 1.866.216.7096, or by email to FraudTip@express-scripts.com, both of which are available 24 hours a day, seven (7) days a week. Any Network Provider filing a report should not fear reprisal of any sort whatsoever. Network Provider is protected from retaliation for complaints under the False Claims Act, as well as by other applicable federal and state anti-retaliation protections.

Network Provider shall submit a report in writing to PBM within 30calendar days of its knowledge of any and all civil judgments and other adjudicated actions or decisions against Network Provider related to the delivery of any healthcare item or service (regardless of whether the civil judgment or other adjudicated action or decision is the subject of a pending appeal).

Network Provider acknowledges that PBM may monitor and audit Network Provider's compliance with these requirements. Network Provider agrees to cooperate with PBM, including providing any information requested by PBM necessary to verify compliance with and undertaking of the requirements set forth herein. In addition, Network Provider agrees PBM shall have the right to inspect, evaluate, and audit all contracts, books, computers and electronic systems, medical records and documentation related to Sponsor's Exchange Contract and as necessary to support PBM's and Sponsor's monitoring and auditing strategies. Additionally, Network Provider may be asked from time to time to certify in writing its compliance with these requirements. Failure to comply with the requirements set forth in this section may result in immediate termination of the Provider Agreement by the PBM or a Sponsor, upon written notice to Network Provider. PBM further reserves the right to assess up to a $500 per day fee per Network Provider location or increase Network Provider's transaction fee to a minimum of $0.30 per transaction until such requirement(s) has been met.

## 9.7 Records Retention and Review

Network Provider shall maintain, for a period of ten (10) years from the end date of Sponsor's plan year, all contracts, books, computers and electronic systems, medical records and documentation involving transactions related to Sponsor's Exchange Contract. Network Provider acknowledges and agrees that: (A) the United States Department of Health and Human Services ("DHHS"), the Office of Inspector General, and/or their designees have the right to inspect, evaluate and audit pertinent contracts, books, computers and electronic systems, medical records and documentation of Network Provider involving claims made on behalf of Eligible Individuals, which may include access to Network Provider's premises and physical facilities consistent with applicable law; and (B) DHHS, the Office of Inspector General, and/or their designees have the right to inspect, evaluate, and audit any pertinent information for any particular Exchange Contract period for 10years from the end date of Sponsor's Exchange Contract with CMS. This provision shall survive termination of the Agreement. Network Provider agrees that DHHS, the OIG and/or their designees shall have direct access to Network Providers contracts, books,

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual - Revised 7/2014

computers and electronic systems, medical records and documentation relating to the Sponsor's Exchange Contract, on Network Provider's premises.  The PBM reserves the right to assess a financial penalty if Network Provider repeatedly fails to provide Exchange-related records.

## 9.8    Delegation of Duties

To the extent Sponsor has delegated to Network Provider any of Sponsor's activities and/or reporting requirements under its Exchange Contract, Network Provider agrees that if CMS, PBM or Sponsor determine that Network Provider has not satisfactorily performed such delegated activities or reporting responsibilities, CMS, PBM or Sponsor may revoke any such activities or reporting responsibilities, or negotiate a remedy in lieu of revocation of delegation.  Sponsor is ultimately responsible to CMS for the performance of such delegated activities or reporting responsibilities.  No delegation shall relieve Sponsor from the statutory responsibility to assess and oversee the provision of health services to Eligible Individuals.  Sponsor retains ultimate responsibility to comply with the terms of its Exchange Contract.

## 9.9    Subcontracts

Network Provider many not subcontract any rights or responsibilities under the Provider Agreement without PBM's written consent.  To the extent Network Provider receives such written consent, Network Provider agrees that any subcontractor (and any downstream subcontractor) must agree, in writing, to comply with all of the obligations set forth herein and in the Provider Agreement, including, without limitation, those involving privacy and security of protected health information (PHI) and exclusion from federal health care programs.

## 9.10   QHP Contractual Requirements Based on Changes in Laws, Rules or Regulations, or Guidance Issued by CMS or Applicable State Regulatory Body from Time to Time

As the laws and regulations implementing the ACA continue to evolve, CMS and states will continue to issue regulatory guidance affecting QHPs.  This regulatory guidance may affect the services provided by Network Providers and as such, PBM may, from time to time, incorporate language into this Provider Manual to comply with CMS or state requirements. Capitalized terms used, but not defined, herein shall have the meaning ascribed to them in the Provider Agreement.

## 9.11   Privacy

Network Providers are required to take reasonable and necessary measures to safeguard the privacy and security of information identifying any Eligible Individual. This includes compliance with all applicable laws, rules and regulations including those relating to Exchanges and such other regulations or guidance promulgated by CMS or state regulatory body applicable to Sponsor's Exchange Contract.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 100 of 36   PageID #: 12136

# Section 10. Specific Sponsor Requirements

## Generally

Network Provider shall (and shall cause its Pharmacies, employees, agents and independent contractors to) process prescription drug claims and supplies in accordance with applicable laws, rules and regulations and in accordance with Sponsors' Prescription Drug Program requirements. Consequently, Network Provider agrees (and shall cause its Pharmacies, employees, agents and independent contractors to agree) that it shall not engage in any activity that would have or has the effect of or encourages a Member to not submit a claim for Covered Medications to such Member's Sponsor and/or through such Member's Prescription Drug Program.

## 10.1   Department of Defense (TRICARE)

### Introduction

The DoD has one of the most unique benefit designs and membership. DoD's geographically dispersed membership and uniformed services culture demands specific Prescription Drug Program requirements. Additionally, since federal funds are involved, there is added federal oversight in the form of unique laws, rules and regulations specific to the DoD's Prescription Drug Program. Accordingly, Network Providers must (and shall require that their Pharmacies, employees, agents, vendors, and independent contractors) comply with all DoD requirements, rules, regulations and policies, in addition to any federal laws, rules and regulations. Any provision of the Provider Agreement or this Provider Manual that is in conflict with the requirements set forth in this DoD-specific Appendix; or has the effect of limiting PBM's ability to perform its obligations for the DoD or in any way causes a Network Provider or any of its Pharmacies to be out of compliance with any DoD requirement, rule or policy; shall be superseded by this DoD-specific section, and the terms of this DoD-specific section shall prevail and apply.

Network Providers servicing TRICARE Members are obligated to comply with all DoD requirements, rules, regulations and policies in addition to all applicable federal laws, rules and regulations.

### Department of Defense Provider Exclusions

See Section 7.19 of this Provider Manual. Additionally, PBM blocks DoD claims for any providers that TMA Pl requests to be blocked.

## 10.2   TRICARE Benefit Summary and Cost Sharing Information

### Cost Sharing

The cost of medication, established by TRICARE, varies according to the type of drug (brand name or generic), the formulary status of the drug and where the prescription is filled.

Active duty service members may not obtain non-Formulary drugs from a Network Provider until medical necessity has been determined. If a reject occurs, Network Provider should follow online instructions for Prior Authorization or call the PBM's Pharmacist Use Only phone number at **877.363.1304.**

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

**Time Limitations on Filing TRICARE Claims**

All claims for benefits must be processed electronically through the PBM within 90 days of the prescription date of service.  If electronic billing is not successful, a manual claim must be submitted no later than one year after the prescription date of service.

**Newborn Enrollment**

In some cases, the newborn will already be added to the system and claims will process.  However, if Network Provider receives NCPDP Reject 07 (M/I Cardholder ID) when processing a claim for a newborn Member, the PBM will create a newborn eligibility exception record.  To request a newborn eligibility exception, the Network Provider should contact the PBM's Pharmacist Use Only phone number at **877.363.1304**.

The exception record is a temporary solution; the DoD Member (parent/guardian) must establish newborn eligibility with the TRICARE benefit program or future prescriptions for the newborn will reject.

## 10.3   Prescription Processing

**RxGroup Number**

The RxGroup number is DODA for the DoD TRICARE pharmacy benefits program.

**Reversal for Failure to Pick-Up**

In accordance with DoD requirements, any prescription drug claim for which a prescription drug was approved for payment by the government and not picked up by the TRICARE Member within the time frame of 10 days of the date of fill, must be reversed online by the 10th day.

**Compound Claims Processing**

Please refer to Section 2.9 of this Provider Manual.

**DURS Review Process Reason for Service and Result of Service Codes**

PBM accepts DUR codes as indicated in the DoD Payer Sheet.

**Coupons & Discount Cards**

Network Provider is prohibited from accepting and/or applying coupons, discount cards, or any other reduction to Copayments for TRICARE Members.

**Refill Too Soon**

If a DoD claim response is NCPDP Reject Code 79 (Refill Too Soon) or 88 (DUR Reject Error), Network Provider will need to perform one of the following actions:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

| NCPDP Reject Code 79 (Refill Too Soon) | NCPDP Reject Code 88 (DUR Reject Error) |
|---|---|
| The pharmacist may call 877-363-1304 for a Prior Authorization | The Network Provider can perform an appropriate action and use the corresponding Reason for Service override code listed above to process the claim. |

## 10.4   Online COB

### Generally

TRICARE is the secondary payer to all health benefits and insurance plans, except for Medicaid, TRICARE supplements, the Indian Health Service, and other programs/plans as identified by the TRICARE Management Activity (TMA) organization.

TRICARE regulations require coordination of benefits with Other Health Insurance (OHI) coverage.  Due to these regulations, TRICARE does not always pay the OHI copayment or the balance remaining after the OHI payment is made.  Payment calculations differ by Network Provider status as detailed below.

TRICARE Network Individual/Group Providers:

If the Member's OHI pays more than the amount allowed by TRICARE, no payment is authorized by TRICARE. The Member may be responsible for the standard TRICARE copay.  Otherwise, TRICARE pays the lesser of:

- The allowed amount minus the OHI payment

- The amount TRICARE would have paid without OHI

- The Member's liability (OHI/copayment)

Non-Network Individual/Group Providers, TRICARE pays the lesser of:

- The billed amount minus the OHI payment

- The amount TRICARE would have paid without OHI

- The Members' liability (OHI/copayment)

### Online COB Processing

The coordination of benefits (COB)/Other Payments Segment is required for submission of both commercial and Medicare Part D TRICARE Member claims. The Express Scripts DoD Payer Sheet includes the fields required for submission within the COB/Other Payments Segment.

The chart on the following page shows the Other Coverage Codes (OCC), the NCPDP Description, and the COB fields required by the TRICARE program. For DoD online COB claims submitted, the following Other Coverage Codes are accepted:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

| OCC Codes | NCPDP Description | COB fields required by TRICARE |
|---|---|---|
| 2 | Other coverage exists— payment collected; to be used when Other Health Insurance (OHI) pays toward the total cost of medication – e.g. Member has double coverage | 341-HB- Other Payer Amount Paid Count<br>342-HC - Other Payer Amount Paid Qualifier<br>353-NR Other Payer–Patient Responsibility Amount Count<br>351-NP Other Payer–Patient Responsibility Amount Qualifier<br>352-NQ Other Payer – Patient Responsibility Amount431-DV - (The sum of all occurrences must NOT be zero)<br>433-DX - Patient Paid Amount Submitted |
| 3 | Other Coverage Billed – claim not covered; to be used when the OHI does not cover the medication | 471-5E - Other Payer Reject Count<br>472-6E - Other Payer Reject Code |
| 4 | Other coverage exists— payment not collected due to primary carrier deductible; to be used when OHI does not make a payment due to this specific reason | 341-HB- Other Payer Amount Paid Count<br>342-HC - Other Payer Amount Paid Qualifier<br>353- NR Other Payer – Patient Responsibility Amount Count<br>351-NP Other Payer – Patient Responsibility Amount Qualifier<br>352-NQ Other Payer – Patient Responsibility Amount<br>431-DV - (Sum of all occurrences must be equal to zero)<br>433-DX - Patient Paid Amount Submitted |

TRICARE COB claims which are secondary to all payer types (including Medicare D) require the Network Provider to include the accurate Copayment amount in the "Patient Paid Amount Submitted" field (433-DX) or the claim will reject with the reject code and messaging shown below.

| Reject Code | Reason | Reject Messaging |
|---|---|---|
| **DX** | Missing/Invalid Patient Paid Amount Submitted | Please submit primary payer's Member copayment amount. |

**When TRICARE is the secondary payer to Medicare Part D plans:**

- BIN number is 003858

- Processor Control Number is "**SC**." If "**SC**" is not used, the claim will reject with <u>41</u>"- "**Must submit claim using PCN: SC.**"

For <u>DoD Medicare Part D claims only</u>, Network Provider will receive a reject response with reject code "DX – M/I Patient Paid Amount Submitted" and additional message "Patient Paid Amount Submitted is not equal to the GAD (Gross Amount Due) minus Other Payer Paid Amount" for the following scenario:

- Field 430-DU (Gross Amount Due) minus field 431-DV (Other Payer Amount Paid) does not equal field 433-DX (Patient Paid Amount Submitted).

## 10.5 Network Provider Reimbursement & Recoupment

The funds used to pay for TRICARE benefits are appropriated funds furnished by the Congress through the annual appropriations act for the DoD. These are federal funds to be used solely to pay for TRICARE benefits, and are not a part of or obtained from the TRICARE fiscal intermediary's funds related to other

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

programs or insurance coverage. Such funds are disbursed through the PBM at the direction of the DoD. PBM receives claims through its online adjudication system, or paper claims if allowed, for TRICARE benefits claimed, and adjudicates these claims in accordance with administrative procedures and instructions proscribed by the DoD.

Payments will be made for TRICARE-only eligible claims or Medicare-dual eligible claims. Network Provider claims will continue to be subject to a 10-day processing hold from the date of submission.

The PBM pays remittances for DoD claims on a bi-weekly (every two weeks) cycle.

## Payment Suspension During Partial Funding Shortages

Funding of the TRICARE benefit is granted annually by Congress through the Department of Defense appropriations acts. Consequently, the funding TMA receives may from time to time be restricted in use to a specific federal agency, military department and/or to a particular health care program. Additionally, funding for these special purpose programs, including the TRICARE benefit, may be depleted before the next annual appropriations are approved by Congress. Therefore, the PBM may be required to suspend claims payments to Network Provider from time to time until Congress approves additional appropriations and the DoD instructs the PBM to resume payment. In such cases, Network Provider acknowledges and agrees that such non-payment is not a breach of PBM's obligations under the Provider Agreement.

## Offset Requests from Other Agencies

The PBM will offset TRICARE claims to collect debts owed by Network Provider to other federal agencies only when instructed to do so by TMA or other government agency, in accordance with this Provider Manual and all applicable laws, rules and regulations.

## Recoupment of Erroneous Payments

Under the Federal Claims Collection Act (FCCA) (31 USC 3701 et seq.), PBM is required to make necessary claims adjustments and initiate recoupment actions for erroneous payments involving Government funds. The FCCA was enacted to avoid unnecessary litigation in collecting debts owed to the United States. This statute, implemented by joint regulations of the Department of Justice (DOJ) and the General Accounting Office (GAO), requires federal agencies (or their designees) to attempt collection of all federal claims of the United States arising from their respective activities.

Claims may be reviewed for a period of up to six (6) years following the year in which the Covered Medications are provided to TRICARE Members. Accordingly, Network Provider must permit the PBM or auditor to inspect, review, audit and reproduce, during regular business hours and without charge, all records maintained by the Network Provider pertaining to the Covered Medications provided to the TRICARE Member, the provision of services under the Provider Agreement or any claim submitted to PBM by Network Provider.

The following list includes, but is not limited to, the circumstances that may result in an erroneous payment and a requirement for recoupment action:

- Network Provider furnished erroneous information or failed to disclose facts that Network Provider knew or should have known were relevant to payment of the benefit and/or claim.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

- Payment made was in excess of the allowable amount.

- Network Provider received and retained duplicate payment for the same claim.

- Network Provider returned a duplicate payment to the TRICARE Member.

- Overpayment was due to a mathematical or clerical error; e.g., an error in calculation of overlapping or duplicate bills. Mathematical error does not include a failure to properly assess the deductible.

- Overpayment was for non-Covered Medications.

- In a COB situation, Network Provider received more than the maximum allowed.

- Payment was made to the wrong pharmacy.

- Member was not eligible at the time services were provided.

- Member had OHI or pharmaceutical coverage primary to TRICARE.

Allegations by a Member or Network Provider that information obtained from a Health Benefits Advisor (HBA), contractor, or other party precipitated the overpayment does not alter liability for the overpayment, nor is it grounds for termination of recoupment activity.

## Recoupment Action

PBM will make at least four (4) attempts to recoup payment, informing Network Provider each time of the consequences of failure to cooperate. The first attempt shall inform Network Provider in writing of the basis for and the amount of the indebtedness. The second attempt will inform Network Provider of the right to inspect and copy all records pertaining to the debt; the right to request an administrative review; that interest on the debt at current rates will begin to accrue on the date of the second demand notification; that such interest shall be waived on the debt, or any portion thereof which is paid within 30 days of the date of the second demand letter; that payment is due within 30 days of the date of the letter; and that administrative costs and penalties will be incurred for processing and handling. PBM will also inform Network Provider that collection by offset against current or subsequent claims may occur.

Payments to Network Provider that are pending or filed subsequent to the time the collection action is initiated will be suspended. All or any part of the debt may be offset depending upon the reimbursement amount available for offset. When there is no possibility of offset within 60 days of the initiation of collection action, and if other collection efforts have been unsuccessful or the Network Provider seeks relief from the indebtedness, the matter will be referred to TMA.

TRICARE recoupment claims shall be collected in one lump sum whenever possible. However, if Network Provider is financially unable to pay the debt in one lump sum, it should contact the PBM by contacting the individual listed in Network Provider's recoupment correspondence.

Interest shall be charged on TRICARE recoupment debts. Interest shall accrue from the date the initial demand is mailed to Network Provider. The interest rate assessed shall be the rate of the current value of funds to the United States Treasury. The interest rate as initially assessed shall remain fixed for the duration of the indebtedness.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information
Network Provider Manual - Revised 7/2014

**Claims Involving Indications of Fraud, Filing of False Claims or Misrepresentation**

Payment on all TRICARE pharmacy claims in which fraud, filing false claims or misrepresentation is suspected will be suspended until payment or denial of the claim is authorized by the Director of TMA. Collection on all federal claims in which a suspicion of fraud, misrepresentation or filing false claims arises will be suspended pending referral to the appropriate law enforcement agencies by the TMA Director. Only the U.S. Department of Justice has authority to compromise or terminate collection on such claims.

**Good Faith Payment**

Network Providers that exercise reasonable care and precaution in identifying persons claiming to be eligible for TRICARE benefits, and furnish otherwise-Covered Medications and supplies to such persons in good faith, may be granted a good faith payment, even though the person receiving the services and medications is subsequently determined to be ineligible for the benefits. In order to meet the requirements for a good faith payment, the Network Provider must have:

- Exercised reasonable care in identifying the patient as TRICARE eligible.

- Made reasonable efforts to collect payment for services provided from the person who erroneously claimed to be a TRICARE beneficiary.

In order to qualify for a good faith payment, Network Provider must submit documentation to substantiate that BOTH of these requirements have been met. Evidence that Network Provider has exercised reasonable care and precaution in identifying the patient as TRICARE-eligible typically includes obtaining a copy of the patient's Identification Card indicating that he/she was eligible for civilian medical care at the time services were rendered. Generally, Network Provider must have obtained the copy of the Identification Card when services were provided. If the Network Provider did not obtain a copy of the Identification Card, it will submit to TMA Beneficiary and Provider Services (BPS) an explanation of why the Identification Card was not copied, along with reason(s) for the determination that the patient was eligible for TRICARE benefits.

Documentation required to establish that Network Provider has made reasonable efforts to collect payment will vary, depending upon the facts of each case. Such documentation may include, but is not limited to, invoices or demand letters sent to the Member, and records of telephone calls to the Member demanding payment. If the TRICARE Member has moved and left no forwarding address, Network Provider must supply copies of returned letters or records of unsuccessful attempts to reach the Member by telephone.

**Administrative Review of Indebtedness**

If Network Provider believes a recoupment action is improper or incorrect, Network Provider has the right to request an administrative review ("Reconsideration"). Requests for Reconsideration must be made in writing, stating specific reasons why the action is incorrect or improper. Written requests must be received within 90 days of the date of the Original Demand Letter (written demand for payment).

Please submit Requests for Reconsideration in writing to:

Express Scripts, Inc.
P.O. Box 66505
St. Louis, MO  63166-6505

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4

If a Network Provider requests Reconsideration of its indebtedness, the PBM will review the documentation contained in the case file and any additional information or documents submitted by Network Provider. Reconsiderations may not be made for the following reasons:

- TRICARE payment was issued without regard to OHI or pharmacy benefit plan, or the TRICARE liability was inaccurately calculated after taking into consideration payments made by OHI or pharmacy benefit plan.

- The action was initiated to recoup a duplicate payment.

- The action was initiated because an error was made in the original determination that a claim was from a participating or a nonparticipating Network Provider.

If it is inappropriate to grant Network Provider a Reconsideration, PBM shall issue a response to the Network Provider's request indicating its inappropriateness. If the Reconsideration is granted and results in a decision to recoup the overpayment, the Network Provider will be advised that full payment or other satisfactory arrangements for repayment must be made within 30 days. A Network Provider's request for a Reconsideration does not result in suspension of the accrual of interest from the date of the initial demand letter.

## 10.6   Pharmacy Audits and Investigations

See Section 5 of this Provider Manual.

## 10.7   Additional information

### Records Retention for TRICARE Claims

Network Providers are required to maintain all TRICARE prescription records and supporting documentation for a minimum of 10 years (or longer if required by law). This retention is consistent with the requirements of other government-sponsored agencies. Access to TRICARE prescription records is required for audit purposes and shall be granted to PBM upon request.

### Conflicts of Interest

When serving DoD TRICARE Members, Network Providers should be aware of potential conflicts of interest. According to 32 CFR 199.9(d)(1) a conflict of interest includes any situation where an active duty member of the Uniformed Services (including a reserve member while on active duty, active duty for training, or inactive duty training) or civilian employee (which includes employees of the Veterans Administration) of the United States Government, through an official federal position has the apparent or actual opportunity to exert, directly or indirectly, an influence on the referral of TRICARE Members to himself/herself or others with some potential for personal gain or the appearance of impropriety. For example, this regulation may prohibit pharmacists who are TRICARE Members from filling prescriptions for other TRICARE Members.

In any situation involving a conflict of interest of a Uniformed Service employee, the Director of TMA, or a designee, may refer the case to the Uniformed Services responsible for review and action.

### Notice of Proposed Action to Terminate

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 18 of 36   PageID #: 12144
201767.4

PBM shall notify Network Provider in writing of proposed action to terminate Network Provider's status as an authorized TRICARE provider when Network Provider falls within the PBM's certifying responsibility and Network Provider fails to meet the requirements of 32 CFR § 199.6.  The Network Provider is not to be terminated when such Network Provider fails to return certification packets, but will be flagged as "inactive" in PBM's system for DoD.

PBM shall notify Network Provider in writing of the proposed action to terminate Network Provider's status as a participating provider due to non-compliance with the Provider Agreement and fails to meet the requirements of 32 CFR § 199.6.

Authority for such termination can be found in32 CFR § 199.6, which provides administrative remedies for termination when Network Providers have not met or failed to satisfy the criteria for TRICARE authorized Network Provider status.  Since Network Providers are expected to be familiar with TRICARE requirements for qualifying as an authorized Network Provider, and PBM has no evidence that Network Provider meets these required qualifications, Network Provider is considered to have forfeited or waived any right or entitlement to bill Members for the care involved in processing and dispensing TRICARE prescription claims.

---

REMAINDER OF PAGE LEFT BLANK

---

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 121 of 236   PageID #: 12145

# PBM Glossary

| | |
|---|---|
| **Average Wholesale Price or AWP** | The average wholesale price as defined and distributed by Medi-Span, or other comparably reliable source as determined and selected by PBM in its sole and absolute discretion. This price is based on the 11-digit NDC number of the dispensed medication. AWP prices will be updated on a daily basis. On average, daily updating will require an additional 1.5 business days to allow for processing, loading and quality management. PBM does not apply any changes to AWP retrospectively. To the extent the reporting source advises of future changes to AWP, such changes will generally be implemented on a prospective date.<br><br>For Medicare Part D, PBM currently uses Medi-Span. |
| **Brand Drug** | A prescription drug protected by a patent, produced by a single manufacturer or supplier, and marketed under the manufacturer's (trademarked) brand name. |
| **Catastrophic Coverage (Medicare)** | Prescription coverage provided by Medicare after a beneficiary has reached the total drug expenditure limit (subject to change annually). |
| **COB** | Coordination of benefits. |
| **Compound Prescription** | A medication that consists of two or more solid, semisolid, or liquid ingredients that are weighed, measured, prepared, or mixed according to the prescription order. These formulations may not be readily available or approved by the Food and Drug Administration. |
| **Copayment** | That portion of the total charge for each prescription drug which a Member is required to pay the Network Provider in accordance with the Member's Prescription Drug Program, whether designated as a "copay" or "deductible" under the applicable Prescription Drug Program. |
| **Coverage Gap** | Under Medicare Part D, Members have an annual coverage gap and are responsible for 100% of this cost. |
| **Covered Drugs Covered Medications, Covered Services, Covered Products** | Those prescription drugs, supplies and other items or services prescribed by an authorized, licensed medical practitioner that are covered by a Prescription Drug Program. |
| **DAW** | DAW means the Prescriber requires the specified Covered Medication to be dispensed as written, not to be substituted with another brand or similar product. |
| **DAW Code** | These are "Dispense As Written" codes developed by the NCPDP, which may be revised from time to time. |
| **DoD** | The Department of Defense. |
| **Dual Eligibles (Full-benefit dual eligibles)** | Members who qualify for both Medicare and Medicaid. Medicare provides payment for acute health services. Medicaid covers Medicare premiums and cost-sharing. |
| **FDA** | The Food and Drug Administration. |
| **Formulary** | A list, designated by each Sponsor, of FDA-approved prescription drugs and supplies, which is developed by the PBM or a Sponsor, that is classified for purposes of benefit design and coverage decisions for each Prescription Drug Program. |
| **GSA** | General Services Administration. |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

| | |
|---|---|
| **Generic Drug(s)** | A "generic" drug is a prescription drug – whether identified by its chemical, proprietary, or non-proprietary name – which is pharmaceutically equivalent and interchangeable with a drug containing an identical amount of the same active ingredient(s) and approved by the FDA. For purposes of reimbursing Network Provider, the designation of a product as "generic" and/or subject to Maximum Allowable Cost (MAC) is determined by the PBM, using PBM's brand / generic algorithm and /or using data elements provided by First DataBank, Medi-Span, or other sources nationally recognized in the retail prescription drug industry. |
| **HIPAA** | The Health Insurance Portability and Accountability Act of 1996 and all amendments, guidance, rules and regulations issued thereto. |
| **HITECH** | Health Information Technology for Economic and Clinical Health Act ("HITECH ACT") of 2009, including applicable rules, regulations and official guidance promulgated thereunder by the U.S. Department of Health and Human Services or otherwise. |
| **HIPAA Rules** | The rules promulgated and implemented pursuant to HIPAA. |
| **HMO** | A health maintenance organization or other managed care entity which typically is licensed to operate as such and may be the subject of federal and/or state laws that apply to, among other things, the provision of Pharmacy services to Members. |
| **Identification Card** | The printed identification card issued to a Member pursuant to the applicable Prescription Drug Program. |
| **Legend Drug** | Any drug or biological that is required by law to have a label stating "Caution Federal Law Prohibits Dispensing Without a Prescription," and that is approved by the FDA for a particular use or purpose. |
| **Long Term Care (LTC)** | A variety of services that help people with health or personal needs and activities of daily living over a period of time.  Long-term care can be provided at home, in the community, or in various facilities including nursing homes and assisted living facilities. |
| **Maximum Allowable Cost (MAC** | The maximum reimbursement to be paid for multi-source product as determined in PBM's sole discretion, and in accordance with any applicable state laws, rules or regulations. |
| **Medicaid Program** | A joint federal-state program that provides health insurance to low-income persons, including prescription benefits. |
| **Medicare Part A** | Beneficiary hospital/inpatient coverage. |
| **Medicare Part B** | Beneficiary outpatient coverage. |
| **Medicare Part C** | Medicare Advantage programs (MA), previously Medicare + Choice. |
| **Medicare Part D Program** | The federal prescription drug program to subsidize the costs of prescription drugs for Medicare Members enacted as part of the MMA (as defined below) and effective as of January 1, 2006. |
| **Medi-Span** | A private agency that works with pharmaceutical manufacturers to develop pricing and product information for all FDA-approved medications. |
| **Member, Eligible Person** | An individual and his or her eligible dependents, as applicable, to whom benefits are available pursuant to a Sponsor's Prescription Drug Program. |
| **MMA** | The Medicare Modernization Act of 2003 (Pub. L. 108-173). |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 121 of 236   PageID #: 12147

| Multi-Source Brand Drug | A Multi-Source Brand Drug is a drug that is available from a brand name manufacturer and also from several generic manufacturers. |
|---|---|
| NCPDP | The "National Council for Prescription Drug Programs" is a non-profit ANSI-accredited Standards Development Organization (SD) consisting of over 1,230 members. These members represent various segments of the pharmacy community interested in electronic standardization within the pharmacy services sector of healthcare. |
| National Provider Identifier (NPI) | The National Provider Identifier (NPI) is a 10-digit all numeric identifier, with no embedded intelligence. The NPI is part of the HIPAA mandate requiring a standard unique identifier for healthcare providers and is intended to enable more efficient electronic health care claims transmissions. The NPI will replace other identifiers such as NCPDP, DEA, State Licenses, Medicaid numbers, etc. in the HIPAA-covered electronic transactions. |
| Network Provider | A provider that has entered into a participating Provider Agreement with Express Scripts and/or Medco. |
| Non-Covered Medications | Prescription products that are not covered by Sponsors. Examples include products that are not covered in a closed Formulary plan, those used primarily for cosmetic purposes, for Member convenience, or that have marginal therapeutic value. Prescribers are advised that if these products are prescribed, the Member will incur the full expense for these drugs. Refer to individual plan information and online messaging for specific reimbursement exclusions. |
| OIG | The Office of the Inspector General. |
| Over-the-Counter (OTC) | Products which do not require a prescription and are usually not covered (except insulin) by the Prescription Drug Program. If a prescription product is available in the identical strength, dosage form and active ingredient(s) as an OTC product, the prescription product will not be covered. |
| PA | Prior Authorization. |
| PSAO | Pharmacy Services Administrative Organization. |
| Part D Agreement | The Medicare Part D Addendum or the Medicare Part D standalone participation agreement, and any and all amendments and addenda thereto, between the PBM and Network Provider setting forth Network Provider's obligations with respect to the provision Medicare Part D Program services. |
| Part D Plan | Medicare Part D Plans include Prescription Drug Plans (PDPs) and Medicare Advantage Plans (MA-PDs). PDPs are private stand alone plans that offer drug-only coverage, while MA-PDs offer both prescription drug and health coverage (e.g. HMOs PPOs). All Part D Plans must be approved by CMS and meet CMS standards for Medicare Part D Prescription Drug Program coverage. |
| Payer Sheets | Documents that provide guidelines to Network Providers for submitting claims to Express Scripts and Medco. |
| Pharmacy(ies) | A Pharmacy or Pharmacies owned or operated by a Network Provider and licensed by the appropriate State Board of Pharmacy or other applicable regulatory authority. If a Network Provider owns only one Pharmacy, then "Network Provider" and "Pharmacy" are used interchangeably in the Provider Agreement and this Provider Manual. |
| Prescriber | A physician or other health care professional licensed to prescribe prescription drugs. |
| Prescription Drug Program | A Prescription Drug Program provided to a Sponsor pursuant to an agreement with the PBM pursuant to which Covered Medications are available to Members in accordance with terms of the program. This includes both commercial and Medicare Part D plans. |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual - Revised 7/2014

| Provider Agreement | The Pharmacy Provider Agreement (contract) between PBM and the Network Provider. The Provider Agreement supersedes this Provider Manual unless otherwise specified. |
|---|---|
| Provider Manual | The written practices, policies, rules, and procedures adopted and implemented by the PBM and applicable to Network Providers dispensing Covered Medications to Members. The Provider Manual may be revised by the PBM from time to time in its sole discretion. |
| Retail Provider | To the extent not defined in the Provider Agreement, "Retail Provider" shall mean a Pharmacy that primarily fills and sells prescriptions via a retail storefront location, is determined by the PBM to fulfill a PBM business need with respect to participation in its retail network(s), and meets and accepts such other criteria established by the PBM from time to time including any specific needs of a population (as determined by the PBM from time to time).  If defined in the Provider Agreement, then to the extent such definition does not contain or address all of the items contained herein, then such additional items shall not be in conflict with the definition in the Provider Agreement, but rather, shall supplement such definition and be read together as one definition. |
| SSI | SSI or "Supplemental Security Income" means the Federal income supplement program funded by general tax revenues (not Social Security taxes) that is designed to assist aged, blind and disabled individuals who have little or no income by providing cash to meet basic needs for food, clothing and shelter. |
| Single Source Brand | Drugs under patent protection that are usually marketed by only one manufacturer. |
| Sponsor or Plan Sponsor | A company. HMO, managed care organization, insurance company, third party administrator, employer or other organization which provides or administers a Prescription Drug Program for Members. |
| Subsidy | Medicare Part D payments to Sponsors from the federal government to encourage retention of employer-sponsored prescription benefits.  Dual Eligible Members qualify for a full subsidy. |
| TRICARE Management Activity (TMA) | The TRICARE Management Activity (TMA) is an organization that reports to the Under Secretary of Defense for Personnel and Readiness through the Assistant Secretary of Defense (Health Affairs) (ASD(HA)).  TMA is responsible for managing TRICARE; managing and executing the Defense Health Program (DHP) appropriation and the DoD Unified Medical Program; and supporting the Uniformed Services in implementation of the TRICARE Program and the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). |
| TrOOP | True Out-of-Pocket or TrOOP refers to the true out-of-pocket expenditures that identify when a Member is eligible for coverage under the catastrophic dollar limit as defined by CMS.  This limit varies from year to year. Reference Section 8.15. |
| TrOOP Facilitator | Entity contracted to work with CMS, Prescription Drug Plans (PDPs), Medicare Advantage Plans (MAPDs), and supplemental coverage carriers to coordinate Medicare Part D benefits and track cost-sharing payment sources. |
| Usual and Customary Retail Price | To the extent not defined in the Provider Agreement, Usual and Customary Retail Price means the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, inclusive of "loss leaders", frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member and offered by the Network Provider (or any of its Pharmacies) on such date.  Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers including Members. |

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

## Appendix A State Legal Requirements For Managed Care Plans, HMOs and Medicaid

**General**
The contents of this Appendix A shall amend the Express Scripts, Inc. Pharmacy Provider Agreement by and between Express Scripts, Inc. and Network Provider as well as the Provider Agreement by and between Medco Health Solutions, Inc. and Provider (such agreements shall collectively and interchangeably referenced to herein as the "Provider Agreement" or "Agreement"). Express Scripts, Inc. and Medco Health Solutions, Inc. shall collectively be referenced to herein as "PBM". The terms "Provider" and "Network Provider" may be used interchangeably and shall have the same meaning. Provider must comply with this Provider Manual and all applicable laws, rules and regulations.

## ALABAMA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Alabama law (as such terms are defined by Alabama law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth below and any statutory or regulatory provision, the regulatory provision shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless.**
   a. Provider hereby agrees that in no event, including but not limited to, nonpayment, PBM insolvency, or breach of the Provider Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member, or persons other than PBM acting on behalf of the Member for services provided pursuant to the Provider Agreement. This provision shall not prohibit collection of Copayments, deductibles, and coinsurances on PBM's behalf made in accordance with the terms of the agreement between PBM and Plan Sponsors. Ala. Code 1975 § 27-21A-3(b)(4); Ala. Admin. Code Rule 420-5-6.10(2)(q).
   b. Provider further agrees that (a) this provision shall survive the termination of the Provider Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of the Member, and that (b) this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Member, or persons on his or her behalf. Ala. Admin. Code Rule 420-5-6.10(2)(q).
   c. Provider may not change, amend, or waive any provision of this section without prior written consent of PBM. Any attempts to change, amend, or waive the Provider Agreement are void. Ala. Admin. Code Rule 420-5-6.10(2)(q).

2. **Workers' Compensation** To the extent Provider provides Covered Medications to Workers' Compensation beneficiaries, Provider agrees that the following additional terms shall apply:
   a. **Repackaged/Relabeled Medications**: Claims for repackaged/relabeled Covered Medications shall be submitted to PBM as a paper claim and shall specify the national drug code (NDC) of the original manufacturer used in the repackaging along with the repackaged/relabeled NDC. For additional information on how to submit a paper claim, contact the Pharmacist Use Only number.

## ALASKA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Alaska law (as such terms are defined by Alaska law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth below and any statutory or regulatory provision, the regulatory provision shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1) **Dispute Resolution.** In the event of a dispute between the parties, the parties shall, at the minimum:
   a) Meet in good faith regarding the matters in dispute within ten (10) business days after receipt of written notice of the dispute from the aggrieved party, unless the parties otherwise have agreed to a different schedule under the Provider Agreement, then in accordance with the Provider Agreement; and
   b) if within thirty (30) days following such initial meeting the parties have not resolved the dispute, the dispute shall be submitted to mediation directed by a mediator who is mutually agreeable to the parties and who is not regularly under contract to or employed by either of the parties; each party shall bear its proportionate share of the cost of mediation, including the mediator fees, all unless the parties otherwise have agreed to a different schedule under the Provider Agreement, then in accordance with the Provider Agreement; and
   c) if after a period of sixty (60) days following commencement of such mediation, the parties are unable to resolve the dispute, either party may seek other relief allowed by law; and
   d) the parties shall agree to negotiate in good faith in the initial meeting and in mediation. Alaska Stat. 21.07.010(a)(4).

2) **Continuation of Care.** Notwithstanding any conflicting termination provisions of the Provider Agreement, if the Provider Agreement is terminated, a Member may continue to be treated Provider as provided in this subsection.
   a) If a Member is pregnant or being actively treated by Provider on the date of the termination of the Provider

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

Agreement, the Member may continue to receive services from Provider as provided in this subsection, and the Provider Agreement shall remain in force with respect to the continuing treatment for such Member. The Member shall be treated for the purposes of benefit determination or claim payment as if Provider in accordance with the Provider Agreement. However, treatment is required to continue only while the Sponsor's Plan remains in effect and

    i)    for the period that is the longest of the following:

    (1)    the end of the current plan year;

    (2)    up to ninety (90) days after the termination date, if the event triggering the right to continuing treatment is part of an ongoing course of treatment;

    (3)    through completion of postpartum care, if the covered person is pregnant on the date of termination; or

    ii)    until the end of the medically necessary treatment for the condition, disease, illness, or injury if the person has a terminal condition, disease, illness, or injury; in this paragraph, "terminal" means a life expectancy of less than one year.

    b)    The requirements of this section do not apply to medical care services covered by Medicaid. Alaska Stat. 21.07.030(f)-(g)

3)    In the event the Provider Agreement provides for without cause termination by either party, such provision shall be applicable to both parties and the longest stated notice period applicable to such termination. Alaska Stat. 21.07.010(a)(3)

## ARIZONA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Arizona law (as such terms are defined by Arizona law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth below and any statutory or regulatory provision, the regulatory provision shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.    **Continuation of Care**. (A) In the event PBM or Sponsor is declared insolvent, Provider shall provide services to Members at the same rates and subject to the same terms and conditions established in the Provider Agreement until the earliest of the following:

i.The expiration of the period during which Sponsor or PBM is required to continue benefits as described in section 20-1069, subsection A.

ii.A notification from the receiver pursuant to section 20-1069, subsection F or a determination by the court that the organization cannot provide adequate assurance it will be able to pay contract providers' claims for covered services that were rendered after the health care services organization is declared insolvent.

iii.    A determination by the court that the insolvent organization is unable to pay contract providers' claims for covered services that were rendered after the health care services organization is declared insolvent.

iv.    A determination by the court that continuation of the contract would constitute undue hardship to the provider.

v.    A determination by the court that the health care services organization has satisfied its obligations to all enrollees under its health care plans. A.R.S. 20-1074(B)

    (B)    In the event Provider is terminated from the provider network, except for reasons of

incompetence or unprofessional conduct, on written request of the Member to PBM, Provider may continue to provide treatment with Provider during a transitional period after the date of the Provider's disaffiliation from the provider network, if both of the following apply:

vi.    The Member has either: (1) A life threatening disease or condition, in which case the transitional period is not more than thirty (30) days after the date of the Provider's disaffiliation from the provider network. (2) Entered the third trimester of pregnancy on or before the date of the Provider's disaffiliation, in which case the transitional period includes the delivery and any care up to six (6) weeks after the delivery that is related to the delivery.

vii.    The Provider agrees in writing to do all of the following: (1) Except for copayment, coinsurance or deductible amounts, continue to accept as payment in full reimbursement from PBM or Sponsor at the rates applicable before the beginning of the transitional period; (2) Comply with the PBM and Sponsor's quality assurance and utilization review requirements and provide to PBM any necessary information related to the care; or (3)Comply with the PBM and Sponsor's policies and procedures pursuant to this article including procedures relating to referrals and obtaining preauthorization, claims handling and treatment approval by the PBM.  A.R.S. 20-841.06B and 20-1057.04B

## ARIZONA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Arizona Medicaid program ("Enrollees") administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control.  Without limiting the generality of the foregoing, Provider agrees as follows:

Provider acknowledges and agrees that it shall comply with all applicable provisions of the Minimum Subcontract Provisions ("MSP"), as required by Arizona Health Care Cost Containment System (AHCCCS), and available at: http://www.azahcccs.gov/commercial/MinimumSubcontractProvisions.aspx. .  Provider further agrees that for the purposes of

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose–in whole or in part–this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

services provided to Arizona Enrollees, all MSPs which are applicable to such services are hereby incorporated by reference in to the Provider Agreement.

## ARKANSAS REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Arkansas law (as such terms are defined by Arkansas law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth below and any statutory or regulatory provision, the regulatory provision shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1) **Continuation of Care**.
   a) In the event the PBM or Sponsor fails to pay for health care services as set forth in the Agreement, the Member shall not be liable to the Provider for any sums owed by the PBM or Sponsor. Ark. Code Ann. 23-76-118(b)(1)(A), 23-76-119(c)(1),(3)(A)
   b) In the event of PBM or Sponsor's insolvency Provider shall continue providing services to Members for the duration of time for which premiums have been paid and shall continue to provide services Members who are confined on the date of insolvency in an inpatient facility until their discharge or expiration of benefits. Ark. Code Ann. 23-76-118(c)(2)
   c) In the event Provider's participation is terminated, Provider shall continue providing services to Members until such Member's current episode of treatment for an acute condition is completed or until the end of ninety (90) days, whichever occurs first, during which period Provider shall be deemed to be a participating Provider for purposes of reimbursement, utilization management and quality of care. Ark. Code Ann. 23-99-408(a)(2); 23-99-408(b)

## CALIFORNIA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under California law (as such terms are defined by California law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth below and any statutory or regulatory provision, the regulatory provision shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Patient Advocate**. PBM shall not terminate the Provider Agreement or otherwise penalize Provider principally for advocating for appropriate health care. Cal. Bus. & Prof. Code § 510; Cal. Ins. Code § 10120.5.
2. **Network Assignment and Promotion**. PBM may sell, lease, transfer, or convey any of the networks that Provider participates in under the Provider Agreement. PBM actively encourages Members' use of Providers by, among other things, providing information to Members in the form of provider directories, use of the toll-free telephone numbers and/or internet web site addresses supplied directly to Members advising them of the existence of the network and Providers. Neither PBM nor Sponsors shall be required to actively encourage Members to use Provider when obtaining medical care in the case of an emergency. Upon execution of the Provider Agreement and a subsequent renewal or amendment, Provider may decline to be included in a network that is sold, leased, transferred, or conveyed to Sponsors that do not actively encourage the Sponsor's Members to use the Providers when obtaining medical care. Provider's election under this provision shall be binding on PBM and any other contracting agent that buys, leases, or otherwise obtains the network. Provider shall not be excluded from a network that is sold, leased, transferred, or conveyed to Sponsors that actively encourage their Members to use Providers when obtaining medical care, based upon Provider's refusal to be included in a network that is sold, leased, transferred, or conveyed to Sponsors that do not actively encourage their Members to use Providers when obtaining medical care. Cal. Bus. & Prof. Code § 511.1(b); Cal. Health & Safety Code § 1395.6; Cal. Ins. Code § 10178.3.
3. **Information Distribution**.

a. Provider acknowledges that PBM has disclosed in an electronic or paper format: (1) information regarding claims processes including directions for the electronic transmission, physical delivery and mailing of claims, all claim submission requirements, instructions for confirming PBM's receipt of claims; and a phone number for claims inquiries and filing information; and (2) information regarding provider dispute processes including the identity of the office responsible for receipt and resolution of disputes, directions for the electronic transmission, physical delivery, and mailing of disputes, all claim dispute requirements, the timeframe for acknowledgment of receipt of a dispute, the phone number for dispute inquiries and filing information, and directions for filing substantially similar claim disputes and other disputes.

b. Provider acknowledges it has received in electronic form: (1) information as to the amount of payment Provider shall receive for each service provided under the Provider Agreement, including any fee schedules or other factors or units used in determining the fees for each service; and (2) detailed payment policies and rules and nonstandard coding methodologies, if applicable, used to adjudicate claims. The parties acknowledge and agree that the fee schedules are set forth in the Provider Agreement. Cal. Bus. & Prof. Code § 511.4; 28 Cal. Code Reg. § 1300.71(l) &(o).
4. **Advertising**. Nothing in the Provider Agreement shall be construed to prohibit, restrict, or limit Provider from advertising. PBM may, however, require that each advertisement contain a disclaimer that Provider's services may be covered for some, but not all, Sponsors utilizing PBM's services and that Sponsors may cover some, but not all of Provider's services. This provision shall not prohibit or limit provisions in the Provider Agreement intended to protect service marks, trademarks, trade secrets, or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

other confidential information or property. Cal. Bus. & Prof. Code § 512; Cal. Health & Safety Code § 1395.5; Cal. Ins. Code § 10127.4.

5. **Non-Delay of Services**. Neither PBM nor Sponsor shall make payment to Provider directly, in any type or form, as an inducement to deny, reduce, limit, or delay specific, medically necessary, and appropriate services provided with respect to a Member or groups of Members with similar medical conditions. Cal. Health & Safety Code § 1348.6; Cal. Ins. Code § 10175.5.

6. **Dispute Resolution**. Provider is entitled a fast, fair, and cost-effective dispute mechanism. Provider shall contact PBM at the address and telephone number listed in the "Audit Grievance Process" section of the Provider Manual for procedures for processing and resolving grievances. PBM shall contact Provider regarding any change(s) to such procedures for processing and resolving such grievances. Cal. Health & Safety Code § 1367(h)(1); Cal. Ins. Code § 10123.137(a).

7. **Payment**. If PBM and Provider agree that Provider shall accept, as payment under the Provider Agreement, the lowest payment rate charged by Provider to any patient or third party, that provision shall not be deemed to apply to, or take into consideration, any cash payments made to Provider by individual patients who do not have any private or public form of health care coverage for the service rendered by Provider. Cal Health & Safety Code § 1371.22; Cal. Ins. Code § 10126.5.

8. **Liability**. Notwithstanding anything in the Provider Agreement to the contrary, PBM, Sponsor, and Provider are each responsible for their own acts or omissions, and are not liable for the acts or omissions of, or the costs of defending, each other. Nothing in this provision shall preclude a finding of liability based on the doctrines of equitable indemnity, comparative negligence, contribution, or other statutory or common law bases for liability. Cal. Health & Safety Code § 1371.25.

9. **Continuation of Services**.

a. If PBM terminates the Provider Agreement for reasons other than medical disciplinary cause, fraud, or criminal activity, Provider agrees, upon request, to continue to provide Covered Medications, including dispensing Covered Medications, to Members who at the time of the Provider Agreement's termination were receiving services from Provider for the following conditions: (1) an acute condition; (2) a serious chronic condition; (3) a pregnancy; (4) a terminal illness; (5) the care of a newborn child between birth and thirty six (36) months; or (6) performance of a procedure that is authorized by Sponsor to occur within one hundred eighty (180) days of the Provider Agreement's termination.

i. For purposes of this provision, an acute condition is a medical condition that involves a sudden onset of symptoms due to an illness, injury, or other medical problem that requires prompt medical attention and that has a limited duration. Provider shall continue to provide Covered Medications, including dispensing Covered Medications, for the duration of the acute condition.

ii. A serious chronic condition is a medical condition due to a disease, illness, or other medical problem or medical disorder that is serious in nature and that persists without full cure or worsens over an extended period of time or requires ongoing treatment to maintain remission or prevent deterioration. Provider shall continue to provide Covered Medications, including dispensing Covered Medications, to a Member with a serious chronic condition for the period of time necessary to complete a course of treatment and to arrange for the safe transfer to another provider, as determined by PBM and Sponsor, in consultation with the Member and Provider, and consistent with good professional practice. Continued services for a serious chronic condition shall not exceed twelve (12) months from the date the Provider Agreement was terminated.

iii. A pregnancy refers to the three (3) trimesters of pregnancy and the immediate postpartum period. Provider shall continue to provide Covered Medications, including dispensing Covered Medications, for the duration of a Member's pregnancy.

iv. A terminal illness means an incurable or irreversible condition that has a high probability of causing death within one (1) year or less. Provider shall continue to provide Covered Medications, including dispensing Covered Medications, for the duration of a Member's terminal illness, which may exceed twelve (12) months from termination of the Provider Agreement.

v. Provider shall continue to provide Covered Medications, including dispensing Covered Medications, for the care of a newborn child between birth and age thirty six (36) months for a period not to exceed twelve (12) months from the Provider Agreement's termination.

vi. Provider shall complete a procedure that is authorized by PBM or Sponsor as part of a documented course of treatment and has been recommended and documented by Provider to occur within one hundred eighty (180) days of the Provider Agreement's termination.

b. Provider agrees that in rendering Covered Medications, including dispensing Covered Medications, during the continuation periods outlined above, Provider shall be subject to the same contractual terms and conditions that were imposed upon Provider prior to termination of the Provider Agreement, including reimbursement rates. Cal. Health & Safety Code § 1373.96; Cal. Ins. Code § 10133.56.

10. **Member Copayment**. Provider acknowledges that Members' Copayments, when based upon a percentage of the fee for services rendered, shall be calculated exclusively from the negotiated rate under the Provider Agreement. Provider shall not charge or collect copayment amounts greater than those calculated in accordance with this provision. Cal. Health & Safety Code § 1373.18; Cal. Ins. Code §§ 10133.2, 10133.3.

11. **Member Hold Harmless**. Except for applicable Copayments and deductibles, Provider shall not invoice or balance bill a Member for the difference between Provider's billed or customary charges and the reimbursement paid by PBM for any Covered Service, including dispensing Covered Medication. Provider agrees that in the event PBM or Sponsor fails to pay for Covered Medications, including dispensing Covered Medications, the Member shall not be liable to Provider for any sums owed by PBM or Sponsor. Provider, its agent, trustee, and assignee, are prohibited from maintaining any action at law against a Member to collect sums owed by PBM or Sponsor. Cal. Health & Safety Code §§ 1358.10(e)(1)(E); 1379.

12. **Member Payments**. Provider shall report to PBM all surcharge and Copayment moneys paid by Members directly to Network Pharmacy. Cal. Health & Safety Code § 1385.

13. **Insolvency**. In the event of the insolvency of PBM or Sponsor, Provider agrees to continue to provide Covered Medications, including dispensing Covered Medications, to Members until the effective date of a Member's coverage in a successor plan pursuant to either open enrollment or the allocation process but in no event longer than forty five (45) days in the event of allocation or thirty (30) days in the case of open enrollment, whichever is greater. Cal. Health & Safety Code §§ 1394.7(e), 1394.8.

14. **Member Acceptance**. Nothing in the Provider Agreement shall be construed to require Provider to accept additional patients if, in Provider's reasonable professional judgment, accepting additional patients would endanger patients' access to, or continuity of, care. Cal. Ins. Code § 10133.65(b).

15. **Quality Improvement and Utilization Management Programs**. Provider shall be required to comply with any quality

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

improvement or utilization management programs or procedures of PBM or Sponsor provided that such programs and procedures were disclosed to Provider at least fifteen (15) days prior to Provider's execution of the Provider Agreement. PBM and Sponsor may, however, make a change to the quality improvement or utilization management programs or procedures at any time if the change is necessary to comply with state or federal law or regulations or any accreditation requirements of a private sector accreditation organization, subject to the provisions of Paragraph 17 below. Cal. Ins. Code § 10133.65(b).

16. **Material Changes to Provider Agreement**. PBM may make material changes to the Provider Agreement upon at least forty five (45) business days' prior notice of the change to Provider. Provider shall have the right to terminate the Provider Agreement prior to implementation of the change. Cal. Ins. Code § 10133.65(c).

17. **Records Retention**. Provider shall maintain and retain for the length of time set forth in the Provider Agreement, but in no event less than two (2) years, such records and provide such information to PBM and Sponsor and to the Director of the California Department of Managed Care as may be necessary to demonstrate compliance by Sponsor with California law. This provision survives termination of the Provider Agreement, whether by rescission or otherwise. 28 Cal. Code Reg. § 1300.67.8(b).

18. **Audit**. Upon demand, and consistent with the Provider Agreement, Provider shall grant PBM and Sponsor access at reasonable times to the books, records and papers of Provider relating to the services provided to Members, to the cost thereof,

and to payments received by Provider from Members (or from others on their behalf). 28 Cal. Code Reg. § 1300.67.8(c).

19. **Member Surcharges**. Provider shall not collect surcharges for Covered Medications, including dispensing Covered Medications. If PBM or Sponsor receives notice of any such surcharge, it shall take appropriate action as provided under the Provider Agreement. 28 Cal. Code Reg. § 1300.67.8(d).

20. **Notice to Members Display**. Provider shall display in a prominent place in each patient reception and waiting area a notice informing Members how to contact Sponsor, file a complaint with Sponsor, obtain assistance from the Department of Managed Health Care, and seek and independent medical review. The notice shall be in the form displayed in the manner set forth at 28 Cal. Code Reg. § 1300.68.

21. **Notice of Termination**. Immediately upon cancellation or amendment of the Provider Agreement, Provider shall send a notice of such cancellation or amendment, the text thereof, and the effective date thereof to Health Plan Registrar, Office of the Attorney General, 3580 Wilshire Boulevard, Los Angeles, California 90010, California Attorney General. 11 Cal. Code Reg. § 536.

22. **Language Assistance Program**. Provider shall cooperate and comply, as applicable, with Sponsor's language assistance program. 28 Cal. Code Reg. § 1300.67.04.

23. **Binding Law**. This Provider Agreement is subject to the requirements of Chapter 22 of Division 2 of the California Health and Safety Code and Chapter 1 of Title 28 of the California Code of Regulations and any provision required to be in the Provider Agreement by either of the above shall be binding whether or not provided in the Providers Provider Agreement.

## CALIFORNIA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the California Medicaid program administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. Compliance with Law. Provider shall meet the subcontractor contract requirements in accordance with the requirements of the Knox-Keene Health Care Services Plan Act of 1975 Health and Safety Code, Section 1340 et seq.; W&I Code, Section 14200 et seq.; Title 22, CCR, Section 53250; as well as the requirements of the contract between Sponsor and the Department of Health Care Services (the "Department") and applicable federal and State laws and regulations. Provider agrees that it will comply with all requirements specified in the contract between the Sponsor and the Department, including subsequent amendments, federal and State laws and regulations, and the Department's Medi-Cal Managed Care Division Policy Letters.

2. Definitions. Terms not defined in the Provider Agreement, the Provider Manual or this Addendum shall have the definitions set forth under applicable law or as set forth in Sponsor's contract with the Department.

3. Services. Provider shall provide Covered Medications to Enrollees and provide for all other applicable services as outlined in the Provider Agreement, required by law, or requested by PBM or sponsor. 22 Cal. Admin. Code § 53520(c)(1).

4. Governing law. The Provider Agreement shall be governed by and construed in accordance with all laws,

regulations and contractual obligations incumbent upon the Sponsor. 22 Cal. Admin. Code § 53520 (c)(2).

5. Amendment. Provider agrees that as required by 22 Cal. Admin. Code § 53520, Subcontract amendments shall become effective only as set forth in 22 Cal. Admin. Code § 53520(a) or as required by any Contract between Sponsor and the Department. 22 Cal. Admin. Code § 53520(c)(3).

6. Reports. Provider agrees to submit reports as required by PBM or Sponsor. 22 Cal. Admin. Code § 53520(c)(5).

7. Records. In accordance with 22 Cal. Admin. Code § 53520(e)(1) and applicable contracts with the Department, Provider agrees to make all of its books and records, pertaining to the goods and services furnished under the terms of this Provider Agreement, available for inspection, examination and copying:

a. By the Department, the United States Department of Health and Human Services (DHHS), the Department of Corporations, the Department of Justice (DOJ), and the Department of Managed Health Care (DMHC);

b. At all reasonable times at the Provider's place of business or at such other mutually agreeable location in California; and

c. In a form maintained in accordance with the general standards applicable to such book or record keeping, for

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is subject to public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

a term of at least five (5) years from the close of the State's Fiscal Year in which this Provider Agreement was in effect.

8. <u>Records Related to Recovery for Litigation.</u>  Provider agrees to timely gather, preserve and provide the Department, in the form and manner specified by the Department, any information specified by the Department, subject to any lawful privilege, in its possession.

9. <u>Subcontracts.</u> To the extent subcontracts are permitted by the Provider Agreement or authorized pursuant to PBMs written consent,  Provider agrees to maintain and make available to the State, upon request, copies of all its subcontracts and to ensure that all subcontracts are in writing and require that its subcontractors:

a.    Make all applicable books and records available at all reasonable times for inspection, examination, or copying by the Department, DOJ, DHHS, and DMHC.

b.    Retain such books and records for a term of at least five (5) years from the close of the State's Fiscal Year in which the subcontract is in effect. 22 Cal. Admin. Code § 53520(e)(3).

10. <u>Notice.</u> Provider agrees to notify the Department in the event this Provider Agreement is amended or terminated. Notice to the Department is considered given when properly addressed and deposited in the United States Postal Service as first-class registered mail, postage attached. 22 Cal. Admin. Code § 53520(e)(4).

11. <u>Assignment.</u>    Provider agrees that assignment or delegation of this Provider Agreement shall be void unless prior written approval is obtained from the Department in those instances where prior approval by the Department is required. 22 Cal. Admin. Code § 53520(e)(5).

12. <u>Hold Harmless.</u>  Provider agrees to hold harmless both the State and Members in the event PBM or Sponsor cannot or will not pay for covered services performed, including dispensing Covered Medications, by Provider pursuant to this Provider Agreement. 22 Cal. Admin. Code § 53520(e)(6).

13. <u>Transfer of Care/Phase Out.</u>    Provider agrees to cooperate in any transfer of care or phase out requirements that may be requested by Sponsor, PBM or the Department in the event of termination of the contract between Department and Sponsor, the Provider Agreement, or the contract between Sponsor and PBM.

14. <u>Interpreter Services.</u>  To the extent required by law, Provider agrees to provide interpreter services at all provider sites.

15. <u>Grievances.</u>  Provider may submit grievances in accordance with the methods outlined in the Provider Manual.

16. <u>Quality Improvement.</u>  Provider agrees to cooperate in any Quality Improvement System adopted by Sponsor.

17. <u>Debarment and Suspension Certification.</u>    Provider certifies that the information provided on the Ownership Disclosure Form is true and accurate, and will immediately notify PBM in the event of any change(s) to the information provided on said form. Provider certifies that it, and none of its principals: (a) are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded  by any federal department or agency; (b) have not within a three-year period preceding the date of the Agreement been convicted of or had a civil judgment rendered against them in connection with obtaining, attempting to obtain, or performing a public transaction or contract under a public transaction; violation of Federal or State anti-trust statutes or commission of embezzlement, theft, forgery bribery, falsification or destruction of records, making false statements, or receiving stolen property; (c) are not presently indicted or otherwise criminally or civilly charged by a government entity with the commission of any offense outlined in sub(b) of this section; and (d) have not within a three-year period preceding the date of this Agreement had one or more public transactions terminated for cause or default; (e) and shall not knowingly enter into a lower-tier covered transaction with a person who is proposed for debarment under federal regulations, debarred, suspended, declared ineligible, or voluntarily excluded from participation in such transaction, unless authorized by the state.

## COLORADO REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Colorado law (as such terms are defined by Colorado law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Disagreement; Termination.** (A) <u>Provider Disagreement.</u> Provider shall not be prohibited from protesting or expressing disagreement with a medical decision, medical policy, or medical practice of PBM or Sponsor. Colo. Rev. Stat. § 10-16-121(1)(a); Colo. Code Regs.  702-4: 4-2-15(V); (B) <u>PBM or Sponsor Disagreement.</u> Neither PBM nor Sponsor shall be prohibited from protesting or expressing disagreement with a medical decision, medical policy, or medical practice of Provider. Colo. Rev. Stat. § 10-16-121(1)(a); Colo. Code Regs. . 702-4: 4-2-15(V); (C) <u>No Disagreement Termination.</u> Neither PBM nor Sponsor shall terminate the Provider Agreement with Provider because Provider expresses disagreement with a decision by PBM or Sponsor to deny or limit benefits to a Member or because Provider assists a Member in seeking reconsideration of the decision or because Provider discusses with a current, former, or prospective patient any aspect of the patient's medical condition, any proposed treatments or treatment alternatives, whether covered by a Sponsor's Prescription Drug Program or not, policy provisions of a Sponsor's Prescription Drug Program, or Provider's recommendation regarding selection of a Sponsor's Prescription Drug Program based on Provider's knowledge of the health needs of such patients. Colo. Rev. Stat. § 10-16-121(1)(b); Colo. Code Regs.  702-4:4-2-15(V).

2. **No Financial Disincentives.**   Provider shall not be subjected to financial disincentives based on the number of referrals made to participating providers for covered benefits so long as Provider adheres to the utilization review policies and procedures of PBM and Sponsor.  Colo. Rev. Stat. § 10-16-121(d).

3. **Member Hold Harmless.**  Provider shall hold Members harmless for money owed to Provider by PBM or Sponsor.  In no circumstance shall Members be liable to Provider for money owed

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

to Provider by PBM or Sponsor. In no event, including but not limited to nonpayment by PBM or Sponsor, insolvency of PBM or Sponsor, or breach of the Provider Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons (other than PBM or Sponsor) acting on their behalf for services provided pursuant to the Provider Agreement. This provision does not prohibit Provider from collecting coinsurance, deductibles, copayments, or fees for noncovered services delivered on a fee-for-service basis to Members. Provider agrees that this provision shall survive termination of the Provider Agreement, for services rendered prior to the termination of the Provider Agreement, regardless of the cause giving rise to termination and shall be construed to be for the benefit of Members. This provision is not intended to apply to services provided after the Provider Agreement has terminated. Provider agrees that this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Members or persons acting on their behalf insofar as such contrary agreement relates to liability for payment of services provided under the terms and conditions of the Provider Agreement. Any modification, addition, or deletion to this provision shall become effective on a date no earlier than thirty (30) days after the Colorado Commissioner of Insurance has received written notification of proposed changes. Colo. Rev. Stat. § 10-16-705(3); Colo. Code Regs. 702-4:4-7-1 § 12.

4. **Material Change to Provider Agreement.** PBM may make changes to the Provider Agreement upon ninety (90) days' notice before the effective date of the change. The writing shall be conspicuously entitled "notice of material change to contract." Provider may object in writing to the material change within fifteen (15) days and has the right to terminate the contract upon written notice of termination provided to PBM not later than sixty (60) days before the effective date of the material change. If Provider does not object, the written change will become effective.

a. **Material Change Creates a New Category of Coverage.** If a material change is the addition of a new category of coverage and the Provider objects, the addition shall not be effective as to the Provider, and the objection shall not be a basis upon which the person or entity may terminate the contract.

b. **Provider Agreement Modified by Law.** Notwithstanding the above, the Provider Agreement may be modified by operation of law as required by any applicable state or federal law or regulation, and PBM may disclose this change by any reasonable means. Colo. Rev. Stat. §§ 25-37-101 et. seq.

5. **Provider Can Decline Services.** Provider can decline to provide services to new Eligible Persons upon sixty (60) days' notice. The Provider's notice shall state the reason or reasons for this action. For the purposes of this subsection (6), "new Eligible Persons" means those patients who have not received services from the Provider in the immediately preceding three (3) years. An Eligible Person shall not become a "new Eligible Person" solely by changing coverage from one Plan Sponsor to another Plan Sponsor. Colo. Rev. Stat. § 25-37-110.

6. **Termination Notice.** Provider and PBM shall provide ninety (90) days advance written notice to each other before terminating the Provider Agreement without cause. Within fifteen (15) working days of receipt from or issuance to Provider of a notice of termination, Sponsor shall make a good faith effort to give written notice of the termination to all Members that are seen regularly by that pharmacy. Within five (5) working days after Provider either gives or receives notice of termination, Provider shall provide PBM and Sponsor(s) with a list of Provider's patients that are Members under Sponsor's Prescription Drug Program. Colo. Rev. Stat. §§ 10-16-705(7) and 25-37-101(15).

7. **Continuation of Services.** Provider agrees to provide covered services, including dispensing Covered Medications, to Members following termination of the Provider Agreement in the following circumstances:

a. Provider shall continue to provide services in accordance with the terms of the Provider Agreement to Members for sixty (60) days after termination if notice of termination was not provided to Members as outlined in Section 6 above;

b. Provider agrees to continue to provide services for Members being treated at an inpatient facility until discharged if Sponsor terminates coverage for any reason other than nonpayment of the premium, fraud, or abuse.
Colo. Rev. Stat. § 10-16-705(4).

8. **Assignment.** Provider shall not assign or delegate any of its rights and responsibilities under the Provider Agreement without prior written consent of PBM. To the extent permitted under the Provider Agreement, any subcontracts Provider has entered into must comply with Colo. Rev. Stat. § 10-16-705(7). Colo Rev. Stat. § 10-16-705(8).

9. **Nondiscrimination.** Provider shall not discriminate, with respect to the provision of medically necessary covered services, including dispensing Covered Medications, against Members that are participants in a publicly financed program. Colo. Rev. Stat. § 10-16-705(9).

10. **Preauthorization.** Provider agrees that the sole responsibility for obtaining any necessary preauthorization rests with Provider, not Members. Colo. Rev. Stat. § 10-16-705(14).

11. **Definitions.** To the extent any definitions or provisions of the Provider Agreement conflict with definitions or provisions contained in Sponsor's Prescription Drug Program or contained in Colorado Revised Statute, Title 10, Article 16, Part 7, the definitions or provisions of the Provider Agreement shall not control. Colo. Rev. Stat. § 10-16-705(15).

12. **Non-Waiver of Rights.** Nothing in the Provider Agreement shall be construed or shall operate to require that Provider waive or forego any right or benefit to which Provider may be entitled under the state or federal law or regulation that provides legal protections to a person solely based on the person's status as a health care provider providing services in Colorado. Colo. Rev. Stat. § 25-37-101(11).

13. **Automatic Termination.** The Provider Agreement shall terminate automatically in the event the Federal Drug Enforcement Agency or other federal law enforcement agency ceases the operations of the Provider or its pharmacists due to alleged or actual criminal activity. Colo. Rev. Stat. § 25-37-101(17).

## COLORADO WORKERS' COMPENSATION ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

If Provider submits workers' compensation claims, Provider agrees that it shall submit cost information as follows: From the Colorado Admin Code; DEPARTMENT OF LABOR AND EMPLOYMENT; Division of Workers' Compensation; 7 ccr 1101-3; WORKERS' COMPENSATION RULES OF PROCEDURE; Rule 18; Section (O)(4)

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

**Clinic Reimbursement:**

**7 CCR 1101-3:18-6(k)(2)(d):** Any prescription for a drug supply to be used longer than a 24 hour period, filled at any clinic, shall fall under the requirements of and be reimbursed as, a pharmacy fee. See Rule 18-6(O).

**Provider Reimbursement.**

**7 CCR 1101-3:18-6(O):**

**(O) Drugs and Medications**

(1) Drugs (brand name or generic) shall be reported on bills using the applicable identifier from the National Drug Code (NDC) Directory as published by the Food and Drug Administration (FDA)

(2) Average Wholesale Price (AWP)

(a) AWP for brand name and generic pharmaceuticals may be determined through the use of such monthly publications as Price Alert, Red Book, or Medispan. In case of a dispute on AWP values, the parties should take the average of their referenced published values.

(b) If published AWP data becomes unavailable, substitute Wholesale Acquisition Cost (WAC) + 20% for AWP everywhere it is found in this rule.

(3) Reimbursement for Drugs & Medications (Except Compounded Drugs)

(a) For Covered Medications written within 30 days from the date of injury, reimbursement shall be AWP + $4.00

(b) For Covered Medications written after 30 days from the date of injury, reimbursement shall be AWP + $4.00. If drugs
have been repackaged, use the original AWP and NDC that was the source of the repackaged drugs to determine reimbursement.

(c) Covered Medications administered in the course of the Provider's direct care shall be reimbursed at the Provider's actual cost incurred.

(4) Compounded Drugs

All compounds shall be billed using the DoWC Z code corresponding with the applicable category for topical products as follows:

| Category I | Z790 | Fee $ 75.00 | per 30 day supply |
|---|---|---|---|

Any anti-inflammatory medication or any local anesthetic single agent.

| Category II | Z791 | Fee $150.00 | per 30 day supply |
|---|---|---|---|

Any anti-inflammatory agent or agents in combination with any local anesthetic agent or agents.

| Category III | Z792 | Fee $250.00 | per 30 day supply |
|---|---|---|---|

Any single agent other than anti-inflammatory agent or local anesthetic, either alone, or in combination with anti-inflammatory or local anesthetic agents.

| Category IV | Z793 | Fee $350.00 | per 30 day supply |
|---|---|---|---|

Two or more agents that are not anti-inflammatory or local anesthetic agents, either alone or in combination with other anti-inflammatory or local anesthetic agents.

All ingredient materials must be listed by quantity used. Category fees include materials, shipping and handling and time. Regardless of how many ingredients or what type, compounded drugs cannot be reimbursed higher than the Category IV fee.

## CONNECTICUT REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of a health maintenance organization ("HMO"), managed care organization ("MCO"), Insurer, or similar carrier licensed under Connecticut law (collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless**. Provider agrees that in no event, including, but not limited to, nonpayment by PBM or Sponsor, the insolvency of PBM or Sponsor, or breach of the Provider Agreement, shall Provider bill, change, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against Members or a person acting on their behalf, other than PBM or Sponsor, for Covered Medications provided pursuant to the Provider Agreement. This provision shall not prohibit collection of cost-sharing amounts, or costs for noncovered services, which have not otherwise been paid by a primary or secondary carrier in accordance with regulatory standards for coordination of benefits, from Members in accordance with the terms of the Member's Prescription Drug Program. C.G.S.A. 38a-193(c)(1)(A).

2. **Insolvency**. Provider agrees that, in the event of the insolvency of PBM or Sponsor, Provider shall continue providing Covered Medications to Members for the duration of the period for which premium payment has been made to Sponsor or until Member is discharged from the inpatient facility, whichever time is greater. C.G.S.A §§ 38a-193(c)(1)(B); 38a-193(d).

3. **Member's Rights**. Notwithstanding any other provision in the Provider Agreement, nothing in the Provider Agreement shall be construed to modify the rights and benefits contained in a Member's Prescription Drug Program. C.G.S.A.§ 38a-193(c)(1)(C).

4. **Non-Payment for Failure to Comply**. Provider shall not bill Members for Covered Medications, except for cost-sharing amounts, where PBM or Sponsor denies payment because Provider has failed to comply with the terms and conditions of the Provider Agreement. C.G.S.A § 38a-193(c)(1)(D).

5. **Survival**. Provider further agrees (i) that the provisions of paragraphs 1, 2, 3, and 4 of this Addendum shall survive termination of the Provider Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of Sponsor's Members, and (ii) that this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Members or persons acting on their behalf. C.G.S.A § 38a-193(c)(1)(E).

6. **Sub-Contracts**. To the extent not otherwise prohibited by the Provider Agreement, if Provider contracts with other providers or facilities who agree to provide Covered Medications to Members with the expectation of receiving payment directly or indirectly from PBM or Sponsor, such providers or facilities shall agree to abide by the provisions of paragraphs 1, 2, 3, 4, and 5 of this Addendum. C.G.S.A. § 38a-193(c)(1)(F).

7. **Unfair Trade Practice**. No Provider, or its agent, trustee or assignee, may: (a) Maintain any action at law against a Member to collect sums owed by PBM or Sponsor; or (b) request payment from a Member for such sums. For purposes of this subdivision "request payment" includes, but is not limited to, submitting a bill for services not actually owed, or submitting for such services an invoice or other communication detailing the cost of the services that is not clearly marked with the phrase "THIS IS NOT A BILL". Provider is informed and acknowledges that pursuant to Connecticut General Statutes section 20-7f, it is an unfair trade practice in violation of chapter 735a for any health care provider to request payment from a Member, other than a copayment or deductible, for Covered Medications, or to report to a credit reporting agency a Member's failure to pay a bill for medical services when a Sponsor has primary responsibility for payment of such services. C.G.S.A. § 38a-193(c)(3).

8. **Termination**. Provider and PBM shall each provide to the other at least sixty (60) days' advance notice to terminate or withdraw from the Provider Agreement. This section shall not apply:

a. When lack of such notice is necessary for the health or safety of a Member;

b. When Provider has entered into a contract with PBM that is found to be based on fraud or material misrepresentation; or

c. When Provider engages in any fraudulent activity related to the terms of the Provider Agreement. C.G.S.A. 38a-193(e); C.G.S.A. 38a-478(h).

9. **No Action for Grievance or Appeal**. Neither PBM nor Sponsor shall take or threaten to take any action against Provider in retaliation for Provider's assistance to a Member in filing an internal grievance or appealing a utilization review determination. C.G.S.A. 38a-478(h)(c).

10. **No Limitation on Member Rights**. Nothing in the Provider Agreement shall be construed as or shall have the effect of prohibiting or limiting any cause of action or contract rights a Member otherwise has. C.G.S.A. 38a-478(i).

11. **Discussions With Members**. Nothing in the Provider Agreement shall be construed as prohibiting Provider from discussing with a Member any treatment options and services available in or out of network, including experimental treatments, or the method that PBM uses to compensate Provider. C.G.S.A. 38a-478(k).

# CONNECTICUT MEDICAID REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Connecticut Medicaid program administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Participation**. Provider agrees to meet the minimum requirements for participation in serving Enrollees in the Medicaid

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

program as set forth in the Regulations of Connecticut State Agencies, Section 17b-262-522 to Section 17b-262-533, as applicable.

2. **Member Hold Harmless**. Except for applicable cost sharing requirements, Provider agrees to hold harmless Enrollees for the costs of all Medicaid-covered goods and services and Covered Medications provided consistent with its Provider Agreement and this Addendum.

3. **Compliance with Law**. Provider shall comply with all applicable Federal and State laws, regulations and written policies, including those pertaining to licensing. In the provision of Covered Medications under this Provider Agreement,
Provider and its contractors (to the extent contractors are allowed under the Provider Agreement) shall comply with all applicable Federal and State statutes and regulations, and all amendments thereto, that are in effect when this Provider Agreement is signed, or that come into effect during the term of this Provider Agreement. This includes but is not limited to Title XIX of the Social Security Act and Title 42 of the Code of Federal Regulations.

4. **Insurance**. Provider must provide evidence of and maintain adequate malpractice insurance consistent with its Provider Agreement.

5. **Member Eligibility**. If there is a discrepancy between information in PBM's or Sponsor's eligibility system and information given to the pharmacists by the Enrollee, the Enrollee's physician or other third party, Provider must utilize the State's Automated Eligibility Verification System to determine eligibility.

6. **Generic Substitutions**. Provider shall adhere to provisions of Connecticut General Statutes § 20-619(b) and (c) related to generic substitutions for Enrollees.

7. **Record Retention**. Provider shall retain financial records, supporting documents, statistical records and all other records supporting the services provided under this Provider Agreement for a period of five (5) years from the completion date of this Provider Agreement, unless a longer period of time is required under the Provider Agreement. Provider shall make the records available to the State or its authorized agents at all reasonable times at Provider's general offices. The State and its authorized agents will request access in writing except in cases of suspected fraud and abuse. If any litigation, claim or audit is started before the expiration of the five (5) year period, , unless a longer period of time is required under the Provider Agreement, the records must be retained until all litigation, claims or audit finding involving the records have been resolved. Provider must make all requested records available within thirty (30) days of the State's request.

8. **Exclusion from Federal Programs**. Provider represents and warrants that it is not excluded from participation in a Federal health care program under either Section 1128 or 1128A

of the Social Security Act and further represents and warrants that it shall notify PBM in the event it is excluded from participation. PBM may immediately terminate this Provider Agreement upon such notification or exclusion.

9. **Eligibility**. Provider shall immediately notify PBM and Sponsor that an Enrollee has become eligible for coverage by a liable third party or has lost eligibility for coverage by a liable third party.

10. **Additional Requirements**. This Provider Agreement shall include any general requirements of the contract between the State and Sponsor that are appropriate to the services being provided herein, including any reporting requirements and shall comply with the requirements of 42 CFR 438.6 that are appropriate to the services or activity delegated under this Provider Agreement.

11. **Evaluation**. Provider agrees to allow the State or other governmental entity to enter the Provider's premises to inspect, monitor or otherwise evaluate the work being performed under this Provider Agreement.

12. **Definitions**. With the exception of subcontracts specifically excluded by the State, all Provider agreements shall include verbatim the Connecticut Medical Assistance Program definitions of Medical Appropriateness/Medically Appropriate and Medically Necessary/Medical Necessity as set forth below:

a. Medical Appropriateness or Medically Appropriate: Health care that is provided in a timely manner and meets professionally recognized standards of acceptable medical care; is delivered in the appropriate medical setting; and is the least costly of multiple, equally-effective alternative treatments or diagnostic modalities.

b. Medically Necessary/Medical Necessity: Health care provided to correct or diminish the adverse effects of a medical condition or mental illness; to assist an individual in attaining or maintaining an optimal level of health, to diagnose a condition or prevent a medical condition from occurring. Conn. Agencies Regs. 17b-262-523 (2012) This Provider Agreement shall use these definitions in all requests for approval of Covered Medications to be dispensed on behalf of Enrollees.

13. **Corrective Action**. Provider agrees that if deficiencies or areas for improvement are identified by PBM or Sponsor, corrective action shall be taken to the satisfaction of PBM and Sponsor.

14. **Surety Bond**. PBM or Sponsor may withhold a portion of the final payment to Provider as a surety bond to ensure compliance under the terminated Provider Agreement.

15. **Clean Air and Water Acts**. Provider shall comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act as amended, 42 U.S.C. 7401, et seq. and section 508 of the Clear Water Act (33 U.S.C. 1368), Executive Order 11738, and 40 CFR Part 15).

# DELAWARE REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Managed Care Organization ("MCO"), Health Care Services Organization, Prepaid Limited Health Service Organization, Insurer, or Carrier licensed under Delaware law (collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

1.  Provider agrees that in no event, including but not limited to nonpayment by PBM or Sponsor, insolvency of PBM or Sponsor, or breach of this agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any Member or a person (other than PBM) acting on behalf of the Member for services provided pursuant to this agreement. This agreement does not prohibit the Provider from collecting coinsurance, deductibles or Copayments, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for-service basis to Members.

2.  In the event of PBM's or Sponsor's insolvency or other cessation of operations, covered Services to Members will continue through the period for which a premium has been paid to PBM on behalf of the Member or until the Member's discharge from an inpatient facility, whichever time is greater. Services to Members confined in an inpatient facility on

the date of insolvency or other cessation of operations will continue until their continued confinement in an inpatient facility is no longer medically necessary.

3.  The provisions contained herein above shall be construed in favor of the enrollee, shall survive the termination of the Agreement regardless of the reason for termination, including the insolvency of PBM or Sponsor, and shall supersede any oral or written contrary agreement between Provider and Member or the representative of the Member if the contrary agreement is inconsistent with the hold harmless and continuation of covered services provisions required herein.

4.  Except in cases where termination was due to unsafe health care practices that compromise the health or safety of Members, Provider shall continue coverage of services at the contract price by a terminated for up to 120 calendar days after notification of termination in cases where it is medically necessary for the Member to continue treatment with the terminated Provider. In cases of the pregnancy of a Member, medical necessity shall be deemed to have been demonstrated and coverage shall continue to completion of postpartum care. Source: Del. Admin. Code, Title 18(1400)(1403)(7.0)(7.1-7.3)

# FLORIDA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Managed Care Organization ("MCO"), Health Care Services Organization, Prepaid Limited Health Service Organization, Insurer, or Carrier licensed under Florida law (collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.  **Termination by DOI**. The Provider Agreement shall be cancelled upon issuance of an order by the Florida Department of Insurance pursuant to Florida Statute §§ 624.4411(3), 636.036(3), or 641.234(3).

2.  **Sponsor's Contracts**.  Nothing in the Provider Agreement shall be construed or have the effect of requiring Provider to accept the terms of other providers' contracts with the Sponsors or any other Prescription Drug Programs under common management and control with the Sponsors as a condition of continuation or renewal of the contact. Fla. Stat. § 627.6474; Fla. Stat. § 641.315(10).

3.  **Termination Notice**.  Provider shall provide no less than ninety (90) days' (for prepaid limited health services organizations) or sixty (60) days' (for HMOs) advance written notice to PBM and the Department of Insurance before cancelling the Provider Agreement for any reason. Nonpayment for goods or services rendered by Provider shall not be a valid reason for avoiding the ninety (90) or sixty (60) day, as applicable, advance written notice of cancellation. Fla. Stat. § 636.035(6); Fla. Stat 641.315(2)(a).

4.  **Termination Without Cause**.  PBM shall provide ninety (90) days' (for prepaid limited health services organizations) or sixty (60) days' (for HMOs) advance written notice to Provider and the Department of Insurance before cancelling, without cause, the Provider Agreement except where a Member's health is subject to imminent danger or Provider's ability to practice is effectively impaired by an action by a governmental agency. Fla. Stat. § 636.035(8); Fla. Stat. § 641.315(2)(b).

5.  **Severability**.  If any provision of the Provider Agreement is held to be unenforceable or otherwise contrary to any applicable laws, regulations or rules, such provision shall have no effect and shall be severable without affecting the validity or enforceability of the remaining provisions of the Provider Agreement. Fla. Stat. § 636.035(9).

6.  **Consultation**.  Nothing in the Provider Agreement shall be construed as restricting Provider's ability to communicate information to a Member regarding care or treatment options for the Member when Provider deems knowledge of such information by the Member to be in the best interest of the health of the Member. Fla. Stat. § 636.035(10); Fla. Stat. § 641.315(5).

7.  **Non-Exclusivity**.  Nothing in the Provider Agreement shall be construed as either prohibiting or restricting Provider from entering into a commercial contract with any other Prescription Drug Program or from prohibiting or restricting PBM or Sponsor from entering into a commercial contract with any other provider. Fla. Stat. § 641.315(6).

8.  **Customer Assistance Notice**.  Provider shall prominently display a consumer assistance notice in its reception areas that is clearly noticeable by all Members.  Such notice shall state the addresses and toll-free telephone numbers of the Agency for Health Care Administration, the Statewide Provider and Subscriber Assistance Program, and the Department of Insurance.  The consumer assistance notice must also clearly state that the address and toll-free telephone numbers of PBM's and Sponsor's grievance department shall be provided to the Members upon request. Fla. Stat. § 641.511(11).

9.  **Continuation of Services**.  In the event the Provider Agreement is terminated for any reason other than for cause, Provider shall continue to provide services to Members undergoing active treatment when medically necessary, through completion of treatment of the condition for which the Member was receiving care at the time of the termination, until the Member selects another treating provider, or during the next enrollment period offered by Sponsor, whichever is longer, but

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 134 of 236   PageID #: 12160

not longer than six (6) months after termination of the Provider Agreement. Provider shall continue to provide services to a Member who has initiated a course or prenatal care at the time of termination, until the Member selects another treating provider, or during the next enrollment period offered by Sponsor, whichever is longer, but not longer than six (6) months after termination of the Provider Agreement. Provider shall continue to provide services to a Member who has initiated a course of prenatal care, regardless of the trimester in which care was initiated, until completion of postpartum care. This provision does not prevent Provider from refusing to continue to provide care to a Member who is abusive, noncompliant, or in arrears in payment for services provided. For care continued under this provision, Provider shall continue to be bound by the terms of the Provider Agreement. Changes made within thirty (30) days before termination of the Provider Agreement are effective only if agreed to by both parties. Fla. Stat. § 641.51(8).

10. **Insurance**. Provider shall maintain appropriate levels of medical malpractice insurance or its equivalent in compliance with Florida Statutes. Fla. Admin. Code Ann. § 690.191.069.

11. **Workers' Compensation**. To the extent Provider provides Covered Medications to Workers' Compensation beneficiaries, Provider agrees that the following additional terms shall apply:

(a)  **Repackaged/Relabeled Medications**:  Claims for repackaged/relabeled Covered Medications shall be submitted to PBM as a paper claim and shall specify the national drug code (NDC) of the original manufacturer used in the repackaging along with the repackaged/relabeled NDC. For additional information on how to submit a paper claim, contact the Pharmacist Use Only number.

# FLORIDA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENTS

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Florida Medicaid Program (the "Plan") administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Capitalized Terms**. All terms capitalized but not otherwise defined in the Provider Agreement or this Addendum shall have the meaning ascribed to them in the contract between State of Florida Agency for Health Care Administration (the "Agency") and Sponsor or the applicable law, rule or regulation.

2. **Hold Harmless**.
a. Provider is prohibited from seeking payment from an Enrollee for any covered services provided, including dispensing Covered Medications, to an Enrollee.
b. Provider shall look solely to PBM for compensation for services rendered, with the exception of nominal cost sharing and patient responsibility, pursuant to the Medicaid State Plan and the Medicaid Provider General and Coverage and Limitations Handbook and in accordance with the Provider Agreement.

3. **Marketing**. Provider shall not engage in any marketing activities prohibited by Sponsor's contract with the Agency or prohibited by state or federal law, rule, or regulation. (42 CFR 438.104, Fla. Stat. §§ 409.912; 641.3901; 641.3903; 641.386; 626.11; 626.342; 626.451; 626.471; 626.511; 626.611). No marketing materials, including any community outreach materials, relating to the Provider Agreement, Sponsor, PBM, Agency or Plan may be displayed without written approval from PBM, Sponsor, and the Agency.

4. **Cooperation with Sponsor**. Provider shall cooperate with any peer review, grievance, quality improvement process ("QIP") and utilization management ("UM") activities, and provide for monitoring and oversight, including monitoring of services rendered to Enrollees, by the Sponsor (or its subcontractors). Provider must complete any applicable abuse, neglect, and exploitation training that may be required by Sponsor from time to time.

5. **Discussions with Enrollees**.
a. Provider shall not be prohibited from discussing treatment or non-treatment options with Enrollees that may not reflect the Plan's position or may not be covered by the Plan.
b. Provider shall not be prohibited from acting within the lawful scope of practice, from advising or advocating

on behalf of an Enrollee for the Enrollee's health status, medical care, or treatment or non-treatment options, including any alternative treatments that might be self-administered.

6. **Advocating on Behalf of Enrollee**. Provider shall not be prohibited from advocating on behalf of an Enrollee in any grievance system or UM process, or individual authorization process to obtain necessary services.

7. **Continuation of Treatment**. Provider shall provide continuity of treatment in the event Provider's contract terminates during the course of an Enrollees' treatment by Provider.

8. **Participation Discrimination**. Provider, PBM and/or Sponsor shall not discriminate with respect to participation, reimbursement, or indemnification of any provider who is acting within the scope of his/her license or certification under applicable state law, solely on the basis of such license or certification.

9. **Enrollee Discrimination**. Provider, PBM and/or Sponsor shall not discriminate against providers serving high-risk populations or those that specialize in conditions requiring costly treatments.

10. **Records**.
a. Provider shall maintain an adequate record system for recording services, charges, dates and all other commonly accepted information elements for services rendered to the Sponsor. Provider shall maintain written procedures for computer system backup and recovery.
b. Provider shall maintain records for a period of not less than ten (10) years from the close of the Provider Agreement, and records shall be retained further if the records are under review or audit until the review or audit is complete. Prior approval for the disposition of records must be requested and approved by PBM if Provider's contract is continuous.

11. **Audit**. Provider shall allow the United States Department of Health and Human Services ("DHHS"), the Agency, the Medicaid Program Integrity Office of the AHCA Inspector General ("MPI"), the Department of Elder Affairs

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

("DOEA") and the Medicaid Fraud Control Unit Office of the Attorney General ("MFCU") to inspect, evaluate and audit all of the following related to the Provider Agreement and the Sponsor: (a) Pertinent books; (b)Financial records; (c) Medical records; and (d) Documents, papers, and records of any provider involving financial transactions.

12. **Reporting**. Provider shall submit all reports and clinical information required by PBM necessary to support services to the Sponsor.

13. **Cooperation**. When providing services to transitioning Enrollees, Provider shall cooperate in all respects with other providers to assure maximum health outcomes for Enrollees.

14. **Screenings**. To the extent applicable, Provider agrees to cooperate with any background screenings required from time to time by Sponsor.

15. **Provider Withdrawal Notice**. Provider shall submit notice of withdrawal from the network at least ninety (90) calendar days before the effective date of such withdrawal.

16. **Insurance**. (A) Provider shall notify PBM in the event of a lapse in general liability or medical malpractice insurance, or if assets fall below the amount necessary for licensure under Florida statutes. (B) Provider shall secure and maintain during the life of the Provider Agreement worker compensation insurance (complying with the Florida worker compensation law) for all of its employees connected with the work under the Provider Agreement.

17. **Confidentiality/HIPAA Compliance**. Provider shall safeguard information about Enrollees in accordance with 42 C.F.R. 438.224. Provider shall comply with HIPAA's privacy and security provisions.

18. **Member/Agency Liability**. Neither Enrollees nor the Agency shall be held liable for any debts of the Provider, including breach of contract due to insolvency. This provision shall survive termination of the Provider Agreement.

19. **Conflict**. Terms of this Provider Agreement, as they pertain to Enrollees, that are in conflict with the specifications of Sponsor's contract with the Agency shall be waived to the extent of such conflict.

20. **Investigation**. Provider shall cooperate fully in any audit, investigation and/or review by the Agency, MPI, MFCU, DOEA, Sponsor or other state or federal entity and in any subsequent legal action that may result from such an investigation involving the Sponsor's Plan. Provider agrees that authorized federal and state agencies and their agents, including but not limited to the Agency, the Florida Attorney General, and DFS, shall have access to Provider's place(s) of business and all medical/case records and data, as required by state and/or federal law. Access shall be during normal business hours except under special circumstances when after-hours admission shall be provided. The Agency and/or the Florida Attorney General shall determine whether special circumstances exist.

21. **Data Submission**. Provider shall promptly submit, complete and accurate claims data to PBM, in accordance with Sponsor's contract with the Agency.

22. **Indemnity/Hold Harmless**. Provider shall indemnify, defend and hold harmless the Agency and Enrollees from and against all claims, damages, causes of action, costs or expenses, including court costs and reasonable attorney fees, to the extent proximately caused by any negligent act or other wrongful conduct arising from this Agreement. This clause shall survive termination of the Provider Agreement, including breach due to insolvency. The Agency may waive this requirement for itself, but not for the Enrollees, for damages in excess of the statutory cap on damages for public entities, if the Provider is a state agency or subdivision as defined by F.S.A. § 768.28, or a public health entity with statutory immunity. All such waivers must be approved in writing by the Agency.

23. **Termination/Sanction**. In addition to any other right to terminate this Provider Agreement, and notwithstanding any other provision of the Sponsor's Plan, the Agency or the Plan may request immediate termination of this Provider Agreement if, as determined by the Agency, Provider fails to abide by the terms and conditions of the Provider Agreement, or in the sole discretion of the Agency, Provider fails to come into compliance with the Provider Agreement within fifteen (15) calendar days after receipt of notice from the Sponsor specifying such failure and requesting Provider aide by the terms and conditions thereof. In addition, Sponsor or PBM may terminate or impose other sanctions, if Provider's performance is deemed inadequate, at Plan, Sponsor's or PBM own discretion.

24. **Termination Appeals**. If Provider's participation is terminated pursuant to the Agreement for any reason, Provider shall utilize the applicable appeals procedures outlined in the Agreement. No additional or separate right of appeal to the Agency or the Sponsor is created as a result of PBM or the Sponsor's act of terminating or decision to terminate, the Provider under the Sponsor's Plan. Provider's termination shall not affect other participating provider's participation in the Plan's network.

25. **Hernandez Settlement**. Provider shall ensure that it complies with all applicable requirements of the *Hernandez* Settlement Agreement ("HSA"). An HSA situation arises when an Enrollee attempts to fill a prescription at a participating pharmacy location and is unable to receive his/her prescription as a result of: (a) An unreasonable delay in filling the prescription; (b) A denial of the prescription; (c) The reduction of a prescribed good or service; and/or (d) The termination of a prescription. If Provider desires, the Bureau of Managed Health Care will provide copies of all *Hernandez* related policies and procedures for review and written approval.

26. **Annual Survey**. Provider shall allow PBM or the Sponsor to conduct an annual on-site survey to ensure compliance with the HSA. If Provider's acts and procedures fail such survey, then Provider shall undergo mandatory training within six (6) months and then be reevaluated within one (1) month of the HSA training course to ensure Provider is in compliance with the HSA.

27. **Post Signs**. Provider shall post signs in English and Spanish, advising Enrollees that if reimbursement for prescription drugs is initially rejected, such individual will be provided written information, in English and Spanish, by Provider, including a pamphlet that will tell such individual the reason their drug claim was rejected and what they can do about it.

28. **Reimbursement Rejection Notices**.
a.    Provider shall provide Enrollees whose claim for reimbursement is rejected with either (i) a printed copy of the computer screen stating the reasons for rejection or (ii) a copy of the pamphlet described in Section 30 with the reason(s) for claim reimbursement rejection and the date of rejection written thereon.

b.    Provider shall deliver the pamphlet described in Section 30 with the notice described in Section 31.a. by the same means by which the prescription medication would have been delivered, to all individuals who are not physically present when their claim for reimbursement is rejected.

29. **Termination by OIR**. The Office of Insurance Regulations may cancel this Provider Agreement at any time upon the issuance of an order.

30. **Subcontract**.
a.    To the extent permitted by the Provider Agreement, if Provider subcontracts or delegates any of the functions in performance of services hereunder, the subcontract or delegation must include all the requirements of the Provider Agreement, including the Provider Manual and all amendments and addenda thereto, including this Addendum.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

b.    The Plan, Sponsor or PBM may revoke delegation or impose other sanctions, if any such subcontractor or delegate's performance is deemed inadequate, at Plan, Sponsor's or PBM own discretion.

31. **Amendment.** To the extent any amendment to the Provider Agreement relates to Sponsor's contract with the Agency, all such amendments shall be in writing and signed by PBM and Provider.

32. **No Incentive to Withhold Care.** Neither PBM nor Sponsor shall make a specific payment under this Provider Agreement, in any type or form, to Provider as an inducement to deny, reduce, limit, or delay the specific, medically necessary, and appropriate dispensing of Covered Medications with respect to a specific Enrollee or group of Enrollees with similar medical conditions.

33. **Presidential Executive Order 12989.** To comply with Presidential Executive Order 12989 and State of Florida Executive Order Number 11-116, Provider agrees to utilize the U.S. Department of Homeland Security's E-verify system to verify the employment of all new employees hired by Provider during the contract term. Provider shall include in related subcontracts a requirement that subcontractors performing work or providing services pursuant to the state contract utilize the E-verify system to verify employment of all new employees hired by the subcontractor during the contract term. Contractors meeting the terms and conditions of the E-Verify System are deemed to be in compliance with this provision.

34. **Hours of Operation.** Provider must offer hours of operation that are no less than the hours of operation offered to commercial Members.

## GEORGIA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Georgia law (as such terms are defined by Georgia law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless**. In addition to the requirements of the Hold Harmless section in the Provider Agreement, a Member shall be held harmless for provider utilization review decisions over which she/he has no control. Ga. Admin. Code Rule 120-2-44-04(3).

2. **Authorization For Services**. Any prospective authorization or other authorization required for covered services, including dispensing Covered medications, shall be conducted as set for the in the Provider Agreement, including the Provider Manual or in accordance with the Sponsor's requirements. Ga. Admin. Code Rule 120-2-80-.06(4)

3. **Review of Provider**. Provider acknowledges and agrees that PBM or Sponsor may continuously review the utilization of Provider's services, facilities and costs. Ga. Admin. Code Rule 120-2-44-.04

## GEORGIA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Georgia Medicaid Managed Care program ("Enrollees") administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Capitalized Terms**. All terms capitalized but not otherwise defined in the Provider Agreement or this Addendum shall have the meaning ascribed to them in the Georgia Families (GF) Contract between the Georgia Department of Community Health (DCH) and Sponsor.

2. **Member Hold Harmless**. Provider shall not seek payment from the Enrollee for any Covered Medications provided to the Enrollee within the terms of the Provider Agreement and shall look solely to the PBM for compensation for services rendered, with the exception of nominal cost sharing pursuant to the Georgia State Medicaid Plan, the Georgia State Medicaid Policies and Procedures Manual, and the Georgia Families Contract.

3. **Quality Improvement Utilization Review**. Provider shall cooperate with the PBM's quality improvement and Utilization Review and management activities.

4. **Transfer**. Provider shall immediately transfer Enrollee to another                  provider if the Enrollee's health or safety is in jeopardy.

5. **Treatment and Non-Treatment Options**. PBM shall not prohibit a Provider from discussing treatment or non-treatment options with Enrollees that may not reflect the PBM's or Sponsor's position or may not be covered by the Provider Agreement.

6. **Scope of Practice**. PBM shall not prohibit a Provider from acting within the lawful scope of practice, from advising or advocating on behalf of an Enrollee for the Enrollee's health status, medical care, or treatment or non-treatment options, including any alternative treatments that might be self-administered.

7. **Advocate**. PBM may not prohibit a Provider from advocating on behalf of the Enrollee in any Grievance System or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

Utilization Review process, or individual authorization process to obtain necessary Health Care services.

8. **Continuation of Services**. In the event a Provider's participation terminates during the course of an Enrollee's treatment by Provider, Provider shall provide for the continuity of treatment.

9. **Discrimination with Respect to Participation, Reimbursement, and Indemnification**. PBM shall not discriminate with respect to participation, reimbursement, or indemnification of any Provider who is acting within the scope of his or her license or certification under applicable State law, solely based on such license or certification. This provision should not be construed as any willing provider law, as it does not prohibit PBMs from limiting Provider participation to the extent necessary to meet the needs of the Enrollees. Additionally, this provision shall not preclude the PBM from using different reimbursement amounts for different specialties or for different practitioners in the same specialty. This provision also does not interfere with measures established by the PBM that are designed to maintain quality and control costs.

10. **Discrimination against High Risk Populations**. PBM shall not discriminate against Providers serving high-risk populations or those that specialize in conditions requiring costly treatments.

11. **Right to Inspection**. CMS and DCH will have the right to inspect, evaluate, and audit any pertinent books, financial records, documents, papers, and records of any Provider involving financial transactions related to the Provider Agreement.

12. **Specify rates of payment**. Provider shall accept payment as specified in the Provider Agreement as payment in full for Covered Services provided to Enrollees, as deemed Medically Necessary and appropriate under the PBM's Quality Improvement and Utilization Management program, less any applicable cost sharing pursuant to the Provider Agreement.

13. **Services Rendered Pre-Enrollment**. PBM and Sponsor shall not be responsible for any payments owed to Provider for services rendered prior to Enrollee's enrollment with the Sponsor, even if the services fell within the established period of retroactive eligibility.

14. **Compliance Requirements**. Provider shall comply with applicable sections of 42 CFR 434 and 42 CFR 438.6.

15. **Exclusion Lists**. Provider is not on and shall not employ or subcontract with individuals on the State or Federal Exclusions list.

16. **Referrals**. Providers shall be prohibited from making referrals for designated health services to health care entities with which the Provider or an Enrollee of the Provider's family has a financial relationship.

17. **Notice of Change to Negotiated Rates**. PBM's negotiated rates with Providers shall be adjusted in the event the Commissioner of DCH directs the PBM to make such adjustments in order to reflect budgetary changes to the Medical Assistance program.

18. **Notice of Change to Reimbursement Rates**. PBM shall notify the Provider in writing no less than thirty (30) calendar days prior to any adjustments to the Provider's contracted reimbursement rates for Georgia Enrollees.

19. **Transitioning Members**. Providers of transitioning Enrollees shall cooperate in all respects with other providers to assure maximum health outcomes for Enrollees.

20. **Provider Termination**.
   a. In addition to any other right to terminate the Provider Agreement, and notwithstanding any other provision of the Provider Agreement, DCH may request Provider termination immediately, or the PBM may immediately terminate on its own, a Provider's participation under the Provider Agreement if the Provider fails to abide by the terms and conditions of the Provider

Agreement, as determined by DCH, or, in the sole discretion of DCH, fails to come into compliance within fifteen (15) Calendar Days after a receipt of notice from the PBM specifying such failure and requesting such Provider to abide by the terms and conditions of the Provider Agreement;
   b. Any Provider whose participation is terminated under the Provider Agreement for any reason shall utilize the applicable appeals procedures outlined in the Provider Agreement. No additional or separate right of appeal to DCH or the PBM is created as a result of the PBM's act of terminating, or decision to terminate any Provider under the Provider Agreement. Notwithstanding the termination of the Provider Agreement with respect to any particular Provider, this Provider Agreement shall remain in full force and effect with respect to all other Providers.

21. **Provider Insurance**. Provider shall maintain, throughout the term of the Provider Agreement at its own expense, professional and comprehensive general liability, and medical malpractice, insurance. Such comprehensive general liability policy of insurance shall provide coverage in an amount established by the PBM pursuant to its written Provider Agreement with Provider. Such professional liability policy of insurance shall provide a minimum coverage in the amount of one million dollars ($1,000,000) per occurrence, and three million dollars ($3,000,000) annual aggregate. Providers may be allowed to self-insure if the Provider establishes an appropriate actuarially determined reserve. DCH reserves the right to waive this requirement if necessary for business need.
   a. In the event any such insurance is proposed to be reduced, terminated or canceled for any reason, Provider shall provide to PBM at least sixty (60) Calendar Days prior written notice of such reduction, termination or cancellation. Prior to the reduction, expiration and/or cancellation of any insurance policy required hereunder, the PBM shall require the Provider to secure replacement coverage upon the same terms and provisions so as to ensure no lapse in coverage, and shall furnish PBM with a Certificate of Insurance indicating the receipt of the required coverage at the request of PBM.
   b. Providers shall maintain insurance coverage (including, if necessary, extended coverage or tail insurance) sufficient to insure against claims arising at any time during the term of the Provider Agreement even though asserted after the termination of the Provider Agreement. DCH or Department of Insurance, at its discretion, may request that the PBM immediately terminate the Provider from participation in the program upon the Provider's failure to abide by these provisions. The provisions of this Section shall survive the expiration or termination of the Provider Agreement for any reason.

22. **Medical Record Requests**. Provider shall ensure a copy of the Enrollee's Medical Record is made available, without charge, upon the written request of the Enrollee or Authorized Representative within fourteen (14) Calendar Days of the receipt of the written request.

23. **Confidentiality Requirements**. Provider shall treat all information, including medical records and any other health and enrollment information that identifies a particular Enrollee or that is obtained or viewed by it or through its staff and subcontractors performance under this Provider Agreement as confidential information, consistent with the confidentiality requirements of 45 C.F.R. parts 160 and 164. The Provider shall not use any information so obtained in any manner, except as may be necessary for the proper discharge of its obligations. Employees or authorized subcontractors of the Provider who have a reasonable need to know such information for purposes of performing their duties under this Provider Agreement shall use personal or patient information, provided such employees and/or subcontractors have first signed an appropriate non-disclosure agreement that has been approved and maintained by DCH.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is exempt from disclosure of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

Provider shall remove any person from performance of services hereunder upon notice that DCH reasonably believes that such person has failed to comply with the confidentiality obligations of the Provider Agreement. Provider shall replace such removed personnel in accordance with the staffing requirements of the Provider Agreement. DCH, the Georgia Attorney General, State officials as authorized by Federal law or regulations, or the authorized representatives of these parties shall have access to all confidential information in accordance with the requirements of State and Federal laws and regulations.

24. **HIPAA Compliance**. Provider shall assist PBM and DCH in their efforts to comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and its amendments, rules, procedures, and regulations. To that end, Provider shall cooperate and abide by any requirements mandated by HIPAA or any other applicable laws. Provider warrants that it will cooperate with PBM and DCH, including cooperation with DCH privacy officials and other compliance officers required by HIPAA and its regulations, in the course of performance of the Provider Agreement so that all parties will be in compliance with HIPAA. Provider acknowledges that HIPAA may require Provider and PBM to sign documents for compliance purposes, including but not limited to a Business Associate Agreement. Provider shall cooperate with PBM and DCH on these matters, sign whatever documents may be required for HIPAA compliance, and abide by their terms and conditions. Provider also agrees to abide by the terms and conditions of PBM and DCH policies and procedures regarding privacy and security.

25. **Non-Discrimination**. Provider agrees to comply with applicable Federal and State laws, rules and regulations, and the State's policy relative to nondiscrimination in employment practices because of political affiliation, religion, race, color, sex, physical handicap, age, or national origin including, but not limited to, Title VI of the Civil Rights Act of 1964, as amended; Title IX of the Education Amendments of 1972 as amended; the Age Discrimination Act of 1975, as amended; Equal Employment Opportunity (45 C.F.R. 74 Appendix A (1), Executive Order 11246 and 11375) and the Americans with Disability Act of 1993 (including but not limited to 28 C.F.R. § 35.100 et seq.). Nondiscrimination in employment practices is applicable to employees for employment, promotions, dismissal and other elements affecting employment.

26. **Records Requirements**. Provider agrees to maintain books, records, documents, and other evidence pertaining to the costs and expenses of this Provider Agreement to the extent and in such detail as will properly reflect all costs for which payment is made under the provisions of this Provider Agreement and/or any document that is a part of this Provider Agreement by reference or inclusion. The Provider's accounting procedures and practices shall conform to generally accepted accounting principles, and the costs properly applicable to the Contract shall be readily ascertainable. Records that relate to appeals, litigation, or the settlements of claims arising out of the performance of this Provider Agreement, or costs and expenses of any such agreements as to which exception has been taken by the Sponsor or any of his duly Authorized Representatives, shall be retained by Provider until such appeals, litigation, claims or exceptions have been disposed of. § 20.0.

27. **Records Retention Requirement**. Provider shall preserve and make available all of its records pertaining to the performance under this Provider Agreement for a period of seven

(7) years from the date of final payment under this Provider Agreement, and for such period, if any, as is required by applicable statute or by any other section of this Provider Agreement. If the Provider Agreement is completely or partially terminated, the records relating to the work terminated shall be preserved and made available for period of seven (7) years from the date of termination or of any resulting final settlement.

28. **Access to Records**.
a. The State and Federal standards for audits of DCH agents, contractors, and programs are applicable to this section and are incorporated by reference into this Provider Agreement as though fully set out herein.

b. Pursuant to the requirements of 42 C.F.R. 434.6(a) (5) and 42 C.F.R. 434.38, the Provider shall make all of its books, documents, papers, provider records, medical records, financial records, data, surveys and computer databases available for examination and audit by DCH, the State Attorney General, the State Health Care Fraud Control Unit, the State Department of Audits, and/or authorized State or Federal personnel. Any records requested hereunder shall be produced immediately for review at DCH or sent to the requesting authority by mail within fourteen (14) Calendar Days following a request. All records shall be provided at the sole cost and expense of the Provider. DCH shall have unlimited rights to access, use, disclose, and duplicate all information and data in any way relating to this Provider Agreement in accordance with applicable State and Federal laws and regulations. DCH shall not be restricted in the number of times it may audit, visit, inspect, review or otherwise monitor Provider during the term of this Provider Agreement. DCH will only conduct audits as determined reasonably necessary by the Department.

c. The Department may issue subpoenas to Provider, which require the Provider or its agents (e.g. employees, subcontractors) to: produce and permit inspection and copying of designated books, papers, documents, or other tangible items; and/or attend and give testimony at a deposition or hearing. The Provider agrees to comply with all subpoenas issued by the Department or parties acting on behalf of the Department. The Provider understands that it is ultimately responsible for its agents' compliance with the subpoenas described herein.

d. During the entire life of the Provider Agreement, the Provider and all subcontractors shall provide PBM with copies of its annual report and all disclosure or reporting statements or forms filed with the State of Georgia and/or the Securities and Exchange Commission (SEC) as soon as they are prepared in final form and are otherwise available for distribution or filing. In the event that the Provider is not required to or does not prepare either an annual report or SEC disclosure or reporting statements or forms by virtue of being a subsidiary of another corporation, it shall fulfill the requirements of this section, with respect to all such documents for any parent corporation, which reflect, report or include any of its operations on any basis. In addition, the Provider and all subcontractors shall furnish PBM with the most recent un-audited and audited copies of its current balance sheet within fourteen (14) calendar days of its receipt of such request.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

# HAWAII REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Hawaii law (as such terms are defined by Hawaii law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1) In the event that Sponsor or PBM fails to pay for Covered Medications, a Member shall not be liable to Provider for any sums owed by Sponsor or PBM. Provider shall not collect or attempt to collect from a Member sums owed by Sponsor or PBM. Provider, or its agent, trustee, or assignee shall not maintain any action at law against a Member to collect sums owed by Sponsor or PBM. Hawaii Rev. Stat. Ann. § 432D-8.

2) In the event of insolvency by Sponsor or PBM, Provider agrees to continue to provide services to Members for the duration of the period after the insolvency for which premium payment has been made and until a Member's discharge from inpatient facilities, whichever is later. Hawaii Rev. Stat. Ann. § 432D-8.

3) Provider shall provide PBM with at least sixty (60) days' advance written notice of termination of the Agreement. Hawaii Rev. Stat. Ann. § 432D-8.

4) Provider shall fully inform Members of their treatment options consistent with Hawaii Rev. Stat. Ann. § 432E-4.

5) Neither PBM nor Sponsor shall impose any type of prohibition, disincentive, penalty, or other negative treatment upon Provider for discussing or providing any information regarding treatment options and medically necessary or appropriate care, including no treatment, even if the information relates to services or benefits not provided by Sponsor. Hawaii Rev. Stat. Ann. § 432E-4.

6) Provider shall comply with PBM's and Sponsors' requests for any information necessary for Sponsor to comply with the requirement of Hawaii Statute, Title 24, Chapter 432E, regarding the measurement of quality outcomes, access, satisfaction, and utilization of services. Hawaii Rev. Stat. Ann. § 432E-10.

# HAWAII MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Hawaii Medicaid program administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Payment**. Provider is prohibited from seeking payment from the Enrollee or the State for any covered services provided to the Enrollee whose is a term of the contract and must look solely to the Sponsor or PBM for compensation for services rendered, with the exception of nominal cost sharing pursuant to the Hawaii Medicaid State plan.

2. **Utilization Review and Quality Improvement**. Provider must cooperate with the Sponsor's and PBM's quality improvement and utilization review and management activities. To the extent

3. **Health and Safety of Enrollee**. Enrollee will be immediately transferred to another provider or Sponsor if the Enrollee's health or safety is in jeopardy.

4. **Treatment or Non-Treatment Options**. Provider shall not be prohibited from discussing treatment or non-treatment options with Enrollees that may not reflect the Sponsor's position or may not be covered by the Sponsor.

5. **Advising and Advocating**. Provider, acting within the lawful scope of practice, is not prohibited, or otherwise restricted, from advising or advocating on behalf of an Enrollee for the Enrollee's health status, medical care, or treatment or non-treatment options, including any alternative treatments that might be self-administered. Provider is not prohibited, or otherwise restricted, from advocating on behalf of the Enrollee to obtain necessary health care services in any grievance system or utilization review process, or individual authorization process.

6. **Access**. Provider shall meet all applicable access requirements contained in the contract between the Sponsor and the State, including but not limited to hours of operation and appointment waiting time standards.

7. **Continuity of Treatment**. Provider agrees to provide continuity of treatment as requested by PBM in the event Provider's participation terminates during the course of an Enrollee's treatment by that Provider.

8. **HIPAA and Confidentiality.** Provider shall comply with all applicable HIPAA provisions and maintain the confidentiality of Enrollee's information and records.

9. **Discrimination**. Sponsor and PBM shall not discriminate with respect to participation, reimbursement, or indemnification of any Provider who is acting within the scope of his or her license or certification under applicable State law, solely on the basis of such license or certification. This provision should not be construed as an any willing provider requirement, as it does not prohibit PBM or Sponsor from limiting provider participation to the extent necessary to meet the needs of the Enrollees. This provision shall not preclude the PBM or Sponsor from using different reimbursement amounts for different specialties or for different practitioners in the same specialty. This provision also does not interfere with measures established by PBM or Sponsor that are designed to maintain quality and control costs.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

10. **High-Risk Populations**.    Providers serving high-risk populations or those that specialize in conditions requiring costly treatments shall not be discriminated against by PBM or Sponsor.

11. **Audit.**    CMS and the DHS or their respective designee will have the right to inspect, evaluate, and audit pertinent books, financial records, medical records, documents, papers, and records of any Provider involving financial transactions related to this contract and for the monitoring of quality of care being rendered with/without the specific consent of the Enrollee.

12. **Encounter Data**.    As applicable, Provider is required to submit complete and accurate encounter data on a monthly basis and any and all medical records to support encounter data upon request from PBM, Sponsor, or DHS or its designee for the purpose of validating encounters with/without the specific consent of the Enrollee.    Provider must certify claim/encounter submissions to the PBM or Sponsor as accurate and complete.

13. **Medical Records**.    Provider shall provide medical records or access to medical records to the Sponsor and the DHS or its designee, within sixty (60) days of a request.    Refusal to provide medical records, access to medical records, or inability to produce the medical records to support the claim/encounter shall result in recovery of payment.

14. **Medical Necessity**.    Medical necessity shall mean health interventions that the Sponsor is required to cover within the specified categories that meet the following criteria: (A) The intervention must be used for a medical condition; (B) There is sufficient evidence to draw conclusions about the intervention's effects on health outcomes; (C) The evidence demonstrates that the intervention can be expected to produce its intended effects on health outcomes; (D) The intervention's beneficial effects on health outcomes outweigh its expected harmful effects; (E) The health intervention is the most cost-effective method available to address the medical condition.

15. **Payment in Full.**    Provider agrees to accept the rates of payment specified in the Provider Agreement as payment in full for covered services provided to Enrollees, as deemed medically necessary and appropriate under the Sponsor's quality improvement and utilization management program, less any applicable Enrollee cost sharing pursuant to this contract.

16. **Cultural Competency**.    Provider shall comply with the Sponsor's and PBM's cultural competency plan.

17. **Marketing Materials**.    Any marketing materials developed and distributed by Provider relating to the programs must be submitted to PBM to submit to the DHS for approval prior to distribution.

18. **Newborns**.    In the case of newborns, the Sponsor shall be responsible for any payment owed to Providers related to the newborn.

19. **Compliance with Federal, State, and Local Law**. Provider shall comply with all applicable federal, state, and local statutes, regulations, and rules now in effect and hereinafter adopted, including but not limited to 42 CFR 434; 2 CFR 438.6; Titles VI, VII, XIX, XXI of the Social Security Act; Title VI of the Civil Rights Act of 1964; the Age Discrimination Act of 1975; the Federal Rehabilitation Act of 1973; the Davis Bacon Act (40 U.S.C. Section 276a et seq.); the Copeland Anti-Kickback Act (40 U.S.C. Section 276c); the Clean Air Act (42 U.S.C. 7401 et seq.); the Federal Water Pollution Control Act as Amended (33 U.S.C. 1251 et seq.); the Byrd Anti-Lobbying Amendment (31 U.S.C. 1352); the Debarment and Suspension (45 CFR 74 Appendix A (8) and Executive Order 12549 and 12689); Title IX of the Education Amendment of 1972; EEO provisions; and Contract Work Hours and Safety Standards.

20. **Exclusions List**.    Providers shall not employ or subcontract with individuals or entities whose owner or managing employees are on the state or federal exclusions list. Provider represents and warrants that neither Provider nor any of its owners or managing employees have been excluded from participation by the Department of Health and Human Services (DHHS), Office of Inspector General (OIG), or have been excluded by the DHS from participating in the Hawaii Medicaid program.

21. **Referrals**.    Providers are prohibited from making referrals for designated health services to health care entities with which the Provider or a member of the Provider's family has a financial relationship.

22. **Transitioning Enrollees**.    Providers of transitioning Enrollees shall cooperate in all respects with providers of other sponsors to assure maximum health outcomes for Enrollees.

23. **Reporting Requirements.**    Provider must submit all data and reports required by the PBM or Sponsor for reporting purposes.

24. **Availability of Providers**.    Provider must accept Enrollees for treatment, unless Provider has a full panel and is not accepting new program Enrollees.    Provider shall not intentionally segregate Enrollees in any way from other persons receiving services.    Provider must provide services without regard to race, color, creed, sex, religion, health status, income status, or physical or mental disability.    Provider shall offer hours of operation that are no less than the hours of operation offered to commercial members or comparable to Medicaid fee-for-service if Provider sees only Medicaid recipients.

25. **ADA Compliance.**    Provider must comply with the Americans with Disabilities Act (ADA) including providing sign language interpretation services, if applicable.

26. **Wages, Hours, and Working Conditions.**    Provider employees shall be paid at wages or salaries not less than the wages paid to public officers and employees for similar work.

27. **Accounting Records Requirements.**    Provider shall, in accordance with generally accepted accounting practices, maintain fiscal records and supporting documents and related files, papers and reports that adequately reflect all direct and indirect expenditures and management and fiscal practices related to the Provider's performance of services under the contract.    Provider's accounting procedures and practices shall conform to generally accepted accounting principles and the costs properly applicable to the contract shall be readily ascertainable from the records.

28. **Medical Records Standards**.    All medical records shall be maintained in a detailed and comprehensive manner that conforms to good professional medical practice, permits effective professional medical review and medical audit processes, and facilitates an adequate system for follow-up treatment.    Medical records shall be legible, signed and dated.

29. **Retention of Medical Records**.    All medical records shall be maintained, in accordance with Sections 622-51 and 622-58, HRS, for a minimum of seven (7) years from the last date of entry in the records.    For minors, Provider shall preserve and maintain all medical records during the period of minority plus a minimum of seven (7) years after the age of majority.    During the period that records are retained under this section, Provider shall allow the state and federal government full access to such records, to the extent allowed by law.

30. **Fraud & Abuse Investigations & Inspections.**    Provider shall cooperate fully with federal and state agencies in investigations and subsequent legal actions.    The DHS, the State Auditor of Hawaii, the U.S. Department of Health and Human Services (DHHS), the General Accounting Office (GAO), the Comptroller General of the United States, the Office of the Inspector General (OIG), Medicaid Fraud Control Unit of the Department of the Attorney General, or their authorized representatives shall, during normal business hours, have the right to enter into the premises of the Provider or such other places where duties under the contract are being performed, to inspect, monitor, or otherwise evaluate the work being performed.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).    Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

31. **Full Disclosure.** Provider agrees that it must complete and submit to PBM a complete and accurate Ownership Disclosure Form before submitting claims on behalf of Members, including all legally required disclosures. Provider must provide PBM with immediate notice of any change of any information submitted in the Ownership Disclosure Form.

32. **Compliance with State Contract.** Provider shall adhere to and cooperate with PBM to ensure PBM's compliance with all applicable requirements set forth in the contract between the State and the Sponsor.

## IDAHO REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Idaho law (as such terms are defined by Idaho law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Confidentiality.** Provider shall not release or sell any information pertaining to prescriptions, drug orders, records or any other prescription information that specifically identifies a Member, except as authorized under the provisions of Idaho Code section 54-1727 and not otherwise precluded by the Provider Agreement. I.C. § 41-1335.

2. **Records Availability.** Provider shall maintain complete and accurate records reflecting transactions with Members for at least seven (7) years. Provider shall make all records available to PBM, Sponsor, and the director of the Idaho Department of Insurance or his designee at all reasonable times upon request, subject to any Idaho law limiting or defining such availability. I.C. § 41-3909.

3. **No Incentive to Withhold Care.** Neither PBM nor Sponsor shall make a specific payment under this Provider Agreement, in any type or form, to Provider as an inducement to deny, reduce, limit, or delay the specific, medically necessary, and appropriate dispensing of Covered Medications with respect to a specific Member or group of Members with similar medical conditions. I.C. §§ 41-1846(1)(f), 41-3928.

4. **Member Hold Harmless.** In addition to the requirements of the Hold Harmless section of the Provider Agreement, Provider agrees that in no event, including but not limited to nonpayment by PBM or Sponsor shall Provider require a Member to make payments for Covered Medications other than specified deductibles, copayments or coinsurance. I.C. §§ 41-1846(2), 41-3915(4)-(5).

5. **Noncovered Services.** This Provider Agreement shall not be construed to require Provider to deny a Member access to services not covered by a Sponsor's Prescription Drug Program if the Member is informed that he or she will be responsible to pay for the noncovered services and he or she nonetheless desires to obtain such services. I.C. § 41-3927(4)(a)&(b).

6. **Continuation of Care.** This Provider Agreement shall not limit a pharmacy's ability to treat a Member even at that person's request and expense if pharmacy had been, but is no longer, a Provider under the Sponsor's Prescription Drug Program and pharmacy has notified the Member that pharmacy is no longer a Provider under Sponsor's Prescription Drug Program. I.C. § 41-3927(4)(b).

7. **Communication With Members.** Neither PBM nor Sponsor shall refuse to contract with Provider or reimburse Provider solely because Provider has in good faith communicated with one or more current, former, or prospective patients regarding the provisions, terms or requirements of Sponsors' Prescription Drug Programs as they relate to the needs of Provider's patients. I.C. § 41-3927(5).

8. **Breach.** PBM or Sponsor shall provide written notice to Provider setting forth any breach of the Provider Agreement for which PBM or Sponsor proposes that the Provider Agreement be terminated or not renewed and shall provide that amount of time set forth in the Provider Agreement for Provider to cure such breach prior to termination or nonrenewal (if it is not specified in the Provider Agreement then that amount of time shall be thirty (30) days); provided, however, that if the breach of Provider Agreement is a willful breach, fraud or a breach which poses an immediate danger to the public health or safety, the Provider Agreement may be terminated or not renewed by PBM or Sponsor immediately. I.C. § 41-3927(2).

9. **Community Standards.** Neither PBM nor Sponsor shall terminate or otherwise penalize Provider solely because Provider advocates for Provider's patients, so long as Provider is practicing in conformity with community standards. I.C. § 41-3927(8).

10. **Charges to Members.** Provider shall not charge or collect from any Member any amount in excess of that amount of compensation determined or allowed for a particular service by PBM or Sponsor. Nothing in this section shall be construed to prevent the collection of any copayments, coinsurance or deductibles allowed for in the Sponsor's Prescription Drug Program design. ID ADC 18.01-26-015 02.

11. **Referrals.** Provider shall not pay for the referral of a Member to Provider. Provider shall not provide or claim or represent to have provided services to a Member, knowing that the Member was referred in violation of this paragraph. I.C. § 41-348(1).

12. **Deductibles.** Provider shall not engage in a regular practice of waiving, rebating, giving, paying, or offering to waive, rebate, give or pay all or part of a Member's deductible or claim for health insurance. I.C. § 41-348(2).

## ILLINOIS REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Network Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Illinois law (as such terms are defined by Illinois law; collectively and/or individually, the "Sponsor"), Network Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Network Provider agrees as follows:

1. **Covered Medications**. Network Provider shall be responsible for providing Covered Medications and shall be notified of such things as Copayments, limitations, etc. via PBM's online system, as set forth in the Provider Agreement and the Provider Manual. 50 Ill. Admin. Code § 2051.290(a).

2. **Administrative Responsibilities**. Network Provider shall comply with all applicable administrative policies and procedures of PBM, including, but not limited to, credentialing, recredentialing, utilization review management, and referral procedures. 50 Ill. Adm. Code 2051.290(b). Network Provider agrees to participate in the quality assurance programs instituted by PBM and Sponsors. 215 ILCS 125/2-8(b) and 215 ILCS 130/2008(b); 50 Ill. Admin. Code § 5421-50(a)(4).

3. **Records**. Network Provider shall maintain and make medical records available to PBM for the purpose of determining, on a concurrent or retrospective basis, the medical necessity and appropriateness of care provided to Members, and to make such medical records available to appropriate state and federal authorities and their agents involved in assessing the accessibility and availability of care or investigating grievances or complaints and to comply with the applicable state and federal laws related to privacy and confidentiality of medical records. 50 Ill. Admin. Code § 2051.290(c).

4. **Pharmacy License**. Network Provider shall be licensed by the State of Illinois to provide pharmacy services and shall notify PBM immediately whenever there is a change in licensure or certification status. 50 Ill. Adm. Code 2051.290 (d).

5. **Termination**.
   a.     Unless a longer time is required by the Provider Agreement, PBM shall give Network Provider at least thirty (30) days notice of nonrenewal or termination of Network Provider's Provider Agreement. The notice shall include a name and address to which Network Provider may direct comments and concerns regarding the nonrenewal or termination. 50 Ill. Adm. Code 2051.290 (f).
   b.     Unless longer is provided for in the Provider Agreement, Network Provider shall give PBM at least ninety (90) days notice for termination without cause.
   c.     PBM may terminate the Provider Agreement immediately for cause.

6. **Continuation of Services**. Upon the termination of the Provider Agreement, Network Provider shall be responsible for continuation of covered services, including dispensing Covered Medications, to the extent required by law or regulation or as otherwise set forth in the Provider Agreement. 50 Ill. Adm. Code 2051.290 (g).

7. **Assignment**. Neither PBM nor Network Provider shall sell, lease, assign or otherwise delegate the rights and responsibilities under the Provider Agreement without the prior written and informed consent of the other party. 50 Ill. Adm. Code 2051.290 (h).

8. **Insurance**. Network Provider must maintain and provide evidence of insurance coverage for professional liability and malpractice insurance effective as of the date of the Provider Agreement. Unless a longer period is required under the Provider

Agreement (and then in accordance with the Provider Agreement), Network Provider must give PBM at least fifteen (15) days advance notice of any reduction or cancellation of such insurance. 50 Ill. Adm. Code 2051.290 (i).

9. **Nondiscrimination**. To the extent not already provided in the Provider Agreement, Network Provider shall provide services, including dispensing Covered Medications, without discrimination against any Member on the basis of participation in the Sponsor's Prescription Drug Program, source of payment, age, sex, ethnicity, religion, sexual preference, health status or disability. 50 Ill. Adm. Code 2051.290 (j).

10. **Collection of Copayments**. Network Provider shall collect all applicable Copayments and/or deductibles from Members, and shall provide notice to Members of their personal financial obligations for non-covered services. 50 Ill. Adm. Code 2051.290 (k).

11. **Hours of Operation**. Network Provider shall comply with Sponsor's requirements regarding operating hours and availability. 50 Ill. Adm. Code 2051.290 (l).

12. **Payment Obligations**. PBM's payment obligations to Network Provider shall be as set forth in the Provider Agreement, including the Provider Manual. 50 Ill. Adm. Code 2051.290 (m).

13. **Sponsor's Information and PBM's Policy Communication**. PBM shall provide a method for Network Provider to obtain each Sponsor's initial information and adequate notice of change in benefits and Copayments. PBM shall provide Network Provider with access to PBM's Provider Manual. 50 Ill. Adm. Code 2051.290 (n).

14. **Appeal and Dispute Procedures**. Internal appeal or arbitration procedures for settling contractual disputes or disagreements between PBM and Network Provider shall be as set forth in the Provider Agreement, including the Provider Manual. 50 Ill. Adm. Code 2051.290 (o).

15. **Member Hold Harmless**. Network Provider agrees that in no event including, but not limited to, nonpayment by PBM and/or Sponsor of amounts due to Network Provider under the Provider Agreement, insolvency of PBM and/or Sponsor or any breach of the Provider Agreement, shall Network Provider or its assignees or subcontractors have a right to seek any type of payment from, bill, charge, collect a deposit from or have any recourse against the Member, persons acting on the Member's behalf (other than PBM or Sponsor), the employer or group contract holder for services provided pursuant to the Provider Agreement except for the payment of applicable Copayments for Covered Medications or fees for services not covered by Prescription Drug Program. The requirements of this clause shall survive any termination of the Provider Agreement for services rendered prior to such termination, regardless of the cause of such termination. Sponsor's Members shall be third party beneficiaries of this clause. This clause supersedes any oral or written agreement now existing or hereafter entered into between Network Provider and a Member or persons acting on the Member's behalf (other than PBM or Sponsor). 215 ILCS 125/2-8(a); 215 ILCS 130/2008(a); 5421.50(e).

## ILLINOIS WORKERS' COMPENSATION ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Network Provider provides services, including dispensing Covered Medications, to Members who are covered employees under the Illinois Workers' Compensation Act, 820 ILCS 305, *et seq*, (the "Act") Network Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to any Sponsor's Members who are covered employees under

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

the Act (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control with regard to any services or Covered Medications provided a Sponsor's Members who are covered employees under the Act. In addition for applicable claims submitted on behalf of covered employees, Network Provider and PBM agree that this Addendum and the Provider Agreement conform to the requirements of Section 8.1a of the Illinois Workers' Compensation Act (820 ILCS 305/8.1a). Without limiting the generality of the foregoing, Network Provider agrees as follows:

1.    **Definitions.**  Network Provider agrees that terms not defined in the Provider Agreement and the Provider Manual shall have the definitions set forth in 820 ILSC 305/1.

2.    **Amendment to this Addendum.**  PBM and Network Provider agree that the terms of this Addendum are required by law and are subject to the approval of the Illinois Department of Insurance.  PBM will not amend this Addendum unless (a) required to do so by a change in law, rule or regulation, (b) directed to do so by the Department of Insurance, or (c) with the consent and approval of the Department of Insurance.  To the extent any update is made to the Provider Manual, other than this Addendum, in accordance with the Provider Agreement such update or change shall not impact the terms of this Addendum. In addition, the terms of this Addendum shall govern in the event of a conflict between the Provider Manual or the Provider Agreement and this Addendum for all services provided to covered employees.

3.    **Covered Medications**.  Network Provider shall be responsible for providing Covered Medications and shall be notified of such things as Copayments, limitations, etc. via PBM's online system, as set forth in the Provider Agreement and the Provider Manual. 50 Ill. Adm. Code 2051.295(b).

4.    **Administrative Responsibilities**.  Network Provider shall comply with all applicable administrative policies and procedures of PBM, including, but not limited to, credentialing, recredentialing, utilization review management, and referral procedures. 50 Ill. Adm. Code 2051.295(c).

5.    **Records**.  With respect to medical records relating to services provided to Members who are covered employees under the Act, Network Agrees that, in accordance with 50 Ill. Adm. Code 2051.295(d), it shall make available all such medical records to:

a.    PBM and/or the Sponsor for the purpose of determining, on a concurrent or retrospective basis, the compensability, medical necessity and appropriateness of care provided to such Members;

b.    Appropriate state and federal authorities and their agents involved in assessing the accessibility and availability of care or investigating Member grievances or complaints; and

c.    Establish compliance with the applicable state and federal laws related to privacy and confidentiality of medical records.

6.    **Pharmacy License**.  Network Provider and all relevant employees shall be licensed by the State of Illinois to provide pharmacy services and shall notify PBM immediately whenever there is a change in licensure or certification status. 50 Ill. Adm. Code § 2051. 295 (e).

7.    **Termination**.

a.    Unless a longer time is provided in the Provider Agreement, PBM may terminate the Provider Agreement without cause by providing thirty (30) days written notice of nonrenewal or termination of Network Provider's Provider Agreement.  50 Ill. Adm. Code 2051.295(g)(1).

b.    Unless a longer time is provided in the Provider Agreement, Network Provider shall give PBM at least ninety (90) days notice for termination without cause.  50 Ill. Adm. Code 2051.295(g)(1).

c.    PBM may terminate the Provider Agreement immediately for cause. 50 Ill. Adm. Code 2051.295(g)(2).

8.    **Continuation of Services.**  Upon the termination of the Provider Agreement, Network Provider shall be responsible for continuation of covered services, including dispensing Covered Medications, to the extent required by law or regulation or as otherwise set forth in the Provider Agreement. 50 Ill. Adm. Code 2051.295(h).

9.    **Assignment**.  Neither PBM nor Network Provider shall sell, lease, assign or otherwise delegate the rights and responsibilities under the Provider Agreement without the prior written and informed consent of the other party.  50 Ill. Adm. Code 2051.295(i).

10.    **Non-Discrimination.**  To the extent not already provided in the Provider Agreement, Network Provider shall provide services, including dispensing Covered Medications, without discrimination against any Member on the basis of participation in the Sponsor's Prescription Drug Program, source of payment, age, sex, ethnicity, religion, sexual preference, health status or disability. 50 Ill. Adm. Code 2051.295(k).

11.    **Insurance**.  Network Provider must maintain and provide evidence of insurance coverage for professional liability and malpractice insurance coverage effective as of the date of the Provider Agreement.  Network Provider shall immediate notice to PBM in the event such insurance coverage is reduced or cancelled. 50 Ill. Adm. Code 2051.295 (j).

12.    **Collection of Copayments & Notice of Non-Covered Services**.  Network Provider shall collect all applicable Copayments and/or deductibles from Members, and shall provide notice to Members of their personal financial obligations for non-covered services. 50 Ill. Adm. Code 2051.295 (l).    Network Provider may charge covered employees for services determined to be non compensable under the Act and that are not otherwise covered by Sponsor.  50 Ill. Adm. Code 2051.295 (m).

13.    **Accessibility**.  Network Provider shall provide services to covered employees during its normal business hours and in accordance with any Sponsor requirements. 50 Ill. Adm. Code 2051.295(n).

14.    **Payment Obligations**.  Network Provider shall be reimbursed for Covered Medication in accordance with the Provider Agreement.  In the event Network Provider does not receive payment for Covered Medications submitted on behalf of covered employees in accordance with the timing set forth in Provider Agreement or applicable laws or regulations, PBM shall provide Network Provider with interest payments in accordance with Section 8.2(d)(3) of the Act. 50 Ill. Adm. Code 2051.295(o).

15.    **Administrative Services and Responsibilities.**  The mechanism for Network Provider access to each Sponsor's current eligibility data system shall be as set forth in the Provider Agreement, including the Provider Manual. PBM's operational policies and procedures that are applicable to Network Provider shall be made available to Network Provider in the Provider Manual. 50 Ill. Adm. Code 2051.295(p); 50 Ill. Adm. Code 2051.295(q).

16.    **Appeal and Dispute Procedures**.  Internal appeal or arbitration procedures for settling contractual disputes or disagreements between PBM and Network Provider shall be as set forth in the Provider Agreement, including the Provider Manual. 50 Ill. Adm. Code 2051.295(r)

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

17.   **Transmission and Duplication Costs.**  For the purposes of Illinois Workers Compensation, Network Pharmacy acknowledges and agrees that Members who are covered employees are not responsible for any costs associated with medical record transmission or duplication in order to have a claim adjudicated. 50 Ill. Adm. Code 2051.315(a)(8).

# INDIANA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Indiana law (as such terms are defined by Indiana law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control.  Without limiting the generality of the foregoing, Provider agrees as follows:

1.   **Disclosure**.
a. Nothing in the Provider Agreement shall be construed to prevent Provider from disclosing all treatment options available to a Member, including those not covered by Sponsor's Prescription Drug Programs.   Ind. Code §§ 27-8-11-4.5(a)(2); 27-13-15-1(a)(2)(B).
b. PBM shall not penalize Provider financially, or in any other manner, for making a disclosure permitted in accordance with applicable law.  Ind. Code §§ 27-8-11-4.5(b); 27-13-15-1(a)(3).
2.   **Member Hold Harmless**.
a. In addition to the requirements of the Hold Harmless section in the Provider Agreement, in the event PBM or Sponsor fails to pay for Covered Medications for any reason, including insolvency or breach of the Provider Agreement, Members shall not be liable to Provider for any sums owed by PBM or Sponsor. This provision does not prohibit the collection of Copayments or uncovered charges consented to by Members.  This provision survives termination of the Provider Agreement, regardless of the reason for termination.  Ind. Code §§ 27-13-15-1(a)(4); 27-13-34-15(1).
b. Provider or its trustee, agent, representative, or assignee shall not bring or maintain a legal action against a Member to collect sums owed to Provider by PBM or Sponsor.  If Provider brings or maintains a legal action against a Member for an amount owed to Provider by PBM or Sponsor, Provider shall be liable to the Member for costs and attorney's fees incurred by the Member in defending the action.  This provision does not prohibit the collection of Copayments or uncovered charges consented to by the Member.  This provision survives termination of the

Provider Agreement, regardless of the reason for termination. Ind. Code §§ 27-13-15-3; 27-13-34-15(2)&(3).
3.   **Termination**.   Unless a longer time is required by the Provider Agreement Provider shall give PBM at least sixty (60) days advance written notice before terminating the Provider Agreement unless Provider provides thirty percent (30%) or more of an HMO Sponsor's services, in which case Provider must give at least one hundred twenty (120) days advance written notice. Ind. Code § 27-13-17-1.
4.   **Continuation of Services**.
a. In the event of termination of the Provider Agreement, Provider shall, for a period not to exceed ninety (90) days, complete procedures in progress on Members receiving treatment for a specific condition at the same schedule of Copayment or other applicable charge in effect on the date the Provider Agreement terminates. Ind. Code § 27-13-34-15(6).
b. In the event of termination of the Provider Agreement, for reasons other than quality of care, Provider shall, upon the request of PBM, the Sponsor or Members, continue to treat Members for up to sixty (60) days following termination or, in the case of a Member in the third trimester of pregnancy, throughout the term of the pregnancy.   During this continuation period, Provider shall accept the terms and conditions of the Provider Agreement, together with applicable deductibles and Copayments, as payment in full.  Provider is prohibited from billing Members for any amount in excess of the Member's applicable deductible or Copayment for treatment given during this continuation period.  Ind. Code § 27-13-36-6.

# INDIANA MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Indiana Medicaid program ("Plan") administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum").  In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control.  Without limiting the generality of the foregoing, Provider agrees as follows Source (unless otherwise stated): IC 12-15-11-3(1):

1.   **Hold Harmless**.
a.        Provider agrees to hold the Office of Medicaid Planning and Policy (hereafter known as "State") harmless and to ensure continuation of benefits.    (Hoosier Healthwise MCO Contract with Indiana Medicaid)
b.        Provider shall not seek payment from the State or Sponsor for any Covered Medications dispensed to an Enrollee under this Provider Agreement.  IC 12-15-11-5 (Must comply

with enrollment requirements established by IC 4-22-2; IC 12-15-11-3(1); Provider Agreement, ¶9.
2.   **State Contract Requirements**.  Provider agrees that the applicable terms and conditions set out in the agreement between the Sponsor and the State and any incorporated documents govern the duties and responsibilities of Provider with regard to the provision of Covered Medications to Enrollees.  In addition, Provider must fulfill the requirements of the State's

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

contract with Sponsor (and any relevant amendments) that are appropriate for provision of any Covered Medications or activity delegated under this Provider Agreement. IC 12-15-30-5.

    3.   **State and Federal Requirements**. Provider must fulfill all state and Federal requirements appropriate for the provision of Covered Medications or activities delegated under this Provider Agreement. . IC 12-15-11-3(1); Provider Agreement, ¶1, 2.

    4.   **Claims Submission Timing**. All Provider claims for payment for services rendered to Enrollees must be originally filed with the Medicaid contractor within twelve (12) months of the date of the provision of the service. 405 IAC 1-1-3(a): Sec. 3. (a)

    5.   **Termination**.

        a.     Provider Agreement shall immediately terminate upon PBM or Sponsor becoming aware of Provider's loss of license.

        b.     Provider's participation under the Plan shall immediately terminate upon PBM's knowledge that Sponsor's IHCP Provider Agreement has terminated.

        c.     In the event Sponsor's Hoosier Healthwise contract terminates, Provider's agreement to service the

Sponsor's Hoosier Healthwise Enrollees shall simultaneously terminate. IC 12-15-30-5(b); IC 12-15-30-5(b); Indiana Health Coverage Program Manual, Chapter 4, Section 2 (Provider Enrollment and Provider Master File).

    6.   **Compliance With Standards**. Provider agrees that if it is found by State, Sponsor, or PBM to be out of compliance with State's, Sponsor's, or PBM's standards, corrective actions may be taken. 405 IAC 1-1-6; Indiana Health Coverage Program Manual, Chapter 4, Section 2 (Provider Enrollment and Provider Master File).

    7.   **Encounter Data Submission**. Provider agrees to submit all encounter data for services rendered in compliance with PBM's or Sponsor's technical specifications. IC 12-15-30-5.

    8.   **Medical Record Disclosure**. Provider agrees to provide a copy of an Enrollee's medical records at no charge upon reasonable request by the Enrollee, and the Provider must facilitate the transfer of the Enrollee's medical records to another provider at the Enrollee's request. 405 IAC 1-5-1; Indiana Health Coverage Program Provide Manual, Chapter 4, Section 1 (Provider Records), p. 4-9.

## IOWA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of a Sponsor licensed under Iowa law, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.    **Definitions**. The definitions contained in 191—Chapter 58 "Third Party Administrators" and 191—Chapter 78 "Uniform Prescription Drug Information Card" of the Iowa Administrative Code are incorporated by reference.

    1.1   "Clean Claim" shall mean a claim which is received by PBM for adjudication and which requires no further information, adjustment or alteration by the Provider, it's Pharmacies or its pharmacists, or the Member in order to be processed and paid by PBM. A claim is clean if it has no defect or impropriety, including any lack of substantiating documentation, or no particular circumstance requiring special treatment that prevents timely payment from being made on the claim. A clean claim includes a resubmitted claim with previously identified deficiencies corrected.

    1.2   "Complaint" means a written communication expressing a grievance or an inquiry concerning a payment transaction between PBM and Provider.

    1.3   "Day" means calendar day, unless otherwise defined or limited.

    1.4   "Paid" means the day on which the check is mailed or the day on which the electronic payment is processed by PBM's bank if EFT is used.

2.    **Payment of Provider Claims**.

    2.1   Time. For claims submissions affected by these requirements, PBM shall pay Provider within twenty (20) days after receipt of a Clean Claim when the claim is submitted via PBM's on-line claims processing system and within thirty (30) days after receipt of a Clean Claim when the claim is submitted in paper or other format. Iowa Admin Code 191-59.3(510B)(1)

    2.2   Failure to Pay Timely. In the event PBM fails to comply with Section 2.1, as applicable, PBM shall pay Provider interest in accordance with the requirements of 191—59.3(3) of the Iowa Administrative Code. Iowa Admin Code 191-59.3(510B)(2)

3.    **Complaints**. In the event Provider would like to report a grievance or an inquiry concerning a payment transaction between PBM and Provider, it may do so by obtaining a complaint form from PBM or Provider may photocopy the "Iowa Complaint Form" printed in **Appendix A-1** "State Specific Forms". Iowa Admin Code 191-59.5(510B)(1)

4.    **Member Hold Harmless**.

    4.1   Provider, or its assignee or subcontractor, hereby agrees that in no event, including, but not limited to nonpayment by PBM or Sponsor, PBM or Sponsor's insolvency or breach of this Agreement, shall Provider, or its assignee or subcontractor, bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons acting on a Member's behalf for services provided pursuant to this Agreement. This provision shall not prohibit collection of supplemental charges or Copayments on PBM or Sponsor's behalf made in accordance with terms of (applicable Agreement) between Sponsor and Member.

    4.2   Provider, or its assignee or subcontractor, further agrees that (1) this provision shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of the Members and that (2) this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and a Member or persons acting on their behalf. Iowa Admin Code 191-40.18 (514B); 191-41.16 (514B)

5.    **Audits**.

    5.1   Performance Standards. Audit of Provider shall be conducted in accordance with the following:

        (a)   With respect to on-site audits, PBM shall provide Provider with at least one (1) week prior written notice;

        (b)   Any audit which involves clinical professional judgment shall be conducted by or in consultation with a pharmacist;

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

(c)    When PBM determines that an overpayment exists, PBM shall provide Provider with documentation routinely provided to providers so that Provider may determine the specific claim(s) included in any alleged overpayment.

(d)    In addition to the documentation provisions set forth in Section 6.9 of the Provider Manual, Provider may use the records of a hospital, physician or other authorized practitioner of the healing arts for drugs and medicinal supplies, written or transmitted by electronic means of communication (i.e., facsimile, email, etc.), for purposes of validating the Provider's record with respect to orders or refills of a legend or narcotic drug, consistent with all other laws.

(e)    To the extent 191—59.6 of the Iowa Administrative Code is applicable to Provider, then Provider shall be audited with respect to a particular Sponsor, using the same audit standards applied to all of PBM's other participating providers that are similarly situated.

(f)    The period covered by an audit may not exceed two (2) years from the date on which the claim was submitted to or adjudicated by PBM or Sponsor, as determined by PBM.

(g)    Unless consented to by Provider, an on-site audit may not be conducted during the first seven calendar days of any month.

(h)    Preliminary on-site audit reports shall be delivered to Provider no later than one hundred twenty (120) days after conclusion of the on-site audit.  Provider shall have thirty (30) days following receipt of the preliminary audit report in which to produce documentation acceptable to PBM to address any discrepancies found during the audit.  A final written report of on-site audit findings shall be received by Provider not later than within six (6) months of the preliminary audit report or final appeal, whichever is later.

(i)    Except as required by law, PBM shall not use the accounting practice of extrapolation in calculating the recuperation of contractual penalties for audits.

(j)    The audit criteria set forth in this Section 4.1 shall apply only to audits of claims submitted for payment on or after January 1, 2009. Iowa Admin Code 191-59.6(510B)(1)

5.2    Audit Appeals.
(a)    Preliminary Audit Findings.
(1)    Provider may appeal an unfavorable preliminary audit report as set forth in Section 6.7 of the Provider Manual.

(2)    If, following the audit grievance procedures set forth in Section 6.7, PBM determines that the unfavorable preliminary audit report is unsubstantiated, PBM shall dismiss the audit report (or the applicable portion that is unsubstantiated) without need for any further proceedings or action.

(b)    Final Audit Determinations.
(1)    If, following the final audit determination or any grievance, PBM determines that an unfavorable audit report is substantiated, PBM shall notify Provider of the final audit determination/grievance determination and of Provider's right to request an independent third party review, as set forth in subsection (2) below, of the final audit findings and the process used to request such a review.

(2)    Prior to either party taking any legal action in connection with the audit findings, both parties agree to meet in good faith to resolve any claim or controversy ("Claim"), whether under federal or state statutory or common law, brought by either PBM or the Provider against the other, or against the employees, members, agents or assigns of the other, arising from or relating in any way to the interpretation or performance of the audit.  The aggrieved party shall notify the other party of its Claim including sufficient detail to permit the other party to respond.  The parties agree to meet and confer in good faith to resolve any Claims that may arise under the audit for a period of not less than thirty (30) days ("Good Faith Discussions").  In the

event the parties cannot resolve any Claims pursuant to Good Faith Discussions and the minimum thirty (30) day period has been met, then the aggrieved party may end discussions with the other party by providing written notice to the other party of its intent to cease discussions.  Thereafter, the parties may proceed to litigation.  The parties agree that no Claims or other dispute may be litigated on a coordinated, class, mass, or consolidated basis. Iowa Admin Code 191-59.6(510B)(4) - (6)

5.3    Applicability.  This Section 4 shall not apply to any investigative audit which involves fraud (or suspected fraud), willful misrepresentation, abuse, or any other statutory provision which authorizes investigations related to but not limited to insurance fraud. Iowa Admin Code 191-59.6(510B)(7)

6.    Termination.  The termination requirements set forth in Section 191—59.5 of the Iowa Administrative Code shall apply to Provider's Provider Agreement.

6.1    Independent Third-Party Review.    To the extent Provider is permitted to pursue independent third party review of a termination, Provider shall notify PBM in writing within thirty days of the final termination notice.  Provider may not provide notice via email or fax.  All such third party reviews shall be conducted in St. Louis, Missouri before a reviewer selected by PBM in its sole discretion.

7.    Continuity of Care.
7.1    Pregnancy.
(a)    Except as provided under subsections (b) and (c) below, if PBM or a Sponsor terminates Providers participation in any pharmacy network, Provider shall continue to provide coverage under the Provider Agreement to a Member in the second or third trimester of pregnancy for continued care from such Provider.  Such Members may continue to receive services related to the child's birth and delivery.  Payment for Provider's services shall be according to the terms and conditions of the Provider Agreement.

(b)    A Member who makes an involuntary change in health plans may request that the new health plan cover the services of Provider who is not a participating provider under the new health plan's selected pharmacy networks, if the Member is in the second or third trimester of pregnancy. Continuation of such coverage shall continue through postpartum care related to the child's birth and delivery.  Payment for Provider's services shall be according to the terms and conditions of the new health plan's applicable contracted networks.

(c)    Notwithstanding (a) or (b) above, PBM or a Sponsor, who terminates the Provider from their pharmacy network for cause shall not be required to cover services provided by Provider to a Member following the date of termination.  Iowa Code 514C.14

7.2    Terminal Illness.
(a)    Except as provided under subsections (b) and (c) below, if PBM or a Sponsor, terminates its contract with Provider, a Member who is undergoing a specified course of treatment for a terminal illness or a related condition, with the recommendation of the Member's treating physician, may continue to receive Provider's, for a period of up to ninety (90) days. Payment for Provider's services shall be according to the terms and conditions of the Provider Agreement.

(b)    A Member who makes a change in health plans involuntarily may request that the new health plan cover services of the Member's treating Provider who is not a Participating Provider under the new health plan's selected provider network, if the Member is undergoing a specified course of treatment for a terminal illness or a related condition. Continuation of such coverage shall continue for up to ninety (90) days.  Payment for covered benefits and benefit levels shall be according to the terms and conditions of the Provider Agreement.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

(c)   Notwithstanding (a) or (b) above, PBM or a Sponsor, who terminates the Provider from their pharmacy network for cause shall not be required to cover services provided by Provider to a Member following the date of termination. Iowa Code 514C.17

# KANSAS REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Kansas law (as such terms are defined by Kansas law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.  **Medicaid Coverage**.  If there is a valid Medicaid coverage providing benefits for Covered Medications, the Medicaid coverage shall be the source of last resort of payment to Provider. Kan. Stat. Ann. § 40-3208(b).

2.  **Member Hold Harmless**.  Nothing in the Provider Agreement shall be construed to require Members to guarantee payment to Provider, other than Copayments and deductibles, in the event of nonpayment by Sponsor or PBM for Covered Medications dispensed under the Provider Agreement. If Sponsor or PBM fails to pay for Covered Medications as set forth in the Provider Agreement, Members shall not be liable to Provider for any amounts owed by Sponsor or PBM. Any action by Provider to collect or attempt to collect from a Member any sum owed by Sponsor or PBM to Provider is expressly prohibited. Kan. Stat. Ann. § 40-3209(b).

3.  **Insolvency**.  In the event of the insolvency of PBM or Sponsor, Provider shall continue providing Covered Medications to Members for the period of time for which premiums have been paid to Sponsor by or on behalf of a Member and, with respect to Members who are confined to an inpatient facility, until their discharge or expiration of benefits.  Kan. Stat. Ann. § 40-3227(k)(2).

4.  **Prior Authorization**.  Where Provider is responsible for obtaining prior authorization before receiving payment for the treatment of emergency medical conditions and a Member is eligible at the time when Covered Medications are provided, Provider shall not hold Member responsible for payment of Covered Medications if prior authorization for emergency services has not been sought and received, other than for what Member would otherwise be responsible, such as Copayments and deductibles. Kan. Stat. Ann. § 40-3229(c).

5.  **Continuation of Services**.  If Provider's participation under the Provider Agreement is terminated for any reason, Provider shall continue to provide Covered Medications to Members for a period up to ninety (90) days in those cases where the continuation of such care is medically necessary and in accordance with the dictates of medical prudence and where the Member has special circumstances such as a disability, a life threatening illness, or is in the third trimester of pregnancy. Members shall not be liable to Provider for Covered Medications during this continuation period other than for any deductibles or Copayment amounts specified in the certificate of coverage or other contract between Members and Sponsor. Provider shall be entitled to payment for Covered Medications during this continuation period at the rate specified in the Provider Agreement. Kan. Stat. Ann. § 40-3230.

6.  **Discussions with Members**.  Provider may discuss with or disclose to any Member or other individual any medically appropriate health care information that Provider deems appropriate regarding the nature of treatment options, the risks or alternatives thereto, the process used or the decision made by Sponsor or PBM to approve or deny health care services, the availability of alternate therapies, consultations, or tests, or from advocating on behalf of a Member within the utilization review or grievance processes established by Sponsor or PBM. Kan. Stat. Ann. § 40-4604.

7.  **No Limitation of Necessary Services**.  Nothing in the Provider Agreement shall directly or indirectly provide an inducement to Provider to reduce or limit the delivery of medically necessary services with respect to a Member. Kan. Stat. Ann. § 40-4605.

8.  **Payment for Emergency Services**.  If PBM has authorized emergency services, it shall not subsequently rescind or modify that authorization after Provider renders the authorized care in good faith and pursuant to the authorization except for (i) payments made as a result of misrepresentation, fraud, omission or clerical error and (ii) repayment, coinsurance or deductible amounts that are the responsibility of the Member. Kan. Stat. Ann. § 40-4603(b).

# KANSAS MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Kansas Managed Care for Medicaid and CHIP Programs ("Enrollees") administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Compliance with Federal Contract Requirements**. All Provider subcontracts must fulfill the requirements of 42 C.F.R. § 438.6 (Contract Requirements) that are appropriate to the service or activity delegated under the subcontract.  Nothing contained in this Provider Agreement shall be construed as creating any contractual responsibility between Provider and the State.

2.  **Compliance with State's Contract Requirements**.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

a.   Provider must be able to perform the same level of review and meet the same applicable requirements as Sponsor under Sponsor's contract with the State.

b.   All applicable terms, conditions and requirements of Sponsor's contract with the State shall apply without qualification to any services performed or goods provided by Provider.

3.   **Compliance with Law**.   Provider must comply with all applicable Federal and State laws and regulations, including but not limited to:  all provisions and applicable conditions of Title VI of the Civil Rights Act of 1964, as amended; Title IX of the Education Amendments of 1972 (regarding education programs and activities); the Age Discrimination Act of 1975, as amended; the Equal Pay Act of 1963; the Rehabilitation Act of 1973, as amended; the Americans with Disabilities Act; and the Civil Rights Act of 1991.  If applicable, Provider must also comply with all provisions of Executive Order # 11246 including amendments, as well as rules, regulations and relevant orders of the Secretary of Labor.  Provider must also remain in compliance with the Balanced Budget Act(s) and comply with all applicable provisions of the Health Insurance Portability and Accountability Act (HIPAA).

4.   **Confidentiality**.      Provider agrees to the same restrictions, conditions, and safeguards that apply to PBM and Sponsor with respect to protected health information. 45 C.F.R. § 164.504(e)(2)(ii)(D).  Provider shall maintain the confidentiality of clinical and medical record information and release the information only in the following manner.

a.   All medical records of Enrollees shall be confidential and shall not be released without the written consent of the Enrollee or responsible party except as required below.

b.   Written consent of the Enrollee is required for the transmission of the medical record information of an Enrollee to any physician not connected with the Sponsor.

c.   The extent to which medical record information is to be released, shall be based upon a test of medical necessity and on a "need to know" basis on the part of the practitioner or a facility requesting the information.

d.   All release of information for substance use disorder (SUD) specific clinical or medical records must meet Federal guidelines at 42 C.F.R. Part 2.

5.   **Records**.

a.   Provider shall maintain a system of access to clinical and medical records.  Provider must have in effect arrangements which provide for access to the clinical and medical records and clinical and medical record-keeping systems which include a complete record for each Enrollee in accordance with provisions set forth in the contract between the Sponsor and the State.  Provider shall include sufficient information in each clinical and medical record to comply with the provisions of 42 C.F.R. 456.111 and 456.211 regarding utilization review.  The State, or its designated agent, and the Federal government shall be allowed access to this system.  Delivery of and access to the records shall be within five (5) business days at no cost to the State.

b.   Provider shall retain, preserve and make available upon request all records relating to the performance of its obligations under the Provider Agreement, including clinical and medical records and claim forms, for a period of not less than six (6) years from the date of termination of the Provider Agreement.  Records involving matters which are the subject of litigation shall be retained for a period of not less than six (6) years following the termination of such litigation, if the litigation is not terminated within the normal retention period.  Electronic copies of documents contemplated herein may be substituted for the originals with the prior written consent of the State, provided that the microfilming procedures are approved by the State as reliable and are supported by an effective retrieval system.  Upon

expiration of the six (6) year retention period, unless the subject of the records is under litigation, the subject records may be destroyed or otherwise disposed of without the prior written consent of the State.

c.   The State reserves the right to review terms of agreements and contracts between PBM and Sponsor and Provider as they relate to the use and disclosure of protected health information belonging to the State.

6.   **Fraud Enforcement**.   Provider acknowledges and agrees that the Kansas Medicaid Fraud Control Unit (MFCU), which is part of the Kansas Attorney General's office, will have the right to recover fraudulent Medicaid payments directly from Provider.  Provider acknowledges and agrees that it is not entitled to any portion of any recovery by the Kansas MFCU.

7.   **Monitoring**.   PBM or Sponsor shall monitor Provider's performance on an ongoing basis and subject it to review according to a periodic schedule established by the State, consistent with industry standards or State Managed Care Organization laws and regulations.  Deficiencies or areas for improvement will be identified and Provider agrees to take corrective action when necessary.

8.   **Indemnity**.   Provider shall indemnify the State against any and all loss or damage to the extent arising out of the Provider's negligence in the performance of services under the Provider Agreement.

9.   **Records Access/Audit**.

a.   Provider shall make available to the Sponsor, State, the State's authorized agents, and appropriate representatives of the U.S. Department of Health and Human Services, any financial records of Provider which relate to the services performed and amounts paid or payable under this Provider Agreement.  Accounting procedures, policies and records shall be completely open to the Sponsor, State and Federal audit at any time during the Provider Agreement period and for six (6) years thereafter, unless a longer period is required under the Provider Agreement.

b.   Throughout the duration of this Provider Agreement, and for a period of six (6) years after termination, unless a longer period is required under the Provider Agreement, Provider shall provide duly authorized representatives of the State or Federal government, access to all records and materials, including financial records, relating to PBM's or Sponsor's provision of and reimbursement for Covered Medications contemplated under this Provider Agreement.   Such access shall include the right to inspect, audit and reproduce all such records and material and to verify reports furnished in compliance with the provisions of this Provider Agreement.

c.   Provider agrees to allow duly authorized agents or representatives of the State and Federal government, during normal business hours, access to the Provider's premises to inspect, audit, monitor or otherwise evaluate the performance of the Provider's contractual activities and shall forthwith produce all records requested as part of such review or audit.

d.   In the event right of access is requested under this section, Provider shall upon request provide and make available staff to assist in the audit or inspection effort, and provide adequate space on the premises to reasonably accommodate the State or Federal representatives conducting the audit or inspection effort.

e.   All inspections or audits shall be conducted in a manner as will not unduly interfere with the performance of Provider's activities.

f.   Provider will provide license verification information to PBM or Sponsor as requested by the State or the External Quality Review Organization.

10.   **Medication Therapy Management**.

a.   Provider agrees that the listed Medical Therapy Management (MTM) services must be reviewed both at the Enrollee's initial encounter and in subsequent Complete Drug

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

Reviews that will occur as needed on an annual basis. Reimbursement for MTM services will be a separate component of reimbursement and will not be included in the Provider's dispensing fee and/or drug ingredient cost.

b.          Provider agrees that MTM services are to be provided on a face-to-face patient/pharmacist basis, and that these services shall be provided by a licensed Kansas pharmacist.

c.          Any other MTM interventions, whether telephonic, electronic, via mail, or by any other means, will only be supplementary to a specific pharmacist/patient face-to-face MTM interaction. Provider further agrees the only acceptable manner of outreach for MTM services will be via telephonic, electronic, or mail media, for notification of eligibility in the MTM program at a Kansas pharmacy.

11.    **Discrimination**.    Provider shall not discriminate in employment practices with regard to race, color, religion, age (except as provided by law), sex, marital status, political affiliation, national origin, or disability.

12.    **Member Hold Harmless**.    Enrollees shall not be held liable under the following situations.

a.          Non-payment to entity:  Enrollees are not held liable for the Covered Medications provided to the Enrollees, for which the State does not pay the Provider.

b.          Non-payment to Provider:  Enrollees are not held liable for the Covered Medications provided to the Enrollee, for which

the State, or the PBM or Sponsor does not pay the individual or health care provider that furnishes the services under a contractual, referral, or other arrangement.

c.          Enrollees are not liable for PBM or Sponsor's debts, in the event of the entity's insolvency.

d.          No Enrollee shall be charged for all, or any part (i.e., balance of bill), of services provided when Enrollee obtains services that are covered under the Provider Agreement.

13.    **Utilization Management (UM) Activities.**    Provider shall cooperate in any UM programs or activities adopted or implemented by Sponsor(s) or PBM from time to time and shall adhere to all applicable requirements relating to UM activities in Sponsor's contract with the State.

14.    **Member Communications.**    PBM shall not prohibit or otherwise restrict a health care professional acting within the lawful scope of practice, from advising or advocating on behalf of an Enrollee who is his or her patient: (a) for the Enrollee's health status, medical care, or treatment options, including any alternative treatment that may be self-administered; (b) for any information the Enrollee needs in order to decide among all relevant treatment options; (c) for the risks, benefits, and consequences of treatment or non-treatment; and (d) for the Enrollee's right to participate in decisions regarding his or her health care, including the right to refuse treatment, and to express preferences about future treatment decisions.

## KENTUCKY REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Kentucky law (as such terms are defined by Kentucky law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.    **Member Hold Harmless**.    Provider may not, under any circumstance, including nonpayment of moneys due Provider by Sponsor and/or PBM, insolvency of Sponsor or PBM, or breach of the Provider Agreement, bill charge, collect a deposit, seek compensation, remuneration, or reimbursement from, or any recourse against Members, or any persons acting on their behalf, for services provided in accordance with the Provider Agreement. This provision shall not prohibit collection of deductible amounts, Copayment amounts, coinsurance amounts, and amounts for noncovered services. This provision shall survive the termination of the Provider Agreement.  Ky. Rev. Stat. Ann. § 304.17A-527(1)(a), (c); Ky. Rev. Stat. Ann. § 304.17A-310(5); Ky. Rev. Stat. Ann. § 304.17C-060(1)(a), (b); see also 806 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3).

2.    **Continuation of Services**.

a.          In the event the Provider Agreement is terminated for any reason, other than a quality of care issue or fraud, Provider shall continue to provide services and PBM shall continue to reimburse Provider in accordance with the Provider Agreement until the Member is discharged from an inpatient facility, or the active course of treatment is completed, whichever is greater. In the case of a pregnant woman, Provider shall continue to provide services through the end of the post-partum period if the pregnant woman is in her fourth or later month of pregnancy at the time the Provider Agreement terminates.    This provision shall survive termination of the Provider Agreement.  Ky. Rev. Stat. Ann. § 304.17A-527(1)(b)-(c); see also 806 KAR 17:300 (Section 3).

b.          In the event of the insolvency of Sponsor or PBM, Provider shall continue providing Covered Medications to

Members for the duration of the contract period for which premiums have been paid or until the date of discharge from an inpatient facility, whichever is longer.  Ky. Rev. Stat. Ann. § 304.17A-310(6).

3.    **Treatment of covered person under special circumstances.**

a.          "Special circumstances" includes a circumstance in which a Member has a disability, a congenital condition, a life-threatening illness, or is past the twenty-fourth week of pregnancy where disruption of the Member's continuity of care could cause medical harm.

b.          Any special circumstance shall be identified by the treating provider, who may request, with the concurrence of the Member or authorized person that the Member be permitted to continue treatment under the provider's care even when the provider is no longer participating in the network, unless the provider has been terminated for a reason related to quality. The treating, non Provider shall agree to care for the Member on under the same guidelines and payment schedule as required by PBM and the Sponsor, and shall report to PBM and the Sponsor on the care being provided.

c.          Procedures for resolving disputes regarding the necessity for continued treatment by a provider shall be established by PBM and shall provide for review through PBM's internal appeal process.

d.          This section, with respect to the Member with "special circumstances" expires with regard to that Member:

i.          Beyond the ninetieth day after the effective date of the termination or nonrenewal of provider;

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

ii.    Beyond nine (9) months in the case of a Member who at the time of the termination has been diagnosed with a terminal illness; or

iii.    If the Member is beyond the twenty-fourth week of pregnancy, the PBM or the Sponsor's obligation to pay for services extends through the delivery of the child, immediate postpartum care, and examination within the first six (6) weeks following delivery. Ky. Rev. Stat. Ann. § 304.17A-643

4.    **Payment.**

a.    Upon written request, PBM shall provide Provider with a copy of Provider's applicable rate schedules in accordance with KY. Rev. Stat. Ann. § 304.17A-577.

b.    The reimbursement rates identified in the Provider Agreement shall apply to all pharmacy services rendered to all Sponsors' Members under the applicable Prescription Drug Program. Ky. Rev. Stat. Ann. § 304.17A-728; see also 806 KAR 17-300 (Section 3).

c.    The Provider Agreement does not contain a most-favored-nation provision; provided, however, that nothing in this section shall be construed to prohibit PBM and Provider from negotiating payment terms and performance-based contract terms that would result in PBM receiving a rate that is as favorable, or more favorable, than the rates negotiated between Provider and other payors. Ky. Rev. Stat. Ann. § 304.17A-560; see also 806 KAR 17:300 (Section 3).

d.    PBM and Provider shall comply with Ky. Rev. Stat, Ann, §§ 304.17A-700 to 304.17A-730, 205.593, 304.14-135 and 304.99-123 regarding payment and audit of claims. Ky. Rev. Stat. Ann. § 304.17A-726.

e.    PBM and Provider shall comply with any applicable laws for resolving disputes over maximum allowable cost pricing. Ky. Rev. Stat. Ann § 304.17A-162.

5.    **Subcontracts**. If Provider enters into any subcontract agreement with another provider to provide Covered Medications to Members where the subcontracted provider will bill PBM or Members directly for the subcontracted services, the subcontract agreement must meet all the requirements of Title XXV, Chapter 304, Subtitle 17A of the Kentucky Insurance Code and be filed with the Kentucky Commissioner of Insurance. Ky. Rev. Stat. Ann. § 304.17A-527(1)(e); Ky. Rev. Stat, Ann. § 304.17C-

060(1)(c); see also 8006 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3).

6.    **Communication With Members.**

a.    Nothing in the Provider Agreement shall be construed to limit Provider's disclosure to a Member, or to another person on behalf of a Member, any information relating to the Member's medical condition or treatment options. Ky. Rev. Stat. Ann. § 304.17A-530(1); Ky. Rev. Stat. Ann. § 304.17C-070(1); see also 806 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3)

b.    Neither PBM nor Sponsor shall penalize Provider or terminate Provider's contract because Provider discusses medically necessary or appropriate care with a Member or another person on behalf of a Member.  Neither PBM nor Sponsor shall prohibit Provider from discussing all treatment options with Members.  Provider may disclose to Members or to another person on behalf of a Member, all information determined by Provider to be in the best interests of the Members. Ky. Rev. Stat. Ann. § 304.17A-530(2); Ky. Rev. Stat. Ann. § 304.17C-070(2); see also 806 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3).

c.    Neither PBM nor Sponsor shall penalize Provider for discussing financial incentives and financial arrangements between Provider and PBM with a Member.  Ky. Rev. Stat. Ann. § 304.17A-530(3); Ky. Rev. Stat. Ann. § 304.17C-070(3); see also 806 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3).

7.    **No Conditional Participation.**  Nothing in this Provider Agreement shall require Provider, as a condition of participation in a Prescription Drug Program of a Sponsor, to participate in any of the Sponsor's other Prescription Drug Programs. Ky. Rev. Stat. Ann. § 304.17A-150(4); see also 806 KAR 17:300 (Section 3).

8.    **Kentucky Law.**  With respect to Covered Medications provided to Sponsor's Members, this Provider Agreement shall be governed by Kentucky law. 806 KAR 17:440 (Section 3).

## KENTUCKY MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Kentucky Medicaid program ("Plan") administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum").  In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control.  Without limiting the generality of the foregoing, Provider agrees as follows:

1.    **Member Hold Harmless.**  Provider may not, under any circumstance, including nonpayment of moneys due Provider by Sponsor and/or PBM, insolvency of Sponsor or PBM, or breach of the Provider Agreement, bill charge, collect a deposit, seek compensation, remuneration, or reimbursement from, or any recourse against Members, or any persons acting on their behalf, for services provided in accordance with the Provider Agreement.  This provision shall not prohibit collection of deductible amounts, Copayment amounts, coinsurance amounts, and amounts for noncovered services.  This provision shall survive the termination of the Provider Agreement.  Ky. Rev. Stat. Ann. § 304.17A-527(1)(a), (c).

2.    **Continuation of Services.**

a.    In the event the Provider Agreement is terminated for any reason, other than a quality of care issue or fraud, Provider shall continue to provide services and PBM shall

continue to reimburse Provider in accordance with the Provider Agreement until the Member is discharged from an inpatient facility, or the active course of treatment is completed, whichever is greater.  In the case of a pregnant woman, Provider shall continue to provide services through the end of the post-partum period if the pregnant woman is in her fourth or later month of pregnancy at the time the Provider Agreement terminates.  This provision shall survive termination of the Provider Agreement. Ky. Rev. Stat. Ann. § 304.17A-527(1)(b)-(c).

b.    In the event of the insolvency of Sponsor or PBM, Provider shall continue providing Covered Medications to Members for the duration of the contract period for which premiums have been paid or until the date of discharge from an inpatient facility, whichever is longer.  Ky. Rev. Stat. Ann. § 304.17A-310(6).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

**© 2014 Express Scripts, Inc.**
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

3. **Payment**.

a. Upon written request, PBM shall provide Provider a copy of Provider's applicable rate schedule(s) in accordance with Ky. Rev. Stat. Ann. § 304.17A-577.

b. The reimbursement rates identified in the Provider Agreement shall apply to all pharmacy services rendered to a Sponsor's Members under the applicable Prescription Drug Program. Ky. Rev. Stat. Ann. § 304.17A-728; see also 806 KAR 17-300 (Section 3).

c. The Provider Agreement does not contain a most-favored-nation provision; provided, however, that nothing in this section shall be construed to prohibit PBM and Provider from negotiating payment rates and performance-based contract terms that would result in PBM receiving a rate that is as favorable, or more favorable, than the rates negotiated between Provider and other payors. Ky. Rev. Stat. Ann. § 304.17A-560.

d. PBM and Provider shall comply with Ky. Rev. Stat, Ann, §§ 304.17A-700 to 304.17A-730, 205.593, 304.14-135 and 304.99-123 regarding payment and audit of claims. Ky. Rev. Stat. Ann. § 304.17A-726.

e. PBM and Provider will comply with any applicable laws for resolving disputes over maximum allowable cost pricing. Ky. Rev. Stat. Ann. § 304.17A-162.

4. **Subcontracts**. If Provider enters into any subcontract agreement with another provider to provide Covered Medications to Members where the subcontracted provider will bill PBM or Members directly for the subcontracted services, the subcontract agreement must meet all the requirements of Title XXV, Chapter 304, Subtitle 17A of the Kentucky Insurance Code

and be filed with the Kentucky Commissioner of Insurance. Ky. Rev. Stat. Ann. § 304.17A-527(1)(e); Ky. Rev. Stat, Ann. § 304.17C-060(1)(c); see also 8006 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3).

5. **Communication With Members**.

a. Nothing in the Provider Agreement shall be construed to limit Provider's disclosure to a Member, or to another person on behalf of a Member, any information relating to the Member's medical condition or treatment options. Ky. Rev. Stat. Ann. § 304.17A-530(1); Ky. Rev. Stat. Ann. § 304.17C-070(1); see also 806 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3)

b. Neither PBM nor Sponsor shall penalize Provider or terminate Provider's contract because Provider discusses medically necessary or appropriate care with a Member or another person on behalf of a Member. Neither PBM nor Sponsor shall prohibit Provider from discussing all treatment options with Members. Provider may disclose to Members or to another person on behalf of a Member, all information determined by Provider to be in the best interests of the Members. Ky. Rev. Stat. Ann. § 304.17A-530(2); Ky. Rev. Stat. Ann. § 304.17C-070(2); see also 806 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3).

c. Neither PBM nor Sponsor shall penalize Provider for discussing financial incentives and financial arrangements between Provider and PBM with a Member. Ky. Rev. Stat. Ann. § 304.17A-530(3); Ky. Rev. Stat. Ann. § 304.17C-070(3); see also 806 KAR 17:300 (Section 3); 806 KAR 17:440 (Section 3).

6. **No Conditional Participation**. Nothing in this Provider Agreement shall require Provider, as a condition of participation in a Prescription Drug Program of a Sponsor, to participate in any of the Sponsor's other Prescription Drug Programs. Ky. Rev. Stat. Ann. § 304.17A-150(4); see also 806 KAR 17:300 (Section 3).

7. **Kentucky Law**. With respect to Covered Medications provided to Sponsor's Members, this Provider Agreement shall be governed by Kentucky law. 806 KAR 17:440 (Section 3).

8. **Records**. Provider must preserve and maintain prescription drug records for no less than five (5) years unless federal requirements require a longer retention period. Members are entitled to one free copy of their medical records. Sponsor or a state or federal agency may access Member medical records for purposes of auditing compliance with applicable requirements. Sponsor Agreement, Section 27.7.

9. **Emergency Supply**. If a member presents a prescription for a non-preferred drug and Provider cannot reach the prescriber for approval and Provider deems the Covered Medication necessary, Provider may dispense a seventy-two (72) hour emergency supply (or less if the prescription is for less than a seventy-two (72) hour supply). Sponsor Agreement, Section 31.5.

## LOUISIANA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Louisiana law (as such terms are defined by Louisiana law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Health Plan Claims**. A time limit of 365 days is applicable to claims for Louisiana health plans.

2. **Communication With Members**.

a. Provider may communicate with patients regarding their health care, including but not limited to communications regarding treatment options and medical alternatives, or other coverage arrangements. Provider shall not, however, solicit alternative coverage arrangements for the primary purpose of securing financial gain. LSA–R.S. § 22:1007(B).

b. Provider may make medical communications without retaliatory action by PBM or Sponsor. Neither PBM nor Sponsor shall refuse to contract, renew, cancel, restrict or otherwise terminate the Provider Agreement with Provider; refuse

to refer Members to or allow others to refer Members to Provider, refuse to compensate Provider for Covered Medications, or take other retaliatory action against Provider based on medical communications. As used in this section, medical communications means information regarding the mental or physical health care needs or the treatment of a Member. LSA-R.S. § 22:1007(C).

c. No communication by Provider regarding treatment options shall be represented or construed to expand or revise the scope of benefits or Covered Medications under Prescription Drug Programs. LSA-R.S. § 22:1007(D).

3. **Reporting on Policies**. Neither PBM nor Sponsor shall prohibit or restrict Provider from filing a complaint, making a report, or commenting to an appropriate governmental body

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© **2014 Express Scripts, Inc.**
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

regarding the policies or practices of Sponsor or PBM which may negatively impact upon the quality of, or access to, patient care. LSA-R.S. § 22:1007(E).

4.  **Advocating For Member**.  Neither PBM nor Sponsor shall prohibit or restrict Provider from advocating to PBM or Sponsor on behalf of Members for approval of coverage of a particular course of treatment or the provision of health care services. LSA-R.S. § 22:1007(F).

5.  **Indemnification**.  Provider shall not be required to provide indemnification or otherwise assume liability relating to activities, actions, or omissions of Sponsor.  LSA-R.S. § 22:1007(G).

6.  **No Incentive**.  No provision of the Provider Agreement shall operate to provide an incentive or specific payment made directly, in any form, to Provider as an inducement to deny, reduce, limit, or delay specific, medically necessary, and appropriate services provided with respect to a specific Member or groups of Members with similar medical conditions.  LA Rev Stat 22:1008; LSA RS 22:263(E).

7.  **Member Hold Harmless**.  In the event PBM or a Sponsor

8.  fails to pay for Covered Medications as set forth in the evidence of coverage, Members shall not be liable to Provider for any sums owed by PBM or Sponsor to Provider.  Neither Provider, its agent, trustee, nor assignee, may maintain an action at law against a Member of an HMO Sponsor to collect sums owed by the HMO Sponsor. LSA-R.S. § 22:263(A)-(C).

9.  **Emergency Services.**  A provider that does not contract with PBM or Sponsor may pursue collection from PBM for emergency services rendered, provided that the provider has no direct knowledge or information that a Member is an enrollee of a PBM Sponsor and the services are Covered Medications.  The provider shall only collect:

a.  From the PBM the amount paid to participating Providers for the same services.

b.  From the Member the difference, if any, between the amounts charged for such services and the amount received from PBM. RS 22:263D(1)

## LOUISIANA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Louisiana Medicaid Coordinated Care Program ("Enrollees") administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control.  Without limiting the generality of the foregoing, Provider agrees as follows:

1.  **Capitalized Terms**.  All terms capitalized but not otherwise defined in the Provider Agreement or this Addendum shall have the meaning ascribed to them in the contract between the Department of Health and Hospitals (DHH) and Sponsor.

2.  **Compliance with Contract, Guides, and State Plan**.  The Provider shall adhere to all requirements set forth for Providers in the contract between the DHH and department issued Guides.  Provider agrees that all services provided this Addendum must be in accordance with the Louisiana Medicaid State Plan and that Provider shall provide these services to Enrollees through the last day that the Provider Agreement is in effect.  All final Medicaid benefit determinations are within the sole and exclusive authority of DHH or its designee.

3.  **Medical Necessity/Nondiscrimination**.

a.  Provider shall not discriminate against Enrollees on the basis of race, gender, color, national origin, age, disability, health status or need for health care services, and shall not use any policy or practice that has the effect of discriminating on any such basis.  Provider shall adhere to the following Federal anti-discrimination laws in order to maintain eligibility:  Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1975; and Americans with Disabilities Act of 1990.  La. Rev. Stat. §46:437.11; La. Admin. Code tit. 50, §§ 3303 and 3503.

b.  Provider may not refuse to provide covered medically necessary or covered preventive benefits and services to Enrollees specified under the contract between DHH and the Sponsor for non-medical reasons (except those services allowable under Federal law for religious or moral objections).  However, the Provider shall not be required to accept or continue treatment of a patient with whom Provider feels he/she cannot establish and/or maintain a professional relationship.

c.  Provider shall provide goods, services or supplies only if medically necessary and that are within the scope and quality of standard care. La. Rev. Stat. §46:437.11.

4.  **Member Communications**.  PBM shall not prohibit or otherwise restrict a health care professional acting within the

lawful scope of practice, from advising or advocating on behalf of an Enrollee who is his or her patient: (a) for the Enrollee's health status, medical care, or treatment options, including any alternative treatment that may be self-administered; (b) for any information the Enrollee needs in order to decide among all relevant treatment options; (c) for the risks, benefits, and consequences of treatment or non-treatment; and (d) for the Enrollee's right to participate in decisions regarding his or her health care, including the right to refuse treatment, and to express preferences about future treatment decisions.

5.  **Licensure**.  Provider must be currently licensed and/or certified under applicable State and Federal statutes and regulations and shall maintain throughout the term of the Provider Agreement all necessary licenses, certifications, registrations and permits as are required to provide the health care services and/or other related activities delegated by the PBM. La. Rev. Stat. §46:437.12; La. Admin. Code tit. 50, § 945.

6.  **Medical Records**.

a.  An adequate record system must be maintained for recording services, service providers, charges, dates and all other commonly required information elements for services rendered to Enrollees pursuant to the Provider Agreement (including but not limited to such records as are necessary for the evaluation of the quality, appropriateness, and timeliness of services performed under the contract between DHH and the Sponsor).  Enrollees and their representatives shall be given access to and can request copies of the Enrollee's medical records, to the extent and in the manner provided by LRS 40:1299.96 and 45 CFR 164.524 as amended and subject to reasonable charges.

b.  Provider must comply with all medical record requirements as specified in the contract between DHH and the Sponsor.

c.  Any and all Enrollee records including but not limited to administrative, financial, and medical must be retained (whether electronic or paper) for a period of six (6) years after

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

the last payment was made for services provided to an Enrollee or for a period of six (6) years from the expiration date of the contract between DHH and the Sponsor, whichever is later, and retained further if the records are under review, audit, or related to any matter in litigation until the review, audit, or litigation is complete. The exception to this requirement shall include records pertaining to once-in-a-lifetime events such as but not limited to appendectomy and amputations etc., which must be retained indefinitely and may not be destroyed. This requirement pertains to the retention of records for Medicaid purposes only; other State or Federal rules may require longer retention periods. Current State law (La. R.S. 40:1299.96) requires physicians to retain their records for at least six (6) years. These minimum record keeping periods commence from the last date of treatment. After these minimum record-keeping periods, State law allows for the destruction of records. Said records shall be made available for fiscal audit, medical audit, medical review, utilization review, and other periodic monitoring upon request of an authorized representative of DHH. If the Provider stores records on microfilm or microfiche or other electronic means, the Provider must agree to produce, at its expense, legible hard copy records upon the request of State or Federal authorities, within twenty-one (21) calendar days of the request. La. Rev. Stat. §46:437.12; La. Admin. Code tit. 50, §§ 3511 and 4001.

d. DHH, U.S. Department of Health and Human Services (HHS), CMS, Office of Inspector General Comptroller, State Legislative Auditor's Office, and the Louisiana Attorney General's Office shall have the right to evaluate through audit, inspection, or other means, whether announced or unannounced, any records pertinent to the contract between DHH and the Sponsor, including quality, appropriateness and timeliness of services and the timeliness and accuracy of encounter data and practitioner claims submitted to the PBM. Such evaluation, when performed, shall be performed with the cooperation of the Sponsor and PBM. Upon request, the Sponsor and PBM shall assist in such reviews. At the time of audit, Providers must be able to produce a daily log, or prescription register. The daily log, whether routinely produced in hard copy or producible in hard copy at the time of audit, must contain, at a minimum, for audit purposes, the following prescription data: Prescription number; Indicator as to new or refill prescription (0-5); Date of dispensing; Patient's name; Prescriber's name; Drug name; NDC number; Quantity dispensed; Plan identifier indicating case or plan making payment; and Amount paid (both copayment and plan payment, which may or may not be separated). La. Rev. Stat. §46:437.12; La. Admin. Code tit. 50, §§ 3511, 4001, 4115.

e. All records originated or prepared in connection with the Provider's performance of its obligations under the Provider Agreement, including but not limited to, working papers related to the preparation of fiscal reports, medical records, progress notes, charges, journals, ledgers, and electronic media, will be retained and safeguarded by the Provider in accordance with the terms and conditions of the contract between DHH and the Sponsor.

7. **Disclosure of Information**. Provider must comply and submit to the PBM disclosure of information in accordance with the requirement specified in 42 CFR §455, Subpart B.

8. **Quality**.

a. Whether announced or unannounced, Provider must participate and cooperate in any internal and external quality assessment review, utilization management, and grievance procedures established by the PBM, Sponsor and/or DHH or its designee.

b. Provider shall monitor and report the quality of services delivered under the Provider Agreement and initiate a plan of correction where necessary to improve quality of care, in accordance with that level of care which is recognized as acceptable professional practice in the respective community in

which the Provider practices and/or the standards established by DHH or its designee.

c. Provider must comply with any corrective action plan initiated by the PBM, Sponsor and/or required by DHH.

d. Provider must adhere to the Quality Assessment Performance Improvement (QAPI) and Utilization Management (UM) requirements as outlined in the contract between DHH and the Sponsor.

9. **Reporting**. Provider must submit all reports and clinical information required by the PBM or Sponsor for reporting purposes.

10. **Confidentiality**. Information about Enrollees must be kept confidential according to applicable State and Federal laws and regulations and as described in contract between DHH and the Sponsor.

11. **Claims Submission**. Provider must promptly submit complete and accurate claims information needed to make payment.

12. **Indemnification.** At all times during the term of the Provider Agreement, the Provider shall indemnify and hold DHH harmless from all claims, losses, or suits relating to activities undertaken pursuant to the contract between DHH and the Sponsor. La. Rev. Stat. §46:437.12.

13. **Compliance with Laws.**

a. Provider agrees to recognize and abide by all State and Federal laws, rules and regulations and guidelines applicable to the provision of services under Bayou Health.

b. The Provider Agreement incorporates by reference all applicable Federal and State laws, rules or regulations, and revisions of such laws, rules, or regulations shall automatically be incorporated into the Provider Agreement as they become effective. In the event that changes in the Provider Agreement as a result of revisions and applicable Federal or State law materially affect the position of either party, the PBM and Provider agree to negotiate such further amendments as may be necessary to correct any inequities.

14. **Disputes**. PBM and Provider shall be responsible for resolving any disputes that may arise between the two (2) parties. PBM and Provider agree that no dispute shall disrupt or interfere with the provisions of services to the Enrollees.

15. **Conflict of Interest**. Provider must have safeguards at least equal to Federal safeguards (41 USC 423, section 27) and shall comply with requirements for physician incentive plans, as required by 42 CFR 438.6(h) and set forth (for Medicare) in 42 CFR 422.208 and 422.210.

16. **Notification**. Providers shall give PBM immediate notification in writing by certified mail of any litigation, investigation, complaint, claim or transaction that may reasonably be considered to have a material impact on the Provider's ability to perform the services included in its contract with the PBM.

17. **Language Assistance**. In accordance with Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et. seq.) and its implementing regulation at 45 C.F.R. Part 80 (2001, as amended), the Provider must take adequate steps to ensure that persons with limited English skills receive free of charge the language assistance necessary to afford them meaningful and equal access to the benefits and services provided under the Provider Agreement.

18. **Subcontracting**. Provider shall not be restricted from subcontracting with another Prepaid Health Plan or other managed care entity. PBM shall not have a contract arrangement with any Provider in which the PBM represents or agrees that it will not contract with another provider.

19. **Utilization Management**. In accordance with 42 CFR §438.210(e) compensation to the PBM or individuals that conduct utilization management activities is not structured so as to provide incentives for the individual or Prepaid Health Plan to

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

deny, limit, or discontinue medically necessary services to any Enrollee.

20. **Exclusive**. Sponsor and PBM shall not advertise or otherwise hold themselves out as having an exclusive relationship with any Provider.

21. **Member Hold Harmless**. Provider shall accept the final payment made by the PBM as payment-in-full for core benefits and services provided and shall not solicit or accept any surety or guarantee of payment from DHH or the Enrollee(s). Enrollee shall include the patient, parent(s), guardian, spouse or any other legally or potentially legally, responsible person of the Enrollee being served. La. Rev. Stat. §46:437.12; La. Admin. Code tit. 50, § 3509.

22. **Non-Payment Status or Exclusion from Federal Programs**. Provider represents and warrants that:

a. Provider is not in non-payment status with the Louisiana Department of Health and Hospitals (Department).

b. Provider is not excluded from participation in a Federal health care program under either Section 1128 or 1128A of the Social Security Act.

c. Provider shall notify PBM in the event it is placed on non-payment status with the Department of Health and Hospitals or is excluded from participation. PBM may immediately terminate this Provider Agreement upon such notification or exclusion. La. Admin. Code tit. 50, §§ 3303 and 3503.

23. **Access to Information**. Provider shall have the right to the following:

a. Information on the Grievance, Appeal and State Fair Hearing procedures.

b. PBM's policies and procedures covering the authorization of services.

c. Notification of any decision by the PBM to deny a service authorization request or to authorize a service in an amount, duration, or scope that is less than requested.

d. An appeal on behalf of a Medicaid/CHIP Enrollee to a State fair hearing a PBM action to deny, reduce or suspend medically necessary services.

e. Not be discriminated against by PBM because Provider serves high-risk populations or specialize in conditions that require costly treatment.

f. To be free from discrimination for the participation, reimbursement, or indemnification of any Provider who is acting within the scope of his/her license or certification under applicable State law, solely on the basis of that license or certification.

g. To dispute any issue or dispute that arises between a Provider and a PBM that is not the result of Provider acting on behalf of an enrollee in the grievance and appeal process and is related to unique administrative functions of the PBM.

24. **Insurance**. Provider must secure all necessary liability and malpractice insurance coverage as is necessary to adequately protect the Enrollees and the Sponsor and PBM under the Provider Agreement. The Provider shall provide such insurance coverage upon execution and at all times during the Provider Agreement and shall furnish the PBM with written verification of the existence of such coverage

## MAINE REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of Sponsors licensed under Maine law, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless**. In the event that PBM, Sponsor or any PSAO fails to pay for services, including dispensing Covered Medications, the Member may not be held liable to Provider, and its agent, trustee or assignee may not maintain any action at law against a Member to collect sums owed by PBM, Sponsor or PSAO. If a petition to liquidate PBM or Sponsor is filed with a court of competent jurisdiction, then after the date of filing the petition for liquidation:

a. Provider is prohibited from collecting or attempting to collect from a Member amounts normally payable by PBM; and

b. Provider or its agent, trustee or assignee may not maintain any action at law against a Member to collect amounts for services, including dispensing Covered Medications, normally payable by PBM.

Nothing in this Section prohibits Provider from collecting or attempting to collect from a Member any amounts for services not normally payable by PBM or Sponsor, including applicable Copayments or deductibles. 24-A M.R.S § 4204.6. (Title 24-A, section 4204.6)

2. **Insolvency/Assignment**.

a. In the event of the insolvency of PBM or Sponsor, Provider shall continue providing services, including dispensing Covered Medications, for Members for the duration of the period for which premium payment has been made to Sponsor and until Member's discharge from inpatient facilities. 24-A M.R.S. § 4204.7

b. In the event of the insolvency of PBM, Sponsor may require the assignment of this Provider Agreement to itself and Provider shall continue to provide services to Members. 02-031 CMR Ch. 191, § 11.C.

3. **Notice of Termination**. Unless a longer period is required under the Provider Agreement either Party shall provide the other at least sixty (60) days advance notice to terminate or withdraw from the Provider Agreement, unless it is based on loss of required licensure or finding of fraud. Provider shall provide a written explanation for termination of the Provider Agreement. 24-A M.R.S. § 4204.8./24-A 4317

4. **Records**.

a. Access to Records. Provider shall allow appropriate access to medical records of Members for purposes of quality management, quality reviews and complaint investigations conducted by PBM, Sponsor, the State or the State's designee. 10-144 CMR Ch. 109, § 1.03-2.E.3.

b. Records Maintenance. Provider shall use and maintain an adequate Member record system that facilitates documentation and retrieval of clinical information to permit evaluation by the PBM and the Sponsor of the continuity and coordination of patient care and the assessment the quality of provided to Members. (Title 24-A, section 4203.2-A(7)) Provider shall retain all records for a minimum of six (6) years, unless more are required under the Provider Agreement and then in accordance with the Provider Agreement.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

5. **Confidentiality and Privacy Policies and Procedures**. Provider shall have policies and procedures for (1) protecting the confidentiality of Members' health information; (2) limiting access to health care information on a need-to-know basis, consistent with existing law; (3) holding all health care information confidential and not divulging it without Member's authorization, except as consistent with existing law; and (4) allowing Members access to their medical records, consistent with existing law. 10-144 CMR Ch. 109, § 1.03-2.E.4.

6. **Prompt Pay**. PBM shall make payment to Provider in accordance with the time frames provided in Title 24-A, Section 4317-2.

7. **Continuation of Coverage.** Any Member who is an inpatient in a hospital or a skilled nursing facility on the date of discontinuance of the Agreement or Sponsor's Plan shall be covered in accordance with the terms of the Agreement until discharged from such hospital or skilled nursing facility. 02-031 CMR Ch. 191, § 11.I.

8. **Extension of Benefits for Total Disability**
   a. Provider shall continue to provide Covered Medications upon discontinuance of Sponsor's Plan with respect to Members who become totally disabled while enrolled under the Sponsor's Plan and who continue to be totally disabled at the date of discontinuance of the Plan. For purposes of this subsection, total disability is defined consistent with Bureau of Insurance Rule Chapter 590.
   b. Coverage shall remain in full force and effect until the first of the following to occur.
      i. The end of a period of 180 days starting with the date of termination of the Sponsor's Plan.
      ii. The date the enrollee is no longer totally disabled;
      iii. The date a succeeding carrier provides replacement coverage to that enrollee without limitation as to the disabling condition. 02-031 CMR Ch. 191, § 11.J.

## MARYLAND REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Maryland law (as such terms are defined by Maryland law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless**. Provider shall not, under any circumstances, including nonpayment of moneys due Provider by Sponsor or PBM, insolvency of Sponsor or PBM, or breach of the Provider Agreement, bill, charge, collect a deposit, seek compensation, remuneration, or reimbursement from, or have any recourse against Members or any persons other than PBM acting on their behalf, for Covered Medications provided in accordance with the Provider Agreement. This provision shall not operate to preclude collection from Members of Copayments or supplemental charges in accordance with the terms of the Prescription Drug Program, or charges for services not covered. Provider agrees that this provision shall survive termination of this Provider Agreement regardless of the cause giving rise to termination. Md. Code Health-General § 19-710(i).

2. **Indemnification**. Nothing in the Provider Agreement shall be construed to require Provider to indemnify or hold Sponsor harmless from a coverage decision or negligent act of the Sponsor. Md. Code Health-General § 19-710(t); Md. Code Ins. § 15-117.

3. **Termination**.
   a. PBM and Provider shall provide written notice to the other of its intent to terminate the Provider Agreement at least ninety (90) days prior to the termination, *provided, however*, this provision shall not apply to PBM in the event PBM terminates Provider for fraud, patient abuse, incompetency, or loss of Provider's license. Network
Provider shall continue to provide Covered Mediations to Members from the date of notice of intent to terminate until the effective date of termination. Md. Code Ins. § 15-112(i).
   b. PBM shall not terminate this Provider Agreement on the basis of: (i) gender, race, age, religion, national origin, or a protected category under the Federal Americans with Disabilities Act; (ii) the type or number of appeals that Provider files; (iii) the number of grievances or complaints that Provider files on behalf of a patient; or (iv) the type or number of complaints or grievances that Provider files or requests

for review under Sponsor's internal review system. Md. Code Ins. § 15-112(e).
   c. PBM shall not terminate this Provider Agreement or otherwise penalize Provider for: (i) advocating the interests of a Member through a Sponsor's internal review system; (ii) filing an appeal; or (iii) filing a grievance or complaint on behalf of a patient. Md. Code Ins. § 15-112(g).

4. **Most Favored Nation Rates**. To the extent required by law, nothing in the Provider Agreement shall operate: (a) to preclude Provider from providing services at a lower rate or reimbursement to members of carriers who are not contracted with PBM; (b) to require Provider to accept from PBM the same reimbursement arrangement that Provider has with a carrier not contracted with PBM if the reimbursement arrangement with that carrier is for a lower rate of reimbursement; or (c) to require Provider to certify that the reimbursement rates in this Provider Agreement are not higher than the reimbursement rates being received by Provider from carriers not contracted with PBM. Md. Code Ins. § 15-112(l).

5. **Communications With Members**. PBM and Sponsor shall not, as a condition to this Provider Agreement, prohibit Provider from discussing with or communicating to a Member, public official, or other person information that is necessary or appropriate for the delivery of health care services, including: (a) communications that relate to treatment alternatives; (b) communications that are necessary or appropriate to maintain the provider-patient relationship while the patient is under Provider's care; (c) communications that relate to a Member's right to appeal a coverage determination of a Sponsor with which Sponsor, or the Member does not agree; and (d) opinions and the basis of an opinion about public policy issues. Md. Code Ins. § 15-116(b).

6. **Experimental Medical Care**. For purposes of this Provider Agreement, "Experimental Medical Care" shall have the meaning set forth in the Sponsor's Prescription Drug Program documents. Md. Code. Ins. § 15-123(d).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

**© 2014 Express Scripts, Inc.**
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

7. **Workers' Compensation**. Provider's participation under this Provider Agreement shall not be conditioned on Provider's participation in a network for workers' compensation services. PBM shall not terminate, limit, or otherwise impair Provider's rights under this Provider Agreement based on Provider's election not to participate in a network for workers' compensation services. Md. Code Ins. § 15-125(c).

8. **Claims Submission and Appeal**. Provider shall have at least one hundred eighty (180) days from the date of providing Covered Medications to a Member to submit a claim for reimbursement pursuant to the terms of the Provider Agreement, and Provider shall have at least ninety (90) working days after notice that a claim has been denied to appeal such denial pursuant to the terms of the Provider Agreement. PBM or Sponsor shall make or deny reimbursement in accordance with § 15-1005 of the Maryland Insurance Code and this Provider Agreement. Md. Code Ins. § 15-1005.

9. **PBM Information**. Provider acknowledges that PBM has provided Provider with a manual or other document that sets forth the claims filing procedures, including: (a) the address where claims shall be sent for processing; (b) the telephone number at which Provider's questions and concerns regarding claims may be addressed; (c) the name, address, and telephone number of PBM; and (d) the address and telephone number of any separate claims processing center for specific types of applicable services. PBM shall update this information as appropriate. Md. Code Ins. § 15-1004(d)(1).

10. **Fees and Reimbursement**. Upon execution of this Provider Agreement, PBM shall provide Provider with a written copy of (a) a schedule of fees for up to the twenty (20) most common services billed by participating pharmacies; (b) a description of the coding guidelines used by PBM or Sponsor that are applicable to Provider's services; and (c) information about Provider and the methodology that PBM or Sponsor uses to determine whether to increase or reduce Provider's level of reimbursement or to provide a bonus or other incentive-based compensation to Provider.
PBM shall also provide this information to Provider thirty (30) days prior to a change and upon request by Provider. Md. Code Ins. § 15-113(d).

11. **Maryland Law**. With respect to Covered Medications dispensed to Sponsor's Members, the provision of Covered Medications pursuant to this Provider Agreement shall be governed by Maryland law. COMAR 31.12.02.13(C)(4)(k).

12. **Retroactive Claim Denial**. PBM or Sponsor shall not retroactively deny Provider reimbursement on a claim beyond the six (6) month period following the date that PBM or Sponsor paid Provider except (i) for services subject to coordination of benefits with another payor, the Maryland Medical Assistance Program, or the Medicare Program, in which case
PBM or Sponsor may retroactively deny reimbursement during the eighteen (18) month period following the date that PBM or Sponsor paid Provider; or (ii) as provided in the audit section. This provision shall not apply if: (a) the information submitted by Provider was fraudulent; (b) the information submitted by Provider was improperly coded and PBM has provided to Provider sufficient information regarding coding guidelines used by PBM or Sponsor at least thirty (30) days prior to the date the services subject to the retroactive denial were rendered; or (c) the claim submitted by Provider was a duplicate claim. Md. Ins. Code § 15-1008(c)-(e).

13. **Reimbursement Denial**. PBM or Sponsor shall not deny reimbursement to Provider if services have been preauthorized or approved by PBM or Sponsor unless: (a) the information submitted by Provider regarding the service to be delivered to the patient was fraudulent or intentionally misrepresentative; (b) critical information requested by PBM or Sponsor regarding the service to be delivered to the patient was omitted such that the determination would have been different had PBM or Sponsor known the critical information; (c) the planned course of treatment for the patient that was approved by PBM or Sponsor was not substantially followed by Provider; or (d) on the date the preauthorized or approved service was delivered: (i) the patient was not a Member; (ii) PBM or Sponsor maintained an automated eligibility verification system that was available to Provider by telephone or via the Internet; and (iii) according to the verification system, the patient was not a Member. Md. Ins. Code § 15-1009(b).

14. **Experimental Services**. Specifically, for Coventry Health Care of Delaware, Inc. – products licensed by the State of Maryland, the following definition of experimental services applies:

a. Experimental Services (including Experimental Drugs): Services or drugs that are not recognized as efficacious as that term is defined in the edition of the Institute of Medicine Report on Assessing Medical Technologies that is current when the care is rendered. "Experimental Services" do not include Controlled Clinical Trials.

## MARYLAND MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENTS

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Maryland Medicaid Program administered by a Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Capitalized Terms**. All terms capitalized but not otherwise defined in the Provider Agreement or this Addendum shall have the meaning ascribed to them in the contract between the Maryland Department of Health and Mental Hygiene (the "Department") and Sponsor or the applicable law, rule or regulation.

2. **Licensing.** Provider represents and warrants that it is legally qualified and duly licensed to furnish covered services, including the provision of Covered Medications. COMAR § 10.09.65.17(a)(3).

3. **Compliance.** Provider shall comply with all laws, rules, and regulations relating to the Maryland Medicaid Program, including but not limited to all applicable provisions of Sponsor's contract the Department and all requirements imposed by COMAR §§ 10.09.62-76, including but not limited to, requirements concerning access, quality assurance, medical records, and reporting requirements. COMAR § 10.09.65.17(5)(a).

4. **Release of Information.** Provider agrees that it shall release to Sponsor and the Department, upon request any information necessary for Sponsor to perform any of its

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

contractual or regulatory obligations under its contract with the Department, including but not limited to, its records, reporting, and quality assurance duties. COMAR § 10.09.65.17(5)(c).

5. **Audits & Inspections.** Provider agrees that its facilities and records shall be open to inspection by Sponsor, the Department, and other government agencies, and that Provider is subject to all audits and inspections to the same extent that audits and inspections may be required of Sponsor under law or under its contract with the Department. COMAR § 10.09.65.17(5)(d).

6. **Medical Records.** Provider shall provide copies of medical records relating to Enrollees to PBM or Sponsor upon request for transfer to a subsequent provider in the event of termination. COMAR § 10.09.65.17(5)(e).

7. **Termination**. Provider may not terminate the Provider Agreement without written notice to the Department. COMAR § 10.09.65.17(5)(f).

8. **Hold-Harmless.** Provider shall look solely to PBM for compensation for covered services provided to Enrollees. COMAR § 10.09.65.17(5)(g). Provider shall not request payment from the Department, DHHS or any Enrollee for contracted services performed pursuant to the Provider Agreement. Provider shall hold harmless Enrollees, the Department, and DHHS in the event of non-payment by PBM.

9. **Insurance.** Provider agrees that it shall maintain professional liability insurance in accordance with the Provider Agreement. Evidence of such insurance shall be submitted to PBM annually. COMAR § 10.09.65.17(5)(h).

10. **Assignment**. In addition to those conditions set forth in the Provider Agreement, Provider agrees that it may not assign any duties under the Provider Agreement without prior written notice to the Department. COMAR § 10.09.65.17(5)(i)

11. **Communications with Enrollees.** PBM and Sponsor shall not prohibit or otherwise restrict Provider or its employees, acting within the lawful scope of practice, from advising or advocating on behalf of an Enrollee who is Provider's patient for: (a) the Enrollee's health status, medical care, or treatment options, including any alternative treatment that may be self-administered; (b) any information the enrollee needs in order to decide among all relevant treatment options; (c) the risks, benefits, and consequences of treatment or non-treatment; or (d) the Enrollee's right to participate in decisions regarding his/her own health care, including, the right to refuse treatment and to express preferences about future treatment. COMAR § 10.09.65.17(7).

12. **Confidentiality.** Provider agrees to protect the confidentiality of all Enrollee information, including but not limited to, names, addresses, medical services provided, and medical data about the Enrollee, such as diagnoses, past history of disease, and disability, and to not release such information to a third party except under consent of the Enrollee, the Department, or as otherwise permitted by State or Federal law or regulation, or pursuant to a court order. Provider shall maintain all records in accordance with Health-General Article §4-301 *et seq.*

13. **Non-Discrimination.** Provider shall not discriminate against an Enrollee on the basis of age, sex, race, creed, color, marital status, national origin, physical or mental handicap, health status, or need for health care services. COMAR § 10.09.65.02(H)(2). Provider shall comply with the standards of the Americans with Disability Act, 42 U.S.C. § 120101, *et seq.* COMAR § 10.09.65.02(H)(1).

## MASSACHUSETTS REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Massachusetts law (as such terms are defined by Massachusetts law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Communications**. PBM shall not refuse to contract with or compensate an otherwise eligible health care provider for Covered Medications solely because Provider has in good faith:

   a. Communicated with or advocated on behalf of one or more of his, her or its prospective, current or former Members regarding the provisions, terms or requirements of a Sponsor's Prescription Drug Program as they relate to the needs of Provider's Members; or

   b. Communicated with one or more of his, her or its prospective, current or former Members with respect to the method by which such Provider is compensated by PBM for services provided to the Member. **Nothing herein shall limit the ability of Sponsor or Provider from disclosing the allowed amount and fees of services to Members or Member's treating health care provider or limit the ability of Sponsor, PBM, or Provider from disclosing out-of-pocket costs to an insured.** Nothing herein shall be construed to allow Provider to disclose specific compensation terms of the Provider Agreement which are hereby deemed confidential. 211 CMR 52.12(1)(a)-(b) and (11).

2. **Indemnification**. Provider is not required to indemnify PBM or Sponsors for any expenses and liabilities, including, without limitation, judgments, settlements, attorneys' fees, court costs and any associated charges, incurred in connection with any claim or action brought against PBM or a Sponsor based on PBM's or Sponsor's management decisions, utilization review provisions or other policies, guidelines or actions. 211 CMR 52.12(2)

3. **Termination.** (a) With respect to an applicable Sponsor, neither party shall have the right to terminate the Provider Agreement without cause. In the event Provider attempts to terminate the Provider Agreement without cause in violation of the Provider Agreement, Provider shall be required to give PBM at least ninety (90) days written notice prior to termination. 211 CMR 52.12(5).(b) PBM shall provide a written statement to Provider of the reason(s) for termination of the Provider Agreement. 211 CMR 52.12(6).

4. **No Incentive**. Any incentive plan in the Provider Agreement that includes a specific payment made to a health care professional as an inducement to reduce, delay or limit specific, medically necessary services covered by the health care contract is null and void. Payment shall not be made to Provider as an inducement to reduce, delay or limit specific, medically necessary Covered Medications under a Prescription Drug Program. Nothing in this (No Incentive) Section shall be construed to prohibit contracts that contain incentive plans that involve general payments such as capitation payments or shared risk agreements that are made with respect to Provider. 211 CMR 52.12(3).

5. **Agreement Modifications**. PBM shall notify Provider in writing of modifications in payments, modifications in covered services or modifications in PBM's procedures, documents or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

requirements, including those associated with utilization review, quality management and improvement, credentialing and preventive health services, that have a substantial impact on the rights or responsibilities of Provider, and the effective date of the modifications. The notice shall be provided sixty (60) days before the effective date of such modification unless such other date for notice is mutually agreed upon between PBM and Provider. 211 CMR 52.12(7).

6. **Member Hold Harmless**. To the extent not already provided for in the Provider Agreement; Provider agrees to the following: (a) Provider shall not bill Members for charges for Covered Medications and related services other than for deductibles, Copayments, or coinsurance. 211 CMR 52.12(8). (b) Provider shall not bill Members for nonpayment by PBM of amounts owed under the Provider Agreement due to the insolvency of PBM. This requirement shall survive the termination of the Provider Agreement for services rendered prior to the termination of the Provider Agreement, regardless of the cause of the termination. 211 CMR 52.12(9).

7. **Compliance**. Provider shall comply with PBM and the Sponsor's requirements for utilization review, quality management and improvement, credentialing and the delivery of preventive health services. 211 CMR 52.12(10).

8. **Definitions.** To the extent used in the Provider Agreement, the following word(s) are defined as follows: (M.G.L.A. 176O § 1; 211 CMR 52.03)

a. "Utilization Review" means a set of formal techniques designed to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy, or efficiency of, health care services, procedures or settings. Such techniques may include but are not limited to, ambulatory review, prospective review, second opinion, certification, concurrent review, case management, discharge planning or retrospective review.

9. **Continuation of Care**. Other than in conditions of fraud or quality of care issues, Provider agrees that following Provider's involuntary disenrollment, if requested to do so, Provider shall continue to provide Covered Medications for to: (a) Members in their second or third trimester of pregnancy for the period up to and including their first postpartum visit and (b) Members who are terminally ill until their death. Provider agrees that in such circumstances Provider shall accept reimbursement at the rates applicable under the Provider Agreement prior to notice of disenrollment as payment in full and not to impose cost sharing with respect to the Member in an amount that would exceed the cost sharing that could have been imposed if Provider had not been disenrolled. Provider further agrees to adhere to PBM and Sponsor's quality assurance standards and to provide PBM and Sponsor with necessary medical information related to the care provided. Provider further agrees to adhere to PBM and Sponsor's policies and procedures, including those related to referrals, prior authorization, and treatment plans. This provision shall survive termination or expiration of the Agreement. M.G.L.A. 176O § 15.

10. **No Member Fees**. Provider shall not charge a fee to Members as a condition to be part of Provider's panel of patients.

11. **Massachusetts Law**. Provider shall comply with all applicable provisions of Chapter 176O of the Massachusetts General Law.

12. **Prompt Pay**. Within 45 days after the receipt of a clean claim for services provided by Network Provider pursuant to the Agreement, PBM or Sponsor shall (i) make payments for the provision of such services, (ii) notify Network Provider in writing of the reason or reasons for nonpayment, or (iii) notify Network Provider in writing of what additional information or documentation is necessary to complete such claim. If PBM or Sponsor fails to comply with the provisions of this paragraph for any claims related to the provision of such services, then PBM or Sponsor shall pay, in addition to any reimbursement for such services provided, interest on such claim, which shall accrue beginning 45 days after receipt of such clean claim at the rate of 1.5 per cent per month, not to exceed 18 per cent per year. The provisions of this paragraph relating to interest payments shall not apply to any claim being investigated due to suspected fraud.

# MICHIGAN REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Michigan law (as such terms are defined by Michigan law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless**. To the extent not already provided for in the Provider Agreement; Provider agrees to the following: Provider agrees to look solely PBM for payment for pharmacy services provided to Members hereunder, except to the extent the collection of co-payment may be required. MCLS 500.3529(3). Mich Admin Code 325.6345(2)

2. **Licensure**. The provider meets applicable licensure or certification requirements. MCLS 500.3529(4)(a); Mich Admin Code 325.6345(3)(a).

3. **Records**. Provider must provide appropriate access by PBM or the Sponsor to records or reports concerning services to its Members. MCLS 500.3529(4)(b); Mich Admin Code 325.6345(3)(b)

4. **Quality Assurance.** Provider shall cooperate with the PBM and Sponsor's quality assurance activities. MCLS 500.3529(4)(c); Mich Admin Code 325.6345(3)(c)

5. **Member Advocate and Discussions**. PBM or Sponsors shall not prohibit or discourage Provider from advocating on behalf of a Member for appropriate medical treatment options pursuant to the grievance procedure in section MCLS500.2213 or the Member's right to independent review under Michigan law or from discussing with Member or provider any of the following:

a. Health care treatments and services.

b. Quality assurance plans required by law, if applicable.

c. The financial relationships between PBM, Sponsor and Provider including all of the following as applicable:

i. Whether a fee-for-service arrangement exists, under which the provider is paid a specified amount for each covered service rendered to the Member.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

**© 2014 Express Scripts, Inc.**
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

ii.    Whether a capitation arrangement exists, under which a fixed amount is paid to the Provider for all Covered Medications that are or may be rendered to each Member.

iii.    Whether payments to providers are made based on standards relating to cost, quality, or Member satisfaction. MCLS 500.3541

6.    **Member Hold Harmless**. This provision supersedes and replaces all other payment provisions when an HMO is the payer, when required by a specific payer other than an HMO, or when required pursuant to applicable statutes and regulations:

a.    In no event, including but not limited to, nonpayment by payer, including PBM and/or Sponsor, for Covered Medications provided by Provider services Members, insolvency of PBM or Sponsor, or breach by PBM of any term or condition of the Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against any Member or persons acting on behalf of the Member for Provider's services eligible for reimbursement under the Agreement; provided, however, that Provider may collect from the Member expenses or charges for services not covered under the Member's applicable benefit contract.

b.    Provider agrees not to maintain any action at law or in equity against a Member to collect sums that are owed to Provider for Covered Medications, even in the event that PBM or Sponsor fails to pay, becomes insolvent, or otherwise breaches the terms and conditions of this Agreement.

c.    The provisions of this section shall (1) apply to all Covered Medications rendered while this Agreement is in force; (2) with respect to pharmacy services rendered while this Agreement is in force, survive the termination of this Agreement regardless of the cause of termination; (3) be construed to be for the benefit of the Members; and (4) supersede any oral or written agreement, existing or subsequently entered into, between Provider and Member or person acting on a Member's behalf, that requires the Member to pay for such pharmacy services. MCLS 500.3529(3)

## MICHIGAN MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Michigan Medicaid Program ("Enrollees") administered by a Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall only apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). To the extent not defined in the Provider Agreement, the Provider Manual or in this Addendum, Provider further agrees that such terms shall have the meaning ascribed to them in Sponsor's contract with the State of Michigan (the "State") or the applicable law, rule or regulation. In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.    **Payment.**    Provider shall look solely to PBM for payment for Covered Medications or Covered Services provided to an Enrollee. Except for Copayments, in no event shall Provider seek payment from Enrollees.

2.    **Cooperation.**    Provider agrees that it will cooperate in any quality improvement and utilization review activities that may be required by PBM, Sponsor or the State, as applicable.

3.    **Communication.**    Provider is not prohibited from communicating with Enrollees who are Provider's patients about treatment options that may not reflect Sponsor or PBM's position or may not be covered.    Providers, acting within its lawful scope of practice, are not prohibited or restricted from advising or advocating on behalf of Enrollees who are patients: (a) for the Enrollee's health status, medical care, or treatment options, including any alternative treatment that may be self-administered; (b) for any information the enrollee needs in order to decide among all relevant treatment options; (c) for risks, benefits and consequences of treatment or non-treatment; and (d) for the Enrollee's right to participate in decisions regarding his or her health care, including the right to refuse treatment, and to express preferences about future treatment.

4.    **Accessibility.**    Provider shall ensure that its pharmacy(ies) meet all Medicaid accessibility standards as defined by the State.

5.    **Continuity of Care.**    In the event Provider is terminated in accordance with the Provider Agreements, or the Provider Manual, Provider shall cooperate in transition any Enrollee's treatment to a participating provider.

6.    **Copayments.**    To the extent any Copayments are required, Provider shall not deny services to any Enrollee based on the Enrollee's inability to pay the co-payment.

7.    **Enrollee Grievances, Appeals, and Fair Hearings.** Provider may access and review information regarding Enrollee grievances, appeals and fair hearings by reviewing Sponsor's Member Handbook, as updated.

8.    **Media Releases.**    Provider agrees that it shall not make any news releases (including promotional literature and commercial advertisements) pertaining to the State's Medicaid program or projects related to the State's Medicaid program without prior written approval from PBM, Sponsor and the State, and then only in accordance with the explicit written instructions from the State. No results of the activities associated with this Addendum are to be released without prior written approval of the State and then only to persons designated.

9.    **Contract Performance.**    Provider agrees that all services provided under this Addendum must be employees of Provider and be fully qualified to perform the work assigned to them. Provider shall cooperate with the State and its agents and other contractors including the State's Quality Assurance personnel.    As reasonably requested by the State in writing, Provider will provide the State (or its agents) with reasonable access to Provider's personnel, systems, and facilities to the extent the access relates to the activities specifically associated with this addendum.

10.    **Confidentiality.**    Provider will use at least the same degree of care to prevent disclosing to third parties all Confidential Information it receives from providing Covered Services under this Addendum as it employs to avoid unauthorized disclosure, publication or dissemination of its own confidential information of like character, but in no event less than reasonable care. Provider shall not l (i) make any use of the Confidential Information of the State, PBM or Sponsor except as

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).    Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

contemplated in the Provider Agreement, (ii) acquire any right in or assert any lien against the Confidential Information of the State, PBM or Sponsor, or (iii) if requested to do so, refuse for any reason to promptly return the other party's Confidential Information to the State, PBM or Sponsor. Provider will limit disclosure of all Confidential Information to employees and subcontractors, to the extent permitted, who must have access to fulfill the purposes of this Addendum. Disclosure to, and use by, a subcontractor is permissible where (A) use of a subcontractor is authorized under the Provider Agreement, (B) the disclosure is necessary or otherwise naturally occurs in connection with work that is within the subcontractor's scope of responsibility, and (C) Provider obligates the subcontractor in a written contract to maintain the Confidential Information in confidence. At the State's request, any employee of Provider having access or continued access to the State's Confidential Information may be required to execute an acknowledgment that the employee has been advised of the obligations under this Section and of the employee's obligation to the Sponsor or PBM, as the case may be, to protect the Confidential Information from unauthorized use or disclosure. Promptly upon termination or cancellation of the Provider Agreement or for any reason, Provider must certify to the PBM that it has destroyed all State Confidential Information. Notwithstanding the foregoing, the provisions of this Section will not apply to any particular information which (i) was, at the time of disclosure to it, in the public domain; (ii) after disclosure to it, is published or otherwise becomes part of the public domain through no fault of the receiving party; (iii) was in the possession of the receiving party at the time of disclosure to it without an obligation of confidentiality; (iv) was received after disclosure to it from a third party who had a lawful right to disclose the information to it without any obligation to restrict its further disclosure; or (v) was independently developed by the receiving party without reference to Confidential Information of the furnishing party. Further, the provisions of this Section will not apply to any particular Confidential Information to the extent the receiving party is required by law to disclose the Confidential Information, provided that the receiving party (i) promptly provides the furnishing party with notice of the legal request, and (ii) assists the furnishing party in resisting or limiting the scope of the disclosure as reasonably requested by the furnishing party. Nothing contained in this Section must be construed as obligating a party to disclose any particular Confidential Information to the other party, or as granting to or conferring on a party, expressly or impliedly, any right or license to the Confidential Information of the other party. The parties' respective obligations under this Section survive the termination or expiration of this Contract for any reason.

11. **Records and Inspection.** Provider agrees that it shall provide access to its premises, or any other place where Covered Services are being performed, to the State. The State's representatives must be allowed to inspect, monitor or otherwise evaluate the work being performed to the extent access will not reasonably interfere or jeopardize the safety or operation of the facility. Provider shall maintain all records for at least seven (7) years after the date Provider provides services under this Addendum (the "Audit Period"). During the Audit Period, the State and/or federal representatives may examine and copy any of Provider's books, records, documents and papers pertinent to establishing compliance with this Addendum and all laws, rules and regulations. The State and/or federal representatives do not have the right to review Confidential Information to the extent access would require the Confidential Information to become publicly available. This provision also applies to the books, records, accounts, documents and papers, in print or electronic form, of any parent, affiliated or subsidiary organization or any subcontractor performing services in connection to this

Addendum. Provider must maintain all records at least until the end of the Audit Period all pertinent financial and accounting records (including time sheets and payroll records, and information pertaining to the Addendum and to the Services, equipment, and commodities provided under the Addendum) pertaining to the Addendum according to generally accepted accounting principles and other procedures specified in this Section. Financial and accounting records must be made available, upon request, to the State and/or federal representatives at any time during the Audit Period. If an audit, litigation, or other action involving Provider's records is initiated before the end of the Audit Period, the records must be retained until all issues arising out of the audit, litigation, or other action are resolved or until the end of the Audit Period, whichever is later. If the audit demonstrates any errors in the documents provided to the State, then the amount in error will be recouped until the amount is paid or refunded in full. In addition to other available remedies, the difference between the payment received and the correct payment amount is greater than 10%, then the Provider may be reasonable for the costs of the State's audit.

12. **Representations and Warranties.** Provider represents and warrants: (A) that it is capable in all respects of fulfilling and must fulfill the obligations under this Addendum. The performance under this Addendum must be provided in a timely, professional, and workman-like manner and must meet the performance and operational standards required by Sponsor's contract with the State; (B) It is qualified and registered to transact business in all locations where required; (C) Provider, nor any affiliate or employee of either, has, must have, or must acquire, any contractual financial, business or other interest, direct or indirect, that would conflict in any manner or degree with performance of its duties and responsibilities under this Addendum or otherwise create an appearance of impropriety with respect to the award or performance of this Addendum. Provider must notify PBM about the nature of the conflict or appearance of impropriety within two (2) days of learning about it; (D) Provider, nor any affiliate or employee of either, has accepted or will accept anything of value based on an understanding that any actions taken as part of this Addendum would be influenced. Provider must not attempt to influence any State employee by the direct or indirect offering of anything of value; (E) Provider, nor any affiliate or employee of either, has paid or agreed to pay any person, other than bona fide employees and consultants working solely for Provider, any fee, commission, percentage, brokerage fee, gift or any other consideration contingent upon or resulting from the award or making of this Addendum; (F) All written information furnished to the State or PBM in connection with this Addendum is true, accurate and complete, and contains no untrue statement of material fact or omits any material fact necessary to make the information not misleading; (G) Provider is not in material breach or default of any other contract or agreement that it may have with the State, its departments, commissions, boards, or agencies and Provider has not been a party to any agreement with the State within the last five years that has been terminated for failure to perform or breach; and (H) Provider will immediately notify PBM if any of its certifications, representations, or disclosures change. Provider agrees that in addition to any remedies available at law, a breach of this section is considered a default in the performance of a material obligation of the Addendum.

13. **Federal and State Contract Requirements.** In the performance under this Addendum, Provider agrees not to discriminate against any employee or applicant for employment with respect to his or her hire, tenure, terms conditions or privileges of employment, or any matter directly or indirectly related to employment, because of race, color, religion, national origin, ancestry, age, sex, height, weight, marital status, physical

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© **2014 Express Scripts, Inc.**
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

or mental disability. Provider further agrees that every subcontract entered into for the performance of this Addendum or any Purchase Order resulting from this Addendum will contain a provision requiring nondiscrimination in employment, as specified here, binding upon each Subcontractor. This covenant is required under the Elliot Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., and the Persons with Disabilities Civil Rights Act, 1976 PA 220, MCL 37.1101, et seq., and any breach of this provision may be regarded as a material breach of the Provider Agreement. Under 1980 PA 278, MCL 423.321, et seq., the State must not award a contract or subcontract to an employer whose name appears in the current register of employers failing to correct an unfair labor practice compiled under Section 2 of the Act. This information is compiled by the United States National Labor Relations Board. A contractor of the State, in relation to its contract with the State, must not enter into a contract with a Subcontractor, manufacturer, or supplier whose name appears in this register. Under Section 4 of 1980 PA 278, MCL 423.324, the State may void any contract if, after award of the contract, the name of contractor as an employer or the name of the subcontractor, manufacturer or supplier of contractor appears in the register. In performing Services for the State, the Contractor must comply with the Department of Civil Services Rule 2-20 regarding Workplace Safety and Rule 1-8.3 regarding Discriminatory Harassment. In addition, the Contractor must comply with Civil Service regulations and any applicable agency rules provided to the Contractor. For Civil Service Rules, see www.mi.gov/mdcs/0,1607,7-147-6877---,00.html.

## MINNESOTA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Minnesota law (as such terms are defined by Minnesota law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

14. **Member Hold Harmless**.

a. PROVIDER AGREES NOT TO BILL, CHARGE, COLLECT A DEPOSIT FROM, SEEK REMUNERATION FROM, OR HAVE ANY RECOURSE AGAINST A MEMBER OR PERSONS ACTING ON THEIR BEHALF FOR SERVICES PROVIDED UNDER THIS AGREEMENT. THIS PROVISION APPLIES TO BUT IS NOT LIMITED TO THE FOLLOWING EVENTS: (1) NONPAYMENT BY THE HEALTH MAINTENANCE ORGANIZATION OR (2) BREACH OF THIS AGREEMENT. THIS PROVISION DOES NOT PROHIBIT PROVIDER FROM COLLECTING COPAYMENTS OR FEES FOR UNCOVERED SERVICES.

b. THIS PROVISION SURVIVES THE TERMINATION OF THIS AGREEMENT FOR AUTHORIZED SERVICES PROVIDED BEFORE THIS AGREEMENT TERMINATES, REGARDLESS OF THE REASON FOR TERMINATION. THIS PROVISION IS FOR THE BENEFIT OF THE HEALTH MAINTENANCE ORGANIZATION ENROLLEES. THIS PROVISION DOES NOT APPLY TO SERVICES PROVIDED AFTER THIS AGREEMENT TERMINATES.

c. THIS PROVISION SUPERSEDES ANY CONTRARY ORAL OR WRITTEN AGREEMENT EXISTING NOW OR ENTERED INTO IN THE FUTURE BETWEEN PROVIDER AND THE MEMBER OR PERSONS ACTING ON THEIR BEHALF REGARDING LIABILITY FOR PAYMENT FOR SERVICES PROVIDED UNDER THIS AGREEMENT. Minn. Stat. 62D123(1).

15. **Cooperation Required.** Provider must cooperate with and participate in the PBM's and the Sponsor's quality assurance programs, dispute resolution procedures, and utilization review programs.

16. **Payment Disclosure.** Provider agrees that it will provide to the Member, for each prescription dispensed where all or part of the prescription is being reimbursed by PBM, the Member's co-payment amount and the Provider's Usual & Customary Price for the prescription or the amount Provider will be paid for the prescription drug by PBM.

17. **Audits.** All audits of Provider shall comply with the terms of the Minnesota Pharmacy Audit Integrity Program, Minn. Stat. Sections 151.60 – 151.70. Any changes to these audit terms will be disclosed sixty (60) days prior to the effective date, unless otherwise required by law.

a. Performance Standards. Audits of Provider shall be conducted in accordance with the following:

i. With respect to an on-site audit, PBM shall provide fourteen (14) days prior written notice and such on-site audit shall not occur during the first five (5) business days of a month, unless consented to by Provider;

ii. An audit that involves clinical or professional judgment shall be conducted by or in consultation with a licensed pharmacist;

iii. Provider shall be audited under the same standards and parameters as other similarly situated providers. Clerical errors found in audit documents will not be considered sole basis for findings of fraud, however such errors may be the basis for recoupment;

iv. Unless otherwise required or permitted by state or federal law, audits of Provider will not exceed twenty-four (24) months from the date the claim was submitted to and adjudicated by PBM;

v. In advance of an on-site audit, PBM shall provide a masked list of prescription numbers or date ranges that will be audited. To the extent random sampling methodologies are employed, the sample size shall be appropriate for a statistically reliable sample.

vi. PBM will not require information to be written on original prescriptions unless said information is required by state or federal law, required by the Provider Manual, required by the Food and Drug Administration (FDA), or required by the drug manufacturer's product safety program. During an on-site audit, PBM will accept documentation that meets the requirements of the Provider Manual and Minn. Stat. 151.65.

vii. No auditor will receive compensation based on a percentage of recoupment.

b. Recoupments and Appeals.

i. As outlined in the Provider Manual, Provider has the right to appeal audit finding.

1. Provider shall receive a preliminary audit report within sixty (60) days of the conclusion of an audit.

2. Provider shall be allowed a minimum of forty-five (45) days following receipt of the preliminary audit report to

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

provide documentation to address any discrepancy found in the audit.

3. PBM shall provide a final audit report within one hundred and twenty (120) days after receipt of the preliminary audit report or final appeal, whichever is later.

4. Any identified underpayment shall be remitted to Provider within forty-five (45) days after the appeals process has been exhausted and the final audit report has been issued.

ii. Recoupments will not be deducted against future remittances until after the appeals process is complete and Provider has received the final audit report.

iii. PBM shall not use extrapolation as part of an audit.

iv. Calculations for overpayments shall not include dispensing fees unless the prescription was not actually dispensed, a prescriber denied authorization, the prescription dispensed was a medication error by Provider, or the identified overpayment was solely based on the dispense fee.

v. Interest may not accrue during the audit period.

18. **Termination**. If Provider's Agreement allows for less than 120 days' advance written notice of termination, and Provider terminates this Agreement without cause, Provider shall give PBM 120 days' advance notice of termination. Minn. Stat. 62D123(3).

19. **Claim Submission**. Provider shall comply with The Minnesota Uniform Companion Guide for NCPDP Uniform Pharmacy Claim Submission and Response Transaction which was promulgated as a rule pursuant to Minnesota Statues, § 62J.536. Requirements include, but are not limited to, the

submission of prescriber's NPI on retail claims, and the submission of prescriber NPI name on Worker's Compensation claims. Minn. Stat. 62J.536(1); 42CFR162.410.

20. **No Retaliation**. PBM will not take retaliatory action against Provider solely on the grounds that Provider disseminated accurate information regarding coverage of benefits or accurate benefit limitations of Member's contract or accurate interpreted provisions of Provider's Agreement that limit the prescribing, providing, or ordering of care.

21. **No Recourse**. Providers shall not have recourse against Members or persons acting on their behalf for amounts above those specified as Copayments. The PBM shall not have recourse against Members or persons acting on their behalf for amounts above those specified in the evidence of coverage as the periodic prepayment, or co-payment, for health care services. This subdivision applies but is not limited to the following events: (i) nonpayment by PBM or Sponsor; (ii) insolvency of PBM or Sponsor; and (iii) breach of the Agreement. This subdivision does not limit Provider's ability to seek payment from any person other than the Member, the Member's guardian or conservator, the Member's immediate family members, or the Member's legal representative in the event of nonpayment PBM or Sponsor. Minn. Stat. 62D12(5).

22. **Complaint and Grievance Procedures**. Provider shall cooperate fully and timely in the investigation and resolution of any complaint or grievance filed by a Member or their authorized representative. Minn. Stat. 62D.11.

## MINNESOTA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Minnesota Medicaid Program ("Enrollees") administered by a Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall only apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). To the extent not defined in the Provider Agreement, the Provider Manual or in this Addendum, Provider further agrees that such terms shall have the meaning ascribed to them in Sponsor's contract with the State of Minnesota (the "State") or the applicable law, rule or regulation. In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

33. **Compliance with Federal, State, and Local Law**. Provider shall comply with all applicable federal and state statutes and regulations, as well as local ordinances and rules now in effect and hereinafter adopted, including but not limited to Minnesota Statutes, §§ 62J.695 through 62J.76 (Minnesota Patient Protection Act), Minnesota Statutes, § 62Q.47 (Alcoholism, Mental Health, And Chemical Dependency Services), Minnesota Statutes, § 62Q.53 (Mental Health Coverage; Medically Necessary Care), Minnesota Statutes, §§ 62Q.56 and 62Q.58 (Continuity of Care and Care Coordination; Access To Specialty Care); Minnesota Statutes, § 62Q.19 (Essential Community Providers); and Minnesota Statutes § 256.969, subds. 3b and 4a, with 42 CFR § 438.6 (f), (Provider-Preventable Conditions).

34. **Collection and Cost-Sharing**. Provider may not deny Covered Services to an Enrollee because of the Enrollee's inability to pay cost-sharing, pursuant to 42 CFR § 447.53 for Enrollees enrolled in the Medical Assistance program and MinnesotaCare.

35. **Enrollee Rights**. Provider shall consider the Enrollee's rights to:

(A) Receive information pursuant to 42 CFR § 43 8.10.

(B) Be treated with respect and with due consideration for the Enrollee's dignity and privacy.

(C) Receive information on available treatment options and alternatives, presented in a manner appropriate to the Enrollee's condition and ability to understand.

(D) Participate in decisions regarding his or her health care, including the right to refuse treatment.

(E) Be free from any form of restraint or seclusion used as a means of coercion, discipline, convenience or retaliation, as specified in other Federal regulations on the use of restraints and seclusion.

(F) Request and receive a copy of his or her medical records pursuant to 45 CFR § 160 and 164, subparts A and E, and request to amend or correct the record as specified in 45 CFR §§ 164.524 and 164.526.

(G) Be provided with health care services in accordance with 42 CFR §§ 438.206 through 43 8.210.

(H) The freedom to exercise his or her rights and that the exercise of these rights will not adversely affect the way the Enrollee is treated.

36. **Electronic Prescribing**. Provider shall comply with Minnesota Statutes § 62J.497 and the applicable standards specified in the statute for electronic prescribing and transmitting prescription or prescription-related information.

37. **Payment**. Except as provided in the Contract between the State and the Sponsor, Provider may not bill or hold the Enrollee responsible in any way for any charges or cost-sharing

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

for Medically Necessary Covered Services or services provided as Substitute Health Services to Covered Services as part of the Sponsor's Care Management Plan. The Enrollee is not liable for payment under any of the following circumstances:

(A) The Sponsor does not receive payment from the State for the Covered Services;

(B) A health care Provider under contract or other arrangement with the Sponsor fails to receive payment for Covered Services from the Sponsor;

(C) Payments for Covered Services furnished under a contract or other arrangement with the Sponsor are in excess of the amount that an Enrollee would owe if the Sponsor had directly provided the services; or

(D) A non-Participating Provider does not accept the Sponsor's payment as payment in full.

38. **Enrollees Held Harmless.**

(A) Except as allowed by the contract between the Sponsor and the State, Enrollee shall not be held responsible for any fees associated with the Enrollee's medical care received from Provider or an Out of Plan Provider with whom the Sponsor or PBM has negotiated a rate for providing the Enrollee services covered under this Contract.

(B) Provider must: 1) notify Enrollees in writing of Enrollee liability for non-covered services; and 2) prior to performance of the service, receive written authorization from the Enrollee for the non-covered service.

39. **Sanctions.** Provider represents and warrants that Provider:

(A) Has not been sanctioned for fraudulent use of federal or state funds by the U.S. Department of Health and Human Services, pursuant to 42 USC § 1320 a-7(a) or by the State of Minnesota; or

(B) Is not debarred, suspended, or otherwise excluded from participating in procurement activities under the Federal Acquisition Regulation or from participating in non-procurement activities under regulations issued pursuant to Executive Order No. 12549 (51 FR 6370, February 18, 1986) or under guidelines interpreting such order, or

(C) Is not an affiliate of such a Provider.

40. **Access Standards.** Provider must meet the applicable access standards required by the contract between the Sponsor and the State and applicable state and federal laws

41. **Potential Enrollee and Enrollee Communication.** Provider must comply with all applicable communication requirements contained in the contract between the Sponsor and the State and must submit all written information intended for Enrollees to PBM for review and approval.

42. **Provider and Enrollee Communications.** Provider shall not be prohibited, or otherwise restricted, when acting within the lawful scope of practice, from advising or advocating on behalf of an Enrollee, with respect to the following:

(A) The Enrollee's health status, medical care, or treatment options, including any alternative treatment that may be self-administered;

(B) Any information the Enrollee needs in order to decide among all relevant treatment options;

(C) The risks, benefits, and consequences of treatment or non-treatment; or

(D) The Enrollee's right to participate in decisions regarding his or her health care, including the right to refuse treatment, and to express preferences about future treatment decisions.

43. **Suspension of Payment.** Except when the Sponsor or PBM has good cause, the Sponsor and PBM must suspend all Medicaid payments to a Provider after the following:

(A) the State has notified the Sponsor that it has suspended all Medicaid payments to the Provider based on a determination there is credible allegation of Fraud against the Provider for which

an investigation of payments made under the Medicaid program is pending; or

(B) the Sponsor or PBM determines there is a credible allegation of Fraud against the Provider for which an investigation is pending under the Medicaid program.

44. **Return of Payments.** Provider must return any third party payments to PBM or Sponsor for Third Party Liability if the Provider received a third party payment more than one hundred and eighty (180) days after the date the claim was adjudicated.

45. **Reporting Requirements.** Provider must submit all data and reports required by the PBM or Sponsor for reporting purposes, including but not limited to encounter data.

46. **Penalty for Illegal Remuneration.** If Provider violates 42 USC § 1320a-7b(d), Provider may be subject to the criminal penalties stated therein.

47. **Audit.** Provider shall provide CMS, the Comptroller General, or their designees, and the State with the right to inspect, evaluate, and audit any pertinent books, financial records, documents, papers, and records of any financial transactions related to this Contract.

48. **Receipt of Federal Funds.** Payments Provider receives are, in whole or in part, from federal funds and are therefore subject to laws which are applicable to individuals and entities receiving federal funds.

49. **Proper Handling of Information.** Provider shall properly handle and safeguard Protected Information collected, created, used, maintained, or disclosed on behalf of State. Provider shall comply with any and all applicable federal, state, and local laws related to Protected Information.

50. **Facilities Evaluation.** Provider agrees the State and CMS may evaluate, through inspection or other means, the facilities of the Provider when there is reasonable evidence of some need for that inspection.

51. **Record Retention.** Provider agrees to maintain and make available to the State and CMS all records related to Enrollees enrolled pursuant to this Contract for a period of ten (10) years after the termination date of this Contract. Records to be retained include, but are not limited to, medical, claims, Care Management, and Service Authorization records.

52. **Quality Assessment and Performance Improvement.** Provider agrees to participate in any and all quality assessment and performance improvement activities requested by Sponsor or PBM.

53. **Exclusions of Individuals and Entities; Confirming Identity.** Provider represents and warrants that no agreements exist with an excluded entity or individual for the provision of items or services related to this Contract. Provider must search monthly, and upon contract execution or renewal, the OIG List of Excluded Individuals/Entities (LEIE) and the Excluded Parties List System (EPLS, within the HHS System for Awards Management) database (and may search the Medicare Exclusion Database), for any Providers, agents, Persons with an Ownership or Control Interest, and Managing Employees to verify that these persons:

(A) Are not excluded from participation in Medicaid under Sections 1128 or 1128A of the Social Security Act; and

(B) Have not been convicted of a criminal offense related to that person's involvement in any program established under Medicare, Medicaid or the programs under Title XX of the Social Security Act.

Provider shall report to the PBM within five (5) days any information regarding individuals or entities specified above, who have been convicted of a criminal offense related to the involvement in any program established under Medicare, Medicaid, the programs under Title XX of the Social Security Act, or that have been excluded from participation in Medicaid under §§ 1128 or 1128A of the Social Security Act.

54. **Medical Necessity Definition.** Medically Necessary or Medical Necessity means, pursuant to Minnesota Rules, Part

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

9505.0175, subpart 25, a health service that is: 1) consistent with the Enrollee's diagnosis or condition; 2) recognized as the prevailing standard or current practice by the Provider's peer group; and 3) rendered:

    (A) In response to a life threatening condition or pain;

    (B) To treat an injury, illness or infection;

    (C) To treat a condition that could result in physical or mental disability;

    (D) To care for the mother and unborn child through the maternity period;

    (E) To achieve a level of physical or mental function consistent with prevailing community standards for diagnosis or condition; or

    (F) As a preventive health service defined under Minnesota Rules, Part 9505.0355.

55. **Compliance with State Contract.** Provider shall adhere to and cooperate with PBM to ensure PBM's compliance with all applicable requirements set forth in the contract between the State and the Sponsor.

56. **Ownership Disclosure Form.** Provider agrees that it must complete and submit to PBM a complete and accurate Ownership Disclosure Form before submitting claims on behalf of Members. Provider must provide PBM with immediate notice of any change of any information submitted in the Ownership Disclosure Form.

## MISSISSIPPI REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Mississippi law (as such terms are defined by Mississippi law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **No Waiver.** A Provider, by or through a pharmacist acting on its behalf as its employee, agent or owner, may not waive, discount, rebate or distort a Copayment of any insurer, policy or plan or Member's coinsurance portion of a prescription drug coverage or reimbursement. Miss Ann Code 83-9-6(4)

2. **Pharmacy Practice Act.** Pharmacy, by or through a pharmacist's acting on its behalf as its employee, agent or owner, provides a pharmacy service to a Member of a Sponsor's benefit plan that meets the terms and requirements of the insurer under the benefit plan, the Provider shall provide its pharmacy services to all Members of that health benefit plan on the same terms and requirements of the Plan Sponsor. A violation of this subsection shall be a violation of the Pharmacy Practice Act subjecting the pharmacist as a licensee to disciplinary authority of the State Board of Pharmacy. Miss Ann Code 83-9-6(4)

3. **Member Hold Harmless.** Provider agrees that in no event, including but not limited to, nonpayment by the Sponsor, intermediary, or PBM; insolvency of the Sponsor, intermediary, or PBM; or breach of the Provider Agreement, shall the Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any Member or a person, other than the Sponsor, intermediary, or PBM acting on behalf of the Member for services provided pursuant to the Provider Agreement. Miss Ann Code 83-41-325(13)

4. **Continuation of Services.** In the event of a Sponsor's, intermediary's, or PBM's insolvency or other cessation of operations, the provision of Covered Medications and related services to Members shall continue through the period for which a premium has been paid to the Sponsor on behalf of the Member or until the Member's discharge from an inpatient facility, whichever time is greater. Miss Ann Code 83-41-325(16)

5. **Termination.** If Provider's Agreement allows for less than 60 days' advance written notice of termination, and Provider terminates this Agreement without cause, Provider shall nevertheless give PBM 60 days' advance notice of termination. Miss Ann Code 83-41-325(17)

6. **Confidentiality.** Provider shall comply with all state and federal laws designed to protect the confidentiality of medical records. Miss Ann Code 83-41-409(f)

7. **Audit Appeals.** If, following the appeal of an audit, as provided for in the Provider Manual, any of the issues raised in the appeal are not resolved to the satisfaction of either party, such party may ask for mediation of those unresolved issues. A certified mediator shall be chosen by agreement of the parties from the Court Annexed Mediators List maintained by the Mississippi Supreme Court. Miss Ann Code 73-21-185

## MISSOURI REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members enrolled with a Missouri health carrier (as such term is defined by Missouri law as an entity subject to the insurance laws and regulations of Missouri that contracts or offers to contract to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services, including sickness and accident insurance company, an HMO, a nonprofit hospital and health service corporation, or any other entity providing a plan of health insurance, health benefits or health services; except that such plan shall not include any coverage pursuant to a liability insurance policy, workers' compensation insurance policy, or medical payments insurance issued as a supplemental policy to a liability policy; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© **2014 Express Scripts, Inc.**
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

1. **Covered Medications**. Provider shall be notified on an ongoing basis of specific Covered Medications for which the Provider shall be responsible, including any limitations or conditions on service. RSMo 354.606.1.

2. **Member Hold Harmless**. Provider agrees that in no event, including but not limited to, nonpayment by the Sponsor, intermediary, or PBM; insolvency of the Sponsor, intermediary, or PBM; or breach of the Provider Agreement, shall the Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any Member or a person, other than the Sponsor, intermediary, or PBM acting on behalf of the Member for services provided pursuant to the Provider Agreement. The Provider Agreement shall not prohibit the Provider from collecting coinsurance, deductibles or Copayments, as specifically provided in the evidence of coverage and the Provider Agreement, or fees for uncovered services delivered on a fee-for-service basis to Members. The Provider Agreement shall not prohibit a Provider, except for a health care professional who is employed full-time on the staff of a Sponsor and has agreed to provide service exclusively to that Sponsor's Members and no others, and a Member from agreeing to continue services solely at the expense of the Member, as long as the Provider has clearly informed the Member that the Sponsor may not cover or continue to cover a specific service or services. Except as provided herein, the Provider Agreement does not prohibit the Provider from pursuing any available legal remedy; including, but not limited to, collecting from any Sponsor providing coverage to a Member. Except as provided herein, this Provider Agreement does not prohibit the Provider from pursuing any available legal remedy. RSMo. 354.606.2; Mo. 20 CSR 400-7.080(1), (2), (3).

3. **Continuation of Services**. In the event of a Sponsor's, intermediary's, or PBM's insolvency or other cessation of operations, the provision of Covered Medications and related services to Members shall continue through the period for which a premium has been paid to the Sponsor on behalf of the Member or until the Member's discharge from an inpatient facility, whichever time is greater. RSMo. 354.606.3.

4. **Agreement**. Sections 2. and 3. herein shall (a) be construed in favor of the Member; (b) survive the expiration or termination of the Provider Agreement regardless of the reason for termination, including the insolvency of the Sponsor or PBM; (c) supersede any oral or written contrary agreement between Provider and a Member or the representative of a Member if the contrary agreement is inconsistent with the hold harmless and continuation of covered services provisions required by Sections 2 and 3 of this Missouri section; and (d) be binding on all subcontractors with which a Provider may contract to provide services, including Covered Medications, to Members. RSMo. 354.606.4; Mo. 20 CSR 400-7.080(3).

5. **Collection of Payment**. In no event shall a Provider collect or attempt to collect from a Member any money owed to the Provider by the Sponsor or PBM, nor shall a Provider collect or attempt to collect from a Member any money in excess of the coinsurance, Copayments or deductibles. RSMo 354.606.5.

6. **Provider's Responsibilities**. Provider shall be notified of the Provider's responsibilities with respect to the Sponsor's or PBM's (or both) applicable administrative policies and programs, including but not limited to payment terms, utilization review, quality assessment and improvement programs, credentialing, grievance procedures, data reporting requirements, confidentiality requirements, and any applicable federal or state programs. RSMo. 354.606.8.

7. **No Inducement**. No Provider shall be offered an inducement under a Sponsor's managed care plan to provide less than medically necessary services to a Member. RSMo. 354.606.10.

8. **Member Advocating**. Provider is not prohibited from advocating in good faith on behalf of Members within the utilization review or grievance processes established by the Sponsor or a person contracting with PBM or the Sponsor. RSMo. Further, Provider's Agreement shall not be terminated solely or in part because Provider in good faith: (i) advocates on behalf of the enrollee; (ii) files a complaint against PBM or Sponsor; (iii) appeals a decision of PBM or Sponsor; (iv) provides information or files a report with the department of insurance, financial institutions and professional registration; or (v) requests a review pursuant to this section. 354.606.11; 354.609.5

9. **Records**. Provider is required to make health records available to appropriate state and federal authorities involved in assessing the quality of care (but shall not disclose individual identities) or involved in investigating the grievances or complaints of Members, and to comply with the applicable state and federal laws related to the confidentiality of medical or health records. RSMo. 354.606.12.

10. **Assignment**. The rights and responsibilities of Provider under the Provider Agreement shall not be assigned or delegated by the Provider without the prior written consent of the Sponsor and/or PBM, as applicable. Sponsor shall have the right, in the event of PBM's insolvency, to require the assignment to the Sponsor of the provisions of the Provider Agreement addressing the Provider's obligation to furnish Covered Medications. RSMo. 354.621.6.

11. **Services to Members**. Provider agrees to provide services hereunder to all Members without regard to the Member's enrollment in the Prescription Drug Program as a private purchaser of the Prescription Drug Program or as a participant in a publicly financed program of services. RSMo. 354.606.14.

12. **Collection of Copayments**. Provider acknowledges and agrees that it has been notified of its obligations to collect applicable Copayments, deductibles, and coinsurance amounts as set forth in the Provider Agreement. Additionally, Provider agrees to notify Members of their personal financial obligations for non-Covered Medication(s) and services. RSMo. 354.606.15.

13. **Reporting to the State**. Provider shall not be penalized by any Sponsor because Provider, in good faith, reports to state or federal authorities any act or practice by a Sponsor that may jeopardize patient health or welfare. RSMo. 354.606.16.

14. **Member Communication**. Provider is not prohibited or restricted from disclosing to any Member any information that Provider deems appropriate regarding the nature of treatment, risks or alternatives thereto, the availability or other therapy, consultation or test, the decision of any Sponsor to authorize or deny services, or the process that the Sponsor or any person contracting with the Sponsor uses or proposes to use, to authorize or deny health care services or benefits. RSMo. 354.441.

15. **Independent Contractors**. The Sponsor, PBM and the Provider are independent contractors. Mo. 20 CSR 400-7.080(2).

16. **Termination**. At least sixty (60) days written notice must be provided to the other party before terminating this Provider Agreement without cause. This written notice shall include an explanation of why the Provider Agreement is being terminated. Within fifteen (15) working days of the date that the Provider either gives or receives notice of termination, the Provider shall supply PBM and Sponsor with a list of those patients of Provider that are covered by a Prescription Drug Program of the Sponsor. RSMo. 354.609.1.

17. **Continuation of Care**. Upon termination of this Provider Agreement, Provider must continue care to Members for a period of up to ninety (90) days where the continuation of care is medically necessary and in accordance with the dictates of medical prudence, including circumstances such as disability,

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

pregnancy, or life-threatening illness. In such circumstances, a Member shall not be liable to Provider for any amounts owed for Covered Medications other than for deductibles or Copayments specified in the certificate of coverage or other contract between the Member and the Sponsor as set forth in Paragraph 2 above. In the event the terminated Provider is authorized to continue treating a Member pursuant to this paragraph, Provider shall have the right to be paid at the previously contracted rate for services provided to the Member. RSMo. 354.612.

18. **Records Access**. Provider shall allow PBM or Sponsor to monitor, on an ongoing basis, the ability, clinical capacity, and legal authority to furnish all contracted benefits to enrollees. Provider shall allow PBM or Sponsor to obtain audited financial statements if Provider received ten percent or more of the total medical expenditures made by a Sponsor. RSMo 354.603.1(3)

# MONTANA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Montana law (as such terms are defined by Montana law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Lien Withhold**. If Sponsor or PBM determine in good faith that a claim may be subject to a lien or encumbrance of any kind, including but not limited to an attorney's fee lien under Montana Code Section 37-61-420, PBM may in its sole discretion withhold, delay, set-off or pay to a third-party any reimbursement or sums otherwise payable to Provider. The Provider agrees that it shall not have recourse against PBM or any Sponsor or Member for any delay, set-off or reduction in reimbursement or payment as a result of such actions.

2. **Prohibited Collection Practices**.
 a. Provider agrees that in no event, including but not limited to, nonpayment by the Sponsor, intermediary, or PBM; insolvency of the Sponsor, intermediary, or PBM; or breach of the Provider Agreement, shall the Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any Member or a person for services provided pursuant to the Provider Agreement. The Provider Agreement shall not prohibit the Provider from collecting coinsurance, Copayments or deductibles, as specifically provided in the evidence of coverage and the Provider Agreement, or fees for uncovered services delivered on a fee-for-service basis to Members. The Provider Agreement shall not prohibit a Provider, except for a health care professional who is employed full-time on the staff of a Sponsor and has agreed to provide service exclusively to that Sponsor's Members and no others, and a Member from agreeing to continue services solely at the expense of the Member, as long as the Provider has clearly informed the Member that the Sponsor may not cover or continue to cover a specific service or services. Except as provided herein, the Provider Agreement does not prohibit the Provider from pursuing any available legal remedy; including, but not limited to, collecting from Sponsor payment for providing Covered Medications to a Member. Mont. Code Ann. 33-36-202(1)
 b. If Medco or Sponsor becomes insolvent or otherwise ceases operations, covered benefits to Eligible Persons will continue through the end of the period for which a premium has been paid to the Sponsor on behalf of the Eligible Person, but not to exceed thirty (30) days or until the persons discharge from an acute care inpatient facility, whichever last occurs. Covered Medications to a Member confined in an acute care inpatient facility on the date of insolvency or other cessation of operations must be continued by Provider until the confinement in an inpatient facility is no longer medically necessary. Mont. Code Ann. 33-36-202(2)
 c. Sections 2(a)&(b) above shall be construed in favor of the Member and survive the termination of the Agreement regardless of the reason for termination, including the insolvency of PBM or Sponsor, and supersede any oral or written contrary agreement between Provider and Member or representative of such Member. Mont. Code Ann. 33-36-202(3)
 d. Provider is prohibited from collecting or attempting to collect from Member or Member's representative any amount owed to Provider by PBM or Sponsor. Mont. Code Ann. 33-36-202(4)

3. **Records Availability**. Provider shall make health records available to appropriate state and federal authorities, in accordance with the applicable state and federal laws related to the confidentiality of medical or health records, when the authorities are involved in assessing the quality of care or investigating a grievance or complaint of a Member. Mont. Code Ann. 33-36-204(4)

4. **Termination**. (A) Unless longer time is provided for in the Agreement, the terminating party shall give the other party at least sixty (60) days advanced written notice in the event of a without cause termination. Mont. Code Ann. 33-36-204(5) (B) Neither party shall terminate the Agreement prior to the expiration of its term except for just cause. For purposes of this subsection, "just cause" means reasonable grounds for termination based on a failure to satisfactorily perform contract obligations or other legitimate business reason. Mont. Code Ann. 33-37-104

5. **Member's Plan Enrollment**. Provider shall furnish Covered Medications to all Members without regard to the Member's enrollment in a Sponsor's plan as a private purchaser or as a participant in a publicly financed program of health care services. This requirement does not apply to circumstances in which the Provider should not render services because of the Provider's lack of training, experience, or skill or because of a restriction on the Provider's license. Mont. Code Ann. 33-36-204(6)

6. **Collection of Copay**. Provider shall collect all of and only the applicable coinsurance, copayments, or deductibles from Members pursuant to the evidence of coverage. Further, Provider shall notify Members of the Member's personal financial obligations for noncovered services. Mont. Code Ann. 33-36-204(7)

7. **Complaint System**. Provider shall cooperate fully and timely in the Insurance Commissioner approved Complaint system established and maintained by Sponsor or PBM, as applicable, for the resolution of a Member's or there representative's written complaints. Mont. Code Ann. 33-31-303(i).

8. **Providing Services to Medicaid Members**: To the extent Provider provides services to Enrollees under the Montana

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

Medicaid program administered by a Sponsor, Provider further agrees as follows:

a. As a condition of participation in the Montana Medicaid program all providers must comply with all applicable state and federal statutes, rules and regulations, including but not limited to federal regulations and statutes found in Title 42 of the Code of Federal Regulations and the United States Code governing the Medicaid Program and all applicable Montana statutes and rules including but not limited to the rights and restrictions set forth at Rule: 37.85.401.

## NEBRASKA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Nebraska law (as such terms are defined by Nebraska law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. Provider shall provide at least sixty (60) days' advance written notice prior to termination, unless longer is required under the Agreement, then in accordance with the Agreement. R.R.S. 44-32,142

## NEVADA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Nevada law (as such terms are defined by Nevada law; collectively and/or individually, the "Sponsor"), including those Sponsors that administer the Nevada Medicaid Program, as applicable, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Continuation of Services**. If the Provider Agreement is terminated by PBM or Sponsor for reasons other than the medical incompetence or professional misconduct of Provider, Provider agrees to continue to provide services to Members who are undergoing a medically necessary course of treatment until the later of the one hundred twentieth (120th) day after the Provider Agreement is terminated or, with respect to Members who are pregnant, until the forty fifth (45th) day after delivery or the date the pregnancy otherwise ends. During this continuation period, Provider agrees to accept the reimbursement rates and terms of participation in effect under the Provider Agreement before it terminated. Provider further agrees not to seek payment from Member for any survive provided by Provider during this continuation period that Provider could not have received from the Members if the Provider Agreement were still in effect. N.R.S. §§ 695C.1691 and 695G.164.

2. **Contraception/Hormone Replacement.** PBM agrees that it shall not (a) require higher deductibles, copayments or coinsurance or require longer waiting periods or other conditions for coverage for a prescription for a contraceptive or hormone replacement therapy than is required for other prescriptions covered by the applicable plans; (b) offer to pay any type of material inducement or financial incentive to a Member to discourage the Member from accessing contraceptives or hormone replacement therapy; (c) penalize Provider for dispensing contraceptives or hormone replacement therapies to a Member, including, without limitation, reducing the reimbursement to said Provider; and (d) offer or pay any type of material inducement, bonus or other financial incentive to Provider to deny, reduce, withhold, limit or delay access to contraceptives or hormone replacement therapies to Members of applicable Sponsors under N.R.S. § 695C.1964-1965. This section shall only apply to contraceptives and hormone replacement therapies that are lawfully prescribed or ordered and which have been approved by the Food and Drug Administration.

3. **Payment**. To the extent applicable, PBM shall approve or deny a claim for services within thirty (30) days after it receives the claim, and if the claim is approved, PBM shall pay the claim within thirty (30) days after it is approved as applicable. If PBM requires additional information to determine whether to approve or deny the claim, it shall notify Provider of its request for additional information within twenty (20) days after it receives the claim. PBM shall notify Provider of all specific reasons for any delay in approving or denying the claim. PBM shall approve or deny the claim within thirty (30) days after receiving the additional information requested. If the claim is approved, PBM shall pay the claim within thirty (30) days after it receives the additional information. PBM shall not ask Provider to resubmit information that Provider has already provided, unless PBM provides a legitimate reason for the request and the purpose of the request is not to delay payment of the claim, harass Provider or discourage the filing of claims. PBM shall not pay only part of a claim that has been approved and is fully payable. If any approved claim is not paid as set forth in this provision, PBM shall pay interest on the claim at a rate of interest equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1 or July 1, as the case may be, immediately preceding the date on which the payment was due, plus six percent (6%). The interest shall be calculated from thirty (30) days after the date on which the claim is approved until the date on which the claim is paid. N.R.S. §§ 695C.187; 695C.185; 689A.410; 689B.255; 695B.2505. Notwithstanding the foregoing, for claims submitted by Provider for a Member of a Medicaid Sponsor, PBM shall pay in accordance with the terms of the Provider Agreement. If PBM fails to make payments in accordance with the agreement for Medicaid Sponsors, PBM shall pay interest at the rate set forth in

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

this paragraph. N.R.S. § 695C.128. Interest due to Provider under this section may be waived if the delay in payment was the result of an act of God or another cause beyond the control of PBM.

4. **Member Hold Harmless**. Provider releases Members from liability for the cost of Covered Medications rendered pursuant to the Provider Agreement. If Sponsor or PBM fails to pay for Covered Medications for any reason, including, but not limited to insolvency or breach of the Provider Agreement, Members shall not be liable to Provider for any money owed to Provider pursuant to the Provider Agreement. Neither Provider nor any of its agents, trustees, or assignees may maintain an action at law or attempt to collect from a Member any money that Sponsor or PBM owes to Provider. This provision does not prohibit the collection of any uncovered charges which a Member agreed to pay or the collection of any Copayment from a Member. This provision survives termination of the Provider Agreement, regardless of the reason for termination. N.R.S. § 695F.220(1)-(4), Nev. Admin Code §§ 695C.190(2), 695C.530(2), 695F.300(2).

5. **Termination**.

a. Termination of the Provider Agreement shall not release Provider from its obligation to complete any procedure on a Member who is receiving treatment for a specific condition for a period not to exceed sixty (60) days, at the same schedule of Copayment or any other applicable charge in effect when the Provider Agreement is terminated. N.R.S. § 695F.220(5).

b. Neither Sponsor nor PBM shall terminate this Provider Agreement with, demote, or refuse to contract with or refuse to compensate Provider solely because Provider in good faith: (i) advocates in private or in public on behalf of a Member; (ii) assists a Member in seeking reconsideration of a decision by Sponsor or PBM to deny coverage for a Covered Medication; or (iii) reports a violation of law to an appropriate authority. N.R.S. § 695G.410.

c. Any party wishing to terminate this Provider Agreement without cause must give the other party at least ninety (90) days' advance written notice, unless a longer period is required under the Agreement, then in accordance with the Agreement. Nev. Admin. Code § 689B.160.

6. **Amendment**. To the extent applicable, any amendment to the Provider Agreement must be submitted to the Nevada Commissioner of Insurance for approval before the amendment is effective. N.R.S. § 695F.220(6).

7. **Member Communications**. Neither Sponsor nor PBM shall restrict or interfere with any communication between Provider and its patients regarding any information that Provider determines is relevant to the health care of its patients. N.R.S. § 695G.400.

8. **No Inducement**. Neither Sponsor nor PBM shall offer to pay any type of material inducement, bonus or other financial incentive to Provider to deny, reduce, withhold, limit or delay specific medically necessary health care services to a Member. N.R.S. § 695G.420(1).

9. **Term**. The Provider Agreement shall be effective for at least one (1) year or longer if longer is provided for the Agreement, subject to any right of termination stated in the Provider Agreement and this Addendum. Nev. Admin. Code §§ 695C.190(3), 695C.530(3), 695F.300(3).

10. **Cooperation**. Provider agrees that it shall participate in and cooperate with any quality assurance programs adopted by PBM or Sponsor, as applicable. Nev. Admin. Code § 695C.190(4).

11. **Participation and Services**. Provider shall provide all medically necessary Covered Medications to each Member for the period for which a premium has been paid to Sponsor. Nev. Admin. Code § 695C.190(5), 695C. 530(4), 695F.300(5).

12. **Insurance**. Provider must provide proof of insurance against loss resulting from injuries to third parties from Provider's practice of pharmacy or a reasonable substitute for it as determined by PBM or Sponsor. Provider shall indemnify PBM and Sponsor for any liability resulting from the health care services rendered by Provider. Nev. Admin. Code §§ 695C.190(6), 695C.530(6), and 695F.300(6).

13. **Assignment**. Provider agrees that PBM may assign the Provider Agreement to Sponsor. Nev. Admin. Code § 695C.505(12).

14. **Deductible/Coinsurance Payment**. Any deductible or coinsurance payment by or on behalf of a Member paid to Provider shall be applied to the negotiated reduced rates set forth in the Agreement.

15. **Confidentiality**.

a. Provider shall not disclose any information relating to the diagnosis, treatment or health of any Member to any person except:

i. Upon the written consent of the Member, PBM or the Sponsor, as appropriate; or

ii. Pursuant to a specific statute or court order for the production of evidence or the discovery thereof; or

iii. For a claim or legal action if that data or information is relevant.

b. PBM or Sponsor may claim any privilege against disclosure which the Provider who furnished the information relating to the diagnosis, treatment or health of an enrollee or applicant to the organization is entitled to claim. Nev. Admin. Code §§ 695F.410.

16. **Enrollees**. If Provider provides services, including Covered Medications, to Members who are enrollees in the Nevada Medicaid Program ("Enrollees"), Provider further agrees that:

a. **Hold harmless**. Provider shall look solely to PBM for reimbursement. Provider understands and agrees that State is not liable or responsible for payment for Covered Medications rendered pursuant to this Provider Agreement.

b. **Nondiscrimination.** Provider shall provide covered services to Enrollees without regard to race, national origin, creed, color, sex, religion, age, health status, physical or mental disability. Prohibited practices include, but are not limited to: (i) denying covered services to Enrollees; (ii) providing an Enrollee a covered service which is different, or provided in a different manner, or at a different time from that provided to other recipients or the public at large; and (iii) subject an Enrollee to segregation or separate treatment in any manner related to receipt of covered medically necessary services.

c. **Provider Enrollment.** Prior to serving Enrollees, Provider must go to the Nevada Department Health and Human Services Division of Health Care Financing and Policy and complete the provider enrollment process.

d. **Cooperation with IQAP.** To the extent applicable, Provider shall cooperate in all Sponsor and PBM Internal Quality Assurance Plan(s) (IQAP).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential, information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

# NEW HAMPSHIRE REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under New Hampshire law (as such terms are defined by New Hampshire law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless**. In no event, including but not limited to nonpayment by Sponsor or PBM, insolvency of Sponsor or PBM, or breach of the Provider Agreement, shall Provider bill, charge, collect a deposit from seek payment or reimbursement from, or have recourse against a Member or a person acting on behalf of a Member (other than Sponsor or PBM) for Covered Medications provide pursuant to the Provider Agreement. This provision does not prohibit Provider from collecting coinsurance, deductibles, or Copayments, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for-service basis to Members. Nor does this provision prohibit Provider and a Member from agreeing to continue services solely at the expense of the Member, as long as Provider has clearly informed the Member that Sponsor may not cover or continue to cover the specific service or services. Except as otherwise provided in the Provider Agreement, this provision does not prohibit Provider from pursuing any available legal remedy. Provider agrees that this provision shall survive termination of the Provider Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of Members. This provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Members or persons acting on their behalf. Any modifications, additions or deletions to this provision shall become effective on a date no earlier than fifteen (15) business days after the New Hampshire Insurance Commissioner has received written notice of such proposed changes. N.H. Rev. Stat. § 420-J:8(I).

2. **Limitation on Liability**. Nothing in the Provider Agreement, which delineates rights and obligations of the parties within the network, shall be construed as limiting Sponsor's liability for any actions of Provider for which Sponsor might otherwise be liable. N.H. Rev. Stat. § 420-J:8(II) & (IV) & 420-A:19(I).

3. **Communications With Members**. The Provider Agreement shall not be construed to limit information Provider may disclose to patients or to prospective patients regarding the provisions, terms, or requirements of Sponsor's Prescription Drug Programs as they relate to the needs of Provider's patients except for trade secrets of significant competitive value. N.H. Rev. Stat. § 420-J:8(V) & 420-A:19(II).

4. **Agreement and Amendment Review**.

a. Provider shall have sixty (60) days from the postmarked date to review any proposed contract with PBM and any modifications to the Provider Agreement, excluding those modifications that are expressly permitted under the Provider Agreement. H.H. Rev. Stat. § 420-J:8(VII).

b. PBM shall give Provider notice of material changes to the applicable prescription charges at least sixty (60) days in advance of the effective date. N.H. Rev. Stat. § 420-J:8(VIII)(d).

5. **No Inducement**. No reimbursement or payment terms under the Provider Agreement shall be offered as an inducement for Provider not to provide medically necessary care to Members. N.H. Rev. Stat. § 420-J:8(VIII).

6. **Network Participation**. Neither PBM nor Sponsor shall remove Provider from the network or refuse to renew Provider's enrollment in the network due to Provider's participation in a Member's internal grievance procedure or external review. N.H. Rev. Stat. § 420-J:8(X).

7. **Continuation of Services**. In the event the Provider Agreement is terminated for a reason other than unprofessional behavior by Provider, Provider agrees to continue to provide Covered Medications to Members for sixty (60) days from the date of termination. Provider agrees to provide Covered Medications during this period in accordance with the terms and conditions imposed by the Provider Agreement and agrees to accept as full payment the amount that would have applied had the Provider Agreement not terminated. N.H. Rev. Stat. § 420-J:8(XI).

8. **Most Favored Nation Provision**. The Provider Agreement does not contain a most-favored-nation provision. Provider shall not be obligated to give PBM the benefit of any lower fee schedules or charges for services which Provider may subsequently agree to with other persons or entities. N.H. Rev. Stat. § 417:4(XXI).

9. **No Referral Requirements**. Provider is not required or in any way obligated to refer Members to providers also employed or under contract with PBM or Sponsor. Nothing in this paragraph shall be construed to prohibit PBM or Sponsor from providing coverage for only those services which are medically necessary and subject to the terms and conditions of the Members policy. N.H. Rev. Stat. § 420-J:8(XIV).

# NEW JERSEY REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under New Jersey law (as such terms are defined by New Jersey law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

1. **Conflict and Definitions**. In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. For purposes of this Addendum, the following capitalized terms shall have the meaning ascribed to them hereunder:

a. **"Claim"** shall mean a claim by a Member for payment of Covered Medications under an insured HMO contract for which the financial obligation for the payment of such Claim under the HMO's coverage for Covered Medications rests upon the HMO. N.J.A.C. 11:22-1.2

b. **"Department of Banking and Insurance" or "DOBI"** shall mean the New Jersey Commissioner of Banking and Insurance.

c. **"Health Maintenance Organization" or "HMO"** shall have the same meaning as defined by 26:2J-2.f.

d. **"State"** shall mean the State of New Jersey.

2. **Internal and External Appeals.** Internal and external appeals mechanisms required to be established pursuant to N.J.S.A. 26:2J-8.1.e. by Sponsors who are HMOs under New Jersey law are incorporated herein by reference and made a part of the Provider Agreement. Consequently, in accordance with N.J.S.A. 26:2J-8.1.e., PBM and Provider agree that any dispute between PBM and a Provider relating to payment of Claims for Members of Sponsors who are HMOs under New Jersey law, but not for: disputes pertaining to medical necessity (which are handled pursuant to N.J.S.A. 26:2S-11) or Claims/appeals made as a result of utilization review determinations (N.J.S.A. 26:2S-12) (each, a "Claims Dispute"), shall be handled by PBM as follows:

a. **Internal Appeals.** If a Sponsor has its own internal resolution process for Claims Disputes, PBM will follow the Sponsor's process if directed to do so by the Sponsor. Alternatively, if not so directed or not maintained by a Sponsor, for Claims submitted to PBM that Provider disputes, Provider:

i. May initiate an appeal on or before the ninetieth (90th) calendar day following receipt by Provider of PBM's Claims determination, which is the basis of appeal, on a form prescribed by DOBI which shall describe the type of substantiating documentation that must be submitted with the form. PBM will conduct a review of the appeal and notify Provider of its determination on or before the thirtieth (30th) calendar day following receipt of the appeal form. If Provider is not notified within such thirty (30) days, Provider may refer the dispute to arbitration as provided in Subsection b. of this Section 2 (Internal and External Appeals).

ii. If PBM issues a determination in favor of Provider, PBM will pay the amount of money in dispute, if applicable, with accrued interest at the rate of twelve percent (12%) per annum, on or before the thirtieth (30th) calendar day following PBM's notification of its determination. Interest shall begin to accrue on the day the appeal is received by PBM.

iii. If PBM issues a determination against Provider, PBM shall notify Provider of its determination on or before the thirtieth (30th) calendar day following receipt of the appeal form and shall include in such notification written instructions for referring the dispute to arbitration as provided in Subsection b. of this Section 2 (Internal and External Appeals). N.J.S.A. 17:48-8.4 e(1).

b. **Arbitration.** Any Claims Dispute regarding the determination of an internal appeal conducted pursuant to Subsection a. of Section 2 (Internal and External Appeals) may be referred to arbitration as provided herein. The DOBI will be responsible for contracting with a nationally recognized, independent organization that specializes in arbitration to conduct the arbitration proceedings.

i. Either party may initiate the arbitration proceeding on or before the ninetieth (90th) calendar day following the receipt of the determination which is the basis of the arbitration request, on a form proscribed by DOBI.

ii. No dispute shall be accepted for arbitration unless the payment amount in dispute is One Thousand Dollars ($1,000) or more, except that Provider may aggregate its own disputed Claim amount for the purposes of meeting the threshold requirement.

iii. No dispute pertaining to medical necessity which is eligible to be submitted to the Independent Health care Appeals Program shall be eligible for arbitration hereunder.

iv. The arbitrator shall conduct the arbitration proceedings pursuant to the rules of the arbitration entity, including the rules of discovery subject to confidentiality requirements established by State or federal law. The arbitrator's decision shall be signed by the arbitrator, issued in writing, in a form proscribed by the DOBI, including a statement of the issues in dispute and the findings and conclusions upon which the determination is based, and issue such determination on or before the thirtieth (30th) calendar day following receipt of the required documentation. The arbitration is non-appealable and binding on all parties to the dispute.

v. If the arbitrator determines that PBM inappropriately withheld or denied payment of a Claim in violation of the provisions of N.J.S.A. 26:2J-8.1, if applicable, the arbitrator may order PBM to make payment of the Claim, with accrued interest, on or before the tenth (10th) business day following the issuance of the determination. If the arbitrator determines that PBM has withheld or denied payment on the basis of information submitted by Provider and PBM requested, but did not receive, this information from the Provider when the Claim was initially processed or reviewed under subsection a, PBM shall not be required to pay any accrued interest.

vi. If the arbitrator determines that Provider has engaged in a pattern and practice of improper billing and a refund is due to PBM, the arbitrator may award PBM a refund, including interest accrued at the rate of twelve percent (12%) per annum. Interest shall begin to accrue on the day the appeal was received by PBM for resolution through the internal appeals process established pursuant to subsection a.

vii. Any arbitration conducted under the Provider Agreement shall be held in New Jersey unless the parties mutually agree to another location.

3. **Insurance.** Provider agrees to maintain licensure, certification and adequate malpractice insurance at least in the amount determined sufficient for its anticipated risk, but no less than $1,000,000 per occurrence and $3,000,000 in the aggregate per year. (N.J.A.C. 11:24-15.2(b)(10)).

4. **Member Hold Harmless.** Provider agrees that in no event, including, but not limited to, nonpayment by Sponsor or PBM, payment by Sponsor or PBM that is other than what Provider believed to be in accordance with the reimbursement provision of the Provider Agreement or is otherwise inadequate, insolvency of Sponsor or PBM, or breach of the Provider Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member or person (other than Sponsor or PBM) acting on behalf of the Member for services provided pursuant to the Provider Agreement. Provider shall hold Members harmless for the cost of Covered Medications, whether or not the Provider believes its compensation for the Covered Medications is made in accordance with the reimbursement provisions of the Provider Agreement, or is otherwise inadequate. Provider shall not balance bill Members who have obtained Covered Medications through the Provider in accordance with the Prescriptions Drug Plan. Neither Provider nor its trustee or assignee may maintain an action at law or attempt to collect

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

from Members sums owed to Provider by PBM or Sponsor. The Provider Agreement does not prohibit Provider from collecting coinsurance, deductibles or Copayments, as specifically provided in the evidence of coverage. Nor does the Provider Agreement prohibit Provider (except for a health care professional who is employed full-time on the staff of a health carrier and has agreed to provide services exclusively to that health carrier's covered persons and no others) and a Member from agreeing to continue services solely at the expense of the Member, as long as Provider has clearly informed the Member that Sponsor may not cover or continue to cover a specific service or services. (N.J.A.C. 11:4-37.4(c)(8), 11:24-15.2(b)(7); N.J.S.A. 17:48F-13). PBM and Sponsor shall not restrict or prohibit, directly or indirectly, Provider from charging Members for services rendered by Provider that are in addition to charges for the Covered Medications, for dispensing the Covered Medications or for prescription counseling. Services rendered by the Provider for which additional charges are imposed shall be subject to the approval of the Board of Pharmacy. Provider shall disclose to the Members the charges for the additional services and the Members' out-of-pocket costs for those services prior to dispensing the Covered Medications. Provider shall not impose any additional charges for patient counseling or for other services required by the Board of Pharmacy, state or federal law or the New Jersey Division of Medical Assistance and Health Services in the Department of Human Services. N.J.S.A. 26:2J-4.7(6).

5. **Confidentiality.** The Provider Agreement shall be construed to be consistent with the laws of the State of New Jersey regarding confidentiality of information and shall not be construed to cause any licensed individual providing services for Provider to violate his or her professional licensing standards, including, but not limited to, N.J.S.A. 45:14B-31 et seq. (N.J.A.C. 11:24A-4.15(a)).

6. **Term, Termination and Effect of Termination.**
a. If the Provider Agreement is terminated, PBM shall give Provider at least ninety (90) days prior written notice. In the event of termination, Provider has the right, within ten (10) days of receipt of notice, to request a hearing. The foregoing shall not apply when the termination is based on non-renewal of the Provider Agreement, a determination of fraud, breach of the Provider Agreement by the Provider, or the opinion of the medical director of the Sponsor that the Provider represents an imminent danger to a patient or the public health, safety and welfare. (N.J.A.C. 11:24-15.2(b)1.i.).
b. The Provider has the following rights upon receipt of the termination notice: (i) the right to obtain a reason for the termination in writing from PBM if the reason is not otherwise stated in the termination notice; (ii) the right to request a hearing, and any exceptions to that right; and (iii) the right to obtain the procedures for exercising either right. These rights, as applicable to Provider, shall be as described in N.J.A.C. 11:24-15.2(b)(1), 11:24-3.5. Provider's participation in a hearing shall not be deemed to be an abrogation of the Provider's legal rights. The internal provider complaint and grievance procedure of Sponsor is incorporated into and made a part of the Provider Agreement and may be used by Provider. (N.J.A.C. 11:24A-4.15(b)1-11).
c. If either PBM or Provider terminates the Provider Agreement, and regardless of the reasons for termination, the parties shall abide by the terms of the Provider Agreement, including reimbursement terms, for up to four (4) months following the date of termination when it is medically necessary for the Member to continue such services; except as follows:
i. In the case of pregnancy of a Member, medical necessity shall be deemed to have been demonstrated and coverage of services under the Provider Agreement by the terminated Provider shall continue to postpartum evaluation of the Member, up to six (6) weeks after delivery;

ii. In the case of post-operative care, coverage of services under the Provider Agreement by the terminated Provider shall continue for a period up to six (6) months;
iii. In the case of oncological treatment, coverage of services under the Provider Agreement by the terminated Provider shall continue for a period up to one (1) year;
iv. In the case of psychiatric treatment, coverage of services under the Provider Agreement by the terminated Provider shall continue for a period of up to one (1) year; and
v. In the event that the Provider terminates the Provider Agreement, coverage of services under the Provider Agreement by the terminated Provider shall continue for Members who received services from the Provider immediately prior to the date of termination for thirty (30) days following the date of termination, but for the remainder of the four (4) month period only in cases where it is medically necessary to continue treatment with the terminated Provider or in accordance with items i) through iv) above as they may apply. The determination as to the medical necessity of a Member's treatment with Provider shall be subject to the appeal procedures provided by New Jersey law.
vi. Notwithstanding the forgoing, terminated Provider shall not be required to continue to provide Covered Medications under the Provider Agreement in the event the Provider Agreement terminates because 1) PBM determines that Provider is an imminent danger to one or more Members or the public health, safety and welfare, 2) PBM determines that Provider committed fraud, 3) PBM determines that Provider breached the Provider Agreement, or 4) Provider is the subject of disciplinary action by any regulatory agency or board of the State of New Jersey.
d. Provider has no obligation under the Provider Agreement to provide, and PBM has no obligation to reimburse at the agreed upon rate, services that are not medically necessary to be provided on and after the 31st day following the date of termination. Provider must notify PBM in writing if it is medically necessary that Provider provide such services and provide any information requested by PBM in support thereof (N.J.A.C. 11:24-3.5(d)).
e. Termination shall have no effect upon the rights and obligations of the parties arising out of any transactions occurring prior to the effective date of such termination.
f. Provider shall continue to provide Covered Medications to Members at the contract price following termination of the Provider Agreement, in accordance with N.J.A.C. 11:24-3.5, 11:24-15.2(b)(4).
N.J.S.A. 26:2S-8; N.J.A.C. 11:24-3.5, 11:24-15.2, 11:24A-4.8
7. **Generally.** In accordance with N.J.A.C. 11:24A-4.15(b), subsections 1-11, Provider:
a. May not be penalized, or its Provider Agreement terminated because Provider filed a complaint or an appeal as permitted by New Jersey law; (N.J.A.C. 11:24-15.2(b)(2)).
b. May not be terminated or penalized for acting as an advocate for a Member in seeking appropriate, medically necessary health services or for exercising his or her right to file a complaint, grievance or appeal, in accordance with the procedures set forth in this Provider Agreement; (N.J.A.C. 11:24-15.2(b)(3); N.J.S.A. 26:2S-9)
c. Shall not receive financial incentives for the withholding of covered health care services that are medically necessary, but this shall not prohibit or limit the use of capitation arrangements between PBM and Provider, provided that capitation shall not be used as the sole method of reimbursement to Provider if Provider primarily provides supplies rather than services; (N.J.A.C. 11:24-15.2(b)(5)(i); N.J.S.A. 26:2S-9)
d. Shall not discriminate in its treatment of Members; (N.J.A.C. 11:24-15.2(b)(8))

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

e. Shall keep all patient information confidential, but PBM and Provider shall engage in timely and appropriate communication of patient information, so that both Provider, PBM and Sponsor may perform their respective duties efficiently and effectively for the benefit of Members; (N.J.A.C. 11:24-15.2(b)(11)) and

f. Shall have a right to communicate openly with a Member about all diagnostic testing and treatment options. (N.J.A.C. 11:24-15.2(b)(13)).

8. **Compliance with Licensing Laws.** The Provider Agreement shall not be construed to impose obligations or responsibilities upon Provider which require Provider to violate New Jersey's statutes or rules governing licensure of providers if Provider is to comply with the terms of the Provider Agreement. N.J.A.C. 11:24-15.2(e).

9. **Governing Law.** When applicable (i.e., Sponsor is an HMO/carrier governed by this Addendum), the governing law with respect to Provider subject to the aforementioned rules shall be the State of New Jersey.

10. **Notification of Changes.** Notwithstanding anything to the contrary in the Provider Agreement, PBM will provide Provider with at least thirty (30) days notice of any changes to the Provider Agreement. N.J.S.A. 17B:27A-54.

11. **Independent Parties.** In the performance of this Agreement, it is mutually understood and agreed to that the relationship created hereunder is that of independent contractors and nothing herein is intended or shall be construed to create or be deemed to create an employer/employee relationship, agency, partnership or joint venture relationship, or any other legal relationship between the parties other than that of independent contractors.

12. **Miscellaneous.**

a. **Section 7.1 of Network Agreement.** Nothing in Section 7.1 (Contacting Sponsors or Media) of the Provider Agreement prohibits Provider from filing a complaint against PBM or any Sponsor with the State of New Jersey (the "State") or any State or federal regulatory agency.

b. **Section 7.4(b) and Section 7.4(c) of the Provider Agreement.** Amendments pursuant to Section 7.4(b) (Change in Law) or Section 7.4(c) (Rate Exhibits) of the Provider Agreement, which are rejected by Provider in accordance with the applicable Section requirements, which result in Provider's termination, shall not be applicable to Provider during any termination notice period. In the event Provider continues to submit claims after the effective date of termination for whatever reason, then the amendment shall be deemed approved and accepted by Provider as if Provider had given its express written consent thereto, and shall be automatically incorporated into and become a part of the Provider Agreement.

c. **Section 7.15 of the Provider Agreement.** Utilization management and payment disputes are not subject to Section 7.15 (Binding Arbitration) of the Provider Agreement. Utilization management disputes shall be conducted in accordance with N.J.S.A. 26:2S-12 and payment disputes in accordance with Section 3 (Internal and External Appeals) of this Addendum.

d. **Termination.** In addition to any right to terminate in the Provider Agreement, Provider may terminate the Provider Agreement in response to any unilateral Adverse Changes or Amendments made by PBM. Such termination must occur prior to the effective date of the proposed Adverse Change or amendment and must be done in writing. For the purposes of the Provider Agreement, an Adverse Change or Amendment means any action taken by PBM or Carrier that could reasonably be expected to have a material adverse impact on either the aggregate level of payment to Provider or the administrative expenses incurred by the Provider in complying with the changes. Adverse Changes or Amendments shall not include fee schedule

changes attributable a third party and over which PBM has no control.

e. **Amendments.** PBM shall not make any Adverse Change or Amendment during the term Provider Agreement without providing 90 days notice prior to the effective date. Provider may decline to accept such amendment by terminating the Provider Agreement in accordance with Section 12(d) of this Addendum.

f. **Access to Contracting Documents.** Upon written request, Provider may receive the fully executed copies of any Provider Agreement or amendments. Such copies shall be provided within thirty (30) days.

g. **Acknowledgement of Provider.** Provider acknowledges and reaffirms that, as agreed to in its Provider Agreement with PBM, Provider shall look solely to PBM for payment for Covered Medications and other covered services provided to Members, meaning that, under the terms of its Provider Agreement, Provider must not bill Sponsor for Covered Medications or other covered services provided to Members and the financial obligation for payment does not rest with the Sponsor.

h. **Third Party Beneficiary.** Sponsor is a third party beneficiary of the Provider Agreement and shall have privity of contract with Provider for the sole purpose that Sponsor shall have standing to enforce the Provider Agreement with Provider. N.J.A.C. 11:24-15.2(f).

i. **Compliance.** Provider agrees to cooperate with and to participate in PBM's and Sponsor's quality assurance and utilization review programs. N.J.A.C. 11:24-15.2(b)(9).

j. **Liability.** Nothing herein exempts PBM from liability for PBM's negligent acts or conduct in the provision of its duties under this Provider Agreement. N.J.S.A. 2A:53A-33.

k. **Conflict With Law.** In the event that any provision of this Provider Agreement is determined to be in conflict with state or federal Law, such provision will be deemed modified to the extent necessary to make it conform to the requirements of such Law.

l. **Method of Reimbursement.** The method of reimbursement shall be as set forth in the Provider Agreement, subject to the following pursuant to N.J.A.C. 11:24A-4.15(b)(5):

i. In no event shall financial incentives be provided to Provider for withholding of Covered Medications that are medically necessary, but this shall not prohibit or limit the use of capitation arrangements between PBM or Sponsor and Provider.

ii. To the extent that some portion of Provider's compensation may be increased or decreased by the occurrence, or nonoccurrence, of a pre-determined event, PBM shall specify such event to Provider in writing and Provider shall have the right to receive a periodic accounting (no less frequently than annually) of the funds held in connection therewith.

iii. Provider may appeal a decision denying Provider additional compensation, in whole or in part, in accordance with any compensation arrangement tied to the occurrence or nonoccurrence of a pre-determined event, in accordance with Section 3 (Internal and External Appeals) of this Addendum.

iv. Notwithstanding subsection (i) above, capitation shall not be used as the sole method of reimbursement to Provider. N.J.A.C. 11:24-15.2(b)(5), 11:24A-4.15(b)(5).

m. **Limitation on Liability and Indemnification.** Any provision in the Provider Agreement regarding limitation on liability or indemnification is subject to Chapter 187 of the New Jersey Laws of 2001, the Health Care Carrier Accountability Act, to the extent applicable.

n. **Nondiscrimination.** PBM shall not differentiate or discriminate in the treatment of Members as to the quality of services rendered on the basis of membership with HMO.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

Prescription services shall be rendered to such Members in the same manner, in accordance with the same standard, and with the availability as provided to all other patients of Provider. N.J.S.A. 10.5-1 et. seq.

    o. **Patient Records.** Provider will maintain records for each Member as dictated by generally accepted pharmaceutical practice and as may be necessary to comply with applicable law. Provider will maintain the confidentiality of such records as provided in Provider's Agreement with PBM. Provider will provide PBM and HMO or either of their respective designees reasonable access during regular business hours to such records, for the period required by applicable law and anytime thereafter that such access is required in connection with the provision of Covered Medications to an Eligible Person. Each of PBM and HMO will have access at reasonable times upon demand to all books, records, and papers of Provider relating to the Covered Medications provided to Members, to the cost thereof and to payments received by Provider directly from Members (or from others on their behalf). The obligations set forth in this paragraph shall survive the termination of Provider's Agreement with PBM. N.J.S.A. 45-14-68.

## NEW JERSEY MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Enrollees enrolled in the New Jersey Medicaid program, directly or through any sponsor (e.g., including, but not limited to, NJ FamilyCare State Plans and any Medicaid managed care program) (collectively, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

    1. **Cooperation with Sponsor Programs**. Provider agrees to cooperate with and to participate in Sponsor's quality and utilization management systems, including credentialing, recredentialing, and appointment standards, and Sponsor's Enrollee and provider complaint and grievance systems and processes. Provider agrees to comply with Sponsor's prior authorization requirements.

    2. **Claims Submission**. Provider shall submit timely, accurate and complete data as required by the Sponsor. All claims for services provided to Enrollees must be submitted electronically (or when electronic submission is not possible, then on the CMS 1500 (HCFA 1500) or the UB-92 (HCFA 1450) or any successor claim forms, in accordance with NCPDP standards.

    3. **Sponsor and State Oversight**. Provider acknowledges and agrees that Sponsor reserves the right to monitor the performance of Provider and its employed providers for the purpose of ensuring that Provider's performance is consistent with the contract between Sponsor and the New Jersey Department of Human Services (the "Department"). Sponsor reserves the right to revoke Provider's participation under the Provider Agreement if Provider does not perform satisfactorily. Sponsor retains the right to approve, suspend, or terminate the provision of services under the Provider Agreement by any Provider. Further, the Department reserves the right to terminate Provider's participation under the Provider Agreement and the right of any Provider to provide services to Enrollees if performance is not consistent with the contract between Sponsor and the Department.

    1. **Licensing**. Provider shall immediately notify the Sponsor of any change in licensing status.

    2. **Care Provided**. Unless a higher standard is required by Sponsor's agreement with the State of New Jersey (the "State"), Provider agrees to provide the same level of medical care and health service to Medicaid/NJ Family Care Enrollees as it does to Enrollees under private or group contracts.

    3. **Additional Requirements**. The following terms are required to be reproduced verbatim. Provider acknowledges and agrees that it shall comply with the following requirements, as applicable and that all terms undefined in the Provider Agreement shall have the meaning ascribed to them in Sponsor's contract with the state. Provider agrees to serve enrollees in New Jersey's managed care program and, doing so, to comply with all the following provisions:

    a. **Subjection of Provider Contract/Subcontract**. This provider contract/subcontract shall be subject to the applicable material terms and conditions of the contract between the contractor and the State and shall also be governed by and construed in accordance with all laws, regulations and contractual obligations incumbent on the contractor.

    b. **Compliance with Federal and State Laws and Regulations**. The provider/subcontractor agrees that it shall carry out its obligations as herein provided in a manner prescribed under applicable federal and State laws, regulations, codes, and guidelines including New Jersey licensing board regulations, the Medicaid, NJ KidCare, and NJ FamilyCare State Plans, and in accordance with procedures and requirements as may from time to time be promulgated by the United States Department of Health and Human Services

    c. **Approval of Provider Contracts/Subcontracts and Amendments**. The provider/subcontractor understands that the State reserves the right in its sole discretion to review and approve or disapprove this provider contract/subcontract and any amendment thereto.

    d. **Effective Date.** This provider contract/subcontract shall become effective only when the contractor's agreement with the State takes effect.

    e. **Non-Renewal/Termination of Provider Contract/Subcontract.** The provider/subcontractor understands that the contractor shall notify DMAHS at least 30 days prior to the effective date of the suspension, termination, or voluntary withdrawal of the provider/subcontractor from participation in the contractor's network. If the termination was "for cause," the contractor's notice to DMAHS shall include the reason for the termination. Provider Resources consumption patterns shall not constitute "cause" unless the contractor can demonstrate it has in place a risk adjustment system that takes into account enrollee health-related differences when compared across providers.

    f. **Enrollee-Provider Communications.**

    **(1)** The contractor shall not prohibit or restrict the provider/subcontractor from engaging in medical communications with the provider's/subcontractor's patient, either explicit or implied, nor shall any provider manual, newsletters, directives, letters, verbal instructions, or any other form of communication prohibit medical communication between the provider/subcontractor and the provider's /subcontractor's patient. Providers/subcontractors shall be free to communicate

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

freely with their patients about the health status of their patients, medical care or treatment options regardless of whether benefits for that care or treatment are provided under the provider contract/subcontract, if the professional is acting within the lawful scope of practice. Providers/subcontractor shall be free to practice their respective professions in providing the most appropriate treatment required by their patients and shall provide informed consent within the guidelines of the law including possible positive and negative outcomes of the various treatment modalities.

(2) Nothing in Section F.1 shall be construed:

(a) To prohibit the enforcement, including termination, as part of a provider contract/subcontract or agreement to which a health care provider is a party, of any mutually agreed upon terms and conditions, including terms and conditions requiring a health care provider to participate in, and cooperate with, all programs, policies, and procedures developed or operated by the contractor to assure, review, or improve the quality and effective utilization of health care services (if such utilization is according to guidelines or protocols that are based on clinical or scientific evidence and the professional judgment of the provider), but only if the guidelines or protocols under such utilization do not prohibit or restrict medical communications between providers/subcontractors and their patients; or

(b) To permit a health care provider to misrepresent the scope of benefits covered under this provider contract/subcontract or to otherwise require the contractor to reimburse providers/subcontractors for benefits not covered.

g. **Restrictions on Termination of Provider Contract/Subcontract by Contractor.** The contractor shall not terminate this provider contract/subcontract for either of the following reasons:

(1) Because the provider/subcontractor expresses disagreement with the contactor's decision to deny or limit benefits to a covered person or because the provider/subcontractor assists the covered person to seek reconsideration of the contractor's decision; or because the provider/subcontractor discusses with a current, former, or prospective patient any aspect of the patient's medical condition, any proposed treatment or treatment alternatives, whether covered by the contractor or not, policy provisions of the contractor, or the provider/subcontractor's personal recommendation regarding selection of a health plan based on the provider/subcontractor's personal knowledge of the health needs of such patients.

(2) Because the provider/subcontractor engaged in medical communications, either explicit or implied, with a patient about medically necessary treatment options, or because the provider/contractor participated in its profession in providing the most appropriate treatment required by its patient and provided informed consent within the guidelines of the law, including possible positive and negative outcomes of the various treatment modalities.

h. **Termination of Provider Contract/Subcontract – State.** The provider/subcontractor understands and agrees that the State may order termination of this provider contract/subcontract if it is determined that the provider/subcontractor:

(1) Takes any action or fails to prevent an action that threatens the health, safety or welfare of any enrollee, including significant marketing abuses;

(2) Takes any action that threatens the fiscal integrity of the Medicaid program;

(3) Has its certification suspended or revoked by DOBI, DOH, and/or any federal agency or is federally debarred or excluded from federal procurement and non-procurement contracts;

(4) Becomes insolvent or falls below minimum net worth requirements;

(5) Bring a proceeding voluntarily or has proceedings brought against it involuntarily, under the Bankruptcy Act;

(6) Materially breaches the provider contract/subcontract; or

(7) Violates state or federal law, including laws involving fraud, waste, and abuse.

i. **Non-Discrimination.** The provider/subcontractor shall comply with the following requirements regarding nondiscrimination:

(1) The provider/subcontractor shall accept assignment of an enrollee and not discriminate against eligible enrollees because of race, color, creed, religion, ancestry, marital status, sexual orientation, national origin, age, sex, physical or mental handicap in accordance with Title VI of the Civil Rights Act of 1964, 42 USC Section 2000d, Section 504 of the Rehabilitation Act of 1973, 29 USC Section 794, the Americans with Disabilities Act of 1990 (ADA), 42 USC Section 12132, and rules and regulations promulgated pursuant thereto, or as otherwise provided by law or regulation.

(2) ADA Compliance. The provider/subcontractor shall comply with the requirements of the Americans with Disabilities Act (ADA). In providing health care benefits, the provider/subcontractor shall not directly or indirectly, through contractual, licensing, or other arrangements, discriminate against Medicaid/NJ FamilyCare beneficiaries who are "qualified individuals with a disability" covered by the provisions of the ADA. The contractor shall supply a copy of its ADA compliance plan to the provider/subcontractor. A "qualified individual with a disability" as defined pursuant to 42 U.S.C.§12131 is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. The provider/subcontractor shall submit to Sponsor a written certification that it is conversant with the requirements of the ADA, that it is in compliance with the law, and certifies that the provider/subcontractor meets ADA requirements to the best of the provider/subcontractor's knowledge. The provider/subcontractor warrants that it will hold the State harmless and indemnify the State from any liability which may be imposed upon the State as a result of any failure of the provider/subcontractor to be in compliance with the ADA. Where applicable, the provider/subcontractor must abide by the provisions of section 504 of the federal Rehabilitation Act of 1973, as amended, regarding access to programs and facilities by people with disabilities.

(3) The provider/subcontractor shall not discriminate against eligible persons or enrollees on the basis of their health or mental health history, health or mental health status, their need for health care services, amount payable to the provider/subcontractor on the basis of the eligible person's actuarial class, or pre-existing medical/health conditions.

(4) The provider/subcontractor shall comply with the Civil Rights Act of 1964 (42 USC 2000d), the regulations (45 CFR Parts 80 & 84) pursuant to that Act, and the provisions of Executive Order 11246, Equal Opportunity, dated September 24, 1965, the New Jersey anti-discrimination laws including those contained within N.J.S.A. 10: 2-1 through N.J.S.A. 10: 2-4, N.J.S.A. 10: 5-1 et seq. and N.J.S.A. 10: 5-38, and all rules and regulations issued there under, and any other laws, regulations, or orders which prohibit discrimination on grounds of age, race, ethnicity, mental or physical disability, sexual or affectional orientation or preference, marital status, genetic information, source of payment, sex, color, creed, religion, or national origin

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

set

or ancestry. The provider/subcontractor shall not discriminate against any employee engaged in the work required to produce the services covered by this provider/subcontractor contract, or against any applicant for such employment because of race, creed, color, national origin, age, ancestry, sex, marital status, religion, disability or sexual or affectional orientation or preference.

(5) Scope. This non-discrimination provision shall apply to but not be limited to the following: recruitment, hiring, employment upgrading, demotion, transfer, lay-off or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship included in PL 1975, Chapter 127.

(6) Grievances. The provider/subcontractor agrees to forward to Sponsor copies of all grievances alleging discrimination against enrollees because of race, color, creed, sex, religion, age, national origin, ancestry, marital status, sexual or affectional orientation, physical or mental handicap for review and appropriate action within three (3) business days of receipt by the provider/subcontractor.

j.    **Obligation to Provider Services after the Period of the Contractor's Insolvency and to Hold Enrollees and Former Enrollees Harmless.**

(1) The provider/subcontractor shall remain obligated to provide all services for the duration of the period after the contractor's insolvency, should insolvency occur, for which capitation payments have been made and, for any hospitalized enrollee, until the enrollee has been discharged from the inpatient facility.

(2) The provider/subcontractor agrees that under no circumstances, (including, but not limited to, nonpayment by the contractor or the state, insolvency of the contractor, or breach of agreement) will the provider/subcontractor bill, charge, seek compensation, remuneration or reimbursement from, or have recourse against, enrollees, or persons acting on their behalf, for covered services other than provided in section 2.P of contractor's contract with the State.

(3) The provider/subcontractor agrees that this provision shall survive the termination of this provider contract/subcontract regardless of the reason for termination, including insolvency of the contractor, and shall be construed to be for the benefit of the contractor or enrollees.

(4) The provider/subcontractor agrees that this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between the provider/subcontractor and enrollees, or persons acting on their behalf, insofar as such contrary agreement relates to liability for payment for or continuation of covered services provided under the terms and conditions of this continuation of benefits provisions.

(5) The provider/subcontractor agrees that any modification, addition, or deletion to this provision shall become effective on a date no earlier than thirty (30) days after the approval by the State.

(6) The provider/subcontractor shall comply with the prohibition against billing members contained in 42 CFR 438.106, N.J.S.A. 30:4D-6.c, and N.J.A.C. 10:74-8.7.

k.    **Inspection.**
The provider/subcontractor shall allow the New Jersey Department of Human Services, the U.S. Department of Health and Human Services (DHHS), and other authorized State agencies, or their duly authorized representatives, to inspect or otherwise evaluate the quality, appropriateness, and timeliness of services performed under the provider contract/subcontract, and to inspect, evaluate, and audit any and all books, records, and facilities maintained by the provider/subcontractor pertaining to such services, at any time during normal business hours (and

after business hours when deemed necessary by DHS or DHHS) at a New Jersey site designated by the State. Inspections may be unannounced for cause.

The subcontractor shall also permit the State, at its sole discretion, to conduct onsite inspections of facilities maintained by the provider/subcontractor, prior to approval of their use for providing services to enrollees.
Books and records include, but are not limited to, all physical records originated or prepared pursuant to the performance under this provider contract/subcontract, including working papers, reports, financial records and books of account, medical records, dental records, prescription files, provider contracts and subcontracts, credentialing files, and any other documentation pertaining to medical, dental, and nonmedical services to enrollees. Upon request, at any time during the period of this provider contract/subcontract, the provider/subcontractor shall furnish any such record, or copy thereof, to the Department or the Department's External Review Organization within 30 days of the request. If the Department determines, however, that there is an urgent need to obtain a record, the Department shall have the right to demand the record in less than 30 days, but no less than 24 hours.

The DMAHS, the MFD, or its designee, and the MFCU, shall have the right to inspect, evaluate, and audit all of the following documents in whatever form they are kept, related to this contract:

(1) Financial records, including but not limited to tax returns, invoices, inventories, delivery receipts, Medicaid claims;

(2) Medical records, including but not limited to medical charts, prescriptions, x-rays, treatment plans, medical administration records, records of the provision of activities of daily living, ambulance call reports;

(3) Administrative documents, including but not limited to credentialing files, appointment books, prescription log books, correspondence of any kind with contractor, DMAHS, CMS, any other managed care contractor, Medicaid recipient, contracts with subcontractors, and contracts with billing service providers; and

(4) All records required to be kept to fully disclose the extent of services provided to Medicaid recipients, pursuant to NJAC 10:49-9.8(b) (1).

l.    **Record Maintenance.** The provider/subcontractor shall agree to maintain all of its books and records in accordance with the general standards applicable to such book or record keeping.

m.    **Record Retention.** The provider/subcontractor hereby agrees to maintain an appropriate recordkeeping system for services to enrollees. Such system shall collect all pertinent information relating to the medical management of each enrolled beneficiary and make that information readily available to appropriate health professionals and the Department. Records must be retained for the later of: (1) Five (5) years from the date of service, or (2) Three (3) years after final payment is made under the provider contract/subcontract and all pending matters are closed.
If an audit, investigation, litigation, or other action involving the records is started before the end of the retention period, the records shall be retained until all issues arising out of the action are resolved or until the end of the retention period, whichever is later. Records shall be made accessible at a New Jersey site and on request to agencies of the State of New Jersey and the federal government. For enrollees who are eligible through the Division of Child Protection and Permanency, records shall be kept in accordance with the provisions under N.J.S.A. 9:6-8.10a and 9:6-8:40 and consistent with need to protect the enrollee's confidentiality.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

If an enrollee disenrolls from the contractor, the provider/subcontractor shall release medical records of the enrollee as may be directed by the enrollee, authorized representatives of the Department and appropriate agencies of the State of New Jersey and of the federal government. Release of records shall be consistent with the provision of confidentiality expressed in Section 2.R., Confidentiality, and at no cost to the enrollee.

n. **Data Reporting**. The provider/subcontractor agrees to provide all necessary information to enable the contractor to meet its reporting requirements, including specifically with respect to encounter reporting. The encounter data shall be in a form acceptable to the State.

o. **Disclosure.**

(1) The provider/subcontractor further agrees to comply with the Prohibition On Use Of Federal Funds For Lobbying provisions of the contractor's agreement with the State.

(2) The provider/subcontractor shall comply with financial disclosure provision of 42 CFR 434, 1903 (m) of the S.S.A., and N.J.A.C. 10:49-19.

(3) The provider/subcontractor shall comply with the disclosure requirements concerning ownership and control, related business transactions and persons convicted of a crime pursuant to 42 CFR 455.100-106.

p. **Limitations on Collection of Cost-Sharing.** The provider/subcontractor shall not impose cost-sharing charges of any kind upon Medicaid or NJ FamilyCare A and B enrollees. Personal costs to care for NJ FamilyCare C enrollees and copayments for NJ FamilyCare D enrollees shall be collected in accordance with the attached schedule.

q. **Indemnification by Provider/Subcontractor.**

(1) The provider/subcontractor agrees to indemnify and hold harmless the State, its officers, agents and employees, and the enrollees and their eligible dependents from any and all claims or losses accruing or resulting from its negligence in furnishing or supplying work, services, materials, or supplies in connection with the performance of this provider contract/subcontract.

(2) The provider/subcontractor agrees to indemnify and hold harmless the State, its officers, agents, and employees, and the enrollees and their eligible dependents from liability deriving or resulting from its insolvency or inability or failure to pay or reimburse any other person, firm, or corporation furnishing or supplying work, services, materials, or supplies in connection with the performance of this provider contract/subcontract.

(3) The provider/subcontractor agrees to indemnify and hold harmless the State, its officers, agents, and employees, and the enrollees and their eligible dependents from liability deriving or resulting from its insolvency or inability or failure to pay or reimburse any other person, firm, or corporation furnishing or supplying work, services, materials, or supplies in connection with the performance of this provider contract/subcontract.

(4) The provider/subcontractor agrees further to indemnify and hold harmless the State, its officers, agents and employees, and the enrollees and their eligible dependents, from all claims, damages, and liability, including costs and expenses, for violation of any proprietary rights, copyrights, or rights of privacy arising out of the publication, translation, reproduction, delivery, performance, use, or disposition of any data furnished to it under this provider contract/subcontract, or for any libelous or otherwise unlawful matter contained in such data that the provider/subcontractor inserts.

(5) The provider/subcontractor shall indemnify the State, its officers, agents and employees, and the enrollees and their eligible dependents from any injury, death, losses, damages,

suits, liabilities judgments, costs and expenses and claim of negligence or willful acts or omissions of the provider/subcontractor, its officers, agents, and employees arising out of alleged violation of any State or federal law or regulation. The provider/subcontractor shall also indemnify and hold the State harmless from any claims of alleged violations of the Americans with Disabilities Act by the subcontractor/provider.

r. **Confidentiality**.

(1) General. The provider/subcontractor hereby agrees and understands that all information, records, data, and data elements collected and maintained for the operation of the provider/subcontractor and the contractor and Department and pertaining to enrolled persons, shall be protected from unauthorized disclosure in accordance with the provisions of 42 U.S.C. 1396a(a)(7)(Section 1902(a)(7) of the Social Security Act), 42 CFR Part 431, subpart F, 45 CFR Parts 160 and 164, subparts A & E, N.J.S.A. 30:4D-7 (g) and N.J.A.C. 10:49-9.4. Access to such information, records, data and data elements shall be physically secured and safeguarded and shall be limited to those who perform their duties in accordance with provisions of this provider contract/subcontract including the Department of Health and Human Services and to such others as may be authorized by DMAHS in accordance with applicable law. For enrollees covered by the contractor's plan that are eligible through the Division of Child Protection and Permanency, records shall be kept in accordance with the provisions under N.J.S.A. 9:6-8.10a and 9:6-8:40 and consistent with the need to protect the enrollee's confidentiality.

(2) Enrollee-Specific Information. With respect to any identifiable information concerning an enrollee that is obtained by the provider/subcontractor, it: (a) shall not use any such information for any purpose other than carrying out the express terms of this provider contract/subcontract; (b) shall promptly transmit to the Department all requests for disclosure of such information; (c) shall not disclose except as otherwise specifically permitted by the provider contract/subcontract, any such information to any party other than the Department without the Department's prior written authorization specifying that the information is releasable under 42 CFR, Section 431.300 et seq., and (d) shall, at the expiration or termination of the provider contract/subcontract, return all such information to the Department or maintain such information according to written procedures sent by the Department for this purpose.

(3) Employees. The provider/subcontractor shall instruct its employees to keep confidential information concerning the business of the State, its financial affairs, its relations with its enrollees and its employees, as well as any other information which may be specifically classified as confidential by law.

(4) Medical Records and management information data concerning enrollees shall be confidential and shall be disclosed to other persons within the provider's/subcontractor's organization only as necessary to provide medical care and quality, peer, or grievance review of medical care under the terms of this provider contract/subcontract.

(5) The provisions of this article shall survive the termination of this provider contract/subcontract and shall bind the provider/subcontractor so long as the provider/subcontractor maintains any individually identifiable information relating to Medicaid/NJ FamilyCare beneficiaries.

(6) Notification in Case of Breach. Should there be a breach of confidentiality with respect to the data, information or records described in this section, the provider/subcontractor is responsible for complying, at a minimum, with the following statues and regulations: (1) Section 13402 of the Health Information Technology for Economic and Clinical Health (HITECH) Act, part of the American Recovery and

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is exempt from disclosure to others under provisions of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

Reinvestment Act of 2009 (ARRA) (Pub. L. 111-5), 42 U.S.C. 17932 et. seq. and the implementing regulations at 45 CFR Part 164, subpart D; and (2) the Identity Theft Prevention Act, N.J.S.A. 56:11-44 et. seq.

s. **Clinical Laboratory Improvement**. The provider/subcontractor shall ensure that all laboratory testing sites providing services under this provider contract/subcontract have either a Clinical Laboratory Improvement Amendment (CLIA) certificate of waiver or a certificate of registration along with a CLIA identification number. Those laboratory service providers with a certificate of waiver shall provide only those tests permitted under the terms of their waiver. Laboratories with certificates of registration may perform a full range of laboratory tests.

t. **Fraud, Waste, and Abuse.**

(1) The provider/subcontractor agrees to assist the contractor as necessary in meeting its obligations under its contract with the State to identify, investigate, and take appropriate corrective action against fraud, waste, and/or abuse (as defined in 42 CFR 455.2) in the provision of health care services.

(2) If the State has withheld payment and/or initiated a recovery action against the provider/subcontractor, or withheld payments pursuant to 42 CFR 455.23 and NJAC 10:49-9.10(a), the contractor shall have the right to withhold payments from the provider/subcontractor and/or forward those payments to the State.

(3) If the State has withheld payment and/or initiated a recovery action against the provider/subcontractor, or withheld payments pursuant to 42 CFR 455.23 and NJAC 10:49-9.10(a), the contractor shall have the right to withhold payments from the provider/subcontractor and/or forward those payments to the State.

(4) MFD shall have the right to recover directly from providers and enrollees in the contractor's network for the audits and investigations MFD solely conducts. Such money that MFD recovers directly shall not be shared with the contractor, but reported to DMAHS in the format that the contractor reports its recoveries to DMAHS. In addition, as a part of its recovery process, MFD shall have the right to request the contractor to withhold payment to a provider in its network as a result of an MFD audit or investigation of managed care claims. Money withheld from a provider by the contractor shall be sent to MFD from the contractor and reported to DMAHS in the format that the contractor reports its recoveries to DMAHS.

(5) The contractor shall have the right to recover directly from providers and enrollees in the contractor's network for the audits and investigations the contractor solely conducts.

u. **Third Party Liability.**

(1) The provider/subcontractor shall utilize, whenever available, and report any other public or private third party sources of payment for services rendered to enrollees.

(2) Except as provided in subsection 3. below, if the provider/subcontractor is aware of third party coverage, it shall submit its claim first to the appropriate third party before submitting a claim to the contractor.

(3) In the following situations, the provider/subcontractor may bill the contractor first and then coordinate with the liable third party, unless the contractor has received prior approval from the State to take other action.

(a) The coverage is derived from a parent whose obligation to pay support is being enforced by the Department of Human Services.

(b) The claim is for prenatal care for a pregnant woman or for preventive pediatric services (including EPSDT services) that are covered by the Medicaid program.

(c) The claim is for labor, delivery, and post-partum care and does not involve hospital costs associated with the inpatient hospital stay.

(d) The claim is for a child who is in a DCP&P supported out of home placement.

(e) The claim involves coverage or services mentioned in 3.a, 3.b, 3.c, or 3.d, above in combination with another service.

(4) If the provider/subcontractor knows that the third party will neither pay for nor provide the covered service, and the service is medically necessary, the provider/subcontractor may bill the contractor without having received a written denial from the third party.

(5) Sharing of TPL Information by the Provider/Subcontractor.

(a) The provider/subcontractor shall notify the contractor within thirty (30) days after it learns that an enrollee has health insurance coverage not reflected in the health insurance provided by the contractor, or casualty insurance coverage, or of any change in an enrollee's health insurance coverage.

(b) When the provider/subcontractor becomes aware that an enrollee has retained counsel, who either may institute or has instituted a legal cause of action for damages against a third party, the provider/subcontractor shall notify the contractor in writing, including the enrollee's name and Medicaid identification number, date of accident/incident, nature of injury, name and address of enrollee's legal representative, copies of pleadings, and any other documents related to the action in the provider's/subcontractor's possession or control. This shall include, but not be limited to (for each service date on or subsequent to the date of the accident/incident), the enrollee's diagnosis and the nature of the service provided to the enrollee.

(c) The provider/subcontractor shall notify the contractor on no less than a weekly basis when it becomes aware of the death of one of its Enrollees age 55 or older, utilizing the "Combined Notification of Death and Estate Referral Form" located in subsection B.5.1 of the Appendix.

(d) The provider/subcontractor agrees to cooperate with the contractor's and the State's efforts to maximize the collection of third party payments by providing to the contractor updates to the information required by this section.

v. **Enrollee Protections Against Liability For Payment**

(1) As a general rule, if a participating or non-participating provider renders a covered service to a managed care enrollee, the provider's sole recourse for payment, other than collection of any authorized cost-sharing and /or third party liability, is the contractor, not the enrollee. A provider may not seek payment from, and may not institute or cause the initiation of collection proceedings or litigation against, an enrollee, an enrollee's family member, any legal representative of the enrollee, or anyone else acting on the enrollee's behalf unless subsections (a) through and including (f) or subsection (g) below apply:

(a) (1) The service is not a covered service; or (2) the service is determined to be medically unnecessary before it is rendered; or (3) the provider does not participate in the program either generally or for that service; and

(b) The enrollee is informed in writing before the service is rendered that one or more of the conditions listed in subsection (a) above exist, and voluntarily agrees in writing before the service is rendered to pay for all or part of the provider's charges; and

(c) 42 USC 1396u-2(b)(2)(A)(i) , 42 CFR 438.114, N.J.S.A. 30:4D-6i or N.J.S.A. 30:4J-4.1 (as both of these provisions may be amended by State Appropriations Act language in effect at the time the service is rendered, as set forth in Section 4.2.1D.2 of the contract), or NJAC 10:74-9.1; and

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© **2014 Express Scripts, Inc.**
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

(d) The service is not a trauma service covered by the provisions of NJAC 11:24-6.3(a)3.i; and

(e) The protections afforded to enrollees under 42 USC 1395w-4(g)(3)(A), 42 USC 1395cc(a)(1)(A), 42 USC 1396a(n)(3), 42 USC 1396u-2(b)(6), 42 CFR 438.106, NJAC 11:24-9.1(d)9, and/or NJAC 11:24-15.2(b)7.ii do not apply; and

(f) The provider has received no program payments from either DMAHS or the contractor for the service; or

(g) The enrollee has been paid for the service by a health insurance company or other third party (as defined in NJSA 30:4D-3.m), and the enrollee has failed or refused to remit to the provider that portion of the third party's payment to which the provider is entitled by law.

(2) Notwithstanding any provision in this contract to the contrary, an enrollee shall not be responsible for the cost of care, except for any authorized cost-sharing, under the following circumstances:

(a) The services are provided in association with an emergency department visit or inpatient stay at a participating network hospital, whether or not the servicing provider(s) or the admitting physician is a participating provider in the contractor's network; or

(b) The enrollee obtains a referral/authorization for services by, and schedules an appointment with, a participating specialist, but a non-participating specialist affiliated with the same practice as the participating specialist renders the services because the participating specialist is not available.

4. **Sharing of Third Party Liability Information by Provider**.

(1) **Other Coverage**. Provider shall notify PBM and Sponsor within thirty (30) days after it learns that an Enrollee has health insurance coverage not reflected in the health insurance provided by the Sponsor, or casualty insurance coverage, or of any change in an enrollee's health insurance coverage.

(2) **Medically Necessary**. If Provider knows that the third party will neither pay for nor provide the covered service, and the service is medically necessary, Provider may bill PBM without having received a written denial from the third party.

(3) **Enrollee Litigation**. When Provider becomes aware that an Enrollee has retained counsel, who either may institute or has instituted a legal cause of action for damages against a third party, the Provider shall notify PBM and Sponsor in writing, including the Enrollee's name and Medicaid identification number, date of accident/incident, nature of injury, name and address of Enrollee's legal representative, copies of pleadings, and any other documents related to the action in the Provider's possession or control. This shall include, but not be limited to (for each service date on or subsequent to the date of the accident/incident), the Enrollee's diagnosis and the nature of the service provided to the Enrollee.

(4) **Death of Enrollee**. Provider shall notify PBM and Sponsor within thirty (30) days of the date it becomes aware of the death of one of its Enrollees age 55 or older, giving the Enrollee's full name, Social Security Number, Medicaid identification number, and date of death.

(5) **Cooperation**. Provider agrees to cooperate with PBM's, Sponsor's and the State's efforts to maximize the collection of third party payments by providing to PBM and Sponsor updates to the information required by this section.

## NEW MEXICO REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer or Carrier licensed under New Mexico law (as such terms are defined under New Mexico law; herein referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

**13.10.22.12    CONTRACTS WITH PROVIDERS IN THE STATE OF NEW MEXICO:** This section shall apply only to health care professionals practicing in and health care facilities located in the state of New Mexico.

**A.**    [reserved]

**B.**    Each contract shall contain a description of the specific health care services for which the health care professional or health care facility will be responsible, including any limitations or conditions on such services.

**C.**    Provider agrees that in no event, including but not limited to nonpayment by PBM or the Sponsor, insolvency of the PBM or the Sponsor, or breach of this agreement, shall Provider bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against, a subscriber, enrollee, covered person, or person acting on behalf of the covered person, for health care services provided pursuant to this Agreement. This does not prohibit Provider from collecting co-insurance, deductibles, or copayments as specifically provided in the evidence of coverage, or fees for uncovered health care

services delivered on a fee-for-service basis to persons referenced above, nor from any recourse against the PBM or the Sponsor.

**D.**    [reserved]

**E.**    Provider shall have maintain, have available and keep confidential Member's health records to monitor and evaluate the quality of care, to conduct evaluations and audits, and to determine on a concurrent or retrospective basis the medical necessity and appropriateness of health care services provided to Members. Provider shall make these health records available to appropriate state and federal authorities involved in assessing the quality of care or in investigating the grievances or complaints of covered persons, and requiring the health care professional or health care facility to comply with applicable state and federal laws related to the confidentiality of medical or health records.

**F.**    The rights and responsibilities herein may not be assigned or delegated by the Provider without the prior written consent of PBM.

**G.**    [reserved].

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).   Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

**H.** Provider shall observe, protect, and promote the rights of Members as patients.

**I.** Provider shall provide health care services without discrimination on the basis of a Member's participation in the health care plan, age, gender, ethnicity, religion, sexual orientation, health status, or disability, and without regard to the source of payments made for health care services rendered to a patient. This requirement shall not apply to circumstances when the health care professional or health care facility appropriately does not render services due to limitations arising from the health care professional's or health care facility's lack of training, experience, or skill, or due to licensing restrictions. Provider shall provide interpreters for limited English proficient (LEP) individuals and interpretative services for patients who qualify under the Americans with Disabilities Act (ADA). Such interpretive services will be made available at no cost to the Member.

**J.** [reserved].

**K.** [reserved].

**L.** Provider recognizes that the hold harmless provision required by Subsection C of 13.10.22.12 NMAC shall survive the termination of the Agreement regardless of the reason for the termination, including the insolvency of PBM or the Sponsor.

**M.** The terms used in this Addendum which are not defined in the Agreement are defined by New Mexico statutes and division regulations and will be used in the contract in a manner consistent with any definitions contained in said laws or regulations.

**N.** PBM does and shall not hereby:

**(1)** offer an inducement, financial or otherwise, to provide less than medically necessary services to a Member;

**(2)** penalize a Provider that assists a Member to seek a reconsideration of the Sponsor's or PBM's decision to deny or limit benefits to a Member;

**(3)** prohibit a Provider from discussing treatment options with Members irrespective of the Sponsor's or PBM's position on treatment options, or from advocating on behalf of a patient or patients within the utilization review or grievance processes established by PBM or the Sponsor;

**(4)** prohibit a Provider or the pharmacist from using disparaging language or making disparaging comments when referring to PBM or the Sponsor; or

**O.** [reserved].

**P.** [reserved].

**Q.** [reserved].

**R.** [reserved].

[Source: 13.10.22.12 NMAC - Rp, 13.10.13.25 NMAC, 09/01/2009]

## NEW MEXICO MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the New Mexico Medicaid Managed Care program administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Retention and Production of Records.**

a. Provider agrees to retain, for a period of at least ten (10) years from the date of creation, all medical and business records that are necessary to verify the treatment or care of any Enrollee:

i. Services or goods provided to any Enrollee;

ii. Amounts paid by Medicaid on behalf of any Enrollee; and

iii. Any records required by Medicaid for administration of Medicaid.

b. Provider agrees that, upon written request by PBM, the Sponsor or the New Mexico Human Services Department ("Department") to a Provider for copies or inspection of records pursuant to the Public Assistance Act [27-2-1 NMSA 1978], the Provider shall provide the copies or permit the inspection, as applicable, within two (2) business days after the date of the request unless the records are held by a subcontractor, agent or satellite office, in which case the records shall be made available within ten (10) business days after the date of the request.

c. Failure to provide copies or to permit inspection of records requested pursuant to this section shall constitute a violation of the Medicaid Provider Act within the meaning of Paragraph (3) of Subsection B of Section 27-11-3 NMSA 1978. N.M. Stat. § 27-11-4; N.M. Admin. C. § 8.302.1.17E; N.M. Admin. C. § 8.305.3.10(f).

2. **Prior Authorizations.** Providers asserts that it has written policies and procedures for prior authorization requests and decisions. N.M. Admin. C. 8.302.8.13.C

3. **Confidentiality.** In addition to any other confidentiality requirements in the Agreement, Provider shall keep member information confidential, as defined by federal or state law, and comply with all applicable HIPAA requirements. N.M. Admin. C. § 8.305.3.9(G)

4. **Access to Records.** Provider shall provide authorized representatives of the Department reasonable access to its facilities, personnel, and records for financial and medical audit purposes. N.M. Stat. § 27-11-3(A)N.M. Admin. C. § 8.305.3.9(H)

5. **Release of Certain Records.** Provider shall release to PBM or Sponsor any information necessary to perform any of Sponsor's obligations. N.M. Admin. C. § 8.305.3.9(i)

6. **Payment.** Provider shall accept payment from PBM for any Covered Medications provided to Enrollees and cannot request payment from the Department. N.M. Admin. C. § 8.305.3.9(j)

7. **Compliance with Laws.** Provider shall comply with all applicable state and federal statutes, rules, and regulations, including the prohibition against discrimination. N.M. Admin. C. § 8.305.3.9(l)

8. **Sanctions.** Provider shall be subject to sanctions for inadequate performance, including termination, rescission, or cancelling the provider agreement for violation of applicable Department requirements. N.M. Admin. C. § 8.305.3.9(m)

9. **Criminal Background Checks.** Provider agrees to perform criminal background checks, as required by law, for all individuals providing services. N.M. Admin. C. § 8.305.3.9(S)

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

# NEW YORK ADDENDUM TO THE PARTICIPATING PROVIDER AGREEEMENT

## APPENDIX 1

### New York State Department of Health Standard Clauses for Managed Care Provider/IPA Contracts
### March 1, 2011

Notwithstanding any other provision of this agreement, contract, or amendment (hereinafter "the Agreement " or "this Agreement ") the parties agree to be bound by the following clauses which are hereby made a part of the Agreement. Further, if this Agreement is between a Managed Care Organization and an IPA, or between an IPA and an IPA, such clauses must be included in IPA contracts with providers, and providers must agree to such clauses.

**1.        Definitions For Purposes Of This Appendix**
1.1        "Managed Care Organization" or "MCO" shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer, or which do provide or offer, a comprehensive health services plan.
1.2        "Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of arranging by contract for the delivery or provision of health services by individuals, entities and facilities licensed or certified to practice medicine and other health professions, and as, appropriate, ancillary medical services and equipment, by which arrangements such health care providers and suppliers will provide their services in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.
1.3        "Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of health care services which are licensed, registered and/or certified as required by applicable federal and state law.
**2.        General Terms And Conditions**
2.1        This Agreement is subject to the approval of the New York State Department of Health and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by the Department of Health for approval or, alternatively, to terminate this Agreement if so directed by the Department of Health, effective sixty (60) days subsequent to notice, subject to Public Health Law §4403(6)(e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.
2.2        Any material amendment to this Agreement is subject to the prior approval of the Department of Health, and any such amendment shall be submitted for approval at least thirty (30) days, or ninety (90) days if the amendment adds or materially changes a risk sharing arrangement that is subject to Department of Health review, in advance of anticipated execution. To the extent the MCO provides and arranges for the provision of comprehensive health care services to enrollees served by the Medical Assistance Program, the MCO shall notify and/or submit a copy of such material amendment to DOH or New York City, as may be required by the Medicaid managed care contract between the MCO and DOH (or New York City) and/or the Family Health Plus contract between the MCO and DOH.
2.3        Assignment of an agreement between an MCO and (1) an IPA, (2) institutional network provider, or (3) medical group provider that serves five percent or more of the enrolled population in a county, or the assignment of an agreement

between an IPA and (1) an institutional provider or (2) medical group provider that serves five percent or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health.
2.4        The Provider agrees, or if the Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree, to comply fully and abide by the rules, policies and procedures that the
MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, or DOH or SID guidelines or policies and (b) has provided to the Provider at least thirty (30) days in advance of implementation, including but not limited to:
        a.        quality improvement/management
        b.        utilization management, including but not limited to precertification procedures, referral process or protocols, and reporting of clinical encounter data
        c.        member grievances; and
        d.        provider credentialing
2.5        The Provider or, if the Agreement is between the MCO and an IPA, or between an IPA and an IPA, the IPA agrees, and shall require its providers to agree, to not discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition.
2.6        If the Provider is a primary care practitioner, the Provider agrees to provide for twenty-four (24) hour coverage and back up coverage when the Provider is unavailable. The Provider may use a twenty-four (24) hour back-up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.
2.7        The MCO or IPA which is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA's own acts or omissions, by indemnification or otherwise, to a provider.
2.8        Notwithstanding any other provision of this Agreement, the parties shall comply with the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996) Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007 and Chapter 237 of the Laws of 2009 with all amendments thereto.
2.9        To the extent the MCO enrolls individuals covered by the Medical Assistance, and/or Family Health Plus programs, this Agreement incorporates the pertinent MCO obligations under the Medicaid managed care contract between the MCO and DOH (or New York City) and/or the Family Health Plus contract between the MCO and DOH as if set forth fully herein, including:
        a.        the MCO will monitor the performance of the Provider or IPA under the Agreement, and will terminate the Agreement and/or impose other sanctions, if the Provider's or IPA's performance does not satisfy standards set forth in the Medicaid managed care and/or Family Health Plus contracts;

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

b.    the Provider or IPA agrees that the work it performs under the Agreement will conform to the terms of the Medicaid managed care contract between the MCO and DOH (or between the MCO and New York City) and/or the Family Health Plus contract between the MCO and DOH, and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the Provider's or IPA's performance; and

c.    The Provider or IPA agrees to be bound by the confidentiality requirements set forth in the Medicaid managed care contract between the MCO and DOH (or between the MCO and New York City) and/or the Family Health Plus contract between the MCO and DOH.

d.    The MCO and the Provider or IPA agree that a woman's enrollment in the MCO's Medicaid managed care or Family Health Plus product is sufficient to provide services to her newborn, unless the newborn is excluded from enrollment in Medicaid managed care or the MCO does not offer a Medicaid managed care product in the mother's county of fiscal responsibility.

e.    The MCO shall not impose obligations and duties on the Provider or IPA that are inconsistent with the Medicaid managed care and/or Family Health Plus contracts, or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services.

f.    The Provider or IPA agrees to provide medical records to the MCO for purposes of determining newborn eligibility for Supplemental Security Income where the mother is a member of the MCO and for quality purposes at no cost to the MCO.

g.    The Provider or IPA agrees , pursuant to 31 U.S.C.§1352 and CFR Part 93, that no Federally appropriated funds have been paid or will be paid to any person by or on behalf of the Provider/IPA for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of

h.    Congress, or an employee of a Member of Congress in connection with the award of any Federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement. The Provider or IPA agrees to complete and submit the "Certification Regarding Lobbying", located at: http://www.health.ny.gov/health_care/managed_care/hmoipa/docs/certification_regarding_lobbying.pdf, and incorporated herein, if this Agreement exceeds $100,000. If any funds other than Federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a member of Congress, in connection with the award of any Federal Contract, the making of any Federal grant, the making of any Federal loan, the entering of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA shall complete and submit Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

i.    The Provider agrees to disclose to MCO on an ongoing basis, any managing employee that has been convicted of a misdemeanor or felony related to the person's involvement in any program under Medicare, Medicaid or a Title XX services program (Block grant programs)

j.    The Provider agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE) and excluded individuals posted by the OMIG on its Website.

k.    The Provider agrees to disclose to MCO complete ownership, control, and relationship information.

l.    Provider agrees to obtain for MCO ownership information from any subcontractor with whom the provider has had a business transaction totaling more than $25,000, during the 12 month period ending on the date of the request made by SDOH, OMIG or DHHS. The information requested shall be provided to MCO within 35 days of such request.

2.10    The parties to this Agreement agree to comply with all applicable requirements of the Federal Americans with Disabilities Act.

2.11    The Provider agrees, or if the Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act; the HIV confidentiality requirements of Article 27-F of the Public Health Law and Mental Hygiene Law§33.13.

**3. Payment; Risk Arrangements**

3.1    Enrollee Non-liability. Provider agrees that in no event, including, but not limited to, nonpayment by the MCO or IPA, insolvency of the MCO or IPA, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a subscriber, an enrollee or person (other than the MCO or IPA) acting on his/her/their behalf, for services provided pursuant to the subscriber contract or Medicaid Managed Care contract or Family Health Plus contract and this Agreement, for the period covered by the paid enrollee premium. In addition, in the case of Medicaid Managed Care, Provider agrees that, during the time an enrollee is enrolled in the MCO, he/she/it will not bill the New York State Department of Health or the City of New York for Covered Medications within the Medicaid Managed Care Benefit Package as set forth in the Agreement between the MCO and the New York State Department of Health. In the case of Family Health Plus, Provider agrees that, during the time an enrollee is enrolled in the MCO, he/she/it
will not bill the New York State Department of Health for Covered Medications within the Family Health Plus Benefit Package, as set forth in the Agreement between the MCO and the New York State Department of Health. This provision shall not prohibit the provider, unless the MCO is a managed long term care plan designated as a Program of All-Inclusive Care for the Elderly (PACE), from collecting copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for-service basis to a covered person provided that Provider shall have advised the enrollee in writing that the service is uncovered and of the enrollee's liability therefore prior to providing the service. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service. This provision shall survive termination of this Agreement for any reason, and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

3.2    Coordination of Benefits (COB). To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the provider. However, with respect to enrollees eligible for medical assistance, or participating in Child Health Plus or Family Health Plus, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third party payers, and amounts thereof, and the MCO shall maintain

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

or have immediate access to records concerning collection of COB proceeds.

3.4    If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA must provide notice to the Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law §4406-c(5-c). Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a material adverse impact on the aggregate level of payment to a health care professional. This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology or payment policy indexing scheme.

3.5    The parties agree to comply with and incorporate the requirements of Physician Incentive Plan (PIP) Regulations contained in 42 CFR §438.6(h), 42 CFR §422.208, and 42 CFR § 422.210 into any contracts between the contracting entity (provider, IPA, hospital, etc.) and other persons/entities for the provision of services under this Agreement. No specific payment will be made directly or indirectly under the plan to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to an enrollee.

3.6    The parties agree that a claim for home health care services following an inpatient hospital stay cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided before a Member's inpatient hospital discharge, consistent with Public Health Law §4903.

**4. Records; Access**

4.1    Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government-sponsored programs) available to the MCO (and IPA if applicable), for purposes including preauthorization, concurrent review, quality assurance, (including Quality Assurance Reporting Requirements (QARR)), payment processing, and qualification for government programs, including but not limited to newborn eligibility for Supplemental Security Income (SSI) and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse. The Provider will also make enrollee medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law. The Provider shall provide copies of such records to DOH at no cost. The Provider (or IPA if applicable) expressly acknowledges that he/she/it shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law. These provisions shall survive termination of the contract for any reason.

4.2    When such records pertain to Medicaid or Family Health Plus reimbursable services the Provider agrees to disclose the nature and extent of services provided and to furnish records to DOH and/or the United States Department of Health and Human Services, the County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their authorized representatives upon request. This provision shall survive the termination of this Agreement regardless of the reason.

4.3    The parties agree that medical records shall be retained for a period of six (6) years after the date of service, and in the case of a minor, for three (3) years after majority or six (6) years after the date of service, whichever is later, or for such longer period as specified elsewhere within this Agreement. This provision shall survive the termination of this Agreement regardless of the reason.

4.4    The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA or to third parties. If the Agreement is between an MCO and an IPA, or between an IPA and an IPA, the IPA agrees to require the providers with which it contracts to agree as provided above. If the Agreement is between an IPA and a provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

**5. Termination and Transition**

5.1    Termination or non-renewal of an agreement between an MCO and an IPA, institutional network provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination or non-renewal of an agreement between an IPA and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population in a county, requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than 45 days after receipt of notice by either party, provided, however, that termination, by the MCO may be effected on less than 45 days notice provided the MCO demonstrates to DOH's satisfaction prior to termination that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

5.2    If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for a review as required by state law. The MCO shall provide the health care professional 60 days notice of its decision to not renew this Agreement.

5.3    If this Agreement is between an MCO and an IPA, and the Agreement does not provide for automatic assignment of the IPA's Provider contracts to the MCO upon termination of the MCO/IPA contract, in the event either party gives notice of termination of the Agreement, the parties agree, and the IPA's providers agree, that the IPA providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180 days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever first occurs. This provision shall survive termination of this Agreement regardless of the reason for the termination.

5.4    Continuation of Treatment. The Provider agrees that in the event of MCO or IPA insolvency or termination of this contract for any reason, the Provider shall continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the subscriber contract, Medicaid Managed Care contract, or Family Health Plus contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period. For purposes of this clause, the term "provider" shall include the IPA and the IPA's contracted providers if this Agreement is between the MCO and an IPA. This provision shall survive termination of this Agreement.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).    Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

5.5     Notwithstanding any other provision herein, to the extent that the Provider is providing health care services to enrollees under the Medicaid Program and/or Family Health Plus, the MCO or IPA retains the option to immediately terminate the Agreement when the Provider has been terminated or suspended from the Medicaid Program.

5.6     In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA agrees to require all participating providers of its network to assist in the orderly transfer of enrollees to another provider.

**6. Arbitration**

To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions. Arbitration or mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation, and copies of all decisions.

**7. IPA-Specific Provisions**

Any reference to IPA quality assurance (QA) activities within this Agreement is limited to the IPA's analysis of utilization patterns and quality of care on its own behalf and as a service to its contract providers.

## NEW YORK MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

In addition to those terms set forth in Appendix 1, and to the extent Provider provides services, including dispensing Covered Medications, to Members who are enrolled in the New York Medicaid Program ("Enrollees"), directly or through any sponsor (collectively, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of Sponsors (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.   Services to Enrollees. Provider shall provide Services to Enrollees as outlined in the Provider Agreement and the Provider Manual. All such Services must be provided in compliance with all state and federal laws and regulations and in accordance with the terms of Sponsor's contract with State Department of Health (SDOH).

2.   Duties of Provider. By providing Services to Enrollees, Provider agrees that it shall:

    i.   Prepare and maintain contemporaneous records demonstrating its right to receive payment under the medical assistance program and to keep for a period of six (6) years from the date care, services or supplies were furnished, all records necessary to disclose the nature and extent of services furnished and all information regarding claims for payment submitted by, or on behalf of, Provider. Provider further agrees to furnish such records and information, upon request, to the Department of Social Services, the Secretary of the United States Department of Health and Human Services, the Deputy Attorney General for Medicaid Fraud Control and the New York State Department of Health (18NYCRR§504.3(a));

    ii.   Comply with the disclosure requirements of Part 502 of Title 18 of the Official Compilation of Codes, Rule and Regulations of the State of New York with respect to ownership and control interests, significant business transactions and involvement with convicted persons (18NYCRR§504.3(b));

    iii.   Accept payment from PBM as payment in full for all care, services and supplies billed under the program, except where specifically provided in law to the contrary 18NYCRR§504.3(c));

    iv.   Not illegally discriminate on the basis of handicap, race, color, religion, national origin, sex or age (18NYCRR§504.3(d));

    v.   Submit claims for payment only for services actually furnished and which were medically necessary or otherwise authorized under the Social Services Law when furnished and which were provided to eligible persons (18NYCRR§504.3(e));

    vi.   Permit audits, by the persons and agencies denominated in subdivision (i) of this section, of all books and records or, in the discretion of the auditing agency, a sample thereof, relating to services furnished and payments received

under the medical assistance program, including patient histories, case files and patient-specific data (18NYCRR§504.3(g));

    vii.   Provided true, accurate and complete information in relation to any claim for payment (18NYCRR§504.3(h)); and

    viii.   Comply with the rules, regulations and other applicable official directives (18NYCRR§504.3(i)).

3.   Confidentiality. In addition to those terms set forth in the Provider Agreement, Provider agree that all information relating to services to Enrollees, Potential Enrollees and Prospective Enrollees which is obtained by the Provider, shall be confidential pursuant to the Public Health Law (PHL), including PHL Article 27-F, the provisions of Section 369(4) of the SSL, 42 U.S.C. § 1396a(a)(7) (Section 1902(a)(7) of the SSA), Section 33.13 of the Mental Hygiene Law, and regulations promulgated under such laws including 42 CFR Part 2 pertaining to Alcohol and Substance Abuse Services, and for Contractors operating in New York City, the New York City Health Code §§11.07 (c) and (d). Such information, including information relating to services provided to Enrollees, Potential Enrollees and Prospective Enrollees under the Provider Agreement, shall be used or disclosed only for a purpose directly connected with performance of Provider's obligations. Provider shall inform its employees and contractors of the confidential nature all Enrollee information. Provider shall comply with any and all other confidentiality requirements under state and federal laws or regulations and applicable requirements contained in the Sponsor's contract with the SDOH.

4.   Impairment of Rights. Provider and PBM agree that nothing in the Provider Agreement shall impair any rights accorded to SDOH, the United States Department of Health and Human Services (DHHS) or any Local Department of Social Services (LDSS). Nothing in the Provider Agreement shall limit or otherwise terminate Sponsor's obligations under its agreements with SDOH.

5.   Relationship to Sponsors and SDOH. Nothing contained in the Provider Agreement or this Addendum shall create any contractual relationship between Provider and Sponsor or Provider and SDOH.

6.   Hold Harmless. Except for any applicable copayment or cost sharing, Provider shall look solely to PBM for payment of

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is subject to public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© **2014 Express Scripts, Inc.**
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

claims. In no event shall Provider seek payment from SDOH, LDSS, the Enrollees, or persons acting on behalf of Enrollees.

7. Dispute Resolution. Applicable dispute resolution procedures are set forth in the Provider Agreement, including the Provider Manual.

8. Acceptance of Infants. When applicable, Provider agrees that it is required to accept a woman's enrollment in a Medicaid or FHPlus product as sufficient to produce services to her newborn, unless the newborn is excluded from enrollment or Sponsor does not offer a Medicaid product in the mother's county of fiscal responsibility.

9. Ongoing Monitoring. Provider acknowledges and agrees that PBM shall monitor Provider's performance on an ongoing basis. To the extent PBM identifies any deficiencies in Provider's performance; PBM may take corrective action in accordance with the Provider Manual.

10. Timely Payment. Subject to the terms of the Provider Agreement, Provider shall be paid for Covered Medications in accordance with SIL § 3224-a.

11. Right to Audit. Consistent with the exception language set forth in SIL § 3224-b, PBM shall have and retain the right to audit Provider's claims for a six year period from the date of service or the date services were provided or billed, whichever is later, and to recoup any overpayments discovered as a result of the audit. The six year limitation does not apply to situations in which fraud may be involved or in which the Provider (or an employee or agent of Provider) obstructs PBM's auditing.

12. Communication. Nothing in the Provider Agreement shall limit, restrict, or prohibit Provider's ability to disclose to any Enrollee or Enrollee representative, where appropriate, any information that Provider deems appropriate regarding (a) a condition or course of treatment, including the availability of alternative therapies consultations or tests; or (b) the provisions, terms, or requirements of Sponsor's product as they relate to the Enrollees. Nothing in the Provider Agreement or this Addendum shall restrict Provider's ability to file or make a complaint or report to an appropriate governmental body regarding the policies and practices of Sponsor or PBM when he or she believes that such policies and practices negatively impact patient care.

13. Termination. In the event Provider is terminated pursuant to the Provider Agreement, PBM shall provide Provider with a written explanation for the reason for the termination. Provider shall have the right to appeal any such termination within thirty (30) days written notice before a panel appointed by

PBM (the "PBM Panel"). The hearing shall occur within thirty (30) days of receipt of the request. The PBM panel shall include at least three individuals appointed by PBM. At least one individual on the panel shall be a pharmacist. The hearing panel shall render a decision on the proposed action in a timely manner. Such decision shall include (a) reinstatement of Provider, or (b) termination of Provider. Such decision shall be provided in writing to Provider. A decision to terminate shall be effective not less than thirty (30) days after the receipt by the health care professional of the PBM Panel's decision. Unless otherwise required by law or requested by Sponsor, termination without cause be effective no earlier than sixty (60) days from the receipt of the notice of termination. This section shall not apply to cases involving imminent harm to patients, cases involving fraud, or cases involving final disciplinary action by a state licensing board or government agency that impairs Provider's ability to practice.

14. Protected Activities. PBM shall not terminate or refuse to renew the Provider Agreement in the in-network benefits portion of an insurer's network for managed care products solely because Provider has: (a) advocated for an Enrollee; (b) filed a complaint against PBM or Sponsor; (c) appealed any decision of PBM or Sponsor; (d) provided information or filed a report pursuant to PHL § 4406-c; or (e) requested a hearing as allowed by law.

15. Non-Renewal. Either party may exercise the right to decline the renewal of the Provider Agreement as set forth therein, upon sixty (60) days notice to the other party. A notice of non-renewal shall not constitute termination the Provider Agreement.

16. Subcontract. Provider may not enter into any subcontracts related to the delivery of services to Enrollees, except by a written agreement, as authorized by PBM and/or Sponsor in writing. Any such subcontract must comply with the applicable sections of 32 CFR Parts 434 and 438 and any requirements set forth in Sponsor's contract with the State. Any such subcontract must be approved by SDOH.

17. Hours of Operation. Network Provider must offer hours of operation for Medicaid members that are not less than the hours of operation to commercial Members.

18. New York Standard Clauses. Provider agrees that the New York Standard Clauses set forth in APPENDIX 1 - New York State Department of Health Standard Clauses for Managed Care Provider/IPA Contracts are incorporated into this Addendum.

# NORTH CAROLINA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer or Carrier licensed under North Carolina law (as such terms are defined under North Carolina law; herein referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum").In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Notwithstanding anything in the Agreement to the contrary, Provider acknowledges and agrees that North Carolina law shall control any dispute relating to the provision of Covered Medications to Members in North Carolina. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Transition**. In the event of termination of this Agreement for any reason, Provider shall maintain all records in accordance with the terms of the Agreement and shall provide PBM and Sponsor with access to such records at PBM's request. To the extent Provider has any administrative duties; Provider shall cooperate with PBM and Sponsor to transition such duties to another provider or to PBM or Sponsor at the direction of PBM. (11 NCAC 20.0202(5)(a)). Where termination occurs due to the insolvency of Sponsor or PBM, Provider will continue to

provide services in accordance with the terms of the Agreement, including the Member/Sponsor Hold Harmless provisions. The insolvency of PBM or Sponsor shall not change Provider's obligations to maintain and provide access to records in accordance with the Provider Agreement. To the extent Provider has undertaken any administrative duties; PBM or Sponsor shall provide timely direction regarding the transition of those duties in the event of insolvency.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

**2. Insolvency/Continuation of Care.** If Sponsor provides or arranges for the delivery of services on a prepaid basis, then in the event of termination of this Agreement or the insolvency of Sponsor or PBM, Provider agrees to continue to provide pharmacy services to a patient receiving inpatient care until the patient is ready for discharge. (11 NCAC 20.0202(5)(b)).

**3. Credentials and Changes.** Provider shall maintain licensure, accreditation, and credentials sufficient to meet PBM's credentialing program requirements and shall notify PBM of subsequent changes in status of any information relating to Provider's professional credentials. (11 NCAC 20.0202(6)).

**4. Professional Liability Insurance.** Provider shall maintain professional liability insurance coverage in an amount acceptable to PBM, but in no event in an amount less than as set forth in the Provider's Provider Agreement, and shall notify PBM of changes in status of such coverage on a timely basis, but at least within the time set forth in the Provider's Provider Agreement. (11 NCAC 20.0202(7)).

**5. Member Billing.** Provider shall not bill any Member for covered services, except for specified coinsurance, Copayments, and applicable deductibles. This provision does not prohibit Provider and a Member from agreeing to continue non-covered services at the Member's expense, as long as Provider has notified the Member in advance that PBM or Sponsor may not cover or continue to cover specific services and that the Member chooses to receive the service. (11 NCAC 20.0202(8)(a)). Provider shall be responsible for billing and collecting the Member or Sponsor for the provision of non-covered services in accordance with Sponsor's requirements. (11 NCAC 20.0202(8)(b)).

**6. Call Services.** Provider agrees to arrange for call coverage or other backup to provide pharmacy services in accordance with Sponsor's standards for network pharmacy accessibility. (11 NCAC 20.0202(9)).

**7. Eligibility.** As outline in the Provider Agreement, Provider shall verify Member eligibility by checking Member Identification Cards and using PBM's then-current online system. Information provided to Provider regarding eligibility through PBM's then-current online system shall be based on the current information held by PBM and Sponsor. Provider shall have access to this eligibility information prior to rendering services by using the PBM then-current online system. Mutually agreeable provision may be made by the Parties for cases where incorrect or retroactive information was submitted by employer groups. (11 NCAC 20.0202(10)).

**8. Records.** Provider shall: (A) **Confidentiality.** Maintain confidentiality of the Member's medical records and personal information as required by G.S. 58, Article 39 and other health records as required by law. (11 NCAC 20.0202(11)(a)); (B) **Standards.** Maintain adequate medical and other health records according to industry, Sponsor's and PBM's standards. (11 NCAC 20.0202(11)(b)); and (C) **Availability.** Make copies of such records available to PBM, Sponsor and the North Carolina Department of Insurance in conjunction with its regulation of Sponsor. (11 NCAC 20.0202(11)(c)).

**9. Member Complaints.** Provider shall cooperate and assist PBM and/or Members with Member complaints and grievance procedures available to Members. (11 NCAC 20.0202(12)). Provider shall cooperate fully and timely in the investigation and resolution of any complaint or grievance filed by a Member or their authorized representative. (N.C.G.S.A. §58-50-62).

**10. Cooperation with Programs.** Provider shall comply with PBM's and Sponsor's utilization management programs, credential verification programs, quality assessment programs, and provider sanction programs but none of these programs shall override the professional or ethical responsibility of Provider or interfere with Provider's ability to provide information or assistance to Members. (11 NCAC 20.0202(16)). To the extent necessary to participate in any PBM or Sponsor program, PBM or Sponsor as applicable shall provide PBM with information on benefit exclusions; administrative and utilization management requirements; credential verification programs; quality assessment programs; and provider sanction policies. Notification of changes in these requirements shall also be provided by the PBM or Sponsor, allowing Provider time to comply with such changes. (11 NCAC 20.0202(15)). Any notice required by this section shall be provider to Provider in accordance with the Section 23 of this Addendum.

**11. Provider Directory.** Provider authorizes and Sponsor agrees to include the name of Provider in the provider directory distributed to Sponsor's Members. (11 NCAC 20.0202(17)).

**12. Assignment.** In the event PBM or Sponsor assigns, delegates or transfers any obligations under the Agreement, PBM or Sponsor (as applicable) shall notify Provider in writing of such assignment, delegation or transfer before such assignment, delegation or transfer occurs. (11 NCAC 20.0202(19)(b)). Provider's duties and obligations under the Agreement shall not be assigned, delegated, or transferred without the prior written consent of PBM. (11 NCAC 20.0202(19)(a)).

**13. Selection by Sponsor.** Provider acknowledges and agrees that Sponsors retain the right and ability to approve or disapprove Provider's participation in their networks, as well as the legal responsibility to monitor and oversee Provider's offering of services to Members and financial responsibility to Members. (11 NCAC 20.0202(b)(2) and(4)).

**14. Non-Payment.** Except with respect to Copayments, deductibles and other co-insurance amounts, Provider shall look solely to PBM for payment for Covered Medications and other covered services provided to Members pursuant to this Agreement. Provider agrees that, in the event of non-payment by PBM (or Sponsor, if applicable), Provider shall not bill or seek reimbursement from the Member (or the Member's representative). No other provision of this Agreement shall, under any circumstances, change the effect of this Section 14. Provider, its agent, trustee, or assignee, may not maintain any action at law against a Member to collect any sums owed by PBM (or Sponsor, if applicable). (N.C.Gen.Stat. §58-67-115(a)).

**15. Provider's Relationship with Member.** Nothing in this Agreement shall, nor shall PBM or Sponsor, limit either of the following: (1) Provider's ability to discuss with a Member the clinical treatment options medically available, the risks associated with the treatments, or a recommended course of treatment; or (2) Provider's professional obligations to patients as specified under such provider's professional license. (N.C.Gen.Stat. §58-3-176(a)).

**16. Overpayment Recovery.** PBM and Sponsor may recover overpayments made to the Provider by making demands for refunds and by offsetting future payments to Provider. Any such recoveries may also include related interest payments that were made under the requirements of this section. Not less than thirty (30) days before PBM seeks overpayment recovery or offsets future payments, PBM shall give written notice to Provider. Such notice shall include specific information to identify the specific claim and the specific reason for the recovery. The recovery of overpayments or offsetting of future payments shall be made within the two (2) years after the date of the original claim payment unless PBM has reasonable belief that fraud or other intentional misconduct by Provider or its agents has occurred, or the claim involves Provider receiving payment for the same service from a government payor. Provider may recover underpayments or nonpayments by PBM by making demands for refunds. Any such recoveries by Provider of underpayments or nonpayment by PBM may include applicable

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

interest. The recovery of underpayments or nonpayments shall be made within the two years after the date of the original claim adjudication, unless the claim involves Provider receiving payment for the same service from a government payor. (N.C.Gen.Stat. §58-3-255(h)).

**17.** **Coverage During a State of Emergency or Disaster.** In the event of a state of emergency or other disaster, ESI and/or Sponsor shall a procedure in place to waive time restrictions on filling or refilling prescription medications as requested by a Member. The procedure shall include waiver or override capabilities for "refill too soon" edits to Provider. Provider shall be paid in accordance with the applicable and then-current rates in the Provider Agreement(s). The procedure required by this section shall include the ability for Members to: (i) obtain one refill on a prescription if there are authorized refills remaining, or (ii) fill one replacement prescription for one that was recently filled, as prescribed, or approved by the prescriber of the prescription that is being replaced and not contrary to the dispensing authority of the Provider or its pharmacists.

Payment shall be made to Provider under this Section regardless of the date upon which the prescription had most recently been filled by Provider, if all of the following conditions apply:

a. The Commissioner of Insurance issues a Bulletin Advisory notifying all insurance carriers licensed in North Carolina of a declared state of disaster or state of emergency in North Carolina. The Department shall provide a copy of the Bulletin to the North Carolina Board of Pharmacy;

b. The covered person requesting coverage of the refill or replacement prescription resides in a county that is covered under a state of emergency issued by the Governor or General Assembly under G.S. 166A-19.20, or a declaration of major disaster issued by the President of the United States under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5121, et seq., as amended; and

c. The prescription medication is requested within 29 days after the origination date of the condition stated in 17(a).

The time period for the waiver of prescription medication refills may be extended in 30-day increments by an order issued by the Commissioner. Additional refills still remaining on a prescription shall be covered by Sponsor as long as consistent with the orders of the prescriber or authority of the dispensing Provider. This section does not excuse or exempt Sponsor or the Member from any other terms of the Prescription Drug Program. Quantity limitations shall be consistent with the original prescription and the extra or replacement fill may recognize proportionate dosage use prior to the disaster. No requirements additional to those under the Provider Agreement or the Prescription Drug Program shall be placed on Provider for coverage of the replacement fill or extra fill. Nothing in this section is intended to affect the respective authority or scope of practice of prescribers or pharmacies.

**18.** **Dispute Resolution.** Except as provided here in, prior to either party taking any legal action in connection with this Agreement, both parties agree to meet in good faith to resolve any claim or controversy ("Claim"), whether under federal or state statutory or common law, brought by either ESI or the Provider against the other, or against the employee, members, agents or assigns of the other, arising from or relating in any way to the interpretation or performance of this Agreement. The aggrieved party shall notify the other party of its Claim including sufficient detail to permit the other party to respond. The parties agree to meet and confer in good faith to resolve any Claims that may arise under this Agreement for a period of not less than thirty (30) days. In the event the parties cannot resolve any Claims pursuant to Good Faith Discussions and the minimum thirty (30) day period has been met, then the aggrieved party may end discussions with the other party by providing written

notice to the other party of its intent to cease discussions. Thereafter, the parties may proceed to litigation. Good Faith Discussion and the thirty (30) day notice period do not apply to Claims by either party solely seeking immediate injunctive relief. Provider acknowledges and agrees that nothing in this section shall be construed to permit or require binding arbitration between the parties or between the Provider and any Member.

**19.** **Prompt Payment.** In addition to the terms of the Agreement, PBM shall provide to Provider within thirty days of the submission of any claim one of the following: (i) payment for the claim; (ii) notice of denial of the claim; (iii) notice that the claim was not submitted in the appropriate form or otherwise did not comply with the terms and conditions of the Agreement; (iv) notice that coordination of benefits information is required for the claim to be processed; or (v) notice that the claim is pending based on nonpayment of fees or premiums. If a claim is not paid or denied within sixty (60) days, PBM or Sponsor shall provide Members with a status report regarding the claim review. Additional status reports will be sent to the Member with a copy to the Provider on thirty (30) day increments thereafter. Claims not paid in accordance with this section shall accrue interest as set forth in N.C.Gen.Stat. §58-3-225(e).

**20.** **Denied Claims.** If the claim is denied, the notice shall include all of the specific good faith reason or reasons for the denial (e.g., lack of eligibility or lack of coverage). If the claim is contested or cannot be paid because is inadequate or incomplete, or not paid pending receipt of requested coordination of benefits information, the notice shall contain the specific

good faith reason or reasons why the claim has not been paid and a description of all of the information needed by PBM. If all or part of the claim is contested or cannot be paid because of the application of a specific utilization management or medical necessity standard is not satisfied, the notice shall contain the specific clinical rationale for that decision or shall refer to specific provisions in documents that are made readily available through the Sponsor which provide the specific clinical rationale for that decision unless the information was already provided. If the claim is contested or cannot be paid because of nonpayment of premiums, the notice shall contain a statement advising the claimant of the nonpayment of premiums. If a claim is not paid pending receipt of requested coordination of benefits information, the notice shall so specify. If a claim is denied or contested in part, PBM shall pay the undisputed portion of the claim and send the notice of the denial or contested status within 30 days. If a claim is contested or cannot be paid because the claim was not submitted on the required form, the notice shall contain the required form and instructions to complete that form. Upon receipt of additional information requested in its notice to the claimant, PBM shall continue processing the claim and pay or deny the claim within 30 days. If additional information is requested, and not received within 90 days, PBM may deny the claim and send the notice of denial to Provider stating the specific reason for the denial and advising Provider that the claim may be reopened if the requested information is provided within one year after the date of the denial notice closing the claim.

**21.** **Timing Requirements.** Provider shall submit all claims within 180 days of provision of the Covered Medications. If submission within 180 days is not reasonably possible, Provider shall be permitted reasonable extension in accordance with the Agreement. Unless otherwise agreed to, failure to submit a claim within this time does not invalidate or reduce the claim if it was not reasonably possible for the claimant to file the claim, provided that the claim was submitted as soon as reasonable possible, and in no event (except in the absence of legal capacity of the insured), later than one year from the time submittal of the claim is otherwise required.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

**22. Notifications of Changes Relating to Payment and Claims Submission.** PBM shall provide advance written notice to Provider of any changes to schedule of fees, reimbursement policies, or submission of claims policies. Such notice shall be provided no less than 30 days prior to the change. Such notice is not required where the change has the effect of increasing fees, expanding health benefit plan coverage, or is made for patient safety considerations. In such cases, PBM shall notify Provider concurrent with the implementation of the changes.

**23. Policies and Procedures.** PBM shall make all policies and procedures relating in any way to Provider available for review prior to contracting. Nothing in any of the policies and procedures shall conflict with or override any term of the Provider Agreement, including fee schedules. In the event of a conflict between any policy or procedure and the language in the Provider Agreement, the Provider Agreement shall prevail.

**24. Amendments.** PBM shall send any proposed amendments to the Agreement to the Provider's contact address. The proposed amendment shall be dated, labeled "Amendment," include an effective date for the proposed amendment. Provider shall have at least sixty (60) days from receipt of the proposed amendment to object. If Provider does not object in writing within sixty (60) days, the proposed amendment shall become effective. If Provider does object within sixty (60) days, the proposed amendment is not effective and PBM shall be entitled to terminate the contract upon sixty (60) days written notice to Provider. Nothing in this section prohibits Provider and PBM from negotiating terms that provide for mutual consent to the amendment. For the purposes of this Section 24, an amendment shall mean "any change to the terms of a contract, including terms incorporated by reference that modifies fee schedules." N.C.G.S.A. § 58-50-270 A change required by federal or State law, rule, regulation, administrative hearing, or court order is not an amendment.

**25. Notice/Calculation of Time.** All notices required under the Provider Agreement shall be sent via one of the follow methods, with the amount of time to be permitted for delivery: (i) For first class mail postage pre-paid in the United States Mail, the notice period shall commence five business days after the notice is placed in the mail; (ii) for hand delivery, the notice period shall commence as of the date of the hand delivery; (iii) for certified registered mail, the notice period shall commence as of the date of the return receipt; or (iv) for commercial courier service, the notice period shall commence as of the date of the return receipt. Nothing in this section prohibits the use of an electronic medium for a communication other than an amendment.

## NORTH DAKOTA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer or Carrier licensed under North Dakota law (as such terms are defined under North Dakota law; herein referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1) Termination of the Provider Agreement does not release Provider from completing procedures in progress on Members then receiving treatment for a specific condition for a period not to exceed sixty (60) days, at the same schedule of copayment or other applicable charge in effect upon the effective date of termination of the Agreement. N.D. Cent. Code 26.1-17.1-16. (5).

3) Provider shall continue to provide services for the duration of the period after the PBM's insolvency for which premium payment has been made and until the Member's discharge from inpatient facilities. N.D. Cent. Code 26.1-18.1-12(5)(b)

## NORTH DAKOTA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the North Dakota Medicaid Managed Care program ("Enrollees") administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). Provider further acknowledges that the following provisions were required to be reproduced in its entirety, and as such, certain provisions may not be applicable to the provision of Covered Medications to Members.

**1. Insolvency.** If PBM or Provider becomes insolvent or bankrupt, Enrollees shall not be liable for the debt of the Provider.

**2. Advocacy.** Provider, acting within the lawful scope of his or her practice, is not prohibited from advising or advocating on behalf of an Enrollee, who is his or her patient for the following: (1) The Enrollee's health status, medical care, or treatment options, including any alternative treatment that may be self-administered; (2) Any information the Enrollee needs in order to decide among all relevant treatment options; (3) The risks, benefits, and consequences of treatment or non-treatment; (4) The Enrollee's right to participate in decisions regarding his or her health care, including the right to refuse treatment, and to express preference about future treatment decisions; and (5)

Adequate information about the grievance, appeal, and the State fair hearing procedures and timelines so that the provider can comply with the grievance system's requirements including: (a) The Enrollee's right to a State fair hearing, how to obtain a hearing, and representation rules at a hearing; (b) The Enrollee's right to file grievances and appeals; (c) The requirements and timeframes for filing a grievance or appeal; (d) The availability of assistance in the filling process; (e) The toll-free numbers that the Enrollee can use to file a grievance or appeal by phone; (f) The fact that, when requested by the Enrollee, disputed services will continue if the Enrollee files an appeal or requests a State fair hearing within the timeframes specified for filing, and the Enrollee may be required to pay the cost of disputed services furnished

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

while the appeal is pending if the final decision is adverse to the Enrollee; and (g) Any other State-determined provider appeal rights to challenge the failure of Sponsor to cover a service.

3. **Compliance with Law.** Provider shall abide by the requirements of Section 1877(E)(3)(B) of the Social Security Act prohibiting providers from making payments directly or indirectly to a physician or other provider as an inducement to reduce or limit medically necessary services provided to Enrollees.

4. **Quality Assurance.** Providers shall cooperate with Sponsor or PBM's quality assurance plan(s) and activities and shall allow Sponsor and PBM access to the medical records of Enrollees being treated by Providers.

5. **Member Charges.** Providers will not balance bill the Enrollee. The reimbursement from PBM shall be payment in full.

Records. Providers shall maintain a medical record keeping system that complies with 42 CFR 456.111, 42 CFR 456.1, and with state and federal law. Notwithstanding the foregoing, Provider shall keep all documents and reports required by this Addendum for a period of not less than six (6) years.

Audit. State and the federal government may inspect and audit any books and/or records of Provider that pertain to: (1) To services performed or determinations of amounts payable under the Addendum; or (2) For any other audit allowed by state or federal law.

Applicable Laws. Providers are obligated and agree to comply with all local, state, and federal laws, regulations, and executive orders related to the performance of this Addendum including the following: Fair Labor Standards Act, Equal Pay Act of 1963, Titles VI and VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the North Dakota Human Rights Act, the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, the Drug Abuse Prevention, Treatment, and Rehabilitation Act of 1970, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, the Drug-Free Workplace Act of 1988, the Americans with Disabilities Act of 1990, Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act of

1992, Title IX of the Education Amendments of 1972, Executive Order 11246, "Equal Employment Opportunity," as amended by Executive Order 11375 and as supplemented by Department of Labor regulations at 41 CFR part 60, the Clean Air Act, the Federal Water Pollution Control Act, and the Pro-Children Act of 1994.

Medicaid Contract. Provider acknowledges that Sponsor has contractual requirements under its agreement with the State Medicaid Program, and Provider shall abide by the rules there under as dictated by PBM. (attachment a, sect 4)

BYRD ANTI-LOBBYING AMENDMENT. (A)No elected appropriated funds have been paid or will be paid, by or on behalf of Sponsor, to any person for influencing or attempting to influence an officer or employee of any federal agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative contract, and the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative contract. (B)If any funds other than federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any federal agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the federal contract, grant, loan, or cooperative contract, such person shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions. (C)This certification is hereby included in any award documents for all subcontracts, including the Agreement, and Provider shall certify and disclose accordingly.

Translation. Provider shall have translation services for those who speak any foreign language.

Termination. In addition to any termination rights otherwise outlined in the Agreement, PBM or Sponsor may revoke delegation or impose other sanctions if it, or PBM, determines Provider's performance is inadequate.

## OHIO REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Ohio law (as such terms are defined by Ohio law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Services**. Provider agrees to provide services to Members as further set forth in the Provider Agreement. Ohio Rev. Code § 1751.13(C)(1).

2. **Member Hold Harmless**. Provider agrees that in no event, including but not limited to nonpayment by Sponsor or PBM, insolvency of Sponsor or PBM, or breach of the Provider Agreement, shall Provider bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against a Member to whom health care services have been provided, or person acting on behalf of the Member, for health care services provided pursuant to the Provider Agreement. This does not prohibit Provider from collecting co-insurance, deductibles, or Copayments as specifically provided in the evidence of coverage, or fees for uncovered health care services delivered on a fee-for-service basis to persons referenced above, nor from any recourse against Sponsor, PBM or their successors. This provision shall survive termination of the Provider Agreement with respect to

Covered Medications provided during the time the Provider Agreement was in effect, regardless of the reason for the termination, including the insolvency of PBM or Sponsor. Ohio Rev. Code §§ 1751.13(C)(2), (12), and 1751.60(C).

3. **Continuation of Services**. In the event of PBM's or Sponsor's insolvency or discontinuance of operations, Provider shall continue to provide Covered Medications to Members as needed to complete any medically necessary procedures commenced but unfinished at the time of the insolvency or discontinuance of operations. The completion of a medically necessary procedure shall include the rendering of all Covered Medications that constitute medically necessary follow-up care for that procedure. If a Member is receiving necessary inpatient care at a hospital, Provider shall continue to provide services until the earliest of the following: (a) the Member's discharge from the hospital; (b) the determination by the Member's attending physician that inpatient care is no longer medically indicated; (c) the Member's reaching the limit for contractual benefits; or (d) the effective date of any new coverage. This

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

provision shall not require Provider to continue to provide Covered Medications after the occurrence of any of the following:

    i.  The end of the thirty (30) day period following the entry of a liquidation order under Chapter 3909 of the Ohio Revised Code;

    ii.  The end of the Member's period of coverage for a contractual prepayment or premium;

    iii.  The Member obtains equivalent coverage with another health insuring corporation or insurer, or the Member's employer obtains such coverage for the Member;

    iv.  The Member or the Member's employer terminates coverage under the Prescription Drug Program; or

    v.  A liquidator affects a transfer of the Sponsor's obligations under the Prescription Drug Program pursuant to Ohio law.  Ohio Rev. Code § 1751.13(C)(3).

4.  **Policies and Programs**.  Provider shall abide by PBM and Sponsor's administrative policies and programs, including, but not limited to, payment systems, utilization review, quality assurance, assessment, and improvement programs, credentialing, confidentiality requirements, and any applicable federal or state programs as further set forth in the Provider Agreement.  Ohio Rev. Code § 1751.13(C)(4).

5.  **Records**.  Provider agrees to make available its records to PBM and Sponsor to monitor and evaluate the quality of care, to conduct evaluations and audits, and to determine on a concurrent or retrospective basis the necessity of and appropriateness of health care services provided to Members as set forth in the Provider Agreement.  Provider agrees to make its health records available to state and federal authorities involved in assessing the quality of care or investigating the grievances or complaints of Members.  Provider further agrees to comply with applicable state and federal laws related to the confidentiality of medical or health records.  Ohio Rev. Code § 1751.13(C)(5).

6.  **Assignment**. If permitted under the Provider Agreement, Provider shall not assign or delegate the contractual rights and responsibilities under the Provider Agreement without the prior written consent of PBM.  Ohio Rev. Code § 1751.13(C)(6).

7.  **Insurance**.  Provider shall maintain adequate professional liability and malpractice insurance as set forth in the Provider Agreement.  Provider shall notify PBM not more than ten (10) days after Provider's receipt of notice of any reduction or cancellation of such coverage.  Ohio Rev. Code § 1751.13(C)(7).

8.  **Rights of Members**.  Provider shall observe, protect, and promote the rights of Members as patients.  Ohio Rev. Code § 1751.13(C)(8).

9.  **Non-Discrimination**.  Provider shall provide health care services without discrimination on the basis of the Member's participation in the Prescription Drug Program, age, sex, ethnicity, religion, sexual preference, health status, or disability, and without regard to the source of payments made for service rendered to Members.  This requirement shall not apply to circumstances when Provider does not render services due to limitations arising from Provider's lack of training, experience, or skill, or due to licensing restrictions.  Ohio Rev. Code § 1751.13(C)(9).

10.  **Dispute Resolution**.  Resolution of disputes arising out of the Provider Agreement shall be resolved pursuant to the terms set forth therein.  Ohio Rev. Code § 1751.13(C)(11)

11.  **Definitions**.  Terms used in the Provider Agreement that are defined by Title XVII, Chapter 1751, Ohio Revised Code, shall be construed in a manner consistent with those statutory definitions.  Ohio Rev. Code § 1751.13(C)(13).

12.  **No Inducement**.  Neither PBM nor Sponsor shall directly or indirectly offer an inducement to Provider to reduce or limit medically necessary health care services to a Member.  Ohio Rev. Code § 1751.13(D)(1)(a).

13.  **Assistance to Members**.  Neither PBM nor Sponsor shall penalize Provider for assisting a Member to seek a reconsideration of PBM of Sponsor's decision to deny or limit benefits to the Member.  Ohio Rev. Code § 1751.13(D)(1)(b).

14.  **Member Advice**.  Nothing in the Provider Agreement shall be construed to limit or otherwise restrict Provider's ethical and legal responsibility to fully advise Members about their medical condition and about medically appropriate treatment options.  Ohio Rev. Code § 1751.13(D)(1)(c).

15.  **Member Advocating**.  Neither PBM nor Sponsor shall penalize Provider for principally advocating for medically necessary health care services.  Ohio Rev. Code § 1751.13(D)(1)(d).

16.  **Confidentiality**.  Neither PBM nor Sponsor shall penalize Provider for providing information or testimony to a legislative or regulatory body or agency provided that the information or testimony is not libelous or slanderous or constitutes trade secrets or confidential information, which Provider has no privilege or permission to disclose.  Ohio Rev. Code § 1751.13(D)(1)(e).

17.  **Provider Participation**.  Sponsor retains the right to approve or disapprove Provider's participation under the Provider Agreement.  Ohio Rev. Code § 1751.13(E), (F)(3).

18.  **Third Party Beneficiary**.  To the extent applicable, Provider acknowledges that Sponsor is a third-party beneficiary of the Provider Agreement with respect to services provided to Sponsor's Members.

19.  **Oversight**.  Provider acknowledges that PBM and Sponsor retain statutory responsibility to monitor and oversee the offering of Covered Medications to Members.

## OHIO MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Ohio Medicaid Managed Care program administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum").  Provider further acknowledges that the following provisions were required to be reproduced in its entirety, and as such, certain provisions may not be applicable to the provision of Covered Medications to Members.

This Addendum will supplement the Base Contract between PBM and Provider (referred to as "Subcontractor") and will run concurrently with the terms of the base Contract. This Addendum is limited to the terms and conditions governing the provision of and payment for services provided to or on behalf of Members of Ohio Medicaid Programs in the fulfillment of Sponsor's contractual responsibilities to the Office of Medical Assistance (OMA) in the provision of health care services to Medicaid members.

### ADDENDUM DEFINITIONS

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

**Base Contract** also known as **Agreement** means the contract between the PBM and the Subcontractor.

**Sponsor** means a Medicaid managed care plan that has entered into a provider agreement to serve Medicaid consumers, which may include consumers enrolled in Integrated Care Delivery System (ICDS) Plans.

**Medicaid** means medical assistance provided under a state plan approved under Title XIX of the Social Security Act.

**Member** means a Medicaid recipient enrolled under the care management system pursuant to ORC 5111.16.

**OAC** means the Ohio Administrative Code.

**ORC** means the Ohio Revised Code.

**OMA** means the Office of Medical Assistance.

**Provider** means a hospital, health care facility, physician, dentist, pharmacy or otherwise licensed, certified, or other appropriate individual or entity, which is authorized to or may be entitled to reimbursement for health care services rendered to a Sponsor's member.

**Subcontractor** means a provider or delegated entity contracting with the Sponsor and providers employed by the Sponsor for the provision of both health care services to members and the fulfillment of any administrative requirements specified in the Sponsor/OMA provider agreement (e.g., a pharmacy benefit manager providing pharmacy services and claims processing)

## ADDENDUM PROVISIONS

The provisions of this Medicaid Combined Services Subcontract Addendum supersede any language to the contrary which may appear elsewhere in the Base Contract.

Subcontractor agrees to abide by all of the following specific terms:

1. The terms of the Base Contract, relating to the beginning date and expiration date or automatic renewal clause, as well as applicable methods of extension, renegotiation, and termination apply to this Addendum.

2. Notwithstanding item 1 of this Addendum, the PBM and/or Sponsor must give the Subcontractor at least sixty days prior notice for the nonrenewal or termination of the Base Contract except in cases where an adverse finding by a regulatory agency or health or safety risks dictate that the contract be terminated sooner.

3. Notwithstanding item 1 of this Addendum, the Subcontractor may non-renew or terminate the Base Contract if one of the following occurs:

    A. The subcontractor gives the PBM at least sixty days prior notice for the non-renewal or termination of the Base Contract. The effective date for the non-renewal or termination must be the last day of the month; or

    B. OMA has proposed action in accordance with OAC Division 5101:3, including OAC rule 5101:-26-10(G), regardless of whether the action is appealed. The subcontractor's non-renewal or termination notice must be received by the PBM within fifteen working days prior to the end of the month in which the subcontractor is proposing non-renewal or termination. If the notice is not received by this date, the subcontractor must extend the non-renewal or termination date to the last day of the subsequent month.

4. The procedures to be employed upon the ending, non-renewal, or termination specified in the Base Contract, apply to this Addendum including an agreement to promptly supply any documentation necessary for the settlement of any outstanding claims.

5. Subcontractor agrees that if the Base Contract provides for assignment to another entity, no assignment, in whole or in part, shall take effect without 60 days prior notice to the PBM and/or Sponsor.

6. Subcontractor agrees that the Base Contract and Addendum are governed by, and are construed in accordance

with all applicable laws, regulations, and contractual obligations of the Sponsor.

    A. OMA will notify the Sponsor and Sponsor shall notify the subcontractor of any changes in applicable state or federal law, regulations, waiver, or contractual obligation of the Sponsor.

    B. This addendum shall be automatically amended to conform to such changes without the necessity for executing written amendments.

    C. The Sponsor and/or PBM shall notify the subcontractor of all applicable contractual obligations.

7. Subcontractor agrees not to hold liable both OMA and the member in the event that the Sponsor cannot or will not pay for covered services performed by the subcontractor pursuant to the Base Contract with the exception that:

    A. Federally Qualified Health Centers (FQHCs) and Rural Health Clinics (RHCs) may be reimbursed by OMA in the event of Sponsor insolvency pursuant to section 1902(bb) of the Social Security Act, or;

    B. Subcontractor may bill the member when the Sponsor and/or PBM has denied prior authorization or referral for the services and the following conditions are met:

        i. The member was notified by the subcontractor of the financial liability in advance of service delivery;

        ii. The notification by the subcontractor was in writing, specific to the service being rendered, and clearly states that the member is financially responsible for the specific service. A general patient liability statement signed by all patients is not sufficient for this purpose;

        iii. The notification is dated and signed by the member.

8. Subcontractor agrees to cooperate with the Sponsor's quality assessment and performance improvement (QAPI) program in all the Sponsor's and/or PBM's provider subcontracts and employment agreements for physician and non-physician providers.

9. The Sponsor shall disseminate written policies that include detailed information about the False Claims Act and other provisions named in 42 U.S.C. Section 1396a(a)(68), any related State laws pertaining to civil or criminal penalties, whistleblower protections under such laws, as well as the Sponsor's policies and procedures for detecting and preventing fraud, waste, and abuse; and the subcontractor agrees to abide by the Sponsor's written policies, regarding their False Claims Act and the detection and prevention of fraud, waste and abuse.

10. Subcontractor agrees to cooperate with the OMA annual external quality review as described in OAC Division 5101:3, including rule 5101:3-26-07.

11. Notwithstanding items 2 and 3 of this Addendum, in the event of a hospital provider's proposed non-renewal or termination of the Base Contract, the hospital provider agrees to notify, in writing, all providers who have admitting privileges at the hospital of the impending non-renewal or termination of the Base Contract and the last date the hospital will provide services to members under the Base Contract. This notice must be sent at least forty-five days prior to the effective date of the proposed non-renewal or termination. If the hospital provider issues less than forty-five days prior notice to the Sponsor, the notice to providers who have admitting privileges at the hospital must be sent within one working day of the hospital provider issuing notice of non-renewal or termination of the Base Contract.

12. Subcontractor agrees to release to the Sponsor, PBM and OMA any information necessary for the Sponsor to perform any of its obligations under the OMA provider agreement, including but not limited to compliance with reporting and quality assurance requirements.

13. Subcontractor agrees to provide a report to the PBM and/or Sponsor, on at least a monthly basis, summarizing the statues of any delegated activity, including a copy of any required reports or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

logs maintained by the subcontractor, the submission dates for any required documentation sent to PBM and/or Sponsor, and indicating any problems, concerns or potential compliance issues which may exist.

14. Subcontractor agrees to provide services through the last day the Base Contract is in effect.

15. Subcontract and all employees of the subcontractor are duly registered, licensed or certified under applicable state and federal statutes and regulations to provide the services that are the subject of the Base Contract and subcontractor and all employees of the subcontractor have not been excluded from participating in federally funded health care programs.

16. If subcontractor is a third party administrator (TPA), subcontractor agrees to include all elements of this Addendum and/or OAC rule 5101:3-26-05(D) in any sub-agreements, as applicable, and will ensure that its subcontractor will forward information to OMA as requested.

17. Subcontractor shall be compensated pursuant to the method and in the amounts specified in Schedule or Exhibit of the Provider Agreement.

18. Any amendment to the Schedule specified in item 17 or on Attachment D of this Addendum must be agreed to in writing by both parties.

19. Subcontractor agrees in providing health care services to members to identify and where indicated arrange pursuant to the mutually agreed upon policies and procedures between the Sponsor and the subcontractor, for the following at no cost to the member:

    A. Sign language services.
    B. Oral interpretation and oral translation services.

20. Sponsor agrees to fulfill the subcontractor's/provider's responsibility to mail or personally deliver notice of the member's right to request a state hearing whenever the subcontractor bills a member due to the Sponsor's denial of payment of a Medicaid service, as specified in OAC Division 5101:3, including rule 5101:3-26-08.4, utilizing the procedures and forms as specified in OAC rule 5101:6-2-35.

21. If the subcontractor is a Medicaid provider, subcontractor must meet the qualification specified in OAC Division5101:3, including rule 5101:3-26-05(C).

22. All laboratory testing sites providing services to members must have either a current Clinical Laboratory Improvement Amendment (CLIA) certificate of waiver, certificate of accreditation, certificate of compliance, or a certificate of registration with a CLIA identification number.

23. Any home health provider used for members must meet the requirements specified in OAC Chapter 5101:3-12 and comply with the requirements for home care dependent adults as specified in section 121.36 of the Ohio Revised Code.

24. If provider is a primary care provider, provider agrees to participate in the care coordination requirements outlined in OAC Division 5101:3, including rule 5101:3-26-03.1.

25. If subcontractor is a hospital, the Addendum must include the completed OMA Hospital Services Form, Attachment C of this Addendum, which specifies which services of the hospital are included in the Base Contract.

26. Sponsor agrees not to prohibit, or otherwise restrict a subcontractor acting within the lawful scope of practice, from advising or advocating on behalf of a member who is his or her patient for the following:

    A. The member's health status, medical care, or treatment options, including any alternative treatment that may be self-administered.
    B. Any information the member needs in order to decide among all relevant treatment options.
    C. The risks, benefits, and consequences of treatment versus non-treatment.

    D. The member's right to participate in decisions regarding his or her health care including the right to refuse treatment, and to express preferences about future treatment decisions.

27. Subcontractor agrees to contact the Sponsor's designated twenty-four hour post-stabilization services phone line to request authorization to provide post-stabilization services in accordance with OAC Division 5101:3, including rule 5101:3-26-03(G).

28. Subcontractor agrees not to identify the addressee as a Medicaid consumer on the outside of the envelope when contacting members by mail.

29. Subcontractor agrees not to bill members for missed appointments.

30. Subcontractor agrees to supply, upon request, the business transaction information required under 42.C.F.R. 455.105.

31. Subcontractor agrees that with the exception of any member Copayments the Sponsor has elected to implement in accordance with OAC Division 5101:3, including rule 5101:3-26-12, the PBM's payment constitutes payment in full for any covered service and will not charge the member or OMA any co-payment, cost sharing, down-payment, or similar charge, refundable or otherwise. This Agreement does not prohibit Nursing Facilities (NF's) from collecting patient liability payments from members as specified in OAC rule 5101: 1-39-24 or Federally Qualified Health Centers (FQHCs) and Rural Health Clinics (RHCs) from submitting claims for supplemental payments to OMA as specified in OAC rules 5101:3-28-07 and 5101:3-16-05.

    a. Sponsor and/or PBM shall notify the subcontractor whether the Sponsor has elected to implement any member Copayments and if applicable under what circumstances member Copayments will be imposed in accordance with OAC Division 5101:3, including rule 5101:3-26-12;

32. Subcontractor agrees that member notification regarding any applicable co-payment amounts must be carried out in accordance with OAC Division 5101:3, including rule 5101:3-26-12.

33. If the subcontractor has been delegated decision-making authority which may determine the reduction, suspension, denial or termination of services and the subcontractor issues the state hearing notification to the member, subcontractor must agree to copy the Sponsor on any notification to a member of the member's right to request a state hearing.

34. Subcontractor shall be bound by the same standard of confidentiality which apply to OMA and the state of Ohio as described in OAC rule 5101:1-1-03 and 45 CFR Parts 160 and 164, including standards for unauthorized uses or disclosures of protected health information (PHI).

35. Subcontractor agrees that their applicable facilities and records will be open to inspection by the Sponsor, PBM, OMA or its designee, or other entities as specified in OAC rule 5101:3-26-06.

36. Subcontractor agrees to allow the PBM and/or Sponsor access to all member medical records for a period of not less than six years from the date of service, or until any audit initiated within the six year period is completed, and allow access to all record keeping, audits, financial records, and medical records to OMA or its designee or other entities as specified in OAC Division 5101:3, including rule 5101:3-26-06.

37. Subcontractor agrees to comply with the provisions for record keeping and auditing in accordance with OAC Division 5101:3, including rule 5151:3-26-06.

38. Subcontractor agrees to make patient records for Medicaid eligible individuals available for transfer to new providers at no cost to the patient.

39. Subcontractor shall not discriminate in the delivery of services based on a member's race, color, religion, gender,

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

genetic information, sexual orientation, age, disability, national origin, military status, ancestry, health status or need for health services.

40. Subcontractor in performance of the subcontract or in the hiring of any employees for the performance of services under the subcontract, shall not by reason of race, color, religion, gender, genetic information, sexual orientation, age, disability, national origin, military status, health status or ancestry discriminate against any citizen of Ohio in the employment of a person qualified and available to perform the services to which the subcontract relates.

41. Subcontractor shall not in any manner discriminate against, intimidate, or retaliate against any employee hired for the performance of services under the subcontract on account of race, color, religion, gender, genetic information, sexual orientation, age, disability, national origin, military status, health status, or ancestry.

The Office of Medical Assistance permits changes to Attachments A, B, C and/or D by mutual written agreement of both parties and without regeneration of this Base Contract or this Addendum.

## OKLAMA REGULATORY ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO licensed under Oklahoma law (as such term is defined by Oklahoma law; referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. In the event PBM fails to pay for Covered Medications as set forth in the Agreement, the Member shall not be liable to Provider for any sums owed by the PBM. 36 Okla. St. 6913(D)(1)

2. Provider shall not maintain an action at law against a Member to collect sums owed by PBM. 36 Okla. St. 6913(D)(3)

3. Provider shall provide services for the duration of the period after the PBM's insolvency for which premium payment has been made and until the Member's discharge from inpatient facilities. 36 Okla. St. 6913(E)(2)

## OREGON REGULATORY ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO licensed under Oregon law (as such term is defined by Oregon law; referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.      Prior to providing services to a Member, Provider will collect from each Member the applicable Copayment as communicated to Provider via the online claims system or as otherwise notified in writing by PBM. Provider cannot waive, discount, reduce, or increase the Copayment. Provider will in no event (including, but not limited to, non-payment by PBM or any Sponsor, PBM's or any Sponsor's insolvency, or breach of this Agreement) bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against, a Member or other person acting on Member's behalf. This provision does not prohibit the collection of Copayments or charges for non-covered services or items; however, Provider shall not add additional charges to theCopayment for the provision of services under this Agreement. If PBM determines that Provider has overcharged a Member, Provider will promptly pay such overpayment to PBM or such Member as directed upon notification by PBM. This provision will survive the termination of this Agreement and supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Member or someone acting on Member's behalf. Or. Rev. Stat. § 743.821; Or. Rev. Stat. § 750.095(2).

2.      Provide that when continuity of care is required to be provided under a health benefit plan by ORS 743.854, the insurer and the individual provider shall provide continuity of care to enrollees as provided in Or. Rev. Stat. 743.854.   Or. Rev. Stat 703.803(2)(h).

## OREGON MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Oregon Medicaid Program ("Enrollees") administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control for the purposes of the Oregon Medicaid Program. Without limiting the generality of the foregoing, Provider agrees as follows:

1. Providers shall not bill Members for Covered Services unless there is a full written disclosure or waiver on file signed by the Member, in advance of the service being provided, in accordance with OAR 410-141-042

2. Provider may review Sponsor's Grievance process in the Member's Handbook or by requesting such information from Sponsor.

3. Provider acknowledges and agrees that the Provider Agreement may be terminated, and other sanctions may be imposed against Provider by Sponsor, if Provider's performance is inadequate to meet the requirements of the Provider Agreement, or Sponsor's contract with the State of Oregon. Provider agrees that it will comply with 42 CFR 438.6 that are applicable to Covered Services, and with all the requirements relating to fraud and abuse. Provider shall refer any suspected fraud or abuse to PBM and/or the OHP. Provider shall further comply with all

protective services, investigation and reporting requirements described in OAR 943-045-0250 through 943-045-0370 and ORS 430.735 through 430.765

4. Provider shall submit valid claims for services including all the fields and information needed to allow the claim to be processed without further information from Provider, and within time frames that assure all corrections have been made within four months of the date of service.

5. Provider agrees to subrogate to OHA any and all claims the Provider has or may have against manufacturers, wholesale or retail suppliers, sales representatives, testing laboratories, or other Providers in the design, manufacture, marketing, pricing, or quality of drugs, pharmaceuticals, medical supplies, medical devices, DMEPOS, or other products. Nothing in this provision prevents Oregon from working with Sponsor, PBM, or Provider and releasing its right to subrogation in a particular case.

## PENNSYLVANIA REGULATORY ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO licensed under Pennsylvania law (as such term is defined by Pennsylvania law; referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Hold Harmless.** In no event, including but not limited to, non-payment by PBM or the Plan Sponsor, the insolvency of Plan Sponsor or PBM, or breach of this Agreement, shall the Provider bill, charge, collect a deposit from, seek compensation or reimbursement from, or have any recourse against a Member or persons other than the Plan Sponsor acting on behalf of such Member for the Covered Medications provided hereunder. This provision does not prohibit collecting supplemental charges or Copayments in accordance with the terms of the applicable agreement between the Plan Sponsor and the Member. This provision shall survive the termination of this Agreement for those Covered Medications provided prior to such termination, regardless of the cause of the termination, and shall be construed for the benefit of the Member. Any modification, addition or deletion to this provision shall become effective no earlier than 15 days after the appropriate state regulatory authorities have received written notification of the proposed changes and such changes shall otherwise comply with all state laws and regulations. This hold harmless language supersedes any written or oral agreement currently in existence, or entered into at a later date, between Provider, PBM and the Member, or persons acting in their behalf. 28 Pa. Code §9.722(e)(1); 28 Pa. Code §9.725(4); and 31 Pa. Code §§152.14, 152.104(a)(3)(i)

2. **Confidentiality of and Access to Records.**

a. Provider shall keep Member information and records confidential in accordance with 40 P.S. § 991.2131 and all applicable State and Federal laws, rules and regulations. Provider agrees to grant access to records to the employees and agents of the Pennsylvania Department of Health, Insurance Department, and the Department of Public Welfare with direct responsibility for quality assurance, investigation of complaints or grievances, enforcement or other activities related to compliance with State law or Plan Sponsor on behalf of such entity. 28 Pa. Code §9.722(e)(2); 31 Pa. Code §152.104(a)(3)(v).

b. In furtherance of the foregoing, Provider agrees to and shall participate in and abide by the decisions of PBM's and the Plan Sponsor's, as appropriate, quality assurance, utilization review and Member complaint and grievance systems. Provider agrees to abide by PBM's and the Plan Sponsor's, as appropriate, rules and regulations. 28 Pa. Code §9.722(e)(3); 31 Pa. Code §152.104(a)(3)(ii)-(iv).

3. **Compliance with Law.** Provider agrees to adhere to all State and Federal laws, rules and regulations. 28 Pa. Code §9.722(e)(5).

4. **Termination.**

a. Neither party shall be permitted to terminate the Agreement without cause upon less than sixty (60) days prior written notice. 28 Pa. Code §9.722(e)(7).

4.2 In the event Provider terminates the Agreement for any reason, it must give PBM at least sixty (60) days advanced written notice. 31 Pa. Code §301.124.

4.3 PBM may immediately terminate Provider's participation and preferred status if the Provider is found to be harming patients. 31 Pa. Code §152.104(a)(3)(vi).

4.4 If PBM terminated the Agreement for cause, including breach of contract, fraud, criminal activity, or posing a danger to a Member or the health, safety, or welfare of the public as determined by PBM or Sponsor, PBM and Sponsor shall not be responsible for Covered Medications provided to the Member following the date of termination. 28 Pa. Code §9.684(j) and 40 P.S. §991.2117(b).

5 **Amendment.** Provider shall be provided at least thirty (30) days prior written notice of any changes to contracts, policies or procedures affecting Providers or the provision or payment of health care services to Members, unless the change is required by law or regulation. 28 Pa. Code §9.722(e)(8).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

6 **Reimbursement**.

6.3 This Agreement shall include no incentive reimbursement system for Provider's pharmacists, which weighs utilization performance as a single component more highly than quality of care, Member services and other factors collectively. 28 Pa. Code §9.722(f)(2).

6.4 This Agreement shall include no financial incentive that compensates a Provider's pharmacist for providing less than medically necessary and appropriate care to a Member. 28 Pa. Code §9.722(f)(3).

7 **Data Reporting Requirements**. Provider agrees that it shall comply with data reporting requirements, including encounter, utilization, and reimbursement methodology required by the Department of Health and Department of Public Welfare. 28 Pa. Code §9.724(d)(9).

8 **Acknowledgements of Provider**.

8.1 Provider acknowledges and agrees that nothing contained in this Agreement limits the following:

8.1.1 The authority of the Sponsor to ensure the Provider's participation in and compliance with the Sponsor's quality assurance, utilization management, UM, complaint and grievance systems and procedures and limits;

8.1.2 The Department of Health's authority to monitor the effectiveness of the Sponsor's system and procedures or the extent to which the Sponsor adequately monitors any function delegated to PBM, or to require the Sponsor to take prompt corrective action regarding quality of care or consumer grievances and complaints; or

8.1.3 The Sponsor's authority to sanction or terminate a Provider found to be providing inadequate or poor quality care or failing to comply with the Sponsor's systems, standards or procedures as agreed to by PBM. 28 Pa. Code §9.725(1).

8.2 Provider acknowledges and agrees that any delegation by the Sponsor to PBM for performance of quality assurance, utilization management, credentialing, network contracting and management and other medical management systems shall be subject to the Sponsor's oversight and monitoring of PBM's performance. 28 Pa. Code §9.725(2).

8.3 Provider acknowledges and agrees that Sponsor, upon failure of PBM to properly implement and administer the systems, or to take prompt corrective action after identifying quality, Member satisfaction or other problems, may terminate its contract with PBM, and that as a result of the termination, Provider's participation in the Sponsor's plans may also be terminated. 28 Pa. Code §9.725(3).

8.4 Provider and PBM further acknowledge and agree that this Agreement does not contain provisions permitting PBM or the Sponsor to sanction, terminate or fail to renew a Provider's participation for any of the following reasons:

8.4.1 Discussing the process that the Sponsor or any entity contracting with the Sponsor uses or proposes to use to deny payment for a health care service;

8.4.2 Discussing medically necessary and appropriate health care services for a Member, including information regarding the nature of the treatment, the risks of the treatment, alternative treatments or the availability of alternative therapies, consultation or tests;

8.4.3 Discussing the decision of any Sponsor to deny payment for a health care service;

8.4.4 Discussing any other information Provider reasonably believes is necessary to provide the Member full information concerning the health care of the Member; (a) – (d) hereof: 40 P. S. §991.2113(a); 28 Pa. Code §9.722(d);

8.4.5 Advocating for medically necessary and appropriate health care services for a Member;

8.4.6 Filing a grievance on behalf of and with the written consent of a Member, or helping a Member to file a grievance;

8.4.7 Protesting a decision, policy or practice of PBM or Sponsor that Provider believes interferes with its ability to provide medically necessary and appropriate health care; and

8.4.8 Taking another action specifically permitted by 40 P. S. §§991.2113, 991.2121 and 991.2171. (e) – (h) hereof: 28 Pa. Code §9.722(c).

## PENNSYLVANIA MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the Pennsylvania Medicaid Program ("Enrollees" or "Members") administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control for the purposes of the Pennsylvania Medicaid Program. Without limiting the generality of the foregoing, Provider agrees as follows:

1. To the extent capitalized terms are not defined in the Provider Agreement, such terms will have the definitions ascribed to them under Pennsylvania law and/or the applicable HealthChoices Agreement.

2. Provider shall not be excluded from participation due to the fact that Provider has a practice that includes a substantial number of patients with expensive medical conditions.

3. Provider will not be excluded from participation because Provider advocates on behalf of a Member for Medically Necessary and appropriate health care consistent with the degree of learning and skill ordinarily possessed by a reputable Health Care Provider practicing according to the applicable legal standard of care.

4. Provider is prohibited from denying services to any Enrollee during the Medicaid Fee-For-Service eligibility window prior to the effective date of enrollment with Sponsor.

5. Provider is prohibited from submitting claims that contain false information or making false statements to PBM or Sponsor. Provider may be subject to legal and contractual sanctions for violation of this provision.

6. For the purposes of Pennsylvania Medicaid, the term "Medically Necessary" means a service or benefit that meets any one of the following: (a) The service or benefit will, or is reasonably expected to, prevent the onset of an illness, condition, or disability; (b) The service or benefit will, or is reasonably expected to, reduce or ameliorate the physical, mental or developmental effects of an illness, condition, injury, or disability; (c) The service or benefit will assist the Enrollee to achieve or maintain the maximum functional capacity in performing daily activities, taking into account both the functional capacity of the Member and those functional capacities that are appropriate for Member of the same age.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

7. Provider is not prohibited or restricted from acting within the lawful scope of practice and from discussing Medically Necessary care and advising or advocating appropriate medical care with or on behalf of a Member including; information regarding the nature of treatment options; risks of treatment; alternative treatments; or the availability of alternative therapies, consultation or tests that may be self-administered.

8. Provider is not prohibited or restricted from acting within the lawful scope of practice from providing information the Member needs in order to decide among all relevant treatment options and the risks, benefits, and consequences of treatment and non-treatment.

9. Provider's Provider Agreement will not be terminated for filing a Grievance on behalf of a Member.

10. Nothing in the Provider Agreement may be construed to require Sponsor or PBM to reimburse Provider for counseling provided to Members when Provider objects to such services on moral or religious grounds.

11. Provider shall cooperate in all QM/UM Program standards outlined in Exhibit M(1) of HealthChoices Agreement.

12. To the extent applicable, Provider shall cooperate in the submission of any and all information necessary for Sponsor to meet any reporting requirements.

13. Provider agrees that in the event of PBM's or Sponsor's insolvency or other cessation of operations, Provider shall continue to provide benefits to Members through the period for which the Capitation has been paid to Sponsor.

14. Provider shall cooperate in Sponsor's and Department of Public Welfare's Recipient Restriction Program(s).

15. Nothing in the Provider Agreement shall be construed as prohibiting or penalizing Provider from contracting with other PBMs or Manage Care Organizations.

16. Provider must comply with all Pennsylvania Medical Assistance Self Audit Protocols.

## RHODE ISLAND REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of Sponsors licensed under Rhode Island law, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

Notwithstanding anything to the contrary in the Provider Agreement, PBM shall not terminate Provider "without cause"; provided, however, that "cause" shall include lack of need due to economic considerations. Gen. Laws of R.I. § 23-17.13-3(c)(10).

1. PBM shall afford Provider due process for all adverse decisions resulting in a change of Provider's status as a participating provider. PBM shall notify Provider of the proposed action(s) and the reasons for the proposed action. PBM shall give Network Pharmacy the opportunity to contest the proposed action and participate in the internal appeals process set forth in the Provider Agreement and the Provider Manual. Gen. Laws of R.I. § 23-17.13-3(c)(11).

2. Provider shall not assert a claim against Members in the event of the rehabilitation, liquidation, conservation, or administrative supervision of Sponsor or PBM. Gen. Laws of R.I. §§ 27-19-28(b), 27-20-24(b).

3. Provider agrees that in the event of the insolvency of Sponsor or PBM, Members shall not be liable to Provider for charges for covered services, including Covered Medications, received before the time of insolvency. Gen. Laws of R.I. § 27-41-13(h).

4. In the event of the insolvency of Sponsor or PBM, Provider shall continue to provide covered services, including Covered Medications, to Members confined at the time of insolvency until the earlier of discharge or ninety (90) days following the insolvency, or in the alternative, for federally qualified health maintenance organizations which are licensed pursuant to this chapter, confinement coverage shall be provided which meets federal standards for federally qualified health maintenance organization plans; and to all other Members for a period of thirty (30) days following the insolvency, unless Members are afforded the opportunity to enroll in another insurance plan as defined in Gen. Laws of R.I. § 27-41-13(h)(3) without waiting periods or exclusions or limitations based on health status. Gen. Laws of R.I. § 27-41-13(h).

5. Provider agrees that Members shall not be liable to Provider for charges for covered health services, including Covered Medications, except for amounts due for Copayments and other appropriate amounts due (i.e., deductible, if applicable), when provided or made available to Members during a period in which premiums were paid by or on behalf of the Member. Gen. Laws of R.I. § 27-41-26.

6. PBM shall not refuse to contract with or compensate Provider for covered services, including Covered Medications, solely because Provider has in good faith communicated with one or more of Provider's patients regarding the provisions, terms, requirements, restrictions, or other treatment options of Sponsor's products as they relate to the needs of Provider's patients. Gen. Laws of R.I. § 27-41-14.1.

7. Nothing in the Provider Agreement shall be construed as providing for the specific payment to Provider, directly or indirectly, as an inducement or incentive to reduce or limit services, to reduce the length of stay or the use of alternative treatment settings or the use of a particular medication with respect to a Member. Gen. Laws of R.I. § 23-17.13-3(b)(8).

## SOUTH CAROLINA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under South Carolina law (as such terms are defined by South Carolina law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Member Hold Harmless**. With the exception of applicable copayments, Provider shall not to bill the Members or otherwise hold the Members financially responsible for Covered Medications rendered, even where Provider had not been paid by ESI or Sponsor. S.C. Stat. § 38-33-130(B).

2. **Liability**. Notwithstanding anything in the Provider Agreement to the contrary, Provider acknowledges that Provider, PBM, and Sponsor are each responsible for the legal consequences and costs of their own acts or omissions and shall not be responsible for the acts or omissions, or both, of the other parties. S.C. Stat. § 38-71-1740(A)(1).

3. **Discussions With Members**. Nothing in the Provider Agreement shall be construed to limit Provider's ability to discuss with a Member, the treatment options available to the Member, risks associated with treatments, utilization management decisions, and recommended course of treatment. S.C. Stat. § 38-71-1740(A)(2)(a).

4. **Provider's Obligations**. Nothing in the Provider Agreement shall be construed to limit Provider's legal obligations to a Member as specified under Provider's professional license. S.C. Stat. § 38-71-1740(A)(2)(b).

5. **Continuation of Services**. In the event Provider terminates its participation under the Provider Agreement, Provider shall, if requested, continue to provide Covered Medications to Members, subject to the terms of the Provider Agreement, for a period of ninety (90) days or the anniversary date of the Sponsor's Prescription Drug Program, whichever occurs first. S.C. Stat. § 38-71-1730(A)(4).

6. **Records**. Provider shall allow the director of the South Carolina Department of Insurance ("SCDOI"), or his designee, to examine its records, books and affairs upon such director's request. S.C. Stat. § 38-33-170. To the extent it is determined that monies are owed as a result of the SCDOI's review, PBM shall have the right to offset such amount against amounts owed to Provider.

## SOUTH CAROLINA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits under the South Carolina Medicaid MCO Program ("Enrollees") administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). Provider further acknowledges that the language provided below was required to be reproduced verbatim. As such, Provider acknowledges and agrees that not all provisions may be applicable to the provision of Covered Medications to Enrollees and that the terms not defined herein shall have the meaning ascribed to them in Sponsor's contract with the South Carolina Department of Health or the applicable law, rule or regulation. In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Medicaid Appendix**.
The provisions in this Section shall be primary and supersede any provision to the contrary which may occur in any other section of this subcontract.
**A. Definitions.**

1. Action – As related to Grievance, either (1) the denial or limited authorization of a requested service, including the type or level of service; (2) the reduction, suspension, or termination of a previously authorized service; (3) the denial, in whole or in part, of payment for a service; (4) the failure to provide services in a timely manner, as defined by SCDHHS; (5) the failure of the MCO to act within the timeframes provided in §9.7.1 of the MCO Contract; or (6) for a resident of a rural area with only one MCO, the denial of a Medicaid MCO Member's request to exercise his or her right, under 42 CFR §438.52(b)(2)(ii), to obtain services outside the MCO's network.

2. Additional Service(s) – A service(s) provided by the MCO which is a non- covered service(s) by the South Carolina State Plan for Medical Assistance and is offered to Medicaid MCO Members in accordance with the standards and other requirements set forth in the MCO Contract which are outlined in another section of this Contract.

3. Clean Claim – A claim that can be processed without obtaining additional information from the Provider of the service or from a third party.

4. Continuity of Care – The continuous treatment for a condition (such as pregnancy) or duration of illness from the time of first contact with a healthcare provider through the point of release or long-term maintenance.

5. Emergency Medical Condition – A medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: placing the health of the individual (or, with respect to a pregnant woman, the health of the woman and/or her unborn child) in serious jeopardy; serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

6. Emergency Services – Covered inpatient and outpatient services that are as follows: (1) furnished by a provider that is qualified to furnish these services under this title; and (2) needed to evaluate or stabilize an Emergency Medical Condition.

7. Federal Qualified Health Center (FQHC) – A South Carolina licensed health center certified by the Centers for Medicare and Medicaid Services that receives Public Health Services grants. An FQHC provides a wide range of primary care and enhanced services in a medically under-served area.

8. Grievance – An expression of dissatisfaction about any matter other than an Action. The term is also used to refer to the overall system that includes grievances and appeals handled at the MCO level. (Possible subjects for Grievances include, but are not limited to, the quality of care or services provided, and aspects of interpersonal relationships such as rudeness of a provider or employee, or failure to respect the Medicaid MCO Member's rights.)

9. Healthcare Medicaid Provider – A provider of healthcare

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

services or products which includes but is not limited to an institution, facility, agency, person, corporation, partnership, practitioner, specialty physician, group or association approved by SCDHHS, licensed and/or credentialed which accepts as payment in full for providing benefits to Medicaid MCO Members amounts pursuant to the MCO reimbursement provisions, business requirements and schedules.

10. Managed Care Organization – An entity that has, or is seeking to qualify for, a comprehensive risk contract that is (1) a Federally qualified HMO that meets the advance directive requirements of subpart I of 42 CFR Part 489; or (2) any public or private entity that meets the advance directives requirements and is determined to also meet the following conditions: (a) makes the services it provides to its Medicaid MCO Members as accessible (in terms of timeliness, amount, duration, and scope) as those services are to other Medicaid recipients within the area serviced by the entity; and (b) meets the solvency standards of 42 CFR §438.116. This includes any of the entity's employees, affiliated providers, agents, or contractors.

11. Medically Necessary Service – Those medical services which:    (a) are essential to prevent, diagnose, prevent the worsening of, alleviate, correct or cure medical conditions that endanger life, cause suffering or pain, cause physical deformity or malfunction, threaten to cause or aggravate a handicap, or result in illness or infirmity of a Medicaid MCO Member; (b) are provided at an appropriate facility and at the appropriate level of care for the treatment of the Medicaid MCO Member's medical condition; and, (c) are provided in accordance with generally accepted standards of medical practice.

12. Medicaid MCO Member – An eligible person(s) who is enrolled with a SCDHHS approved Medicaid Managed Care Organization. For purpose of this subcontract, Medicaid MCO Member shall include the patient, parent(s), guardian, spouse or any other person legally responsible for the Medicaid MCO Member being served.

13. MCO - The Managed Care Organization who is requesting services under this Contract.

14. Primary Care Provider (PCP) – The provider who serves as the entry point into the health care system for the Medicaid MCO Member. The PCP is responsible for providing primary care, coordinating and monitoring referrals to specialist care, authorizing hospital services, and maintaining Continuity of Care.

15. Rural Health Clinic (RHC) – A South Carolina licensed rural health clinic is certified by the Centers for Medicare and Medicaid Services and receiving Public Health Services grants. An RHC is eligible for state defined cost based reimbursement from the Medicaid fee-for-service program.    An RHC provides a wide range of primary care and enhanced services in a medically underserved area.

16. Provider – The Healthcare Medicaid Provider who is providing services for the MCO under this Contract.

**B.    Administration**.

1.    SCDHHS retains the right to review any and all subcontracts entered into for the provision of any services under this Contract.

2.    SCDHHS does not require Provider to participate in any other line of business (i.e. Medicare Advantage or commercial) offered by the MCO in order to participate in the MCO's Medicaid network.

3.    SCDHHS does not require Provider to participate in the network of any other Managed Care Organization as a condition of participation in MCO's network.

4.    MCO and Provider shall be responsible for resolving any disputes that may arise between the two (2) parties, and no dispute shall disrupt or interfere with the Continuity of Care of a Medicaid MCO Member.

5.    Provider represents and covenants that it presently has no interest and shall not acquire any interest, direct or indirect,

which would conflict in any manner or degree with the performance of its services hereunder.  Provider further covenants that, in the performance of this Contract, no person having any such known interests shall be employed.

6.    Provider recognizes that in the event of termination of the MCO Contract between MCO and SCDHHS,    MCO is required to make available to SCDHHS or its designated representative, in a usable form, any and all records, whether medical or financial, related to the MCO's and Provider's activities undertaken pursuant to this Contract. The Provider agrees to furnish any records to the MCO which the MCO would need in order to comply with this provision. The provision of such records shall be at no expense to SCDHHS.

7.    In the event of termination of this Contract, SCDHHS will be notified of the intent to terminate this Contract one hundred and twenty (120) calendar days prior to the effective date of termination. The date of termination will be at midnight on the last day of the month of termination.

8.    If the termination of this Contract is as a result of a condition or situation which would have an adverse impact on the health and safety of Medicaid MCO Members, the termination shall be effective immediately and SCDHHS will be immediately notified of the termination and provided any information requested by SCDHHS.

**C.    Hold Harmless**.

1.    At all times during the term of this Contract, Provider shall, except as otherwise prohibited or limited by law, indemnify and hold SCDHHS harmless from all claims, losses, or suits relating to activities undertaken pursuant to this Contract.

2.    If Provider is not a political subdivision of the State of South Carolina, an affiliate organization, or otherwise prohibited or limited by law, Provider shall indemnify, defend, protect, and hold harmless SCDHHS and any of its officers, agents, and employees from:

a.    Any claims for damages or losses arising from services rendered by any subcontractor, person, or firm performing or supplying services, materials, or supplies for the Provider in connection with the performance of this Contract;

b.    Any claims for damages or losses to any person or firm injured or damaged by erroneous or negligent acts, including disregard of state or federal Medicaid regulations or legal statutes, by Provider, its agents, officers, employees, or subcontractors in the performance of this Contract;

c.    Any claims for damages or losses resulting to any person or firm injured or damaged by Provider, its agents, officers, employees, or subcontractors by the publication, translation, reproduction, delivery, performance, use, or disposition of any data processed under this Contract in a manner not authorized by the Contract or by federal or state regulations or statutes;

d.    Any failure of the Provider, its agents, officers, employees, or subcontractors to observe the federal or state laws, including, but not limited to, labor laws and minimum wage laws;

e.    Any claims for damages, losses, or costs associated with legal expenses, including, but not limited to, those incurred by or on behalf of SCDHHS in connection with the defense of claims for such injuries, losses, claims, or damages specified above;

f.    Any injuries, deaths, losses, damages, claims, suits, liabilities, judgments, costs and expenses which may in any manner accrue against SCDHHS or their agents, officers or employees, through the intentional conduct, negligence or omission of the Provider, its agents, officers, employees or subcontractors.

3.    As required by the South Carolina Attorney General, in circumstances where the Provider is a political subdivision of the

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

State of South Carolina, or an affiliate organization, except as otherwise prohibited by law, neither Provider nor SCDHHS shall be liable for any claims, demands, expenses, liabilities and losses (including reasonable attorney's fees) which may arise out of any acts or failures to act by the other party, its employees or agents, in connection with the performance of services pursuant to this Contract.

4.    In accordance with the requirements of S.C. Code Ann. § 38-33-130(b) (Supp. 2001, as amended), and as a condition of participation as a Healthcare Medicaid Provider, Provider hereby agrees not to bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have recourse against, Medicaid MCO Members, or persons acting on their behalf, for health care services which are rendered to such Medicaid MCO Members by the Provider, and which are covered benefits under the Medicaid MCO Member's Handbook.    This provision applies to all covered health care services furnished to the Medicaid MCO Member for which SCDHHS does not pay the MCO or the MCO does not pay the Provider.    Provider agrees that this provision is applicable in all circumstances including, but not limited to, non-payment by MCO and insolvency of MCO.    Provider further agrees that this provision shall be construed to be for the benefit of Medicaid MCO Members and that this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and such Medicaid MCO Members.

5.    It is expressly agreed that the MCO, Provider and agents, officers, and employees of the MCO or Provider in the performance of this Contract shall act in an independent capacity and not as officers and employees of SCDHHS or the State of South Carolina.    It is further expressly agreed that this Contract shall not be construed as a partnership or joint venture between the MCO or Provider and SCDHHS and the State of South Carolina.

D.    **Health Care Services**.

1.    Provider shall ensure adequate access to the services provided under this Contract in accordance with the prevailing medical community standards.

2.    The services covered by this Contract must be in accordance with the South Carolina State Plan for Medical Assistance under Title XIX of the Social Security Act, and Provider shall provide these services to Medicaid MCO Members through the last day that this Contract is in effect. All final Medicaid benefit determinations are within the sole and exclusive authority of SCDHHS or its designee.

3.    Provider may not refuse to provide Medically Necessary Services or covered preventive services to Medicaid MCO Members for non-medical reasons.

4.    Provider shall render Emergency Services without the requirement of prior authorization of any kind.

5.    The Provider shall not be prohibited or otherwise restricted from advising a Medicaid MCO Member about the health status of the Medicaid MCO Member or medical care or treatment for the Medicaid MCO Member's condition or disease, regardless of whether benefits for such care or treatment are provided under the MCO Contract, if Provider is acting within the lawful scope of practice.

6.    Provider must take adequate steps to ensure that Medicaid MCO Members with limited English skills receive, free of charge, the language assistance necessary to afford them meaningful and equal access to the benefits and services provided under this Contract in accordance with Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et. seq.) (2001, as amended) and it's implementing regulation at 45 C.F.R. Part 80 (2001, as amended).

7.    Provider shall provide effective Continuity of Care activities, if applicable, that seek to ensure that the appropriate personnel, including the Primary Care Provider (PCP), are kept

informed of the Medicaid MCO Member's treatment needs, changes, progress or problems.

8.    Provider must adhere to the Quality Assessment Performance Improvement and Utilization Management (UM) requirements as outlined by SCDHHS and/or its designee.

9.    Provider shall have an appointment system for Medically Necessary Services that is in accordance with prevailing medical community standards.

10.    Provider shall not use discriminatory practices with regard to Medicaid MCO Members such as separate waiting rooms, separate appointment days, or preference to private pay patients.

11.    Provider must identify Medicaid MCO Members in a manner which will not result in discrimination against the Medicaid MCO Member in order to provide or coordinate the provision of all core benefits and/or Additional Services and out of plan services.

12.    Provider agrees that no person, on the grounds of handicap, age, race, color, religion, sex, or national origin, shall be excluded from participation in, or be denied benefits of the MCO's program or be otherwise subjected to discrimination in the performance of this Contract or in the employment practices of Provider.    Provider shall upon request show proof of such non-discrimination, and shall post in conspicuous places, available to all employees and applicants, notices of non-discrimination.

13.    If the Provider performs laboratory services, the Provider must meet all applicable state and federal requirements related thereto.

14.    If Provider is a hospital, Provider shall notify the MCO and SCDHHS of the births when the mother is a Medicaid MCO Member.    Provider shall also complete SCDHHS Request for Medicaid ID Number (Form 1716 ME), including indicating whether the mother is a Medicaid MCO Member, and submit the form to the local/state SCDHHS office.

15.    If Provider is an FQHC/RHC, Provider shall adhere to federal requirements for reimbursement for FQHC/RHC services. This Contract shall specify the agreed upon payment from the MCO to the FQHC/RHC. Any bonus or incentive arrangements made to the FQHCs/RHCs associated with Medicaid MCO Members must also be specified and included this Contract.

16.    If Provider is a PCP, then Provider shall have an appointment system for covered core benefits and/or Additional Services that is in accordance with prevailing medical community standards but shall not exceed the following requirements:

a.    Routine visits scheduled within four (4) to six (6) weeks.

b.    Urgent, non-emergency visits within forty-eight (48) hours.

c.    Emergent or emergency visits immediately upon presentation at a service delivery site.

d.    Waiting times that do not exceed forty-five (45) minutes for a scheduled appointment of a routine nature.

e.    Walk-in patients with non-urgent needs should be seen if possible or scheduled for an appointment consistent with written scheduling procedures.

f.    Walk-in patients with urgent needs should be seen within forty-eight (48) hours.

17.    As a PCP, Provider must also provide twenty-four (24) hour coverage but may elect to provide twenty-four (24) hour coverage by direct access or through arrangement with a triage system. The triage system arrangement must be prior approved by MCO.

18.    Provider shall submit all reports and clinical information required by the MCO, including Early Periodic Screening, Diagnosis, and Treatment (if applicable).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential proprietary information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

**E.     Laws.**

1.    Provider shall recognize and abide by all state and federal laws, regulations and SCDHHS guidelines applicable to the provision of services under the Medicaid MCO Program.

2.    Provider must comply with all applicable statutory and regulatory requirements of the Medicaid program and be eligible to participate in the Medicaid program.

3.    This Contract shall be subject to and hereby incorporates by reference all applicable federal and state laws, regulations, policies, and revisions of such laws or regulations shall automatically be incorporated into the Contract as they become effective.

4.    Provider represents and warrants that it has not been excluded from participation in the Medicare and/or Medicaid program pursuant to §§ 1128 (42 U.S.C. 1320a-7) (2001, as amended) or 1156 (42 U.S.C. 1320 c-5) (2001, as amended) of the Social Security Act or is not otherwise barred from participation in the Medicaid and/or Medicare program.

5.    Provider also represents and warrants that it has not been debarred, suspended or otherwise excluded from participating in procurement activities under the Federal Acquisition Regulation or from non- procurement activities under regulations issued under Executive Orders.

6.    Provider shall not have a Medicaid contract with SCDHHS that was terminated, suspended, denied, or not renewed as a result of any action of Center for Medicare and Medicaid Services (CMS), United States Department of Health and Human Services (HHS), or the Medicaid Fraud Unit of the Office of the South Carolina Attorney General. Providers who have been sanctioned by any state or federal controlling agency for Medicaid and/or Medicare fraud and abuse and are currently under suspension shall not be allowed to participate in the Medicaid MCO Program. In the event Provider is suspended, sanctioned or otherwise excluded during the term of this Contract, Provider shall immediately notify MCO in writing.

7.    Provider ensures that it does not employ individuals who are debarred, suspended, or otherwise excluded from participating in federal procurement activities and/or have an employment, consulting, or other Contract with debarred individuals for the provision of items and services that are significant to the MCO's contractual obligation.

8.    Provider shall check the Excluded Parties List Service administered by the General Services Administration, when it hires any employee or contracts with any subcontractor, to ensure that it does not employ individuals or use subcontractors who are debarred, suspended, or otherwise excluded from participating in federal procurement activities and/or have an employment, consulting, or other contract with debarred individuals for the provision of items and services that are significant to Provider's contractual obligation. Provider shall also report to the MCO any employees or subcontractors that have been debarred, suspended, and/or excluded from participation in Medicaid, Medicare, or any other federal program.

9.    In accordance with 42 CFR §455.104 (2010, as amended), the Provider agrees to provide full and complete ownership and disclosure information with the execution of this Contract and to report any ownership changes within thirty-five (35) calendar days to MCO. Provider must download the appropriate form from the MCO website or request a printed copy be sent. Failure by the Provider to disclose this information may result in termination of this Contract.

10.  It is mutually understood and agreed this Section of the Contract shall be governed by the laws and regulations of the State of South Carolina both as to interpretation and performance by Provider. Any action at law, suit in equity, or judicial proceeding for the enforcement of this Section of the Contract or any provision thereof shall be instituted only in the courts of the State of South Carolina. Specific provisions related to dispute resolution between the MCO and Provider related to the other sections of this Contract are provided in those other sections.

**F.     Billing a Medicaid MCO Member.**

Provider may only bill a Medicaid MCO Member under the following conditions:

1.    When Provider renders services that are non-covered services and are not Additional Services, as long as the Provider:

•    Provides to the Medicaid MCO Member a written statement of the services prior to rendering said services, which must include:

o    The cost of each service(s)

o    An acknowledgement of Medicaid MCO Member's payment responsibility, and

•    Obtains Medicaid MCO Member's signature on the statement.

2.    When the service provided has a co-payment, as allowed by the MCO, Provider may charge the Medicaid MCO Member only the amount of the allowed co-payment, which cannot exceed the co-payment amount allowed by SCDHHS.

**G.     Audit, Records and Oversight.**

1.    Provider shall maintain an adequate record system for recording services, service providers, charges, dates and all other commonly accepted information elements for services rendered to Medicaid MCO Members pursuant to this Contract (including, but not limited to, such records as are necessary for the evaluation of the quality, appropriateness, and timeliness of services performed). Medicaid MCO Members and their representatives shall be given access to and can request copies of the Medicaid MCO Members' medical records, to the extent and in the manner provided by S.C. Code Ann. §44-115-10 et. seq., (Supp. 2000, as amended).

2.    SCDHHS, HHS, CMS, the Office of Inspector General, the State Comptroller, the State Auditor's Office, and the South Carolina Attorney General's Office shall have the right to evaluate, through audit, inspection, or other means, whether announced or unannounced, any records pertinent to this Contract, including those pertaining to quality, appropriateness and timeliness of services and the timeliness and accuracy of encounter data and Provider claims submitted to the MCO. The Provider shall cooperate with these evaluations and inspections. Provider will make office work space available for any of the above- mentioned entities or their designees when the entities are inspecting or reviewing any records related to the provision of services under this Contract.

3.    Whether announced or unannounced, Provider shall participate and cooperate in any internal and external quality assessment review, utilization management, and Grievance procedures established by SCDHHS or its designee.

4.    Provider shall comply with any plan of correction initiated by the MCO and/or required by SCDHHS.

5.    All records originated or prepared in connection with the Provider's performance of its obligations under this Contract, including, but not limited to, working papers related to the preparation of fiscal reports, medical records, progress notes, charges, journals, ledgers, and electronic media, will be retained and safeguarded by the Provider in accordance with the terms and conditions of this Contract. The Provider agrees to retain all financial and programmatic records, supporting documents, statistical records and other records of Medicaid MCO Members relating to the delivery of care or service under this Contract, and as further required by SCDHHS, for a period of five (5) years from the expiration date of the Contract, including any Contract extension(s). If any litigation, claim, or other actions involving the records have been initiated prior to the expiration of the five (5) year period, the records shall be retained until completion of the action and resolution of all issues which arise from it or until the end of the five (5) year period,

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is exempt from public disclosure of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

whichever is later. If Provider stores records on microfilm or microfiche, Provider must produce, at its expense, legible hard copy records upon the request of state or federal authorities, within fifteen (15) calendar days of the request.

6. SCDHHS and/or any designee will also have the right to:

a. Inspect and evaluate the qualifications and certification or licensure of Provider;

b. Evaluate, through inspection of Provider's facilities or otherwise, the appropriateness and adequacy of equipment and facilities for the provision of quality health care to Medicaid MCO Members;

c. Audit and inspect any of Provider's records that pertain to health care or other services performed under this Contract, determine amounts payable under this Contract;

d. Audit and verify the sources of encounter data and any other information furnished by Provider or the MCO in response to reporting requirements of this Contract or the MCO Contract, including data and information furnished by subcontractors.

7. Provider shall release medical records of Medicaid MCO Members, as may be authorized by the Medicaid MCO Member or as may be directed by authorized personnel of SCDHHS, appropriate agencies of the State of South Carolina, or the United States Government. Release of medical records shall be consistent with the provisions of confidentiality as expressed in this Contract.

8. Provider shall maintain up-to-date medical records at the site where medical services are provided for each Medicaid MCO Member for whom services are provided under this Contract. Each Medicaid MCO Member's record must be legible and maintained in detail consistent with good medical and professional practice which permits effective internal and external quality review and/or medical audit and facilitates an adequate system of follow-up treatment. SCDHHS representatives or designees shall have immediate and complete access to all records pertaining to the health care services provided to the Medicaid MCO Member.

**H.**    **Safeguarding Information.**

1. Provider shall safeguard information about Medicaid MCO Members according to applicable state and federal laws and regulations.

2. Provider shall assure that all material and information, in particular information relating to Medicaid MCO Members, which is provided to or obtained by or through the Provider's performance under this Contract, whether verbal, written, electronic file, or otherwise, shall be protected as confidential information to the extent confidential treatment is protected under state and federal laws. Provider shall not use any information so obtained in any manner except as necessary for the proper discharge of its obligations and securement of its rights under this Contract.

3. All information as to personal facts and circumstances concerning Medicaid MCO Members obtained by the Provider shall be treated as privileged communications, shall be held confidential, and shall not be divulged to third parties without the written consent of SCDHHS or the Medicaid MCO Member, provided that nothing stated herein shall prohibit the disclosure of information in summary, statistical, or other form which does not identify particular individuals.    The use or disclosure of

information concerning Medicaid MCO Members shall be limited to purposes directly connected with the administration of this Contract.

4. All records originated or prepared in connection with    Provider's performance of its obligations under this Contract, including but not limited to, working papers related to the preparation of fiscal reports, medical records, progress notes, charges, journals, ledgers, and electronic media, will be retained and safeguarded by the Provider and its subcontractors in accordance with the terms and conditions of this Contract.

**I.**    **Payment Timeframes**.

1. The MCO shall pay ninety percent (90%) of all Clean Claims from practitioners, either in individual or group practice or who practice in shared health facilities, within thirty (30) days of the date of receipt. The MCO shall pay ninety-nine percent (99%) of all Clean Claims from practitioners, either in individual or group practice or who practice in shared health facilities, within ninety (90) days of the date of receipt.    The date of receipt is the date the MCO receives the claim, as indicated by its data stamp on the claim. The date of payment is the date of the check or other form of payment.

2. The MCO and Provider may, by mutual agreement, establish an alternative payment schedule to the one presented.

3. Provider shall accept payment made by the MCO as payment-in-full for covered services and Additional Services provided and shall not solicit or accept any surety or guarantee of payment from the Medicaid MCO Member, except a specifically allowed by Subsection F, Member Billing, of this Section.

4. This Contract shall not contain any provision which provides incentives, monetary or otherwise, for the withholding of Medically Necessary Services.

5. Any incentive plans for providers shall be in compliance with 42 CFR Part 434 (2009, as amended), 42 CFR §417.479 (2008, as amended), 42 CFR §422.208 and 42 CFR §422.210 (2008, as amended).

2. **Continuation of Services**.    Provider covenants and agrees that in the event of a breach of the Provider Agreement by the PBM, termination of the Provider Agreement, or insolvency of the PBM, each Provider shall (i) provide all services and fulfill all of its obligations pursuant to the Provider Agreement for the remainder of any month for which the South Carolina Department of Health and Human Services (Department) has made payments to the Sponsor or PBM, and (ii) fulfill all of its obligations respecting the transfer of Enrollees to other providers, including record maintenance, access and reporting requirements. All such covenants, agreements, and obligations expressed in this paragraph shall survive the termination of this Provider Agreement. Additional information regarding these requirements may be found in the MCO Policy and Procedure Guide.

3. **Termination by Department**. The Department shall have the right to invoke against any Provider any remedy set forth in the Contract between Sponsor and Department, including the right to require the termination of the Provider Agreement, for each and every reason for which it may invoke such a remedy against the Sponsor or require the termination of the contract between Sponsor and Department.

4. **Compliance with State Contract.**    Provider must comply with all applicable requirements in the contract between the Sponsor and the Department.

## SOUTH DAKOTA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO licensed under South Dakota law (as such term is defined by South Dakota law; referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).    Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.   Member Hold Harmless.   In no event may Provider collect or attempt to collect from a Member any money owed to the Provider by PBM or Sponsor nor may the Provider have any recourse against Members for any charges for Covered Medications in excess of the copayment, coinsurance, or deductible amounts specified in the coverage, including Members who have a health savings account. S.D. Codified Laws 58-17F-11 (2)

2.   Member Communications. PBM and Sponsor will not prohibit or penalize a Provider from discussing treatment options with Members irrespective of PBM's or Sponsor's position on the treatment options, from advocating on behalf of Members within the utilization review or grievance processes established by PBM or Sponsor or from, in good faith, reporting to the state or federal authorities any act or practice by PBM or Sponsor that jeopardizes patient health or welfare. S.D. Codified Laws 58-17F-11 (5)

3.   Record Requests. Provider shall make any health records necessary to process claims, perform necessary quality assurance or quality improvement programs, or to comply with any lawful request for information from appropriate state authorities available to PBM or Sponsor upon request. S.D. Codified Laws 58-17F-11 (6)

4.   Termination/Continuation of Services. Unless a longer period is required under the Agreement, the terminating party shall provide at least sixty (60) days advance written notice to the other party before terminating the Agreement without cause. If Provider is terminated without cause or chooses to leave the network, then upon its own request or request by a Member and upon agreement by the Provider to follow all applicable network requirements, PBM and Sponsor shall permit the Member to continue an ongoing course of treatment for ninety (90) days following the effective date of the Agreement termination. If a Member has entered a second trimester of pregnancy at the time of Agreement termination as specified in this section, the continuation of network coverage through Provider shall extend to the provision of postpartum care directly related to the delivery. S.D. Codified Laws 58-17F-11 (7)

5.   Collection of Payments. The Provider shall collect applicable coinsurance, copayments, or deductibles from

Members pursuant to the evidence of coverage, and shall notify Members of their personal financial obligations for noncovered services. S.D. Codified Laws 58-17F-11 (8)

6.   Member Communications. PBM and Sponsor will not prohibit or penalize a Provider from discussing treatment options with Members irrespective of PBM's or Sponsor's position on the treatment options, from advocating on behalf of Members within the utilization review or grievance processes established by PBM or Sponsor or from, in good faith, reporting to the state or federal authorities any act or practice by PBM or Sponsor that jeopardizes patient health or welfare. S.D. Codified Laws 58-17F-11 (5)

7.   Record Requests. Provider shall make any health records necessary to process claims, perform necessary quality assurance or quality improvement programs, or to comply with any lawful request for information from appropriate state authorities available to PBM or Sponsor upon request. S.D. Codified Laws 58-17F-11 (6)

8.   Termination/Continuation of Services. Unless a longer period is required under the Agreement, the terminating party shall provide at least sixty (60) days advance written notice to the other party before terminating the Agreement without cause. If Provider is terminated without cause or chooses to leave the network, then upon its own request or request by a Member and upon agreement by the Provider to follow all applicable network requirements, PBM and Sponsor shall permit the Member to continue an ongoing course of treatment for ninety (90) days following the effective date of the Agreement termination. If a Member has entered a second trimester of pregnancy at the time of Agreement termination as specified in this section, the continuation of network coverage through Provider shall extend to the provision of postpartum care directly related to the delivery. S.D. Codified Laws 58-17F-11 (7)

9.   Collection of Payments. The Provider shall collect applicable coinsurance, copayments, or deductibles from Members pursuant to the evidence of coverage, and shall notify Members of their personal financial obligations for noncovered services. S.D. Codified Laws 58-17F-11 (8)

## TENNESSEE REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO licensed under Tennessee law (as such term is defined by Tennessee law; referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. Continuity of Care.

a. If PBM or Provider terminates the Agreement without cause, as provided for in the Agreement, then the Provider and issuer shall allow a Member who is:

i.   Under active treatment for a particular injury or sickness, to continue to receive covered benefits from Provider for the injury or sickness for a period of one hundred twenty (120) days from the date of notice of termination;

ii.   In the second trimester of pregnancy to continue care with treating Provider until completion of postpartum care; or

iii.   Being treated as an inpatient facility to remain at the facility until the Patient is discharged.

b.   Section 1 shall apply only if the treating Provider or inpatient facility agrees to continue to be bound by the terms, conditions and reimbursement rates of the Provider Agreement. Tenn. Code Ann. 56-7-2358

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential, information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

2.    Termination by DOI. To the extent Provider's services hereunder are provided to Members of a prepaid limited health service organization, the Agreement will be cancelled upon issuance of such an order by the Tennessee Department of Insurance pursuant to Tenn. Code § 56-51-129(c).

# TEXAS REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO licensed under Texas law (as such term is defined by Texas law; referred to as the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1.    **Applicability**.    The terms and conditions of this Addendum apply to Provider Agreements entered into with Providers located in Texas on or after August 16, 2003, and, on a prospective basis only, to existing Provider Agreements renewed on and after such date, to the extent such Providers are servicing entities subject to VATS Ins. Code 3.70-3C.

2.    **Notice to Members**.  Provider shall post a notice at each of its physical locations describing the process for resolving complaints with the applicable Sponsor.  The notice must include the Texas Department of Insurance's toll-free telephone number for filing complaints.  Tex. Ins. Code 843.283; 28 TAC §§ 3.9204(k), 11.901(a)(6).

3.    **Indemnification**.  Notwithstanding anything in the Provider Agreement to the contrary, Provider shall not be required to indemnify or hold harmless PBM or the applicable Sponsor to the extent any tort liability results from acts or omissions of PBM or the Sponsor, respectively.   Tex. Ins. Code §§ 843.310, 1301.065; 28 TAC §§ 11-901(a)7, 3.3703(a)(9), 3.9204(h).

4.    **Contracting**.  Notwithstanding anything in the Provider Agreement to the contrary, Provider is not restricted under the terms of the Provider Agreement from contracting with insurers, preferred provider plans, preferred provider organizations, or HMOs. 28 TAC 3.3703(a)(1).

5.    **Termination**.

    5.1    PBM shall provide a written explanation to Provider of the reason(s) for termination at least ninety (90) days prior to the effective date of such termination to the extent required by law.  On request (as allowed in Section 5.2 hereof) and before the effective date of the termination, and within at most sixty (60) days of request, Provider shall be entitled to such review and formal, though non-binding, recommendation from PBM in accordance with, and to the extent required by, 28 TAC 3.3703(a)(19), except in a case where there is imminent harm to patient health or an action by a state pharmacy board or other licensing board or governmental agency, that effectively impairs Provider's ability to practice or in a case of fraud or malfeasance. Tex. Ins. Code 843.306; 843.308; 1301.057; 28 TAC 11.901(a)(4), 3.9204(e); 28 TAC 3.3703(a)(19); 28 TAC 3.3706(d).

    5.2    Any notice of termination by PBM shall include Provider's right to request, within thirty (30) days of receipt of the termination notice, a review by insurer in accordance with, and to the extent required by 28 TAC § 3.3706(h), 3.9204(g), Tex Admin Code 843.307.

    5.3    If Provider voluntarily terminates the Provider Agreement or participation in any network, the Provider shall provide reasonable notice to Members under the Provider's care. PBM and/or Sponsor shall provide assistance to Provider in assuring that such notice requirements are met.  Tex. Ins. Code §§ 843.309, 1304.160; 28 TAC 3.3703(a)(18).  If PBM or

Sponsor terminates the Provider Agreement, reasonable advance notice shall be given by PBM or Sponsor as applicable to Members currently being treated by Provider as permitted by law. Tex. Ins. Code §§ 843.309; 28 TAC § 11.901(a)(4), 3.3706(i)(2); Tex. Ins. Code 1301.160.

    5.4    In the event of termination of this Provider Agreement, Provider shall provide reasonable advance notice of the impending termination to Members who are current patients of Provider.  Termination of the Provider Agreement, unless based on medical competence or professional behavior, does not release PBM or Sponsor from the obligation to continue reimbursing Provider for providing medically necessary Covered Medications at the time of termination to Members who have special circumstances in accordance with the dictates of medical prudence.   Examples of Members who may have special circumstances include a Member with a disability, acute condition, life-threatening illness, or who is past the twenty fourth (24th) week of pregnancy.  Sponsor shall provide continued reimbursement at rates no less than the rates set forth in the Provider Agreement for the Members care in exchange for continuity of ongoing treatment.  For purposes of this provision, "special circumstance" means a condition such that Provider reasonably believes that discontinuing care by Provider could cause harm to the Members. Provider shall identify in writing a special circumstance warranting continued service and must request that a Member be permitted to continue treatment under Provider's care and agree not to seek payment from the Member of any amount for which the Member would not be responsible if the Provider continued to participate under the Provider Agreement.  Disputes regarding the necessity for continued treatment by Provider shall be resolved directly between Provider and PBM.  This provision does not extend the obligation of Sponsor or PBM to reimburse Provider for ongoing treatment of a Member after: (1) the ninetieth (90th) day following the effective date of termination or (2) if Member has been diagnosed with a terminal illness at the time of termination, the expiration of the nine (9)-month period after the effective date of the termination. However, the obligation of Sponsor to reimburse Provider for services provided to a Member who is past the twenty fourth (24th) week of pregnancy at the time of termination, extends through delivery of the child, immediate postpartum care, and a follow-up checkup within the six-week period after delivery.  Tex. Ins. Code. §§ 843.362, 1272.302, 1301.152-1301.154; 28 TAC §§ 3.3703(12), 3.9204(f), 11.901(a)(3)& (5).

6.    **Requests for Information**.

    6.1    Provider shall be entitled to request from PBM all information reasonably necessary to determine that Provider is being compensated in accordance with the Provider Agreement.  Such request shall be handled in accordance with 28 TAC § 3.3703(a)(20) and 28 TAC § 11.901(11).  Provider may request a description and copy of the applicable coding guidelines,

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

including any applicable (a) underlying bundling, recoding, or other payment methodology and (b) fee schedules applicable to payment for specific services that Provider will receive under the Provider Agreement. PBM may provide the required information by any reasonable method. PBM shall provide the information not later than the thirtieth (30th) day after the date PBM receives the request.

6.2 PBM will provide notice of changes to information that will result in a change of payment to Provider not later than the ninetieth (90th) day before the date the changes take effect and shall not make retroactive revisions to the applicable coding guidelines and fee schedules. The Provider Agreement may be terminated by Provider on or before the thirtieth (30th) day after the date Provider receives information requested in this paragraph without penalty or discrimination in participation in other health care products or plans. 28 TAC 3.3703(a)(20)(D)

6.3 Upon receipt of information described in this paragraph, Provider may only: (a) use or disclose the information for the purpose of practice management, billing activities, and other business operations and (b) disclose the information to a governmental agency involved in the regulation of health care or insurance. 28 TAC 3.3703(a)(20)(G)

6.4 PBM shall, on Provider's request, provide the name, edition, and model version of the software that PBM uses to determine bundling and unbundling of claims, if applicable. 28 TAC 3.3703(a)(20)(a)

6.5 All information provided by PBM shall be considered confidential and proprietary to PBM, and Provider shall be prohibited from disclosing such information to any third party, unless required by law and then, in accordance with the terms of the Provider Agreement. Nothing in this section shall be construed to require PBM to provide specific information that would or may violate any applicable copyright law or agreement. However, PBM would supply, in lieu of any such withheld information, a summary of applicable information that would allow a reasonable person with sufficient training, experience and competence in claims processing, to determine that payment is made according to the terms of the Provider Agreement

6.6 This provision may not be waived, voided, or nullified by contract. Tex. Ins. Code 843.321, 1301.136; TAC 3.3703(a)(20); 11.901(a)(11)

7. **Member Hold Harmless**. Provider will hold Members harmless for payment of the cost of covered health care services in the event PBM fails to pay Provider for health care services. PBM will not engage in any retaliatory action, including termination of or refusal to renew a contract, against Provider because Network Provider has, on behalf of a Member, reasonably filed a complaint against PBM or has appealed a decision of PBM. Provider agrees that in no event, including, but not limited to non-payment by Sponsor or PBM, insolvency of Sponsor or PBM, or breach of the Provider Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against a Member or a person, other than Sponsor or PBM, acting on their behalf for Covered Medications provided pursuant to the Provider Agreement. This provision shall not prohibit collection of supplemental charges or Copayments made in accordance with the terms of the Prescription Drug Program. Provider further agrees that this provision shall survive termination of the Provider Agreement regardless of the cause giving rise to the termination and shall be construed to be for the benefit of Members and Sponsor. This provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Members or persons acting on their behalf. Any modification, addition, or deletion to the provisions of this clause shall be effective on a date no earlier than fifteen (15) days after the Texas Insurance Commissioner has received written notice of

such proposed changes. Tex. Ins. Code §§ 843.361, 1272.055; 28 TAC § 3.9204(i), 11.901(a)(1).

8. **Waiver**

8.1 Provider shall be entitled to a waiver of the requirement that claims be electronically submitted under the Provider Agreement in any of the following circumstances:

(a) During a systems failure or a catastrophic event that substantially interferes with the business operations of Provider (Tex Admin Code 21.3701(d)).

(b) No method is available for the submission of claims in electronic form. This exception applies to situations in which the federal standards for electronic submissions (45 C.F.R., Parts 160 and 162) do not support all of the information necessary to process the claim.

(c) The operation of small provider practices. This exception applies to those providers with fewer than ten full-time-equivalent employees, consistent with 42 C.F.R. § 424.32(d)(1)(vii).

(d) Demonstrable undue hardship, including fiscal or operational hardship.

(e) Any other special circumstances that would justify a waiver. 21.3701(e).

8.2 Provider's request for a waiver must be in writing and must include documentation supporting the issuance of a waiver. Upon receipt of a request for a waiver, PBM shall, within fourteen (14) calendar days, issue or deny a waiver in writing to Provider. A written denial shall include the reasons therefore and provide notice of Provider's right to appeal the determination to the Texas Department of Insurance within fourteen (14) calendar days of receipt. PBM shall not refuse to contract or renew the Provider Agreement with Provider because Provider has requested a waiver or appealed a waiver determination. Tex. Admin Code 21.3701(o)

8.3 Notwithstanding anything to the contrary in the Provider Agreement, PBM shall not limit the mode of electronic transmission that Provider may use to submit information to PBM electronically. Notwithstanding anything to the contrary in the Provider Agreement, Sponsor shall not directly or indirectly charge or hold Provider responsible for a fee for the adjudication of a claim. ESI shall provide Provider ninety (90) calendar day's written notice before requiring Provider to electronically submit claims or equivalent encounter information, referral certifications, or any authorization or eligibility transactions. Tex. Ins. Code § 1213.005; 28 TAC § 11.901(a)(13)

9. **Miscellaneous Restrictions and Requirements**.

9.1 Neither PBM nor Sponsor shall engage in any retaliatory action against Provider, including terminating Provider's participation under the Provider Agreement or refusing to renew the Provider Agreement, because Provider has reasonably filed a complaint against Sponsor on behalf of a Member or appealed a decision by Sponsor. Tex. Ins. Code §§ 843.281, 1301.066; 28 Tex. Admin. Code § 11.901(a)(2), 3.3703(a)(13)

9.2 Neither PBM nor Sponsor shall prohibit, attempt to prohibit, or discourage Provider from discussing or communicating in good faith with a current, prospective, or former Member, or a person designated by a Member regarding: (a) information or an opinion about the Member's health care, including the Member's medical condition or treatment options; (b) the provisions, terms, requirements, or services of the Prescription Drug Program as they relate to the Member's medical needs; (c) the fact that the Provider Agreement has terminated or that Provider will otherwise no longer be providing services under the Prescription Drug Program; or (d) the fact that Sponsor must allow referral to a non-Provider within no more

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

than five (5) business days of Provider's request if medically necessary Covered Medications are not available in network. Neither PBM nor Sponsor shall in any way penalize, terminate the participation of, or refuse to compensate Provider for Covered Medications because Provider discussed or communicated with a current, prospective, or former Member, or a person designated by a Member regarding such matters.  Tex. Ins. Code §§ 843.363, 1301.067; 28 Tex. Admin. Code §§ 3.3703(13), 3.9204(l)-(m), 11.903.

9.3      Neither PBM nor Sponsor shall use any financial incentive or make payment to Provider that acts directly or indirectly as an inducement to limit medically necessary services. Tex. Ins. Code §§ 843.314, 1301.068; 28 Tex. Admin. Code § 3.3703(a)(7).

9.4      Neither PBM, nor Sponsor or Provider may shall sell, lease, or otherwise transfer information regarding the payment or reimbursement terms of the Provider Agreement without the express authority of and prior adequate notification to the other. Tex. Ins. Code § 1301.056(b).

9.5      Provider agrees that Provider may bill Members based only on the discounted rate and provisions set forth in the Provider Agreement. Tex. Ins. Code § 1301.060; 28 Tex. Admin. Code § 3.3703(a)(10).

9.6      Neither PBM nor Sponsor shall refuse to process or pay an electronically submitted clean claim as defined by Tex. Ins. Code Title 8, Subtitle D, Chapter 1301, Subchapter C or Title 6, Subtitle C, Chapter 843, Subchapter J, because the claim is submitted together with or in a batch submission with a claim that is not a clean claim.   Tex. Ins. Code §§ 843.323, 1301.0641; 28 Tex. Admin. Code § 3.3703(22), 11.901(c).

9.7      Nothing in the Provider Agreement shall be construed to condition the administration of an immunization or vaccination by Provider upon the issuance of an immunization or vaccination protocol by a physician. 28 Tex. Admin. Code §§ 3.3703(a)(16), 11.904(a).

9.8  Nothing in the Provider Agreement shall be construed to prohibit Provider from administering immunizations or vaccinations if such immunizations or vaccinations are administered in accordance with the Texas Pharmacy Act and the rules promulgated thereunder. §§ 3.3703(a)(17), 11.904(b).

9.9  Nothing in the Provider Agreement shall be construed to extend statutory or regulatory time frames set forth by Texas law or to waive Provider's right to recover reasonable attorney's fees and court costs where provided for by statute.  28 Tex. Admin. Code § 21.2817.

9.10  To the extent capitation is used as a method of compensation, such capitation shall be in accordance with Tex. Ins. Code § 843.315 or Tex. Ins. Code § 843.316, and any primary care provider shall be selected in accordance with Tex. Ins. Code § 843.135; 28 Tex. Admin Code §§ 11.901(a)(9)-(10).

9.11 Provider agrees that it will comply with all applicable requirements of the Insurance Code 1661.005 (relating to refunds of overpayments from Members).  Tex. Admin Code 3.3703(25)

9.12 Provider is required to retain in its records updated information concerning a Member's other health benefit plan coverage. Tex. Admin Code 3.3703(21)

9.13 Provider shall permit the commissioner to examine at any time any information the department reasonably considers is relevant to: (A) the financial solvency of Provider and (B) the ability to meet Providers responsibilities in connection with providing services hereunder. Tex. Admin Code 11.260(b)(11)

## TEXAS MEDICAID ADDENDUM TO PARTCIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Texas Medicaid program administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control.  Without limiting the generality of the foregoing, Provider agrees as follows:

1.    **Information and Records**.
      a.      Provider agrees to, in accordance with the timelines, definitions, formats, and instructions specified by the Texas Health and Human Services Commission (hereafter referred to as "State"), provide to the State:
          i.      All information required under the Provider Agreement, including but not limited to the reporting requirements and other information related to Provider's performance of its obligations under this Provider Agreement; and
          ii.      Any information in its possession sufficient to permit State to comply with the Federal Balanced Budget Act of 1997 or other Federal or State laws, rules, and regulations.
      b.    Subject to the confidentiality requirements of the Provider Agreement, Provider agrees to provide the following entities or their designees with prompt, reasonable, and adequate access to this Provider Agreement and any records, books, documents, and papers that are related to this Provider Agreement and/or Provider's performance of its responsibilities under this Provider Agreement:
          i.      Texas Health and Human Services Commission (HHSC) and Managed Care Organization (MCO) Program personnel;
          ii.      U.S. Department of Health and Human Services;
          iii.      Office of Inspector General (OIG) and/or the Texas Medicaid Fraud Control Unit;
          iv.      an independent verification and validation contractor or quality assurance contractor acting on behalf of the State;
          v.      State or Federal law enforcement agency;
          vi.      special or general investigation committee of the Texas Legislature;
          vii.      the U.S. Comptroller General;
          viii.      the Office of the State Auditor of Texas; and
          ix.      any other State or Federal entity identified by the State, or any other entity engaged by State.
Provider must provide access wherever it maintains such records, books, documents, and papers.  Provider must provide such access in reasonable comfort and provide any furnishings, equipment, and other conveniences deemed reasonably necessary to fulfill the purposes described herein.
      c.    Requests for access may be for, but are not limited to, the following purposes:
          i.      examination;

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 205 of 236   PageID #: 12231

ii.   audit;

iii.   investigation;

iv.   contract administration;

v.   the making of copies, excerpts, or transcripts; or

vi.   any other purpose State deems necessary for contract enforcement or to perform its regulatory functions.

d.   Provider understands and agrees that the acceptance of funds, as a result of providing services to Sponsor's Enrollees, acts as acceptance of the authority of the State Auditor's Office ("SAO"), or any successor agency, to conduct an investigation in connection with those funds. Provider further agrees to cooperate fully with the SAO or its successor in the conduct of the audit or investigation, including providing all records requested.

e.   Upon receipt of a record review request from the HHSC OIG or another state or federal agency authorized to conduct compliance, regulatory, or program integrity functions, Provider must provide, at no cost to the requesting agency, the records requested within three (3) business days of the request. If the OIG or another state or federal agency representative reasonably believes that the requested records are about to be altered or destroyed or that the request may be completed at the time of the request and/or in less than 24 hours, the Provider must Provide the records requested at the time of the request and/or in less than 24 hours. The request for record review includes, but is not limited to: (i) all medical, business, financial and administrative records, including, all books, contracts, medical records, and patient care documentation; (ii) original prescriptions; (iii) signature logs (or other evidence approved in writing by PBM); (iv) wholesaler, manufacturer and distributor purchase records, excluding pricing information; (v) prescriber information; (vi) patient profiles; and (vii) such other records and information relating to Covered Medications provided to Enrollee or other health and human services program recipients and payments made for those Services. Failure to produce the records or make the records available for the purpose of reviewing, examining, and securing custody of the records may result in OIG imposing sanctions against the Provider as described in 1 TEX. ADMIN. CODE Chapter 371 Subchapter G.

2.   **Advance Directives**.   Provider agrees that it must comply with the requirements of State and Federal laws, rules and regulations relating to the advance directives.

3.   **Complaint and Appeal Process**.   Provider acknowledges the complaint and appeal process are more fully set forth in the Provider Manual.

4.   **Complaints**.   Provider understands and agrees that State reserves the right and retains the authority to make reasonable inquiry and to conduct investigations into Provider and Enrollee complaints. In addition, program violations are subject to administrative enforcement by the HHSC Office of Inspector General.

5.   **Confidentiality**.

a.   Provider must treat all information that is obtained through the performance of the services under this Provider Agreement as confidential information to the extent the confidential treatment is required under State and Federal laws, rules, and regulations. This includes, but is not limited to, information relating to applicants or Enrollees of State programs.

b.   Provider shall not use information obtained through the performance under this Provider Agreement in any manner except as is necessary for the proper discharge of obligations and securing of rights under this Provider Agreement.

c.   Provider shall protect the confidentiality of an Enrollee's Protected Health Information (PHI). Provider must comply with State and Federal laws, including the HIPAA Privacy and Security Rule governing the use and disclosure of PHI.

d.   Provider must comply with State and Federal laws and regulations governing Enrollee confidentiality (including minors) when providing information on family planning services to Enrollees.

6.   **Collection of Payments From Enrollees**.

a.   Provider is responsible for collecting at the time of service any applicable CHIP-Copayments or deductibles in accordance with CHIP cost-sharing limitations. Network may not refuse to provide services to an Enrollee if the Enrollee is unable to afford his/her copayment.

b.   Copayments are the only amounts that Provider may collect from CHIP Enrollees, except for costs associated with unauthorized non-emergency services provided to an Enrollee by out-of-providers for non-covered services.

c.   Provider shall not charge:

i.   Cost-sharing or deductible to CHIP Enrollees of Native American Tribes or Alaskan Natives;

ii.   Cost-sharing obligation for the balance of their term of coverage; and

iii.   Copayments for well-child or well-baby visits or immunizations.

d.   Provider must inform Enrollees of the costs for non-covered services prior to rendering such services and must obtain a signed private pay form from such Enrollee.

7.   **Early Childhood Intervention**.   To the extent applicable to pharmacy providers, Provider must cooperate and coordinate with local Early Childhood Intervention (ECI) programs to comply with Federal and State requirements relating to the development, review and evaluation of Individual Family Service Plans (IFSP). Provider understands and agrees that any Medically Necessary Health and Behavioral Health Services (as defined by the Sate) contained in an IFSP must be provided to the Enrollee in the amount, duration, scope and setting established in the IFSP.

8.   **Enrollee Counseling**.   If an Enrollee requests contraceptive services or family planning services, Provider must also provide the Enrollee counseling and education about family planning and available family planning services, if appropriate. Provider cannot require parental consent for Enrollees who are minors to receive family planning services.

9.   **Provider Agreement**.   Provider understands and agrees to the following:

a.   State Office of Inspector General ("SOIG") and/or the Texas Medicaid Fraud Control Unit must be allowed to conduct private interviews of Provider and its employees, agents, contractors, and patients;

b.   Requests for information from such entities must be complied with, in the form and language requested;

c.   Provider and its employees, agents, and contractors must cooperate fully with such entities in making themselves available in person for interviews, consultation, grand jury proceedings, pre-trial conference, hearings, trials and in any other process, including investigations at Provider's own expense;

d.   Compliance with these requirements will be at Provider's own expense;

e.   Provider is subject to all State and Federal laws and regulations relating to fraud, abuse, or waste in health care and the Medicaid and/or CHIP Programs, as applicable;

f.   Provider must cooperate and assist State and any State or Federal agency that is charged with the duty of identifying, investigating, sanctioning or prosecuting suspected fraud, abuse or waste;

g.   Provider must provide originals and/or copies of any and all information, allow access to premises, and provide records to the Office of the Inspector General, State, the Centers for Medicare and Medicaid Services (CMS), the U.S. Department of Health and Human Services, FBI, TDI, the Texas Attorney

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).   Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

General's Medicaid Fraud Control Unit or other unit of State or Federal government, upon request, and free-of-charge;

h.    If Provider places required records in another legal entity's records such as a hospital, Provider is responsible for obtaining a copy of these records for use by the above-named entities or their representatives;

i.    Provider must report any suspected fraud or abuse including any suspected fraud and abuse committed by Sponsor or an Enrollee to the State;

j.    Provider understands and agrees that it is subject to all State and Federal laws, rules, regulations, waivers, policies and guidelines, and court-ordered consent decrees, settlement agreements and other court orders that apply to this Provider Agreement, the Sponsor's Prescription Drug Program, and all persons or entities receiving state and federal funds. Provider understands and agrees that any violation of a State or Federal law relating to the delivery of services pursuant to this Provider Agreement or any violation of the contract between the State and Sponsor could result in liability for money damages, and /or civil or criminal penalties and sanctions under State and/or Federal law; and

k.    The following laws, rules, and regulation, and all amendments or modifications thereto, apply to this Provider Agreement:

i.    Environmental protections laws:

1.    Pro-Children Act of 1994 (20 U.S.C. §6081 *et seq.*) regarding the provision of a smoke-free workplace and promoting the non-use of all tobacco products.

2.    Environmental Policy Act of 1969 (42 U.S.C. § 4321 *et seq.*) and Executive Order 11514 ("Protection and Enhancements of Environmental Quality") relating to the institution of environmental quality control measures.

3.    Clean Air Act and Water Pollution Control Act regulations (Executive Order 11738, "Providing for Administration of the Clean Air Act and Federal Water Pollution Control Act with Respect to Federal Contracts, Grants, and Loans").

4.    State Clean Air Implementation Plan (42 U.SC. §740 *et seq.*) regarding conformity of federal actions to State Implementation Plan under §176(c) of the Clean Air Act.

5.    Safe Drinking Water Act of 1974 (21 U.S.C. §349; 42 U.S.C. §300f to 300j-9) relating to the protection of underground sources of drinking water.

ii.    State and Federal anti-discrimination laws:

1.    Title VI of the Civil Rights Act of 1964, Executive Order 11246 (Public Law 88-352);

2.    Section 504 of the Rehabilitation Act of 1973 (Public Law 93-112);

3.    Americans with Disabilities Act of 1990 (Public Law 101-336);

4.    Age Discrimination Act of 1975 (42 U.S.C. §§6101-6107);

5.    Title IX of the Education Amendments of 1972 (20 U.S.C. §200 *et seq*);

6.    Executive Order 13279, and its implementing regulations at 45 C.F.R. Part 87 or 7 C.F.R. Part 16;

7.    The HHS agency's administrative rules, as set forth in the TAC, to the extent applicable;

8.    Title 40, Texas Administrative Code, Chapter 73;

9.    the Immigration Reform and Control Act of 1986 (8 U.S.C. § 1101 *et seq.*) and the Immigration Act of 1990 (8 U.S.C. § 1101, *et seq.*) regarding employment verification and retention of verification forms; and

10.    the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Public Law 104-191) and the Health Information Technology for Economic and Clinical Health Act (HITECH Act) (42 U.S.C. 17931 *et seq*), each as amended.

10.    **Insurance**. Provider shall maintain, during the term of this Provider Agreement, Professional Liability Insurance as specified in the Provider Agreement or as required by law, but in no event, less than $100,000 per occurrence and $300,000 in the aggregate.

11.    **Enrollee Hold Harmless**.

a.    In the event that the PBM or Sponsor becomes insolvent or ceases operations, Provider understands and agrees that its sole recourse against the PBM or Sponsor will be through the PBM or Sponsor's bankruptcy, conservatorship, or receivership estate. Provider understands and agrees that the Enrollees may not be held liable for the PBM's or Sponsor's debt in the event of such entity's insolvency.

b.    Provider shall not bill or collect any amount from an Enrollee for Covered Medications provided pursuant to this Provider Agreement. Federal and State laws provide severe penalties for any provider who attempts to bill or collect any payment from a Medicaid recipient for a Covered Service.

c.    Provider understands and agrees that State is not liable or responsible for payment for Covered Medications rendered pursuant to this Provider Agreement.

12.    **Liability**. Provider understands and agrees that the State does not assume liability for the actions of, or judgments rendered against, the PBM or Sponsor, its respective employees, agents or subcontractors. Further, Provider understands and agrees that there is no right of subrogation, contribution, or indemnification against State for any duty owed to Provider by PBM or Sponsor for any judgment rendered against the PBM or Sponsor. State's liability to Provider, if any, will be governed by the Texas Tort Claims Act, as amended or modified (Tex. Civ. Pract. & Rem. Code §101.01 *et seq.*).

13.    **Marketing**.

a.    Provider agrees to comply with State's marketing policies and procedures, as set forth in the contract between the State and Sponsor (which includes the State's Uniform Managed Care Manual).

b.    Provider is prohibited from engaging in direct marketing to Enrollee's that is designed to increase enrollment in a particular health plan. The prohibition should not constrain Provider from engaging in permissible marketing activities consistent with broad outreach objectives and application assistance.

14.    **Dispute Resolution**.

a.    PBM or Sponsor may initiate and maintain any action necessary to stop Provider or employee, agent, assignee, trustee, or successor-in-interest from maintaining an action against State, an HHS Agency, or any Enrollee to collect payment from State, an HHS Agency, or any Enrollee above an allowable Copayment or deductible, excluding payment for non-covered services. This provision does not restrict Provider from collecting allowable Copayment and deductible amounts from Enrollees.

b.    Provider understands and agrees that it may not interfere with or place any liens upon the State's right or the PBM's or Sponsor's right, acting as the State's agent, to recovery from third party resources.

15.    **Communication With Enrollees**. Neither PBM nor Sponsor shall impose restrictions upon Provider's free communication with an Enrollee about the Enrollee's medical conditions, treatment options, PBM or Sponsor referral policies, and other PBM or Sponsor policies, including financial incentives or arrangements and all managed care plans with whom Provider contracts.

16.    **Provision of Services**. While performing the services described in the Provider Agreement, Provider agrees to: (i) comply with applicable laws, rules, and regulations and State's requests regarding personal and professional conduct generally

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

**© 2014 Express Scripts, Inc.**
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

applicable to the service locations; and (ii) otherwise conduct themselves in a businesslike and professional manner.

17. **Quality Assurance**. Provider agrees to comply with the PBM or Sponsor's quality assessment and performance and improvement program requirements.

18. **Termination**.

a. For CHIP, the Sponsor termination process for provider contracts must comply with the Texas Insurance Code and TCI regulations.

b. PBM or Sponsor must follow the procedures in 843.306 of the Tex. Ins. Code, herein described, if terminating this Provider Agreement. At least sixty (60) days before the effective date of the proposed termination, PBM or Sponsor must provide a written explanation to Provider of the reasons for termination. PBM or Sponsor may immediately terminate this Provider Agreement if Provider presents imminent harm to patient health, actions against a licensee or practice, fraud or malfeasance, or according to the Agreement in cases of fraud, waste or abuse. Tex. Ins. Code § 843.306.

c. Within sixty (60) days of the termination notice, Provider may request a review of PBM or Sponsor's proposed termination, as applicable, except in a case in which there is imminent harm to patient health, an action against a private licensees, fraud or malfeasance.

d. Provider may not offer or give anything of value to an officer or employee of the State of the State of Texas in violation of State law. A "thing of value" means any item of tangible or intangible property that has a monetary value of more than fifty dollars ($50.00) and includes, but is not limited to, cash, food, lodging, entertainment and charitable contributions. The term does not include contributions to public office holders or candidates for public office that are paid and reported in accordance with State and/or Federal law. PBM or Sponsor may terminate this Provider Agreement at any time for violation of this requirement. V.T.C.A., Penal Code § 36.10. .

19. **Child Protection**. At the request of the State, Provider must testify in court as needed for child protection litigation.

20. **TB Program**. Provider must report to the Texas Department of State Health Services or the local TB control program any Enrollee who is non-compliant, drug resistant, or who is or may be posing a public health threat.

21. **Emergency Supply**. Provider may supply a 72-hour supply of a prescribed drug when the medication is needed without delay and a prior authorization is not available. This applies to all drugs requiring a PA, either because they are non-preferred on the PDL or because they are subject to clinical edits.

The 72-hour emergency supply should be dispensed any time a PA cannot be resolved within 24 hours for a medication on the Vendor Drug List formulary that is appropriate for the Enrollee's medical condition. If the prescriber cannot be reached or is unable to request a PA, Provider should submit an emergency 72-hour prescription. A pharmacy can dispense a product that is packaged in a dosage form that is fixed and unbreakable, e.g., an albuterol inhaler, as a 72-hour emergency supply. HHSC Uniform Managed Care Manual, Chapter 3.3, Attachment E.

22. **Updates to contact information**. Provider must inform PBM of any changes to the Provider's address, telephone number, etc. HHSC Uniform Managed Care Manual, Chapter 3.3, Section VI, A.

23. **Coordination of Benefits**. Provider must coordinate benefits with an Enrollee has Medicare Part D or other insurance benefits. HHSC Uniform Managed Care Manual, Chapter 3.3, Section VI, C; HHSC Uniform Managed Care Pharmacy Claims Manual, Chapter 2.2, Section VI.

24. **Cancellation of Product Orders**. If Provider offers delivery services for Covered Medications, it must reduce, cancel or stop delivery if the Enrollee or the Enrollee's authorized representative submits an oral or written request to do so. Provider must maintain records documenting such request.

25. **Payment**. PBM shall adjudicate clean claims within 18 days from the date an electronic clean claims is submitted to PBM. PBM shall pay interest at a rate of 18% per year on all clean claims that are not adjudicated within 30 days. This provision applies to Texas Managed Medicaid claims.

26. **Fraud and Abuse**. If the Provider receives annual Medicaid payments of at least $5 million (cumulative, from all sources), the Provider must:

1. Establish written policies for all employees, managers, officers, contractors, subcontractors, and agents of the Provider. The policies must provide detailed information about the False Claims Act, administrative remedies for false claims and statements, any state laws about civil or criminal penalties for false claims, and whistleblower protections under such laws, as described in Section 1902(a)(68)(A) of the Social Security Act.

2. Include as part of such written policies detailed provisions regarding the Provider's policies and procedures for preventing Fraud, Waste, and Abuse.

3. Include in any employee handbook a specific discussion of the laws described in Section 1902(a)(68)(A) of the Social Security Act, the rights of employees to be protected as whistleblowers, and the Provider's policies and procedures for detecting and preventing Fraud, Waste, and Abuse.

# TEXAS WORKERS' COMPENSATION ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

## Requirements for Use of the Closed Formulary for Claims Subject to Certified Networks

(a) Applicability. The closed formulary applies to all drugs that are prescribed and dispensed for outpatient use for claims subject to a certified network on or after September 1, 2011 when the date of injury occurred on or after September 1, 2011.

(b) Preauthorization for claims subject to the Division's closed formulary. Preauthorization is only required for:

(1) drugs identified with a status of "N" in the current edition of the *ODG Treatment in Workers' Comp* (ODG) / Appendix A, *ODG Workers' Compensation Drug Formulary*, and any updates;

(2) any compound that contains a drug identified with a status of "N" in the current edition of the *ODG Treatment in Workers' Comp* (ODG) / Appendix A, *ODG Workers' Compensation Drug Formulary*, and any updates; and

(3) any investigational or experimental drug for which there is early, developing scientific or clinical evidence demonstrating the potential efficacy of the treatment, but which is not yet broadly accepted as the prevailing standard of care as defined in Labor Code §413.014(a).

(c) Preauthorization of intrathecal drug delivery systems.

(1) An intrathecal drug delivery system requires preauthorization in accordance with the certified network's treatment guidelines and preauthorization requirements pursuant

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

to Insurance Code Chapter 1305 and Chapter 10 of this title (relating to Workers' Compensation Health Care Networks).

(2) Refills of an intrathecal drug delivery system with drugs excluded from the closed formulary, which are billed using Healthcare Common Procedure Coding System (HCPCS) Level II J codes, and submitted on a CMS-1500 or UB-04 billing form, require preauthorization on an annual basis. Preauthorization for these refills is also required whenever:

(A) the medications, dosage or range of dosages, or the drug regime proposed by the prescribing doctor differs from the medications dosage or range of dosages, or drug regime previously preauthorized by that prescribing doctor; or

(B) there is a change prescribing doctor.

(d) Treatment guidelines. The prescribing of drugs shall be in accordance with the certified network's treatment guidelines and preauthorization requirements pursuant to Insurance Code Chapter 1305 and Chapter 10 of this title. Drugs included in the closed formulary prescribed and dispensed without preauthorization are subject to retrospective review of medical necessity and reasonableness of healthcare by insurance carrier in accordance with subsection (f) of this section.

(e) Appeals process for drugs excluded from the closed formulary.

(1) For situations in which the prescribing doctor determines and documents that a drug excluded from the closed formulary is necessary to treat an injured employee's compensable injury and has prescribed the drug, the prescribing doctor, other requestor, or injured employee must request approval of the drug in a specific instance by requesting preauthorization in accordance with the certified network's preauthorization process established pursuant to Chapter 10, Subchapter F of this title (relating to Utilization Review and Retrospective Review) and applicable provisions of Chapter 19 of this title (relating to Agents' Licensing).

(2) If preauthorization is pursued by an injured employee or requestor other than the prescribing doctor, and the injured employee or other requestor requests a statement of medical necessity, the prescribing doctor shall provide a statement of medical necessity to facilitate the preauthorization submission as set forth in §134.502 of this title (relating to Pharmaceutical Services).

(3) If preauthorization for a drug excluded from the closed formulary is denied, the requestor may submit a request for medical dispute resolution in accordance with §133.308 of this title (relating to MDR by Independent Review Organizations).

(4) In the event of an unreasonable risk of a medical emergency, an interlocutory order may be obtained in accordance with §133.306 of this title (relating to Interlocutory Orders for Medical Benefits) or §134.550 of this title (relating to Medical Interlocutory Order).

(f) Initial pharmaceutical coverage.

(1) Drugs included in the closed formulary which are prescribed for initial pharmaceutical coverage, in accordance with Labor Code §413.0141, may be dispensed without preauthorization and are not subject to retrospective review of medical necessity.

(2) Drugs excluded from the closed formulary which are prescribed for initial pharmaceutical coverage, in accordance with Labor Code §413.0141, may be dispensed without preauthorization and are subject to retrospective review of medical necessity.

(g) Retrospective review. Except as provided in subsection (f)(1) of this section, drugs that do not require preauthorization are subject to retrospective review for medical necessity in accordance with §133.230 of this title (relating to

Insurance Carrier Audit of a Medical Bill), §133.240 of this title (relating to Medical Payments and Denials), the Insurance Code, Chapter 1305, applicable provisions of Chapters 10 and 19 of this title.

(1) In order for an insurance carrier to deny payment subject to a retrospective review for pharmaceutical services that fall within the treatment parameters of the certified network's treatment guidelines, the denial must be supported by documentation of evidence-based medicine that outweighs the evidence-basis of the certified network's treatment guidelines.

(2) A prescribing doctor who prescribes pharmaceutical services that exceed, are not recommended, or are not addressed by the certified network's treatment guidelines, is required to provide documentation upon request in accordance with §134.500(13) of this title (relating to Definitions) and §134.502(e) and (f) of this title. 28 TAC § 134.540.

**Reconsideration for Payment of Medical Bills**

(a) If the health care provider is dissatisfied with the insurance carrier's final action on a medical bill, the health care provider may request that the insurance carrier reconsider its action.

(b) The health care provider shall submit the request for reconsideration no later than eleven months from the date of service.

(c) A health care provider shall not submit a request for reconsideration until:

(1) the insurance carrier has taken final action on a medical bill; or

(2) the health care provider has not received an explanation of benefits within 50 days from submitting the medical bill to the insurance carrier.

(d) The request for reconsideration shall:

(1) reference the original bill and include the same billing codes, date(s) of service, and dollar amounts as the original bill;

(2) include a copy of the original explanation of benefits, if received, or documentation that a request for an explanation of benefits was submitted to the insurance carrier;

(3) include any necessary and related documentation not submitted with the original medical bill to support the health care provider's position; and

(4) include a bill-specific, substantive explanation in accordance with §133.3 of this chapter (relating to Communication Between Health Care Providers and Insurance Carriers) that provides a rational basis to modify the previous denial or payment.

(e) An insurance carrier shall review all reconsideration requests for completeness in accordance with subsection (d) of this section and may return an incomplete reconsideration request no later than seven days from the date of receipt. A health care provider may complete and resubmit its request to the insurance carrier.

(f) The insurance carrier shall take final action on a reconsideration request within 21 days of receiving the request for reconsideration. The insurance carrier shall provide an explanation of benefits for all items included in a reconsideration request in the form and format prescribed by the Division.

(g) A health care provider shall not resubmit a request for reconsideration earlier than 26 days from the date the insurance carrier received the original request for reconsideration or after the insurance carrier has taken final action on the reconsideration request.

(h) If the health care provider is dissatisfied with the insurance carrier's final action on a medical bill after reconsideration, the health care provider may request medical

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

dispute resolution in accordance with Chapter 133, Subchapter D of this title (relating to Dispute of Medical Bills).  28 TAC § 134.250.

# UTAH REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Utah law (as such terms are defined by Utah law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

(1)    **Insolvency**.
   (a)  In the event PBM or Sponsor:
      (i)  fails to pay for Covered Medications as set forth in the Agreement, the Member shall not be liable to Provider for any sums owed by PBM or Sponsor; and
      (ii)  becomes insolvent, the rehabilitator or liquidator may require Provider to:
         (A)  continue to provide Covered Medications under the Agreement until the earlier of:
            (I)  ninety (90) days after the date of the filing of a petition for rehabilitation or the petition for liquidation; or
            (ii)  the date the term of the Agreement ends; and
         (B)  subject to Subsection (1)(c), reduce the fees Provider is otherwise entitled to receive from PBM under the Agreement during the time period described in Subsection (1)(a)(ii)(A).
   (b)  If the conditions of Subsection (1)(c) are met, Provider shall:
      (i)  accept the reduced payment as payment in full; and
      (ii)  relinquish the right to collect additional amounts from the Member.
   (c)  Notwithstanding Subsection (1)(a)(ii)(B):
      (i)  the rehabilitator or liquidator may not reduce a fee to less than seventy five (75%) of the regular fee set forth in the Agreement; and
      (ii)  the Member shall continue to pay the same Copayments, deductibles, and other payments for Covered Medications received from Provider that the Member was required to pay before the filing of:
         (A)  the petition for rehabilitation; or
         (B)  the petition for liquidation. Utah Code 31A-8-407(1), 31A-22-617(1)
(2)    **Member Hold Harmless.** Provider may not collect or attempt to collect from the Member sums owed by PBM or Sponsor or the amount of the regular fee reduction authorized under Subsection (1)(a)(ii) if Provider's contract:
   (a) is not in writing as required in Subsection (1); or
   (b) fails to contain the language required by Subsection (1). Utah Code 31A-8-407(2), 31A-22-617(1)

(3)    **Payment Disputes**.
   (a)  A person listed in Subsection (3)(b) may not bill or maintain any action at law against a Member to collect:
      (i) sums owed by the PBM or Sponsor; or
      (ii) the amount of the regular fee reduction authorized under Subsection (1)(a)(ii).
   (b) Subsection (3)(a) applies to:
      (i) Provider;
      (ii) an agent;
      (iii) a trustee; or
      (v)  an assignee of a person described in Subsections (3)(b)(i) through (iii).
   (c)  In any dispute involving a Provider's claim for reimbursement, the same shall be determined in accordance with applicable law, the Agreement, the subscriber contract, and the PBM and Sponsor's written payment policies in effect at the time services were rendered.
   (d)  If the parties are unable to resolve their dispute, the matter shall be subject to binding arbitration by a jointly selected arbitrator. Each party is to bear its own expense except the cost of the jointly selected arbitrator shall be equally shared. This Subsection (3)(d) does not apply to the claim of a general acute hospital to the extent it is inconsistent with the hospital's Agreement.
   (e)  PBM or Sponsor may not penalize Provider solely for pursuing a claims dispute or otherwise demanding payment for a sum believed owing. Utah Code 31A-8-407(3), 31A-22-617(1)
(4)  **Network Payment Guarantee**. If PBM permits another private entity with which it does not share common control to use or otherwise lease one or more of the organization's networks that include participating providers, PBM ensures that the entity pays Provider in accordance with the same fee schedule and general payment policies as PBM would for that network unless payment for services is governed by a public program's fee schedule. Utah Code 31A-8-407(4), 31A-22-617(1)
(5)    **Termination**. During the first two (2) years of Providers Agreement with PBM, PBM may terminate the Agreement with Provider with or without cause upon giving the requisite amount of notice provided in the Agreement, but in no case shall it be less than sixty (60) days. Utah Code 31A-22-617.1(2)(a)

# VERMONT REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Vermont law (as such terms are defined by Vermont law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

1) **Continuation of Care**. In the event of PBM or Sponsor's impairment or insolvency Provider shall continue providing Covered Medications for the duration of the contract period for which premiums have been paid and continue providing Covered Medications Members who are confined on the date of impairment or insolvency in an inpatient facility until their discharge or expiration of benefits. Vt. Admin Code 4-5-3:10.500 § 5.3 (M)

2) Provider shall notify PBM in the event of any change that would impact Provider's credentialing status or ongoing availability to Members. Vt. Admin Code 4-5-3:10.500 § 5.3 (G)

3) **Records**. Provider ensure the availability and confidentiality of the health records necessary for monitoring and evaluation of the quality of care, and to conduct medical and other health care evaluations and audits to determine, on a concurrent or retrospective basis, the necessity and appropriateness of care provided to Members. Each Provider make health records available as required by law to appropriate state and federal authorities involved in assessing the quality of care or investigating the grievances or complaints of Members, and to comply with the applicable state and federal laws related to the confidentiality of medical or health records. Vt. Admin Code 4-5-3:10.500 § 5.3 (I)

4) **Hold Harmless**. Provider agrees that in no event, including nonpayment by the managed care organization, insolvency of PBM or the Sponsor, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member or a person acting on behalf of the Member for services provided pursuant to this Agreement. This Agreement does not prohibit Provider from collecting coinsurance, deductibles or copayments, as specifically provided in the certificate of coverage, or fees for uncovered services delivered on a fee-for-service basis to Members. This Agreement does prohibit Provider from requesting payment from a Member for any services that have been confirmed by independent external review obtained through the Department of Banking, Insurance, Securities and Heath Care Administration pursuant to Vermont law to be medically unnecessary, experimental, investigational or a medically inappropriate off-label use of a drug. Vt. Admin Code 4-5-3:10.500 § 5.3 (L)

5) **Terminations**. In addition to any other obligations under the Agreement, within five (5) working days from the date of a final notice of termination, either for or without cause, Provider shall supply PBM with a list of his or her patients that are Members. Vt. Admin Code 4-5-3:10.500 § 5.3 (O) To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Virginia law (as such terms are defined by Virginia law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"): In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

    i. **Fair Business Standards**. In the processing of any payment of claims for Covered Medications rendered by Provider under the Provider Agreement and in performing under the Provider Agreement, the parties shall adhere to and comply with the minimum fair business standards required under Va. Code Ann. § 38.2-3407.15(B) (see also Va. Code Ann. § 38.2-4319 and 4214), Va. Code Ann. § 38.2-3407.15(B)(1).

    ii. **Electronic Records**. PBM shall maintain a written or electronic record of the date of receipt of a claim. Provider shall be entitled to inspect such record on request and to rely on that record or on any other admissible evidence as proof of the fact of receipt of the claim, including without limitation electronic or facsimile confirmation of receipt of a claim. Va. Code Ann. § 38.2-3407.15(B)(1).

    iii. **Clean Claim Determination**. PBM shall, within thirty (30) days after receipt of a claim, request electronically or in writing from Provider the information and documentation that PBM believes will be required to process and pay the claim or to determine if the claim is a clean claim. Upon receipt of the additional information, necessary to make the original claim a clean claim, requested under this subsection, claims shall be paid in compliance with this Section. PBM shall not refuse to pay a claim for Covered Medications rendered pursuant to this Provider Agreement if PBM fails timely to notify or attempt to notify Provider of the matters identified above unless such failure was caused in material part by Provider; however, nothing herein shall preclude PBM from imposing a retroactive denial of payment of such a claim if permitted by the Provider Agreement unless such retroactive denial of payment of the claim would violate subsection (h) set forth below. Nothing in this subsection shall require PBM to pay a claim that is not a clean claim. Va. Code Ann. § 38.2-3407.15(B)(2).

    a) **Interest on Claim**. Any interest owing or accruing on a claim under § 38.2-3407.1 or § 38.2-4306.1 of Title 38.2 of the Virginia Code, under the Provider Agreement, or under any other applicable law shall, if not sooner, be paid without necessity of demand at the time the claim is paid or within sixty (60) days thereafter. Va. Code Ann. § 38.2-3407.15(B)(3).

    b) **Communications Regarding Claims**. PBM and/or Sponsor, as applicable, shall establish and implement reasonable policies to permit Provider (i) to confirm in advance during normal business hours by free telephone or electronic means if available whether the health care services to be provided are medically necessary (if applicable) and a covered benefit and (ii) to determine the Sponsor's requirements applicable to Provider (or to the type of health care services which Provider has contracted to deliver under this Provider Agreement) for (1) pre-certification or authorization of coverage decisions, (2) retroactive reconsideration of a certification or authorization of coverage decision or retroactive denial of a previously paid claim, (3) pharmacy-specific payment and reimbursement methodology, coding levels and methodology, downcoding, and bundling of claims, and (4) other pharmacy-specific applicable claims processing and payment matters necessary to meet the terms and conditions of the Provider Agreement, including determining whether a claim is a clean claim. Va. Code Ann. § 38.2-3407.15(B)(4)(a).

    c) **Access to Policies**. PBM shall make available to Provider within ten (10) business days of receipt of a request, copies of or reasonable electronic access to all such policies that are applicable to Provider or to the particular health care services identified by Provider. In the event the provision of the entire policy would violate any copyright law, PBM may instead comply with this subsection by timely delivering to Provider a clear explanation of the policy as it applies to Provider and to any health care services identified by Provider. Va. Code Ann. § 38.2-3407.15(B)(4)(b).

    d) **Previously Authorized Claims**. PBM and/or Sponsor shall pay a claim if PBM and/or Sponsor has previously

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is exempt from public disclosure under 5 U.S.C. §552 (b).   Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

authorized the health care service or has advised Provider or Member in advance of the provision of health care services that the health care services are medically necessary and a covered benefit, unless:

      i)   The documentation for the claim clearly fails to support the claim as originally authorized; or

      ii)   The refusal is because (1) another sponsor is responsible for the payment, (2) Provider has already been paid for the health care services identified on the claim, (3) the claim was submitted fraudulently or the authorization was based in whole or material part on erroneous information provided to PBM or Sponsor by Provider, Member, or other person not related to PBM or Sponsor, as applicable, or (4) the person receiving the health care services was not eligible to receive them on the date of service and PBM and/or Sponsor did not know, and with the exercise of reasonable care could not have known, of the person's eligibility status. Va. Code Ann. § 38.2-3407.15(B)(5).

    e)   **No Retroactive Denial**. Neither PBM nor Sponsor may impose any retroactive denial of a previously paid claim unless the PBM or the Sponsor has provided the reason for the retroactive denial and (i) the original claim was submitted fraudulently, (ii) the original claim payment was incorrect because Provider was already paid for the health care services identified on the claim or the health care services identified on the claim were not delivered by the Provider, or (iii) the time which has elapsed since the date of the payment of the original challenged claim does not exceed the lesser of (iv) twelve (12) months or (v) the number of days within which the carrier requires under its Provider Agreement that a claim be submitted by Provider following the date on which a health care service is provided. PBM shall notify Provider at least thirty (30) days in advance of any retroactive denial of a claim. Va. Code Ann. § 38.2-3407.15(B)(6).

    f)   **Retroactive Denial Exception**. Neither PBM nor Sponsor may impose any retroactive denial of payment or in any other way seek recovery or refund of a previously paid claim unless PBM or Sponsor specifies in writing the specific claim or claims for which the retroactive denial is to be imposed or the recovery or refund is sought, and provides a written explanation of why the claim is being retroactively adjusted. Va. Code Ann. § 38.2-3407.15(B)(7).

    g)   **Included Information**. This Provider Agreement shall include, at the time it is presented to Provider for execution, (i) the fee schedule, reimbursement policy, or statement as to the manner in which claims will be calculated and paid which is applicable to Provider or to the range of health care services reasonably expected to be delivered by Provider on a routine basis and (ii) all material addenda, schedules and exhibits thereto and any policies (including those referred to in subsection e above) applicable to Provider or to the range of health care services reasonably expected to be delivered by Provider under the Provider Agreement. Va. Code Ann. § 38.2-3407.15(B)(8).

    h)   **Amendment**. No amendment to the Provider Agreement or to any addenda, schedule, exhibit or policy thereto (or new addenda, schedule, exhibit or policy) applicable to Provider (or to the range of health care services reasonably

expected to be delivered by Provider) shall be effective as to Network Provider, unless Network Provider has been provided with the applicable portion of the proposed amendment (or the proposed new addenda, schedule, exhibit or policy) at least sixty (60) calendar days before the proposed effective date and Provider has failed to notify PBM in writing within thirty (30) calendar days of receipt of the documentation of Provider's intention to terminate the Provider Agreement at the earliest date thereafter permitted under the Provider Agreement. Va. Code Ann. § 38.2-3407.15(B)(9).

    i)   **Failure to Comply**. PBM and/or Sponsor shall not be violation of Va. Code Ann. § 38.2-3407.15 if its failure to comply is caused in material part by Provider or if PBM's or Sponsor's compliance is rendered impossible due to matters beyond such entity's control (such as an act of God, insurrection, strike, fire, or power outages), which are not caused in material part by PBM or Sponsor, as applicable. Va. Code Ann. § 38.2-3407.15(D).

    j)   **Payment Dispute**. PBM and/or Sponsor, as applicable, has established in writing its claim payment dispute mechanism and shall make this information available to Provider upon request. Va. Code Ann. § 38.2-3407.15(11).

    k)   **Services to HMO Members/Member Hold Harmless**. In addition, to the extent Provider provides services to Members of an HMO, Provider agrees to the following:

    l)   Provider hereby agrees that in no event, including, but not limited to nonpayment by Sponsor or PBM, or the insolvency of Sponsor or PBM, or breach of the Provider Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from or have any recourse against any Member other than the Sponsor for Covered Medications provided pursuant to this Provider Agreement. This provision shall not prohibit collection of any applicable Copayments or deductibles billed in accordance with the terms of Sponsor's subscriber Provider Agreement. Provider further agrees that (i) this provision shall survive the termination of the Provider Agreement regardless of the cause giving rise to such termination and shall be construed to be for the benefit of Sponsor's Members and (ii) this provision supersedes any oral or written agreement to the contrary now existing or hereafter entered into between Provider and Members or persons acting on such Member's behalf. Va. Code Ann. § 38.2-5805(C)(9), (10); Va. Code Ann. § 38.2-4301(C)(2).

    m)   Neither Provider nor its agent, trustee, or assignee thereof, may maintain any action at law against a Member to collect sums owed by Sponsor or PBM. Va. Code Ann. § 38.2-5805(C)(2), (5).

    n)   In the event either Sponsor or PBM fails to pay for Covered Medications as set forth in the Provider Agreement, Members shall not be liable to Provider for any sums owed by either PBM or Sponsor. Va. Code Ann. § 38.2-5805(C)(4).

    o)   **Termination**. If Provider terminates this Provider Agreement, Provider shall give PBM and Sponsor at least sixty (60) days, unless longer is required under the Agreement, then in accordance with the Agreement, advance written notice of termination. Va. Code Ann. § 38.2-5805(C)(1), (7).

## VIRGINIA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the Kentucky Medicaid program ("Plan") administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose–in whole or in part–this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: This information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

1.  **Sponsor's Agreement with the Virginia Department of Medical Assistance Services**.  PBM and Provider agree to abide by all applicable provisions of a Sponsor's agreement with the Virginia Department of Medical Assistance Services (the "Medicaid Contract") and no terms of this Agreement shall terminate the legal liability of Sponsor to Sponsor's Medicaid Contract.

2.  **Hours of Operation**.  Provider's hours of operation for Medicaid Members shall be no less than the hours of operation offered to non-Medicaid Members.

3.  **Member Communication**.  Nothing in the Provider Agreement shall be construed to limit Provider from advising a Medicaid Member about his or her health status, medical care, or treatment.

4.  **Provider shall**:

a)  Participate in and contribute required data to a Sponsor's quality improvement and other assurance programs as required in the Medicaid Contract;

b)  Abide by the terms of the Medicaid Contract for the timely provision of emergency and urgent care.  Where applicable, Provider agrees to follow those procedures for handling urgent and emergency care cases stipulated in any required hospital/emergency department Memorandums of Understanding signed by the Sponsor in accordance with the Medicaid Contract;

c)  Submit Sponsor's utilization data in the format specified by the Sponsor, so the Sponsor can meet the Virginia Department of Medical Assistance Services' specifications required by the Medicaid Contract;

d)  Comply with all non-discrimination requirements in the Medicaid Contract;

e)  Comply with all record retention requirements;

f)  Provide representatives of Sponsor, as well as duly authorized agents or representatives of the Virginia Department of Medical Assistance Services, the U.S. Department of Health and Human Services, and the Virginia State Medicaid Fraud Unit access to Provider's premises and this Agreement and/or its medical records in accordance with the Medicaid Contract. Provider agrees to preserve the full confidentiality of Medicaid Members' medical records in accordance with the Medicaid Contract;

g)  Disclose the required information, at the time of application, credentialing, and/or re-credentialing, and/or upon request, in accordance with 42 C.F.R. §455 Subpart B, as related to ownership and control, business transactions, and criminal conviction for offenses against Medicare, Medicaid, CHIP and/or other Federal health care programs;

h)  Comply with the requirements for maintenance and transfer of medical records stipulated in the Medicaid Contract.  Provider shall make medical records available to Medicaid Members and their authorized representatives within ten (10) working days of the records request. Provider shall maintain all Medicaid Member medical records in paper or electronic format for all Medicaid members.  Provider shall comply with HIPAA;

i)  Ensure the confidentiality of family planning services in accordance with the Medicaid Contract, except to the extent required by law, including but not limited to, the Virginia Freedom of Information Act;

j)  Not create barriers to access to care by imposing requirements on Medicaid Members that are inconsistent with the provision of medically necessary and Covered Medicaid Services;

k)  Hold Medicaid Members harmless for charges for any Covered Services, including circumstances where the Provider fails to obtain necessary referrals, pre-authorization, or fails to perform other required administrative functions;

l)  Not bill a Medicaid Member for medically necessary Covered Services that are provided during the Medicaid Member's period of Sponsor enrollment.  This provision shall be in effect even if the Sponsor becomes insolvent.  If a Medicaid Member agrees in advance of receiving the service and in writing to pay for a non- Covered Service, Provider may bill the Medicaid Member;

m)  Forward to the PBM, or Sponsor, medical records within then (10) working days of the PBM's or Sponsor's request;

n)  Promptly provide or arrange for the provision of all services required under this Agreement.  This provision shall continue to be in effect during the term of this Agreement, and for periods for which payment as been made even if Provider becomes insolvent, until such time as the Medicaid Members are withdrawn from Provider's care.

5.  **Obligations of the State of Virginia**.  Notwithstanding any other provision to the contrary, the obligations of the State of Virginia shall be limited to annual appropriations by its governing body for the purpose of the Provider Agreement.

6.  PBM shall pay Network Pharmacy within thirty (30) days of the receipt of a claim.

## WASHINGTON REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Washington law (as such terms are defined by Washington law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum").  In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control.  Without limiting the generality of the foregoing, Provider agrees as follows:

1.  **Administrative Policies**.  The Provider Agreement (including the Provider Manual) sets forth Provider's responsibilities with respect to applicable administrative policies and programs, including but not limited to:  payment terms, utilization review, quality assessment and improvement programs, credentialing, grievance procedures, data reporting requirements, confidentiality requirements, and applicable federal and state requirements.  RCW 48.43.505; WAC 284-43-320(4).

2.  **Audit Guidelines**.  The audit of records by PBM shall be limited to Members and shall be limited to the extent necessary to perform the audit.  To the extent required by law, Provider shall have the right to audit denials of claims.  WAC 284-43-324.

3.  **Compensation Notification**.  Notwithstanding anything in the Provider Agreement to the contrary, Provider shall have reasonable notice of not less than sixty (60) days of changes that affect Provider compensation and that affect health care service delivery unless changes to federal or state law or regulations make such advance notice impossible, in which case notice shall be provided as soon as possible.  Subject to any termination and continuity of care provisions of the Provider Agreement, Provider may terminate the Provider Agreement without penalty prior to the effective date of the change if Provider does not agree with the changes.  No change to the Provider Agreement may be

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

made retroactive without the express consent of Provider. WAC 284-43-320(4).

4. **Contracting Outside Plan**. Provider acknowledges and agrees that Sponsors may not prohibit directly or indirectly Members from freely contracting at any time to obtain any health care services outside the Prescription Drug Program on any terms or conditions the Members choose. Nothing in this section shall be construed to bind a Sponsor or PBM for any services delivered outside the Plan. RCW 48.43.085; WAC 284-43-320(10).

5. **Termination Without Cause/Continuity of Care**. To the extent the parties are permitted to terminate the Provider Agreement without cause, the parties shall provide at least sixty (60) days', unless longer is required by the Agreement, then in accordance with the Agreement, written notice to each other before terminating the contract without cause. Provider shall make a good faith effort to assure that written notice of termination is provided to all Members who are customers of the Provider on a regular basis within fifteen (15) working days of receipt or issuance of a notice of termination. WAC 284-43-320(7). In the event of termination of the Provider Agreement without cause, Provider shall continue to provide services to Members in accordance with the terms and conditions of the Provider Agreement for at least sixty (60) days following notice of termination to the Members or, in group coverage arrangements involving periods of open enrollment, only until the end of the next open enrollment period. RCW 48.43.515(7).

6. **Non-Discrimination**. Provider shall provide services under the Provider Agreement to Members without regard to the Member's enrollment in a Prescription Drug Program as a private purchaser of a Prescription Drug Program or as a participant in publicly financed programs of health care services. This requirement does not apply to circumstances when the Provider should not render services due to limitations arising from lack of training, experience, skill, or licensing restrictions. WAC 284-43-320(8).

7. **Member Eligibility / Benefit Notification**. PBM shall provide eligibility and benefit information access as set forth in the Provider Agreement. Coverage for emergency and non-emergency care that had prior authorization under the Provider Agreement and a Prescription Drug Program's written policies at the time the care was rendered shall not be retrospectively denied as not covered. Nothing contained in the Provider Agreement may have the effect of modifying benefits, terms, or conditions contained in a Prescription Drug Program. In the event of any conflict between the Provider Agreement and a Prescription Drug Program, the benefits, terms, and conditions of the Prescription Drug Program shall govern with respect to coverage provided to Members. RCW 48.43.525; WAC 284-43-320(1).

8. **Grievance Procedures/Dispute Resolution**. Provider is entitled a fair dispute resolution mechanism. In addition to the dispute resolution process set forth in the Provider Agreement, Provider shall contact PBM at the address listed in the "Notice" provision of the Provider Agreement for the procedures for processing and resolving disputes. WAC 284-43-320(11). In all events, the following shall apply:

a. Provider shall have the opportunity to be heard regarding a compliant after submitting a written request to PBM for review. If PBM fails to grant or reject a request within thirty (30) days after it is made, Provider may proceed as if the complaint had been rejected. A complaint that has been rejected by PBM may be submitted to nonbinding mediation. Mediation shall be conducted under the rules of mediation agreed to by the parties. If PBM and Provider do not resolve Provider's complaint through the nonbinding mediation process, Provider may seek resolution of the complaint before a court of competent jurisdiction. This section is solely for resolution of Provider complaints. Complaints by, or on behalf of, a Member are not subject to these grievance processes. RCW 48.43.055.

b. With respect to billing disputes, PBM shall render a decision within sixty (60) days of receipt of a written complaint from Provider. WAC 284-43-322(5).

c. In all events, Provider shall have not less than thirty (30) days after the action giving rise to a dispute for Provider to complain and initiate the dispute resolution process. Prior to initiating any judicial remedy, Provider must first exercise the dispute resolution process set forth in the Provider Agreement. WAC 284-43-322.

9. **Member Hold Harmless**.

a. In accordance with WAC 284-43-320(2), the parties agree as follows:

i. Provider hereby agrees that in no event, including, but not limited to nonpayment by PBM or a Sponsor, insolvency of PBM or a Sponsor, or breach of this Provider Agreement shall Provider bill charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against a Member or person acting on their behalf, other than Sponsor, for services provided pursuant to the Provider Agreement. This provision shall not prohibit collection of deductibles, Copayments, coinsurance, and/or non-Covered Medications, which have not otherwise been paid by a primary or secondary carrier in accordance with regulatory standards for coordination of benefits, from Members in accordance with the terms of the Member's Prescription Drug Program.

ii. Provider agrees, in the event of insolvency of PBM or a Sponsor, to continue to provide the services promised in the Provider Agreement to Members for the duration of the period for which premiums on behalf of the Member was paid or until the Member's discharge from inpatient facilities, whichever time is greater.

iii. Notwithstanding any other provision of this Provider Agreement, nothing in the Provider Agreement shall be construed to modify the rights and benefits contained in the Member's Plan.

iv. Provider may not bill the Member for Covered Medications (except for deductibles, copayments, or coinsurance) where payment is denied because Provider has failed to comply with the terms or conditions of the Provider Agreement.

v. Provider further agrees (1) that the provisions of (i), (ii), (iii), and (iv) of this subsection shall survive termination of the Provider Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of Members, and (2) that this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Provider and Members or persons acting on their behalf.

vi. To the extent permitted by the Provider Agreement, if Provider contracts with other providers or facilities which agree to provide Covered Medications to Members with the expectation of receiving payment directly or indirectly from PBM or Sponsor, such providers or facilities must agree to abide by the provisions of (i), (ii), (iii), (iv), and (v) of this subsection.

b. Providers that willfully collect or attempt to collect an amount from a Member, knowing that collection to be in violation of the Provider Agreement, constitutes a Class C felony under RCW 48.80.030(5). WAC 284-43-320(3); RCW 48.80.030(5) and (6).

c. In the event PBM or Sponsor fails to pay for services as provided in the Provider Agreement, the Member shall not be liable to the Provider for sums owed by PBM or Sponsor. This requirement shall survive termination of the Provider Agreement. Network Provider and its agents, trustees, or assignees may not maintain any action against a Member to collect sums owed by PBM and/or Sponsor. RCW 48.44.020(4)(a) and (b); RCW 48.46.243(1) and (4).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is made pursuant to public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

10. **Overpayment Recovery**. In accordance with RCW 48.43.600 and RCW 48.43.605, the parties agree as follows:

a. PBM may at any time request a refund from Provider of a payment previously made to satisfy a claim if: (i) a third party, including a government entity, is found responsible for satisfaction of the claim as a consequence of liability imposed by law, such as tort liability; and (ii) PBM and/or Sponsor (as applicable) is unable to recover directly from the third party because the third party has either already paid or will pay Provider for the services covered by the claim.

b. Except in the case of fraud, or as provided herein, Provider may not: (i) Request additional payment from PBM to satisfy a claim unless he or she does so in writing to the PBM within twenty-four months after the date that the claim was denied or payment intended to satisfy the claim was made; or (ii) request that the additional payment be made any sooner than six months after receipt of the request. Provider may not, in doing so for the reason of coordination of benefits with another carrier or entity responsible for payment of a claim: (i) Request additional payment from PBM to satisfy a claim unless he or she does so in writing to PBM within thirty months after the date the claim was denied or payment intended to satisfy the claim was made; or (ii) request that the additional payment be made sooner than six months after receipt of the request. Any such request must specify why the Provider believes PBM owes additional payment, and include the name and mailing address of any entity that disclaimed responsibility for payment of the claim.

c. Except in the case of fraud, or as provided herein, PBM may not: (i) Request a refund from Provider of a payment previously made to satisfy a claim unless it does so in writing to the Provider within twenty-four months after the date that the payment was made; or (ii) request that a contested refund be paid sooner than six months after receipt of the request. Any such request must specify why PBM believes the Provider owes the refund. If Provider fails to contest the request in writing to the carrier within thirty days of its receipt, the request is deemed accepted and the refund must be paid. PBM may not, if doing so for reasons related to coordination of benefits with another carrier or entity responsible for payment of a claim: (i) Request a refund from Provider of a payment previously made to satisfy a claim unless it does so in writing to Provider within thirty months after the date that the payment was made; or (ii) request that a contested refund be paid any sooner than six months after receipt of the request. Any such request must specify why the PBM believes that Provider owes the refund, and include the name and mailing address of the entity that has primary responsibility for payment of the claim. If Provider fails to contest the request in writing to PBM within thirty days of its receipt, the request is deemed accepted and the refund must be paid.

d. Nothing in this section prohibits Provider from choosing at any time to refund to PBM any payment previously made to satisfy a claim.

e. For purposes of this section, "refund" means the return, either directly or through an offset to a future claim, of some or all of a payment already received by Provider.

f. This section neither permits nor precludes Provider from recovering from a Member any amounts paid to Provider for benefits to which Member was not entitled under the terms and conditions of the Prescription Drug Program or other benefit agreement or policy.

g. This section does not apply to claims for services provided through dental-only health Sponsors, health care services provided under Title XVIII (Medicare) of the Social Security Act, or Medicare supplemental Plans regulated under chapter 48.66 RCW.

11. **Prompt Payment**. PBM shall pay Provider for services provided to Members as soon as practical, and subject to the following minimum standards:

a. Ninety-five percent of the monthly volume of clean claims shall be paid within thirty (30) days of receipt by PBM; and

b. Ninety-five percent of the monthly volume of all claims shall be paid or denied within sixty (60) days of receipt by the PBM, except as agreed to in writing on a claim-by-claim basis.

c. A "clean claim" means a claim that has no defect or impropriety, including any lack of any required substantiating documentation, or particular circumstances requiring special treatment that prevents timely payments from being made on the claim in accordance with WAC 284-43-321(3).

d. If PBM fails to pay claims within the standards set forth in Section 11(a) and 11(b), PBM shall pay interest on undenied and unpaid clean claims more than sixty-one (61) days old until PBM meets the standards. Interest shall be assessed at the rate of one percent (1%) per month, and shall be calculated as simple interested prorated for any portion of a month. PBM shall add the interest payable to the amount of the unpaid claim without the necessity of Provider submitting an additional claim. Any interest paid under this section shall not be applied to a Member's deductible, copayment, coinsurance, or similar obligation.

e. If PBM issues payment in the Provider and Member's name, PBM shall make claim checks payable in the name of the Provider first and the Member second.

f. The receipt date of a claim is the date PBM or its agent receives written or electronic notice of the claim. PBM has established a reasonable method for confirming receipt of claims and responding to Provider inquiries via the online adjudication system and Provider Help Desk.

g. Claim denials shall be communicated by PBM to Provider and will include the specific reason for the denial. If denial is based upon medical necessity or similar grounds, PBM upon request from the Provider, will also promptly disclose the supporting basis for the decision.

h. PBM is responsible for ensuring that all persons acting on behalf of or at the direction of PBM complies with the provisions of Section 11.

i. Notwithstanding the foregoing, nothing in this Section 11 shall apply to any claim about which there is substantial evidence of fraud or misrepresentation by Provider, Provider's facilities, Member, or instances where PBM has not been granted reasonable access to information under Provider's control.

j. Provider and PBM are not required to comply with these provisions if the failure to comply is occasioned by any act of God, bankruptcy, act of a government authority responding to an act of God or other emergency, or the result of a strike, lockout, or other labor dispute.

12. **Provider/Patient Care**. Provider shall not be precluded or discouraged from informing a Member of the care he or she requires, including various treatment options, and whether in Provider's view such care is consistent with medical necessity, medical appropriateness, the health coverage criteria, or otherwise covered by the Member's medical coverage agreement with a Sponsor. Provider is not prohibited or discouraged and shall not be penalized for advocating on behalf of a Member when practicing in compliance with the law. Nothing in this section shall be construed to authorize Provider to bind a Sponsor or PBM to pay for any service. Nothing in the Provider Agreement precludes or discourages Members or those paying for their coverage from discussing the comparative merits of different carriers with Provider. Provider may not preclude or

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

201767.4

discourage Members, or those paying for their coverage, from discussing the comparative merits of different health carriers, even if critical of Sponsor. RCW 48.43.510(6) and (7); WAC 284-43-320(5). Provider shall not be penalized because it, in good faith, reports to state or federal authorities any act or practice by the Sponsor or PBM that jeopardizes patient health or welfare or that may violate state or federal law. WAC 284-43-320(9).

13. **Record Retention**. Provider shall make records available to appropriate state and federal authorities involved in assessing the quality of care or investigating the grievances or complaints of Members subject to applicable state and federal laws related to the confidentiality of medical or health records. WAC 284-43-320(6).

14. **Standard of Care**. Provider shall not be required to provide indemnification or otherwise assume liability relating to activities, actions, or omissions of Sponsor in violation of RCW 48.43.545.

15. **Subcontractors**. To the extent permitted by the Provider Agreement, in the event Provider subcontracts with providers in connection with the Provider Agreement, Provider shall require that its subcontracts comply with the provisions set forth in the Provider Agreement and in this Addendum as required by WAC 284-43-300.

16. **Utilization Review**. Clinical protocols, medical management standards, and other review criteria of a Sponsor are available to Provider upon written request to the extent required by law. RCW 48.43.520; WAC 284-43-410(2).

## WASHINGTON MEDICAID ADDENDUM TO THE PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members who are enrolled in the Washington State Medicaid Program ("Enrollees") administered by a Sponsor, Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement or the Provider Manual, the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. _Definitions._ Terms not defined in the Provider Agreement or the Provider Manual shall have the meanings set forth in Sponsor's contract with the Washington State Health Care Authority (HCA) or as set forth in applicable statutes and regulations.

2. _Legal Authority._ Provider represents and warrants that it is appropriately licensed within the state of Washington and duly authorized to provide services to Enrollees. PBM holds all appropriate licenses to operate in Washington.

3. _Provision of Information._ Provider agrees that it shall release to PBM or Sponsor any and all information necessary for Sponsor to discharge its obligations under its contract with the HCA.

4. _Records and Facilities._ Provider shall keep information about enrollees, including their medical records, shall be kept confidential in a manner consistent with state and federal laws and regulations. All records relating to Enrollees shall be maintained for a minimum of six (6) years. Provider shall provide reasonable access to facilities and financial and medical records for duly authorized representatives of HCA or the United States Department of Health and Human Services (DHHS) for audit purposes and immediate access for Medicaid fraud investigators (42 CFR 438.6(g)).

5. _Accurate Claim Submission._ Provider represents and warrants that all claims submitted for reimbursement to PBM are true and accurate.

6. _Program Integrity._ Providers that it shall cooperate fully with the Program Integrity Requirements applicable to Sponsor pursuant to its contract with HCA, including any Program Integrity policies and procedures adopted by Sponsor or PBM and communicated to Provider.

7. _Assignment._ Provider agrees that any assignment of this Provider Agreement shall be authorized in writing by PBM pursuant to the Provider Agreement, shall take effect without written consent by HCA.

8. _Subcontracts._ To the extent subcontracting is permitted by the Provider Agreement, any such subcontract shall be in writing consistent with 32 CFR 434.6.

9. _Compliance with Laws._ Provider agrees that it shall comply with all applicable state and federal rules and regulations as set forth in Sponsor's contract with HCA, including the applicable requirements of 42 CFR 438.6(i) and any terms that are applicable to the services provider pursuant to the Provider Agreement. Provider further agrees that it shall comply with applicable provisions of the Americans with Disabilities Act.

10. _Quality Assurance._ Provider shall cooperate with applicable quality assurance programs adopted by Sponsors, including freely providing information to Sponsor for the purposes of complying with its contract with HCA.

11. _Patient Privacy/Enrollee Rights._ Information about Members who are Enrollees, including their medical records, shall be kept confidential in a manner consistent with state and federal laws and regulations. Provider is required to comply with all applicable state and federal laws that pertain to Enrollee rights. Such rights must be taken into account when furnishing services to Enrollees. 42 CFR 438.100(a)(2). Provider shall provide all relevant treatment information to Enrollees in accordance with 32 CFR 438.102(a)(1)(iii) and shall comply with all applicable informed consent requirements as set forth in RCW 7.70.065, all state and federal Medicaid rules concerning advanced directives (WAC 182-501-0125 and 42 CFR 438.6(m)), the Natural Death Act (RCW 70.122), and, when appropriate, inform Enrollees of their right to make anatomical gifts (RCW 68.50.540).

12. _Hold Harmless._ Provider agrees that, except for applicable Enrollee copayments, it shall accept as payments from PBM as payments in full and shall not request payment from HCA or any Enrollee for contracted services performed pursuant to the Provider Agreement. Provider shall hold harmless HCA, its employees and all Enrollees served under the terms of this Addendum in the event of non-payment by PBM. Provider further agrees to indemnify and hold harmless HCA and its employees against all injuries, deaths, losses, damages, claims, suits, liabilities, judgments, costs, and expenses which may in any manner accrue against HCA or its employees through the intentional misconduct, negligence, or omission of Provider, its agents, employees or contractors. (42 CFR 438.230(b)(2)).

13. _Provider/Enrollee Communication:_ PBM shall not restrict Provider acting within its lawful scope of practice from advising or advocating on behalf of an Enrollee who is their patient for any

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

of the following: (a) the Enrollee's health status, medical care, or treatment option including any alternative treatment that might be self administered; (b) any information the Enrollee needs in order to decide among all relevant treatment options; (c) the risks, benefits and consequences of treatment or non-treatment; and (d) the Enrollee's right to participate in decisions regarding their health, including the right to refuse treatment, and to express preferences about future treatment decisions. 42 CFR 438.102(a)(1).

14. Monitoring. PBM and Sponsor shall have the right to monitor Provider on an ongoing basis. Provider agrees to cooperate with periodic formal reviews consistent with industry standards and OIC regulations. Provider understands and agrees that it shall be recredentialed or otherwise subject to review at least every three years and must identify applicable deficiencies or area of improvement and provide for corrective action when requested.

15. Termination. In addition to those terms set forth in the Provider Agreement, the parties agree that:
a. Either party may terminate the Provider Agreement without cause upon ninety (90) days written notice to the other party.
b. Provider may be terminated immediately if Provider is excluded from participation in the Medicaid Program.

16. Marketing and Informational Materials. Provider shall not engage in direct and/or indirect door-to-door, telephonic or other cold-call marketing prohibited by 42 CFR 438.104(b)(1)(v). Any informational or marketing materials permitted by law that are distributed to Enrollees must be at a 6th Grade Reading level and be approved by Sponsor prior to distribution.

17. Referral to Plan Sponsors/Grievances. To the extent necessary, Provider agrees that it will advise any and all Enrollees to contact applicable Sponsors in the event the Enrollee (1) is in need of interpreter services, or (2) would like to file a grievance. In addition, Provider acknowledges that it will direct Enrollees to their member handbooks for appropriate information relating to the Sponsor's grievance system including, but not limited to (i) a toll-free number for filing oral grievances or appeals, (ii) the availability of assistance in filing appeals/grievances, (iii) the Enrollee's right to request the continuation of benefits during the appeal and, if Sponsor's action is upheld, the Enrollee's responsibility to pay for the continued benefits, (iv) the Enrollee's right to file grievances and appeals, including appropriate timeframes for filing and for external review; and (v) the Enrollee's right to a fair hearing and to be represented at that hearing. (42 CFR 438.414 and 42 CFR 439.10(g)(1)). Provider agrees that it will provide reasonable assistance to Enrollees filing grievances and appeals.

18. Subrogation & Coordination of Benefits. Provider acknowledges and agrees benefits available under this Addendum shall be secondary to any other medical coverage, except in accordance with the applicable rules of WAC 284-51-205(1)(a). Provider shall not refuse or reduce services provided under this Addendum solely due to the existence of similar benefits und any other health care contract.

# WEST VIRGINIA REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under West Virginia law (as such terms are defined by West Virginia law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

1. **Services to Members**. Provider shall render to Members any service as Provider is entitled to render under the terms and conditions of the Prescription Drug Program and the Provider Agreement and shall submit only such charges to PBM as are set forth in the fee schedule of the Provider Agreement. W.Va. Code §§ 33-24-7.

2. **Member Hold Harmless**. In the event Sponsor or PBM fails to pay fees for services, including Covered Medications, rendered to Members by Provider, the Member shall not be liable to Provider. Provider shall not collect or attempt to collect from Members any money for Covered Medications except for applicable cost sharing amounts (Copayments or deductibles). Neither Provider nor its representative may maintain any action at law against Members to collect money owed to Provider by Sponsor or PBM. This provision shall not be construed to apply to the amount of any deductible or Copayment. W. Va. Code §§ 33-25A-7a(1)-(6), 33-25D-10(a)-(g).

3. **Notice of Termination**. With respect to participation for any Sponsor, Provider shall provide sixty (60) days' advance written notice to PBM and the West Virginia Commissioner of Insurance before canceling the Provider Agreement for any reason, unless a longer period is required under the Provider Agreement, then in accordance with such requirement. Nonpayment for goods or services rendered by Provider to Members is not a valid reason for avoiding the sixty (60) day advance notice of cancellation. W. Va. Code § 33-25A-7a(7)&(8), 33-25D-10(h)-(i).

4. **No Inducement to Reduce Services**. PBM shall not provide Provider an incentive or disincentive plan that includes specific payment made directly or indirectly, in any form, or to Provider as an inducement to deny, release, limit, or delay

specific, medically necessary and appropriate services provided with respect to a Member or a group of Members with similar medical conditions. W. Va. Code § 33-25C-4(b); W. Va. Admin. Code § 114-53-4(4.5)(a).

5. **Communication With Members**.
a. Nothing in the Provider Agreement shall be construed to restrict or limit Provider from communicating medical advice or options available to Members or in any way limiting the communication between Provider and its patients. Nothing in the Provider Agreement shall prevent Provider from advising a Member whether or not a treatment is covered by a Prescription Drug Program. W. Va. Admin. Code § 114-53-4(4.5).
b. Provider is allowed open provider-patient communication regarding appropriate treatment alternatives and shall not be penalized, nor Agreement terminated, by PBM because Provider discussed medically necessary or appropriate care for a Member.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

6. **Indemnification**. Notwithstanding anything to the contrary in the Provider Agreement, Provider shall not be required to indemnify and hold harmless Sponsor for Sponsor's acts and conduct in making coverage and health care treatment decisions as addressed by W. Va. Code § 33-25C-7. W. Va. Code § 33-25C-7(b).

7. **Processing and Payment of Claims**. PBM shall adhere to the following standards in the processing and payment of claims:

a. PBM shall establish and implement reasonable policies to permit Provider to promptly confirm in advance during normal business hours whether the health care services to be provided are Covered Medications and to determine requirements applicable to Provider for: (i) precertification or authorization of coverage decisions; (ii) retroactive reconsideration of a certification or authorization of coverage decision or retroactive denial of a previously paid
claim; (iii) specific payment and reimbursement methodology; and (iv) claims processing and payment matters necessary to meet the terms and conditions of the Provider Agreement, including determining whether a claim is a clean claim.

b. PBM shall make available to Provider within twenty (20) business days of receipt of a request, reasonable access either electronically or otherwise, to all policies that are applicable to Provider.

c. Sponsor or PBM shall pay a clean claim if PBM or Sponsor has previously authorized the services or has advised Provider or the Member in advance of the provision of the services that the services are Covered Medications unless the documentation for the claim provided by Provider clearly fails to support the claim as originally authorized or unless the refusal is because:

i. Another party is responsible for the payment;
ii. Provider has already been paid for the services;
iii. The claim was submitted fraudulently or the authorization was based in whole or material part on erroneous information provided to PBM or Sponsor by Provider or another person not related to PBM or Sponsor;
iv. The person receiving the services was not a Member on the date of service and neither PBM nor Sponsor knew or with the exercise of reasonable care could have known, of the person's eligibility status;
v. There is a dispute regarding the amount of charges submitted: or
vi. The services were not Covered Medications and neither PBM nor Sponsor knew or with the exercise of reasonable

care could have known, at the time of the certification that the services were not covered.

d. A previously paid claim may be retroactively denied only if:

i. The claim was submitted fraudulently;
ii. The claim contained material misrepresentations;
iii. The claim payment was incorrect because Provider was already paid on the claim or the services were not delivered by Provider;

iv. Provider was not entitled to reimbursement;
v. The service was not for a Covered Medication; or
vi. The person to whom the service was rendered was not a Member.

e. Upon receipt of notice of a retroactive denial, Provider shall notify PBM within forty (40) days of its intent to pay or demand written explanation of the reasons for the denial.

f. Upon receipt of explanation for retroactive denial, Provider shall reimburse PBM within thirty (30) days for allowing an offset against future payments or provide written notice of dispute.

g. Disputes shall be resolved between the parties within thirty (30) days of receipt of notice of dispute.

h. Upon resolution of dispute, Provider shall pay any amount due or provide written authorization for an offset against future payments.

i. PBM may retroactively deny a claim for the reasons set forth in section subparagraph (h)(iii)-(vi) above within one (1) year from the date the claim was originally paid. There shall be no time limit for retroactively denying a claim for the reasons set forth in subparagraph (h)(i)-(ii) above.

j. Provider acknowledges that at the time the Provider Agreement was presented to Provider for execution it included or was accompanied by (i) a fee schedule, reimbursement policy, and statement as to the manner in which claims will be calculated and paid and the range of services reasonably expected to be delivered by Provider; and (ii) all referenced addenda, schedules, and exhibits.

k. An amendment to the Provider Agreement that relates to payment or the delivery of care by Provider shall not be effective as to Provider unless Provider has been provided with the proposed amendment and has failed to notify PBM within twenty (20) business days of receipt of Provider's intent to terminate the Provider Agreement at the earliest date thereafter permitted under the Provider Agreement.

l. PBM shall complete its initial credentialing process and accept or reject Provider within four months after submission of Provider's completed application. This time frame may be extended for an additional three months because of delays in primary source verification. PBM shall make available to Provider a list of all information required to be included in the application. If Provider is permitted by PBM to provide services during the credentialing period, Provider shall be paid for the services pursuant to the terms and conditions of the Provider Agreement if Provider's application is approved. W. Va. Code § 33-45-2.

8. **Quality Improvement**. Provider agrees to participate in and adhere to all quality improvement activities of PBM or Sponsor. W. Va. Admin. Code § 114-53-5.4.

9. **Records**. Provider shall have an organized medical record keeping system. Medical records shall be maintained in a manner that is current, detailed, organized, and permits effective patient care and quality review. WV ADC § 114-53-9.

## WEST VIRGINIA MEDICAID ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications to individuals who are recipients of benefits ("Enrollees") under the West Virginia Medicaid program administered by the Sponsor (the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services to Enrollees of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows:

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential, proprietary information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

1. **Non-Discrimination.** Provider may not discriminate against Enrollees in the order that patients are seen or in the order that appointments are given.

2. **Non-Segregation.** Provider certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any locations, under its control, where segregated facilities are maintained. Provider agrees that a breach of this certification is a violation of Equal Opportunity in Federal employment. In addition, Provider must comply with the Federal Executive Order 11246 entitled "Equal Employment Opportunity" as amended by Executive Order 11375 and as supplemented in the United States Department of Labor Regulations (41 CFR Part 30). As used in this certification, the term "segregated facilities" includes any waiting rooms, restaurants, and other eating areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated on the basis of race, color, religion, or national origin, because of habit, local custom, national origin, or otherwise.

3. **Compliance with Applicable Laws, Rules and Policies.** Provider, in providing covered services to Enrollees, shall comply with all applicable Federal and State laws, regulations, and written policies, including those pertaining to licensing and including those affecting the rights of Enrollees. Work performed hereunder must conform to the federal requirements set forth in Title 45, CFR Part 75 and Title 42, Part 434 and all other applicable state and federal laws and regulations.

4. **Confidentiality of Records.** Provider must maintain the confidentiality of all records relating to Enrollees. Such information shall be released only in the following manner or as required by law:

a. Written consent is not required for the transmission of medical record information to physicians, other practitioners, or facilities that are providing services to Enrollees under a subcontract with the Sponsor. This provision also applies to specialty providers who are retained by the Sponsor to provide services that are infrequently used or are of an unusual nature. This also allows for transfer of information (written or verbal) to the West Virginia Bureau for Medical Services ("BMS"), BMS staff and to BMS subcontractors.

b. Written consent is not required for the transmission of medical record information to physicians or facilities providing emergency care, or to the Sponsor, PBM, its staff, contracted providers or Sponsor's contractors that are providing cost, quality, or medical appropriateness reviews or coordination of services or subrogation.

c. Written consent is required for the transmission of the medical record information of a former enrollee to any physician not connected with the Sponsor, except as set forth in (b) above.

Provider shall comply with applicable state and federal law regarding confidentiality/privacy including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPPA) and the Health Information Technology for Economic and Clinical Health Act (HITECH Act) at 42 U.S.C. 17931, et.seq. The extent of medical record information to be released in each instance shall be based upon tests of medical necessity and a "need to know" basis on the part of the practitioner or a facility requesting the information. Medical records maintained by subcontractors must meet the above requirements.

5. **Records Retention.** Provider shall maintain all books and records relating to covered services provided to Enrollees under this Addendum in accordance with 45 CFR 74.21 through 74.23. Provider shall provide Sponsor, PBM, and BMS with

access to: (a) all information required under the Sponsor's managed care contract with BSM, including but not limited to the reporting requirements and other information related to Provider's performance of its obligations under the Provider Agreement and this Addendum; and (b) any information in its possession sufficient to permit BMS to comply with the federal Balanced Budget Act of 1997 or other federal or state laws, rules and regulations. If Provider places records in another legal entity's records, such as a hospital, Provider is responsible for obtaining a copy of these records for use by the above named entities or their representatives.

6. **Marketing.** Provider shall comply with 42 CFR 438.104. Provider shall not engage in direct marketing to Enrollees that is designed increase enrollment with a particular Sponsor. This prohibition does not constrain Provider's ability to engage in permissible marketing activities consistent with broad outreach objectives and applicable assistance.

7. **Liens.** Provider agrees that it shall not interfere with or place any liens upon the State of West Virginia's right or the Sponsor's right, acting as the agent of the State of West Virginia, to recover from third party resources.

8. **Advanced Directives.** Provider shall comply with 42 CFR 438.414 and the West Virginia Health Care Decisions Act relating to advanced directives.

9. **Conflict of Interest.** Provider agrees that it shall not acquire any interest, direct or indirect, which would conflict or compromise in any manner or degree with the performance of services hereunder. If Provider does acquire such an interest, it shall provide immediate notice to PBM, Sponsor, and the Department of Health and Human Resources (the "Department").

10. **Inspections.** Provider shall provide the State of West Virginia and any other legally authorized governmental entity, or their authorized representatives, the right to enter at all reasonable times on Provider's premises or other places where work under this Addendum is performed to inspect, monitor or otherwise evaluate the quality, appropriateness, and timeliness of services performed under this Addendum. Provider shall provide reasonable facilities and assistance for the safety and convenience of the persons performing these duties (*e.g.*, assistance from Provider's staff to retrieve and/or copy materials). BMS and its authorized agents will request access in writing except in cases of suspected fraud and abuse. All inspections, monitoring, and evaluation must be performed in such a manner as not to interfere with the work performed under this Addendum.

11. **Insurance.** Provider shall procure and maintain all insurance required by federal and state law and regulation. Such insurance shall include, at a minimum, liability insurance for loss, damage, or injury (including death) of third parties arising out of acts or omissions of Provider and its agents/employees, workers compensation, unemployment insurance, and adequate reinsurance if applicable.

12. **Provider-Preventable Conditions.** Provider shall report to Sponsor and/or PBM any provider-preventable conditions associated with claims.

13. **Hold Harmless.** Provider shall look solely to PBM for reimbursement for Covered Medications for Enrollees. Enrollees shall be held harmless for the costs of all Medicaid-covered services provided. Provider must inform Enrollees of the costs for non-covered services prior to rendering those services. Provider agrees that Medicaid and BMS shall not be held liable for debts in the event that PBM or Sponsor become insolvent, or the insolvency of Provider.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

## WISCONSIN REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Wisconsin law (as such terms are defined by Wisconsin law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows (if applicable, as determined by PBM):

1. **Continuation of Services**.
   a. If Provider's participation under the Provider Agreement terminates for reasons other than misconduct on the part of Provider or Provider's cessation of practice in the network's geographic service area, Provider shall continue to provide care to Members undergoing a course of treatment for the following time periods:
      i. For the remainder of the course of treatment or for ninety (90) days after Provider's participation under the Provider Agreement terminates, whichever is shorter; or
      ii. If the Member is a woman in the second or third trimester of pregnancy when Provider's participation under the Provider Agreement terminates, until the completion of postpartum care for the woman and infant.
   b. Provider agrees to accept the rates set forth in the Provider Agreement as reimbursement for services rendered during these time periods.
   c. When providing services under this provision, Provider shall be subject to the hold harmless requirements of Wis. Stat. Ann. § 609.91. Wis. Stat. Ann 609.24; Wis. Admin. Code Ins. 9.35

2. **Member Communication**. Nothing in the Provider Agreement shall be construed to limit Provider's disclosure of information, to or on behalf of a Member, about the Member's medical condition or treatment options. Provider may discuss, with or on behalf of a Member, all treatment options and any other information that Provider determines to be in the best interest of the Member consistent with applicable law. Neither PBM nor Sponsor shall penalize or terminate the Provider Agreement because Provider makes referrals to other participating providers or discusses medically necessary or appropriate care with or on behalf of an enrollee. Neither PBM nor Sponsor may retaliate against Provider for advising a Member of treatment options that are not covered benefits. Wis. Stat. Ann. § 609.30; Wis. Admin. Code Ins. § 9.36.

3. **Member Hold Harmless**. In addition to the hold harmless provisions set forth in the Provider Agreement, Provider agrees to adhere to the requirements of Wis. Stat. Ann. §§ 609.91 to 609.935 and 609.97(a) regarding the recovery of health care costs from Members. An Member's immunity under the statutory hold harmless is not affected by any of the following:
   a. Any agreement entered into by the Provider, the Sponsor or PBM, or any other person, whether oral or written, purporting to hold the Member liable for costs (except a notice of election or termination permitted under the statute).
   b. A breach of or default on any agreement by the Sponsor or PBM, or any other person to compensate the provider for health care costs for which the Member is not liable.
   c. The insolvency of Sponsor or PBM or any person contracting with the Sponsor or PBM, or the commencement of insolvency, delinquency or bankruptcy proceedings involving the Sponsor or PBM or other persons which would affect compensation for health care costs for which a Member is not liable under the statutory hold harmless.
   d. The inability of the Provider or other person who is owed compensation to obtain compensation for health care costs for which the Member is not liable.
   e. Failure by the Sponsor or PBM to provide notice to Provider of the statutory hold-harmless provisions.
   f. Any other conditions or agreement existing at any time. Wis. Stat. Ann. §§ 609.94; 609.91 et seq; Wis. Admin. Code Ins. § 9.13; Wis. Admin. Code Ins. Ch. 9, Subch. III, Appendix. C.

4. **Provider Participation**. Nothing in the Provider Agreement shall be construed to require Provider to participate in PBM's Network on an exclusive basis or to prevent or materially inhibit Provider from participating as a provider for other health care plans or insurers. Wis. Stat. Ann. §§ 628.35, 628.36.

5. **Complaints**. Provider shall promptly respond to complaints and grievances filed with the insurance commissioner to facilitate resolution and to cooperate fully and promptly with PBM and/or Sponsor in the investigation and resolution of complaints and grievances. Wis. Admin. Code § Ins. 18.03

## WYOMING REGULATORY ADDENDUM TO PARTICIPATING PROVIDER AGREEMENT

To the extent Provider provides services, including dispensing Covered Medications, to Members of an HMO, Insurer, or Carrier licensed under Wyoming law (as such terms are defined by Wyoming law; collectively and/or individually, the "Sponsor"), Provider agrees that the Provider Agreement is hereby amended, as required by and consistent with law, so that the following rules and requirements are included and shall apply with respect to those services provided to Members of the Sponsor (the "Addendum"). In the event there is a conflict between the terms and conditions set forth in this Addendum and the terms and conditions set forth in the Provider Agreement (including the Provider Manual), the terms and conditions set forth in this Addendum shall control. Without limiting the generality of the foregoing, Provider agrees as follows (if applicable, as determined by PBM):

1) **Member Hold Harmless**.
a) In the event PBM or Sponsor fails to pay for Covered Medications pursuant to this Agreement, Provider shall not be held liable for such Covered Medications. WY Stat. 26-34-114(o).

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose in whole or in part this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

b)    Provider shall not maintain any action at law against a Member to collect sums owed by PBM or Sponsor. WY Stat. 26-34-114(q).

2)    **Termination**.  Unless a longer time is required under the Agreement, if Provider terminates as may be provided for in the Agreement, it shall give PBM no less than sixty (60) days advance notice. WY Stat. 26-34-114(s).

---

### REMAINDER OF PAGE LEFT BLANK

---

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

# Appendix A-1 Specific Forms

## Iowa
   1.  "Iowa Complaint Form"................................................................................................See Page 226

## Medicaid
   1.  Provider Grievance & Complaint Form.......................................................................See Page 227

REMAINER OF PAGE LEFT BLANK

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

## Iowa Complaint Form

### Regarding a Payment Transaction Between PBM and Network Provider

Pursuant to Iowa law (Iowa Admin Code 191—59.7), a Network Provider may file a complaint with PBM regarding a transaction between PBM and Network Provider.

The Network Provider must mail this form to Express Scripts at the following address:
Express Scripts, Inc.
ATTN: HQ2W02, Pharmacy Care Team
One Express Way
St. Louis, MO 63121

| Pharmacy Name: | | NCPDP/NPI: | Contact Name: |
|---|---|---|---|
| Pharmacy Address: | | | Contact Phone: |
| Prescription Number(s): | Date of Service: | RxGroup: | Plan Benefit Cert: |
| Disputed Claim Payment Date(s): | | | Reimbursement Amount(s): |

**Please indicate the nature of your complaint in sufficient detail. You may attach any additional pages if necessary to fully describe the situation.**

_____

**Provider's Signature** _____ **Title:**_____ **Date:**_____

### Express Scripts Response (FOR PBM INTERNAL USE ONLY)

PBM Findings:_____

PBM Rep:_____ **Title:**_____

**NOTE TO PROVIDER: When printing this form, please select "current page" to print only this page.**

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Network Provider Manual - Revised 7/2014
201767.4

## Medicaid Provider Grievance & Complaint Form

In order to formally file this complaint and/or grievance relating to covered services for Medicaid members, Network Provider must mail this competed form to Express Scripts at the following address:

Express Scripts, Inc.
ATTN: HQ2W02, Pharmacy Care Team
One Express Way
St. Louis, MO 63121

If Network Provider has questions regarding this form, please contact the Pharmacist Use Only Line for additional assistance.  **Please note:**  This form is only valid for complaints and grievances relating to covered services provided to Medicaid Members.  If you have a complaint or issue that does not relate to a Medicaid Member, please contact 1-888-571-8182.

Please Check One:   Pharmacy Appeal ☐        Pharmacy Grievance ☐

| A pharmacy appeals is a request for review of an "action."  The term "action" is defined in 42 C.F.R. § 438.400 and includes, but is not limited to, the denial of payment for services, in whole or in part and the reduction, suspension or termination of previously authorized services. | A pharmacy grievance means an expression of dissatisfaction about any matter other than an action.  For example, a grievance could relate to rudeness or problems with claims processing. |
|---|---|

| Pharmacy Name: | | NCPDP/NPI: | Contact Name: |
|---|---|---|---|
| Pharmacy Address: | | | Contact Phone: |
| Prescription Number(s): | Date of Service: | RxGroup: | Plan Benefit Cert: |
| Disputed Claim Payment Date(s): | | | Reimbursement Amount(s): |

**Please indicate the nature of your complaint/grievance in sufficient detail.  You may attach any additional pages if necessary to fully describe the situation.** _____

_____
_____
_____
_____
_____

Provider's Signature _____    Title:_____    Date:_____

### Express Scripts Response (FOR PBM INTERNAL USE ONLY)
PBM Findings: _____
_____
**PBM Rep:**_____    Title:_____
Date Findings were communicated to Provider:_____

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Network Provider Manual – Revised 7/2014

# Appendix A-2 State Legal Requirements for Maximum Allowable Cost Appeals

## General

In accordance with certain state law(s), PBM has adopted this Appendix A-2 State Legal Requirements for Maximum Allowable Cost Appeals (the "Appendix"). This Appendix shall be considered a part the Express Scripts Pharmacy Provider Agreement by and between Express Scripts, Inc. and Network Provider (including all Amendments, Addenda, or Rate Exhibits) as well as the Provider Agreement between Medco Health Solutions, Inc. and Network Provider (including all Amendments, Addenda or Schedules) to the extent that Network Provider provides Covered Medications to Members in impacted states. The terms of this Appendix shall be considered general requirements regarding MAC. Network Provider agrees and understands that to the extent any state specific law, rule or regulation differs or contradicts the terms set forth herein, PBM shall follow the state specific law, rule or regulation. Network Provider is subject to any MAC list(s) associated with the PBM network(s) in which Network Provider participates.

## MAC Sources

MAC pricing is determined by PBM based on industry available pricing information of a reputable nationally recognized pricing service (which service is Medi-Span), and at least one reputable national drug wholesaler and/or manufacturer of PBM's choosing. PBM regularly reviews and/or updates the MAC price list(s) at least every seven (7) calendar days. PBM reserves the right to change the MAC pricing methodology or to use additional or alternative reputable sources, in its sole discretion. Upon written request and to the extent required by law, PBM will make available then-current MAC price information to Network Provider. Such MAC price lists constitute Confidential Information.

## MAC Appeals

In accordance with certain state laws, Network Provider may appeal MAC pricing. The following appeals process will be generally applicable to MAC appeals. In general, MAC appeals, when permitted, should be filed online through the Pharmacist Resource Center (PRC) website which can be accessed at http://www.express-scripts.com/services/pharmacists. In the event Network Provider is unable to submit appeals through the PRC, appeals may be directed via email to ESIRetailAccountMg@express-scripts.com. Network Providers may also contact PBM at the Pharmacist Use Only telephone number(s) set forth in the Network Pharmacy Information Section of the Provider Manual for more information.

All MAC appeals must include adequate information to allow PBM to analyze the MAC appeal, including any data requested through the PRC. If Network Provider has not provided sufficient information, PBM may request additional information from Network Provider. A MAC appeal will not be considered complete until all necessary information has been received by PBM from Network Provider.

The right to appeal is generally limited to ten (10) business days (unless different timing is required by law)[1] following the date the claim in question is successfully adjudicated. Appeals shall be investigated and resolved by PBM as soon as practicable and within any timing prescribed by law. PBM shall communicate the results of any appeal to Network Provider via email(s). In the event a Network Provider's appeal is successful, the relevant MAC Price will be adjusted as of the date of the determination for Network Provider and similarly situated Network Providers. Any additional details relating to a successful MAC appeal will be communicated directly to Network Provider via email(s).

## Third Party Vendors

Unless expressly approved by PBM in writing, Network Provider may not contract with or otherwise use third-party vendors to submit or administer MAC appeals.

---

[7]For MAC Appeals filed pursuant to Arkansas Code Annotated § 17-92-507(c)(4)(C)(i)(b), the MAC appeal must be submitted within three (3) business days of the applicable fill date in the state of Arkansas.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

201767.4 — Proprietary & Confidential Information — Network Provider Manual - Revised 7/2014

# Appendix A-3. Additional Contract Terms Applicable to Clinical Programs

The following are additional contract terms applicable to a Network Provider's participation in Express Scripts' clinical programs.

**1. PBM Clinical Programs**

PBM offers a number of clinical and professional services programs aimed to advance pharmacy practice and improve health for PBM members. There may be instances where a Provider agrees to participate in specific clinical programs via a specific program schedule ("Clinical Program Schedules"). This Appendix C shall be considered additional terms to Network Provider's Clinical Program Schedules. The language in this section does not apply to any other services provided by Provider.

**2. Software License Grant**

Subject to the terms and conditions set forth herein, PBM grants Network Provider a limited, non-exclusive, non-transferable, non-sublicensable license to access and use the clinical program software, in performing patient care services only for Network Provider's internal business purposes to perform services only for eligible PBM members (the "Program Patients"). Network Provider will incur no fee for use of the clinical program software except as set forth in the Provider Agreement, including the Clinical Program Schedules.

**3. Use Restrictions**

All information relating to PBM's clinical programs, including but not limited to the Clinical Program Schedules, protocols, together with all other documents and materials relating to or contained within the program software, constitutes "PBM Confidential Information" and are subject to all confidentiality provisions set forth in the Provider Agreement. As between the parties, PBM exclusively owns, and shall exclusively own, all PBM Confidential Information. Network Provider will not have any rights in the PBM Confidential Information, except those limited rights expressly granted by PBM in the Clinical Program Schedule. All licenses, rights, and interests not specifically granted to Network Provider are reserved to PBM. Network Provider shall not decompile, disassemble, reverse engineer, modify, distribute, transmit, publicly display, publish, create derivative works from, translate, transfer, sell, offer for sale, or license PBM Confidential Information.

**4. Obligations and Activities of Provider When Acting as a Business Associate**

When performing services under a Clinical Program Schedule, Provider is acting, in certain circumstances, as the Business Associate of PBM who, in turn, is the Covered Entity for the Clinical Program. Accordingly, this Section outlines the parties' respective obligations and requirements of a Business Associate (Network Provider) and a Covered Entity (PBM). Furthermore, all capitalized terms are as defined in 45 CFR 160 et seq.

In performing services for or on behalf of PBM, Network Provider shall:

a. not use or disclose Protected Health Information ("PHI") other than as permitted or required by the Provider Agreement, including any Clinical Program Schedules or as required by law;

b. make reasonable efforts to limit requests for and the use and disclosure of PHI to the minimum necessary, and as applicable, in accordance with the regulations and guidance issued by the Secretary on what constitutes the minimum necessary for Network provider to perform its obligations under the Provider Agreement or as required by law;

c. use appropriate safeguards, and comply with the Security Standards with respect to Electronic PHI, to prevent use or disclosure of PHI other than as provided for in the Section;

d. mitigate, to the extent practicable, any harmful effect that is known to Network Provider of a use or disclosure of PHI by Network Provider in violation of the requirements of the Provider Agreement, including this Appendix C;

e. immediately report to PBM any use or disclosure of the PHI not provided for by the Provider Agreement, including any Clinical Program Schedules, of which it becomes aware;

f. ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Network Provider on behalf of PBM, agrees to the same restrictions and conditions that apply through this Appendix C to Provider with respect to such information;

g. immediately notify PBM if Network Provider is required by law (including, but not limited to, by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand, any informal or formal investigation by any government or governmental agency or authority or otherwise) to disclose any of the PHI. To the extent Network Provider ultimately discloses PHI, it will furnish only that portion of the PHI that it is advised by counsel is legally required and will exercise its reasonable best efforts to obtain reliable assurance that confidential treatment will be accorded the PHI

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information. All rights reserved
Network Provider Manual—Revised 7/2014

h. document such disclosures of PHI and information related to such disclosures as would be required for PBM to respond to a request by an individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528;

i. provide to PBM or an individual, in a timely manner, information collected in accordance with paragraph (g) above, to permit PBM to respond to a request by an individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528;

j. to make any amendment(s) to PHI in its possession contained in a Designated Record Set that PBM directs or agrees to pursuant to 45 CFR § 164.526 at the request of PBM or an Individual and in a time and manner mutually acceptable to the parties;

k. to provide access, at the request of PBM, and in a time and manner mutually acceptable to Network Provider and PBM, to PHI in a Designated Record Set to PBM or as directed by PBM to an Individual, in order to meet the requirements under 45 CFR 164.524

l. to the extent Network Provider is carrying out one or more of PBM's obligations under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to a Covered Entity in the performance of such obligations;

m. PBM and Network Provider recognize and agree that in some instances Network Provider may have compliance obligations as a Health Care Provider under the Privacy Rule and nothing herein shall prohibit, restrict, or otherwise limit compliance with any such obligations by Provider under the Privacy Rule. By way of example, Provider agrees that, to the extent that an individual requests restrictions with respect to the disclosure of PHI, and such restrictions relate to disclosure to PBM for the purposes of carrying out payment or health care operations (but not treatment), and the PHI pertains solely to a health care item or service for which the Health Care Provider involved has been paid out of pocket in full, such restrictions shall be enforced by the Network Provider and not disclosed to PBM.

### 4.1 Ownership of PHI

Network Provider acknowledges that all rights, title and interest in and to any PHI furnished to Network Provider solely and exclusively with PBM or the Individual to whom such PHI relates.

### 4.2 Permitted Uses and Disclosures by Business Associate

Except as otherwise limited in this Section, Network Provider may use or disclose PHI to perform functions, activities, or services for, or on behalf of, PBM as specified in the Clinical Program Schedule, provided that such use or disclosure would not violate the Privacy Rule, the Security Standards, the

Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("HIPAA"), or HIPAA'S implementing regulations if done by PBM or the minimum necessary policies and procedures of PBM.

### 4.3 Security Requirements

Network Provider shall:

a. implement administrative safeguards, physical safeguards, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic PHI that Business Associate receives from PBM or that Provider creates, receives, maintains, or transmits on behalf of PBM as required by the Security Standards;

b. ensure that any agent, including the subcontractor, to whom Network Provider provides electronic PHI received from PBM or created, received, maintained, or transmitted by Network Provider on behalf of PBM agrees to implement reasonable and appropriate safeguards and complies with the Security Standards to protect such electronic PHI;

c. to the extent that Network Provider creates, receives, maintains or transmits Electronic PHI, immediately report to PBM any Security Incident and any Breach of which Network Provider becomes aware in accordance with the HIPAA Rules. At the request of PBM, Network Provider shall identify the date of the Security Incident, scope of the Security Incident, Network Provider's response to the Security Incident, and the party responsible for the Security Incident, if known;

d. make its policies and procedures, as well as documentation required by the Security Standards relating to the safeguards required by this section, available to PBM, or to the Secretary, for purposes of the Secretary determining compliance with the Security Standards.

### 5. Termination of Provider's Obligations When Acting as a Business Associate

PBM may terminate the above-referenced business associate provisions in the event of a threatened or actual breach by Network Provider of any of the terms and conditions set forth herein. At any time upon PBM's request, and, except as otherwise directed by PBM, upon completion or termination of Network Provider's services, Network Provider will immediately, not to exceed three (3) business days, destroy or return to PBM all PHI without retaining any copies thereof.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual—Revised 7/2014

# Appendix B Additional Provisions

To the extent the following provisions are not set forth in the Provider Agreement by and between PBM and Network Provider (including all Amendments, Addenda, or Rate Exhibits or Schedules), the following shall apply:

## Indemnification.

Network Provider shall indemnify and hold harmless PBM and its shareholders, officers, directors, employees, agents and affiliates from and against any and all claims, liabilities, losses, damages, costs, and expenses (including, without limitation, expert and professional fees and attorneys' fees) arising out of: (a) any breach by Network Provider of any of Network Provider's contractual obligations or requirements; (b) the sale, compounding, dispensing, manufacturing, consultation or use of any prescription drug or any service provided by a Provider or Pharmacy; (c) failure of Network Provider to act in accordance with generally accepted pharmacy practice or any applicable law, rules or regulation; or (d) any actual or alleged malpractice, negligence, misconduct, act (or failure to act) or responsibility of Provider related to dispensing and providing Covered Medications.

## Non-Discrimination.

Network Providers must not refuse to provide services required under any Prescription Drug Program or attempt to disenroll any Member. Network Provider must render services to Members in the same manner and with the same standards as offered to other customers. Network Provider must not discriminate against any Member because of race, national origin, color, ancestry, sex, marital status, sexual orientation, religion, age, medical condition, health status, disability, political convictions, and source of payment or participation in any Prescription Drug Program.

## Relationship of the Parties.

The relationship created between PBM and Network Provider is that of independent contractors and nothing herein is intended or shall be construed to create or be deemed to create an employer/employee relationship, agency, partnership or joint venture relationship, or any other legal relationship between the parties other than that of independent contractors. Further, Provider shall not be considered a client of PBM. No provision of Provider's Agreement, this Provider Manual or any part of any Sponsor's Prescription Drug Program shall be construed to require any pharmacist to dispense any Covered Medication to any Member if, in the pharmacist's reasonable professional judgment, such Covered Medication should not be dispensed to such Member. In such event, Network Provider agrees to notify PBMI in writing of the circumstances of the decision not to dispense such Covered Medication(s) to the applicable Member.

## Governing Law.

Network Provider's Agreement shall be construed and governed in all respects according to the internal laws in the State of Missouri, without regard to conflict of law principles. Notwithstanding the foregoing sentence, solely with respect to services rendered in the state of New York to any Member of any Prescription Drug Program offered by a Sponsor that is certified as a managed care organization under Article 44 of the New York State Public Health Law, Network Provider's Agreement shall be construed

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
201767.4    Proprietary & Confidential Information    Network Provider Manual - Revised 7/2014

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 228 of 236 PageID #: 12254

and governed in all respects according to the internal laws in the State of New York, without regard to conflict of law principles.

1. **Incorporation of NY Standard Clauses.** As required by the New York State Department of Health, solely with respect to services rendered in the state of New York under this Agreement to any Member of any Prescription Drug Program offered by a Sponsor that is certified as a managed care organization under Article 44 of the New York Public Health Law, the New York State Department of Health Standard Clauses for Managed Care Provider/IPA Contracts ("NY Standard Clauses") shall be and are expressly incorporated and adopted herein by reference. Solely with respect to the same services, to the extent of any inconsistency between the NY Standard Clauses and other provisions of Network Provider's agreement, the provision of the NY Standard Clauses shall control, except to the extent applicable law requires otherwise and/or to the extent a provision of this Agreement exceeds the minimum requirements of the NY Standard Clauses

## Waiver.

No waiver of a breach of any covenant or condition shall be construed to be a waiver of any subsequent breach. No act, delay or omission done, suffered, or permitted by the parties shall be deemed to exhaust or impair any right, remedy or power of the parties hereunder.

## Severability.

Should any provision of Network Provider's Agreement be held or ruled unenforceable or ineffective under the law, such a ruling will in no way affect the validity or enforceability of any other clause or provision contained herein.

## Non-Competition.

Network Provider agrees during the term of its Agreement and for a period of one (1) year thereafter it will not use any of the information it obtains pursuant to its contractual agreement with PBM or as a result of providing services hereunder, to its benefit or for the benefit of any of its affiliates, including to solicit any of the Sponsors for which Network Provider provided services to Members of such Sponsors.

## Subcontractor.

The services provided by Network Provider are unique to Network Provider and may only be performed by Network Provider. Unless otherwise agreed to in writing by the parties, Network Provider may not subcontract all or any portion of the services it provides hereunder. In the event the parties agree in writing that Network Provider may subcontract services it performs hereunder, then all subcontractors shall be subject to the terms and conditions of this Agreement. Further, any subcontract agreement must reference this Agreement and the subcontractor's foregoing obligation. PBM shall not be bound by any obligations under Network Provider's Agreement with PBM when Network Pharmacy has assigned or subcontracted its Agreement without PBM's prior written approval.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Proprietary & Confidential Information. All rights reserved
Network Provider Manual – Revised 7/2014

## Coupons.

Network Provider acknowledges that it is the Member's or Network Provider's responsibility to obtain reimbursement from the responsible party for the amount of any coupon accepted by Provider for a Covered Medication.  Network Provider shall: (a) accurately apply all coupons to a Member's claim, including the Copayment, if applicable; and (b) not seek additional reimbursement from Sponsor or any other insurer when such reimbursement would result in Network Provider being paid more than its contracted rate hereunder.

## Member/Sponsor Hold Harmless.

Except with respect to Copayments, Network Provider shall look solely to PBM for payment for Covered Medications and other covered services provided to Members.  PBM shall only be obligated to make payment to Network Provider for Covered Medications provided to an individual, who at the time services are provided, is an eligible Member and when such services are provided in accordance with the terms and conditions of Network Provider's Agreement.  Notwithstanding the foregoing, Network Provider agrees that in no event, including, but not limited to, nonpayment by PBM for any reason, PBM's insolvency, or PBM's breach of this Agreement, shall Provider bill, charge, or collect a deposit from, seek compensation from, condition the provision of services on payment from, or have any recourse against any (i) Member, (ii) person acting on behalf of the Member, other than PBM, or (iii) Sponsor, for Covered Medications.  Further, Network Provider shall not bill any Member (or any person acting on behalf of the Member), except for Copayments, for Covered Medications in instances where PBM has denied or reversed payment to Network Provider for failing to comply with the terms and conditions of Network Provider's agreement.  Network Provider shall be permitted to collect Copayments from Members and collect for non-Covered Medications and related services provided to Members.  This Section shall survive the expiration or termination of Network Provider's agreement regardless of the reason giving rise to such expiration or termination and shall be construed for the benefit of the Member.  Additionally, this Section shall supersede any oral or written agreement to the contrary now existing or hereafter entered into between Network Provider and a Member (or any person acting on behalf of the Member).  In the event PBM determines that Provider has violated any portion of this Section by inappropriately collecting amounts to which it is not entitled, then PBM shall have the right to offset such inappropriate amounts collected against any amounts owed to Provider by PBM.

## Notice.

Any notice required to be given pursuant to the terms and conditions of this Agreement shall be in writing and: (a) delivered in person, evidenced by a signed receipt; (b) deposited in the United States mail, certified or registered, return receipt requested (or other similar method of delivery with a nationally recognized carrier (e.g., FedEx, UPS)); (c) delivered by facsimile, evidenced by a transmission receipt; or (d) delivered by email transmission to the email address listed below, as evidenced by a copy of the successful email transmission displaying such email address, to PBM or the Provider at the address set forth below or (e) to the last address or fax number or email address subsequently reported in writing to the respective party:

*If to PBM:*          Express Scripts, Inc.
                     One Express Way
                     St. Louis, Missouri 63121
                     Attention: Vice President, Provider Strategy and Contracting

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.  All rights reserved
Network Provider Manual - Revised 7/2014

Email: providernotices@express-scripts.com
Fax: 866.515.3482

*With copies to:*  Express Scripts, Inc.
One Express Way
St. Louis, Missouri 63121
Attention: General Counsel and
Assistant General Counsel for Network Contracting and
Management

## Contacting Sponsors or Media.

Network Provider agrees (and shall cause its employees, independent contractors, shareholders, members, officers, directors and agents to agree) that it shall not engage in any conduct or communications, including, but not limited to, contacting any media or any Sponsor and/or a Sponsor's Members or other party without the prior consent of PBM. Further, Network Provider acknowledges and agrees that any breach of this Section by Provider (or any employee, independent contractor, shareholder, member, officer, director or agent) would cause PBM immediate and irreparable injury or loss that cannot be fully remedied by monetary damages. Accordingly, in the event of a breach of this Section by Network Provider (or any employee, independent contractor, shareholder, member, officer, director or agent), PBM shall be entitled to specific performance, including immediate issuance of a temporary restraining order or preliminary injunction enforcing the terms of this Agreement, and to judgment for damages (including reasonable attorneys' fees and costs) caused by the breach, and to all other legal and equitable remedies available to PBM.

## Confidentiality.

PBM acknowledges and agrees, and Provider acknowledges and agrees, itself and on behalf of its Pharmacies, that in the performance of services hereunder, the parties will come into contact with certain confidential business and other information regarding and belonging to the other party, including, but not limited to, the following: (a) the terms and conditions of Network Provider's agreement and all information disclosed to the other pursuant to negotiations between the parties; (b) all information pertaining to a party's business, including pricing, 835 electronic remittance files and other financial and contractual arrangements, products, programs, services, marketing strategies, and customer lists; (c) PBM's manuals, policies and procedures, including quality assurance procedures, and any other similar information provided to the other party, and all copies thereof regardless of the medium in which it is provided (e.g., paper or electronic); (d) a party's information technology, including all databases, software, applications, systems, layouts, designs, formats, procedures, and processes; and (e) PBM's information pertaining to Sponsors, any Prescription Drug Program, and all Formularies; (collectively, (a) through (e) shall be referred to herein as the "Confidential Information").

Any PBM documents, including but not limited to, any proposed Exhibits or amendments, in whatever form or medium, whether or not executed by Network Provider, constitute Confidential Information of PBM and shall be governed by the same terms and conditions of this section regarding confidentiality. All Confidential Information provided by PBM hereunder shall be and remain the property of PBM. Network Provider shall not obtain any rights in or to any Confidential Information disclosed to Provider by PBM as a result of such disclosure. PBM agrees, and Provider agrees that it shall not (and shall cause its Pharmacies and its and their employees, officers, directors, independent contractors and agents to

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

agree to not) disclose, sell, assign, transfer, give or use or enable anyone else to disclose, sell, assign, transfer, give or use, in whole or in part, any Confidential Information to any third party. Any such Confidential Information may be disclosed to employees, agents or contractors of a party only to the extent necessary for such party to perform their duties and comply with contractual obligations and only if they undertake the obligations of confidentiality as provided herein, including, Provider working in good faith with PBM to cause such employee, agent, and/or contractor to execute a Confidentiality and Nondisclosure Agreement ("NDA") with PBM. Network Provider must (and shall cause its Pharmacies to) immediately notify PBM if it becomes aware of any unauthorized use of Confidential Information. PBM shall immediate-ly notify Provider if it becomes aware of any unauthorized use of Confidential Information. The parties agree to immediately return all Confidential Information to the other party upon request and/or upon termination of this Agreement for any reason. Nothing herein shall be construed to prohibit PBM from using and/or disclosing any information to its clients (including Sponsors) and potential clients in the performance of its business as a pharmacy benefits manager and in the performance of its obligations to such clients and the performance of any related services. Notwithstanding anything herein to the contrary, Express Scripts owns all information it transmits to Network Provider and that Network Provider transmits to Express Scripts via the online adjudication system, or otherwise, in connection with the processing and administration of claims hereunder.

### Records.

1. **Generally**.  Provider shall, and shall cause its Pharmacies to, for a period of five (5) years following the Agreement year in which Covered Medications were provided to Members, or in accordance with applicable law, if longer, cause its Pharmacies to, maintain: (i) all medical, business, financial and administrative records, including, all books, contracts, medical records, and patient care documentation; (ii) original prescriptions; (iii) signature logs (or other evidence approved in writing by PBM); (iv) wholesaler, manufacturer and distributor purchase records; (v) Prescriber information; (vi) patient profiles; and (vii) such other records and information relating to Covered Medications provided to Members as may be required by PBM from time to time. Network Provider shall maintain such records in a readily retrievable manner. The parties agree that such records shall be treated as confidential so as to comply with all applicable state and Federal laws regarding the confidentiality of patient records.  Provider and Pharmacies agree that it shall not disclose by sale, or exchange, whether or not for profit, any identifiable medical, financial or administrative records or data relating to Express Scripts and/or its Sponsor's Members and their prescriptions that it obtains as a result of providing services hereunder.

2. **Requests for Information**.  Network Provider authorizes appropriate agencies, including, but not limited to, governmental authorities, third party payors, professional review entities and such other organizations, to release information deemed to be necessary to determine Network Provider's (or any of its Pharmacies') compliance with this Agreement, including all policies and procedures and the Provider Manual.  Provider shall, or shall cause its Pharmacy(ies) to, provide copies of all records requested by PBM or Sponsor, or their designee, within ten (10) calendar days from the date such request is made, or within such shorter time as may be required by applicable laws, rules or regulations or in order to comply with any court order or other similar legal request or requirements.

3. **Failure to Comply**.  In the event Network Provider (or any Pharmacy) fails to comply with the requirements of this section, PBM shall have the right to withhold payments to Network Provider or any Pharmacy, in Express Scripts' sole discretion, until Provider or Pharmacy, as the case may

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

be, corrects such failure by fully complying with the requirements of this section and/or PBM has finalized its review of the information received.

## Counterfeit Reporting.

Provider agrees it shall cooperate and coordinate with Express Scripts in implementing any counterfeit identification, investigation, tracking and reporting efforts undertaken by Express Scripts. Provider must notify Express Scripts in writing if it becomes aware that any counterfeit drugs have been provided to Members by Provider. Further, Provider represents and warrants (for itself and on behalf of its Pharmacies) that it (and its Pharmacies) purchase prescription drugs and supplies only from reputable wholesalers and/or manufacturers in accordance with the then prevailing industry standards.

## Amendment.

Unless prohibited or modified by existing law, Express Scripts may amend any term, part or provision of this Agreement, including without limitation, any exhibits, requirements for participation, schedules, amendments, or addenda (including an amendment required due to a change in law, rule or regulation), by giving written notice to Provider at least ten (10) calendar days prior to the Effective Date of the amendment ("Notice Period"). Provider shall be deemed to have accepted such amendment in the event it fails to provide written notice of its objection to Express Scripts prior to the expiration of the Notice Period. If Provider continues to submit claims after the effective date of any proposed amendment, then such amendment will be deemed approved and accepted by Provider as if Provider had given its express written consent thereto, and such amendment shall automatically become a part of this Agreement. In the event Provider rejects such amendment in accordance herewith, then Provider may terminate this Agreement by giving written notice of such election to Express Scripts on or before the expiration of the Notice Period, and such termination shall be effective ninety (90) days from the expiration of the Notice Period. In the event Provider rejects such amendment but does not terminate this Agreement on or before the expiration of the Notice Period, then the amendment will be deemed approved and accepted by Provider as if Provider had given its express written consent thereto, and such amendment shall automatically become a part of this Agreement and take effect as of the expiration of the Notice Period. Notwithstanding the foregoing, and only to the extent a signature is required or requested by Express Scripts, the parties acknowledge and agree that any contract document, including, but not limited to, rate exhibits, schedules, letters of agreement, etc., proposed by Express Scripts and executed by Provider hereafter shall automatically become incorporated into this Agreement without the necessity of a formal amendment.

## Marketing, Advertisement and Reservation of Rights.

PBM may use Network Provider's and any Pharmacy's name, location and description of services for purposes of advertising or marketing prescription drug programs or listing Network Provider in applicable Provider directories and databases as determined by PBM for use by Members, Sponsors and other to identify participating Network Providers. PBM reserves the exclusive rights to, control of and in the use of the names "Express Scripts", "Medco" and all other names, symbols, trademarks and service marks that have been used, are presently existing or used by or hereinafter adopted by PBM in the future. Neither Provider nor any Pharmacy shall advertise or use any names, symbols, trademarks or service marks of PBM in any advertising or promotional materials or otherwise without the prior written consent of PBM. Upon termination of Provider for any reason, Provider will immediately discontinue the use of any name, symbol, trademark or service mark of Express Scripts.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc. EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b). Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

## Termination.

1. **Medco Agreement**.  With respect to Network Provider's Medco Agreement, the following shall apply:  Medco may, at any time, limit or withdraw Network Provider's providing of Covered Services to any Eligible Person/Member, group, or Plan Sponsor's Plan regardless of the network(s) Network provider participates in.

2. **Without Cause**.  This Agreement may be terminated by either party without cause upon at least thirty (30) days written notice to the other party, with such termination effective at the end of such thirty (30)-day notice period.

3. **Breach**.  In the event a party defaults in the performance of any of its obligations under this Agreement (the "Defaulting Party") the other party (the "Non-Defaulting Party") may give written notice to the Defaulting Party of such breach.  If the Defaulting Party has not cured such breach to the reasonable satisfaction of the Non-Defaulting Party within thirty (30) days after it receives such notice, then the Non-Defaulting Party shall have the right to immediately terminate the Agreement as of the expiration of the 30-day cure period. In addition to all other rights, PBM shall have the right to: (i) suspend any and all obligations of PBM hereunder and in connection with this Agreement; (ii) impose investigation and handling fees as further described in the Provider Manual; and/or (iii) offset against any amounts owed to Network Provider under this Agreement or under any other agreement between PBM and Provider, any amounts owing or required to be paid by Provider to PBM.  These rights and remedies are in addition to any and all other rights that exist or are available or may exist or be available to PBM pursuant to this Agreement, at law or in equity.

4. **Immediate Termination**.  PBM shall have the right to immediately terminate this Agreement upon written notice to Network Provider in the event that: (i) Network Provider ceases to be licensed by the appropriate licensing authority; (ii) Network Provider submits a fraudulent prescription drug claim or any information in support thereof; (iii) Network Provider is insolvent, goes into receivership or bankruptcy or any other action is taken on behalf of its creditors; (iv) Network Provider routinely fails to designate on its claims submission and/or supporting documents the information required by PBM or fails to comply with PBM's policies and procedures including, but not limited to, the Provider Manual and/or quality assurance and/or utilization review procedures; (v) any representation to PBM or any response to a question set forth on the Provider Certification is untrue or becomes untrue; (vi) there is a change in ownership or control of Network Provider without PBM's prior written consent; (vii) PBM determines that the Network Provider is dispensing Covered Medications in violation of any applicable law, rule and/or regulation; (viii) Network Provider is excluded from participating in any federal or state health care program; (ix) Network Provider fails to maintain insurance; (x) Network Provider breaches any of its representations and warranties set forth in this Agreement or any other document provided to PBM; (xi) Network Provider has not submitted a claim to PBM for ninety (90) calendar days; (xii) Network Provider (or any Pharmacy) fails to comply with any audit or investigative request, including the provision of information, made by PBM or any Sponsor or their designee, within the time period stated in such request; (xiii) a determination is made by PBM that Network Provider (or any Pharmacy) failed to document purchases of prescriptions drugs sufficient to support its claims for reimbursement to PBM; or (xiv) PBM determines that Network Provider's continued performance of services poses a risk to the health, welfare or safety of any Member.

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.    EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.

Case 1:18-cr-00011-HSM-CHS   Document 576-7   Filed 03/29/21   Page 236 of 237 PageID #: 12260

5. **Sponsor Prescription Drug Programs**.   Network Provider acknowledges and agrees that Sponsors may not utilize Network Provider and/or all or any Pharmacies in a network for their respective Prescription Drug Programs. Accordingly, without terminating this entire Agreement, PBM may terminate Network Provider (or any Pharmacy) from participating in any Sponsor's Prescription Drug Program, in accordance with the Sponsor's timing for termination

6. **Specific Pharmacies**. PBM may terminate any Pharmacy's participation under this Agreement in accordance with this Section, without terminating Provider or the entire Agreement.

7. **Network Termination**.   With respect to Network Provider's participation in any network (as evidenced by an executed rate exhibit or schedule), Network Provider's or any Pharmacy's participation in a specific network (and therefore, the specific Exhibit or Schedule may be terminated by PBM pursuant to and in accordance with this Section without terminating the entire Agreement or Network Provider's or a Pharmacy's participation in any other network.

8. **Closure of Networks**.   Notwithstanding any notice requirements, in the event an PBM client ceases to utilize PBM, a client-specific network is terminated or PBM terminates (ceases operation of) an entire network, the notice requirement to Provider will be waived.

9. **Effect of Termination**.   In the event of termination of this Agreement or any Rate Exhibit or Schedule for any reason, in addition to all other rights and remedies PBM may have under this Agreement, at law or in equity, PBM shall have the right to offset from any amounts owing to Network Provider any amounts which Network Provider may owe to PBM.

10. **Continuation of Services**.   Upon the expiration or termination of this Agreement or any Exhibit or Schedule, for any reason or no reason, this Agreement will remain in effect for purposes of those obligations and rights arising prior to the effective date of such expiration or termination. In addition, upon expiration or termination of this Agreement or any Exhibit or Schedule for any reason or no reason (with the exception of Immediate Termination), and, upon PBM's request, Network Provider shall (i) continue to provide Covered Medications to Members during the longer of a one hundred (100) day period following the date of such termination or expiration or such other period as may be required by federal or state laws, regulations, standards or requirements applicable to a Sponsor (the "Continuation Period"), and, if further requested by PBM, Network Provider shall (ii) continue to assist in the transition of Members to another provider, (iii) continue to comply with and abide by all the terms and conditions of this Agreement including any applicable Exhibit or Schedule, and (iv) sign any extensions to this Agreement necessary in order to allow PBM, Sponsor, and/or Network Provider to comply with all applicable laws, rules and regulations.   During the Continuation Period, Network Provider will be compensated in accordance with the then current Agreement, including any applicable Exhibit A or Schedule that existed just prior to expiration or termination of this Agreement or the applicable Exhibit or Schedule and shall accept such compensation as payment in full.

**Survival of Terms and Conditions.**

Terms and conditions of Network Provider's agreement, which by their nature should continue beyond the termination of Provider's Agreement, will survive the termination.

**Dispute Resolution.**

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.   EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.
Proprietary & Confidential Information.   All rights reserved
Network Provider Manual - Revised 7/2014

Except as provided here in, prior to either party taking any legal action in connection with this Agreement, both parties agree to meet in good faith to resolve any claim or controversy ("Claim"), whether under federal or state statutory or common law, brought by either PBM or the Provider against the other, or against the employee, Members, agents or assigns of the other, arising from or relating in any way to the interpretation or performance of this Agreement. The aggrieved party shall notify the other party of its Claim including sufficient detail to permit the other party to respond. The parties agree to meet and confer in good faith to resolve any Claims that may arise under this Agreement for a period of not less than thirty (30) days. In the event the parties cannot resolve any Claims pursuant to Good Faith Discussions and the minimum thirty (30) day period has been met, then the aggrieved party may end discussions with the other party by providing written notice to the other party of its intent to cease discussions. Thereafter, the parties may proceed to litigation. Good Faith Discussion and the thirty (30) day notice period do not apply to Claims by either party solely seeking immediate injunctive relief. All litigation between the parties arising out of or related in any way to the interpretation or performance of the Agreement shall be litigated in the U.S. District Court for the Eastern District of Missouri, or, as to those lawsuits to which the Federal Court lacks jurisdiction, before a court located in St. Louis County, Missouri. The parties agree that Claims shall not be consolidated or coordinated in any action with the Claim of any other individual or entity. No Claim or other dispute may be litigated on a coordinated, class, mass, or consolidated basis. No Claim may be brought as a private attorney general.

## Entire Agreement.

The Provider Agreement, including its exhibits, appendices, Provider Certification, Provider Manual, and any requirements of a Sponsor's Prescription Drug Program communicated to Provider constitutes the entire agreement of the parties with respect to the subject matter herein and, upon execution by the parties, supersedes all prior oral or written agreements between the parties with respect to the subject matter hereof. With the exceptions of federal, state and/or Sponsor-specific requirements as set forth in the appendices of the Provider Manual, in the event of any conflict between the terms and conditions of this Provider Agreement and the Provider Manual, the terms of this Provider Agreement shall prevail.

## Transition.

Medco Health Solutions, Inc. and its subsidiaries (collectively, "MHS") are a party to the PBM Provider Agreement, including this Provider Manual. Any pharmacy agreement including all amendments, schedules and the Provider Manual in effect between MHS and Network Provider (collectively, the "MHS Pharmacy Agreement") shall remain in effect with respect to each MHS Sponsor covered under the MHS Pharmacy Agreement, until such time as PBM transitions such MHS Sponsor to the PBM Provider Agreement and/or one or more of the rate sheets, generally known as Exhibit A, which shall be determined in a commercially reasonable manner by PBM in its sole discretion. Upon transition of a MHS Sponsor to the PBM Provider Agreement, the MHS Pharmacy Agreement shall no longer apply with respect to such transitioned MHS Sponsor. PBM shall have the right to utilize a MHS adjudication system to administer the MHS Pharmacy Agreement and/or the PBM Provider Agreement.

---

### END OF PROVIDER MANUAL

---

This document contains Express Scripts, Inc. proprietary information and/or data. Recipient, by accepting this document, agrees that it will not duplicate, use, or disclose-in whole or in part-this document, or the information contained therein, or any part thereof to others for any other purpose except as specifically authorized in writing by Express Scripts, Inc.  EXEMPT FROM PUBLIC DISCLOSURE: Information contained herein is confidential information of Express Scripts, Inc. and is exempt from public disclosure under 5 U.S.C. §552 (b).  Do not disclose outside of the recipient organization of the United States Government.

© 2014 Express Scripts, Inc.